# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERIC BLACKMON, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 19 C 767 |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eric Blackmon brings this 42 U.S.C. § 1983 suit alleging several constitutional violations and state law violations by Defendants City of Chicago (the "City") and Chicago Police Officers Gregory Jones, James Sanchez, and Eugene Schleder (together, the "Officers") stemming from Blackmon's arrest and murder conviction. Defendants now move to dismiss Blackmon's malicious prosecution claim (Count V) under Rule 12(b)(6) for failure to state a claim. For the reasons set forth below, Defendants' Motion to Dismiss (Dkt. 40) is granted and Count V is dismissed without prejudice. If Blackmon wishes to file an amended complaint, he must do so within 21 days of the entry of this order.

## BACKGROUND

### I.     Tony Cox's Murder

The Complaint's well-pleaded facts are presumed true for purposes of this motion and any reasonable inferences are drawn in the Plaintiff's favor. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017) (citing *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)).

On the afternoon of July 4, 2002, Tony Cox was shot and killed by two assailants outside a restaurant at 1143 South Pulaski Road in Chicago. (Dkt. 1 ¶ 15.) Richard Arrigo was standing approximately five feet away from Cox when Cox was shot. (*Id.* ¶ 19.) Arrigo saw the two assailants escape north on Pulaski Road and turn on Grenshaw Street. (*Id.*) Arrigo stayed at the crime scene to speak with police officers but could not identify the assailants. (*Id.* ¶ 25.)

At the time of the shooting, Lajuan Webb and Latonya Thomas were working at a barber shop next to the restaurant. (*Id.* ¶ 21.) Both saw portions of the shooting. (*Id.*) Webb gave his name to a police officer who came into the barber shop after the shooting, but Webb and Thomas were never contacted by police. (*Id.*) Two other witnesses saw Cox's murder. Frencshun Reece and Lisa McDowell were driving separately on Pulaski Road and were stopped at a red light. (*Id.* ¶¶ 20, 22.) Reece saw the two assailants shoot Cox, called the police, and remained at the scene to give a statement. (*Id.* ¶ 20.) Later that evening, the Officers showed Reece a photo array of potential suspects that did not include Eric Blackmon's photo. (*Id.* ¶ 28.) Reece identified photos of two individuals as "resembling" the assailants. (*Id.*) Reece was also shown other books of mugshots, one of which contained Blackmon's photo, but she did not identify him as one of these assailants. (*Id.* ¶ 29.) Lisa McDowell was behind several cars at the intersection and was farther away from the crime scene than Reece. (*Id.* ¶ 22.) McDowell did not stay at the scene but called the police as she drove away. (*Id.*) The Officers interviewed McDowell a month after the shooting. (*Id.*) She said she heard gunshots and saw Cox lying on the ground in front of the restaurant while a Hispanic man stood nearby holding a silver gun. (*Id.*) She then saw two black men emerge from the north side of the restaurant, and one of the men shot Cox twice while he was lying on the ground. (*Id.*)

## II.    The Investigation and Arrest

The day Cox was murdered, Blackmon hosted an Independence Day barbecue where twenty to forty people saw him from around 1:00 p.m. until 10:00 p.m. (*Id.* ¶ 23.)  That evening, the Officers learned that a gang leader, George Davis (also known as "Boonie Black"), may have ordered Tony Cox's murder. (*Id.* ¶ 27.)  Over the next few days, the Officers heard from multiple other sources that Boonie Black ordered Cox's murder because Cox owed Boonie Black money. (*Id.* ¶¶ 30-33.)  Others reported that Cox was protecting two individuals who owed Boonie Black a drug debt. (*Id.*)  The Officers also received information that Michael Davis (also known as "Keno") and an individual known as "Pride" may have been the two assailants who killed Cox. (*Id.* ¶ 36.)

On August 29, 2002, two months after the shooting, Officer Sanchez showed McDowell, one of the eyewitnesses, a photo array that included photos of Blackmon and Keno. (*Id.* ¶ 40.) Blackmon alleges he was included in the array because "he had braids and a former address on Grenshaw Street, and Officer Defendants had a mugshot of him." (*Id.*)  McDowell identified Blackmon as one of the assailants because she remembered one of the assailants had braids, and Blackmon was the only individual in the photo array with braids. (*Id.* ¶ 41.)  Based on McDowell's identification, Defendant Sanchez issued an investigative alert for Blackmon. (*Id.* ¶ 42.)  On August 31, 2002, Reece, the other eyewitness, was also shown a photo array that included Blackmon's photograph. (*Id.* ¶ 43.)  Reece told the Officers she recognized Blackmon's photo because she had previously seen it in the mugshot book on the night of Cox's murder, but she did not identify him as one of the assailants. (*Id.* ¶ 43-44.)  Arrigo, who was standing next to the victim, was also shown a photo array that included Blackmon's photo. (*Id.* ¶ 45.)  The Officers told Arrigo that "we think we know who did it," "we got a photo," and that two of the photos were

of the assailants, which violated the Chicago Police Department's policy requiring the Officers to tell witnesses that the offender's photo may or may not be in the array. (*Id.* ¶¶ 45-46.) Arrigo did not identify Blackmon as an assailant. (*Id.* ¶ 47.)

