**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ERIC BLACKMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:19-cv-767 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| CITY OF CHICAGO, Chicago Police | ) |
| Officers GREGORY JONES, JAMES | ) |
| SANCHEZ, and EUGENE SCHLEDER, | ) |
| and other as-yet unidentified employees | ) JURY TRIAL DEMANDED |
| of the City of Chicago, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

Plaintiff Eric Blackmon, by and through his attorneys, Riley Safer Holmes and Cancila LLP, for his Complaint against Chicago Police Officers Gregory Jones, James Sanchez, Eugene Schleder, and as-yet unidentified City of Chicago Employees (collectively "Officer Defendants") and the City of Chicago, alleges as follows:

**INTRODUCTION**

1. Plaintiff Eric Blackmon spent fifteen years, six months, and twenty-one days in prison for a crime he did not commit. Mr. Blackmon was wrongfully convicted of the murder of Tony Cox and sentenced to sixty years in prison. This miscarriage of justice was the direct result of police misconduct and in accordance with the unlawful pattern and practices of the Chicago Police Department.

2. Not a single piece of physical or forensic evidence linked Mr. Blackmon to this crime. Instead, Mr. Blackmon's wrongful conviction rested solely upon evidence fabricated by Officer Defendants, including two false eyewitness identifications of Mr. Blackmon during tainted

lineups. The tainted lineups were intentionally engineered by Officer Defendants pursuant to the City of Chicago's widespread policy at the time, which called for "solving" crimes at all costs, regardless of a suspect's guilt or innocence. At the time the eyewitnesses identified Mr. Blackmon based on the tainted lineups, Officer Defendants knew Mr. Blackmon was not the true offender.

3. In addition to engineering the improper lineups, Officer Defendants intentionally caused Mr. Blackmon's wrongful conviction by withholding and/or destroying critical evidence that proved Mr. Blackmon's innocence. Additionally, Officer Defendants' egregious failure to follow up on investigative leads that would have identified the real offender is further evidence of their intentional misconduct.

4. Mr. Blackmon brings this lawsuit to redress the injustice that Defendants inflicted upon him.

## JURISDICTION AND VENUE

5. This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution, and under various state law causes of action.

6. The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

7. Venue in this District is proper under 28 U.S.C. § 1391(b) because Defendant City of Chicago is a municipal corporation that resides within this District, and the events giving rise to the claims asserted in this Complaint occurred within this District.

## THE PARTIES

8.      Plaintiff Eric Blackmon ("Plaintiff" or "Mr. Blackmon") is a United States citizen who resides within the territorial limits of the United States District Court for the Northern District of Illinois.  At the time of the events leading to the wrongful conviction described in this Complaint, Mr. Blackmon was twenty-one years old and had been working as a laborer for United Van Lines for the last five years.

9.      At all times relevant to this Complaint, Defendants Gregory Jones (Star #21285), James Sanchez (Star #20336), and Eugene Schleder (Star #20371) were Area Four detectives with the Chicago Police Department, employed by Defendant City of Chicago and acting within the scope of their employment.

10.      Officer Defendants were responsible for conducting and managing the investigation into the July 4, 2002 murder of Tony Cox.  They also were responsible for (1) preserving evidence, (2) interviewing all witnesses to the crime, (3) canvassing the areas adjacent to the crime scene to identify additional witnesses, (4) preparing reports to record all substantive information learned during the investigation, (5) ensuring that all information obtained during the investigation was included in the investigative file and preserved, and (6) investigating any material information obtained about the case, among other responsibilities.

11.      Defendant Schleder was the primary detective assigned to investigate the July 4, 2002 shooting death of Tony Cox.  He responded to the crime scene, interviewed key witnesses, presented photo arrays to eyewitnesses, and conducted the tainted live lineup viewed by one of the eyewitnesses.

12.      Defendant Jones was Defendant Schleder's partner and was one of the detectives assigned to investigate the shooting.  He responded to the crime scene, interviewed key witnesses,

presented photo arrays to eyewitnesses, and conducted the tainted live lineups viewed by eyewitnesses.

13.     Defendant Sanchez was one of the detectives assigned to investigate the shooting. He interviewed key witnesses, presented a photo array to an eyewitness, conducted the tainted lineups viewed by eyewitnesses, and issued the investigative alert for Mr. Blackmon's arrest.

14.     Defendant City of Chicago (the "City") is a municipal corporation under the laws of the State of Illinois.  The City operates the Chicago Police Department ("CPD") and is responsible for the policies, practices, and customs of the City and the CPD.

## FACTUAL BACKGROUND

### The Murder of Tony Cox

15.     On July 4, 2002, Tony Cox was shot and killed by two assailants outside Fat Albert's restaurant at 1143 South Pulaski, near the intersection of Roosevelt Road and Pulaski Avenue in Chicago.

16.     According to police reports, in the early afternoon of July 4, 2002, Cox received a voicemail message from a man with an Italian accent, identifying himself as "Fat Albert" (now believed to be Richard Arrigo) and telling Cox to get in touch with him right away.  At around 1:30 p.m., Cox told his girlfriend that he had to go out for a while.

