IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC BLACKMON, | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) No. 19 C 767 |
| CITY OF CHICAGO, et al., | ) Judge Virginia M. Kendall ) ) |
| *Defendants*. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eric Blackmon filed a civil rights action against the City of Chicago, Chicago Police Officers Gregory Jones, James Sanchez, Eugene Schleder and as-of-yet unidentified City of Chicago Employees ("the Defendant Officers"). The Complaint alleges several different claims arising from his wrongful conviction of the July 4, 2002 murder of Tony Cox. There are several claims pursuant to 42 U.S.C. § 1983 against the Defendant Officers for deprivation of fair trial and wrongful conviction, conspiracy to deprive plaintiff's Constitutional rights, failure to intervene, wrongful arrest and detention (Count I-III, V); a claim for municipal liability under *Monell* against the City alleging that its policies, practices and customs and/or inadequate training, discipline and supervision caused the unconstitutional acts committed the Defendant Officers and Plaintiffs' resulting injuries (Count IV); and various state law claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, *respondeat superior*, and indemnification (Count VI-

1

X). (Dkt. 73). The City now seeks to bifurcate and stay discovery on Plaintiff's *Monell* claims (Count IV) against it. (Dkt. 71). For the following reasons, the City's Motion to Bifurcate and Stay Discovery and Trial on Plaintiff's *Monell* Claims is granted.

## BACKGROUND

Plaintiff's case stem from the 2002 killing of Tony Cox. The following summary of the allegations is based on the facts as alleged in Plaintiff's Complaint. On July 4, 2002, Tony Cox was shot and killed by two assailants outside Fat Albert's restaurant at 1143 South Pulaski, near the intersection of Roosevelt Road and Pulaski Avenue in Chicago. (Dkt. 73 at ¶15). According to police reports, in the early afternoon of July 4, 2002, Cox received a voicemail message from a man with an Italian accent, identifying himself as "Fat Albert" (now believed to be Richard Arrigo) and telling Cox to get in touch with him right away. (*Id.*). At around 1:30 p.m., Cox told his girlfriend that he had to go out for a while. (*Id.* at ¶ 16). According to witness accounts, at approximately 4:30 p.m., Cox and Arrigo were outside of Fat Albert's restaurant, of which Arrigo is part owner, with two other men, both of whom shot Cox. (*Id.* at ¶ 17). According to Arrigo, he met Cox inside the restaurant on the afternoon of July 4, 2002 and spoke with him for twenty to thirty minutes. (*Id.* at ¶ 19). Cox and Arrigo then exited the restaurant together. (*Id.*). Arrigo turned his back to lock the restaurant doors when he heard two gunshots. (*Id.*). Arrigo turned around and saw a black male shoot Cox twice before running away with another black male. (*Id.*). Arrigo was standing about five feet away from Cox at the time he was

shot. (*Id.*). Frencshun Reece was driving with her children on Pulaski Avenue and saw the two assailants shoot Cox in the head before calling the police. (*Id.* at ¶ 20). Two additional people, Lajuan Webb and Latonya Thomas, were eyewitnesses to portions of the shooting who knew the assailants but were never interviewed by the police. (*Id.* at ¶ 21). Lisa McDowell was also driving down Pulaski Avenue and was stopped at the stoplight at Roosevelt Road when she heard gunshots and saw Cox on the ground. (*Id.* at ¶ 22). She saw a Hispanic male holding a silver gun and saw two black males emerge from the north side of the building, where one shot Cox two times while Cox was on the ground. (*Id.*). When the stoplight turned green, McDowell drove away while calling 911. (*Id.*).

On July 4, 2002, Blackmon was hosting a barbecue to celebrate Independence Day, where between twenty and forty people saw him between 1:00 p.m. and 10:00 p.m. (*Id.* at ¶ 23). At the time of the shooting, Blackmon was twenty-one years old and was 6'1" tall, 150 pounds, and wore his hair in braids. (*Id.* at ¶ 24). Both Arrigo and Reece provided descriptions that did not match with Blackmon's. (*Id.* at ¶¶ 25-26). Later in the evening on July 4, Reece participated in a photo array and identified the photos of two individuals who did not have braids or otherwise resemble Blackmon. (*Id.* ¶ 28). Reece said she would need to see the individuals live to determine if they were assailants, but this was never arranged. (*Id.*). While at the station, Reece viewed two books of mugshots, one of which contained Blackmon's photograph. (*Id.* at ¶ 29). She did not identify Blackmon as the assailant. (*Id.*).