On September 5, 2002, Blackmon was arrested without a warrant and taken to a police station for separate live lineups for Reece and McDowell. (*Id.* ¶¶ 49-51). Blackmon told Officers Jones and Schleder that he was at a barbecue at the time of the shooting and that the other attendees could vouch for his presence there. (*Id.*) The Officers placed Blackmon in a lineup with Davis (a/k/a "Keno") and four others. (*Id.*) Blackmon was noticeably taller than the other men in the lineup and was the only one with braids, which matched McDowell's original description of one of the assailants. (*Id.* ¶ 52.) Blackmon was called forward to the viewing window three or four more times than the other lineup subjects. (*Id.* ¶ 53.) Blackmon was also called forward with Davis and instructed to stand back-to-back with him in the viewing window, which none of the other lineup subjects were asked to do. (*Id.* ¶ 54.) Reece again said she recognized Blackmon only from the mugshot books she saw on the day of the shooting. (*Id.* ¶ 55). The Officers responded, "we got him" and "slapped hands and told [Reece] that she 'did a good job.'" (*Id.*) The next day, Reece returned to the police station and again told the Officers that Blackmon was not one of the assailants. (*Id.* ¶ 56.) Nevertheless, the Officers responded "we got the shooter" and "you picked him out of the lineup." (*Id.*)

When Officer Jones called McDowell to arrange her live lineup viewing, he told her "we've got someone." (*Id.* ¶ 57.) During McDowell's live lineup viewing, the Officers similarly asked Blackmon to move to the front viewing window more times than the other lineup subjects. (*Id.* ¶ 58.) McDowell identified Blackmon as one of the assailants. (*Id.* ¶ 59.) After McDowell identified Blackmon, Officer Jones listed Blackmon as using the nickname "Pride" in the report

of McDowell's identification, even though he had no basis to do so. (*Id.* ¶ 60.) Blackmon alleges the Officers knew McDowell's identification was false for three reasons: (1) Blackmon did not match the descriptions of the assailants given by Reece and Arrigo; (2) the Officers received multiple tips linking Cox's shooting to other individuals with no ties to Blackmon; and (3) they falsely reported that Blackmon's nickname was "Pride" in order to bolster McDowell's identification. (*Id.* ¶ 61.) He also alleges the Officers knew her identification was unreliable because of her limited ability to view the shooting, the length of time that passed between the shooting and her identification, and the suggestive nature of the lineup. (*Id.*)

On September 8, 2002, Officers Sanchez and Jones conducted a live lineup viewed by Arrigo. (*Id.* ¶ 62.) Before the lineup, the Officers showed Arrigo a photo array containing Blackmon's and Davis's photos. (*Id.*) The live lineup included Blackmon and Davis, who Arrigo recognized from the earlier photo array. (*Id.* ¶ 63.) Arrigo did not identify any of the lineup subjects and told the Officers the assailants were not in the lineup. (*Id.*)

The Officers did not interview Cox's two associates who owed Boonie Black a drug debt and were reportedly the cause of Cox's murder. (*Id.* ¶ 66.) They also did not interview Webb or Thomas, who saw portions of the shooting from the barber shop next door. (*Id.* ¶ 67.) They also failed to fully investigate the true identity of "Pride," who was reported by multiple sources to be one of the shooters, nor did they investigate whether Blackmon had any connections to Boonie Black (*Id.* ¶¶ 68-69.)

III. **The Prosecution, Trial, and Exoneration**

Blackmon alleges the Officers intentionally withheld or destroyed interview reports and investigative notes related to their interviews of Cox's brother and cousin. (*Id.* ¶ 73.) He further alleges that the Officers' investigative file index (which would catalogue the individuals

interviewed and the notes or reports prepared) and the investigative file control card (which would identify which officers accessed the file and when) were both withheld or destroyed. (*Id.* ¶ 74.) He also alleges that his photo was included in the photo arrays merely as "filler" and that at the time McDowell identified him, there was no other evidence linking him to the crime, which should have been disclosed to him as exculpatory evidence before trial. (*Id.* ¶ 72.) He alleges the Officers failed to disclose the exculpatory information that Reece told the Officers that Blackmon was not one of the assailants and that she recognized him only from the mugshot book. (*Id.* ¶ 75.) Sometime in 2003, Blackmon was placed in additional lineups. No reports or information related to those lineups were produced to Blackmon before his trial. (*Id.* ¶ 76.)