17.     According to witness accounts, at approximately 4:30 p.m., Cox and Arrigo were outside of Fat Albert's restaurant with two other men, both of whom shot Cox.  The first assailant shot Cox in the head as the second assailant started to run north on Pulaski.  The first assailant also began to run north on Pulaski.  After Cox was on the ground and struggling to get up, the first assailant returned and shot Cox again in the head, and then the second assailant returned and shot Cox in the head.  Both assailants then ran north on Pulaski and turned west on Grenshaw Street.

18.     On September 5, 2002, Mr. Blackmon was arrested and falsely accused by Officer Defendants of being the second assailant.

### The Eyewitnesses

19.     Richard Arrigo was a part-owner of Fat Albert's.  According to Arrigo, he met Cox inside the restaurant on the afternoon of July 4, 2002 and spoke with him for twenty to thirty minutes.  Cox and Arrigo then exited the restaurant together.  Arrigo turned his back to lock the restaurant doors when he heard two gunshots.  Arrigo turned around and saw a black male shoot Cox twice before running away with another black male.  He said they ran west on Grenshaw Street.  Arrigo was standing about five feet away from Cox at the time he was shot.

20.     Frencshun Reece was driving with her children on Pulaski Avenue.  While she was stopped at the stoplight at the intersection of Pulaski Avenue and Roosevelt Road, she saw four males who appeared to be talking together: Cox, a white male (later identified as Arrigo), and the two assailants.  The assailants were standing on either side of the victim.  While Arrigo turned away from the group to lock the door to the restaurant, the first assailant, who was standing to the left of Cox, shot him in the head as the second assailant began to run north on Pulaski.  After shooting Cox, the first assailant also began running north on Pulaski.  Reece then saw Cox struggle to get up.  At that point, the first assailant returned and shot Cox again in the head, and then the second assailant returned and shot Cox in the head.  They both ran north on Pulaski and turned west on Grenshaw Street.  After witnessing the shooting, Reece called the police and waited at the scene for officers to arrive.

21.     At the time of the shooting, Lajuan Webb and Latonya Thomas were working at Hair Fanatic Salon and Barber Shop, which was located next door to Fat Albert's.  They were both eyewitnesses to portions of the shooting incident.  Webb gave his name to a police officer who

entered the salon shortly after the shooting, but Webb and Thomas were never contacted by police officers for an interview or shown a photo array or live lineup. Had Webb been interviewed, he would have told the police that he saw two black men with guns run past his shop. He recognized the men because he had previously seen them in the neighborhood near the barber shop. After viewing Mr. Blackmon's photo years later during Mr. Blackmon's post-conviction proceedings, he confirmed that neither one of the assailants was Mr. Blackmon. Had Thomas been interviewed, she would have told the police that she saw a man shoot the victim as he tried to rise. She saw a second man she knew as "Pee" approach the victim and shoot him several more times and then both men fled north on Pulaski towards Grenshaw Street. She said that she could identify the shooters because she had seen them both hanging out on the street around the salon "countless times." After viewing Mr. Blackmon's photograph years later during Mr. Blackmon's post-conviction proceedings, she confirmed that neither one of the assailants was Mr. Blackmon.

22.     Lisa McDowell was driving on Pulaski Avenue, and she was stopped at the stoplight at Roosevelt Road at the time of the murder. She was behind several cars at the intersection, so she was farther away from the crime scene than the other eyewitnesses. Her three children and her nephew also were in the car. More than a month after the murder, Officer Defendants interviewed her. She stated that when she heard gunshots, she looked over and saw Cox lying on the ground in front of Fat Albert's, while a Hispanic male stood nearby holding a silver gun. She then saw two black males emerge from the north side of the building. One of the males shot Cox two times while Cox already was lying on the ground. When the stoplight turned green, McDowell drove away while calling 911. As she was driving away and making the call, she said that she could see the two assailants in her rearview mirror run south on Pulaski Avenue.

**Investigation Provides No Link to Mr. Blackmon**

23.     On July 4, 2002—the day Tony Cox was shot—Mr. Blackmon was hosting a barbecue to celebrate Independence Day.  Somewhere between twenty and forty people saw him over the course of that afternoon, starting around 1:00 p.m. when he fired up the grill and lasting until at least 10:00 p.m. when guests left after the fireworks display.

24.     At the time of the events described in this Complaint, Mr. Blackmon was twenty-one years old.  He was 6'1" tall, 150 pounds, and wore his hair in braids.

25.     Defendant Schleder reported that Arrigo described two assailants who were both significantly shorter than Mr. Blackmon.  Arrigo did not describe either assailant as having braids.

26.     Defendant Jones interviewed Reece at the crime scene.  Reece described two assailants who were both significantly shorter than Mr. Blackmon.  She did not describe either assailant as having braids.

27.     On the evening of July 4, Officer Defendants obtained information indicating that the assailants might have been inside a building located at 4024 West Grenshaw shortly before the shooting.  They also obtained information indicating that George Davis, whose nickname was "Boonie Black," might have ordered the murder of Cox.  Boonie Black was known to Officer Defendants as a leader in the New Breed Organization street gang.  Mr. Blackmon had no affiliation with this street gang.