On the evening of July 4, 2002, Officer Defendants obtained information that George Davis, also known as "Boonie Black," might have ordered the murder of Cox. (*Id.* at ¶ 27). Boonie Black was known to the Officer Defendants as a leader in the New Breed Organization street gang. (*Id.*). Boonie Black was repeatedly linked to the murder of Cox. (*Id.* at ¶¶ 30-34). On July 9, 2002, Cox's brother told Defendant Sanchez that individuals known as "Pride" and Michael Davis, who was Boonie Black's nephew and was nicknamed "Keno", killed Cox. (*Id.* at ¶ 36). Later the same day, Officer Defendants received an anonymous tip that "Pride" and "Keno" killed Cox. (*Id.* at ¶ 36). Officer Defendants knew that Blackmon's nickname was "Forty," not "Pride." (*Id.*).

In August 2002, Defendant Jones contacted Lisa McDowell and requested an interview. (*Id.* at ¶ 37). On August 12, 2002 McDowell described the assailant as being over 6 feet tall, slender, and having braids in his hair. (*Id.* at ¶ 38). On August 29, 2002, Defendant Sanchez went to McDowell's house and showed her a photo array that included Michael Davis and Blackmon. (*Id.* at ¶ 40). Blackmon was the only individual in photographs with braids. (*Id.*). McDowell identified Blackmon as one of the assailants, despite only having seen the assailant's face for about five seconds from 30 or 35 feet away and seeing his profile for a few seconds in her review mirror. (*Id.* at ¶ 41). After McDowell identified Blackmon, with no additional evidence implicating him, Defendant Sanchez issued an "investigative alert" that Blackmon was wanted in connection with the Cox shooting. (*Id.* at ¶ 42). Defendants Jones and Schleder then falsely reported that Reece identified Blackmon as one of the offenders

4

on August 31, 2002. (*Id.* at ¶ 43). Reece's son identified Davis as one of the assailants, but not Blackmon. (*Id.* at ¶ 44). On or around September 3, 2002, Defendants Jones and Schleder included Blackmon in a photo array they presented to Arrigo and made comments in violation of the CPD's lineup policy. (*Id.* at ¶ 45). Arrigo stated that he did not recognize any of the individuals in the photographs, and Jones and Schleder pulled two photographs from the array and asked him if he recognized the individuals, one of whom was Blackmon. (*Id.* at ¶ 47). Arrigo stated the two individuals were not the assailants, angering Defendants Jones and Schleder. (*Id.* at ¶¶ 47-48).

On September 5, 2002, Blackmon was arrested without a warrant. (*Id.* at ¶ 49). After his arrest, Blackmon told the detectives that he was at a barbecue at the time of the shooting, provided the location and said people could vouch for him. (*Id.* at ¶ 50). Tainted live lineups were also conducted after Blackmon's arrest. (*Id.* at ¶ 50-63). Reece and McDowell both viewed the lineups, which included Davis and Blackmon. (*Id.* at ¶ 51). Improperly suggestive tactics were used multiple times. (*Id.* at ¶¶ 53-54, 57-59). Officer Defendants then falsely reported that Reece identified Blackmon as one of the offenders, continuing to suggest that she did even when she returned to the police station the following day and reiterated that Blackmon was not one of the offenders. (*Id.* at ¶¶ 55-56). McDowell identified Blackmon as one of the offenders as the result of the improperly suggestive lineup. (*Id.* at ¶ 59). After McDowell identified Blackmon, Defendant Jones listed Blackmon as going by the nickname "Pride" on his report of McDowell's identification,

5

knowing there was no basis for the attribution, even as Blackmon's arrest report reflected his nickname, "Forty." (*Id.* at ¶¶ 49, 61). Arrigo also participated in a live lineup which included Davis and Blackmon, but he did not identify any of the subjects as the assailants. (*Id.* at ¶¶ 62-63).