At Blackmon's September 2004 bench trial, Officer Sanchez falsely testified that Blackmon's photo was included in the photo arrays because Cox's family members told Sanchez that Blackmon was involved in the murder. (*Id.* ¶ 70.) He also falsely testified about the propriety of the photo arrays and lineups, and falsely stated that Reece identified Blackmon without hesitation. (*Id.* ¶¶ 81-82.) Reece, who had previously told police multiple times that she did not see either of the assailants in the photo arrays or lineups, changed her story at trial and "testified consistently with the fabricated identification." (*Id.* ¶ 79 n.1.) On September 27, 2004, Blackmon was convicted of first-degree murder based on the Officers' fabricated identifications. (*Id.* ¶ 83.) He was sentenced to sixty years in prison. (*Id.*)

On April 7, 2011, Blackmon filed a habeas corpus petition. (*Id.* ¶ 84.) The district court dismissed the petition, but the United States Court of Appeals for the Seventh Circuit reversed and remanded for an evidentiary hearing. (*Id.*) On February 13, 2018, the district court granted Blackmon's petition and entered judgment in his favor. (*Id.*) On March 26, 2018, Blackmon's

conviction judgment was vacated and was released on bond. (*Id.* ¶ 85.) On January 16, 2019, the State dismissed all charges against Blackmon. (*Id.* ¶ 86.)

Blackmon filed this suit bringing ten separate claims against the Officers and the City of Chicago stemming from his wrongful arrest, prosecution, and conviction. (*Id.* ¶¶ 103-162.)

## LEGAL STANDARD

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, a plaintiff's claim need only be plausible, not probable. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Evaluating whether a plaintiff's claim is sufficiently plausible to survive a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

## DISCUSSION

Defendants now move under Rule 12(b)(6) to dismiss Count V only, styled as "Federal Malicious Prosecution" against the Officer Defendants under 42 U.S.C. § 1983. In Count V, Blackmon alleges the Officers violated his constitutional rights under the Fourth and Fourteenth Amendments by accusing him of criminal activity and "exert[ing] influence to initiate, continue, and perpetuate judicial proceedings" against him without probable cause to do so. (Dkt. 1 ¶ 136.) Defendants argue that Count V must be dismissed because there is no federal Fourth Amendment

cause of action for malicious prosecution. Defendants are correct, and Count V is dismissed without prejudice.

"After [*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917-20 (2017)], Fourth Amendment malicious prosecution is the wrong characterization. There is only a Fourth Amendment claim— the absence of probable cause that would justify the detention. The problem is the wrongful custody. There is no such thing as a constitutional right not to be prosecuted without probable cause. But there *is* a constitutional right not to be held in custody without probable cause." *Manuel v. City of Joliet, Ill.*, 903 F.3d 667, 670 (7th Cir. 2018) (emphasis in original) (internal citations and quotations omitted) ("*Manuel II*"); *see also, e.g.*, *Anderson v. City of Rockford*, 932 F.3d 494, 512 (7th Cir. 2019) (affirming grant of summary judgment on § 1983 Fourth Amendment malicious prosecution claim alleging plaintiffs were "improperly subject[ed] [] to judicial proceedings without probable cause" and noting that "plaintiffs do not assert they were subjected to pretrial detention"); *Camm v. Faith*, 937 F.3d 1096, 1100 (7th Cir. 2019) ("Though the parties and the district judge referred to this as a claim for malicious prosecution, we've since explained that 'malicious prosecution' is the wrong label. It's a Fourth Amendment claim for wrongful arrest and detention.").

Defendants' argument is straightforward: Blackmon has brought a claim for Fourth Amendment malicious prosecution and the Seventh Circuit has made it clear that he cannot. Blackmon seems to acknowledge that Defendants are correct on the case law, but he insists that Defendants' arguments are merely semantic and that he actually brought a claim for wrongful seizure, pretrial detention, and deprivation of liberty without probable cause, which was simply mislabeled as a claim for "federal malicious prosecution." But as Defendants correctly note, Blackmon's complaint suggests otherwise. Count V makes no mention of any wrongful arrest,

pretrial detention, or custody. As pleaded, Count V is clearly based on Blackmon's wrongful prosecution and his being "improperly subjected to judicial proceedings"—not his wrongful pretrial detention. (*See* Dkt. 1 ¶¶ 135-141.) Though Count V does mention that Blackmon "suffered loss of liberty," there are no allegations connecting the loss of liberty to any kind of arrest or pretrial detention or custody without probable cause. This can easily be remedied in an amended complaint. Because Count V is based on Blackmon's wrongful prosecution without probable cause, it is dismissed without prejudice. *See Manuel II*, 903 F.3d at 670; *see also, e.g.*, *Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at \*5-6 (Sept. 26, 2019) (Pallmeyer, C.J.) (dismissing Fourth Amendment malicious prosecution claim where the allegations "all . . . concern the institution of judicial proceedings against Plaintiff and not his detention"); *Neita v. City of Chicago*, No. 19 C 595, 2019 WL 5682838, at \*4 (N.D. Ill. Nov. 1, 2019) (Lefkow, J.) (dismissing Fourth Amendment malicious prosecution claim because "[a]s distinct from a claim of unlawful detention, there is no right of action for malicious prosecution based on the Fourth Amendment").

## CONCLUSION

For these reasons, Defendants' motion to dismiss (Dkt. 40) is granted and Count V is dismissed without prejudice. If Blackmon wishes to file an amended complaint, he must do so within 21 days of the entry of this order.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: January 6, 2020