28.     Later that evening, Officer Defendants prepared a photo array, consisting of prior offenders who had used a home address on the 4000 block of West Grenshaw Street.  Mr. Blackmon was not included in this photo array.  Defendants Jones and Schleder presented the photo array to Reece.  She identified the photos of two individuals as "resembling" the assailants.  The individuals Reece identified did not have braids or otherwise resemble Mr. Blackmon's facial

features or complexion. Reece said that she would have to see these individuals live to be sure that they were the assailants. She was never shown a live lineup involving these individuals.

29. While she was at the station, Reece also viewed two books of mugshots. According to Reece, one of these mugshot books contained Mr. Blackmon's photograph. After viewing the mugshot books, including Mr. Blackmon's photograph, she told Officer Defendants that she did not recognize either of the assailants in the additional photos.

30. On July 5, one of Cox's girlfriends provided Defendant Sanchez with information indicating that Boonie Black may have ordered the murder of Cox because Cox was protecting two individuals who owed Boonie Black a drug debt.

31. Later that day, Officer Defendants received a tip from another law enforcement officer that a confidential informant provided information that Cox owed Boonie Black money and that Boonie Black directed that Cox be killed as a result of the debt.

32. On July 6, Defendant Sanchez and other officers interviewed Cox's other girlfriend. She also informed them that Cox had been having problems with Boonie Black due to a drug debt owed to Boonie Black by Cox's associates. She further stated that she knew where Boonie Black lived and could show Officer Defendants the location.

33. On July 7, Cox's cousin informed Officer Defendants that "word on the street" was that Boonie Black had ordered the murder of Cox.

34. Mr. Blackmon had never met or spoken to Boonie Black, and there was no evidence linking Mr. Blackmon to Boonie Black in any way.

35. On July 8, Cox's brother provided Defendant Sanchez with the names of two individuals who may be the shooters. Neither of these individuals were Mr. Blackmon.

36. On July 9, Cox's brother informed Defendant Sanchez that he received information that individuals known as "Pride" and Michael Davis (a/k/a "Keno") killed Cox. Michael Davis was Boonie Black's nephew. Later that day, Officer Defendants received an anonymous telephone tip that "Pride" and "Keno" killed Cox. Officer Defendants knew that Mr. Blackmon's nickname was "Forty," not "Pride."

37. Almost a month later, in August 2012, Defendant Jones decided to contact Lisa McDowell, one of three individuals who had called 911 after the shooting of Cox, and requested an interview.

38. McDowell was interviewed on August 12, 2002, over a month after the shooting. McDowell described the assailant who she saw shoot Cox as being about 6 feet tall, slender, and having braids in his hair.

39. McDowell also told Officer Defendants that she saw the individual identified as Arrigo holding a gun and standing near Cox, when in fact Arrigo was only holding a cell phone. Officer Defendants later told McDowell that Arrigo did not have a gun but rather a cell phone, so when McDowell testified at Mr. Blackmon's trial, she did not testify that she saw Arrigo with a gun.

### False Identification and Wrongful Arrest of Mr. Blackmon

40. On August 29, 2002, almost two months after the shooting, Defendant Sanchez went to McDowell's residence and showed her a photo array. The photo array included Michael Davis (a/k/a "Keno"). The photo array also included Mr. Blackmon. Based on information and belief, Mr. Blackmon was included solely because he had braids and a former address on Grenshaw Street, and Officer Defendants had a mugshot of him. Mr. Blackmon was the only individual in the photo array who had braids.

41.     McDowell identified Mr. Blackmon as one of the assailants.  McDowell saw the assailant's face for about five seconds from 30 or 35 feet away.  She also saw his profile for several seconds in her rearview mirror from approximately 45 feet away as he ran away.  What she remembered was the assailant's braids, and Officer Defendants only showed her one photograph of an individual with braids—Mr. Blackmon.

42.     Following McDowell's identification of Mr. Blackmon, and with no other evidence implicating Mr. Blackmon, Defendant Sanchez issued an "investigative alert" advising that Mr. Blackmon was wanted in connection with the Cox shooting.

43.     On or around August 31, 2002, Defendants Jones and Schleder included Mr. Blackmon's photograph in a photo array that they presented to Reece.  They falsely reported that Reece identified Blackmon as one of the offenders.  What Reece actually told them was that she only recognized Mr. Blackmon's photograph as one she had previously viewed in the mugshot book on the night of the shootings.  She further explained to them that she did not recognize Mr. Blackmon as one of the assailants.

44.     Reece was unable to identify Davis as one of the assailants, but her son identified Davis.  He did not identify Mr. Blackmon as one of the assailants.

45.     On or around September 3, 2002, Defendants Jones and Schleder included Mr. Blackmon's photograph in a photo array that they presented to Arrigo.  When Defendant Schleder called Arrigo to make arrangements to view the photo array, Defendant Schleder told Arrigo that "we think we know who did it" and "we got a photo."  These comments were in violation of the CPD's lineup policy, which required Officer Defendants to tell the witness that the offender may or may not be in the lineup.

46. According to Arrigo, when he viewed the photo array, Defendants Jones and Schleder told Arrigo that two of the photographs were of the offenders, again violating the CPD's lineup policy.