Officer Defendants continuously failed to fully investigate the murder, including failing to interview potential leads, failing to interview eyewitnesses, and failing to investigate the true identify of "Pride." (*Id.* at ¶ ¶ 64-69). Additionally, Defendant Sanchez testified falsely at Blackmon's criminal trial, despite his testimony being contradicted by a CPD timeline. (*Id.* at ¶¶ 70-71). Exculpatory evidence, such as why Blackmon was included in the photo array, has not been disclosed. (*Id.* at ¶ 72). Additionally, Officer Defendants intentionally withheld or destroyed the interview reports, investigative notes and investigative file index. (*Id.* at ¶¶ 73-74). Officer Defendants also repeatedly withheld exculpatory and impeachment information that would have been material to Blackmon's defense. (*Id.* at ¶¶ 75-78).

In September 2004, Blackmon's case proceeded to bench trial, with the only evidence implicating him was the fabricated eyewitness identifications by Reece and McDowell. (*Id.* at ¶ 79). The case against Blackmon was bolstered by Defendant Sanchez's intentionally false testimony. (*Id.* at ¶ ¶ 80-82). On September 27, 2004, Blackmon was convicted of first-degree murder based on Officer Defendants' fabricated identifications and he was sentenced to sixty years in prison. (*Id.* at ¶ 83). On April 7, 2011, Blackmon filed a petition for writ of habeas corpus in the U.S. District Court for the Northern District of Illinois. (*Id.* at ¶ 84). The District Court

dismissed, but the Seventh Circuit reversed and remanded for an evidentiary hearing. (*Id.*). On February 13, 2018, the District Court granted the petition and entered judgment in favor of Blackmon. (*Id.*). The State declared its intention to retry Blackmon before finally dismissing the charges in January 16, 2019. (*Id.* at ¶¶ 85-86).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 42(b), the Court has considerable discretion to separate claims or issues for trial if the separation would prevent prejudice to a party or promote judicial economy. *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007) (citing *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999)); Fed. R. Civ. P. 42(b). "If one of these criteria is met, the district court may order bifurcation as long as doing so will not prejudice the non-moving party or violate the Seventh Amendment," which guarantees a jury trial for civil cases in federal court. *Id.* at 700 (citing *Krocka v. City of Chi.*, 203 F.3d 507, 516 (7th Cir. 2000)). Federal Rule of Civil Procedure 26(d) also permits a court to stay discovery on *Monell* claims. Fed. R. Civ. P. 26(d); *see also, e.g., Horton v. City of Chi.*, 2016 WL 316878, at *2 (N.D. Ill. Jan. 26, 2016); *Saunders v. City of Chi.*, 146 F. Supp. 3d 957, 968 (N.D. Ill. 2015).

Motions for bifurcation are "now commonplace" and "there is a growing body of precedent in this district for both granting and denying bifurcation in § 1983 cases." *See, e.g., Allison v. Gallagher*, 2012 WL 4760863, at *1 (N.D. Ill. Oct. 5, 2012) (quoting *Elrod v. City of Chi.*, 2007 WL 3241352, at *2 (N.D. Ill. Nov.1, 2007)); *see*

*also, e.g., Rodriguez v. City of Chi.*, 2018 WL 3474538, at *2 (N.D. Ill. July 19, 2018). "Such motions and the inclination of many judges to grant them stems in large part from the recognition that, often, 'claims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove them.'" *See, e.g., Horton*, 2016 WL 316878, at *2 (quoting *Moore v. City of Chi.*, 2007 WL 3037121, at *9 (N.D. Ill. Oct.15, 2007)); *see also, e.g., Allison*, 2012 WL 4760863, at *1 (same). Deciding whether to bifurcate a plaintiff's *Monell* claim is left to the Court's sound discretion and "must be done on case-by-case basis, looking at the specific facts and claims presented." *See, e.g., Rodriguez*, 2018 WL 3474538, at *2; *Estate of Loury by Hudson v. City of Chi.*, 2017 WL 1425594, at *2 (N.D. Ill. Apr. 20, 2017); *Ojeda-Beltran v. Lucio*, 2008 WL 2782815, at *1 (N.D. Ill. July 16, 2008).