47. According to Arrigo, when he stated that he did not recognize any of the individuals in the photographs, Defendants Jones and Schleder pulled two of the photographs from the array and asked him again if he recognized those individuals. One of those photographs was of Mr. Blackmon. Arrigo stated that the individuals in those two photographs were not the assailants.

48. According to Arrigo, Defendants Jones and Schleder were angry that he would not identify the suspects.

49. On or around September 5, 2002, Mr. Blackmon was arrested without a warrant. His arrest report reflected his actual nickname, "Forty."

**Tainted Live Lineups and Further Fabrication of Evidence**

50. Immediately following Mr. Blackmon's arrest, he was transported to Area Four headquarters to participate in a live lineup. While at Area Four, after Detectives Jones and Schleder explained why he had been arrested, Mr. Blackmon told them that he was at a barbecue at the time of the shooting. Mr. Blackmon provided the location of the barbecue and stated that a number of people who lived on the block could vouch for his presence there.

51. Mr. Blackmon subsequently was placed in a lineup that was viewed by both Reece and McDowell. The lineup was composed of six subjects, two of whom—Davis (a/k/a "Keno") and Mr. Blackmon—were suspects.

52. Mr. Blackmon was noticeably taller than the other subjects, and he was the only one with braids, which matched McDowell's original description of one of the offenders. The other subjects were bald or wore their hair closely cropped.

53.     Officer Defendants conducted the lineup viewed by Reece.  During the lineup, the subjects were seated along the wall opposite the witness viewing window.  They were each called to stand up and approach the viewing window individually.  Mr. Blackmon was called forward more times than the other subjects—at least three to four times—which was improperly suggestive.

54.     Mr. Blackmon also was called forward with Davis.  The two men were instructed to stand back-to-back in front of the viewing window.  None of the other lineup subjects were asked to stand next to each other in front of the viewing window.

55.     Officer Defendants falsely reported that Reece identified Mr. Blackmon as one of the offenders.  Rather, she told Officer Defendants that she recognized Mr. Blackmon in the lineup because his photo was in one of the mugshot books she viewed on the night of the shooting.  Nevertheless, one of the Officer Defendants responded, "we got him."  Officer Defendants also slapped hands and told her that she "did a good job."

56.     Reece returned to the police station the following day and reiterated to Officer Defendants that Mr. Blackmon was not one of the offenders.  Yet Officer Defendants insisted "we got the shooter," and "you picked him out of the lineup."

57.     Defendants Sanchez and Jones conducted the lineup viewed by McDowell.  According to McDowell, when Defendant Jones called her to make arrangements to view the lineup, he told her that "we've got someone."  Additionally, based on Officer Defendants' statements to her on the day of the lineup, McDowell was aware that there were two suspects in the lineup.  These statements violated the CPD's lineup policy, which required officers to tell the witness that the offenders may or may not be in the lineup.

58. During the lineup, Sanchez and Jones repeated the improperly suggestive practice of having Mr. Blackmon move to the front of the viewing window more times than the other suspects and having him stand together with Davis.

59. As a result of the improperly suggestive lineup, McDowell identified Mr. Blackmon as one of the offenders.

60. After McDowell identified Mr. Blackmon in the lineup, Defendant Jones listed Mr. Blackmon as going by the nickname "Pride" on his report of McDowell's identification, knowing he had no basis for attributing that nickname to Mr. Blackmon. He fabricated a link between Mr. Blackmon and the nickname "Pride" for the sole purpose of bolstering the apparent strength of the evidence against Mr. Blackmon and falsely indicating that Officer Defendants had an evidentiary basis to include Mr. Blackmon in the lineup that was independent of McDowell's identifications.

61. Officer Defendants knew McDowell's identification was false. First, Mr. Blackmon did not match the descriptions of the assailants that Reece and Arrigo provided immediately after the shootings, and they specifically told Officer Defendants Mr. Blackmon was not one of the assailants. Second, Officer Defendants received multiple tips linking the shootings to other individuals to whom Mr. Blackmon had no ties. Third, they falsely reported that Mr. Blackmon's nickname was "Pride" in a police report with no basis and for the sole purpose of bolstering the strength of McDowell's identification (i.e., creating the appearance that she identified someone who already was a suspect rather than a filler in the lineup). Finally, they knew that McDowell's identification was unreliable based on her limited ability to view the offenders, the length of time that had passed between her identification and the shooting, and the suggestive nature of the lineup.

62.     On or around September 8, 2002, Defendants Sanchez and Jones conducted a live lineup viewed by Arrigo.  Prior to Arrigo viewing the lineup, they again showed him the photo array that they previously had shown him, which contained Mr. Blackmon's and Davis' photos.

63.     The subjects in the live lineup included Davis and Mr. Blackmon, whom Arrigo recognized from the earlier photo array.  Arrigo did not identify any of the subjects as one of the assailants and informed Defendants Sanchez and Jones that the individuals he saw shoot Cox were not in the lineup.

### Failure to Investigate

64.     Officer Defendants' failure to investigate in this case was egregious and is further evidence of their intentional misconduct.

65.     Officer Defendants had no evidence that Mr. Blackmon had a motive to kill Cox, yet they ignored investigative leads related to the motives of the individuals actually involved.

66.     Officer Defendants failed to interview the two associates of Cox who owed Boonie Black for a drug debt and were reportedly the cause of Cox's murder.