## **DISCUSSION**

The City argues bifurcation of Plaintiff's *Monell* claims is appropriate under Federal Rule of Civil Procedure 42 because bifurcation (1) best serves the interests of efficient litigation and judicial economy and (2) will assist in eliminating the risk of unfair prejudice and potential unnecessary expense to the parties without prejudicing Plaintiffs' ability to recover compensatory damages. (Dkt. 71). Much of the City's arguments here follow its arguments in *Ezell v. City of Chicago*, where this Court ultimately approved the bifurcation. 2019 WL 3776616 (N.D. Ill. Aug. 12, 2019). In support of its Motion, the City argues that Plaintiff's *Monell* claims are dependent first on their claims against the Defendant Officers. (Dkt. 71 at 4–7). The City has

8

offered to agree to consent of limited entry of judgment against it should the finder of fact determine the Defendant Officers committed a violation of Plaintiff's constitutional rights in one of the ways alleged in the complaint, even if the Officers are protected from civil liability due to qualified or absolute immunity, without Plaintiff having to prove any of the elements required to hold the City liable under *Monell*. (*Id.* at 7; Dkt. 84 at 5-6). Plaintiff states in his response that the City's motion is based on the "flawed premise" that disposition of the claims against the Defendant Officers would end the litigation and that the City does not address that Defendant Officers have asserted absolute immunity on Mr. Blackmon's false testimony claims. (Dkt. 77 at 2). Plaintiff further disputes that the City would be prejudiced by not bifurcating the *Monell* claims and that instead Blackmon would be prejudiced. (*Id.* 10-11).

### I. Interests of Litigation and Judicial Economy

The City argues that bifurcation would best serve the interests of litigation and judicial economy because the City's liability is entirely dependent on the liability of Officer Defendants. (Dkt. 71 at 4). While a "municipality's liability is dependent on its employees' actions, it is not necessarily dependent on its employees' liability." *Ezell*, 2019 WL 3776616, at *4. The City concedes, "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." (Dkt. 71 at 4, citing *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010). To make this determination, the Court

9

"must look to the nature of the constitutional violations, the theory of municipal liability and the defenses set forth." *Thomas*, 604 F.3d at 305.

Here, Blackmon alleges the Defendant Officers violated his constitutional rights by depriving him of a fair trial, wrongfully convicting him, fabricating evidence used against him, intentionally ignoring material information or failing to investigate, and concealing exculpatory evidence to which he was lawfully entitled. (Dkt. 73 ¶¶ 116-119). Blackmon's *Monell* claims relate specifically to these allegedly unconstitutional practices. (*See, e.g., id.* at ¶ 129 ("The City's policies and practices were underlying causes of the misconduct described in this Complaint in that CPD employees and agents regularly pursued wrongful convictions through flawed investigations to 'solve' cases at all costs"). Blackmon alleges six *de facto* policies, practices and customs that caused him injury, as well as a failure to properly train, supervise, or discipline the Officer Defendants which "directly and proximately" caused injury to Blackmon. (*Id.* at ¶ 134). Additionally, as the City points out, Blackmon alleges only "'intentional' misconduct of the Defendant Officers…Based on the nature of these alleged constitutional violations, it is clear the City's potential *Monell* liability is contingent on the officers' liability for the underlying misconduct." (Dkt. 71 at 4). Therefore, the City cannot be found liable under *Monell* unless Blackmon proves that one or more of the Officer Defendants committed a constitutional violation under § 1983 as alleged in Counts I–V. *See, e.g., Williams v. City of Chi.*, 214 F. Supp. 3d 1060, 1080–81 (N.D. Ill. 2018).

10

Blackmon does not dispute the above, instead focusing on the factual differences between this case and other cases where this Court has bifurcated *Monell* claims, namely *Ezell*. 2019 WL 3776616. Blackmon states the fact that *Ezell* dealt with qualified immunity and did not state a claim for relating to false testimony puts this case in distinct territory. Blackmon argues his "claims related to false testimony cannot be resolved without addressing the City's liability for this constitutional violation." (Dkt. 77 at 6). Blackmon also argues because the Defendant Officers may have absolute immunity for their false testimony, the consent to the entry of judgment would not practically end the litigation. (*Id.*).

However, both of these distinctions are unavailing. As stated in *Ezell*, the "question is whether the Officers committed the constitutional violation(s) underlying [Plaintiff's] *Monell* claims, not whether they can be held liable for them." 2019 WL 3776616, at *4. It does not matter for the analysis whether the Officer Defendants have qualified or absolute immunity, as the baseline determination is whether the Officers did, in fact, commit the constitutional violations that form the basis for the *Monell* claims. *Williams v. City of Chi.*, 315 F. Supp. 3d 1060, 1081 (N.D. Ill. 2018) ("[W]hether the Officers can be found liable is beside the point; rather, the issue is 'whether the individual defendants committed a constitutional violation that is a prerequisite for' the City's liability." As to the second point that the consent to the entry of judgment would not practically end the litigation, the City puts forth an Amended Limited Consent that addresses these concerns. (84-1 at ¶ 6). With the Amended Limited Consent, the City has guaranteed that so long