67.     Officer Defendants failed to interview eyewitnesses Webb and Thomas, even though Webb had provided his contact information to the police, and Officer Defendants knew that the hair salon was located right next to Fat Albert's.

68.     Officer Defendants also failed to fully investigate the true identity of "Pride," who was reported by multiple sources to be one of the shooters.  They failed to do this even though both Reece and Arrigo insisted that Mr. Blackmon was not one of the offenders.  Instead, Officer Defendants inexplicably identified Mr. Blackmon as "Pride" in their police reports, with no basis for doing so and for the sole purpose of bolstering their fabricated case against Mr. Blackmon.

69. Officer Defendants failed to investigate whether Mr. Blackmon had any affiliation with Boonie Black or failed to report their confirmation that Mr. Blackmon had no such affiliation.

**Failure to Produce Exculpatory Evidence**

70. Defendant Sanchez testified at Mr. Blackmon's criminal trial. When asked why he included Mr. Blackmon's photograph in the photo arrays, he falsely stated that the victim's family members told him that Mr. Blackmon was involved in the murder of Cox.

71. Defendant Sanchez's testimony was contradicted by a CPD timeline that had been prepared by Officer Defendants during the course of the investigation. This timeline indicated that Cox's relatives, including his cousin and brother, implicated "Pride," Michael Davis (a/k/a "Keno"), and others in the murder of Cox, but not Mr. Blackmon (whose nickname was "Forty," not "Pride").

72. Still to this day, Officer Defendants have not disclosed the true reason they originally placed Mr. Blackmon in the photo array that was shown to McDowell. Upon information and belief, he was merely a filler in the photo array, and at the time McDowell identified him in the photo array there was no other evidence linking him to the crime. This was exculpatory information that should have been disclosed to Mr. Blackmon prior to trial. The information also would have impeached Defendant Sanchez's trial testimony.

73. Based on information and belief, Officer Defendants also intentionally withheld or destroyed the interview reports and investigative notes related to their interviews of Cox's brother and cousin, contrary to the CPD's policy that all interview notes and reports be preserved in the investigative file. Based on information and belief, these reports and notes would have included additional investigative leads and exculpatory information regarding the identity of the true assailants and Cox's relatives' basis of knowledge about the identity of the true assailants.

74. Relatedly, Officer Defendants' investigative file index, which should have identified which family members were interviewed and what notes and reports of those interviews were prepared, and the investigative file control card, which should have identified which officers accessed the file and when, were both withheld or destroyed.

75. Officer Defendants also withheld the exculpatory and impeachment information that Reece told them that Mr. Blackmon was not one of the assailants and that she only recognized Mr. Blackmon from his photograph in the mugshot book that she reviewed on the night of the shooting.

76. In approximately 2003, Mr. Blackmon was transported from Cook County jail back to Area Four and placed in additional lineups. No reports or information related to these lineups were produced to Mr. Blackmon prior to his trial. Based on information and belief, Officer Defendants showed other witnesses live lineups involving Mr. Blackmon, but those witnesses did not identify him as one of the assailants who killed Cox. This exculpatory information was withheld from Mr. Blackmon.

77. Given the nature of the evidence described in paragraphs 70-76 above, Mr. Blackmon could not obtain comparable evidence from any other source. The evidence was material to Mr. Blackmon's defense, and if it had been disclosed prior to his trial, there is a reasonable likelihood that it would have affected the outcome of his trial.

78. Officer Defendants intentionally withheld and/or destroyed the evidence described in paragraphs 70-76 above, and the exculpatory value of this evidence was apparent to them at the time they withheld and/or destroyed the evidence.

## The Malicious Prosecution

79.     In September 2004, Mr. Blackmon's case proceeded to a bench trial.  The only evidence directly implicating him in the shooting was the fabricated eyewitness identifications by Reece and McDowell.[1]

80.     Reece's and McDowell's testimony was bolstered by the perjured testimony of Defendant Sanchez, who intentionally lied under oath about the propriety of the photo arrays and lineups.

81.     For example, Defendant Sanchez falsely testified that Reece identified Mr. Blackmon during the lineup without hesitation.  In fact, Reece insists that she told police officers from the beginning that she did not recognize either of the assailants as being in the lineup.

82.     Defendant Sanchez also falsely testified that he included Mr. Blackmon's photograph in the photo arrays based on information from Cox's "family members" and that these family members "verified" that Mr. Blackmon was "responsible for it."

83.     On September 27, 2004, Mr. Blackmon was convicted of first-degree murder based on Officer Defendants' fabricated identifications.  He was sentenced to sixty years in prison.

## Reversal of Mr. Blackmon's Conviction

84.     On April 7, 2011, Mr. Blackmon filed a petition for writ of habeas corpus in the U.S. District Court for the Northern District of Illinois.  The District Court dismissed the petition, and the Seventh Circuit reversed and remanded for an evidentiary hearing.  On February 13, 2018, the District Court granted the petition and entered judgment in favor of Mr. Blackmon.

---

[1] At trial, Reece testified consistently with the fabricated identification.  According to Reece, she did so because she understood that Officer Defendants falsely reported that she identified Mr. Blackmon, and she felt pressured to testify consistently with their reports.  She also feared for her safety during the trial and worried that the real shooter might try to cause her harm.