11

as Blackmon succeeds in showing a constitutional violation occurred, he "will recover compensatory damages from the City without anything more—either as indemnification for a judgment entered against the Defendant Officers or, if the Defendant Officers are found to be immune from liability, against the City pursuant to the proposed Limited Consents." *Ezell*, 2019 WL 3776616, at *4; *see also* Dkt. 84-1). Here, as in other similar cases, the question of whether the Defendant Officers committed a constitutional violation is dispositive and Blackmon's claims can be resolved without delving into the *Monell* claims. *Id.*

Blackmon further states that bifurcating the *Monell* proceedings will create "duplication, delay, and disputes." (Dkt. 77 at 7). Blackmon claims that the risk of unnecessary duplication is high in this case as "the evidence regarding the *Monell* claims and the claims against the Defendant Officers significantly overlap" and that due to the close connection between the evidence for the two sets of claims, "concerns regarding efficiency and judicial economy weigh in favor of litigating the claims simultaneously, as is standard in these types of cases." (*Id.*). Blackmon does not proffer any analysis into how the evidence regarding the *Monell* claims and the claims against the Officer Defendants overlap. The City, however, points out that discovery on any of Blackmon's *Monell* allegations will likely be costly. As stated by the City, "each theory would likely require the City to produce decades-worth of CPD documents regarding each subject, associated training records, discipline records, and witnesses who would be able to testify on each subject. The number and type of documents that would fall within the scope of these *Monell* issues

will be voluminous, and preparing responses will be burdensome, expensive, and time-consuming." (Dkt. 71 at 9). As this Court stated in *Ezell*, "[a]llowing discovery—much less the presentation of evidence at trial— into [Plaintiff's] broad *Monell* allegations will unquestionably complicate matters further and exponentially increase the cost to the parties and burden on the Court." 2019 WL 3776616 at *6. It is in the interest of litigation and judicial economy to bifurcate the *Monell* claims where resource-heavy discovery process and litigation of the various *Monell* claims are unnecessary to Blackmon's recovery due to the Amended Limited Consent form.

Blackmon claims that the City has not established that the burden imposed by *Monell* discovery is disproportionate to the needs of the case and that the City's assertions on burden are premature. (Dkt. 77 at 8, 10). Blackmon argues that the City does not explain why or how locating responsive information would be excessively costly or time-consuming. (*Id.*). Blackmon states, without support, that the "City likely overstates the burden imposed because the City has surely collected and produced many of the relevant documents in other cases." (*Id.*). Blackmon is incorrect that the City has not established the heavy burden imposed by *Monell* discovery. Blackmon describes the analysis correctly: Courts must look to whether the burden imposed, however great, is disproportionate to the needs of the case by looking at, among other things, "the importance of the issues at stake in the action, the amount in controversy, [and] the parties' relative access to relevant information[.]" (Dkt. 77 at 9, citing *Cadiz v. Kruger*, 2007 WL 4293976, *3 (N.D. Ill.

13

Nov. 29, 2007)). But as stated by the Court in *Ezell*, "relevance and proportionality [under Rule 26(b)(1)] act as relatively insignificant limits here given the broad scope of Plaintiff's *Monell* claims as alleged." 2019 WL 3776616, at *5.

First, as described above, the *Monell* claims are unnecessary to Blackmon's recovery due to the Amended Limited Consent form. Blackmon's claims for compensatory damages can be resolved without ever delving into the *Monell* claims. Second, the City shows that allowing discovery and presentation of evidence at trial into Blackmon's expansive *Monell* claims would be unduly burdensome. The City demonstrates that Blackmon's *Monell* claims include a multitude of areas of police work dating back to the 1970s. (Dkt. 71 at 8-9). The City also admits that while there will be some overlap, it claims "it will involve only a fraction of the broad *Monell* policy and practice discovery implicated in the complaint." (*Id.* at 10). And there is no guarantee that the City can easily produce such wide-ranging documents that may have been produced in other similar cases (which cases, Blackmon does not say), as each party has a right under Federal Rule of Civil Procedure to any discovery that is relevant to a claim or defense and proportional to the needs of the case, giving the parties considerable leeway to request any relevant or proportional documents given the expansive *Monell* claims. Fed. R. Civ. P. 26(b)(1). There is no indication the City's request is premature considering the expansive discovery requests that have already been served. (Dkt. 84 at 8-9). The Court agrees that bifurcation here would avoid the needless expense of litigation, in particular due to the City's agreement to entry of judgment against itself if the