85.     The State did not appeal and instead declared its intention to retry Mr. Blackmon. On March 26, 2018, the trial court entered an order vacating the judgment of conviction and sentence for first-degree murder and setting bond.

86.     The State asked for several extensions of the trial date.  Finally, on January 16, 2019, the State dismissed the charges against Mr. Blackmon.

### The City's Policies and Practices Enabling Police Misconduct

87.     Officer Defendants' flagrant misconduct in this case was not an isolated incident. Rather, it was consistent with and the natural consequence of the *de facto* policies and practices of the City and the CPD.

88.     Beginning in the 1970s, CPD officers engaged in a systematic pattern of fabrication of evidence, withholding and destruction of exculpatory information, and various other illegal tactics to "solve" cases at all costs.  Their methods included many of those employed against Mr. Blackmon, such as: (1) manufacturing, fabricating, or using improperly suggestive tactics to obtain false witness statements; (2) using improperly suggestive identification procedures or otherwise tampering with lineups; (3) filing false reports and giving false statements or testimony;  (4) withholding, destroying, covering up, or suppressing exculpatory evidence and evidence of misconduct; and (5) committing perjury during criminal proceedings and failing to retain records of such misconduct.

89.     These institutional practices were so pervasive and entrenched as to constitute *de facto* policies in the CPD during the relevant time period.  In addition to Mr. Blackmon, there are now dozens of other known victims of similar abuses.

90.     Based on information and belief, more than 100 individuals have been exonerated in Cook County alone in cases where police misconduct was alleged.

91.     These practices flourished because municipal policymakers in positions of authority exhibited deliberate indifference to the problem.  The City failed to implement adequate training, supervision, police misconduct investigatory procedures, and disciplinary measures to prevent these and similar abuses, instead choosing to perpetuate a "code of silence" within the CPD.

92.     Chicago police officers who manufactured criminal cases against individuals like Mr. Blackmon understood that they not only enjoyed *de facto* immunity from both departmental discipline and criminal prosecution, but they also stood to be rewarded for closing a case, no matter the cost.  Moreover, they faced pressure from colleagues and supervisors to keep quiet about misconduct and flawed investigations.

93.     The "code of silence" has been well documented.  In a December 2015 speech to the Chicago City Council, current Mayor Rahm Emanuel acknowledged "a tendency to ignore . . . a tendency to deny . . . a tendency, in some cases, to cover up the bad actions of a colleague or colleagues."

### Mr. Blackmon's Damages

94.     At the time of his conviction, Mr. Blackmon was twenty-one years old with his whole life ahead of him.  Because of Defendants' wrongful conduct, Mr. Blackmon spent 5,724 days in prison for a crime he did not commit.

95.     Mr. Blackmon first suffered through over two years in pre-trial detention.  In addition to the intense anxiety caused by the looming first-degree murder charges, Mr. Blackmon also lived in fear for his safety.

96. After his trial and conviction, Mr. Blackmon was forced to endure nearly fourteen years of incarceration in maximum security prisons. Surviving in this environment for so long was emotionally, physically, and psychologically dehumanizing and debilitating.

97. Mr. Blackmon was surrounded by violence, sometimes inflicted by guards and sometimes inflicted by other inmates. He lived in constant fear and anxiety for his personal safety. Because Mr. Blackmon was not affiliated with a gang, he lacked any protection within the walls of the prison.

98. On one occasion, certain inmates caused a melee to distract the prison guards, while another inmate stabbed Mr. Blackmon three to four times in the back. Mr. Blackmon was hospitalized following this assault.

99. On other occasions, inmates smashed Mr. Blackmon's hand in a door, pushed him down the stairs, attacked him in the shower, and stole his belongings. Over the course of his imprisonment, Mr. Blackmon suffered black eyes, split lips, a chipped tooth, a broken nose, a fractured arm, and a concussion, among other injuries.

100. Mr. Blackmon was deprived of life's everyday joys. He missed the birth of his children and every one of their birthdays that followed, as well as family vacations, graduations, weddings, and the funerals of his grandmother and brother.

101. Mr. Blackmon was deprived of an income and the ability to work. Mr. Blackmon was arrested at the start of his prime working years.

102. While prison life is traumatic for most, it is unimaginable for an innocent man like Mr. Blackmon, who knew all along he did not belong there. As a result of the foregoing, Mr. Blackmon suffered tremendous and immeasurable damage, including loss of liberty, mental

anguish, humiliation, degradation, physical injury, psychological damage, emotional pain and suffering, and other grievous injuries, all proximately caused by the Defendants' misconduct.

## CLAIMS FOR RELIEF

### COUNT I – 42 U.S.C. § 1983
### Deprivation of Fair Trial and Wrongful Conviction
### (Against Officer Defendants)

103. Plaintiff re-alleges paragraphs 1 through 102.

104. Each Officer Defendant is named individually, jointly, and/or in conspiracy, as well as acting under color of state law and within the scope of their employment.

105. As described more fully above, Officer Defendants deprived Mr. Blackmon of his constitutional right to a fair trial.