14

factfinders determine liability of the Officer Defendants. *See Treece v. Hochstetler*, 213 F.3d 360, 365 (7th Cir. 2000) ("[B]ifurcation avoided the needless costs and burdens of a second trial, as well as, but not limited to, the waste of the valuable time and resources of the court, and the inconveniencing of witnesses, especially in light of the fact that the City agreed to entry of judgment against itself should the jury enter a finding of liability against [the individual defendant].")

Blackmon additionally argues that there are non-monetary reasons not to grant bifurcation. Blackmon cites the "need to encourage the municipality to reform patterns and practices that lead to constitutional violations and the deterrent effect of a judgment naming the municipality based on its policies and customs." (Dkt. 77 at 9). Blackmon cites as a particular concern the City's failure to hold accountable those police officers who provide false testimony at trial and how a finding of *Monell* liability could incentivize the City to track officer's false testimony. (*Id.* at 10). The Court agrees with Blackmon that a benefit of § 1983 claims is to deter future constitutional deprivations. However, the Court does not agree that in situations such as the instant case, where the City has agreed to pay damages so long as Blackmon is able to prove a constitutional violation by one of the named individual Officer Defendants, would not be sufficient deterrent. *Parker v. Banner*, 479 F.Supp.2d 827, 829 (N.D. Ill. 2007) ("If a constitutional violation occurred, then the City pays…[T]hat is all Owen requires. The idea that the Supreme Court requires some extra incentive to deter cities from allowing their employees to violate rights is inconsistent with its policy of immunizing cities from punitive damages."). While

15

Blackmon assuredly has strong reasons for wanting to pursue his *Monell* claim, the Court does not believe that the City will continue with its practices undeterred should the Officer Defendants be found liable for a constitutional violation.

## II. Prejudice to the Parties

Having found that the Rule 42(b) criteria are met, bifurcation is appropriate as long as it will not prejudice the non-moving party or violate the Seventh Amendment. *Anderson*, 2016 WL 7240765, *5 (N.D. Ill. Dec. 14, 2016) (citing *Treece*, 213 F.3d at 365). The City argues for bifurcation of the *Monell* claims because the litigation of the claims against the Defendant Officers and the City at the same time raises the possibility of prejudice for both the Defendant Officers and the City. (Dkt. 71 at 12-14). The City states that by "arguing non-defendant officer misconduct in front of the jury would invite the jury to find the Defendant Officers guilty by association, rather than deciding their liability based on their own actions." (*Id.* at 13). The City argues that it could be prejudiced because "a jury asked to weigh evidence of Defendant Officers' alleged misconduct at the same time as policy evidence may confuse that evidence and the law surrounding *Monell* liability." (*Id.*). However, it is premature to raise these concerns of prejudice at trial at this stage. *Anderson*, 2016 WL 7240765, *6, n.6 (N.D. Ill. Dec. 14, 2016). There are a number of tools the Court can use, including limiting instructions, motions *in limine*, and others to limit any such prejudice, and, the Court can assess the propriety of bifurcating the trial at a later date if the steps are inadequate. *Id.* As it stands, "prejudice at trial does not militate in favor of bifurcation at this time." *Id.*

16

Blackmon, for his part, states that he has "a right to select the claims he wishes to pursue" and that requiring him to pursue two trials "will substantially increase the costs of litigation and the use of judicial resources by the end of the second trial," while involving significant time and costs due to extensive discovery disputes. (Dkt. 77 at 12). However, Blackmon will not be prejudiced against receiving any compensatory damages he seeks. Bifurcation here is intended to avoid the needless costs and burdens of a second trial, as well as "avoiding waste of the valuable time and resources of the court, and the inconveniencing of witnesses, especially in light of the fact that the City 'agree[d] to entry of judgment against [itself]'" should the jury find the individual defendants liable. *Treece*, 213 F.3d at 365.

## CONCLUSION

For the reasons stated above, the City's motion to bifurcate and stay discovery on Blackmon's *Monell* claim [71] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: April 16, 2020

17