106. This claim is based upon the fabrication of evidence that occurred before and after Mr. Blackmon's arrest on September 5, 2002.

107. Officer Defendants knowingly fabricated false evidence, including engineering tainted lineups and falsifying reports to link Mr. Blackmon to the nickname "Pride," thereby misleading and misdirecting the criminal prosecution of Mr. Blackmon and causing his wrongful conviction.

108. The tainted lineups were unduly suggestive and used against Mr. Blackmon at trial.

109. Officer Defendants also withheld exculpatory information about the reason Mr. Blackmon was included in the photo arrays, as well as exculpatory interview reports and notes, among other evidence that is not yet known to Mr. Blackmon.

110. Officer Defendants also intentionally and recklessly ignored and/or failed to investigate evidence supporting the fact that Mr. Blackmon was at a barbeque during the events in question, as well as evidence indicating that other individuals killed Cox, which further

demonstrates their intent to fabricate evidence against Mr. Blackmon, while knowing he was not the true offender.

111. Officer Defendants' misconduct directly and proximately resulted in the unjust criminal conviction of Mr. Blackmon, thereby denying his constitutional right to a fair trial guaranteed by the Fifth and Fourteenth Amendments. Absent this misconduct, the prosecution of Mr. Blackmon could not have and would not have been pursued, and Mr. Blackmon would not have been convicted.

112. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to Mr. Blackmon's constitutional rights, and in total disregard of the truth and Mr. Blackmon's innocence.

113. As a result of the misconduct described herein, Mr. Blackmon suffered injuries, including but not limited to personal physical injury and emotional distress, as more fully alleged above.

114. This misconduct described in this Count was undertaken by employees of the City, including but not limited to the named Officer Defendants, pursuant to the policy and practice of the CPD in the manner described more fully above.

### COUNT II – 42 U.S.C. §§ 1983 & 1985
### Conspiracy to Deprive Plaintiff's Constitutional Rights
### (Against Officer Defendants)

115. Plaintiff re-alleges paragraphs 1 through 102.

116. Officer Defendants, acting within the scope of their employment and under the color of law, agreed among themselves to act in concert to deprive Mr. Blackmon of his constitutional rights, including his rights to due process and to a fair trial.

117. Additionally, before and after Mr. Blackmon's conviction, Officer Defendants further conspired to deprive Mr. Blackmon of exculpatory information to which he was lawfully entitled, and which would have led to Mr. Blackmon not being charged or being acquitted at trial.

118. As outlined above, Officer Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

119. In furtherance of the conspiracy, each of the Defendant co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence, withholding and destroying exculpatory evidence, and intentionally ignoring material information or failing to investigate—and were otherwise willful participants in the joint activity.

120. The misconduct described in this Count was undertaken with malice, willfulness, and/or reckless indifference to Mr. Blackmon's rights.

121. As a direct and proximate result of Officer Defendants' conspiracy and actions in furtherance of the conspiracy, Mr. Blackmon's rights were violated, and he suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

122. This misconduct described in this Count was undertaken by employees of the City, including but not limited to the named Officer Defendants, pursuant to the policy and practice of the CPD in the manner described more fully above.

**COUNT III – 42 U.S.C. §§ 1983 & 1986**
**Failure to Intervene**
**(Against Officer Defendants)**

123. Plaintiff re-alleges paragraphs 1 through 102.

124. During the constitutional violations described herein, one of more of the Officer Defendants stood by without intervening to prevent the misconduct, even though they had a reasonable opportunity to do so.

125. This misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Mr. Blackmon's constitutional rights.

126. As a result of Officer Defendants' failure to intervene to prevent the violation of Mr. Blackmon's constitutional rights, Mr. Blackmon was wrongfully convicted and suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

127. The misconduct described in this Count was undertaken by employees of the City, including but not limited to the named Officer Defendants, pursuant to the policy and practice of the CPD in the manner described more fully above.

**COUNT IV – 42 U.S.C. § 1983**
***Monell* Claim**
**(Against Defendant City of Chicago)**

128. Plaintiff re-alleges paragraphs 1 through 102.

129. The City's policies and practices were underlying causes of the misconduct described in this Complaint in that CPD employees and agents regularly pursued wrongful convictions through flawed investigations to "solve" cases at all costs—and did so with the knowledge and approval of individuals with final policymaking authority for the City.

130. At all relevant times, the CPD's interrelated *de facto* policies, practices, and customs included, but were not limited to: (1) manufacturing, fabricating, or using improperly suggestive tactics to obtain false witness statements; (2) using improperly suggestive identification

procedures or otherwise tampering with lineups; (3) filing false reports and giving false statements or testimony; (4) withholding, destroying, covering up, or suppressing exculpatory evidence and evidence of misconduct; (5) perpetuating, encouraging, and condoning a "code of silence," under which Chicago police officers and detectives refused to report or otherwise concealed instances of police misconduct; and (6) failing to properly document and retain records of false testimony and related internal investigations and disciplinary proceedings.

131. The practices described above were so pervasive and entrenched as to constitute *de facto* policies of the CPD. These practices flourished because municipal policymakers in positions of authority exhibited deliberate indifference to the misconduct, effectively ratifying it.

132. Additionally, the City failed to adequately train, supervise, and discipline its police officers and other employees and agents, including Officer Defendants in this case, to ensure that they:

    a. employed proper and non-suggestive identification techniques;

    b. faithfully represented material facts when seeking criminal charges;

    c. secured, maintained, and disclosed exculpatory and impeachment information to prosecutors; and

    d. adequately investigated potential leads, including questioning witnesses; and

    e. testified truthfully during criminal proceedings.

133. The City's failure to train, supervise, and discipline its officers was done with deliberate indifference to the constitutional rights of citizens, including Mr. Blackmon.

134. The City's failure to adequately train, discipline, and supervise its police officers, and its creation and continued tolerance of unconstitutional customs, policies, and practices, directly and proximately caused Mr. Blackmon to suffer constitutional deprivations, including his

false arrest, unfair trial, wrongful conviction, and other grievous and permanent injuries and damages described above.

## COUNT V – 42 U.S.C. § 1983
## Wrongful Arrest and Detention
## (Against Officer Defendants)

135. Plaintiff re-alleges paragraphs 1 through 102.

136. Officer Defendants accused Mr. Blackmon of criminal activity and exerted influence to arrest and detain Mr. Blackmon without any probable cause in violation of his rights under the Fourth Amendment.

137. Officer Defendants caused Mr. Blackmon to be improperly seized and subjected to pre-trial detention for which there was no legitimate probable cause. Mr. Blackmon's arrest and pre-trial detention were instituted and continued maliciously, resulting in injury.

138. Moreover, Officer Defendants caused Mr. Blackmon to be improperly subjected to seizure and pre-trial detention when Officer Defendants possessed evidence supporting probable cause to believe that an individual *other* than Mr. Blackmon had committed the crime.

139. This misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Mr. Blackmon's constitutional rights.

140. As a result of the misconduct described in this Count, Mr. Blackmon was wrongfully arrested and detained before trial and suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

## COUNT VI – State Law Claim
## Malicious Prosecution
## (Against Officer Defendants)

141. Plaintiff re-alleges paragraphs 1 through 102.

142. Officer Defendants accused Mr. Blackmon of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

143. Officer Defendants caused Mr. Blackmon to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

144. Moreover, Officer Defendants caused Mr. Blackmon to be improperly subjected to judicial proceedings for which Officer Defendants possessed evidence to support probable cause to believe that an individual other than Mr. Blackmon had committed the crime. These judicial proceedings against Mr. Blackmon were instituted and continued maliciously, resulting in injury.

145. Officer Defendants' statements regarding Mr. Blackmon's alleged culpability were made with knowledge that the statements were false and fabricated. Officer Defendants withheld the facts of their fabrications from Mr. Blackmon.

146. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Mr. Blackmon's constitutional rights.

147. As a result of the misconduct described in this Count, Mr. Blackmon was wrongfully convicted and suffered loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

**COUNT VII – State Law Claim**
**Intentional Infliction of Emotional Distress**
**(Against Officer Defendants)**

148. Plaintiff re-alleges paragraphs 1 through 102.

149.     The acts, omissions, and conduct of Officer Defendants as set forth above were extreme and outrageous. Officer Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Blackmon, as is more fully alleged above.

150.     As a direct and proximate result of Defendants' outrageous conduct, Mr. Blackmon was, and continues to be, injured and has experienced, and continues to experience, severe emotional distress.

**COUNT VIII – State Law Claim**
**Civil Conspiracy**
**(Against Officer Defendants)**

151.     Plaintiff re-alleges paragraphs 1 through 102.

152.     As described more fully above, Officer Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

153.     In furtherance of the conspiracy, Officer Defendants committed overt acts and were otherwise willful participants in joint activity.

154.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Mr. Blackmon's constitutional rights.

155.     As a proximate result of Officer Defendants' misconduct described in this Count, Mr. Blackmon suffered damages including loss of liberty, mental anguish, humiliation, personal physical injury and emotional distress, and other grievous injuries.

## COUNT IX – State Law Claim
## Respondeat Superior
### (Against Defendant City of Chicago)

156.    Plaintiff re-alleges paragraphs 1 through 102.

157.    In committing the acts alleged in the preceding paragraphs, Officer Defendants were members of, and agents of, the CPD acting at all relevant times within the scope of their employment and under color of law.

158.    Defendant City of Chicago is liable as a principal for all torts committed by its agents.

## COUNT X – State Law Claim
## Indemnification

159.    Plaintiff re-alleges paragraphs 1 through 102.

160.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

161.    In committing the acts alleged in the preceding paragraphs, Officer Defendants were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment and under color of law.

\*      \*      \*

WHEREFORE, Plaintiff Eric Blackmon respectfully requests that this Honorable Court enter judgment in his favor and against all Defendants, jointly and severally, for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants Jones, Sanchez, Schleder, and the City, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiff Eric Blackmon hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ *Ronald S. Safer*
Ronald S. Safer
Valarie Hays
John K. Theis
Sarah E. Finch
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (tel)
(312) 471-8701 (fax)
rsafer@rshc-law.com
vhays@rshc-law.com
jtheis@rshc-law.com
sfinch@rshc-law.com

*Attorneys for Plaintiff Eric Blackmon*