**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC BLACKMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No.  19-cv-767 |
| Vs. | ) | Honorable Virginia M. Kendall |
| | ) | |
| CITY OF CHICAGO, Chicago Police | ) | |
| Officers GREGORY JONES, JAMES | ) | |
| SANCHEZ, and EUGENE | ) | |
| SCHLEDER, and other as-yet | ) | |
| unidentified employees of the City of | ) | |
| Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO BAR CERTAIN OPINIONS BY  DEFENDANTS' EXPERT ANTHONY MONHEIM

Defendants, Gregory Jones, James Sanchez, and Eugene Schleder, by and through their attorneys, Johnson and Bell, Ltd., for their Response in Opposition to Plaintiff's Motion to Bar Anthony Monheim, state the following:

Plaintiff retained "police practices expert" Dennis Waller, a former evidence technician with practically no experience in investigating homicides, who opined that nearly all aspects of the Defendant Officers' investigation into the murder of Tony Cox were conducted improperly. As a result, the Defendant Officers disclosed Sergeant Anthony Monheim, an actual homicide detective, as a police practices expert to opine regarding the propriety of the investigation. Sgt. Monheim's opinions are based upon a reliable methodology of comparing the Defendant Officers' conduct to the standards in the field. Plaintiff seeks to bar certain opinions of Sgt. Monheim because, in Plaintiff's view, he (1) lacks specialized knowledge regarding eyewitness perception

or memory; (2) should not be able to state that probable cause to arrest existed after Plaintiff was identified; (3) lacks expertise to opine about Plaintiff's failure to challenge the eye witness identifications in all prior proceedings, the Cook County State's Attorney's Office decision to approve charges against Plaintiff and pursue the case, the trial judge's determinations of the live witnesses, (4) his determinations as an investigator regarding which witnesses were reliable are inadmissible; and (5) he provides an insufficient basis that the police investigation of Tony Cox's murder was conducted properly. Plaintiff's arguments are without merit.

## **BACKGROUND**

Anthony Monheim served 30 years in law enforcement during the course of his career with the Miami-Dade Police Department. (See Monheim Report attached hereto and incorporated herein by reference as Exhibit A). The vast majority of Sgt. Monheim's career included positions related to investigations, such as detective and supervisor of detectives. (Id.) He spent the final 12 years of his career in the Homicide Bureau as a supervisor. (Id.) Indeed, Sgt. Monheim has personally investigated more than 500 homicides. (Id.) Sgt. Monheim's years of service with Miami-Dade PD at various ranks and positions alone qualify him as an expert in the field of police practices related to investigating homicides. (Id.)

Sgt. Monheim teaches a course called "Conducting Death and Homicide Investigations" for the International Association of Chiefs of Police (IACP), the largest law enforcement association in the world. (Id.) He has trained investigators on homicide investigative techniques for the Department of Justice, the FBI, the DEA, the Treasury Department (ATF), the Florida Department of Law Enforcement (FDLE), the Southeast Florida Institute of Criminal Justice in Miami, the Metropolitan Police Institute (MPI) also in Miami, SRR Training in Boston, the Taylor Group in Maryland, and the Public Agency Training Council (PATC) in Indianapolis, Indiana.

(Id.) Sgt. Monheim has been granted expert witness status regarding homicide investigative procedures, line-up techniques, and general investigative procedures in both Federal and State courts. (Id.)

Sgt. Monheim rendered the following opinions:

**Opinion 1: "**As an experienced homicide investigator, it is my opinion that the investigation into the murder of Timothy Cox undertaken by the Chicago police department homicide investigators was properly conducted and clearly developed sufficient probable cause to justify the arrest of Eric Blackmon."

**Opinion 2:** "As an experienced homicide investigator, it is my opinion that the overall investigation conducted by the Chicago Police Department's homicide detectives into the murder of [Tony] Cox was consistent with generally established and accepted investigative practices in place in 2002."

**Opinion 3: "**It is also my opinion that the photographic and live lineup identification procedures utilized by the Chicago Police Department's homicide investigators were appropriate, legally sufficient, properly conducted, and consistent with all generally accepted and established investigative practices in place in 2002."

**Opinion 4:** "In my opinion, the totality of the circumstances renders both identifications reliable. The detectives' acceptance of these identifications as reliable is consistent with nationally recognized police standards and training in place in 2002. I have viewed the photo array shown to witnesses Reece and McDowell and find it to be fair and not "improperly suggestive" or "tainted" as the Complaint maintains. The photo array itself, and the method in which it was generated and presented, complies with nationally accepted police standards and training in place in 2002.

**Opinion 5:** "The complaint alleges that the photo array and the live-physical lineup were suggestive. Judge Lacy decided they were not. It was ultimately his decision to allow the lineups to be introduced into evidence during the trial, and to allow the testimony of the witnesses. In announcing his verdict Judge Lacy said that the identification procedures, "were in no way suggestive in nature, and that they were conducted in an almost pristine manner." I concur with Judge Lacy. The lineups were not unduly suggestive or prejudicial and complied with generally accepted police practices in place in 2002."

## <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 702 allows for expert testimony, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," the witness is "qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." A district court performs a gate-keeping function to determine whether expert scientific and non-scientific evidence is admissible under Rule 702. *Daubert*, 509 U.S. 579; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to other non-scientific types of expert testimony). The factors a court examines for admissibility of expert evidence under Daubert are "flexible to account for the various types of potentially appropriate expert testimony." *Deputy v. Lehman Bros.*, 345 F.3d 494, 505 (7th Cir. 2003). The main focus of the gate-keeping "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The focus of the

district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).

## ANALYSIS

### I. Sgt. Monheim's expertise allows him to opine about the construction and administration of the photographic and live lineups.

Plaintiff argues that Mr. Monheim's opinions regarding the reliability of the eyewitnesses' identification of Plaintiff should be barred because he is not qualified as an expert on eyewitness perception or memory. (See Plaintiff's Motion at 3-4). Plaintiff essentially argues that Sgt. Monheim, a police practices expert, does not have any specific social science qualifications in the area of reliability of eyewitness identification, therefore, he is not qualified to testify about this topic. Plaintiff also argues that Sgt. Monheim made "several speculative opinions" about eyewitness perception and memory. (Id.)

Plaintiff takes issue with Sgt. Monheim's analysis of the eyewitnesses' opportunity to view the offender at the time of the offense, degree of attention, level of certainty, and the length of time between the offense and the identification. (Id.) Specifically, Plaintiff takes issue with the following analysis made by Sgt. Monheim:

- Ms. Reece has a "discerning eye," making it unlikely she would inaccurately positively identify a perpetrator;
- The eyewitnesses had a heightened **degree of attention** and awareness enabling them to better perceive and remember the perpetrators because they were alerted to the incident by the sound of gunfire;
- An eyewitness's **certainty** in an identification after a long period of time signified reliability of the identification;
- The eyewitnesses here had ample **opportunity** to make an identification due to the duration of time and the vantage points from which they observed the homicide;
- The **lapse in time between the homicide and the identifications**, while long here, did not negatively affect the reliability of the identifications;
- Eyewitnesses make identifications based on facial features rather than clothing, hairstyles, or facial hair.

Plaintiff's Motion at 4 (emphasis added).

Notably, these are the well-established factors from *Manson v Brathwaite*, 432 U.S. 98, 97

S.CT. 2243 (1997). Indeed, Sgt. Monheim used the terms as described by the *Manson* Court. (Ex.

A at 19, 22, 23-26.) In *Manson*, the Supreme Court held "[w]hen you weigh the identification

testimony of a witness, you should consider all of the facts and circumstances in evidence including

but not limited to the following. "The factors to be considered are set out in *Biggers*. 409 U.S., at

199-200, 93 S.Ct., at 382. These include the **opportunity** of the witness to view the criminal at the

time of the crime, the witness' **degree of attention**, the accuracy of his prior description of the

criminal, the level of **certainty** demonstrated at the confrontation, and the **time between the crime**

**and the confrontation**." *Manson,* 432 U.S. at 114 (emphasis added). Sgt. Monheim's opinion

relies on the eyewitnesses account of the shooting and their subsequent identification of Plaintiff.

He then juxtaposed that evidence with the five factors of identifications as required by *Manson v*

*Brathwaite*. A seasoned investigator understands that the identifications must meet the *Manson*

standards. Sgt. Monheim addressed this in his report:

> In order to prevent erroneous eyewitness identifications during
> photo displays and live-physical lineups, the courts have established
> standards and criteria delineating what is acceptable and what is not.
> Police investigators are constantly schooled on these distinctions.
> National police practices rigidly adhere to these touchstones and
> most of these standards have not perceptibly changed in the last 50
> years. The courts have also provided a conclusive method to
> safeguard the integrity and propriety of the identification procedure
> and that is the suppression hearing.

Exhibit A at pg. 17.

To argue that Sgt. Monheim's opinions are rooted in eyewitness perception and memory is

patently incorrect. Plaintiff's argument that Sgt. Monheim is not qualified to testify regarding the

circumstances of identification and the area of photo arrays and lineups is without merit.

Accordingly, this Court should deny this aspect of Plaintiff's *Daubert* motion.

II.     **Sgt. Monheim's opinions regarding probable cause are admissible because he limited his opinion as he described sound professional standards and identified any potential departures from them**.

A witness is qualified as an expert to testify regarding his or her opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) *citing* Federal Rule of Evidence 702(a). It is the role of the judge to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. *Id*. As a general rule, accordingly, an expert may not offer legal opinions. *Id.* However, [w]hen an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is "limited to describing sound professional standards and identifying departures from them." *Id*. at 721 citing *West v. Waymire*, 114 F.3d 646, 652 (7th Cir.1997); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir.2005) (commenting that expert's testimony could be relevant to jury in determining whether officers deviated from reasonable police practices).

Sgt. Monheim pointed out that the detectives did not place any individual in custody until Lisa McDowell identified Plaintiff. (Exhibit A at 15). He also indicated that even when an identification is made does not always mean that an arrest should be made just because "probable cause had been minimally established."   (Exhibit A at 15). He did not state a bright line rule. He merely opined that the detectives in this case did not act contrary to any accepted standards of police work when they arrested Plaintiff after he was identified as one of the shooters. Sgt. Monheim did not head into any impermissible area and thus this Court should deny this aspect of Plaintiff's *Daubert* motion.

III.    **Sgt. Monheim has the experience to opine that the Felony Review Unit's decision to approve and pursue charges after reviewing the Defendant Officers'**

**investigation and that Plaintiff's failure to challenge the admissibility of the eyewitness identifications is indicative that the identifications are reliable.**

Sgt. Monheim is an expert in the field of police practices. His experience alone in investigating cases and his knowledge of proper police investigation makes him professionally qualified to offer a number of opinions regarding the underlying matters in the case at bar. "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Cage v. City of Chicago,* 979 F. Supp. 2d 787, 802 (N.D. Ill. 2013) (quoting *Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 591 (7th Cir.2000)); *id.* (quoting *Kumho Tire Co.,* 526 U.S. 137, 153 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *id.*(quoting *Jordan v. City of Chi.,* No. 08 C 6902, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012) ("An expert may be qualified to render opinions based on experience alone.")). The Advisory Notes to Rule 702 explicitly contemplate experts qualified through their experience alone:

> [s]ome types of expert testimony will not rely on anything like a scientific method.... Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

> Rule 702, advisory notes to the 2000 amendment.

Sgt. Monheim's experience in the field of police practices satisfies the Rule 702 requirement. Based upon his experience, Sgt. Monheim provided the following opinions regarding Plaintiff's issues with the identification procedures used in the underlying criminal matter:

- "In this case the Plaintiff's defense attorney inexplicably withdrew his Motion to Suppress the identifications. In a murder case where the only evidence implicating the

defendant was eyewitness testimony, it is indeed puzzling that Mr. Cowan would not even attempt to challenge the validity of the identifications. If the lineups were so suggestive and the manner in which they were shown to the witnesses so flagrantly flawed, why would he have elected to withdraw his motion? The propriety of the identification procedure can be found in the fact that the motion to suppress was withdrawn by the Plaintiff in his criminal case." (See Exhibit A at 17)

- "The same must be said for the prosecuting attorneys, who obviously had no reservations about bringing the case to trial. Homicide investigators rely on prosecutors and legal practitioners for advice and direction regarding the law. Since none of these legal experts expressed any opposition to the actual lineups or the manner in which they were presented, it can only be assumed that they considered the actions of the detectives to be proper and legally acceptable." (See Exhibit A at 18)

- "The complaint alleges that the photo array and the live-physical lineup were suggestive. Judge Lacy decided they were not. It was ultimately his decision to allow the lineups to be introduced into evidence during the trial, and to allow the testimony of the witnesses. In announcing his verdict Judge Lacy said that the identification procedures, "were in no way suggestive in nature, and that they were conducted in an almost pristine manner." I concur with Judge Lacy. The lineups were not unduly suggestive or prejudicial and complied with generally accepted police practices in place in 2002." (See Exhibit A at 27)

Sgt. Monheim based these opinions on his 30-year experience as a homicide detective which included dealings with a myriad prosecutors, defense attorneys, and judges at both the state and Federal levels regarding various homicide cases. (Exhibit A at 15-17) Indeed, Sgt. Monheim's

extensive experience allows him to understand the various moving pieces of the criminal justice system. Plaintiff argues that the Court should prohibit Sgt. Monheim from rendering these opinions simply because he "is not an attorney." Plaintiff also argues that allowing Sgt. Monheim to opine as to these matters "would create "a distracting trial within a trial" and foment the "potential for jury confusion." Plaintiff's arguments are best left for cross-examination of Sgt. Monheim. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination."). Sgt. Monheim's extensive experience in police practices qualifies him to offer these types of opinions and this Court should deny this aspect of Plaintiff's *Daubert* motion.

**IV.    Sgt. Monheim opined regarding what a reasonable detective should have done when presented with conflicting statements during a murder investigation.**

Plaintiff also contends that Sgt. Monheim impermissibly testified regarding the credibility of certain witnesses. Specifically, Plaintiff takes issue with the following:

- "Richard Arrigo, an eyewitness who provided evidence regarding the impropriety of the lineup procedures, "is clearly not credible." (See Exhibit A at 32);

- "Eyewitness Ms. Reece—a "solid witness in front of the grand jury and at the trial, the two proceedings that led to Mr. Blackmon's indictment and conviction—somehow became incredible when she later recanted her identification of Mr. Blackmon." (Id. at 32-33); and

- "The Officer Defendants did not withhold or destroy evidence, did not conspire to falsely accuse Mr. Blackmon of murder, and instead "simply followed the investigative leads to their conclusion" (Id. at 31, 40).

Sgt. Monheim did not merely testify regarding the credibility of these witnesses. He offered a few observations on credibility, but they were limited to proper discussions of the evidence that the detectives received in the investigation. First, Sgt. Monheim noted that evidence pointed toward Arrigo's complicity in Tony Cox's murder and that his potential involvement would provide a motive to undermine the investigation. (See Exhibit A at 32). He explained that even a "novice homicide investigator reviewing the facts of the case would conclude that he was complicit in the murder of Tony Cox." (Id). That point is hard to dispute and certainly would not invade the province of the jury.

Sgt. Monheim also opined that a reasonable officer would have taken Reece's statement that she was present when Cox was shot, and that Plaintiff was one of the shooters, as credible evidence. Sgt. Monheim explained that her later recantation "is completely contrary to what she told the prosecutors, swore to the grand jury, and swore to Judge Lacy during the trial." (See Exhibit A at 32). Sgt. Monheim also found that if her allegations of improper identification procedure by the detectives "were true, she had ample opportunity to make her concerns known. Over a month after the identifications, she testified (under oath) before the grand jury, and two years after that testified (under oath) at the trial." (Id.) Monheim did not opine regarding whether Reece had been telling the truth, but he explained that Reece's statement and identifications to the detectives had strong indications of credibility so that a reasonable detective would have taken it as competent evidence. (Id.) This is a significant distinction. To be clear, Monheim did not opine that Reece was extremely credible when she identified Plaintiff as the murderer, nor did he opine that she was completely incredible when she recanted years later. He opined that her pre-recantation story to detectives, prosecutors, a grand jury, and Judge Lacy were reliable, and could be relied upon by the defendants, and that is an admissible opinion. See *Nunez v. BNSF Railway*

*Co.*, 730 F.3d 684–85 (7th Cir. 2013) (expert could not testify as to whether another witness was telling the truth but could testify about implications if he was).

Sgt. Monheim at no point in his report decided which witnesses to believe. His opinions are centered on what a reasonable detective should have done when presented with these types of statements during this particular gangland murder investigation. This was within the bounds of proper testimony for a police practices expert. Accordingly, this Court should deny this aspect of Plaintiff's *Daubert* motion.

V.     **Sgt. Monheim provides a sufficient basis to opine that the police investigation was properly conducted**.

Plaintiff argues that Sgt. Monheim did not identify a methodology for his conclusion that the police investigation was properly conducted. Plaintiff states, "[h]e does not identify a methodology for this conclusion and provides no reliable basis for his conclusion other than his subjective intuition." This argument has no merit. It is readily evident that Sgt. Monheim reviewed the investigative file and trial transcripts and rendered his opinions based on his vast experience as a homicide detective and the "generally established and accepted investigative practice in place in 2002." (See Exhibit A at 31). Sgt. Monheim cites to 21 reference materials including "Fundamentals of Criminal Investigation," "Criminal Investigation: Basic Perspectives."   (See Exhibit A at 4-5). To the extent that Plaintiff takes issue with whether Sgt. Monheim failed to properly cite to the authority he relied upon in his expert report or deposition is not a basis to exclude his expert testimony under *Daubert*. See *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."); Fed.R. Evid. 702(b)-(d). Accordingly, this Court should deny this aspect of Plaintiff's *Daubert* motion.

**Conclusion**

For the reasons set forth above, the Defendant Officers respectfully request that this

Honorable Court deny Plaintiffs' motion to bar certain testimony by Anthony Monheim.


Ahmed A. Kosoko                                     Respectfully submitted,
JOHNSON & BELL, LTD.                                JOHNSON & BELL, LTD,
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603 (312) 372-0770              By:     s/ *Ahmed A. Kosoko*

# EXHIBIT A

November 12, 2021


Mr. Ahmed A. Kosoko, Attorney at Law.
Johnson and Bell
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603


Dear Mr. Kosoko:

RE:  Eric Blackmon v. The City of Chicago, Illinois, et al. United States District Court, Northern District of Illinois, Eastern Division, Case No.: 1:19-cv-767

Contained within this correspondence are my findings and opinions concerning the above captioned case. These findings and opinions are based upon the materials I have reviewed thus far. Of course, I reserve the right to add to or modify my opinion if new information becomes available.

## CREDENTIALS

What follows is a summary of my law enforcement and academic background which, I believe, qualifies me to render expert opinion, analysis, and testimony regarding this case.

I retired from the Miami-Dade Police Department in 2004. My employment with the department spanned 30 years. The Miami-Dade Police Department is the largest law enforcement agency in the Southeastern United States and is the eighth largest metropolitan police department in the entire nation. The vast majority of my career was spent occupying investigative positions such as detective or supervisor of detectives. I was assigned to the Homicide Bureau as a squad supervisor during the final 12 years of my career. Prior to that, I spent 16 years in the Robbery Bureau as both a detective and a supervisor.

At one point in my career, Miami-Dade County had the dubious distinction of being considered "the murder capital of the United States." The U.S. Department of Justice annually recognizes Miami-Dade County as one of most violent jurisdictions in the country. The per capita murder rate in Miami-Dade is consistently well above the national average. I have been personally responsible for more than 500 homicide investigations, thousands of robbery investigations, countless death investigations and scores of Officer-Involved Shooting

investigations. I have been granted expert witness status regarding homicide investigative procedures, robbery investigative procedures (including line-up techniques), and general investigative procedures in both Federal and State (Florida) courts.

In 2006, I was asked to return to the Miami-Dade Homicide Bureau as a paid Cold Case consultant. I was hired to evaluate the 2000+ unsolved murders within the bureau's archives for viable investigative leads. I successfully reviewed more than 400 cold cases and recommended that 65 be reopened.

I was also hired by the Alachua County (FL) Sheriff's Office, in 2011, to audit and assess their homicide cold case files. This evaluation (20 cases) was completed in eight months and investigative recommendations were made in several of the county's unsolved murders.

I have been a certified instructor of criminal investigations courses since 1985. For several years, I conducted an eight-hour seminar for the Southern Police Institute entitled, "How to Conduct Robbery Investigations." This block of instruction placed heavy emphasis on how to properly manage photo lineups and physical lineups.

In 1999, I began teaching a course called "Conducting Death and Homicide Investigations" for the International Association of Chiefs of Police (IACP). The IACP is the largest law enforcement association in the world and has a sterling reputation for providing an exceptional training curriculum.

I have conducted training sessions on homicide investigative techniques for the Department of Justice, the FBI, DEA, the Treasury Department (ATF), the Florida Department of Law Enforcement (FDLE), the Southeast Florida Institute of Criminal Justice in Miami, the Metropolitan Police Institute (MPI) also in Miami, SRR Training in Boston, the Taylor Group in Maryland, and the Public Agency Training Council (PATC) in Indianapolis, Indiana.

I am currently a member of the Public Agency Training Council's Cold Case Committee. The committee provides pro bono assistance to police departments across the country by analyzing unsolved murder cases and recommending new investigative strategies. I have also provided this same service individually to a number of homicide investigators who have sought my help in evaluating suicides, natural deaths, accidental deaths, and homicides.

In 2004, I formed my own company called HomicideTraining.com. HomicideTraining.com offers training in homicide investigative techniques and officer involved shooting investigative procedures to law enforcement agencies

throughout the country. Since the company's inception, I have personally trained more than 7,500 investigators in these specialized methodologies.

I received my Baccalaureate degree (B.S.) in Law Enforcement from Western Illinois University in Macomb, Illinois, and my Masters (M.S.) in Public Administration from St. Thomas of Villanova in Miami. Throughout my career, I have attended a number of homicide schools, including the Metro-Dade Medical Examiner's Office, "Police Medical Investigation of Death", Advanced Homicide Investigations (MPI), and the renowned Colonel Henry F. Williamson Homicide School in Albany, New York, sponsored by the New York State Police. I have also attended a variety of training sessions regarding the use of DNA evidence, including a seminar presented by Bode Laboratories.

## MATERIALS

I have reviewed the following materials in the preparation of this report:

1. Complaint filed under case number 1:19-cv-767 in the United States District Court Northern District of Illinois, Eastern Division.
2. Deposition of Commander Eric Winstrom dated July 13, 2021.
3. Deposition of Sergeant John Pellegrini dated July 26, 2021.
4. Deposition of Michael Cronin dated July 30, 2021.
5. Deposition of Detective Gregory Jones dated March 9, 2021.
6. Deposition of Lisa McDowell dated January 22, 2021.
7. Deposition of Frencshun Reese dated April 18, 2017.
8. Deposition of Eric Blackmon dated July 27, 2021.
9. Deposition of Kenneth Fiedler dated November 18, 2021.
10. Deposition of Eugene Schleder dated March 4, 2021.
11. Deposition of Rimas Cernius dated March 9, 2021.
12. Deposition of Detective James Sanchez dated July 20, 2021.
13. Court testimony of Geoffrey Loftus and Eric Blackmon dated January 14, 2021
14. Trial testimony of Lisa McDowell dated September 22, 2004.
15. Trial testimony of Frencshun Reece.
16. Verdict announcement by Judge Lacy
17. Application for Electronic Surveillance Order No.: 02 ESO-002.
18. Federal Writ of Habeas Corpus Memorandum dated January 27, 2018.
19. Appeal Decision from Circuit Court of Cook County dated September 28, 2007.
20. Appeal Decision from Circuit Court of Cook County dated May 14, 2021.
21. Motion to Suppress Identification Testimony dated April 28, 2004.

22. Chicago Police Department General Order 88-18.
23. Tony Cox Homicide Timeline.
24. Report of Expert Dennis Waller dated September 27, 2021.
25. Chicago Police Department Area File which includes Police Reports, Medical Examiner Report, Crime Scene Photos, Line-up Photos, Police Department's Annual Report, Detective Bureau Standard Operating Procedure and more.

## REFERENCE MATERIALS

I have utilized the following reference materials in preparation of my report; therefore, these materials have influenced my evaluation of this case:

O'Hara, Charles. Fundamentals of Criminal Investigation. Springfield, Charles Thomas Publisher, 2003.

Weston, Paul & Lushbaugh, Charles. Criminal Investigation: Basic Perspectives. New Jersey, Prentice-Hall, 2006.

Shuster, Beth. Police Lineups: Making Eyewitness Identification More Reliable, NIJ Journal (issue number 258), Washington D.C., U.S. Department of Justice, National Institute of Justice, 2007

Mecklenburg, Sherry. Eyewitness Identification: What Chiefs Need to Know Now, Police Chief Magazine, April 2009.

Showups, Photo Identification and Lineups: Concepts Paper, International Association of Chiefs of Police (IACP), Alexandria, Virginia, 1993, revised 2003.

Eyewitness Identification: Model Policy, International Association of Chiefs of Police (IACP), Alexandria, Virginia, Effective Date: September 2010.

Showups, Photo Identification and Lineups: Model Policy, International Association of Chiefs of Police (IACP), Alexandria, Virginia, 1993, revised 2003.

Showups, Photo Identification and Lineups: Training Key #414, International Association of Chiefs of Police (IACP), Alexandria, Virginia, 1992.

Reno, Janet and Fisher, Raymond and Robinson, Laurie and Brenan, Noel and Travis, Jeremy. Eyewitness Identification: A Guide for Law Enforcement Officers, Washington, D.C., U.S. Department of Justice, National Institute of Justice, 1999.

Ashcroft, John, Daniels, Deborah, and Hart, Sarah V. <u>Eyewitness Identification: A Trainer's Manual for Law Enforcement Officers</u>, Washington, D.C., U.S. Department of Justice, National Institute of Justice, 2003.

Reno, Janet and Fisher, Raymond and Robinson, Laurie and Brenan, Noel and Travis, Jeremy. <u>National Guidelines for Death Investigation</u>, Washington, D.C., U.S. Department of Justice, Nation Institute of Justice, 1997.

Parker, Robert. <u>Florida Law Enforcement Handbook</u>, Board of County Commissioners, Miami, 2007.

United States Supreme Court decision, *United States v. Wade*, 388 U.S. 218 (1967).

United States Supreme Court decision, *Kirby v. Illinois*, 406 U.S. 682 (1972)

United States Supreme Court decision, *Simmons v. United States*, 390 U.S. 377 (1968)

United States Supreme Court decision, *Brady v. Maryland*, 373 U.S. 83 (1963).

United States Supreme Court decision, *Giglio v. United States*, 450 U.S. 150 (1972).

United States Supreme Court decision, *Manson v. Braithwaite*, 432 U.S. 98 (1977).

United States Supreme Court decision, *Neil v. Biggers*, 409 U.S. 188 (1972).

United States Court of Appeals, Seventh Circuit. *Coleman v. City of Peoria, Illinois, et al.* 925 F.3d 336 (2019).

<u>Identification Procedures</u>. Rules 42.2.11 and 42.2.12, Commission on Accreditation for Law Enforcement Agencies (CALEA), 2008.

## CASE SUMMARY

On July 4, 2002, at approximately 4:30 in the afternoon, 36-year-old Tony Cox was shot multiple times by two assailants while standing in front of Fat Albert's Kitchen located at 1143 S. Pulaski Road in the city of Chicago. When Chicago Police Department uniform officers arrived on the scene, they observed the victim bleeding profusely from several gunshot wounds to the head. He was attended to by Chicago Fire Department personnel and eventually transported to Mt. Sinai Hospital where he was pronounced deceased.

A review of CPD police reports revealed the following:

A black female who identified herself as 33-year-old **Frencshun Reece** told officers that she had witnessed the shooting. She advised that she was travelling northbound on Pulaski Road in her Jaguar when she observed the victim standing on the sidewalk in front of Fat Albert's Restaurant. Standing with the victim was a white male and two black males. All four of the individuals appeared to be involved in casual conversation. She watched as the white male walked away from the group and appeared to be locking or unlocking the door to the restaurant. One of the black males (Subject #1) was standing to the left of the victim and the other black male (Subject #2) was standing on the victim's right side. As the victim turned to speak with Subject #2, Subject #1 shot the victim in the head. A split second before the victim was shot Subject #2 began running north on Pulaski. After firing the weapon into the victim, Subject #1 also ran north on Pulaski. Reece watched as the victim fell to his hands and knees. The victim was shaking violently and trying to stand up when he fell back on his butt. Apparently realizing the victim was still alive, Subject #1 returned and shot him again. Subject #2 also returned and shot the victim twice in the face. As they fled, both subjects ran directly in front of her vehicle. She would later testify that they were so close that she could have hit them with her car. In fact, her son told her to "ram them." They looked directly at her and fled north on Pulaski toward Grenshaw. Reece then called 911 and pulled her vehicle into an alleyway near the restaurant. She described the offenders as follows:

**Subject #1**- Black male; late 20s or early 30s; approximately 5'5"; 150 pounds; dark complexion; wearing a yellow shirt, dark shorts, white gym shoes and no socks.

**Subject #2**- Black male; in his 20s; approximately 5'10'; 160 pounds; dark complexion; wearing dark shorts and white gym shoes.

The witness's son, 12-year-old **Davious Whitaker** was a passenger in the car. He said he heard four shots and saw two black males run north on Pulaski and then west on Grenshaw. He gave the following descriptions:

**Subject #1**- Black male; medium afro; short; thin; wearing an oversized white shirt, black shorts, and black shoes. He saw him stick a handgun in his waistband.

**Subject #2**- Black male; no further description.

Frencshun Reece also testified that when the second subject returned, he shot the victim right in the eye and as he turned to flee, she saw him nod at the white male who was looking directly at him. She went on to say that the white male prevented

her from rendering aid to the victim and told her not to call 911 because he had already done so. (Phone records later revealed that the white male **did not** call 911). On a taped line Reece told the 911 operator, "Two black males shot another black male. This guy right here, this white guy with me, he can also give a positive ID because he was standing right there. I'm surprised they didn't shoot him."

The white male was subsequently identified as **Richard Arrigo**. He told detectives he was part owner of Fat Albert's and that he has known the victim since February of 2002. Before the shooting incident he said he and the victim were talking inside the restaurant for 20 or 30 minutes. They eventually walked outside because Arrigo wanted to show the victim a new dent on his car. As they were standing on the sidewalk Arrigo said he turned to lock the door to his business and as his back was to the victim, he heard two gunshots. When he looked around, he saw Tony on the ground and watched as a black male shot him two or three more times. He then saw two black males run north on Pulaski to Grenshaw. He gave descriptions of both:

**Subject #1**- Black male; 25-26; 5'8" – 5'9"; muscular build; short Afro; wearing a yellow shirt and jeans.

**Subject #2**- Black male; 20s; 5'6"; medium build; dark complexion; wearing a light blue tee shirt, jeans, and a blue baseball cap.

Arrigo acknowledged that his nickname was "Popeye." He gave permission to Detective Jones to examine his cell phone. He also showed Detective Jones a business card with a phone number (708) 960-0709 on it and "Boonie (house)" written next to it. Arrigo identified a photograph of George Davis as the same person he knew as Boonie. When Detective Jones viewed the call log on Arrigo's cell phone, he determined that Arrigo had placed a call to George Davis, aka: aka Boonie Black, immediately after the homicide had occurred. Investigators were familiar with Davis, aka: Boonie Black, as the leader of the New Breed Street Gang that was active in that area.

Arrigo also called someone at 4024 Grenshaw shortly before the murder. Investigators now suspected that Arrigo may be complicit in a plot to kill the victim[1]. Based on this information, detectives conducted a computer search of the criminal history database for individuals who had recently been arrested and given a home address in the 4000 block of Grenshaw. Seven names emerged as a result of that search and digital photographs of each person were obtained.

---

[1] Bates 5860

Richard Arrigo's phone records were obtained via subpoena and revealed that he did not call 911 as he had told the witness. However, he did call George Davis, aka: Boonie Black at 4:28:09 p.m. The first police car was dispatched to the murder scene at 4:28:15 p.m.; so, Arrigo called Davis even before the first emergency units were notified of the shooting incident.

The subpoena also revealed the following:

> On July 1, 2002, Arrigo called Davis eleven times
> On July 2, 2002, Arrigo called Davis six times
> On July 3, 2002, Arrigo called Davis three times
> On July 4, 2002, Arrigo called Davis nine times (seven of those calls were made shortly after the murder. One of the calls was made immediately following his interview with detectives at Area Four HQ. During that interview he stated that he had not spoken to Davis in weeks).

Between July 1 and July 4, Arrigo either called Cox (victim) or Cox called Arrigo ten times. Arrigo called Davis 58 minutes before leaving a voice mail message on Tony Cox's phone and less than four hours before the murder. A pen register placed on Arrigo's phone indicates that he called Davis 48 times between July 1 and August 12, 2002[2].

Witness, Frencshun Reece, was asked to go to Area Four police headquarters where she was shown the digital photos. From that group of seven she said two photos (Deon Howard and Vincent Williams) resembled the subjects. She also pointed to the hairstyle of one of the individuals in the pictures (Laranes Jackson) and said that it was similar to the way the second subject was wearing his hair.

On July 5, 2002, an autopsy was performed on the victim at the Cook County Medical Examiners' Office. Assistant Medical Examiner Dr. Eupil Choi determined that the cause of death was multiple gunshot wounds and that the manner of death was homicide. Dr. Choi's postmortem exam found that Tony Cox had sustained four gunshot wounds:

1. Through and through gunshot wound to the right ocular angle involving the eye and the brain.
2. Through and through gunshot wound of the right cheek involving the maxillary sinuses.
3. Gunshot wound of the left forehead involving the brain.

---

[2] Bates 6956-6981

4. Gunshot wound to the left forehead involving the brain.

He also suffered a laceration to the back of his head which may have occurred when he fell to the pavement after being shot.

Projectiles that were removed from the victim and shell casings that were collected at the crime scene were submitted to the Illinois state Police crime lab for analysis. The crime lab determined that the casings and the projectiles were fired by two different guns. The casings were ejected from a .25 caliber automatic pistol and the projectiles were fired by a .38/.357 caliber weapon.

A thorough area canvass was conducted by both uniform officers and detectives. Ridgell Lavelle was interviewed at the Hair Fanatics barber shop located next to Fat Albert's Kitchen. Lavelle said he did not see the shooting, but he did tell the detectives that the Jeep, which was parked in front of Fat Albert's Kitchen, was his.

Sherrie Stevenson, the victim's live-in girlfriend, was interviewed by investigators. She told them that on the afternoon of the murder the victim was taking a shower when she checked the messages on his cell phone to see if another woman had been calling him. One of the messages she listened to was from a male with an Italian accent who said it was important that Tony Cox get in touch with him right away. A search warrant was obtained for the voice mail on Cox's cell phone and the message was retrieved. The male voice on the message said, "Yeah Tone, it's Fat Albert. Give me a call buddy. You've got the number. 268-5555 area code 708." That number was known to be the phone number to Richard Arrigo's cell phone. When asked about the message Arrigo initially denied leaving the message; however, when it was played back, he recognized his voice and conceded that it was him on the recorded voice mail.

Stevenson also told investigators that Tony Cox had confided in her about problems he was having with Boonie Black the leader of the New Breed gang. Apparently Boonie Black (George Davis) had loaned $2000 and a quantity of drugs to the victim's cousins, "Darnell" and "L" to open a drug hole in another state. The two individuals never paid back the money or the drugs and Boonie told Tony Cox that it was now his problem and he needed to take care of it. Cox said that he told Boonie he was not going to get involved because "Darnell" and "L" are family.

In an interview with Sophia Jackson, a girlfriend of the victim, Detective Sanchez was told that the victim was "having problems" with "Pops." Jackson knew "Pops" to be the leader of the New Breed gang, George Davis, aka: Boonie Black. Tony Cox told her that Pops had given his cousin "L" and another person $2000 and an ounce of narcotics to start their own drug operation in either Minnesota or Indiana.

Pops was angry because he had not been paid back and he held the victim personally responsible for the loss because they were his friends. Pops told the victim that he either wanted his investment returned or he wanted them shot as punishment. Cox told Jackson that he refused Pops demands. She said that whenever Pops wanted to talk business with Tony, he would arrange to meet him at Fat Albert's on Pulaski. The victim told Jackson he was taking precautions because he knew Pops was angry about the money and drugs and might try to harm him.

On July 9, 2002, an anonymous phone call was received during which an unknown black male stated that "Pride" aka: "Little E" and "Keno" killed Tony Cox. The caller claimed they were driving a red Ford Tempo and still had the guns used in the murder with them. They were last seen in the area of Country Club Hills.

On July 24, 2002, the victim's brother Ethienne Cox was interviewed at the Cook County Jail by Detective Cronin. He said that approximately one month prior to the murder, his brother visited him in jail and told him that Boonie Black wanted to kill "Little L" and "Poo." Tony told his brother that Boonie had given an ounce of cocaine to "Little L" and "Poo" to sell in Peoria, Illinois. Because they had not paid him for the drugs, Boonie Black wanted them killed. Ethienne Cox also told Detective Cronin that another one of his brothers, Xavier Cox, told him he had heard a rumor that "Keno", also known as "Little Mike," and "Pride" were the two black males who killed their brother. He said "Pride's" first name is Eric and both subjects are members of the New Breed street gang.

By conducting various searches through CPD records it was learned that Keno's real name is Michael Davis. Michael Davis is the nephew of George Davis, aka: Boonie Black. Michael Davis' mother is Ruth Davis, who is George Davis' sister.

As part of the ongoing investigation, recordings of the 911 calls were requested by the investigators from the police department's dispatch center. It took several weeks for technicians to compile the information. The analysis of the 911 calls revealed that three females made emergency calls regarding the shooting. One call was from the known witness, Frencshun Reece, and the second was from a woman named Lisa McDowell.

On August 12, 2002, Detective Cronin interviewed Ms. McDowell. She told Detective Cronin she was driving southbound on Pulaski Road when she observed a black male and a Hispanic male standing on the sidewalk in front of a restaurant. She heard a gunshot, turned, and saw the black male had fallen to the ground. The Hispanic male was standing over the victim holding what she thought was a gun in his left hand and a cigar in his right. (It was later learned that the H/M was

holding a cell phone and not a gun). She then saw two black males emerge from the north side of a building and approach the victim. One of the black males was holding a dark colored handgun in his right hand. She watched as the gunman shot the victim twice while he was lying on the sidewalk. She described the subjects as follows:

**Subject #1**- Black male, early 30s; 6'; slender; braided hair; wearing a light blue shirt and dark colored pants. Armed with a dark handgun.

**Subject #2**- Black male; early thirties; 5'9"; slender; wearing a white shirt and dark colored pants.

McDowell described the Hispanic male as; late 40's; 5'10"; 210-220 pounds; with grey hair and a big stomach; wearing a dark green tee shirt and blue jeans. As she continued driving southbound on Pulaski, she looked in her rear-view mirror and saw the two black males run west and then south on Pulaski.

On August 29, 2002, Detective Sanchez interviewed Lisa McDowell and presented her with a photo array containing a picture of the Plaintiff. After viewing the photo display, she positively identified the plaintiff here, Eric Blackmon, as the person she saw shoot the victim and run from the scene.

On August 31, 2002, a photo array containing the photograph Eric Blackmon was shown to witness Frencshun Reece. From that photo array, Reese positively picked Blackmon as the person she saw shoot the victim in the head on July 4, 2002, in front of Fat Albert's Kitchen. She also tentatively identified the photo of Michael Davis as being the other subject involved in the murder.

During this interview Detective Sanchez learned that McDowell's niece, Natasha Conley, was also in the vehicle at the time of the shooting. Conley said she was in her aunt's vehicle traveling southbound on Pulaski Road when she heard three shots. She looked in the direction of the shots and saw a Hispanic male standing over a black male who was lying on the sidewalk. She also saw two black males run north on Pulaski. She said that one of the black males had braids but went on to say that she would be unable to identify either of them.

On September 3, 2002, Richard Arrigo was shown the photo array that contained the photographs of the Plaintiff and Michael Davis. After viewing the photographs, Arrigo stated that the subjects who shot Tony Cox were not in the photo display.

On September 5, 2002, Eric Blackmon was arrested when he attended a court appearance regarding an unrelated case. He was transported to Area Four

Headquarters where he was advised of his Miranda rights. He waived his rights and agreed to be interviewed. He denied his involvement in the homicide of Tony Cox. He claimed that on July 4th he spent the entire day at a Bar-B-Q near Homan Avenue and Douglas Boulevard. He declared that he was not a member of the New Breed street gang but maintained that he was affiliated with Traveling Vice Lords. He said he is known on the street as "Forty" and never frequents the area of Pulaski and Grenshaw.

While the plaintiff was being interviewed contact was made with Lisa McDowell who agreed to come to the Area Four station for the purpose of viewing a live physical line up. The lineup included the Plaintiff, Michael Davis, aka: Keno, and four other individuals. From that corporeal lineup the witness positively identified Eric Blackmon as the same person she watched shoot the victim in the head on July 4, 2002.

Two hours later, Witness Frencshun Reece viewed the same corporeal lineup and positively identified the Plaintiff as the person she watched shoot the victim as he was lying on the sidewalk in front of Fat Albert's Restaurant on July 4th. Reese's son Davious Whitaker positively identified Michael Davis, aka; Keno, as the other individual who shot the victim. He did not identify the Plaintiff.

Assistant State's Attorneys Jim Murphy and Rimas Cernius responded to Area Four to conduct a review of the case to determine if formal charges against the two identified subjects were warranted. The ASAs interviewed the witnesses at length regarding the murder and their positive identifications. A decision was made by the attorneys to not initiate formal charges for Blackmon or Davis until speaking with Richard Arrigo and Lisa McDowell.

On September 8, 2002, Richard Arrigo was present at Area Four for a live lineup that included the Plaintiff, Michael Davis and four others. Arrigo did not identify any of the participants in the lineup.

Later that same evening, ASA Kenneth Fiedler and Detective Jones responded to Lisa McDowell's residence where she was re-interviewed. She also furnished a written statement detailing what she saw occur during the murder. After evaluating all of the evidence, the State Attorney's Office approved the filing of formal charges of First-Degree Murder against the Plaintiff. No charges were filed against Davis.

On September 10, 2002, a traffic stop was conducted on a vehicle driven by Richard Arrigo. The passenger in the vehicle was George Davis, aka: Boonie Black, the purported leader of the New Breed street gang.

Federal Prison inmate Terrence Boyd was interviewed by ASA Rimas Cernius and Detectives Jones and Schleder on July 16, 2004. Boyd was incarcerated awaiting sentencing after having been convicted of perjury. He claimed that he witnessed the murder of Tony Cox. He alleged that he saw "Eric" and "Pride" shoot the victim multiple times while he was on the ground. He said that Eric had a tattoo on his neck that spelled "LEAH." When Boyd was asked to describe the scene and the events that took place during the shooting, his account was inconsistent with the facts. He stated that there was only one shooter, and that George Davis, aka: Boonie Black, was present at the time of the murder. He made no mention of seeing a white male (Richard Arrigo) standing near the victim. (He eventually related his version of the incident at the trial). Investigators did locate an individual named Eric Bridges in the criminal database that had the tattoo "LEAH" on his neck; however, Bridges' physical description differed from those provided by the witnesses of Shooter #2. Bridges is listed as 5'7" and both witnesses described the second shooter as 5'10" to 6 feet.

On September 22, 2004, the Plaintiff went to trial in the Circuit Court of Cook County. The Plaintiff opted for a bench trial and Judge William Lacy presided over the proceedings. As a result of that trial the Plaintiff was found guilty of First-Degree Murder and sentenced to sixty years in prison.

On April 7, 2011, the Plaintiff filed a petition for writ of habeas corpus in the U.S. District Court of Northern Illinois. The petition was dismissed by the District Court; however, the Seventh Circuit Court reversed that decision and remanded for an evidentiary hearing. Finally, on February 7, 2018, District Court Judge Ronald Guzman granted the petition solely on the issue of ineffective assistance of counsel and ordered the Plaintiff free on bond pending any retrial.

On January 16, 2019, the State of Illinois dismissed all charges and announced that the case would not be retried. No reason was given by the state as to why the Plaintiff would not be required to face trial once more.

## THE COMPLAINT

The complaint alleges Plaintiff was wrongfully convicted as a "direct result of police misconduct and in accordance with the unlawful pattern and practices of the Chicago Police Department." It further alleges that the Plaintiff's conviction for First-Degree murder was "wrongful" and "rested solely upon evidence fabricated by the Officer Defendants' false eyewitness identifications of Mr. Blackmon during tainted lineups." Additionally, the complaint alledges that the Officer Defendants

withheld and destroyed critical evidence that would have proven the Plaintiff's innocence.

Further the complaint alleges that the Officer Defendants: fabricated false evidence, engineered tainted lineups that were unduly suggestive, intentionally ignored material information, egregiously failed to investigate the case properly, and finally lacked motive and probable cause to arrest the Plaintiff.

**I reject these assertions. As an experienced homicide investigator, it is my opinion that the investigation into the murder of Timothy Cox undertaken by the Chicago police department homicide investigators was properly conducted and clearly developed sufficient probable cause to justify the arrest of Eric Blackmon.**

The complaint further implies that the investigation was shoddy, exculpatory evidence was withheld or ignored, suggestive or improper lineup procedures were utilized, and that the named police officers perjured themselves while actively suborning the perjured testimony of the witnesses.

**I also reject these assertions. As an experienced homicide investigator, it is my opinion that the overall investigation conducted by the Chicago Police Department's homicide detectives into the murder of Timothy Cox was consistent with generally established and accepted investigative practices in place in 2002.**

**It is also my opinion that the photographic and live lineup identification procedures utilized by the Chicago Police Department's homicide investigators were appropriate, legally sufficient, properly conducted, and consistent with all generally accepted and established investigative practices in place in 2002.**

**THESE OPINIONS ARE BASED ON THE FOLLOWING ANALYSIS:**

Let me first address the issue of probable cause. Throughout their careers, law enforcement officers are indoctrinated on the issue of probable cause. From the police academy on, the subject of what constitutes probable cause is continually examined. Black's Law Dictionary maintains that "probable cause exists when the facts and circumstances known to police are such as to justify a belief in the mind of a reasonable person that a crime is being, or has been, committed by the individual who is about to be arrested."

There is absolutely no doubt that probable cause existed for the arrest of Eric Blackmon. Any assertions to the contrary are misguided and have no basis in the accepted standards of police work. As soon as Lisa McDowell picked Blackmon out of the six-photograph array, probable cause to arrest him was created. This does not, however, mean that an immediate arrest should have been made just because probable cause had been minimally established. The ultimate decision to bring formal charges in any homicide investigation, in most jurisdictions, rests solely with the prosecutor. Based on my four decades of experience as an investigator and based on the evidence available to the CPD investigators at the time, probable cause did exist.

In over 30 years as a detective, I have worked with dozens of prosecutors at both the state and Federal levels. Without exception it is the prosecutor who decides if a case has merit and if it will proceed or not. The investigator's role is to pursue all available leads and if possible, develop sufficient probable cause to make an arrest. The prosecutor, though has the added burden of accepting cases, and formally charging a suspect, only when he or she ethically believes the case can be presented to a jury. In homicide cases this duty is elevated, and it is nearly always the prosecutor who makes the call whether the suspect will be charged or not.

That is exactly what occurred in this case. The investigators developed additional probable cause when Frencshun Reese identified the Plaintiff. The live lineups in which both McDowell and Reese positively identified the Plaintiff bolstered the probable cause even more. However, it was the prosecutors who, after a formal felony review of the evidence, and interviews with the witnesses, decided to proceed with the charges. It was not the homicide detectives who made the decision to formally charge the Plaintiff, it was the prosecutors. The detectives simply presented their findings to the prosecutors. In fact, the same prosecutors concluded that Michael Davis would be released and not charged even though the detectives had developed sufficient probable cause to also arrest him.

Once the arrest is made, after the State's Attorney's Office accepts the case, the whole dynamic of the investigation changes. The case now becomes the prosecutor's responsibility to evaluate. Any physical evidence, admissions by the defendant, eyewitness testimony, identification procedures, seizures, searches, and all other facets of the investigation are now assessed by the prosecutor for legal sufficiency. They will also independently interview the witnesses to determine their veracity. I can recall several cases I handled where the prosecutor declined to continue the prosecution after scrutinizing the evidence. Charges are then dropped, and the defendant is released from custody. It has been my experience that prosecutors have no qualms about dumping cases that are questionable. By

my count, at least five prosecutors (Murphy, Cernius, Fiedler, McCarthy, and Walowksi) reviewed all aspects of this case, determined it to be legally sound, and agreed that it should proceed to trial.

After the formal charges are made, it is the prosecutor who now controls the investigation as it proceeds forward. All decisions about how any new leads are managed becomes the province of the prosecutor. That is why the Plaintiff's criticism of the detectives for not showing the photograph of Eric Bridges to the witnesses is misplaced. ASA Rimus Cernius was present for the interview with Terrence Boyd at the Metropolitan Correctional Center. After the interview, the investigator's located a photograph of the same Eric Bridges, Boyd referred to and immediately notified Mr. Cernius. This is clearly stated in a police report authored by Detective Jones:

> *On Monday 19-Jul-2004, the reporting detectives informed ASA REMUS CERNIUS of the newly discovered information[3].*

If Mr. Cernius thought it was necessary to show a photo of Bridges to the witnesses he would have undoubtedly instructed Detective Schleder or Jones to do so. At this point it would have been inappropriate for the detectives to show the photo on their own without first checking with one of the prosecutors. It is the prosecutor who decides on any investigative strategies while the case is being prepared for trial. As a homicide supervisor I have been required to discipline subordinates who acted unilaterally without first clearing their actions with the prosecutor.

As to motive, something that is repeatedly referred to by the Plaintiffs expert in his report. There is no legal requirement to ascertain the defendant's motive (or motives) in a homicide case. Motive, means, and opportunity are sometimes referred to as the "categorical trinity" of homicide investigations. Proof that the defendant had the means and the opportunity are generally required to convict.

## IDENTIFICATION PROCEDURES

Even though eyewitness testimony is and always has been vital to the prosecution of criminals, the criminal justice system has long been aware of the fallibility of eyewitness identifications. Police investigators who deal with eyewitnesses frequently know that, while many are extremely accurate in their perceptions and recognitions, others tend to be unreliable. As stated by Charles O'Hara in his book, Fundamentals of Criminal Investigation, "Years of unfortunate experience have

---

[3] Bates 233

instilled in the investigator a deep-seated suspicion of the reliability of eyewitnesses."

Because of this longstanding skepticism, the courts have established certain guidelines to ensure that witness identification procedures are conducted fairly and impartially. Since most witnesses have a genuine desire to see to it that the perpetrator of a violent crime is brought to justice, they may be overly influenced by subtle suggestions communicated to them during the identification process. In United States v. Wade, the Supreme Court of the United States recognized this fact by stating:

> The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor.  Perhaps it is responsible for more such errors than all other factors combined.

In Simmons v. United States, though, the court opined:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement.

Therefore, in order to prevent erroneous eyewitness identifications during photo displays and live-physical lineups, the courts have established standards and criteria delineating what is acceptable and what is not. Police investigators are constantly schooled on these distinctions. National police practices rigidly adhere to these touchstones and most of these standards have not perceptibly changed in the last 50 years. The courts have also provided a conclusive method to safeguard the integrity and propriety of the identification procedure and that is the suppression hearing.

In this case the Plaintiff's defense attorney inexplicably withdrew his Motion to Suppress the identifications. In a murder case where the only evidence implicating the defendant was eyewitness testimony, it is indeed puzzling that Mr. Cowan would not even attempt to challenge the validity of the identifications. If the lineups were so suggestive and the manner in which they were shown to the witnesses so flagrantly flawed, why would he have elected to withdraw his motion? The propriety

of the identification procedure can be found in the fact that the motion to suppress was withdrawn by the Plaintiff in his criminal case.

The same must be said for the prosecuting attorneys, who obviously had no reservations about bringing the case to trial. Homicide investigators rely on prosecutors and legal practitioners for advice and direction regarding the law. Since none of these legal experts expressed any opposition to the actual lineups or the manner in which they were presented, it can only be assumed that they considered the actions of the detectives to be proper and legally acceptable

Photo displays and live-physical lineups are investigative tools that serve a dual purpose. First, they are utilized to correctly identify the perpetrator of a crime, and secondly, they are utilized to exonerate an innocent party incorrectly or falsely accused of a crime.

When the name of a suspect surfaces during an investigation, it is the duty of the lead investigator to determine if the information he has been given is valid or not; not only to identify the perpetrator but to ensure that an individual who is completely innocent is not wrongfully accused. The most expeditious way to accomplish both goals is for the accuser to view a photograph of the named person. This has been a basic principal of criminal investigations for over a century.

Plaintiff contends, in his complaint, that the Plaintiff's photograph should not have been included in the photo arrays shown to the witnesses because there is no verifiable information that links him to the crime. The complaint further maintains that it is the Plaintiff's belief that he was merely a filler in the photo displays and therefore the identifications should be nullified. These claims have no valid foundation in legality or accepted investigative practices. There is no requirement to establish probable cause or even reasonable suspicion in order to show a photographic lineup of an individual to a witness.[4] Investigators often show photo displays to establish suspects. I have done it myself. In a robbery investigation, for example, if the description of the offender furnished by the victim or witnesses "sounded like" a subject I was familiar with, I would pull that person's picture from my working file and compose an immediate photo array to be viewed by the witnesses. If the MO of the crime was similar to a previous case I had investigated, I would do the same thing.

Photo line-ups are routinely shown to victims and witnesses that result from an anonymous phone call or even a Crime Stoppers tip. There is no legal requirement

---

[4] COLEMAN v. CITY OF PEORIA, ILLINOIS, et al. 925 F.3d 336 (2019). "The U.S. Constitution does not mandate that photo arrays and lineups meet a certain standard of quality."

that an investigator disclose why an individual has been included in a photo array. But failure to act when receiving information can have adverse consequences. As any seasoned investigator is aware, failure to act responsibly to any accusation can be detrimental if it is later discovered that the individual, they neglected to follow-up on, is the actual perpetrator; or even worse, if that person committs another violent offense (murder, rape, robbery). Therefore, the most prudent course of action, many times, is to compile and show a photo display to determine if the person named is, or is not, the subject who committed the crime.

In the first photo array shown to Frencshun Reece, all seven of the photographs were of males who had recently been arrested in the 4000 block of Grenshaw. It could be argued that those depicted in that array were all fillers and all suspects simultaneously, because there was not any specific target in the lineup. This is a standard investigative tactic.

I have shown thousands upon thousands of photographs to witnesses over the years. Based on my experience with photo arrays and witnesses, the fact that Reece picked out two photographs of individuals that *resembled* subject #2 indicates to me that she probably possesses a discerning eye and is not inclined to positively identify the first photograph she sees that vaguely looks like the perpetrator.

As a robbery detective, I routinely carried stacks of photographs in my briefcase. These photographs were separated by geographical area and comprised of known robbers who were active in a particular region of the county. This was commonly referred to as a "working file." Mugshots were continually added and removed from these stacks. Victims and witnesses were routinely shown these groups of photos to see if they could identify the person who robbed them. Some of the stacks contained as few as 10-12 photos, others 50 or more. The photos in these stacks, therefore, could be considered both suspects and fillers. Identifications that resulted in the arrest of a perpetrator were often made from this working file. The courts are more concerned with how **reliable** the identification is, rather than how the photographs were compiled.

As mentioned previously, due to the shortcomings of eyewitness identification, the courts and the law enforcement profession have created general requirements when presenting the photograph of a crime suspect to a witness. In 1999, the National Institute of Justice made the following recommendations regarding photo arrays and live lineups:

**Photo Array (Simultaneous or "six pack")**

- Include only one suspect in each identification procedure.

- Select fillers who generally fit the witness's description.

- If multiple photos of the suspect are reasonably available to the investigator, select a photo that resembles the suspect description or appearance at the time of the incident.

- Include a minimum of five fillers (non-suspects) per identification procedure.

- Create a consistent appearance between the suspects and fillers with respect to any unique feature (e.g., scars tattoos) used to describe the perpetrator by artificially adding or concealing that feature.

- Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly in the lineup.

- When showing a new suspect, avoid reusing fillers in lineups shown to the same witness.

- Ensure that no writings or information concerning previous arrests will be visible to the witness.

- View the spread, once completed, to ensure that the suspect does not stand out.

- Preserve the presentation order of the photo lineup. In addition, the photos themselves should be preserved in their original condition.

The NIJ also emphasizes that the lineup should not be "too good"; meaning, the lineup should not defeat its own purpose by making the fillers and the subject so closely resemble one another that any identification would be impossible. According to the NIJ:

> **Complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar**

*with the suspect might find it difficult to distinguish the suspect
from the fillers.*

## Live Lineup (Simultaneous viewing)

Regarding the live-physical lineup, many of the same recommendations apply as they do to the photo display. According to the National Institute of Justice, when composing the live lineup, the investigator should:

- Include only one suspect in each identification procedure.

- Select fillers who generally fit the witness' description of the perpetrator.

- Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case.

- Include a minimum of four fillers (non-suspects) per identification procedure.

- Create a consistent appearance between the suspects and the fillers with respect to any unique or unusual feature (e.g., scars, tattoos).

Again, as in the photo display, the NIJ cautions against composing a lineup in which the participants all look identical:

*Complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers.*

It should be emphasized that these were nothing more than **recommendations** by the NIJ and that they were implemented in 1999. These United States Department of Justice guidelines have remained constant since the manual was published in 1999.

## Photo Arrays

In my experience, when witnesses are presented photo displays, they are keenly aware of the importance of the process. They realize they are making a serious

accusation; one that could result in the arrest and lengthy incarceration of an individual. They are also acutely aware that they may be required to confirm their selection, under oath, in a public court of law. They are deeply concerned about any reprisals or retaliations that may result from their involvement in the process.

The Courts are fully aware of how difficult an undertaking this can be and have consistently ruled accordingly. The Courts have long held that it is the "totality of the circumstances" that dictates whether or not an eyewitness identification is acceptable. **In the landmark decisions, Neil v. Biggers and Manson v. Braithwaite, the Supreme Court ruled that even if a lineup is suggestive, it can still be viewed as reliable and, therefore, admissible; it is the totality of the circumstances that determines if it is reliable or not.** Nationally recognized police standards and training are tailored accordingly.

The Court has also indicated that when evaluating reliability, one factor that should be considered is the "level of certainty of the witness." By evoking this level of certainty standard, the Court is obviously acknowledging that there are different degrees of identification that may still be acceptable. Police investigators are trained to evaluate and consider the certainty and reliability of witnesses.

Here both witnesses were initially alerted to the incident by the sound of gunfire. This undoubtedly heightened their "degree of attention" and awareness. The degree of accuracy by the witnesses in describing the event was considerable. Both witnesses testified that they heard four gunshots and that they were fired from close range. This is confirmed by the postmortem examination report that indicates that the victim suffered four gunshot wounds and gunpowder tattooing was present on the wounds[5]. Witness Reece was even more specific:

> *"The victim turned around and looked at him with a face like: Oh my God. And then he shot in his ear. He grabbed his head and went down to the ground and tried to get back up."*

> *"He had the victim by the shoulders to keep him from getting up and he shot him. He fell backwards. And when he fell forwards, this guy still had his hand on his shoulder and he crossed[6] down on one knee and he shot him in his neck and blood started shooting out on the right side of his neck."*

---

[5] The autopsy also confirms that there were two shooters as claimed by the witness.
[6] Probably "crouched."

*"He bent all the way down and shot him point blank in his eye."*[7]

What is remarkable about Reese's account is that it conforms exactly to the autopsy report regarding the placement of the wounds. The victim **was** shot directly in the eye and to the side of his neck as she described. This uncanny accuracy enhances her standing as a witness. I would argue that her abilities of observation are far above average.

Both witnesses were certain of their identifications and this certainty was exhibited numerous times: (1) to the detectives, (2) to the prosecutors, (3) to the grand jury, and (4) to Judge Lacy. In fact, witness McDowell is still positive of her identification today, twenty years later.

Both witnesses had ample opportunity to view the suspects, during the commission of the murder, and as they fled from the scene. The fact that the subjects returned to the scene to shoot the victim again allowed for an even longer look. The average witness is only afforded one chance to observe the subject.

When I viewed the crime scene photographs, I was surprised by how narrow Pulaski Road actually is. After reading the depositions, I was under the impression that it was a much wider thoroughfare. In my opinion, the photos validate the witnesses' statements and confirm that they could accurately survey the crime scene from their vehicles.

The descriptions furnished by the two witnesses were strikingly similar:

**Reese** - Black male; in his 20s; approximately 5'10'; 160 pounds; dark complexion; wearing dark shorts and white gym shoes.

**McDowell** - Black male, early 30s; 6'; slender; braided hair; wearing a light blue shirt and dark colored pants. Armed with a dark handgun.

Defense attorneys are generally enamored with witness descriptions, distances, and time. When confronted with a seemingly insurmountable case presented by the prosecution and with no evidence to the contrary, many defense attorneys will resort to attacking discrepancies in these areas. Admittedly, this is a valid method used to impeach a witness' credibility, but years of interviewing thousands of witnesses has taught me that they are rarely accurate in their descriptions or their estimates of time and distance. Mr. Cowan, the Plaintiff's defense attorney during

---

[7] Bates 5936-5938

the trial, used these very tactics repeatedly when questioning the witnesses and Judge Lacy rejected them.[8]

My 30 plus years of experience as an investigator has taught me that there are many factors that enter into the equation when considering the accuracy of witness descriptions. Tall people tend to perceive others as shorter than they actually are, and vice-versa, short people tend to perceive others as taller. An older person will have a much more difficult time affixing an estimate of age to a younger person. An individual running will appear shorter because they tend to lean forward. A witness standing on a platform will often conclude that a subject is shorter. A person seated in a vehicle will have a more difficult time estimating the height of a subject. A person standing will appear taller to someone sitting in a chair or lying on the ground, etcetera, and etcetera.

Skin tone is also highly subjective. "Light skinned" to one person might be "bright skinned" to another, or "medium complexioned" to another, or "high yellow" to another. Lighting conditions can have a profound effect on how skin tone is perceived.

As a homicide investigator, after obtaining a physical description from a witness, I would routinely ask, "How tall do you think I am? How much do you think I weigh? How old am I?" Very often I would be stunned by the responses. But in the sterile environment of the courtroom, a witness who has misjudged the defendant's height by one or two inches can easily be made to look unreliable. Not everyone is capable of making precise estimates. The average witness just does the best that he or she can do. Human nature dictates that not all witnesses will agree on every point. Any absence of variations in the witnesses' accounts would be suspicious.

The foremost reason why witness descriptions are obtained at the scene of a crime is for the issuance of a BOLO. A BOLO is a bulletin, broadcast over the police radio, which describes the offender and alerts all police officers in the area to "Be On the Look Out" for a particular person. All police officers are trained to issue a BOLO description over the police frequencies promptly. This is a basic tenet of police work: to obtain the BOLO information and circulate it as expeditiously as possible, hoping that the offender will be apprehended quickly. It is indeed ironic that this information, sometimes obtained with great haste, can be later used to challenge the credibility of the witnesses.

The time that elapsed between the murder and the first photo identification by Lisa McDowell is 56 days. While this is admittedly longer than most homicide detectives would like, it does not nullify the witness's ability to be certain. The delay in receiving the 911 call tapes prolonged the time it took to locate witness McDowell;

---

[8] Bates 4636-4637

however, her identification can still be deemed reliable. Her trial testimony indicates that she was positive of her selection and that she was not pressured or told which photograph to choose:

> *Q. And when you marked this photograph what did you tell the detectives that the individual did that you were identifying?*
>
> *A. That was the person I saw shoot the gun.*
>
> *Q. And shoot the victim on the street, is that right?*
> *A. Yes, twice.*
>
> *Q. Ma'am, at any time that day when detectives were at your home, did they in any way suggest to you or tell you who you should be picking out of those photographs that they showed you?*
>
> *A. No.[9]*

There is similar trail testimony from Frencshun Reese:

> *Q. And, Miss Reese, when Detective Jones showed you the pictures, first the night that this happened and then again when he came to your house in a car, did he tell you who to pick out?*
>
> *A. No.[10]*

It is not unheard of for dependable identifications to be made weeks, months, even years, after the crime. I was researching cold cases at the Miami-Dade Police Department in November of 2006 when a University of Miami football player, was shot in the head and killed by a gunman who fled on foot. Only one person, who just happened to be driving by the shooting scene, witnessed the crime. Fifteen years later (2021) that witness positively identified the gunman from a photo array, and he was charged with First-Degree murder.

**In my opinion, the totality of the circumstances renders both identifications reliable. The detectives' acceptance of these identifications as reliable is consistent with nationally recognized police standards and training in place in 2002.**

---

[9] Bates 4252
[10] Bates4173

**I have viewed the photo array shown to witnesses Reece and McDowell and find it to be fair and not "improperly suggestive" or "tainted" as the Complaint maintains. The photo array itself, and the method in which it was generated and presented, complies with nationally accepted police standards and training in place in 2002.**

It has been my experience that witnesses typically do not identify suspects in a lineup from articles of clothing, hair styles or facial hair; they identify facial features. Clothing, hair styles and facial hair are inconstant and can be easily changed.

Hypothetically, if a witness or victim described a perpetrator as wearing a number "12" Green Bay Packers jersey, and the subject of the lineup is wearing a number "12" Green Bay Packers jersey, this would certainly warrant a challenge of the lineup during a Suppression Hearing. But this would not necessarily nullify the lineup. If the witness could convince the presiding judge that the jersey had no influence on his or her selection, the photo spread would be considered reliable and, therefore, allowed as evidence. Again, the "totality of the circumstances" prevails.

In this case the Plaintiff alleges that he was the only person with braids in the photo array. When I first viewed the photos, I was somewhat puzzled because the hair style Eric Blackmon was wearing was not what I would refer to as braids but "rows" or "cornrows." In fact, the victim, Tony Cox had the exact same hairstyle, and it was described in the autopsy report as cornrows. In the first photo array Reece was shown, William Hall's hair was in braided cornrows. Neither witness ever stated that the braids had any influence whatsoever on their identifications. **Live Lineup**

When photo arrays are the only evidence linking a suspect to a crime it is advisable that a live physical lineup be conducted as soon as possible. Admittedly, the witness could be influenced in his/her choice by having seen the photograph of the suspect previously, but the value of the witness being able to view the accused in person far outweighs any of these concerns.

Photographs can be deceiving, even to the best witness. There is no better method for witness identification than a face-to-face confrontation with other individuals in a live-physical lineup. Many jurisdictions insist that whenever a photo display is the only probable cause connecting a suspect to a crime, and an arrest has been made, that a live-physical lineup must be held. The photo lineup establishes the probable cause to affect the arrest, and the live lineup is then used to confirm or invalidate that identification.

I have conducted scores of live-physical lineups during my career. On a few occasions, witnesses, upon viewing the suspect in person, failed to make any identification (even though they had already chosen the suspect in a previous photo spread). In these instances, all charges are dropped, and the suspect is immediately released. On other occasions, witnesses/victims have told me, "Detective, from the photograph that I saw, I was sure that he was the person who robbed me…but now that I see him in person, I know that's not the man."

Thus, the live-physical lineup is a valuable investigative tool that, when used properly, safeguards the innocent, and ensures that justice prevails. It also serves to reassure the investigator that no mistakes have been made.

The difficulty that always exists with live lineups is locating sufficient fillers or foils. The supply of stand-ins is usually limited by the number of prisoners in the local lock-up. It is possible to use volunteers, but most people are not eager to participate in such a procedure.

The Plaintiff contends that the lineup in which he was identified was suggestive because he was the only person with braided rows in his hair. The lineup was shown two months after the murder occurred. Just as with photo arrays, witnesses make identifications based on facial features, not hair styles, facial hair, or clothing, which can change over time. None of the witnesses who viewed the live lineup indicated that it was the Plaintiff's hairstyle that they identified or were drawn to. Again, it is the totality of the circumstances that prevails.

**The complaint alleges that the photo array and the live-physical lineup were suggestive. Judge Lacy decided they were not. It was ultimately his decision to allow the lineups to be introduced into evidence during the trial, and to allow the testimony of the witnesses. In announcing his verdict Judge Lacy said that the identification procedures, "were in no way suggestive in nature, and that they were conducted in an almost pristine manner."[11] I concur with Judge Lacy. The lineups were not unduly suggestive or prejudicial and complied with generally accepted police practices in place in 2002.**

In addition, attorneys for the Plaintiff filed two separate appeals to the Appellate Court of Illinois First Judicial District. In both of those appeals, nothing was mentioned regarding any improprieties by the homicide investigators or any deficiencies in the lineups or the lineup procedures. A writ of habeas corpus was

[11] Bates 4638. He also stated. "As to Miss McDowell and Miss Reese, I am struck by the level of certainty that they showed while testifying as to the identity of the second shooter. They expressed confidence in their previous identifications in the photo array and the lineups. Both witnesses withstood an extensive and vigorous cross-examination. They did not waver in any way.

filed in Federal court by the Plaintiff which also made no mention of any wrongdoing by the detectives or errors in the identification process.

## In-Court Identifications

The criminal justice system is highly proficient at weeding out the prevaricator. The whole process from beginning to end is designed to ensure that the truth will prevail. The endless interrogation of witnesses by investigators, defense attorneys, prosecutors, and judges, has been conceived to safeguard the rectitude of the system.

A vital element of this paradigm is the in-court identification. Although admittedly highly suggestive, courts have long felt that even the most devious witness would crumble before entering a courtroom and, under oath, point out an innocent person.

Both witnesses made in-court identifications during the trial.

## Frencshun Reese:

> Q. Now Miss Reese, I'm going to have you look in this courtroom. The person you saw come back to the victim and lean over him and shoot him in the eye, do you see that person in the court today?
>
> A. Yes
>
> Q. Can you please point him out and describe what he's wearing in court today? What is he wearing in court today?
>
> A. A beige jumper.
>
> MS. WASLOWSKI: May the record reflect an in-court identification of the defendant?
>
> THE COURT: The record may so reflect[12].

## Lisa McDowell:

> Q. Ma'am, I'm going to ask you to take a look around the courtroom and tell me if you see the individual that you saw with the dark colored

---

[12] Bates 4172

*gun in his right hand firing two shots into the body of the victim on the sidewalk on Pulaski that day.*

*A. Yes.*

*Q. Okay. Can you indicate an article of clothing that he is wearing? Where is he sitting?*
*A. He is sitting to my left.*

*Q. Okay. What is he wearing, ma'am?*

*A. A beige jump suit.*

*MR. MCCARTHY: Judge, may the record reflect the in-court identification of the defendant?*

*THE COURT: The record may so reflect.[13]*

## Investigative issues

The Complaint and the Plaintiff's expert imply that the homicide investigation undertaken by the Chicago Police Department detectives into the murder of Tony Cox was inferior, and "slanted". Mr. Waller opines that:

*"Detectives Sanchez, Jones and Schleder failed to conduct a thorough and complete investigation into the death of Tony Cox.[14]*

*The involved detectives conducted an investigation that was neither objective nor thorough. They fabricated evidence designed to implicate Mr. Blackmon to clear the case instead of working diligently to determine the truth about what happened."[15]*

### I disagree.

In fact, I believe that the Tony Cox homicide investigation actually exceeded the established criteria for what was generally accepted as proper homicide investigative techniques for that time period.

---

[13] Bates 4243-4244
[14] Waller report page 20.
[15] Waller report page 28.

A review of the investigator's reports, and their testimony at the trial, leads me to conclude that the detectives simply followed the investigative leads to their conclusion; and if those leads resulted in the disclosure of exculpatory evidence that benefitted the Plaintiff, they were not hesitant to include that information in their reports. For example, the fact that eyewitness Richard Arrigo did not identify Eric Blackmon in either the photo array or the live lineup is fully divulged. The non-identification of Mr. Blackmon by Davious Whitaker is also included. Moreover, the interview with Terrence Boyd in which he claimed to be a witness to the shooting and gave information that led to Eric Bridges, is also fully documented, as is the fact that Boyd failed to identify Mr. Blackmon from a photo array. The interviews with Kenya Pittman and Torrance Williams who furnish the nickname "Cameo" to the detectives are documented. They also faithfully recorded in their reports that Mr. Blackmon denied killing Tony Cox, denied knowing Michael Davis, and claimed to be at a Bar-B-Q at the time of the murder.

There is every indication that the investigation conducted by the named detectives was typical for that era and was diligently and thoroughly pursued.

Homicide investigations can be complex, confounding, and at times, overwhelming. Law enforcement and society both view murder as the ultimate crime. Generally, the most seasoned, skilled, and experienced investigators are assigned to death investigations. Homicide investigations are a blend of art, science, and craft. They require finesse, deductive reasoning, sound judgment, exceptional communication skills, and complete dedication.

This is a crime that receives no input from the victim. The investigator must literally start from scratch and follow the clues to their successful conclusion.

I say all of this to emphasize how intricate and formidable homicide investigations can be. Consequently, there is no such thing as a flawless murder investigation. The sheer enormity and duration of these cases guarantees that mistakes do, in fact, occur. Mistakes are inevitable and are many times magnified by the carping scrutiny of "armchair quarterbacks." The goal, of course, is to keep mistakes to a minimum and to always safeguard the integrity of the case.

That being said, there is, however, a minimum baseline, an accepted standard, if you will, that investigators must adhere to. After reviewing all of the police reports generated by the Chicago Police Department homicide investigators involved in the Tony Cox murder investigation, I can only conclude that they either met or surpassed these generally accepted practices.

The critical junctures of a competent homicide investigation include:

- Securing the crime scene and making it safe.
- Preserving the crime scene.
- Photographing the crime scene.
- Obtaining a search warrant to enter the crime scene (if necessary)
- Documenting the crime scene.
- Properly impounding evidence.
- Properly submitting items of evidence to the crime lab
- Conducting an area canvass
- Separating and interviewing witnesses
- Issuing a BOLO (Be On The Lookout)
- Identifying the victim
- Notifying the victim's next of kin
- Reviewing the autopsy
- Securing an arrest warrant
- Locating and arresting the subject (if known)
- Interrogating the subject
- Recording any confession or statement
- Completing the required reports
- Presenting the case to the prosecutor
- Testifying in court

All of the above were adequately accomplished by the homicide detectives in this case. They then ventured into areas that exceeded the typical homicide inquiry. They secured subpoenas for phone records and voice mail. They monitored a pen register and eventually applied for and received a court order to establish a wiretap. These actions are far above and beyond what is expected in the average murder investigation.

**For these reasons, it is my opinion that the investigation into the homicide of Tony Cox by the Chicago Police Department and in particular by Detectives Schleder, Jones, Sanchez, Cronin, and Pellegrini, was more than properly conducted and was consistent with all generally established and accepted investigative practices in place in 2002.**

**Further, it is also my opinion that there is no justification to contend that the named detectives engaged in any type of conspiracy to falsely accuse Mr. Blackmon of murder. Indeed, their reports contain many exculpatory entries.**

## CONCLUSION

The vast majority of the allegations of impropriety on the part of the homicide detectives mentioned in the complaint come from two sources: Richard Arrigo and Frencshun Reese.

Arrigo is clearly not credible. Any novice homicide investigator reviewing the facts of the case would conclude that he was complicit in the murder of Tony Cox. He seemingly lured the victim to his restaurant the day he was killed and then lied about it. Arrigo was clearly in league with George Davis, aka: Boonie Black, leader of the New Breed street gang, who had a "beef" with the victim and had previously threatened him. This close affiliation between Arrigo and Davis would plainly invalidate any of Richard Arrigo's allegations regarding the investigation because he had a vested interest in undermining it. The fact that he did not identify anyone in the photo array, or the live lineup, is not surprising.

Reese was a solid witness in front of the grand jury and at the trial. The fact that she recanted her story nearly 20 years later does not diminish the impact of that testimony. There are a variety of reasons why a person may disavow previous statements to the police, but the fact remains that she swore that she was telling the truth then, and now swears that it was not the truth. Reese now asserts that she first noticed Eric Blackmon's photograph while perusing "mug books" at Area Four Headquarters the night of the murder.

The complaint states that when Detective Jones and Schleder showed her the Blackmon photo array:

> *"They falsely reported that Reece identified Blackmon as one of the offenders. What Reece actually told them was that she only recognized Mr. Blackmon's photograph as one she had previously viewed in the mugshot book on the night of the shootings. She further explained to them that she did not recognize Mr. Blackmon as one of the assailants."*

This is completely contrary to what she told the prosecutors, swore to the grand jury, and swore to Judge Lacy during the trial. If this were true, she had ample opportunity to make her concerns known. Over a month after the identifications, she testified (under oath) before the grand jury, and two years after that testified (under oath) at the trial. On both occasions she positively and unequivocally identified Eric Blackmon as the shooter.

I read Frencshun Reece's' testimony to the grand jury and during the trial. My experience with witnesses tells me she is no shrinking violet. Any witness who will challenge a prosecutor and the judge during a murder trial about revealing her age:

> *Q. How old are you:*
>
> *A. My age is not relevant.*
>
> *THE COURT: Your age is what?*
>
> *A. Not relevant to this case, my age.*
>
> *THE COURT: You see, that's my job to decide what's relevant, okay? She is asking you what your age is. Answer the question.*
>
> *MS. WALOWSKI: If you could just give us your age?*
>
> *A. Thirty something.[16]*

Or would interrupt the entire proceedings to insist that she be allowed to go to the bathroom:

> *THE COURT: No, you don't, ma'am. Hold on. You don't ask me any questions. You just answer the lawyer's questions, and the state attorneys can ask you questions as well.*
>
> *A. But your honor I have to go bad.[17]*

Would certainly not hesitate to tell one of the five Assistant State Attorney's that interviewed her, or the grand jurors that questioned her, or Judge Lacy during the trial, that the wrong man had been arrested and was erroneously on trial for First Degree murder.

I don't know who killed Tony Cox. I have no opinion on Eric Blackmon's guilt or innocence.

**It is my opinion, though, that the homicide detectives from the Chicago Police Department conducted a sound, complete, unbiased investigation,**

---

[16] Bates 4156
[17] Bates 4228

**and that the investigation met or exceeded generally accepted police practices for investigating homicides during that time period.**

Respectfully,

Anthony Monheim

# Addendum #1 – Fee Schedule

My fee schedule as an expert witness is as follows:

1.    Charges for work involving research, analysis, review, and inspections will be billed at the rate of two hundred fifty dollars ($250) per hour.

2.    Sworn testimony of any kind will be billed at the rate of two thousand five hundred dollars ($2500) per day.

3.    Out-of-town travel of any kind will be billed at seven hundred fifty dollars ($750) per day.

4.    Any materials used or other expenses, including but not limited to out-of-town travel, lodging and meals will be added at cost.

5.    An initial retainer of three thousand dollars ($3000) is required. The retainer fee will be credited at the time of issuance of a final bill.

**Addendum #2 – Expert Testimony (Past five years)**

1. Carlos Starks v. Lesia Moore, et al. Federal District Court for the Southern District of Indiana, Indianapolis Division Case No.: 1:12-cv-1008-WTL-DML

   I was a witness for the defense and testified at a deposition only.

2. Engel v. Village of Buffalo Grove, ET AL Federal District Court for the Northern District of Illinois, Eastern Division Case No.: 10CV03288

   I was a witness for the defense and testified at a deposition only.

3. Dewy Amos Jones v. The City of Akron, ET AL, Unite States District Court Northern District of Ohio, Eastern Division Case No.: 5:14-cv-02618

   I was a witness for the defense and testified at a deposition only.

4. Cornell McKay v. The City of St. Louis, Missouri, et al. United States District Court, Eastern District of Missouri, Eastern Division, Case No.: 4:15-cv-01315-JAR.

   I was a witness for the defense and have yet to testify.

5. Roger Dean Gillispie v. The City of Miami Township, ET AL, United States District Court Southern District of Ohio, Case No.: 3:13-cv-416.

   I was a witness for the defense and testified at deposition only.

# Addendum #3 – Publications

Monheim, Tony (2007). "The Forgotten Area Canvass." Law and Order Magazine, Hendon Publications: Deerfield, Illinois.

Monheim, Tony (2011). "Murder by Poison: Rare or Rarely Detected?" <u>Law and Order Magazine</u>, Hendon Publications: Deerfield, Illinois.

Monheim, Tony (2006). "The Shocking Truth About Lightning Deaths." <u>Florida Police Chief Magazine</u>: FPCA Publications, Tallahassee, Florida.

Monheim, Tony. *I Have a Devil Inside Me.* Amazon Publishing, 2021.

# EXHIBIT B

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS

2              EASTERN DIVISION

3

  ERIC BLACKMON,              )

4                         )

          Plaintiff,    )

5                         )

    v.                )   19-CV-767

6                         )

  CITY OF CHICAGO; Chicago    )

7  Police Officers GREGORY JONES,  )

  JAMES SANCHEZ and EUGENE     )

8  SCHLEDER; and other as-yet    )

  unidentified employees of the  )

9  City of Chicago,          )

                         )

10        Defendants.     )

  _____)

11

12

13    The videotaped deposition of ANTHONY MONHEIM,

14  taken on behalf of the plaintiff in the above-

15  entitled case before Debra L. Kleszyk, a Certified

16  Shorthand Reporter within and for the State of

17  Illinois, taken remotely via videoconference on

18  January 31, 2022, commencing at 10:00 a.m.

19  pursuant to the Federal Rules of Civil Procedure.

20

21

22

23

24

25

Page 2

1      A P P E A R A N C E S
2
3    RILEY SAFER HOLMES & CANCILA LLP
     BY:  MR. JOHN K. THEIS
4      MS. SARAH FINCH
       MS. RACHEL SIFUENTES
5      MS. GEORGIA ALEXAKIS
     70 West Madison Street, Suite 2900
6    Chicago, Illinois 60602
     (312) 471-8700
7    jtheis@rshc-law.com
     sfinch@rshc-law.com
8    rsifuentes@rshc-law.com
     galexakis@rshc-law.com
9
       Appeared via videoconference on behalf
10     of Plaintiff
11
12
     REITER BURNS LLP
13   BY:  MR. TERRENCE M. BURNS
     311 South Wacker Drive, Suite 5200
14   Chicago, Illinois 60606
     (312) 982-0090
15   tburns@reiterburns.com
16     Appeared via videoconference on behalf of
       Defendant City of Chicago
17
18
19
20
21
22
23
24
25

Page 3

1      A P P E A R A N C E S, cont.
2
3    JOHNSON & BELL, LTD.
     BY:  MR. AHMED A. KOSOKO
4    33 West Monroe Street, Suite 2700
     Chicago, Illinois 60603
5    (312) 372-0770
     kosokoa@jbltd.com
6
       Appeared via videoconference on behalf of
7      Defendants Gregory Jones, James Sanchez,
       and Eugene Schleder
8
9
10
11   ALSO PRESENT:
12   MR. MICHAEL PRAGER, Videographer
       Veritext Legal Solutions
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1             I N D E X
2
3    WITNESS:  ANTHONY MONHEIM
4    EXAMINATION                    PAGE
5      By Mr. Theis          7, 259, 275
6      By Mr. Kosoko       229, 268, 276
7
8
9
10        INDEX OF EXHIBITS
11   EXHIBIT    DESCRIPTION         MARKED
12   Exhibit 1    November 12, 2021, report   110
13   Exhibit 2    subpoena          110
14   Exhibit 3    U.S. Department of Justice    111
               National Institute of
15             Justice
               Eyewitness Evidence:
16             A Guide for Law Enforcement
17   Exhibit 4    Chicago Police Department    228
               Material Submitted For
18             Use in the Daily Bulletin
19   Exhibit 5    live lineup photos and    228
               information
20
     Exhibit 6    video              228
21
     Exhibit 7    IPI 3.15 - Circumstances    240
22             of Identification
23
24
25

Page 5

1         THE VIDEOGRAPHER:  Good morning.  We
2    are going on the record at 10:00 a.m. on
3    January 31, 2022.
4         Please note that the microphones
5    are sensitive and may pick up whispering, private
6    conversations, and cellular interference.  Please
7    turn off all cell phones or place them away from
8    the microphones as they can interfere with the
9    deposition audio.
10        Audio and video recording will
11   continue to take place unless all parties agree to
12   go off the record.
13        This is media unit one of the
14   video-recorded deposition of Anthony Monheim
15   taken by counsel for plaintiff in the matter of
16   Eric Blackmon versus City of Chicago, et al.,
17   filed in the United States District Court for the
18   Northern District of Illinois, Eastern Division,
19   case number 19-CV-767.  This deposition is being
20   held remotely.
21        My name is Michael Prager from the
22   firm Veritext, and I am the videographer.  The
23   court reporter is Debra Kleszyk from the firm
24   Veritext.  I am not authorized to administer an
25   oath, I am not related to any party in this

2 (Pages 2 - 5)

Page 6

1  action, nor am I financially interested in the
2  outcome.
3          Counsel and all present in the room
4  and everyone attending remotely will now state
5  their appearances and affiliations for the record.
6  If there are any objections to proceeding, please
7  state them at the time of your appearance,
8  beginning with the noticing attorney.
9          MR. THEIS: I'm John Theis on behalf
10 of the plaintiff.
11         MS. SIFUENTES: Rachel Sifuentes on
12 behalf of the plaintiff, Eric Blackman.
13         MS. FINCH: Sarah Finch on behalf of
14 Plaintiff Eric Blackmon.
15         MR. KOSOKO: Ahmed Kosoko on behalf
16 of the individual defendant officers:
17 Eugene Schleder, Gregory Jones, and James Sanchez.
18         MR. BURNS: Terrence Burns on behalf
19 of the City of Chicago.
20         THE VIDEOGRAPHER: Will the court
21 please swear in the witness.
22         (The witness was duly
23         sworn by the court
24         reporter.)
25         / / /

Page 7

1          ANTHONY MONHEIM,
2  called as a witness herein, having been
3  first duly sworn, was examined and
4  testified as follows:
5          EXAMINATION
6          BY MR. THEIS
7   Q.  Good morning, Mr. Monheim.
8   A.  Good morning.
9   Q.  My name is Jack Theis. I represent
10 the plaintiff in this case, Eric Blackmon. I'll
11 be taking your deposition today.
12         Could you state and spell your name
13 for the record.
14  A.  Sure. Anthony Monheim. M-o-n-h-e-i-m.
15  Q.  Are there -- Mr. Monheim, are there
16 other people in the room with you?
17  A.  No.
18  Q.  And how old are you, Mr. Monheim?
19  A.  Seventy.
20  Q.  Do you have any conditions or taking
21 any medications that would affect your ability to
22 understand my questions or recall any answers?
23  A.  No.
24  Q.  Have you been deposed before?
25  A.  Yes.

Page 8

1   Q.  You probably have ground rules that
2  you're aware of for depositions. I'm just going
3  to walk through a few. If you have any questions,
4  please let me know. Is that -- is that all right?
5   A.  Sure.
6   Q.  Okay. There's a court reporter that's
7  going to be taking down everything that we say.
8  It's going to be a lot easier for the court
9  reporter if we don't speak over each other during
10 this examination. So if you would let me finish
11 my questions before you start your answer, and I
12 will let you finish your answer before I start my
13 next question. Does that make sense?
14  A.  Sure.
15  Q.  Okay. And that's especially important
16 because we're doing this remotely and doing this
17 by two screens, so let's -- we'll be careful about
18 that.
19         We'll also need verbal answers.
20 So, please, you know, not head nods or uh-huhs.
21 We'll want you to say yes or no to yes-or-no
22 questions. Is that all right?
23  A.  Of course.
24  Q.  And if you don't understand any of my
25 questions, please let me know, and I'll try to

Page 9

1  clarify that point.
2          And if you do answer a question,
3  I'm going to assume that you understood the
4  question, that that makes sense. Does that sound
5  fair?
6   A.  Yes.
7   Q.  If you need to take a break at any
8  time, just ask. We'll probably take a few breaks
9  today. The only exception is that if there's a
10 question pending I'd ask that you answer that
11 question before we take the break.
12  A.  Okay.
13  Q.  Okay. Great. Do you have any
14 questions at the start before we get started?
15  A.  No.
16  Q.  Did you -- I notice counsel is on the
17 call here today. Did you meet counsel for the
18 individual defendants or for the City in
19 preparation for your deposition today?
20  A.  I did not. Personally? You're
21 talking in person?
22  Q.  Yeah. In-person let's start with.
23  A.  No.
24  Q.  Okay. Did you have telephone
25 conferences with them?

3 (Pages 6 - 9)

Page 10

1    A.   I did.
2    Q.   About how many conferences did you
3 meet with them in preparation for the deposition?
4        MR. BURNS:  Before you answer that,
5 I --
6        MR. KOSOKO:  Object to the form.  It's
7 compound.  You got me and Terry both included in
8 his answer, so if you could --
9        MR. THEIS:  Sure thing.
10       MR. KOSOKO:  -- bifurcate it.
11       MR. THEIS:  Yeah, I'll back that up.
12 Yep.
13 BY MR. THEIS:
14   Q.   So let's start with Mr. Kosoko.  How
15 many times did you have a telephone call with him
16 to prepare for your deposition?
17   A.   Just one this morning.
18   Q.   And so -- and how long was that call?
19   A.   Maybe five minutes.
20   Q.   Okay.
21   A.   I could look on my phone.
22   Q.   That's -- that's fine.  That's fine.
23       Did you meet with the attorney for
24 the City of Chicago at any point in preparation
25 for your deposition today?

Page 11

1    A.   No.
2    Q.   In preparation for the deposition, did
3 you review any documents?
4    A.   Only my report.
5    Q.   Okay.  No other documents related to
6 the case file in this case or anything else.  Is
7 that --
8    A.   I did.  I have the box in my office,
9 and I did look at the -- I just perused through
10 some of the items in there just to acquaint
11 myself, reacquaint myself, with some of the
12 depositions.  But it was very, very short, maybe a
13 half hour I just took.
14   Q.   Okay.  And, in the course of that,
15 were you reviewing the -- you said you reviewed
16 the deposition transcripts?
17   A.   Depositions, the photos, the -- some
18 of the reports, the police reports.
19   Q.   Okay.  Were -- are you aware that the
20 defendants in this lawsuit are the City of
21 Chicago, Gregory Jones, James Sanchez, and
22 Eugene Schleder?
23   A.   Yes.
24   Q.   Okay.  Have you spoken to any -- let's
25 just focus on the individual what I'll call today

Page 12

1 the -- either the individual defendants or the
2 defendant detectives.  Is that fair for those --
3 that group of individuals?
4    A.   Sure.
5    Q.   Have you ever spoken to any of the
6 individual defendants?
7    A.   No.
8    Q.   Have you ever spoken to any of the
9 attorneys for the City of Chicago at any point
10 related to this case?
11   A.   No.
12   Q.   Have the -- have you been asked any
13 questions indirectly from the individual
14 defendants through their counsel?
15   A.   No.
16       MR. KOSOKO:  Object to form.
17 BY MR. THEIS:
18   Q.   Other than Mr. Kosoko, did you -- is
19 there anyone else you spoke to about your
20 deposition today?
21   A.   No.
22   Q.   What's your -- what is your current
23 job?
24   A.   I'm retired.
25   Q.   Okay.  Are you the owner of a company

Page 13

1 known as Homicide Training or a --
2    A.   I am.
3    Q.   -- co-owner?
4    A.   I am.
5    Q.   Okay.  And can you just clarify, are
6 you the sole owner or are there multiple owners of
7 the business?
8    A.   I am.  I'm the sole owner.
9    Q.   Do you have partners in that business?
10   A.   No.
11   Q.   There's a website that we've seen for
12 your business, HomicideTraining.com.  Is that
13 the -- is that the website for your business?
14   A.   It is, yes.
15   Q.   Okay.  There's a Jeff Lewis and a
16 Pam Harris that are listed as instructors.  Are
17 they --
18   A.   Yes.
19   Q.   -- directly -- I'm sorry.
20   A.   That's correct.
21   Q.   Okay.  Are they -- are they affiliated
22 with the business itself or are they instructors
23 for your business?
24   A.   They -- they're instructors for me.
25 They're hired by me to instruct certain classes.

4 (Pages 10 - 13)

Page 14

1    Q.   Okay.  Okay.  And when did you start
2  this business?
3    A.   In 2004 when I retired.
4    Q.   Are you currently the owner, officer,
5  director, any other corporate official for any
6  other companies other than Homicide Training?
7    A.   I do have an LLC, Doris Properties
8  LLC, which is a rental house that my mother-in-law
9  owned.  And we created an LLC for that for
10  protection, legal protection.
11   Q.   Okay.  And is that in Florida?
12   A.   Yes, it is.
13   Q.   It's in Florida?  Okay.
14        What -- other than the Homicide
15  Training business, do you have any other sources
16  of income --
17   A.   No.
18   Q.   -- let's say --
19   A.   Well, my -- my pension.
20   Q.   Pension?
21   A.   My pension.
22   Q.   Okay.
23   A.   That's it.  My pension and Homicide
24  Training.
25   Q.   The LLC that you mentioned does not

Page 15

1  provide you with additional income?
2    A.   It does.  It's a rental property, one
3  house, one property.  So I -- it's $1900 a month
4  in rent.  But there are expenses that go along
5  with it.
6    Q.   And just to get a sense, you know, of
7  the business here and the percentage of your total
8  income, so if you said $1900 in rent, does that
9  all go to your -- to that LLC?
10   A.   Yes.
11   Q.   And does that all go to you?
12   A.   Yes.  Well --
13   Q.   Okay.
14   A.   Actually, it's my wife's -- it's my
15  wife's house, so it goes to her.
16   Q.   Okay.  So what percentage of your
17  income in 2021 would you say is related to your
18  expert practice, Homicide Training?
19   A.   Zero.  I had no classes.  COVID
20  literally destroyed my business.
21   Q.   Were you paid as a consultant in this
22  case last year?
23   A.   I was.
24   Q.   Okay.  So there was some income that
25  came into the business?

Page 16

1    A.   Yes.  That was the only income that I
2  had other -- I thought you were referring to the
3  teaching, the Homicide Training teaching.
4    Q.   So maybe -- maybe can you explain that
5  a little bit?  So is the business, is it two
6  different businesses?  Is there a consulting and a
7  teaching component to it?
8    A.   That's correct.  That's exactly right.
9    Q.   Okay.  And you said last year for the
10  teaching side of the fence there was zero income
11  because there were no classes.  Is that correct?
12   A.   Exactly.
13   Q.   On the consulting side what was the
14  total income?
15   A.   One case.  This case.  I'm not sure,
16  I think it's somewhere around 6 or 7 thousand
17  dollars.
18   Q.   Do you have any other active matters
19  in which you are consulting currently?
20   A.   There are a couple of cases that have
21  not resolved themselves that I've given
22  depositions on but have not resolved, and I'm
23  still waiting to hear from the attorneys on those
24  cases.  They're several years old, though.
25  They're four or five years old, many, a couple of

Page 17

1  them.
2    Q.   Okay.  And so you weren't paid for
3  those cases in the past year in 2021?
4    A.   No.  No.
5    Q.   And the depositions were certainly not
6  last year, is that --
7    A.   No.
8    Q.   What was the income on the teaching
9  side in 2020, do you recall?  Was it --
10   A.   I'd have to look back.  Normally I do
11  a class a month.  For the last, oh, 18 years since
12  I retired, I've probably done on average a class a
13  month.  And each class, it varies.  Of course, the
14  amount of students determines how much money I
15  receive.  I charge $225 per person.  Each class --
16  I have a 25-person minimum for each class.  So
17  some classes are 70 people.  Some I've had as many
18  as 150 in classes.  Some classes are just 25.  So
19  it's very difficult to say.  But usually my yearly
20  income is somewhere around 70 to 80 to 90 thousand
21  depending upon what kind of year I've had, how
22  many students.
23   Q.   And that's just on the teaching side?
24   A.   Yes.
25   Q.   Okay.  And then on the consulting

5 (Pages 14 - 17)

Page 18

1  side, what would you say in the last five years is
2  an average income for that side?
3      A.  Well, I don't do that many cases.
4  Probably one every year or so.  So probably 6,
5  7 thousand dollars a year on each of those cases.
6      Q.  Okay.  Have you been --
7      A.  Some more, some more, some I think
8  I've made as much as 10,000 on.  It depends upon
9  the amount of reading material that I'm given.
10     Q.  Okay.  And by reading material do you
11 mean material that is provided to you by the party
12 that's retained you for the consultancy?
13     A.  Exactly.  Police reports, depositions,
14 things like that.
15     Q.  Okay.  Have you been retained by
16 Johnson & Bell previously, the law firm?
17     A.  No.
18     Q.  Have you been retained by the law firm
19 Reiter Burns before?
20     A.  No.
21     Q.  Have you been retained by the City of
22 Chicago in any matter before?
23     A.  No.
24     Q.  Have you been retained in cases where
25 the City of Chicago was a defendant?

Page 19

1      A.  No.  Not that I recall, no.
2      Q.  You mentioned before that you had been
3  deposed before.  Were those civil cases, criminal
4  cases?  What kind of cases were those?
5      A.  Are you referring during my police
6  career or just the consultant?
7      Q.  Let's -- let's start with just the
8  consultant, so after you retired from the police
9  department.
10     A.  On the appendix in the back, the
11 addendum in the back, I think I have the amount of
12 cases I -- probably, probably nine cases, eight
13 cases maybe.
14     Q.  And these were all civil cases or were
15 any of them criminal cases?
16     A.  Civil.  But since I have retired, I've
17 given depositions in criminal cases regarding
18 homicides that occurred while I was working.  Even
19 after I retired, I have gone to court and I've
20 given depositions.
21     Q.  So were those -- those were criminal
22 cases related to cases that you were involved with
23 while you were at the police department?
24     A.  Yes.
25     Q.  Okay.  And those were depositions?

Page 20

1      A.  Depositions and trial testimony, too.
2      Q.  Okay.  And let's -- you just mentioned
3  trial testimony.  So about how many times do you
4  think you've testified in court?  Let's -- I'm
5  sorry, let's break this up.  Post-retirement from
6  the police department, how many times?
7      A.  Maybe seven, eight, somewhere in that
8  area.  If it -- you're talking about an old case
9  that popped up after I retired and I have to
10 return to testify --
11     Q.  Start with just that.  In that
12 category --
13     A.  Yes.  Okay.  Criminal cases, yep,
14 probably seven.
15     Q.  So those are seven or eight
16 criminal cases that were related to your time when
17 you were at the department.  Is that right?
18     A.  That's correct.
19     Q.  Okay.  And then in civil cases how
20 many times have you testified in court?
21     A.  None.
22     Q.  I'm going to show you on the screen
23 here, can you see what's on the screen here?
24     A.  Yes.
25     Q.  Okay.  Is this a copy of the report

Page 21

1  that you prepared in this case?
2      A.  It is.
3      Q.  Okay.  I'm going to go -- the pages
4  are not numbered, so I'm going to refer to the
5  page of the PDF, if that makes sense.
6      A.  I've numbered them.  So, yeah, that
7  will help.  I've numbered -- noticed that when I
8  was reading it a couple of days ago, so I've
9  numbered them.  So I'll be able to do that.
10 That's fine.  Sure.
11     Q.  Okay.  Well, hopefully the pages are
12 consistent.  We'll -- if it's not, we'll try to
13 figure it out together.
14     A.  Okay.  Sure.  Sure.
15     Q.  I want to go to what I have as starts
16 on page 35.  And it's -- at the bottom there it
17 says addendum number two, expert testimony, past
18 five years.  Do you see that?
19     A.  Yes.
20     Q.  Okay.  And then on the next page
21 there's five cases that are listed here.  Do you
22 see those five cases?
23     A.  I do.
24     Q.  Okay.  All right.  Let's walk through
25 this, these cases that you identify here.

6 (Pages 18 - 21)

Page 22

1    The first one is Carlos Starks
2 versus Lesia Moore, et al. And this is in the
3 Federal District Court for the Southern District
4 of Indiana, Indianapolis Division, and the case
5 number is 12-CV-1008. Who -- who retained you in
6 this case?
7    A. I believe it was the City of
8 Indianapolis. I don't recall. I'd have to look
9 -- I'd have to look up the case. I could do that.
10 I have it on my computer in the back, if you'd
11 like to know who the attorney was.
12    Q. I'm more interested if you -- if you
13 were testifying on behalf or if you were retained
14 on behalf of the -- if any individual officers
15 were the defendant or if it was the City versus if
16 it was the plaintiff.
17    A. I see. It was the -- it was the
18 defendants, defendant officers. Lesia Moore was a
19 homicide investigator.
20    Q. Okay.
21    A. Mr. Starks was the plaintiff.
22    Q. Do you recall if it was the officers
23 and the City as well or was it just the officer?
24    A. It was the City also, yes.
25    Q. Okay. Can you give a general

Page 23

1 description of that matter?
2    A. It was a photo ID case in which she --
3 there was a robbery and a shooting. Carlos Starks
4 was accused of the murder and shooting. And she
5 showed a photo lineup, among other things. There
6 were other matters that were involved in it. But
7 primarily it revolved around a photo lineup that
8 she showed and how she conducted the investi-
9 gation.
10    Q. Okay. You said -- mentioned photo
11 lineup. I want to -- it's going to be important
12 in this deposition to make sure we understand the
13 terminology that we're using. So in your
14 deposition it sounds like you made a distinction
15 between photo arrays and live lineups.
16    A. I do.
17    Q. Okay. Can you give me just a quick
18 understanding of how you use those two terms
19 differently?
20    A. Well, photo -- there's many terms for
21 a photo array, a photo display, a photo packet.
22 A lot of terms are used to refer to the photos
23 that are shown to a witness or a victim -- a
24 victim in a robbery of course, not a homicide.
25    But a lineup, a live lineup, is an

Page 24

1 in-person lineup. The witness and the defendant
2 are actually in the same area, the same vicinity.
3 Sometimes there's a one-way mirror between them,
4 but they are viewed through this mirror, and the
5 witness attempts to pick out the person that they
6 saw at the crime scene from a group of other
7 individuals, live individuals.
8    Q. All right. So that first category of
9 -- you give a few different terms for it, but when
10 I refer to photo arrays today, that's what I'm
11 going to be discussing is the --
12    A. Sure.
13    Q. -- showing of the photograph. Does
14 that make sense?
15    A. Yes.
16    Q. Okay. And then the live lineup, I'll
17 try to say live lineup. But, you know, if I -- if
18 I -- if you're not clear about it, just make sure
19 that we can clarify it whether you mean live
20 lineup or array. But when I say lineup, I will
21 typically mean live lineup --
22    A. Okay.
23    Q. -- in the course of this.
24    In the Starks case, so was this a
25 photo array or photo display case?

Page 25

1    A. It was. And there might have been --
2 there may have been a live lineup involved, too.
3 I'd have to -- I'd have to look back. This has
4 been several years ago.
5    Q. Sure. Can you give a brief summary
6 what your opinion was in that case?
7    A. Basically that -- the detectives and
8 how they conducted their investigation and how
9 they showed the lineups, and the lineups were not
10 prejudicial as was alleged by the plaintiff.
11    Q. Do you recall how the -- how the
12 plaintiff alleged that the lineup was prejudicial?
13    A. It's a long time ago. One of the --
14 one of the things that was mentioned, that the
15 lineup was someone was wearing a red shirt and
16 there was a reference to dreadlocks, that only
17 the -- only Carlos Starks was depicted in the
18 lineup with dreadlocks, which was incorrect, as
19 someone, whoever the attorney was, did not know
20 what dreadlocks looked like, because everyone in
21 the lineup had dreadlocks. And that was the gist
22 of my analysis of the lineup.
23    Q. Got it. And so because everyone had
24 dreadlocks in that array, it was not a suggestive
25 lineup?

7 (Pages 22 - 25)

Page 26

1    A.   Well, that's --
2         MR. KOSOKO:  Objection.
3         THE WITNESS:  -- part of it.  That's
4    part of it.
5    BY MR. THEIS:
6    Q.   Okay.  What was the other part of it?
7    A.   Well, there was a mention of a red
8    shirt, that the -- Carlos Starks had a red shirt
9    and he was the only one with a red shirt.  But,
10   again, that was not completely accurate.  There
11   were other people that had -- he had a red stripe
12   on his shirt and it was called a red shirt and it
13   turned out that he actually -- other people in the
14   lineup had red on their shirts, too.
15   Q.   Got it.  So because the other people
16   in the lineup had that similar unique
17   characteristic, the lineup was not suggestive?
18        MR. KOSOKO:  Objection to form.
19        You can answer.  Sorry to inter-
20   rupt.
21        MR. THEIS:  Yeah.
22        THE WITNESS:  Basically -- that's
23   basically what I remember.  There's probably a lot
24   more to it than that.  I would have to re-read the
25   report.

Page 27

1    BY MR. THEIS:
2    Q.   Okay.  Was your opinion in that case,
3    was it excluded do you recall?
4    A.   No.
5    Q.   And was your -- do you recall if your
6    opinion was limited by the judge in any way?
7    A.   No.
8    Q.   Was that -- you were used -- you were
9    deposed in that case.  Correct?
10   A.   Yes.
11   Q.   Okay.  But, just to confirm again, you
12   didn't testify at any trial related to that case.
13   Right?
14   A.   That's correct.
15   Q.   Okay.  Do you know what the resolution
16   of that case is?
17   A.   I do not.
18   Q.   Okay.  Is that one of the ones that
19   you're waiting to see, or you just don't recall?
20   A.   No.  I think that's been resolved.  I
21   have not heard from them in a long time, so I can
22   assume that's been resolved.  But I don't know
23   what the resolution was.  I may -- I may have
24   looked it up years ago to determine, but I can't
25   recall what it was.

Page 28

1    Q.   Got it.  Okay.
2         How about Engel versus Village of
3    Buffalo Grove, et al., Federal District Court for
4    the Northern District of Illinois, Eastern
5    Division, case number 10-CV-03288, can you -- do
6    you recall who retained you in that case?
7    A.   I do.
8    Q.   Who was that?
9    A.   It was a very interesting case.  It
10   had to do with two police officers.  Engel was one
11   of them and the other, I'm trying to recall his
12   name, worked for the City of Chicago Police
13   Department.  And they had both been fired from
14   their respective departments and they were
15   committing armed robberies.  They attempted to rob
16   a drug dealer in Missouri I believe, Kansas City
17   I think.
18        And they were arrested by the FBI.
19   And one of the investigators worked for
20   Buffalo Grove Police Department because he was --
21   he was interested in these two for several murders
22   that occurred in his jurisdiction.
23        That's basically what I remember
24   about the case.
25        And you may remember the case

Page 29

1    because it made national headlines when this
2    retired or fired Chicago police officer attempted
3    to abduct a businessman and bring him to a torture
4    chamber where -- what they -- what these two did,
5    Engel and his partner did, is they would torture
6    people for their accounts, the money in their
7    accounts, their account numbers or passwords, and
8    then kill them.  And it was a pretty famous case.
9    Q.   That is -- that is a unique set of
10   circumstances.  So it was -- so you represented --
11   who did you represent in that then?
12   A.   The detective that worked for
13   Buffalo Grove.  And, actually, his involvement was
14   minimal in the case.
15   Q.   Okay.  So not -- but not the City of
16   Chicago Police Department?
17   A.   No.  No.  The Chicago police officer
18   had been fired.
19   Q.   Got it.  Okay.  Okay.  Do you recall
20   what -- you started to -- what was your general
21   opinion in that case?
22   A.   Well, this again was a photo lineup
23   basically that I was called in for.  But it was
24   presented by the FBI.  And I didn't -- I wasn't
25   involved with the FBI defendant, only the

8 (Pages 26 - 29)

**Page 30**

1  detective. And the detective merely went along
2  with the FBI agent when he showed the lineups.
3      Q.  Did you -- did you give an opinion as
4  to the propriety of that lineup in that case?
5      A.  I did.
6          I should say photo array. We're --
7      Q.  Yep. We're doing it.
8      A.  Yeah. We're going from lineup to
9  photo -- the photo array.
10      Q.  Okay.
11      A.  I did. I indicated that it was --
12  nothing improper was done during the displaying of
13  the photo arrays.
14      Q.  Was the individual that retained you
15  involved in the photo array or is it the FBI that
16  was conducting the photo array?
17      A.  The FBI conducted it and they compiled
18  the photo array. He was merely there as a
19  witness.
20      Q.  Did you give an opinion about how the
21  photo array was compiled?
22      A.  I did.
23      Q.  And what was your opinion?
24      A.  That it was compiled correctly. There
25  was no violation of either general practices or

**Page 31**

1  law.
2      Q.  And can we go back to the Starks case?
3  Did you in that case give a specific opinion about
4  how the array was gathered?
5      A.  I'm sure I did. I don't recall
6  specifically, but I'm sure I did.
7      Q.  Okay. And in that case was your
8  opinion limited by the judge in any way?
9      A.  No. Which case, the Engel case?
10      Q.  I'm sorry, the Engel. Let's go back
11  to the Engel case. Thank you. Yeah. In that
12  case was your opinion limited by the court or
13  excluded?
14      A.  No.
15      Q.  And do you know what the resolution of
16  that case was?
17      A.  Engel committed suicide.
18      Q.  Oh. Okay.
19          The Dewey Amos Jones versus City of
20  Akron case. This is United States District Court,
21  Northern District of Ohio, Eastern Division, case
22  number 5:14-CV-02618. Could you -- who were you
23  -- who retained you in that case?
24      A.  It was the City of -- an attorney
25  representing the City of Akron and the police

**Page 32**

1  officers involved.
2      Q.  So that was one where you did both the
3  police officers and the City?
4      A.  I think it was just the police
5  officers. But the City was involved also. But it
6  was just the police officers.
7      Q.  Okay. And in that -- can you give a
8  description of that case, a brief overview?
9      A.  It was a home -- a semi home
10  invasion/robbery. They all knew each other in
11  this case. Dewey Amos Jones was supposedly one of
12  the robbers. The victim in the house was an older
13  gentleman that they -- he allowed some of these
14  narcotics addicts to frequent his home and -- both
15  women and men. And he was shot and killed during
16  a robbery attempt, the elderly gentleman was. And
17  Dewey Jones was accused of shooting.
18      Q.  And what did -- what was the claim in
19  that case, do you recall?
20      A.  As in all these other cases, there are
21  many claims, but, again, this one centered around
22  a photo lineup, photo identification, witness
23  identification. But there were other aspects of
24  the case, too.
25          Had I known you were going to delve

**Page 33**

1  into these cases today, I probably would have read
2  them.
3      Q.  That's fine. We can -- your memory
4  here is fine for now.
5          Do you recall in that case what
6  your opinion was?
7      A.  Again, my opinion was that the photo
8  lineups were shown in a correct manner. There
9  was, I believe, one picture that was shown of
10  Dewey Jones, and that was allowed in to trial.
11  And I opined also that that was -- given the
12  circumstances, that was appropriate.
13      Q.  And was your opinion limited by the
14  judge at any point?
15      A.  No.
16      Q.  And did you testify at trial?
17      A.  No.
18      Q.  Do you know if your opinion was
19  excluded in that case?
20      A.  No, it was not.
21      Q.  The next one is the Cornell McKay
22  versus City of St. Louis, Missouri, et al. case in
23  the United States District Court of Eastern
24  District of Missouri, Eastern Division, case
25  number 4:15-CV-01315. Could you give a brief

9 (Pages 30 - 33)

Page 34

1  description of that case?
2      A.   Cornell McKay, as I recall, was
3  accused of robbing a woman in her driveway.  She
4  had just gotten out of her car, and she robbed --
5  he robbed her.  But there was no shooting involved
6  in this case.
7           However, if I'm remembering the
8  case correctly, he was also accused of shooting a
9  volleyball player, a female volleyball player,
10 from one of the universities in St. Louis.  She
11 was, I think, an Olympic volleyball player.  She
12 was going on to the Olympics.  And he killed her
13 days after this particular robbery.
14          And I was asked to give an opinion
15 on the robbery and the photo lineup that was shown
16 in the robbery.  I was not asked to give an
17 opinion on the murder case.  But, of course, they
18 kind of meshed together.  They -- they were both
19 intertwined.
20     Q.   Was your opinion about the propriety
21 of the -- I'm sorry, was it a photo array or a
22 lineup?
23     A.   Both.  There was --
24     Q.   Okay.
25     A.   -- a photo array and a lineup.  I

Page 35

1  believe, if I'm remembering the case correctly,
2  there was both.
3      Q.   And in that case was your opinion
4  concerning the propriety of the photo array and
5  the lineup?
6      A.   Yes.
7      Q.   And what was your opinion?
8      A.   It was it was conducted correctly.
9  Both were conducted correctly.
10     Q.   Do you recall if your testimony was
11 excluded -- your opinion was excluded in that
12 case?
13     A.   No, it was not.
14     Q.   Do you recall if your -- if the judge
15 in that case limited your opinion in any way?
16     A.   No.
17     Q.   No, you don't recall or, no, the judge
18 did not limit it?
19     A.   As far as I know, no.  In any of these
20 cases, I've never been told it's been excluded or
21 limited.
22     Q.   The last one you list here is the
23 Roger Dean Gillespie versus City of Miami
24 Township, et al.  United States District Court for
25 the District of Ohio, case number 3:13-CV-416.

Page 36

1  Could you give a description of that case?
2      A.   This was a rape case.  Mr. Gillespie
3  was accused of raping two women that he abducted
4  from a shopping center and brought them into a
5  wooded area and raped them.  He was also accused
6  of raping at least one other victim the next week
7  or so.  But there may have been other victims
8  also.  And, again, this hinged on the identifi-
9  cation of Mr. Gillespie from photographs from a
10 photo lineup, among other things.
11          All of these other cases involved
12 other things, but the main area of concern was the
13 photo lineups in each of these.
14     Q.   Do you -- who retained you in that
15 case?
16     A.   It was the -- I represented the
17 investigator, the detective.  I think also the
18 City of Miami Township.
19     Q.   Did you know the investigator or
20 detective in that case?
21     A.   No.  No.  This is Miami, Ohio.
22     Q.   Oh, I'm sorry.  Okay.  Thank you.
23          Could you give a description of
24 what your opinion was in that case?
25     A.   Basically that the -- I was asked to

Page 37

1  give an opinion of the investigation in general.
2  And I opined that the investigation was conducted
3  properly given the -- that time period and that
4  the photo lineup was shown properly.
5      Q.   I want to go back to the McKay case.
6  Can you remind me who represented -- or retained
7  you in that case, the City of St. Louis case?
8      A.   It was -- I believe it was the
9  Attorney General's Office in this case.  But I'd
10 have to go back and look.  This was --
11     Q.   Was it -- I'm sorry.
12     A.   Missouri Attorney General's Office.  I
13 have it on my computer, if you'd like me to check.
14     Q.   That's okay for now.  We might come
15 back to it.  But that's -- that's helpful to know
16 that's available.
17          Okay.  And I think you answered
18 this in my previous round about the previous case,
19 but in the Gillespie case was your opinion limited
20 by the judge or excluded in any way?
21     A.   No.
22     Q.   You did not testify in trial in that
23 case --
24     A.   That's correct.
25     Q.   -- correct?

10 (Pages 34 - 37)

Page 38

1  A.  That's correct.
2  Q.  In the McKay case, it says that you
3  have yet to testify.
4  A.  Oh, that's correct.  Yes.  I have not
5  even given a deposition in that case.
6  Q.  Okay.  And so that -- is that case
7  ongoing?
8  A.  I think it's resolved.  I think that
9  one has been resolved.
10  Q.  And how about the Gillespie case?
11  A.  That is still ongoing, too.  Those are
12  the two that are still ongoing, I believe.
13  Q.  Okay.  I'm going to ask about a few
14  other cases just to press your memory a bit.
15  The first one is the
16  Clarence Elkins versus Summit County, Ohio, case
17  in the Eastern Division County Court of the United
18  States District Court, Northern District of Ohio.
19  This is case number 06-CV-3004.  Do you recall
20  that case?
21  A.  I do.
22  Q.  Can you give a brief description of
23  that case?
24  A.  Sure.  A woman, an older -- elderly --
25  older woman and her granddaughter were attacked in

Page 39

1  her home, raped, and beaten and dead.  The young
2  girl survived.  I believe she was six at the time.
3  And she -- to make a long story short, she
4  identifies her uncle, Clarence Elkins, as the
5  attacker and said that that was the person that
6  beat her grandmother to death and beat and raped
7  her also.  She testified at trial.  She pointed
8  out Mr. Elkins at trial.
9  Again, to make a long story short,
10  as it turned out it wasn't him.  There was DNA
11  evidence that was found at the scene that was
12  compared to a person who had just been released
13  from prison that was living with his girlfriend
14  that lived next door to this grandmother, and it
15  turned out that he was the person that actually
16  raped and murdered -- raped both of them and
17  murdered the grandmother.
18  Clarence Elkins' wife was the one
19  who basically solved the case.  It's been the
20  subject of numerous Datelines, the shows that you
21  see on the identification channel, ID Channel.
22  It's been the subject of several documentaries
23  about her solving the case.
24  Q.  And who retained you in that case?
25  A.  It was the police officers who were

Page 40

1  involved in the investigation.  He sued -- he
2  sued the City and he sued the police officers,
3  Clarence Elkins did.
4  Q.  What was the -- what was the summary
5  of the opinion that you gave in that case?
6  A.  Well, it was -- it was a basic
7  analysis of how they conducted the investigation.
8  My opinion was they conducted the investigation
9  properly, that there was nothing they could do
10  about the witness who insisted over and over that
11  it was her uncle.  I mean, that was -- that was
12  what caused Mr. Elkins to go to jail was his niece
13  identifying him over and over.
14  Q.  Had the DNA evidence exonerated
15  Mr. Elkins at that point when you were doing the
16  analysis?
17  A.  I'm sorry, repeat that.
18  Q.  Did you say that Mr. Elkins was
19  exonerated?  Was he released from prison?
20  A.  He was, yes.  Yes.
21  Q.  And then he later filed suit against
22  the officers that were involved in the case.  Is
23  that --
24  A.  That's correct.
25  Q.  -- correct?

Page 41

1  A.  That's correct.
2  Q.  And so at the time that you gave your
3  opinion, you were already aware of the fact that
4  Mr. Elkins had been exonerated.  Correct?
5  A.  Yes.
6  Q.  That he had been found innocent?
7  Okay.
8  A.  Yes.
9  Q.  And so you limited your investigation
10  to whether the investigation itself that led to
11  that was proper?
12  A.  That's correct.
13  Q.  In that case, did the fact that he had
14  been found innocent factor into your analysis of
15  whether or not the investigation was proper?
16  MR. KOSOKO:  Object to form.
17  THE WITNESS:  No.
18  BY MR. THEIS:
19  Q.  And why is that?
20  A.  I just looked at the facts.  I just
21  looked at how they conducted their investigation,
22  trying to place myself back in their shoes at the
23  time they conducted the investigation.  And I
24  offered my opinion based on that.
25  Q.  But, as a factual matter, it was later

11 (Pages 38 - 41)

Page 42

1   proven that he was not the one that murdered the
2   woman and raped the two individuals. Correct?
3       A.   That's correct.
4           MR. KOSOKO: Object to form.
5   BY MR. THEIS:
6       Q.   But even though those facts had been
7   proven, in your opinion the investigation was
8   still sound?
9           MR. KOSOKO: Object to form.
10          You can answer, sir.
11      THE WITNESS: They had a witness who
12  insisted that that was the person that did it.
13  There was virtually nothing they could do about
14  that.
15  BY MR. THEIS:
16      Q.   What was the resolution of the civil
17  case in that case?
18      A.   I'm not sure.
19      Q.   Okay. Okay. Could you give --
20  another case, Darryl Burton versus City of
21  St. Louis, Missouri. Federal District Court for
22  the Eastern District of Missouri, Eastern
23  Division, case number 4:10-CV-01540. Do you
24  recall that case?
25      A.   Vaguely.

Page 43

1       Q.   Okay. Could you give a brief summary
2   of what you remember about that case?
3       A.   I believe it was a shooting.
4   Darryl Burton was accused of shooting someone at
5   an Amoco station, and I think it was during a
6   robbery. But I don't remember much about that
7   case. I'd have to review it.
8       Q.   I'm sorry, I'll stop my screen share
9   here.
10          Okay. Do you remember what your --
11  who you -- who -- I'm sorry, do you remember who
12  retained you in that case?
13      A.   Again, it was the police officers, the
14  attorney for the police officers involved, the
15  investigators.
16      Q.   Okay. And how about Wydrick,
17  W-y-d-r-i-c-k, Phillips versus Commander
18  Jimenez Allen, et al., Federal District Court for
19  the Northern District of Illinois, Eastern
20  Division, case number 07-CV-666, do you remember
21  that case?
22      A.   I do. Again, that's very old. I
23  remember the basics of the case. It was two women
24  that were robbed in front of a library and shot.
25  Both of them were shot, but they both survived.

Page 44

1   And Mr. Phillips was arrested for that crime.
2       Q.   And where -- was Mr. Phillips a
3   Chicago police officer?
4       A.   No, he was not a police officer. He
5   was just a --
6       Q.   Oh, I'm sorry. That was the -- that
7   was the plaintiff in the case.
8           Who retained you? Was that
9   Jimenez Allen, Commander --
10      A.   Yes. Yes.
11      Q.   Okay. And was --
12      A.   Well, his attorney. His attorney,
13  yes.
14      Q.   Okay. And was Commander Allen in the
15  Chicago Police Department?
16      A.   No. No. It was another department
17  outside of Chicago.
18      Q.   Was it Buffalo Grove again or was it a
19  -- do you remember --
20      A.   No. I don't -- I'd have to look it
21  up. I'm not sure.
22      Q.   That's fine. Do you recall what
23  the -- was that a lineup case?
24      A.   Part of it was. There was a live
25  lineup and a photo array. But there were other

Page 45

1   issues, too, regarding witnesses, how witnesses
2   were interviewed.
3           Again, all of these cases had
4   several issues involved, issues involved.
5   However, the main issue in most of them was a
6   lineup or a photo array.
7       Q.   And have you ever given an opinion
8   that a photo array or a lineup was not shown in a
9   manner that was consistent with police practices
10  or national standards?
11      A.   Not in any of the cases I've been
12  hired for, no.
13      Q.   Okay. In your report when you state
14  that you've been granted expert witness status in
15  both federal and state (Florida) courts regarding
16  homicide investigative procedures, what cases do
17  you recall were in state -- in Florida in the
18  state court?
19      A.   Numerous. I mean, I could -- I'd have
20  to check all the cases. But there are numerous
21  cases where I've been granted expert status in
22  state court.
23          In federal court, there's a couple.
24  Kenneth Williams, there was a Kenneth Williams
25  case. And Efrain Casado. Those two cases. Far

12 (Pages 42 - 45)

Page 46

1 less in federal court, of course, than state
2 court.
3      Q.   Can you spell the name of the second
4 case you mentioned?  You said Kenneth Williams
5 and?
6      A.   Well, this was a famous case that we
7 had down in Miami known as the Boobie Boys.  I was
8 the lead investigator on the Boobie Boys.  And the
9 two main defendants were Kenneth Williams and
10 Efrain Casado.  And I was granted expert status in
11 both of those cases.
12          There were a couple other
13 defendants that I was also in the federal court
14 granted expert status as far as robbery and
15 homicide investigations.  And, in state court,
16 several cases where I was granted expert witness
17 status regarding live -- I'm sorry, photo arrays
18 and live lineups.
19      Q.   Was -- was that when you were still at
20 the Miami-Dade Police Department or is this after?
21      A.   No.  No.  While I was an investigator.
22 Not after, no.
23      Q.   Okay.  So after you retired, have you
24 been granted expert witness status in any state
25 cases that you can recall?

Page 47

1      A.   No.
2      Q.   Okay.  I asked about lineups and
3 photos.  Have you ever been retained by a party
4 claiming that law enforcement acted improperly?
5      A.   Not retained, no.  Consulted.  I've
6 been asked several times to look into a case.
7      Q.   Okay.  But you haven't been retained
8 by --
9      A.   Not retained.
10      Q.   -- a party?
11      A.   Not retained, no.
12      Q.   Okay.  You mentioned I think -- I
13 think I asked you before what you were -- how much
14 you were paid last year in this case.  Do you have
15 a total amount that you are aware of that you've
16 been paid in this case?
17      A.   Somewhere around -- I think I have the
18 invoice.  Somewhere around 6 to 7 thousand
19 dollars, I believe.
20      Q.   Do you hope to be hired by the City
21 of Chicago or members of the Chicago Police
22 Department in the future?
23          MR. KOSOKO:  Object to form.
24          THE WITNESS:  Do I hope to be hired?
25 I have no idea.  I don't really care.

Page 48

1 BY MR. THEIS:
2      Q.   Would you like to be retained by the
3 City of Chicago or its officers in the future?
4          MR. KOSOKO:  Object to form.
5          THE WITNESS:  It doesn't really matter
6 to me.
7 BY MR. THEIS:
8      Q.   Okay.  I'm going to go back to your
9 report.  I'm going to show this on the screen.
10          At the top there is that sentence
11 that I read a moment ago:  I have been granted
12 expert witness status regarding homicide
13 investigative procedures, robbery investigative
14 procedures, including lineup techniques, and
15 general investigative procedures in both federal
16 and state, Florida, courts.
17          Do you see that section there?  I'm
18 going to highlight it for you.
19      A.   Yes.  And homicide.  I think you left
20 out homicide.
21      Q.   Regarding homicide investigative
22 procedures.
23      A.   Yeah.
24      Q.   In this sentence, what do you mean by
25 granted expert witness status?

Page 49

1      A.   Well, it usually occurs during trial
2 when they will move to make me considered an
3 expert during a particular trial regarding
4 investigative procedures.
5      Q.   I see.  So this is not -- this is all
6 prior to -- this is all when you were still at the
7 police department.  Is that correct?
8      A.   Yes.  Yes.
9      Q.   Have you -- and I want to understand
10 what you're saying here.  Have you testified as an
11 expert regarding lineup techniques only in the
12 context of robbery investigative procedures?
13      A.   Yes.  Yes.  I don't think I've ever --
14 I don't recall ever having done that in a homicide
15 trial.  I believe that would all -- I believe
16 you're correct.  That would be all robbery
17 investigations, yes.
18      Q.   So the cases when you were a police
19 officer when you were, in your words, granted
20 expert witness status regarding homicide
21 investigative procedures, those did not involve
22 photo arrays or lineups?
23      A.   I don't specifically remember, ever
24 remember, that occurring, no.  It was usually for
25 investigative techniques purposes.  I was a

13 (Pages 46 - 49)

Page 50

1 supervisor in homicide, so very often I was called
2 to render my expert opinion about how one of the
3 investigators conducted an investigation in
4 homicide. That is typically how that would occur.
5 But there could have been
6 situations that I don't recall offhand where --
7 that involved lineup procedures or photo arrays.
8 Q. Are the --
9 A. But generally I would say that was --
10 that was confined to robbery investigations.
11 Q. Okay. Are the standards for
12 conducting a photo array or a lineup for a robbery
13 investigation similar to those that you would use
14 for a homicide investigation?
15 A. Exactly the same.
16 Q. Okay. You are not holding yourself
17 out as an expert in eyewitness identifications.
18 Correct?
19 A. No, not at all.
20 Q. And you're not holding yourself out as
21 an expert in Chicago gangs from 2002 to 2004.
22 Correct?
23 A. That's correct.
24 Q. I want to ask about some of the
25 trainings that you've done. On page two, it says:

Page 51

1 I have been a certified instructor of criminal
2 investigation courses since 1985.
3 Do you see that in the middle of
4 the page there?
5 A. I do.
6 Q. Okay. And in 1985, and we'll get to
7 your bio in a second, but you were at the -- were
8 you at the Miami-Dade Police Department at that
9 time?
10 A. I was, yes.
11 Q. Okay. So do -- first of all, do you
12 recall what courses, what specific courses, you
13 taught?
14 A. Initially I taught a course for the
15 Florida Department of Law Enforcement on robbery
16 investigation. That was the first instructing
17 that I did. And that went for a couple of years
18 for -- I taught throughout Florida and did several
19 courses for them.
20 I then started working for the
21 Southern Police Institute and taught an eight-hour
22 block on how to conduct robbery investigations.
23 And a couple of those hours, as I mentioned, had
24 to do with lineups and photo arrays.
25 After working for the Southern

Page 52

1 Police Institute, I was hired by the International
2 Association of Chiefs of Police to conduct a
3 course, I believe it was a three-day course or
4 maybe two-day course at the time, on homicide
5 investigations.
6 And, from there, I started working
7 for other agencies. But that was actually after I
8 retired. Up until my retirement, those were
9 the -- that's the teaching that I did prior to my
10 retirement in 2004.
11 Q. So all of the courses that you're
12 discussing here in this section all occurred
13 before you -- or when you were at the Miami-Dade
14 Police Department?
15 A. Yes. I taught not often but a couple
16 times several times a year. And I would take my
17 own time off. It really wasn't productive for me
18 to do it, but I did it anyway. I taught because I
19 thought maybe after I retired I might like to
20 teach. So I taught for the IACP and I taught for
21 the Southern Police Institute, but I would have to
22 use my own time. I would have to take off comp
23 time or annual leave time to conduct the seminars.
24 Q. Okay. So what were the years that --
25 let's -- I think there's three different

Page 53

1 categories of instruction we're talking about.
2 The first one is this, the certified instructor of
3 criminal investigations since 1985. What were the
4 years that you provided that training?
5 A. Well, that's when I was certified as
6 an instructor. I went through a course through
7 our academy to become a certified instructor in
8 the state of Florida. That was a -- I believe it
9 was a week-long session, a week-long course.
10 And subsequent to that is when I
11 started doing eight-hour sessions for the Florida
12 Department of Law Enforcement. I think the first
13 class I did, as I recall, was in Panama City,
14 Florida, and it was a group of detectives. It was
15 a robbery investigation seminar. And I continued
16 doing that for several years and then eventually
17 was contacted by the FBI Southern Police
18 Institute. They asked me if I would like to do a
19 similar type of course for them, which I did.
20 But I was restricted into how many
21 I could do because I was working at the time, so
22 it was very difficult. I had to take time off to
23 do those courses.
24 Q. Got it. So I'm trying to pinpoint the
25 years of the courses --

14 (Pages 50 - 53)

Page 54

1    A.  Well, I mean, it was -- it was from
2  1985 on.
3    Q.  Until when?  When was the last time
4  that you provided one of those courses?
5    A.  I don't recall.
6    Q.  Okay.
7    A.  I know that -- I mentioned here in
8  1999 I started teaching for IACP.  But these were
9  intermingled.  Sometimes I would teach a course
10  for IACP.  Sometimes I would teach for the
11  Southern Police Institute.  I'm not sure when each
12  of those initiated or when they stopped.
13    Q.  Okay.  Other than the IACP.  Right?
14  That starts in 1999.  Correct?
15    A.  Correct.  Correct.
16    Q.  And how many of the IACP courses did
17  you teach?
18    A.  Maybe, I don't know, maybe 15, 10 to
19  15, somewhere in there, a dozen.
20    Q.  Do you still have the materials from
21  those cases [sic]?
22    A.  No.
23    Q.  Do you have the materials for the --
24  I'm sorry, not for the cases.
25        But do you have the materials for

Page 55

1  the classes that you taught for the IACP?
2    A.  At IACP?
3    Q.  Yeah.  The IACP courses that you
4  taught, do you still have those materials?
5    A.  No.  A lot of it has been incorporated
6  and redone and is now part of my three-day course
7  that I offer through my company.  But, no, the
8  original class notes, no.
9    Q.  For the training that you provide for
10  your company, do you -- you said that -- what sort
11  of trainings do you provide?
12    A.  I used to do both homicide --
13  conducting a homicide -- conducting death and
14  homicide investigations course and conducting
15  officer-involved shootings and in-custody death
16  course.
17        I started out, when I started my
18  company, I was teaching both of those.  However,
19  it got to be too much.  I just had too many
20  courses.  So I reached out to a co-worker,
21  Chief Russ Fischer.  He was a chief of detectives
22  at Miami-Dade Police Department for years.  And he
23  and I worked together in robbery years before, so
24  we were good friends.  And he agreed to teach the
25  conducting officer-involved shootings and death

Page 56

1  investigation -- and in-custody death investi-
2  gations course for me to alleviate some of the
3  workload that I was encountering.
4    Q.  Do you recall when that was?
5    A.  Well, I started my company in 2004.
6  And probably by 2008 or 2009 he had come aboard
7  and helped me do some of the courses.  Maybe,
8  maybe before that, maybe 2006.
9    Q.  Okay.  So have you -- have you stopped
10  teaching the death and homicide courses since
11  then?
12    A.  No.  No.  I still teach that.
13  However, COVID has stopped me from teaching.  But
14  I still teach that course.
15        I gave the other course, the
16  officer-involved shooting and in-custody deaths
17  course to Chief Fischer.
18    Q.  And for the death and homicide
19  investigation course, do you have training
20  materials related to that?
21    A.  I do.
22    Q.  Okay.  And if we were to ask for
23  those, would you be able to gather them?
24    A.  I would be able to gather them.  But
25  I'm not going to give them out.  I'm not going --

Page 57

1  unless I'm given an order by a judge.  I mean,
2  I've had my materials stolen previously, and I'm
3  not going to give that up.
4    Q.  Did you rely on what's in the training
5  materials to provide your testimony -- or your
6  opinions in this case?
7        MR. KOSOKO:  Object to --
8            (Indecipherable
9            simultaneous speaking.)
10            (Court reporter clarifi-
11            cation.)
12        MR. KOSOKO:  Object to form.
13        THE COURT REPORTER:  And the answer,
14  please?
15        THE WITNESS:  Some of it, sure.
16  BY MR. THEIS:
17    Q.  Because you relied on those materials,
18  some of them, in forming your opinions, we're
19  likely going to ask for them after this
20  deposition.
21        Let's go back to the time period of
22  your -- when you were at the Miami Police
23  Department.
24        And, by the way, we're about an
25  hour in.  Do you want to take a break at this

15 (Pages 54 - 57)

Page 58

1  point? Do you want to keep going?
2      A.  I'm okay for a while. I might have to
3  use the bathroom later, but for now I'm okay.
4      Q.  Okay. Are you -- are you currently
5  employed in any way by the Miami-Dade Police
6  Department?
7      A.  No.
8      Q.  Okay. Are you currently employed by
9  the -- and I apologize for not pronouncing this
10 correctly probably, the Alachua County Sheriff's
11 Office?
12     A.  Alachua. Alachua County. No.
13     Q.  Thank you.
14     A.  That was a -- we reviewed all the
15 cases and that -- that was completed, the review
16 was completed.
17     Q.  And that was in 2011?
18     A.  Correct.
19     Q.  Okay. And, going to your report
20 again, you say that you were -- in 2006 you were
21 asked to return to Miami-Dade Homicide Bureau as a
22 paid cold case consultant. Excuse me. How long
23 did that consultancy last?
24     A.  Probably three years.
25     Q.  Did you -- was that three you said?

Page 59

1      A.  Three. Yes. Three.
2      Q.  Okay. Have you been hired as a
3  consultant by any other -- let me rephrase that.
4          Apart from your -- the -- well,
5  let's talk a bit about -- so you retired from the
6  Miami-Dade Police Department at what time? What
7  year?
8      A.  2004 was when I retired.
9      Q.  Okay. Can you give us an overview of
10 the structure of the Miami-Dade Police Department?
11 Is it one -- how many different units are there?
12 Is there a single chief of police? What is the
13 structure overall?
14     A.  Well, it's a little unusual --
15         MR. KOSOKO: Object to form.
16         THE WITNESS: This could take hours.
17 It's -- it's a little unusual. There's probably
18 3500 -- 3500 sworn and I'm sure over 6,000 total
19 employees. It's the -- one of the largest police
20 departments in the country. I think it's -- at
21 various times, it's either the eighth or the sixth
22 largest in the country. I think it's smaller now
23 because we're -- we have more territory that's
24 being incorporated into municipalities.
25         It's run by a director at present.

Page 60

1  At present we have a director. It's a little
2  different than other police agencies, county
3  police agencies, in Florida in that they're run by
4  sheriff's offices.
5          Now, just two years ago there was a
6  statute that was enacted in Florida that mandates
7  that Miami-Dade Police Department will become a
8  sheriff's office. So in 2025 I believe there will
9  be a sheriff that will be elected. A lot of
10 things will change. There will be -- there will
11 no longer be a director. The sheriff will no
12 longer be under the control of the county
13 government or the mayor.
14         There's a county mayor in
15 Miami-Dade County. And right now the county mayor
16 designates or appoints the director. So that will
17 go by the wayside. That's the way it's been for
18 the last 30 years under a home rule charter.
19         And this new -- it was a referendum
20 that was voted on by the people of Florida, and
21 they voted for a new type of government. All
22 other 67 counties in Florida are run by sheriffs.
23 The law enforcement is run by the sheriff. So the
24 rest of the state decided that Miami-Dade should
25 conform and have a sheriff.

Page 61

1  BY MR. THEIS:
2      Q.  Okay.
3      A.  We have a -- I think nine different
4  divisions within the present Miami-Dade Police
5  Department. Nine chiefs that run each division.
6  We have homicide. We have criminal investigations
7  division. A uniform division. It's typical of
8  many large -- the way the department is structured
9  is typical to many large police departments
10 throughout the country.
11     Q.  And are there detectives in all of
12 those divisions or is there a detectives division?
13     A.  There's a criminal investigations
14 division that involves homicide, robbery, sexual
15 battery, and a couple of others. However, there
16 is also an organized crime division that has
17 investigators that are considered -- there's no
18 such rank as detective within the Miami-Dade
19 Police Department. There -- each investigator is
20 simply a police officer who is plainclothes and
21 has become a detective. There's no specific rank.
22 They're considered investigators. And there are
23 sergeants that are promoted within those ranks,
24 but they could also be uniformed sergeants that
25 come to the detective or the criminal

16 (Pages 58 - 61)

Page 62

1 investigations division. So we have no detective
2 rank as other. Like, for example, New York has a
3 rank of detective. We have just a plainclothes
4 police officer who becomes a detective, an
5 investigator.
6     Q.   So just on that last part, do you
7 still become a detective or do you --
8     A.   Well, they're referred to as detective
9 but there's no specific rank. In other agencies,
10 larger agencies, you have to take a test many
11 times to become a detective. There's no test.
12 It's an appointment. It's usually an interview,
13 an interview process where you're interviewed,
14 your background is conducted, and you're asked to
15 come to a specific unit, for example, robbery or
16 homicide. And you can just as easily be asked to
17 leave. You could be asked to leave -- come one
18 day and the following day asked to leave. So
19 there's no -- there's no seniority involved.
20     Q.   And you mentioned sergeants and
21 promotions within the rank of sergeant. Is that
22 -- are there ranks within -- for sergeants is that
23 separate?
24     A.   There are. They are ranked sergeant,
25 lieutenant, captain, all the way up to major.

Page 63

1 However -- it's hard to explain, but you don't --
2 just because you make sergeant doesn't mean you're
3 going to stay a detective. You could -- and for
4 the most part, 99 percent of the time, when a
5 person makes sergeant they go back to uniform and
6 have to work their way back into an investigative
7 unit.
8     Q.   What do you need to do to become a
9 sergeant? Is there a test?
10     A.   There's a test, an interview, an
11 assessment center.
12     Q.   What was your -- I don't want to say
13 rank. What was your title at the -- when you
14 retired?
15     A.   Sergeant.
16     Q.   Okay. And how long had you been a
17 sergeant at that point?
18     A.   I made sergeant in 1981.
19     Q.   And had -- were there different ranks
20 within sergeant that you had been promoted to at
21 any point?
22     A.   No.
23     Q.   Okay.
24     A.   Just one sergeant's rank. As a
25 sergeant, you can be a sergeant anywhere in the

Page 64

1 police department. You could be a sergeant in the
2 property and evidence room. You could be a
3 sergeant in the crime lab. You could be a
4 sergeant in the public information office, in
5 homicide.
6     Q.   And between 1981 and 2000- -- my
7 apologies. Is it 2004 or 2006 when you retired?
8     A.   2004.
9     Q.   2004. Between 1981 and 2004 when you
10 were a sergeant, where were you assigned?
11     A.   From 19 -- well, I started in robbery
12 in 1977. I was in unit -- I came on the police
13 department in October of '74. I was in the police
14 academy. I graduated in March of '75. I did
15 18 months in uniform. And then I interviewed for
16 robbery, I was accepted as a robbery detective,
17 and I stayed in robbery until 1981. I made
18 sergeant in 1981. But unlike the tradition, I
19 stayed in robbery. I didn't go back to uniform as
20 99 -- as I mentioned, 99 percent stay in robbery.
21 And I remained in robbery until 1992 where I was
22 asked to go to homicide. And I transferred to
23 homicide and stayed in homicide until I retired in
24 2004.
25     Q.   And you were a sergeant that whole

Page 65

1 time, 1992 to --
2     A.   Correct. Correct.
3         I also functioned as an acting
4 lieutenant for several years. My lieutenant died
5 of a heart attack very young. And because we were
6 not -- there weren't many promotions being made
7 during those years, I was given the rank of acting
8 lieutenant for a couple of years until promotions
9 were made off of an existing promotional list.
10     Q.   And what were -- what were those
11 years?
12         (Ms. Alexakis joined the
13         deposition.)
14         THE WITNESS: Somewhere in the '90s.
15 I'd say probably mid-'90s.
16 BY MR. THEIS:
17     Q.   When you were the acting lieutenant,
18 was that of a specific division? Or what was --
19     A.   Homicide. In the homicide. As I --
20 that was known as an A slash. As a sergeant, a
21 A slash is an alternate sergeant. A lieutenant --
22 when my lieutenant is gone on vacation or takes a
23 holiday or is off sick, I act as the lieutenant
24 for that platoon. He was mainly working
25 afternoons, so I became the afternoon platoon

17 (Pages 62 - 65)

Page 66

1 lieutenant while he was away.
2     This is very typical. Many
3 sergeants do this throughout the department. And
4 there was also an acting sergeant on my squad who
5 when I was on vacation would be the sergeant. So
6 we filled the ranks for people when they're gone.
7     But, in my case, for a couple of
8 years in the mid to late '90s when my lieutenant
9 died I stayed the acting lieutenant for a couple
10 of years. But, again, after they filled that
11 rank, I was still the acting lieutenant when my
12 lieutenant, the new lieutenant, would take days
13 off or go on vacation.
14     I know it sounds kind of
15 complicated, but it's not. It's very simple.
16   Q. No. Thank you.
17     How many did you supervise when you
18 were in the lieutenant role -- I'm sorry, let's
19 start with the sergeant role, the sergeant role in
20 homicide from '92 to 2004?
21   A. Usually -- usually five to six
22 investigators on each team. There was -- each
23 shift there were three to four -- depending on the
24 shift. On one shift afternoons it was four teams.
25 So anywhere from 20 to 25 detectives I guess on --

Page 67

1 20 to 24 detectives on each shift. Now, on day
2 shift there were only three teams, so it would be
3 15, 15 to 18.
4   Q. And were you an active participant in
5 the investigations that those investigators were
6 handling?
7   A. Yes.
8   Q. About how many --
9   A. We have a lead -- I'm sorry.
10   Q. No, go ahead.
11   A. I shouldn't have talked over you.
12     We have -- we had a lead for each
13 case. But, as a sergeant, I had a hands-on role
14 to supervise the lead. We discussed everything
15 that the lead did on each case between the two of
16 us.
17   Q. About how many homicide investigations
18 were you a part of between '92 and 2004?
19   A. Well, you figure each detective was
20 the lead -- we had five to six detectives. Each
21 detective every year was the lead on at least six
22 or seven murders; in really heavy years, maybe
23 eight. So that's, what, 40, 50 cases a year times
24 10, probably around 500 cases, I guess, 50 --
25   Q. Is that --

Page 68

1   A. -- cases a year.
2   Q. I'm sorry. So does that -- does that
3 include both death investigations and homicides?
4   A. No. That's homicides. That's
5 homicides alone and police shootings.
6     The lead would rotate through our
7 squads. So each squad member became the lead on a
8 strictly rotational basis. If you were up, you
9 were up. It didn't matter what the case was.
10     The only exception would be a
11 police shooting. In that instance, the A slash
12 that I mentioned earlier would be the lead
13 investigator on the police shooting, and he would
14 drop out of the rotation and then the next
15 detective would handle the next homicide.
16     There were many days where we had
17 enough homicides on one shift to go through the
18 entire rotation.
19   Q. Was there a department of internal
20 affairs?
21   A. Yes.
22   Q. Okay. Were you ever the subject of an
23 internal affairs investigation?
24   A. Yes.
25     MR. KOSOKO: Object to form.

Page 69

1 Foundation.
2 BY MR. THEIS:
3   Q. Was there -- was it more than one or
4 was it one? How many do you think there were?
5   A. Oh --
6     MR. KOSOKO: Object to foundation.
7     THE WITNESS: -- 40 years, you're
8 going to -- if you're on the police force, you're
9 going to be the subject of an IA investigation.
10 BY MR. THEIS:
11   Q. Got it. And, I'm sorry, how many do
12 you think that you were --
13   A. I don't know.
14   Q. -- the subject of?
15   A. Ten I would say.
16     (Indecipherable
17     simultaneous speaking.)
18 BY MR. THEIS:
19   Q. Less than ten?
20     (Court reporter clarifi-
21     cation.)
22     MR. KOSOKO: Yeah, the objection is
23 object to form and foundation.
24 BY MR. THEIS:
25   Q. Of the less than ten IA investigations

18 (Pages 66 - 69)

Page 70

1 that you were the subject of, can you recall what
2 the subject matter of those investigations were,
3 was?
4     A.   No.  I mean, I don't recall what the
5 allegations were.  There are allegations that are
6 levied many times that we have to go to internal
7 affairs.  And many of those cases I was probably
8 just a witness on some of those, too, on those
9 cases that I mentioned, probably not the subject.
10 The subject officer?  Minimal cases.  I'm not
11 really sure.  And I don't recall the specifics of
12 the investigations.  They were so long ago.
13          I'll tell you this.  I never was
14 involved in one in homicide, so I know that they
15 all occurred probably when I was in robbery.  And
16 you're talking 30, 35 years ago, so I don't
17 remember the complete details.
18     Q.   Were you ever disciplined as a result
19 of any of those investigations?
20     A.   I've never received discipline, no, by
21 the department of any kind.
22     Q.   Separate from an internal affairs
23 investigation, were you ever the subject of any
24 form of complaint when you were at the police
25 department?

Page 71

1          MR. KOSOKO:  Object to form.
2          THE WITNESS:  I'm sure there were
3 complaints of some type, but I don't recall them.
4 I'm sure my sergeant got complaints when I was a
5 detective.  And I'm sure my lieutenant got some
6 complaints.  But I don't recall.  I don't recall
7 what the specifics were.
8 BY MR. THEIS:
9     Q.   Were you -- I'm sorry, go ahead.
10     A.   Complaints were the byproduct of being
11 a police officer.  They happen.
12     Q.   Were you ever the defendant in a
13 lawsuit related to any of your conduct at the
14 police department?
15     A.   No.
16     Q.   Do you recall in 1996 a rule to show
17 cause proceeding before Judge Jorge Cueto?
18     A.   No.
19     Q.   Do you have any memory of what
20 happened in that proceeding?
21     A.   None.  What was the judge's name?
22     Q.   Jorge Cueto.
23     A.   Never heard of him.
24     Q.   Would a -- why would a police officer
25 be subject to a criminal rule to show cause order

Page 72

1 from a judge during the time of --
2          MR. KOSOKO:  Object to form --
3             (Indecipherable
4           simultaneous speaking.)
5          MR. KOSOKO:  -- foundation.
6          Hang on.  Hang on, Sergeant --
7          THE WITNESS:  Sure.
8          MR. KOSOKO:  Object to form.
9 Foundation.  Also calls for a legal conclusion.
10 Incomplete hypothetical.
11          Go ahead.  You can answer.
12          THE WITNESS:  It could be any number
13 of reasons.  Maybe reports weren't done correctly.
14 Maybe one of my detectives hadn't turned in their
15 reports needed for trial.
16          But I don't recall that judge, his
17 name at all.  I don't -- in '96 I would have been
18 in homicide.  It could very well have been a
19 detective who didn't turn in -- I'm just guessing
20 here, but a detective who may not have turned in
21 the reports and I was called in front of the judge
22 to explain why those reports weren't done, being
23 the supervisor.  I'm not really sure.
24 BY MR. THEIS:
25     Q.   In your report, you have a section

Page 73

1 called credentials.  Are there any other
2 credentials other than what you list in your
3 report that would be relevant to whether you're
4 qualified to provide expert testimony in this
5 case?
6     A.   I'm not sure what you'd be referring
7 -- I don't -- not that I can think of.  I believe
8 I listed them.  I'm not sure what you mean.
9     Q.   Well, is there anything else that --
10 in your professional experience that would, in
11 your opinion, qualify you to give expert testimony
12 in this case?
13     A.   None that I have -- other than I've
14 mentioned I don't think.
15     Q.   Back to your report.  Let's go to page
16 three.  You have a section here titled Materials.
17 Do you see that?
18     A.   Yes.
19     Q.   Okay.  And there's -- and you say:
20 I have reviewed the following materials in the
21 preparation of this report.
22          Do you see that section?
23     A.   I do.
24     Q.   And you number, there's 25 different
25 items that are listed here in this section.  Were

19 (Pages 70 - 73)

Page 74

1   these -- are these all of the materials that you
2   reviewed in preparation for this report, the
3   report that you prepared?
4        A.   That's correct.  I tried to -- I've
5   done this before of course.  So I tried to list
6   them as I read them.  And I tried to make a list
7   of the materials as I read them, and this is the
8   list that I came up with, yes.
9        Q.   Okay.  I'm going to put you to -- and,
10  sorry, were these materials all produced to us?
11       MR. KOSOKO:  Object to -- object to
12  form.  Foundation.  I mean, I don't know how he
13  could answer that.  We produced that.
14       THE WITNESS:  You're asking me?  I
15  don't know.
16  BY MR. THEIS:
17       Q.   Yeah.  I want to point -- talk about a
18  specific item, number 25 here on page 4.  It says:
19  Chicago Police Department area file which includes
20  police reports, medical examiner report, crime
21  scene photos, lineup photos, police department's
22  annual report, detective bureau standing [sic]
23  operating procedures and more.
24       Do you see that section?
25       A.   I do.

Page 75

1        Q.   I'll ask this part again.  Are there
2   any parts of what you're calling the Chicago
3   Police Department area file that you reviewed that
4   were not produced to us?
5        MR. KOSOKO:  Object to form.
6   Foundation.
7        THE WITNESS:  I have no idea.
8   BY MR. THEIS:
9        Q.   I'm sorry?
10       A.   I have no idea.  I don't -- I don't
11  know what you got.
12       Q.   You received a subpoena in this case.
13  Correct?
14       A.   I've never seen a subpoena.
15       Q.   You've never seen a document subpoena
16  that was issued related to your expert testimony
17  in this case?
18       A.   There may be a subpoena.  I don't --
19  I don't recall that I ever saw one.  I may have
20  been told there was a subpoena.
21       Q.   Okay.  Were you told to collect
22  documents in response to that subpoena?
23       A.   I believe so, yes.  That's generally
24  what's included in the subpoena.
25       Q.   Okay.  But you don't recall reviewing

Page 76

1   the subpoena.  Is that right?
2        A.   No.  I discussed it with the attorney,
3   but that's all, with Mr. Kosoko.  That's all I
4   know.
5        Q.   Okay.  I'm showing you a copy of the
6   subpoena that was issued in this case.  It sounds
7   like you have not seen this before.  But I want to
8   ask about a couple categories of documents.
9        The first question is -- the first
10  category of documents is any and all documents and
11  other materials prepared by Anthony Monheim in
12  forming his opinions in this case, including but
13  not limited to notes, summaries, memoranda,
14  transcriptions, diaries, photographs, drawings and
15  maps, but excluding those materials that are
16  protected from disclosure by Federal Rule of Civil
17  Procedure 26.  Do you see that request?
18       A.   I do.
19       Q.   Okay.  Did you turn over -- did you
20  take any notes in this case as you were reviewing
21  the depositions and the case file?
22       A.   No.  What I do is I highlight.  I
23  highlight.  I read the material and I highlight.
24  It's kind of a strange procedure I go through, but
25  I highlight and I put the highlighted sections to

Page 77

1   one side and the sections that I have no
2   highlights on to another.  Then I go back through
3   the highlights when I write my report.
4        Q.   I see.  Okay.  So you did not take any
5   additional notes on the materials other than the
6   highlighting?
7        A.   Just the highlighting.  That's what I
8   use.  Yes.
9        Q.   Did you review all the materials in
10  this case in hard copy or in -- electronically?
11       A.   Well, it was on a -- it was
12  electronically sent to me, but I printed a lot of
13  it.  I couldn't print the area file, it was like
14  15, 17 hundred pages, so I went through that on
15  my -- I reviewed that on the computer page by
16  page.  But the depositions and other things, I
17  have hard copies in a box here.
18       Q.   I want to go back to the materials
19  that you reviewed in this case.
20       Just to confirm, item number 24 is
21  the report of Expert Dennis Waller dated
22  September 27, 2021.  Do you see that?
23       A.   Yes.
24       Q.   So you reviewed that report before you
25  drafted your report, your report.  Is that

20 (Pages 74 - 77)

Page 78

1 correct?
2 A. As I recall, yes. I'm not -- yes, I
3 believe so.
4 Q. Were you provided with any other
5 materials other than what's listed in the
6 materials section here of your report?
7 A. No. As I said, when I received the
8 materials on the -- it was in an e-mail, I went
9 through each of the files and I would read them
10 and then I would highlight them and I would list
11 them on a report form. I would list them in my
12 report. So I would do them chronologically.
13 Q. But there's no other documents that
14 you reviewed in preparation of your report other
15 than what's included here in this materials
16 section?
17 A. Not that I recall, no. Not that I
18 knew of.
19 Q. Did defense counsel provide you with
20 any assumptions that they wanted you to make in
21 preparing your report?
22 A. No.
23 Q. Did they provide you with any court
24 cases or legal research?
25 A. No. Other than what I read, no.

Page 79

1 MR. THEIS: Okay. I saw a comment
2 about the video. I'm kind of at a breaking point
3 here. We can take a short break, if that's
4 helpful.
5 MR. KOSOKO: Yeah. So the video-
6 grapher can reload. That's fine.
7 THE VIDEOGRAPHER: We are going off
8 the record. The time is 11:27 a.m.
9 (A break was taken from
10 11:27 a.m. until
11 11:42 a.m.)
12 THE VIDEOGRAPHER: We are back on the
13 record. The time is 11:42 a.m. Please proceed.
14 BY MR. THEIS:
15 Q. Mr. Monheim, I'm showing you your
16 report here again on the screen. This report
17 contains all of the opinions that you would
18 provide if you were called at trial in this
19 matter. Correct?
20 A. Yes.
21 Q. And the report contains all of the
22 factual bases for your opinions. Correct?
23 A. Yes.
24 Q. You didn't leave out any facts that
25 were relevant to your opinions when drafting your

Page 80

1 report. Right?
2 A. Not that I know of, no.
3 Q. I want to ask you about your under-
4 standing of the role of a detective in a homicide
5 investigation. What is your understanding of that
6 role?
7 A. Well, solve the murder, to find out
8 who the person is that committed the murder.
9 Q. Okay.
10 A. And to provide evidence against them.
11 Q. Okay. Would you agree it's the goal
12 of a homicide investigation to determine the
13 truth?
14 MR. KOSOKO: Object --
15 THE WITNESS: Absolutely.
16 MR. KOSOKO: -- to form.
17 BY MR. THEIS:
18 Q. And the response there was
19 "absolutely." Is that correct?
20 A. Correct.
21 Q. And was that the case when you were a
22 sergeant and an investigator?
23 A. Again, yes.
24 Q. Properly gathering evidence is
25 important to ensuring that you find the right

Page 81

1 person. Correct?
2 A. It is.
3 Q. And a homicide investigation in
4 particular, it's important to ensure that you are
5 properly preserving evidence related to that
6 investigation. Correct?
7 A. Correct. I would agree with that.
8 Q. Okay. Would you -- and we agree that
9 a homicide investigation needs to be thorough?
10 A. Again, absolutely. Yes. More so than
11 most other investigations.
12 Q. More so than most investigations.
13 And how do you determine whether a homicide
14 investigation is thorough?
15 A. Well, it's all relative. I mean, each
16 investigation, each case is different from another
17 case. Some cases are simple. Some are quite
18 complex. I mean, we go from the husband shooting
19 his wife and committing suicide to a true whodunit
20 where someone is killed in their home and there's
21 no evidence of who that person is. So it runs the
22 whole gamut. I mean, there's a huge, huge area
23 that we're talking about there. So thoroughly
24 is important, but it's all relative, too.
25 Q. Okay. Would you agree that a proper

21 (Pages 78 - 81)

Page 82

1  homicide investigation should include an
2  investigation into physical evidence?
3      A.  It could, yes, if there is any, yes.
4      Q.  Okay.  If there is any.
5          And would you also agree that a
6  proper homicide investigation should include an
7  investigation into forensic evidence, if there is
8  any?
9      A.  If there is any, yes.
10     Q.  Would you agree that a proper homicide
11 investigation should include an investigation into
12 opportunity to commit the crime?
13     A.  Sure.  That's one of the criteria,
14 opportunity.  And if the person has the
15 opportunity to commit the crime, yes, and the
16 means.  So yes.
17     Q.  And you mentioned means.  In your
18 report, you refer to a categorical trinity of
19 homicide investigations.  Correct?
20     A.  That's a teacher's term.  But, yes,
21 that's what we refer to it as.
22     Q.  Okay.  And that includes opportunity
23 to commit the crime and means, and it also
24 includes motive.  Correct?
25     A.  Well, motive is part of that trinity,

Page 83

1  but it's not required.  There's no requirement
2  that you establish motive in a homicide
3  investigation.  Does the jury want to know motive?
4  Sure they want to know the motive.  But there's no
5  requirement that you determine what the motive is.
6  There could be a motiveless murder easily.  I've
7  had many of them.
8      Q.  You say there's --
9      A.  Or at least --
10     Q.  Sorry.
11     A.  I'm sorry.  Or at least never
12 determined what the motive was.  Of course, the
13 killer knows their motive.  But many times the
14 investigator never -- it's never revealed to the
15 investigator.
16     Q.  But you would agree that a homicide
17 investigator should at least consider and look
18 into motive?
19         MR. KOSOKO:  Object to form.
20         THE WITNESS:  Sure.  And the reason
21 being that a jury wants to know motive.  They
22 are -- they have a difficult time with jury
23 deliberation if they don't know what the motive
24 is.  That's one of the reasons we try to -- we
25 strive as investigators to determine the motive,

Page 84

1  and for our own information so that we can pursue
2  the case based on the motive.  But sometimes you
3  don't know the motive.
4  BY MR. THEIS:
5      Q.  So is it -- it sounds like you're
6  saying it's not just about what you can prove
7  before a jury but also what is important for
8  convincing the investigator that they have the
9  right person.  Would that be fair?
10         MR. KOSOKO:  Object to form.
11         THE WITNESS:  Well, motive can --
12 motive can give you direction.  If you establish
13 what the motive is, then it gives you direction to
14 who that person might be.  It's more difficult to
15 solve a case without motive; that's true.  So a
16 motive is important, if you can establish it, to
17 help you in your investigation.
18 BY MR. THEIS:
19     Q.  You would agree that it's important
20 for homicide detectives to record information in
21 reports.  Correct?
22         MR. KOSOKO:  Object to form.
23         THE WITNESS:  Oh, within reason, yes.
24 I mean, you can't record every single thing you
25 do.  I mean, you can't record I put my keys in the

Page 85

1  ignition, I put it in park, I put it in drive.  I
2  mean, you know within reason, yes.  If it pertains
3  to the homicide investigation, yes, it should be
4  documented.  If it's important to the investi-
5  gation, it should be documented, yes.
6  BY MR. THEIS:
7      Q.  In the city of Chicago in 2002,
8  detectives were supposed to put everything created
9  in connection with a criminal investigation into
10 an investigative file.  Right?
11         MR. KOSOKO:  Object to form.
12         THE WITNESS:  I would assume that's
13 typical.  That's a typical.  Yes, we have a --
14 usually we have a file.  But L.A. calls it a
15 murder book.  But it's basically the same thing,
16 yes.
17 BY MR. THEIS:
18     Q.  And you reviewed the investigative
19 file compiled by the investigators in this case.
20 Correct?
21     A.  I reviewed what was given to me.  I'm
22 not sure if that was the entire file.
23     Q.  Did you review the deposition
24 transcripts of the three officer -- detective
25 defendants in this case?

22 (Pages 82 - 85)

1    A.   I did.
2    Q.   And, in those three depositions, they
3  were presented with an exhibit that they each
4  identified as the investigative file in this case.
5  Do you recall reading that?
6    A.   I do, yes.
7    Q.   Okay.  That investigative file should
8  include exculpatory information as well as
9  inculpatory information.  Correct?
10      MR. KOSOKO:  Object --
11      THE WITNESS:  Yes.
12      MR. KOSOKO:  -- to form.
13 BY MR. THEIS:
14   Q.   All right.  I just want to make sure.
15 The answer was yes to that?
16   A.   Yes.
17   Q.   You would agree that detectives
18 investigating homicides should not fabricate
19 evidence.  Correct?
20   A.   Yes.
21   Q.   And you would agree that probable
22 cause to arrest should not be based on fabricated
23 evidence?
24   A.   Yeah.  I would agree with that.
25   Q.   So, for example, if a detective

1  created a false link between a murder weapon and a
2  suspect and then used that to justify probable
3  cause to arrest, that would be improper.  Correct?
4    A.   That example you gave would be
5  improper.  However, you know, we can't say always
6  always always.  There are exceptions to every --
7  every situation.  But the example you gave I would
8  agree with, yes.
9    Q.   One of the homicide detective's role
10 is to present information to a prosecutor in the
11 course of presenting evidence for potential
12 charges against a suspect.  Is that right?
13   A.   Correct.
14   Q.   Okay.  And it would be against
15 nationally recognized standards of police
16 practices for a detective to present false
17 information to a prosecutor in the course of
18 making a charging decision.  Correct?
19   A.   Yes.  Yes.
20   Q.   And you would agree that under no
21 circumstances should a detective provide false
22 testimony in a court proceeding.  Correct?
23   A.   That's correct.
24   Q.   And you would agree that under no
25 circumstances should a detective provide false

1  testimony to a Grand Jury?
2    A.   That's correct.
3    Q.   Providing false testimony to -- in a
4  court proceeding or to a Grand Jury, that would
5  violate nationally recognized police standards.
6  Correct?
7    A.   It certainly would, yes.
8    Q.   Police officers have a duty to
9  disclose what's known as Brady material.  Correct?
10   A.   Yes.
11   Q.   And so, right, if detectives have
12 exculpatory information, they should disclose that
13 to the prosecutor.  Is that correct?
14   A.   Correct.
15   Q.   Okay.  In general terms, what is the
16 purpose of conducting either a -- well, let's
17 start with a photo array.  What's the purpose of
18 conducting a photo array in a homicide investi-
19 gation?
20      MR. KOSOKO:  Object to form.
21 Foundation.
22      THE WITNESS:  Well, as I mentioned in
23 my report, it's twofold.  It's, number one, to
24 determine if the person's that you -- whose name
25 you've been given or you've determined is actually

1  the perpetrator of the homicide.  Or to exonerate
2  a person falsely accused of being involved in a
3  murder.  So it's a -- it's a double purpose when
4  you show a photo array.
5  BY MR. THEIS:
6    Q.   And what's the purpose of conducting a
7  lineup in a homicide investigation?
8    A.   A live lineup?
9    Q.   A live lineup.
10   A.   Again, as I mentioned in my report,
11 it's important for a witness to see that
12 individual in person.  And, again, referring back
13 to my report, I've had many situations over the
14 years where, after identifying someone in a photo
15 array, the person is not identified by the witness
16 or witnesses in a -- or a victim in some cases in
17 robberies -- in a live lineup.
18      So if that occurs, then that person
19 is generally released from custody, unless there's
20 other evidence against them.  But if the sole
21 evidence is that photo array, that person would be
22 released from custody and not prosecuted unless
23 there was further evidence obtained.
24      And, again, and referring back to
25 my report, I've mentioned there have been several

23 (Pages 86 - 89)

Page 90

1  situations that I've encountered where witnesses
2  have identified someone from a photo array and
3  then said to me at the live lineup, live physical
4  lineup, "Detective, from the picture I thought
5  that was the person. But this isn't. That's not
6  him. No, that's not the person." And, again, if
7  that's the case, that person would be released
8  from custody if they were in custody, if they were
9  in custody at the time, if they had been arrested.
10     Q.  In that circumstance you described
11  where the person first identifies the individual
12  in a lineup but -- I'm sorry, in a photo array but
13  then not in the lineup, are they released because
14  there's no longer probable cause to arrest that
15  person?
16         MR. KOSOKO:  Object to form.
17  Foundation.
18         THE WITNESS:  Well, I'm not --
19  BY MR. THEIS:
20     Q.  Why would they be released I guess is
21  my question.
22     A.  I guess because that's -- because it
23  doesn't support the photo array. The photo array
24  gives you the probable cause to arrest that person
25  initially. And then when you place them in the

Page 91

1  live lineup, if they're not identified, then you
2  just can't proceed. There's no way you can
3  proceed in court because they're not able to
4  identify that person in person. So it's just --
5  it's always the case and point where you can't
6  proceed.
7     Q.  At what stage of an investigation of a
8  homicide would you employ a line -- either a --
9  let me restart, if I can.
10        At what stage of a homicide
11  investigation would you employ a photo array?
12    A.  When a suspect is determined, if you
13  have a genuine suspect, that's -- for the most
14  part, that's when a photo array is shown.
15  However, I've done photo arrays just based on
16  Crime Stopper information or information from
17  witnesses. "I think it was so-and-so. It may
18  have looked like so-and-so."
19        I've also compiled photo displays
20  that I mentioned in my report just on information
21  that I had acquired over the years about
22  descriptions of people, MOs that certain people
23  have. Particularly in robbery cases, MO is
24  important. And once a person has an MO it becomes
25  distinctive and you may reach back, remember an

Page 92

1  old MO and pull that file, that photo out of your
2  working file, and compile a photo lineup.
3        So there's any number of reasons
4  why a photo array might be established. But it's
5  usually because you suspect that this person might
6  be that perpetrator. That's why you compile the
7  photo array.
8        And, again, you're trying to
9  determine if it is the person or if it's not the
10  person. You have a duty to determine if it's not
11  them, see, so. And you have an obligation to the
12  investigation because, if it's not them, then you
13  can go on to different avenues. If you have a
14  hunch or you think this might be the person and
15  then you show a photo lineup and they say, "No.
16  No. That's not him," well, then you're satisfied
17  as an investigator that's not the person, let's go
18  on to something else.
19    Q.  In your report, you state that when
20  the name of a suspect surfaces during an
21  investigation, it is the duty of the lead
22  investigator to determine if the information has
23  been given -- he has been given is valid or not.
24  Do you recall that part of your report?
25    A.  I do.

Page 93

1     Q.  Okay. And you say that the most
2  expeditious way to accomplish -- actually, let me
3  read the whole thing: Not only to identify the
4  perpetrator but to ensure that an individual who
5  is completely innocent is not wrongfully accused.
6        That's what you were just
7  discussing now. Correct?
8     A.  Exactly. Yes. Yes.
9     Q.  And the most expeditious way to
10  accomplish both goals is for the accuser to view a
11  photograph of the named person. Is that -- is
12  that right?
13    A.  In a photo array, yes, it should --
14    Q.  In a photo array.
15    A.  -- a photo array.
16    Q.  Okay. So when you have a suspect --
17  I'm sorry.
18    A.  You don't just show one picture.
19  There are situations where you can show one
20  picture, but in most situations it's the array.
21    Q.  Okay. So when you have a suspect that
22  comes up in an investigation, the most expeditious
23  way to accomplish the goal of determining whether
24  or not that person is the person who committed the
25  crime is to show the photo array. Is that

Page 94

1 accurate?
2    A.   Right.
3         But there are situations where you
4 could just show a single photo.  For example, if
5 someone says, "The person that killed so-and-so --
6 [audio distortion] -- I went to high school with
7 them --
8              (Court reporter clarifi-
9              cation.)
10       THE WITNESS:  "I know them by their
11 nickname as, say, Chino" -- or something like that
12 -- "I know their nickname.  I was in class with
13 them.  I know who they are."  In a situation like
14 that, there's no requirement to show a photo
15 lineup.  You could show a single photo to
16 determine that this is, in fact, the Chino that
17 they're referring to or the -- whatever the
18 nickname is that they're referring to.
19       So there's not a requirement to
20 always show a photo array, but generally, yes,
21 generally a photo array is what we would use.
22 BY MR. THEIS:
23    Q.   Are you familiar with the term
24 "filler"?  You used that in your report, I
25 believe.

Page 95

1    A.   Yeah.  Sometimes they call them foils,
2 fillers, yes.
3    Q.   Okay.  And what is a filler or a foil?
4    A.   Well, when you have a specific suspect
5 that you're going to make the -- I hate to use the
6 word "target" but the target of your photo array,
7 you generally go through older pictures that you
8 have.
9         In my case, we used to use -- we
10 had several huge boxes of photographs, ID,
11 identification photographs, and we would go
12 through each photograph individually and compile a
13 photographic lineup.  Now today it's done by
14 computer.  You just enter the person's photograph,
15 and the computer sorts through its thousands upon
16 thousands of photographs and compiles a photo
17 lineup for the detective.
18       So it's -- that's what I was
19 referring to as compiling the photo lineup -- the
20 photo array I should say, I'm sorry.
21    Q.   And how -- can you give a little more
22 detail about the process that you would use to
23 compile the photo array in that circumstance?
24 When you have a suspect and you need additional
25 fillers, what process would you use to identify

Page 96

1 who the fillers should be?
2    A.   Well, you would want to make the
3 filler photographs resemble the person as the --
4 again, I hate to use the word "target," but the
5 subject, I should say the subject of the photo
6 array, but you don't want them too closely to look
7 like that person.  That would defeat the purpose
8 of showing the photo array both to exonerate and
9 to implicate.
10       So, for example, the first thing,
11 if the subject of the lineup is white, you're not
12 going to put all black fillers in the photo
13 lineup.  I mean, that's just rudimentary.  That's
14 just basic.  If the person in the photograph has a
15 mustache and a goatee like I do, you would try to
16 include people in that photo lineup that have the
17 same facial hair.  If the person has a huge scar
18 on their forehead, you would incorporate people
19 that have a scar.
20       I've had situations where a person
21 has a scar on their forehead but we can't come up
22 with enough filler pictures to include in the
23 lineup, so we had to put a piece of white tape or
24 Wite-Out, we used to use Wite-Out in the old days,
25 white out the scar on everyone, just put a

Page 97

1 Wite-Out streak where that scar was just to make
2 the lineup fair so that no one stands out.  That's
3 what you want -- the goal of the lineup is to make
4 sure that no one, particularly the subject, stands
5 out.
6    Q.   And, as you mentioned, you know, you
7 mentioned the goatee and the mustache.  If
8 someone -- if the suspect had a goatee or
9 mustache, you'd want to have other individuals in
10 the -- that were the fillers to also have the
11 mustache or goatee?
12    A.   See, now you're getting into the weeds
13 a little bit because if the person in the picture
14 that you're going to show has a mustache or a
15 goatee, you want to make the filler pictures
16 similar so that that person won't stand out.
17    Q.   I see.
18    A.   But it may be at the time of the
19 robbery or the murder the witnesses did not
20 describe a mustache or did not describe a goatee
21 or did not describe a scar.  So you still have to
22 include those things so that that person does not
23 stand out in the lineup.
24    Q.   And just to -- we're still talking
25 about photo arrays here.  Right?

25 (Pages 94 - 97)

Page 98

1    A.   Yes.
2    Q.   Okay.  In terms of a lineup, is it --
3  was it standard practice when you would conduct
4  lineups to include a suspect in the lineup and
5  then several fillers?
6    A.   There you're talking --
7         MR. KOSOKO:  Object to form.
8  Foundation.
9         THE WITNESS:  You're talking about a
10  live physical lineup?
11  BY MR. THEIS:
12    Q.   Right.
13    A.   Correct?  Yes.  Live physical lineups
14  are much more difficult, of course, than a photo
15  array because a photo array you have thousands and
16  thousands of fillers to choose from.  In a live
17  lineup, you're limited, you're drastically limited
18  in many cases by the people that are in custody at
19  that time.
20         We used to walk the floors of the
21  Dade County Jail and try to entice people into
22  participating in a lineup.  We would offer them
23  cigarettes many times to participate in a lineup.
24  And it was very difficult.  Most people turned us
25  down.  Doing a live lineup can be a difficult

Page 99

1  undertaking because of the effort it takes to come
2  up with fillers.
3    Q.   And how would -- and just to get a
4  little more detail, how would you go about finding
5  fillers in a live lineup?
6    A.   Exactly as I explained --
7    Q.   Yeah.
8    A.   -- you would go -- you would have to
9  use people in custody.  Now, theoretically you
10  could go out on the street and you could ask
11  people if they would participate.  But most people
12  are very reluctant, they don't want to participate
13  in a live lineup.  I've tried that many times.
14  I've had people who volunteer, they've agreed to
15  come and stand in line.
16         Another option is to use actual
17  police officers or employees.  For example, we
18  worked out of a headquarters building where the
19  lineup room was, other employees who might be
20  willing to stands in the lineup.  But that's
21  difficult to do also.
22    Q.   And I'm sorry -- no, go ahead.
23    A.   I was going to mention, so what I was
24  going to end up saying is live physical lineups
25  are very difficult to conduct because you have --

Page 100

1  for that reason, is coming up with the foils or
2  the stand-ins.
3    Q.   And, I'm sorry, I didn't mean how do
4  you physically bring the people in but --
5    A.   Oh.
6    Q.   -- how do you select individuals
7  that -- to go into the lineup?  Are there
8  characteristics that you're looking for when you
9  have a suspect that's in the lineup as well?
10    A.   The same as a photo array.  Basically
11  the same criteria as the photo array.
12    Q.   Okay.
13    A.   But, again, you're limited.  In a
14  photo array, you have a lot of options.  And
15  sometimes you have to compromise in a live
16  physical lineup because of your limited options,
17  you have to compromise with characteristics.
18    Q.   So in a -- in a photo array, you have
19  much more ability to, because of the number of
20  photos that are out there, find individuals that
21  have similar characteristics.  Would that be fair?
22    A.   That's fair to say, yes.
23    Q.   You would agree that eyewitness
24  identifications can be fallible.  Correct?
25    A.   Yes.

Page 101

1    Q.   And you would agree that there are
2  shortcomings of eyewitness identifications.
3  Correct?
4    A.   Yes.
5    Q.   You would agree that specifically
6  sometimes eyewitnesses themselves can be
7  unreliable in the identifications that they make.
8  Is that correct?
9    A.   That's correct.
10         And, on the other hand, we have to
11  talk about the other side of the coin, they can be
12  extremely reliable.  I mean, I've had situations
13  where I'm just amazed at how -- at the ability of
14  people to identify -- it depends upon the person.
15  Each person is different.  So it depends upon each
16  individual person, each individual case.
17    Q.   In those --
18    A.   But in general, yes.
19    Q.   In those circumstances where, in your
20  words, the identification is more reliable, what
21  factors are you using to determine that?  How do
22  you know that an identification is more or less
23  reliable?
24    A.   Well, I've had situations where --
25  particularly in robberies where a 7-Eleven or gas

26 (Pages 98 - 101)

Page 102

1 station are robbed where I would be given a name
2 through either an informant or a Crime Stoppers
3 tip or some information would come forward that
4 would give me a name, and I'd compile a photo
5 lineup, and I'd go show it to that person thinking
6 in a million years they'll never identify and they
7 go right to that person, "That's the person right
8 there. That's him." And I was amazed sometimes
9 at how they were able to identify someone from an
10 event that was so terrifying that occurred so
11 quickly.
12         And, again, I'd have to be fair on
13 the other side of the coin. There are people that
14 could never identify --
15    Q.   Right.
16    A.   -- someone.
17    Q.   I guess -- but I guess in that
18 circumstance where there -- you are amazed at how
19 well they can identify someone, how do you know
20 that they're identifying the right person? What
21 corroborating --
22    A.   Well --
23    Q.   -- evidence are you using?
24    A.   Well, it's the name --
25         MR. KOSOKO: Object to form.

Page 103

1         THE WITNESS: -- that's given.
2 BY MR. THEIS:
3    Q.   I'm sorry?
4    A.   Well, if it was the name that I was
5 given, that someone, an informant, told me that
6 this is the person who did the robbery, and if you
7 show a photograph with five fillers in it, the
8 odds are astronomical that they're not going to
9 pick out the right person. And I've seen them
10 with -- so positive that this is them, that that's
11 what I'm saying, it was amazing to me. There are
12 other situations where no ID is made also.
13         And then, again, I would -- I
14 would not arrest someone just based on one single
15 photo ID. It would be then I would -- if there
16 were other witnesses and then someone else would
17 identify that same person from the same photo
18 array, then the odds go up even more
19 astronomically that they could pick that person
20 out. So multiple victims and multiple witnesses
21 identifying the same person increases the probable
22 cause dramatically.
23    Q.   So you would not -- just to rephrase
24 what you just said, you would not arrest someone
25 based on a single identification in a photo array?

Page 104

1    A.   Sole -- solely just on a photo array,
2 no. But usually there's more information than
3 that. If I had a hunch that it was this person
4 and I compiled a photo lineup and gave them that
5 photo lineup, they picked out that person, I would
6 be very reluctant to arrest them just based on
7 that. However, had I received information from an
8 informant that this was the person that did that,
9 then I don't have just information -- an ID from
10 the photo array, I have informant information also
11 that would corroborate it.
12         So just based on a photo ID that I
13 would show, no, I would be reluctant to do it. I
14 would do some more investigation. But then it
15 would point me to that person for sure.
16    Q.   You would agree that witnesses are
17 rarely accurate in their descriptions of time.
18 Correct?
19         MR. KOSOKO: Object to form.
20 Foundation.
21         THE WITNESS: They can be. However,
22 it's been my experience that they are not, that
23 they have difficulties with specific times, with
24 heights, with weights, with specifics.
25         And, again, as I mentioned in my

Page 105

1 report, defense attorneys try to use that to an
2 advantage in the courtroom by confronting them
3 about time and distance and height and weight,
4 things like that. And they -- they generally are
5 not that accurate, the average witness, I would
6 say.
7 BY MR. THEIS:
8    Q.   So you said height and weight, too.
9 So are you saying that witnesses are rarely
10 accurate in their descriptions of height and
11 weight as well?
12         MR. KOSOKO: Object to form.
13         THE WITNESS: They are. They are.
14 Because they -- they're looking at -- they're
15 viewing something from a distance. Maybe they're
16 frightened at the time. So it's difficult them
17 to -- for them to come up with an exact height and
18 weight.
19         And, as I mentioned in my report, I
20 would ask the witnesses many times, "How tall do
21 you think I am," and they would be off
22 considerably.
23         So, yeah, witnesses, again, are
24 just trying to do the best they can do. They're
25 not trying to trick anyone. They're not trying to

27 (Pages 102 - 105)

Page 106

1  hamper the investigation in any way. It's just
2  they're doing the best they can, just trying to do
3  the best they can. They're giving the best
4  information that they can at the time. They're
5  doing -- they're making the best estimate that
6  they can of height and weight. And for some
7  people it's difficult.
8  BY MR. THEIS:
9      Q.   You would -- I know you said this a
10  couple different times, but I just want to make
11  sure we get it, that you would agree that
12  witnesses are rarely accurate in their
13  descriptions of distance as well. Correct?
14      MR. KOSOKO:  Object to form.
15      THE WITNESS:  Yeah. Distance
16  becomes -- sorry. Yeah. Distance can become
17  fallible, too. I mean, some people are very
18  accurate, "It's 20 yards away," and they're good
19  at it. But some witnesses have no clue how far
20  20 yards is, you know. So it's hard.
21          Each individual is different. So
22  you have to gauge your witness to try and figure
23  out if -- how good or how bad this witness is.
24  That's part of being a good investigator also, to
25  gauge the abilities of your witness.

Page 107

1  BY MR. THEIS:
2      Q.   Okay. You would agree that a choice
3  that a witness makes in a live lineup could be
4  influenced by having seen the photograph of the
5  suspect previously. Correct?
6      MR. KOSOKO:  Object to form.
7  Foundation.
8      THE WITNESS:  I did mention that in my
9  report. And I went on to say that the -- the
10  benefit of having seen that person in a lineup
11  outweighs that prejudice because it's more
12  important that they see that person actually
13  standing before them. And, again, that's when I
14  mentioned in the report that witnesses have said,
15  "No, that's not the person." So the benefit of
16  showing that person, even though it could be that
17  they were influenced by the photograph, far
18  outweighs the prejudice.
19  BY MR. THEIS:
20      Q.   You -- in your report, you state that
21  there is standards that are promulgated by the
22  National Institute of Justice in 1999 regarding
23  eyewitness identifications. Do I have that
24  correct?
25      A.   That's correct. That's -- that's in

Page 108

1  a -- a booklet that was published by the
2  Department of Justice. Now, again, those are just
3  recommendations. That's not hard and fast.
4  That's not legal.
5          I mean, the two prevailing opinions
6  are Manson versus Braithwaite and -- I'm trying to
7  think of the other case, that decide photo
8  identification.
9          So those are -- those are
10  suggestions from the --
11      Q.   Okay.
12      A.   -- Institute of Justice.
13      Q.   Got it. So you don't identify any
14  other standards in your report about -- about
15  witness -- eyewitness identifications. Correct?
16      A.   Well, there are standards that I
17  mentioned in the beginning that I list of the
18  IACP. The IACP, International Association of
19  Chiefs of Police, has standards. And I think I
20  listed that in "Showups, Photo Identification:
21  Concepts Paper" [sic] by the International
22  Association of Chiefs of Police. Expert --
23  "Eyewitness Identification: Model Policy."
24  There's several model policies, trainings, too,
25  that I mentioned. So the IACP also had some

Page 109

1  recommendations on how identifications should be
2  conducted.
3      Q.   The IAC -- the "Eyewitness
4  Identification: Model Policy" that you mentioned,
5  that was effective in September 2010. Correct?
6      A.   Correct. So it would have been before
7  this case or after -- I'm sorry, after this
8  case, yes.
9      Q.   Okay. And so let's go to -- I want to
10  show you your section of the report.
11          Can you see the report here?
12      A.   Yes.
13      Q.   Okay. We're on the bottom of page 19.
14  And, actually, I'll scroll up for just a second
15  here to give you some context of where we are. So
16  this is in the section called Identification
17  Procedures. And you have here a section about
18  photo arrays. And you specifically discuss, I'll
19  point this out, the NIJ standards from 19 --
20      A.   Right.
21      Q.   -- 99. Do you see that? And then you
22  list --
23      A.   Right.
24      Q.   -- a series of bullet points here.
25  Correct? This is from the NIJ. Correct?

28 (Pages 106 - 109)

Page 110

1    A.   Yeah.  I copied that exactly as it
2  appears in the -- in the publication.
3    Q.   All right.  So let's -- let's go over
4  to -- is this the 1999 NIJ report on eyewitness
5  evidence that you referenced?
6    A.   That would be it, yes.
7    Q.   Okay.  We're going to go to page 29 of
8  the document.
9         And I'm realizing that I need to --
10 I have not been marking exhibits.  So I'm going
11 to -- if you're -- indulge me for a second here,
12 Mr. Monheim.
13        We'll say that the investigative
14 report is Exhibit 1.
15        (Monheim Deposition
16         Exhibit 1 was marked.)
17    MR. THEIS:  The subpoena is Exhibit 2.
18    THE WITNESS:  Okay.
19        (Monheim Deposition
20         Exhibit 2 was marked.)
21    MR. THEIS:  The -- and we'll call this
22 Exhibit 3.  And if I've forgotten an exhibit,
23 we'll come back to it.  But we'll call this
24 Exhibit 3.
25    THE WITNESS:  Okay.

Page 111

1         (Monheim Deposition
2          Exhibit 3 was marked.)
3  BY MR. THEIS:
4    Q.   So on page 29 there's a section, at
5  the top here it says Procedures for Eyewitness
6  Identification of Suspects.  Do you see that
7  section?
8    A.   I do.
9    Q.   Okay.  So this is the section of the
10 NIJ guide that applies to photo arrays and
11 lineups.  Correct?
12    A.   Correct.
13    Q.   There's a policy that's listed at the
14 top, and it states the investigator shall compose
15 the lineup in such a manner that the suspect does
16 not unduly stand out.  Do you see that?
17    A.   Correct.
18    Q.   So if an investigator composed a photo
19 array or a lineup in such a manner that the
20 suspect stood out, that would violate this policy.
21 Correct?
22    A.   Well, for example, a white person and
23 five black people as fillers, yes, that would
24 violate, yes.  Unduly stands out, yes.
25    Q.   So if a suspect stands out, that would

Page 112

1  violate the policy in a photo array or a lineup?
2    MR. KOSOKO:  Object to form --
3    THE WITNESS:  Unduly --
4    MR. KOSOKO:  -- it misstates
5  testimony.
6    THE WITNESS:  "Unduly" is, I think,
7  the key word there.
8  BY MR. THEIS:
9    Q.   Okay.  So if the suspect unduly stands
10 out in a lineup, live lineup, or a photo array as
11 compared to the fillers in the photo array or
12 lineup, that would violate the policy of this
13 policy.  Correct?
14    A.   Well, when you say violate, I mean
15 there's nothing to violate.  This is just a
16 recommendation from the NIJ.  It's not like it's a
17 law or some legal document.  It's -- it would --
18 it would not comply, I would say, with what they
19 state.
20    Q.   Would you agree it would be
21 inconsistent with what is said in this, these
22 guidelines?
23    A.   That's a better word, yes.
24    Q.   Okay.
25    A.   Yeah, that's a better word.  I'd

Page 113

1  agree.
2    Q.   So the section here on photo lineups
3  that starts here in the middle, do you see that
4  section?  Here, I'll highlight it.
5    A.   I do.
6    Q.   Okay.  I'm going to ask you about a
7  few of these.
8         Number one, it says include only
9  one suspect in each identification procedure.
10 That's the very first one.  Do you see that?
11    A.   Yes.
12    Q.   So you would agree that it would be
13 inconsistent with this policy to include more than
14 one suspect in a photo array?
15    A.   Again, this is a recommendation for
16 best case scenario.  There are situations where
17 I've included two suspects in the same lineup.
18 You're limited many times on how many fillers you
19 have because of certain characteristics that the
20 subject has.  So, generally speaking, I would say
21 this is correct and I would -- I'd this is
22 inconsistent.  But it's not a hard and fast rule.
23 This is -- again, this is a recommendation by the
24 NIJ.  It doesn't mean you could never, ever, ever
25 put two people in a lineup.  That's not what

29 (Pages 110 - 113)

Page 114

1 they're saying.
2 Q. But, just reading the text, it says
3 that you -- the investigator should, in composing
4 a photo lineup, include only one suspect in each
5 identification procedure. That is what it states.
6 Correct?
7 A. That's what it says. But if you go
8 further down, it says these are merely
9 recommendations. So, yes, it does say that.
10 And I would say ideally that's
11 correct. I mean, every photo array, that would be
12 my goal is to include only one person in the photo
13 array unless there were some type of extenuating
14 circumstances. But that's not --
15 Q. And by one person -- I'm sorry.
16 A. I'm sorry. That's not to say that
17 it's wrong to do that. It's just this is a
18 recommendation by the NIJ to make to -- in
19 essence, what it is is to make sure that you
20 not -- you don't have your photo lineup compressed
21 and this is the ideal.
22 Q. So it would be inconsistent with the
23 recommendations given by the NIJ to include more
24 than one suspect --
25 / / /

Page 115

1 (Indecipherable
2 simultaneous speaking.)
3 BY MR. THEIS:
4 Q. Just one second.
5 -- to include more than one suspect
6 in an identification procedure when using a photo
7 lineup?
8 A. Yes --
9 MR. KOSOKO: Object to form.
10 THE WITNESS: -- this particular --
11 BY MR. THEIS:
12 Q. Okay.
13 A. Sorry. With this particular
14 publication, yes.
15 Q. And this is, again, the publication
16 that you cite almost word for word in your report.
17 Correct?
18 A. Yes.
19 Q. Okay. Number two states select
20 fillers who generally fit the witness's
21 description of the perpetrator. Do you see that?
22 A. Yes.
23 Q. So it would be inconsistent with the
24 recommendations in this NIJ report to select
25 fillers that do not generally fit the witness's

Page 116

1 description of the perpetrator when conducting a
2 photo lineup?
3 A. Well, yeah, correct. But I mean
4 "generally" is a big word, and it means that you
5 have a lot of latitude in producing fillers. But,
6 yes, I agree with what you just said, yes.
7 Q. Number -- number six at the bottom
8 states create a consistent appearance between the
9 suspect and fillers with respect to any unique or
10 unusual features, e.g. scars, tattoos -- and I'll
11 skip to the next page -- used to describe the
12 perpetrator by artificially adding or concealing
13 that feature. Do you see that section?
14 A. Yes.
15 Q. So if the suspect had, in the words of
16 the recommendations by the NIJ, unusual features,
17 the photographs of the fillers should also have
18 that unusual feature. Would that be fair to say?
19 A. Yes. But in a -- in the area of
20 tattoos, that's going to be really difficult to
21 do.
22 Q. Right.
23 A. So there are certain things that you
24 could do to circumvent that, to make it equitable.
25 As I mentioned, you can put Wite-Out over the scar

Page 117

1 on everybody in the same position and that would
2 make the photo array more fair.
3 Q. Number 11 -- number 11 here states
4 preserve the presentation order of the photo
5 lineup. In addition, the photos themselves should
6 be preserved in their original condition. Do you
7 see that?
8 A. Yes.
9 Q. So you would agree if the photos to --
10 presented to a witness in a photo array are not
11 preserved in their original condition, that would
12 violate the recommendations in this NIJ report.
13 Correct?
14 MR. KOSOKO: Object to form.
15 THE WITNESS: Well, again, again, I
16 wouldn't say violate. I would say, you know, it's
17 inconsistent with what they are -- recommend in
18 this publication, yes.
19 BY MR. THEIS:
20 Q. The next section is on live lineups
21 below here on page 30. Do you see that section?
22 A. I do.
23 Q. In the first, number one, is -- again,
24 it says include only one suspect in each
25 identification procedure. Did I read that

30 (Pages 114 - 117)

Page 118

1 correctly?
2    A.  Yes, sir.  I see that.
3    Q.  Okay.  So similar to the photo arrays,
4 in a live lineup you would agree that if the
5 investigator includes more than one suspect in a
6 lineup, that would be inconsistent with the
7 recommendations that are made in this NIJ report?
8    A.  Correct.
9        And, again, as I mentioned earlier,
10 with the live lineup that's very difficult.  So I
11 have had several situations where I was not able
12 to adhere to this recommendation because of the
13 inability to find proper fillers.  So there are
14 situations where you may put two people in a live
15 lineup.  But, generally speaking, yes, the
16 recommendation -- and that's the ideal, that's the
17 goal, yeah.  Your goal is to just have one person
18 per identification procedure.  But real world
19 controls, and sometimes you can't do that.
20        But I agree, yes, what you said is
21 true.  It would be inconsistent with this
22 recommendation.
23    Q.  Number two, similar to the photo
24 array, states that select fillers who generally
25 fit the witness's description of the perpetrator.

Page 119

1 Do you see that section?
2    A.  I do, yes.
3    Q.  So as with the live lineups -- I'm
4 sorry.
5        As with the photo arrays, you would
6 agree that fillers in a live lineup should
7 generally fit the witness's description of the
8 perpetrator.  Correct?
9    A.  Yes.  Yes.  With the same comments I
10 made previously about that.
11    Q.  Okay.  Scrolling down to the next
12 section of this -- of the NIJ report is
13 Instructing a Witness Prior to Viewing a Lineup.
14 Do you see this section here?
15    A.  I do.
16    Q.  And the policy that's listed here,
17 I'll highlight here, it states prior to presenting
18 a lineup the investigator shall provide
19 instructions to the witness to ensure the witness
20 understands that the purpose of the identification
21 procedure is to exculpate the innocent as well as
22 to identify the perpetrator.
23    A.  Yes.
24    Q.  Do you see -- did I read that
25 correctly?

Page 120

1    A.  Yes.
2    Q.  Okay.  So if the investigator failed
3 to provide the instruction to a witness during a
4 photo array or a live lineup, that the purpose of
5 the procedure is to exculpate the innocent as well
6 as to identify the actual perpetrator, that would
7 violate the policy of this section of the NIJ
8 report?
9        MR. KOSOKO:  Object to form.
10        THE WITNESS:  Well, that would be
11 inconsistent.  You say violate.  I don't like
12 "violate."  But it would be inconsistent with this
13 recommendation.
14        But it would not invalidate,
15 necessarily invalidate, it could but not
16 necessarily, invalidate the whole procedure.  That
17 would be determined by a judge at a suppression
18 hearing.
19 BY MR. THEIS:
20    Q.  Would you agree that -- going back to
21 the purpose of a photo array, that the purpose --
22 one of the purposes is to employ a fair,
23 unprejudiced method through which a witness is
24 given the opportunity to identify the suspect of a
25 crime from a group of similar-appearing persons?

Page 121

1 Would that be a fair description of what the
2 purpose of a photo array is?
3    A.  Yes.  I would agree.  That's fair.
4    Q.  And would you -- you would agree that
5 when showing a photo array, in general, the photo
6 display should consist of six photos, the subject
7 plus five filler photos?
8        MR. KOSOKO:  Object to form.
9 Foundation.
10        THE WITNESS:  That's suggested.  I've
11 had photo lineups with four photos and it's still
12 not been suppressed.  I mean, there's all kinds of
13 variables that enter into this.  It's not all hard
14 and fast you have to have five fillers, you have
15 to have six fillers.  No, that's not -- that's not
16 always true.  I've done photo lineups with 12
17 photos in them.  So that's the recommendation, but
18 it's not -- it's not -- there's no legal
19 requirement that says you have to do that.
20 BY MR. THEIS:
21    Q.  Would you say that's one of the photo
22 display guidelines that you would follow, that you
23 would have six photos, one being a filler -- one
24 being a subject plus five fillers?
25    A.  Yes.  I would --

31 (Pages 118 - 121)

Page 122

1    MR. KOSOKO: Object to form and
2  foundation.
3    THE WITNESS: -- say that -- I'm
4  sorry. I would say that generally that's how most
5  photo lineups in this country are shown today --
6  BY MR. THEIS:
7    Q. Okay.
8    A. -- and were shown even 20, 25 years
9  ago. That's how they were shown. But there are
10 -- there are other ways to show a lineup. That's
11 not the only way that the lineup can be shown.
12 But, yes, that's -- that's the general way they're
13 shown.
14   Q. And I think you said this before.
15 But, in your practice, if a picture of the suspect
16 that you have displays some sort of peculiarity,
17 then each filler photo must also contain the same
18 peculiarity?
19   MR. KOSOKO: Object to form.
20   THE WITNESS: Well, not must. You
21 could strive to do that. I mean, if it's an
22 enormous -- like, for example, if some person has
23 one eye and they have an eye patch on, you're
24 going to have a really difficult time coming up
25 with filler pictures for that. So you're going to

Page 123

1  do the best you can. But it doesn't mean you're
2  not going to show the lineup. You're going to try
3  maybe and cover up, maybe take a piece of paper
4  and cover up that side of the face. And what
5  you're doing is diminishing the ability of the
6  witness to recognize that person. But there are
7  steps you can take to mitigate certain situations.
8    So in photo lineups you cannot --
9  you can never say always, always, always it should
10 be done this way, this way, this way. There are a
11 lot of variables that can take place. And I've
12 seen a lot over the years.
13 BY MR. THEIS:
14   Q. And you would agree that if a witness
15 describes the perpetrator, for example, as a black
16 male with green eyes, then every individual in
17 that photo array should be a black male with green
18 eyes. Correct?
19   MR. KOSOKO: Object to form --
20   THE WITNESS: You should try to --
21   MR. KOSOKO: -- foundation.
22   THE WITNESS: -- do that. I'm sorry.
23 You should try to do that. But if you can't,
24 that doesn't necessarily make the photo lineup
25 invalid. I mean, you could -- you could maybe use

Page 124

1  black-and-white photos. Even if you have color
2  photographs, you could take black-and-white photos
3  and you could show that same lineup. So there are
4  ways that you can get around a lot of situations.
5    But, in general, what you're saying
6  is true. There should not be one person that
7  stands out dramatically from the others, you know.
8    There are going to be certain
9  consistencies with the other people in line. I
10 mean, they're all going to be male or female.
11 They're all going to have noses. They're all
12 going to have two eyes or -- presumably. They're
13 going to have ears. So, I mean, you can't really
14 get down in the weeds too far.
15 BY MR. THEIS:
16   Q. But if there's something unusual about
17 the suspect, in the photo array you want to have
18 other photos with that same unusual charac-
19 teristic. Would that be fair?
20   MR. KOSOKO: Object to form --
21   THE WITNESS: Again, not just -- it
22 depends on -- it depends on each situation. I
23 mean, there are certain situations where I've
24 stated -- for example, the eye patch. Well, yeah,
25 I mean. And you have to even go even further. If

Page 125

1  the person that committed -- the subject that
2  committed the crime, if the witnesses did not see
3  an eye patch and when you finally arrest this
4  person you arrest them and they have an eye patch,
5  well, then maybe you're not -- you just have a
6  variety of individuals with different deformities
7  in that lineup. So there's a lot of things that
8  you can do to -- if the -- if the victim or the
9  witnesses at the time of the crime said this
10 person had an eye patch, then you're kind of stuck
11 with that picture and you have to make
12 accommodations for that picture. But, again,
13 there's so many variables that take place in photo
14 arrays.
15 BY MR. THEIS:
16   Q. Do you recall appearing at an
17 instruction video on identification procedures for
18 robbery investigations when you were in the
19 Metro Dade -- I'm sorry, the robbery investigation
20 unit in Miami?
21   A. I don't think I understand your
22 question. What was it again?
23   Q. Do you recall -- do you recall
24 appearing in an instructional video about identi-
25 fication procedures for robbery investigations

32 (Pages 122 - 125)

Page 126

1  when you were in the -- I believe it's the
2  Miami-Dade robbery investigation unit?
3      A.  Maybe.  I'm not sure.  What are you
4  referring to?  Is there a year, specific year,
5  specific video?
6      Q.  Sure.  Sure.  Sure.  So, well, let me
7  ask a slightly different question.
8          Do you recall posting a video on
9  You Tube of a presentation that you gave about
10 identification procedures for robbery investi-
11 gations?
12     A.  Oh, that.  Now I know what you're
13 referring to.  Yes, I do.
14     Q.  Okay.  All right.  So I'm going to
15 show you a couple scenes from this video, if
16 you'll give me a second, if I can handle the tech.
17         Okay.  Can you see my screen here?
18     A.  Yes.
19     Q.  Okay.  Mr. Monheim, is that -- is that
20 you in this --
21     A.  That's me.  But it was a long time
22 ago.
23     Q.  Okay.  Do you have a sense of -- do
24 you recall when this video took place, generally
25 speaking?

Page 127

1      A.  Oh, boy, probably before I was a
2  sergeant, I think.  It was probably '78, '79
3  maybe.
4      Q.  Okay.  And it says here that you're a
5  robbery investigator.  I will represent to you --
6      A.  Yes.
7      Q.  -- that you're -- yes.  Okay.  I'll
8  represent to you that you're going to talk about
9  lineup procedures.
10         Just to reconfirm, I think earlier
11 today you said that the lineup procedures you used
12 when you do a robbery -- in robberies was not
13 different than what you did when you were in
14 homicide.  Is that generally correct?
15     A.  Correct.
16     Q.  Okay.  The time stamp for this, the
17 video that I'm just clicking on here, is at 2:16.
18 I'm going to jump ahead to 12:45.  Actually, here,
19 let me do this.  I'm going to jump to minute 9:49,
20 and I'll just play this for a second.
21         (A video was played.)
22 BY MR. THEIS:
23     Q.  So a minute ago I asked you about
24 this, and you agreed that that is one of the
25 purposes, which could be consistent with what you

Page 128

1  said in the late '70s.  It sounds like you still
2  agree with that, with this position here.
3      A.  I'm sorry, you're kind of cutting out
4  a little bit.  Again?
5      Q.  So I just want to make sure that -- so
6  what you identify here in this video, photo
7  display, the purpose of a photo display, and it
8  states on the screen:  To employ a fair and
9  unprejudiced method through which a witness is
10 given an opportunity to identify a suspect of a
11 crime from a growing -- I'm sorry, from a group of
12 similar-appearing persons.
13         That's what it says on the screen
14 here.  Correct?
15     A.  Yes.
16     Q.  And a minute ago I asked you this and
17 you confirmed that this is actually still -- you
18 agree with this proposition that this is one of
19 the purposes for a photo display.  Correct?
20     A.  Generally, yes.
21     Q.  Okay.
22     A.  Yes.
23     Q.  I'm going to jump ahead to 12:45.
24         (Court reporter clarifi-
25            cation.)

Page 129

1      MR. THEIS:  Okay.  I think what's on
2  the screen is important, and so we're capturing
3  that by video.  And I'll ask some questions about
4  the audio just to see if we can get more detail.
5  And, actually, let me see if I can pump up the
6  volume.
7  BY MR. THEIS:
8      Q.  So at 12:45 it states photo display
9  guidelines.  Do you see this on the screen?
10     A.  I do.
11     Q.  Okay.  And it says ideally a photo
12 display should consist of six photos, the subject
13 plus five filler photos.  Do you -- did I read
14 that correctly?
15     A.  Yes.
16     Q.  All right.  I'm going to go to 12:54.
17 And at 12:54 it states:  Photo display guidelines.
18 If the picture of the suspect displays a deformity
19 or peculiarity, each filler photo must contain the
20 same deformity or peculiarity.
21         Did I read that correctly?
22     A.  Yes.
23     Q.  Okay.  So do you -- do you agree still
24 that, as you state in this video, if the picture
25 of a suspect displays a deformity or peculiarity,

33 (Pages 126 - 129)

Page 130

1 each filler photo must contain the same deformity
2 or peculiarity?
3    A.   I do. And I think I've restated
4 several times about the eye patch, et cetera, the
5 scar, yes.
6    Q.   Okay. All right. Mr. Monheim, you're
7 aware that this case involves, as we've discussed
8 a little bit, lineups and photo arrays. Correct?
9    A.   Yes.
10    Q.   In the materials section that you
11 reviewed -- I'm sorry, in the materials section of
12 your report, you state that you reviewed Chicago
13 Police Department General Order 88-18. Correct?
14         I'll show you a copy of your
15 report, if that's helpful.
16    A.   Okay.
17    Q.   And this is --
18    A.   Yes, I see it.
19    Q.   You see it -- yeah, you see it -- you
20 see it there on -- okay.
21    A.   22.
22    Q.   Great. Great. And this is the only
23 part of your report where you reference Chicago
24 Police Department General Order 88-18. Is that
25 correct?

Page 131

1    A.   I believe so, yes.
2    Q.   So you do not in your report, and will
3 not at trial, offer any opinion as to whether or
4 not the photo arrays or lineups that were
5 conducted in this case satisfied the requirements
6 of CPD General Order 88-18. Correct?
7         MR. KOSOKO: Object to form.
8         THE WITNESS: I don't know. I may if
9 I'm asked. I don't know.
10 BY MR. THEIS:
11    Q.   Well, again, you stated at the
12 beginning of the deposition that all the report --
13 all the opinions that you will give at trial are
14 included in your report. Correct?
15    A.   Well, that -- I was -- I was -- in
16 response to your question. But I'm sure there
17 will be other questions. I've been through trials
18 enough to know that you can't be pigeonholed into
19 one set of -- one report. I mean, there's -- I'm
20 sure there are going to be questions that will be
21 asked that will supersede or go beyond this
22 report.
23    Q.   You've never actually testified at a
24 trial in a civil case, though. Correct?
25    A.   No. In criminal cases, though, I know

Page 132

1 that you can't be confined to one report.
2    Q.   Let's go back to the -- well, to break
3 up my question, in your report you don't offer any
4 opinion as to whether or not the photo arrays or
5 lineups that were conducted in this case satisfied
6 the requirements of the Chicago Police Department
7 General Order 88-18. Correct?
8    A.   I don't believe I do.
9         But as I recall vaguely reading
10 that general order, it was in line with the norms
11 of showing photo lineups. There was nothing
12 unusual about it that I recall.
13    Q.   Okay. But, again, what you just said
14 is not in your report either. Correct?
15    A.   No.
16    Q.   Okay. In your report, you don't offer
17 any opinion as to whether or not Mr. Blackmon had
18 a motive to shoot Tony Cox. Correct?
19    A.   No.
20    Q.   And you don't give any opinion as to
21 whether Mr. Blackmon was in the -- a gang known as
22 the New Breeds in 2002. Correct?
23    A.   I don't believe I mentioned that. I
24 don't believe I mentioned that in my report.
25 Actually, he denied being in the New Breeds when

Page 133

1 he was questioned. I mentioned that.
2    Q.   And he made that denial to detectives
3 in this case. Correct?
4    A.   Correct.
5    Q.   You do not give any opinion as to
6 whether the defendant detectives in this case
7 believed Mr. Blackmon was in the New Breeds.
8 Correct?
9    A.   No.
10    Q.   And you do not give any opinion as to
11 whether or not that belief or nonbelief was
12 reasonable or unreasonable. Correct?
13    A.   Correct.
14    Q.   And you -- your report does not
15 indicate whether or not the defendant detectives
16 linked Eric Blackmon to the nickname Pride.
17 Correct?
18    A.   Say that again.
19    Q.   Your report does not state that the
20 detective defendants in this case linked
21 Eric Blackmon to the nickname Pride. Correct?
22    A.   I made that -- I've referenced the
23 nickname Pride. But whether they linked it, I
24 don't believe I got into that, no.
25    Q.   Okay. That's not a fact that formed

34 (Pages 130 - 133)

Page 134

1 the basis for your opinion or a -- it's not
2 something that you have an opinion about that you
3 include in your report. Correct?
4    A.   Correct.
5    Q.   Okay. And you -- your report does not
6 indicate whether the detective defendants believed
7 that Mr. Blackmon was known as Little E. Correct?
8    A.   I believe his brother, Cox's brother,
9 mentioned Little E, and I summarized that in my
10 report. But whether they connected that, I don't
11 think I got into that.
12    Q.   Okay. And by "connected that" you
13 mean connected it directly to Eric Blackmon.
14 Correct? That is not in your report?
15    A.   Correct.
16    Q.   Okay. You do not indicate an opinion
17 as to why Eric Blackmon's photo was included in
18 the photo array shown to Ms. McDowell on
19 August 29, 2002. Correct?
20    A.   Not directly. But, I mean, I think
21 indirectly that it appears that because he was a
22 New -- he was selling narcotics in the New Breed
23 area that it's inferred, that that's why it fit
24 this picture.
25    Q.   Can you point me to the section of

Page 135

1 your report where you set that opinion out?
2    A.   That what now?
3    Q.   Can you point to the section in your
4 report where you state why Mr. Blackmon's photo
5 was included in the photo array shown to
6 Ms. McDowell on August 29, 2002?
7    A.   Well, I do mention that it was because
8 -- let me see.
9         What I talk about in my report is
10 that it's not required. I think -- is that what
11 you're referring to, it's not required to have a
12 reason to include someone in a photo lineup? Is
13 that the portion you're referring to?
14    Q.   I'm just asking -- I'm just stating
15 that you don't state in your report why
16 Mr. Blackmon's photo was included in the photo
17 array shown to Ms. McDowell.
18    A.   Oh. Oh, I see. No. What I say is
19 that there's no reason that you have to give to
20 include someone in a photo array, that -- and I
21 think we mentioned this earlier on, that you can
22 include people from Crime Stoppers tips, you can
23 include people that just frequent that area, that
24 are known to frequent that area, and you can put
25 them in a -- in a -- in a photo array.

Page 136

1         Let me see if I can find that part.
2 I assume this is what you're -- yeah, here.
3    The complaint contends that the
4    plaintiff's photographs should not been
5    included in the photo arrays because
6    there's no verifiable information that
7    links him to the crime. The complaint
8    further maintains that it is the
9    plaintiff's belief he was merely a
10    filler. These claims have no valid
11    foundation and valid accepted
12    investigative practice. There is no
13    requirement to establish probable cause
14    or even reasonable suspicion in order
15    to show a photographic lineup of an
16    individual to a witness.
17         Is that what you're referring to,
18 that portion?
19    Q.   Well, so you're reading from page 18
20 of your report, correct, in the paragraph that
21 begins "plaintiff contends in his complaint"?
22    A.   Yeah. For me, it's 19. But I guess
23 that's the same, yeah.
24    Q.   Okay. Nowhere in this paragraph do
25 you state why Eric Blackmon's photo was

Page 137

1 included in the photo array shown to Ms. McDowell
2 on August 29, 2002. Correct?
3    A.   That's correct. And what I'm saying
4 is there's no need to show that. You don't have
5 to show that.
6    Q.   Okay. But you don't have an opinion
7 -- you don't state an opinion -- I'm sorry to
8 interrupt you.
9    A.   No, that's it. That's it.
10    Q.   Okay.
11    A.   I'm done.
12    Q.   You don't state an opinion in your
13 report as to why they were -- why the photos were
14 included in the photo array. Correct?
15    A.   No.
16    Q.   Okay. On pages six and seven of your
17 report, if you could turn to that -- those two --
18 those pages. And, actually, I'll show on the
19 screen, too, if it's helpful.
20    A.   Okay.
21    Q.   Here is page --
22    A.   I think we're off by one, one number
23 on these.
24    Q.   Okay.
25    A.   Mine and yours.

35 (Pages 134 - 137)

Page 138

1     Q.   Got it.  So I'm going to use the
2  number in the PDF.  So if you can see on the
3  screen here up at the top --
4     A.   Okay.
5     Q.   -- it says 6.  You know, I hope that's
6  -- we can get -- we'll be on the same page while
7  we're talking through this.  Okay.
8        MR. KOSOKO:  Is this a new exhibit?
9        MR. THEIS:  No.  This is the report.
10        MR. KOSOKO:  Thank you.
11        MR. THEIS:  Exhibit 1.
12  BY MR. THEIS:
13     Q.   In this section of your report, you
14  detailed eyewitness accounts of Ms. Reece and
15  Richard Arrigo.  Do you see this discussion here
16  of Ms. Reece?
17     A.   Yes.
18     Q.   And then I'm going to go to the next
19  -- I'm sorry, and there's also, at the bottom
20  here, Davious Whitaker that's discussed.
21     A.   Yes.
22     Q.   Do you see that?  And then the next
23  section is Richard Arrigo that's discussed.
24     A.   Right.
25     Q.   Okay.  So, according to your report,

Page 139

1  both Reece and Arrigo stated that they saw the
2  shooters at the scene around the time of the
3  shooting.  Correct?
4     A.   Yes.
5     Q.   And, according to your report, both
6  Reece and Arrigo provided heights for the
7  shooters.  Correct?
8     A.   Yes.
9     Q.   Your report states that Ms. Reece
10  stated that the first shooter was 5'5" and the
11  second shooter was 5'10".  Is that accurate?
12     A.   Yes.
13     Q.   And then Mr. Arrigo stated that one of
14  the shooters was 5'6" and the other one was
15  5'8"/5'9".  Do you see that?  Is that correct?
16     A.   Yes.
17     Q.   Okay.  Do you have any reason to
18  believe that Ms. Reece and Mr. Arrigo might have
19  coordinated to provide false heights to the
20  police?
21        MR. KOSOKO:  Objection to form.
22        THE WITNESS:  Well, I think it was
23  very obvious why Mr. Arrigo did not provide an
24  accurate description because he was complicit in
25  the homicide, as far as I'm concerned from all the

Page 140

1  information I've received in that material.  So
2  he --
3  BY MR. THEIS:
4     Q.   Well, the height -- I'm sorry.
5     A.   He has a vested interest in making
6  sure the description is incorrect.  I would base
7  my description on the subjects on Ms. Reece's
8  description more than Mr. Arrigo.  He has no
9  standing -- he has -- he has -- his motive is
10  suspect --
11     Q.   Well, the --
12     A.   -- very suspect.  I think there's --
13  I don't think anyone that's reading the report
14  that would not conclude that he was complicit in
15  this homicide.
16     Q.   And the investigators in this case
17  thought that, too.  Correct?
18     A.   I believe they did, from reading the
19  reports, yes.
20     Q.   I'm just trying to understand the --
21  what your distinction between Arrigo and Reece.
22  To me, those heights seem identical.  Ms. Reece
23  states --
24        MR. KOSOKO:  Object to form.
25            / / /

Page 141

1  BY MR. THEIS:
2     Q.   Ms. Reece --
3     A.   Subject number two is -- subject
4  number two is Mr. Blackmon.  And they -- Reece
5  describes him as 5'10" and Arrigo describes him as
6  5'6".  I mean, an obvious attempt to disguise his
7  height is what I would assume from that.  That's
8  what I would draw from that.
9     Q.   Why do you think that subject number
10  two from Richard Arrigo is Eric Blackmon?  What is
11  your basis for that?
12     A.   Because throughout the -- the summary,
13  I tried to make the second shooter subject number
14  two and the first shooter subject number one.
15     Q.   So if we went to the descriptions that
16  were provided -- let me just ask you this
17  question.  Both witnesses identify a witness [sic]
18  that is either 5'5" or 5'6".  Correct?
19        MR. KOSOKO:  Object to form.  Are you
20  talking about both subjects or just are you saying
21  the height and range?
22        MR. THEIS:  I'll restate it.  That's
23  good.
24  BY MR. THEIS:
25     Q.   Ms. Reece and Mr. Arrigo both stated

36 (Pages 138 - 141)

Page 142

1  that one of the suspects was either 5'5" or 5'6".
2  Correct?
3     A.  Yes.  But different suspects --
4  different subjects.  Subject number one as opposed
5  to subject number two.
6     Q.  Okay.  But I'm just getting at the
7  heights.  Both of them identify one of the
8  suspects as 5'5" or 5'6".  Correct?
9     A.  Right.  Okay --
10    Q.  Okay.  And then --
11    A.  -- I agree.
12    Q.  -- both of them identify a subject,
13  the other subject, as either 5'10" or, for
14  Mr. Arrigo, 5'8"/5'9".  Correct?
15    A.  Well, if you throw in all the subjects
16  into one pot, sure.  But I didn't -- I didn't
17  distinguish it that way.  There's subject number
18  one, the first shooter, and subject number two,
19  the second shooter.
20    Q.  Okay.  So, in your view, the second
21  shooter is, for Ms. Reece, is the one that's --
22  that she identifies as Mr. Blackmon?
23    A.  Well, it's the taller of the two.
24  And, yes, I believe that's who she identified as
25  Mr. Blackmon.

Page 143

1     Q.  And what is your basis for that
2  conclusion?
3     A.  Well, from the identification she made.
4     Q.  Did she say that subject number two,
5  the one I previously identified as 5'10", is the
6  shooter?
7     A.  I think she identified subject number
8  two as the person that came back and shot the
9  victim.
10    Q.  At the top of page eight, you discuss
11  information that was obtained from a subpoena from
12  Mr. Arrigo -- of Mr. Arrigo.  Do you see this
13  section here?
14    A.  I do.
15    Q.  Okay.  And you detail phone calls that
16  are made between Mr. Arrigo and a George Davis.
17  Do you see that section?
18    A.  Yes.
19    Q.  And those calls were made both before
20  and after the shooting of Tony Cox.  Correct?
21    A.  Yes.
22    Q.  Who is George Davis?
23    A.  Well, he's Boonie Black, Boonie,
24  Boonie Black, ops.  He's the leader of the New
25  Breeds.

Page 144

1     Q.  Do you know when the subpoena was
2  issued that provided this information to the
3  investigating detectives in this case?
4     A.  No.  I just synopsized it in my
5  description of the case.  I have it in this box,
6  if you want me to look through and see.
7     Q.  Well, let me ask it this way.  Would
8  you agree that shortly after the shooting the
9  police had evidence linking the shooting to the
10  New Breed street gang?  Would that be fair to say?
11       MR. KOSOKO:  Object to the form of the
12  question.
13       THE WITNESS:  Well, all I can say is
14  that after the shooting Richard Arrigo called
15  Boonie Black, who's the head of the New Breeds.
16  I can say that.  That's what I found in reading
17  the material.
18  BY MR. THEIS:
19    Q.  Mr. George Davis, also known as
20  Boonie Black, he was never charged with
21  involvement in the Tony Cox murder.  Correct?
22    A.  I don't know.  As far as I know, no.
23  But not that I read, no.
24    Q.  Okay.  And you didn't see anything
25  that said that Mr. Arrigo was charged with the

Page 145

1  shooting of Mr. Cox.  Correct?
2     A.  That's correct.
3     Q.  Okay.  On page nine, you describe an
4  interview that investigators had with
5  Sherrie Stevenson, one of Tony Cox's girlfriends.
6  Do you see this paragraph that begins here with
7  "Sherrie Stevenson"?
8     A.  I do.
9     Q.  Stevenson, she described an apparent
10  motive for George Davis to want Tony Cox killed.
11  Correct?
12    A.  Yes.
13    Q.  And that motive was that George Davis
14  was upset at Tony Cox for failing to get money
15  from Tony Cox's cousins.  Would that be accurate?
16    A.  Yes.
17    Q.  And that motive was corroborated by
18  an interview that Detective Sanchez had with
19  Sophia Jackson.  Correct?  And here's --
20    A.  Yes, I believe --
21    Q.  Okay.  And here's the discussion of
22  the interview with Sophia Jackson here.
23       So investigators had from two
24  different witnesses a specific motive for this
25  shooting to occur.  Correct?

37 (Pages 142 - 145)

Page 146

1    MR. KOSOKO: Object to the form of the
2 question.
3    THE WITNESS: Well, they had motive
4 for why Boonie Black would want him. Yes. So
5 there's motive, yes.
6 BY MR. THEIS:
7    Q.  Okay. And that motive was never tied
8 to Mr. Blackmon. Correct?
9    MR. KOSOKO: Object to form.
10    THE WITNESS: As far as I know.
11 BY MR. THEIS:
12    Q.  I want to go to the section that we
13 talked about a little bit ago about motive. You
14 said here, and we talked about this briefly, at
15 page 16, in the highlighted section here, you say
16 there is no legal requirement to ascertain the
17 defendant's motive, or motives, in a homicide
18 case. Did I read that correctly?
19    A.  Yes.
20    Q.  What is that conclusion based on?
21    A.  On the law. I mean, involvement in
22 numerous homicide files, there's no requirement.
23 I've had cases where the motive was not ever
24 determined and the person has been convicted. So
25 there's no legal requirement that you enter a

Page 147

1 motive into the -- into the homicide case.
2    Now, of course you have to have
3 means and opportunity. If you didn't have means
4 and opportunity, you couldn't commit the crime.
5 But motive, there's no -- that's kind of serial.
6 You can't -- you don't really -- it's hard to
7 determine motive many times. Many times there's
8 multiple motives.
9    Q.  Okay. So I just want to understand
10 what the legal requirement is. Is this a legal
11 requirement set forth by some sort of nationally
12 recognized standard of police practices?
13    A.  No. It's my experience being involved
14 in homicide cases and information received from a
15 number of prosecutors. We don't have to prove
16 motive. I've heard that numerous times in
17 pretrial conferences. There's no requirement to
18 prove motive.
19    Q.  And so do you mean that detectives
20 conducting a homicide investigation do not need to
21 ask why did the suspect kill the victim?
22    A.  No. That's absolutely not. I believe
23 I earlier stated that juries would like to know
24 motive. The detectives would like to know motive.
25 Everyone involved in the case would like to know

Page 148

1 the motive because it makes the investigation
2 easier many times. If you can determine the
3 motive, then that points you toward a suspect many
4 times. Not always, but it can. So, yeah, motive
5 is something you try to determine, but it's not
6 legally required to establish a motive and
7 introduce that motive into a trial situation and
8 tell the jury what the motive is, or even for the
9 prosecutor to know the motive.
10    Q.  You state here at the end here that --
11 I'm sorry, were you still speaking?
12    A.  I was going to say maybe I'm not
13 explaining myself well. But I think it's pretty
14 evident that motive is not required but you would
15 like to find out what the motive is.
16    Q.  It's not part of a requirement to
17 conducting a thorough investigation in a homicide?
18    A.  No, I didn't say that. I'm saying
19 it's not required to introduce into court.
20    Q.  Okay. Well, that's different.
21    A.  But to do a good investigation, you
22 would like to try and find motive. Sometimes --
23    Q.  Okay.
24    A.  -- it's not possible.
25    Q.  Okay. So part of conducting a

Page 149

1 thorough investigation into a homicide should
2 include some sort of investigation of the motive.
3 Would that be fair to say?
4    MR. KOSOKO: Object to form.
5 Foundation.
6    THE WITNESS: If it's possible, yes.
7 If you can possibly find the motive.
8    Every investigator wants to
9 determine what the motive is. I don't think
10 there's an exception to that. That's just basic
11 to the investigation. Motive can lead you many
12 times to the -- to the perpetrator. So, yes, a
13 motive is -- is part of the investigation. Does
14 it always reveal itself? No.
15 BY MR. THEIS:
16    Q.  So when you say legal requirement here
17 in this paragraph, you're talking about a legal
18 requirement to convict. Is that accurate?
19    A.  If I want to arrest somebody for the
20 crime of murder, do I have to know what their
21 motive is? And the answer is no. That's what I'm
22 referring to as legal requirement.
23    Q.  So legal requirement for probable
24 cause to arrest? Is that what you're stating
25 here?

38 (Pages 146 - 149)

Page 150

1    A.  For any phase of the arrest, the
2  prosecution, any of that phase, there's no
3  requirement to establish motive and enter it into
4  the prosecution, for the judge to know what the
5  motive is, for the jury to know what the motive
6  is, for the prosecutor to know what the motive is,
7  for the investigators to know.
8    Q.  The last sentence you state here that
9  proof that the defendant had the means and
10  opportunity are generally required to convict.  Do
11  you see that --
12    A.  Yeah.
13    Q.  -- statement?  What is that --
14    A.  I do.
15    Q.  What's that conclusion based on?
16    A.  Well, it's common sense.  If you don't
17  have the means or the opportunity, how are you
18  going to commit the crime?
19    Q.  You're making a distinction between --
20  I'm sorry, go ahead.
21    A.  You have to have the means to kill
22  someone and you have to have the opportunity.  If
23  you don't have the opportunity or the means, it
24  can't be accomplished.
25    Q.  And what do you mean by means?

Page 151

1    A.  The means, the ability, did you have
2  -- well, for example, in a poisoning case, if
3  someone poisons another person, did they have the
4  means to do it?  Did they have the cyanide?  Did
5  they have the ethanol?  Did they have access to
6  the weapon that was used to kill them?  Did they
7  have access to a gun?  Did they have access to a
8  knife?  They have to have the means.
9        And they have to be in close
10  proximity at the time, except in poisoning, to
11  that victim, did they have the opportunity.
12    Q.  Did the detectives in this case ever
13  establish that Mr. Blackmon had access to a weapon
14  that killed Tony Cox?
15    A.  Not that I know of, no.
16    Q.  So they did not establish --
17    A.  I believe --
18    Q.  I'm sorry.
19    A.  I'm sorry.  I believe he was arrested
20  for possession of firearm.  That was a previous
21  arrest.  But I just remember reading that.  But I
22  don't think it pertained to this situation, no.
23    Q.  So, in this case, means to kill
24  Tony Cox was not established.  Correct?
25      MR. KOSOKO:  Object to form.

Page 152

1      THE WITNESS:  Well, I think it was.
2  I think that anybody has the means to commit
3  murder.  It's just the means and the opportunity.
4  BY MR. THEIS:
5    Q.  Okay.  When I -- I'm sorry, when I
6  asked you before what means meant, it sounded like
7  you were saying you have to show, in the poisoning
8  context for example, some sort of access to poison
9  to kill an individual.
10    A.  Well, that's -- that was an example I
11  was using.  The means could be simply can that
12  person travel to that place.
13        Now, for example, if during the
14  time of the murder we prove he was in prison,
15  well, he didn't have the means.  But if that
16  person was available to travel to that place to
17  commit that crime, that's just simple means.
18        There's a variety of means that you
19  can use.  And it elevates.  It can be elevated.
20  There's different levels of means.  But if the
21  person was in prison, he didn't have the means.
22  That's simply what I'm referring to there.
23    Q.  What's the distinction between means
24  and opportunity?  Because it sounds like what
25  you're describing now is opportunity.

Page 153

1    A.  Did they have the opportunity?  If
2  they were in prison, they didn't have the
3  opportunity either.  Were they in the same
4  proximity as that person at that time?
5    Q.  Okay.  So would it be fair to say
6  opportunity is what you just said, the ability to
7  be in the vicinity of where the crime took place?
8  Would that be fair?
9    A.  Well, I think they both are.  I think
10  both can be categorized that way.  Did they have
11  the means and the opportunity?
12    Q.  Is there anything different in your
13  view between means and opportunity?
14    A.  I think they're referring to the same
15  general principle, did they have the ability to do
16  it.  If you can prove they didn't, that takes away
17  means and opportunity.  If they were in prison, if
18  they were dead at the time that they alleged
19  to have done this, then they don't have the means
20  and the opportunity.
21    Q.  Are you aware of an operation run by
22  the Chicago Police Department called Operation
23  Don?
24    A.  No.
25    Q.  Did you review any deposition

39 (Pages 150 - 153)

Page 154

1 transcripts or documents in this case related to
2 an Operation Don?
3    A.  I may have.  It sounds familiar.  I
4 don't remember specifics of it.
5    Q.  Okay.  We talked about the -- I'll
6 take this down for a second.
7        We talked about the subpoena that
8 was mentioned earlier for -- related to wiretap
9 phone records.  Did you review any documents that
10 showed that Eric Blackmon called Richard Arrigo?
11    A.  Not that I recall.  I think I would
12 have documented that in my report if there were.
13    Q.  Okay.  And the same thing, did you
14 see any evidence that George Davis talked to
15 Mr. Blackmon at any point?
16    A.  I don't believe so, no.
17    Q.  Okay.  Are you actually -- are you
18 aware of any evidence linking Mr. Arrigo to
19 Mr. Blackmon?
20    A.  Offhand, no.
21    Q.  Okay.  Or any evidence linking
22 Mr. George Davis to Mr. Blackmon?
23    A.  No.
24    Q.  I'll go back to your report on page
25 nine.  Up at the top here -- and, actually, I'm

Page 155

1 sorry, the bottom of page eight we'll start.  You
2 mention -- you discuss an autopsy that was
3 performed on July 5, 2002.  Do you see that
4 section?
5    A.  I do.
6    Q.  Okay.  And then if you continue on to
7 the next page -- I'm sorry, I keep -- I got to --
8 there we go.
9        If you continue on to the next
10 page, on page nine, that talks about projectiles
11 that were removed from the victim and shell
12 casings that were collected at the crime scene
13 that were submitted to the Illinois State Police
14 crime lab for analysis.  Do you see that section?
15    A.  I do.
16    Q.  The shell casings were never connected
17 to Mr. Blackmon in any way.  Correct?
18    A.  Not that I know of, no.
19    Q.  And the projectiles were never
20 connected to Mr. Blackmon in any way.  Correct?
21    A.  Again, not that I know of, no.
22    Q.  On page ten, there is a reference to,
23 at the top here, on July 9, 2002, an anonymous
24 phone call was received during which an unknown
25 black male stated that Pride a/k/a Little E and

Page 156

1 Keno killed Tony Cox.  Do you see that section
2 there?
3    A.  You're not on that page, at least I'm
4 not seeing that.
5    Q.  Yes, you know what?  Here, let me --
6 let me remove some of this other highlighting
7 here.  All right.  So just the highlighted --
8    A.  Okay.  Now.  Yeah.  Now I see it, yes.
9    Q.  Okay.  So this is on July 9, so this
10 is five days after the shooting.  Correct?
11    A.  Yes.
12    Q.  Okay.  Is it your understanding that
13 this is the first reference to the nickname Pride
14 in the investigative file?
15    A.  It may be.  I'd have to look through
16 the reports again.  But I believe that's the first
17 time I mention it --
18    Q.  Okay.
19    A.  -- in my report.  And I try to
20 document chronologically the police reports.
21    Q.  The anonymous caller on July 9 did
22 not state that Eric Blackmon killed Tony Cox.
23 Correct?
24    A.  No.  Not that I recall, no.
25    Q.  You didn't see anything in the record

Page 157

1 that suggests that the investigating officers in
2 this case did anything to identify this anonymous
3 caller.  Correct?
4    A.  I don't believe so.
5    Q.  The next part of page ten you talk
6 about an interview with Ethienne Cox on July 24,
7 2002.  Do you see that section?
8    A.  Yes.  The brother of the victim, yes.
9    Q.  Okay.  Exactly.  So this is the
10 brother of the victim that's being referenced
11 here.
12        It states Ethienne Cox also told
13 Detective Cronin -- I'm going to cut this part
14 out -- that one of his brothers, Xavier Cox, told
15 him that he had heard a rumor that Keno, also
16 known as Little Mike, and Pride were the two black
17 males who killed their brother.  Do you see that
18 section?
19    A.  Yes.
20    Q.  This interview was with Detective
21 Cronin.  Correct?  Or Gang Specialist Cronin.
22 Correct?
23    A.  It looks that way, yes.
24    Q.  And in this section -- and I'll read
25 the last sentence here -- he said Pride's first

40 (Pages 154 - 157)

Page 158

1  name is Eric and both are subjects -- both
2  subjects are members of the New Breeds gang.  Did
3  I read that correctly?
4      A.   Yes.
5      Q.   So Mr. Ethienne Cox did not state that
6  Eric Blackmon was involved in the shooting of his
7  brother, Tony Cox.  Correct?
8      A.   Well, he said Eric was.  But he didn't
9  say Eric Blackmon.
10     Q.   Right.  So he did not say that
11 Eric Blackmon was involved in the murder.  Is that
12 correct?
13     A.   He didn't say the last name Blackmon.
14 That's correct.  Yes.
15     Q.   Okay.
16     A.   According to the report.  I'm just
17 synopsizing the reports in this section of my
18 report.
19     Q.   And you didn't see any other report
20 that stated that another family member told -- of
21 Mr. Tony Cox told detectives that Eric Blackmon
22 was involved in the murder.  Right?
23     A.   I don't believe I did, no.  By
24 specific name, that name with the last name, no.
25         MR. THEIS:  Okay.  I think I've --

Page 159

1  there's a video issue.  And I can do a little bit
2  of a break here, if that's helpful.
3          THE VIDEOGRAPHER:  We are going off
4  the record.  The time is 1:14 p.m.
5              (A break was taken from
6               1:14 p.m. until 1:50 p.m.)
7          THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 1:50 p.m.  Please proceed.
9  BY MR. THEIS:
10     Q.   Mr. Monheim, I'm going to show you
11 your report again.
12     A.   Okay.
13     Q.   Can you see this?  This is -- we're on
14 page ten of the report.  I want to talk about this
15 section here.  Okay.
16         So we had just finished discussing
17 your -- your review and your report of the
18 July 24, 2002, interview with Ethienne Cox.
19     A.   Right.
20     Q.   The next paragraph -- and in that
21 paragraph, let me know if I'm reading this
22 correctly, you state that there were -- that
23 Ethienne Cox told Detective Cronin that one of his
24 brothers, Xavier Cox, told him that he heard a
25 rumor that Keno, also known as Little Mike, was

Page 160

1  one of the shooters.  Did I read that generally
2  correctly?
3      A.   Correct.  Yes.
4      Q.   The next paragraph states:  By
5  conducting various searches through CPD records,
6  it was learned that Keno's real name is
7  Michael Davis.  Do you see that?
8      A.   Yes.
9      Q.   You say it was learned that Keno's
10 real name is Michael Davis.  Who learned that
11 Keno's real name was Michael Davis?
12     A.   I'm not sure if I know.  I just read
13 that in the report, that they had determined it
14 was Michael Davis.  Probably through a nickname
15 file, I would assume.
16     Q.   Okay.  So that's not -- you don't
17 recall specifically the basis for that statement
18 there?
19     A.   I don't.  And I probably, if it was --
20 if it was -- if I saw that, I think I probably
21 would have put it in that synopsis.  So I don't
22 think I did.
23     Q.   Okay.  And the same thing.  It says
24 various searches through CPD records.  Do you know
25 what -- what do you mean by various searches

Page 161

1  there?
2      A.   No.  It just -- I believe it just said
3  they searched and found the nickname.  I would
4  assume it would be either arrest records -- we use
5  nicknames on arrest records, we have field
6  interrogation cards, and we have nickname files.
7  So it could have been any of those, I guess.  I
8  assume they -- most major departments have those
9  same search abilities.
10     Q.   Okay.  You don't state here that
11 searches through CPD records revealed the identity
12 of Pride.  Is that accurate?
13     A.   If it would have, I'm sure I would
14 have included that in the synopsis.  So it
15 probably didn't.  Right.
16     Q.   Okay.  You continue here in this
17 paragraph that Michael Davis is the nephew of
18 George Davis a/k/a Boonie Black.  Michael Davis's
19 mother is Ruth Davis who is George Davis's sister.
20 Do you see that?
21     A.   I do.
22     Q.   The police had -- again, you mentioned
23 this before, that they had evidence that
24 George Davis wanted Tony Cox killed.  Correct?
25     A.   It appeared that way, yes.

41 (Pages 158 - 161)

Page 162

1    Q.   And they had evidence that
2 Michael Davis was involved in the shooting.
3 Correct?
4    A.   Yes.  There was -- he was implicated,
5 yes.
6    Q.   And Michael Davis was never charged
7 with the shooting of Tony Cox.  Correct?
8    A.   Not that I could see, no.
9    Q.   On page ten, there's a 9-1-1 call
10 that's discussed -- or, I'm sorry, recordings of
11 9-1-1 calls.  Do you see this next paragraph here?
12    A.   I do, yes.
13    Q.   You state that it took several weeks
14 for technicians to compile the -- I should just
15 read the whole paragraph.  Let me start that
16 again.
17          As part of the ongoing
18 investigation, recordings of the 9-1-1 calls were
19 requested by the investigators from the police
20 department's dispatch center.
21          Did I read that correctly?
22    A.   Yes.
23    Q.   It then states that it took several
24 weeks for technicians to compile the information.
25 Do you see that?

Page 163

1    A.   I do.
2    Q.   What's the basis for your statement
3 that it took several weeks for technicians to
4 compile the information?
5    A.   I believe it was stated in reports
6 that it took some time for them to get the
7 technicians to pull the tapes.
8          And it -- and I would commiserate
9 with that because it happens with us, too.  We had
10 the same problems of getting the tapes pulled from
11 the dispatch centers, the 9-1-1 centers, and it
12 takes some time.
13          I must have -- everything that I've
14 included here was in a police report, so it must
15 have been in a police report somewhere.
16    Q.   So there's a -- and your guess is that
17 there's a police report that states it took
18 several weeks for technicians to compile the
19 information, or words to that effect.  Is that
20 accurate?
21    A.   As far as I know, yes.  That's why --
22 I'm sure that's why I put it in there.
23    Q.   Okay.  You would agree that recordings
24 of 9-1-1 calls made in connection with a homicide
25 investigation or in connection with a homicide,

Page 164

1 that those are important pieces of evidence.
2 Correct?
3          MR. KOSOKO:  Object --
4          THE WITNESS:  Yes.
5          MR. KOSOKO:  -- to form.  Foundation.
6 BY MR. THEIS:
7    Q.   I mean, I'm sorry, the answer to that
8 was yes?
9    A.   Yes.
10    Q.   With the objection.  Okay.
11          On page 11, you discuss here a
12 photo array that was presented to Lisa McDowell by
13 Detective Sanchez.  Do you see that section?
14    A.   I do.
15    Q.   Did you review the actual photo array
16 that was shown to Ms. McDowell?
17    A.   I believe so.  I have the photo arrays
18 here.  I believe I did, yes.  I don't know if it
19 was the actual one, but I reviewed several photo
20 arrays.  I'd have to look and see which one is
21 linked to which witness.
22    Q.   Okay.  I'll represent to you just for
23 purposes of this deposition that what I'm going to
24 show you is what at trial was identified as the
25 photo array that was shown to Ms. McDowell.

Page 165

1    A.   Okay.
2    Q.   Do you recall reviewing these
3 documents and these photos?  I'm going to skim
4 through them briefly.
5    A.   Yes.  I saw this sequence, yeah.
6    Q.   Okay.  Great.  In your report -- and
7 this is Eric Blackmon's photo here.
8          In your report, you state that
9 Mr. Blackmon's hair is in a style known as rows or
10 cornrows.  And that's here.  Let me show you that
11 part of your report.  I'm going to skip ahead to
12 26.  Here.  When I first viewed -- let me know if
13 I'm reading this correctly:  When I first viewed
14 the photos, I was somewhat puzzled because the
15 hairstyle Eric Blackmon was wearing was not what I
16 would refer to as braids but rows or cornrows.  Do
17 you see that section?
18    A.   I do.
19    Q.   Okay.  So, in your view, the hairstyle
20 that's in the photo is more akin to cornrows than
21 braids.  Would that be accurate?
22    A.   Well, actually, in that photo I can't
23 even see the cornrows.  I can see right here.  Can
24 you see my cursor?
25    Q.   I can't.

42 (Pages 162 - 165)

Page 166

1   A.   Maybe not.
2   Q.   Yeah.
3   A.   I see what I would call a braid
4   sticking out from behind.  But even in that photo
5   it's difficult to even -- it just looks like a
6   shaved, short cut, low-cut haircut.
7   Q.   Okay.
8   A.   It doesn't even look like cornrows to
9   me.  In that other -- other photographs I've seen,
10  it did.
11  Q.   Okay.
12  A.   Especially of the physical lineup.
13  Q.   But this one looks more like braids to
14  you.  Would that be accurate?
15  A.   No.  It looks like one braid back
16  here.
17  Q.   Okay.
18  A.   But the rest looks like -- I don't
19  even know if that's part of hair.  It's just
20  something sticking out from behind and I think
21  there's the shadow beneath it.  But the rest of
22  the hair just looks like low-cut hair to me.
23  Q.   Okay.  In your -- in your report,
24  though, you state that there's a distinction
25  between cornrows and braids.  Could you expand on

Page 167

1   that?
2   A.   Well, to me, when I refer to braids,
3   they came down, like braids -- braided hair that
4   comes down.  And this is -- and if you look in
5   some of the pictures, especially of Tony Cox, if
6   you see his autopsy pictures, he has braided hair
7   that is arranged in rows.  And I'm more familiar
8   with that than when I would say -- I would call
9   that cornrows or rows.  Maybe it's just a personal
10  preference to what to call something.  But, to
11  me, braided is longer and braided down, not
12  dreadlocks, but braided and hanging down.  To me,
13  that's braided hair.  But that might just be me.
14  Q.   Okay.  So, in your report, you did not
15  indicate that any of the other individuals in the
16  photo array that was shown to Ms. McDowell had
17  either braids or cornrows.  Correct?
18  A.   Well, I'm not -- can we see those
19  again?
20  Q.   Well, I'm actually interested what's
21  in your report, which I keep going back to this
22  document.  Let me close this up.
23       So here's the -- here's the
24  paragraph that I want to talk about.  It states:
25  In this case the plaintiff alleges that he was the

Page 168

1   only person with braids in the photo array.  Did I
2   read that correctly?
3   A.   Yes.
4   Q.   And then you say:  When I first viewed
5   the photos, I was somewhat puzzled because the
6   hairstyle Eric Blackmon was wearing was not what I
7   would refer to as braids but rows or cornrows.
8   A.   Correct.
9   Q.   Okay.  So are you -- do you disagree
10  with -- are you saying in that statement that you
11  disagree with plaintiff's allegation that he was
12  the only person with braids in the photo array?
13  A.   I don't even think you can tell he has
14  braids in that photo array.  So, yeah, I would --
15  I would disagree with that.  I don't think you can
16  tell he has even cornrows in that photo, in that
17  particular photo.  And then I go on to say that in
18  Reece's array -- I don't think they were the same
19  photo arrays that were shown -- William Hall had
20  braided cornrows, too.  But, again, not what I
21  would call braids depending -- yeah.
22  Q.   Did you review the testimony of Lisa
23  -- I'm sorry to interrupt you.
24  A.   I'm sorry?  Say that again.
25  Q.   Did you review the testimony of

Page 169

1   Lisa McDowell in this case?
2   A.   I did.  You mean the testimony in
3   court?
4   Q.   Her deposition testimony.
5   A.   Both, yes.
6   Q.   Okay.  Both.
7        And in her deposition she stated
8   that the only photo that she saw of an individual
9   with braids was Mr. Blackmon.  Is that correct?
10  A.   Now, what was the date of that
11  deposition?  That was the deposition that was
12  taken 20 years later?
13  Q.   Correct.
14  A.   I believe she did say that, yes.
15  Q.   Okay.  You would agree that hairstyles
16  of individuals in a photo array can be important
17  in determining whether a photo array is
18  suggestive.  Correct?
19       MR. KOSOKO:  Object to form.
20  Foundation.  Calls for a legal conclusion.
21       THE WITNESS:  Can be, but not
22  necessarily that they would -- they nullify a
23  photo lineup.  They can be.  That's part of -- I
24  should say photo array.  That's part of compiling
25  a photo array, yes, you look at hairstyles.  I

Page 170

1 mean, they'd have to be extremely different for it
2 to affect the photo array. And, again, it's the
3 judge at the suppression hearing that decides
4 that.
5 BY MR. THEIS:
6     Q.   Yep. And so in -- well, although, I
7 think you've said, before, that the photos that
8 are -- when you are compiling a photo array you
9 want to find ways to make sure that no specific
10 photo has any unique characteristics. Would that
11 be fair?
12     A.   Yes. Stand out.
13         And I also said that people, when
14 they identify photos, don't look at facial hair or
15 hairstyles or clothing. They look at facial
16 features, generally speaking. And many times when
17 you show a photo lineup, the hairstyle is
18 different from the person that was described by
19 the witnesses and the victim at the time of the
20 incident. So there could be variations.
21         Again, I don't want to be
22 pigeonholed in saying one thing about photo
23 lineups because there are a lot of variables that
24 are involved and enter into the composition of
25 a reliable photo array. It doesn't have to be

Page 171

1 perfect. It just has to be -- the identification
2 just has to be reliable.
3     Q.   And if the individual has a -- well,
4 let me ask you a different question.
5         We talked earlier about a case that
6 you had previously where the shooter was alleged
7 to have had dreadlocks. Correct?
8     A.   Yes.
9     Q.   Okay. And so let's just -- putting
10 that case in your mind, but let me just ask you
11 the question. If an eyewitness said that a
12 shooter had dreadlocks and the detectives wanted
13 to show that witness a photo array, it would be
14 best practices to have everyone have dreadlocks in
15 the photo array. Correct?
16     A.   Yes. Generally speaking, you wouldn't
17 want shaved heads with one person with dreadlocks,
18 the subject wearing dreadlocks. Yes. I would
19 agree to that, yes.
20     Q.   Okay. And that's because, if you
21 don't do it that way, then one of the -- one of
22 the photos might be more suggestive -- or that
23 photo array might be suggestive. Would that be
24 accurate?
25         MR. KOSOKO: Object to form.

Page 172

1 Foundation --
2         THE WITNESS: Correct.
3         MR. KOSOKO: -- calls for a legal
4 conclusion.
5 BY MR. THEIS:
6     Q.   Okay.
7     A.   Correct. But that's not to say that
8 the person didn't shave their heads after the
9 commission of the crime and the dreadlocks photo
10 might just be a red herring. But if it's the
11 intended subject in the lineup, I would be in
12 agreement, yes.
13     Q.   Okay. On the photo array that we just
14 discussed, going back to this report at page 10 --
15 I'm sorry, page 11, you state that Detective
16 Sanchez on August 29 interviewed Lisa McDowell and
17 presented her the photo array containing a picture
18 of the plaintiff.
19         Did you review a report from a
20 daily bulletin that was prepared by Detective
21 Sanchez? Do you recall that document?
22     A.   I believe I do, yes.
23     Q.   And that document is dated August 30.
24 Correct?
25     A.   I can't be sure of the date. I'd have

Page 173

1 to go back and look at it.
2     Q.   Okay. Let me show you a copy of the
3 document. Do you recall reviewing this document?
4 This is a Material Submitted for a Daily Bulletin
5 dated August 30, 2002.
6     A.   I'm not seeing it yet. There we go.
7 Okay.
8         Yeah, I believe I did. Yeah.
9 Yeah. It looks familiar, yeah.
10     Q.   In the middle of this document, it
11 states -- it describes Mr. Blackmon. And it
12 includes a hairstyle, do you see that, in the
13 middle of this document here?
14     A.   Yeah. It says black rows.
15     Q.   Right. So Mr. -- or Detective
16 Sanchez, when he filled out this report, stated
17 that Mr. Blackmon wore his hair in cornrows.
18 Correct?
19     A.   He must use the same nomenclature that
20 I do. I mean --
21     Q.   Okay.
22     A.   -- he used the same.
23     Q.   Yeah. And that's because -- and
24 that's a -- he said that because he wanted to
25 provide some sort of unique information about the

44 (Pages 170 - 173)

Page 174

1  hairstyle.  Correct?
2      A.   Possibly, yes.
3      Q.   Going back to your report, on page 12
4  you state that Assistant State's Attorneys
5  Jim Murphy and Rimas Cernius responded to Area
6  Four to conduct a review of the case to determine
7  if formal charges against the two identified
8  suspects were warranted.  Do you see that section?
9      A.   I do.
10     Q.   Okay.  So if I -- let me know if I
11  have this wrong.  But after -- at some point after
12  the alleged identifications of Mr. Blackmon and a
13  second individual, these two assistant state's
14  attorneys were called to Area Four.  Is that
15  correct?
16     A.   Well, I don't know when that occurred,
17  if it was before or after.  I just know that they
18  responded to review if formal charges should be
19  levied.  I'm not sure when that was.  I just --
20  again, I'm gleaning this from the reports, all
21  this information.
22     Q.   You state responded to Area Four.  I
23  want to understand what you mean by that.  Do you
24  mean reported to Area Four?
25     A.   I think they showed up, I believe.

Page 175

1  That's what I -- that's what I understood from
2  reading the reports.
3      Q.   And they -- did they just walk into
4  the building or were they responding to a request
5  to approve charges?
6          MR. KOSOKO:  Object to the form of the
7  question.
8          THE WITNESS:  Well, I --
9          MR. KOSOKO:  You can answer.
10         THE WITNESS:  That I don't know.
11  BY MR. THEIS:
12     Q.   In your experience when a homicide
13  detective believe there's sufficient evidence to
14  charge a suspect with murder, the homicide
15  detective will request the review of the evidence
16  by a prosecutor to make that charging decision.
17  Right?
18     A.   Generally, yes.
19     Q.   And that's what happened here.
20  Correct?
21     A.   That's what I assume, yes.
22     Q.   At the bottom of this page, it states
23  September 10, 2002, a traffic stop was conducted
24  on a vehicle driven by Richard Arrigo.  Do you see
25  that?

Page 176

1      A.   I do.
2      Q.   It then says the passenger of the
3  vehicle was George Davis a/k/a Boonie Black, the
4  purported leader of the New Breed street gang.
5  Did I read that correctly?
6      A.   Yes.
7      Q.   Okay.
8      A.   Yes.
9      Q.   Do you recall -- so George Davis a/k/a
10  Boonie Black was brought to Area Four after this
11  traffic stop.  Correct?
12     A.   I don't know.
13     Q.   Do you recall reading documents that
14  stated that he was interviewed in connection with
15  the shooting of Tony Cox?
16     A.   I do not.  It may be.  It may -- I may
17  not recall reading that, but it may have -- I may
18  not.  I don't know if I did or not.
19     Q.   Do you recall reading that, in
20  Detective Sanchez's deposition, that Detective
21  Sanchez drove Boonie Black home after this traffic
22  stop?  Do you remember reading that?
23     A.   No, I don't remember that.
24     Q.   In your experience, is that something
25  that would typically happen after conducting an

Page 177

1  interview of someone who was alleged to have been
2  related to a homicide?
3          MR. KOSOKO:  Object to form.
4  Foundation.
5          THE WITNESS:  What would happen?  They
6  would drive him home?
7  BY MR. THEIS:
8      Q.   Yeah.  Would a detective after
9  interviewing a witness who may be a target or a
10  suspect of a crime, would the detective drive that
11  individual home?
12         MR. KOSOKO:  Same objection.
13         THE WITNESS:  Sure.  I've done it
14  numerous times.  If we brought them to the
15  headquarters building, we're not going to just
16  kick them out the back door.  We -- we drive them
17  home.
18  BY MR. THEIS:
19     Q.   Okay.  When you state at page 22 that
20  -- let me skip ahead to this -- that here -- I'm
21  going to ask you a few questions about your
22  understanding of the identifications that took
23  place here.
24         On page 22 here, you state both
25  witnesses were initially alerted to the incidents

45 (Pages 174 - 177)

Page 178

1  by the sound of gunfire.  Do you see that section?
2      A.   I remember writing that.  But, no,
3  it's not on my screen yet.
4      Q.   Oh, I'm sorry.  I'm not -- I'm not
5  sharing right now.  Let's get to it.
6      A.   I see it now, yes.
7      Q.   Okay.  And then you state that that --
8  this, meaning the sound of gunfire, undoubtedly
9  heightened their degree of attention and
10  awareness.  Do you see that statement?
11      A.   Yes.
12      Q.   What is that conclusion based on?
13      A.   Well, as you know, it's in quotes,
14  degree of intention.  And that refers to Manson
15  versus Braithwaite and Neil versus Biggers in
16  which the court listed several things that a
17  witness -- what -- that might make a witness's
18  identification more reliable, and one of those was
19  degree of attention and awareness.
20          And by -- what I'm referring to or
21  getting at here is that their -- they heard the
22  sound of gunfire so that heightened their
23  awareness because, of course, anybody that hears
24  gunfire that's going to make them look very
25  quickly and they're going to be more attentive.

Page 179

1  I mean, it's just -- it's just common -- just
2  natural to them to do that.
3      Q.   Okay.  So you're -- are you relying on
4  then your just common sense about this or is there
5  anything else that you're relying on to make the
6  statement that --
7      A.   And that -- what I'm trying to get at
8  in a sense is not that they were alerted by the
9  gunfire.  It's what the, in quotes, degree of
10  attention because I'm referring to those two
11  important court cases that prescribed what makes a
12  witness reliable, more reliable, than another
13  witness, and one of them is the degree of
14  attention and awareness.
15      Q.   And do those court cases specifically
16  state that the sound of gunfire increases your
17  degree of attention?
18      A.   I don't believe so.  But I think that
19  we can all agree.  I mean, if you disagree, I
20  would disagree with you.  I think if you hear
21  gunfire it increases your attention.
22      Q.   And, well --
23      A.   I think most people --
24      Q.   I'm sorry.  Go ahead.
25      A.   I think most people would.  Human

Page 180

1  nature.
2      Q.   And the degree of attention is
3  relevant for identification purposes?
4      A.   Or the reliability.  There's several
5  factors that they list in the court case, and one
6  of those is degree of attention.
7          And I've talked about others, too,
8  as we go on, more -- more so in my analysis of the
9  case, not in the -- in the -- well, I guess we are
10  in the analysis now, yes, in this part.  Exactly.
11      Q.   Then you next state that the degree of
12  accuracy by the witnesses in describing the event
13  was considerable.  Do you see that statement?
14      A.   I do.
15      Q.   What is that conclusion based on?
16      A.   Well, I think I talk about it here.
17  They heard four gunshots.  They were fired at
18  close range.  And the autopsy confirms that there
19  were four gunshots and they were fired at close
20  range because there was tattooing, powder, gun
21  powder tattooing, present on the wounds.  So this
22  would have to be extremely close range, within
23  maybe a foot or so, for that type of tattooing to
24  occur.  So the autopsy validates what the
25  witnesses are saying in their statements, and I

Page 181

1  think that makes them more credible witnesses.
2      Q.   Is there anything else that supports
3  the conclusion that the degree of accuracy by the
4  witnesses in describing the event was considerable
5  other than what's in the autopsy?
6      A.   Well, the fact that they said there
7  were two guns, two shooters.  And that was
8  confirmed by the autopsy.  The whole description
9  of the scene is -- appears to be very accurate,
10  and it's in line with the physical evidence.
11      Q.   When you say witnesses here, which
12  witnesses are you referring to?
13      A.   Well, primarily Reece.  But I think
14  part of it is McDowell, too.  She talks about the
15  shootings, there being two shooters.  And that's
16  confirmed by the State Police and the ballistics
17  that they did, that there were two shooters.
18      Q.   Let's skip -- let's talk about the
19  McDowell identification.  Isn't it true that
20  Ms. McDowell gave some incorrect details about
21  what happened at the scene?
22          MR. KOSOKO:  Objection.  Form of the
23  question.
24          THE WITNESS:  Such as?
25              / / /

46 (Pages 178 - 181)

Page 182

1  BY MR. THEIS:
2      Q.   Well, she stated that she saw a third
3  man on the scene who appeared to be watching the
4  shooting and that that man was Hispanic. Correct?
5  That's the description she gave to officers? Do
6  you recall reading that?
7      A.   I do.
8      Q.   And it turned out that she was wrong
9  about the individual being Hispanic. Correct?
10     A.   Well, this goes back to the witness
11 identification and the witness doing the best that
12 they can do.
13          I mean, Hispanic, Italian. My
14 mother's family is Italian, and I guarantee you
15 that if you look through our family album they
16 would look Hispanic to you. So Hispanic, Italian
17 look very similar.
18     Q.   And she also stated that the
19 individual who was the third man had a gun in his
20 hand. Correct?
21     A.   Yes.
22     Q.   And that was incorrect. He had a cell
23 phone in his hand. Correct?
24     A.   That's true. But I've had police
25 shootings where police officers have described a

Page 183

1  cell phone as a gun, too.
2          So, again, that just goes back to
3  witnesses can make mistakes. There's no -- no
4  question about that. Mistakes can be made. It's
5  not intentional. It's just human nature to not be
6  accurate on every point. They're doing the best
7  they can.
8      Q.   I agree with you on the general
9  proposition. But in this specific case
10 Ms. McDowell made some mistakes in her identifi-
11 cation. Correct?
12     A.   Well, if you consider Hispanic,
13 Italian --
14         MR. KOSOKO: Object to the form of the
15 question.
16         THE WITNESS: I don't think Hispanic,
17 Italian could be called a mistake. That's just --
18 from point of view, I might have called him
19 Hispanic, too. I don't know. I haven't seen a
20 picture of him. But, again, if you look at my
21 relatives on my mother's side, you would swear
22 they were Hispanic.
23 BY MR. THEIS:
24     Q.   She wasn't close enough to the
25 individual to see that what she thought was a gun

Page 184

1  was really a phone. Correct?
2      A.   That's a -- that's a common mistake
3  that witnesses can make. As I've said, trained
4  police officers have made that mistake in cases
5  that I've reviewed in police shootings. So that's
6  not that uncommon.
7      Q.   So meaning you're -- it's common that
8  eyewitnesses think that cell phones are guns?
9      A.   No. I mean, it's possible. I mean,
10 it doesn't in every case of course. But the fact
11 that it happened doesn't surprise me.
12     Q.   So does the fact that it happened here
13 call into question the reliability of her
14 identification?
15     A.   I don't think it does. I don't think
16 that -- I don't think it does. If those are the
17 two things you're going to hang your hat on, I
18 don't think it does.
19     Q.   Why not?
20     A.   I mean, things are happening quickly.
21 She also said he had a cigar in one hand. She was
22 correct about that. So, I mean, when things are
23 happening fast and she's driving in traffic --
24 and, as I mentioned, I was under the impression
25 that she was much further away, both witnesses

Page 185

1  were much further away than they were, until I
2  looked at the crime scene pictures and I saw that
3  it was a very narrow thoroughfare. So they were
4  probably close enough to see a lot of the details,
5  particularly when she was describing how the event
6  took place and who shot and who ran was pretty
7  accurate.
8      Q.   You state in your report that your
9  understanding of the -- you were surprised, and
10 you just said now that you were surprised, by how
11 narrow Pulaski Road really is.
12     A.   Yes.
13     Q.   Have you been to Pulaski Road, the
14 corner of Pulaski and Roosevelt?
15     A.   No.
16     Q.   So your understanding of that, how
17 wide the road is, is based on your crime scene
18 photographs that you reviewed. Is that correct?
19     A.   Right. Right. Exactly.
20     Q.   And how wide is Pulaski Road?
21     A.   I don't know. I actually asked that,
22 but nobody seemed to know, so.
23     Q.   How far away was Ms. McDowell from the
24 shooting?
25     A.   That I don't know.

47 (Pages 182 - 185)

1    Q.   It's an important fact --
2    A.   I did --
3    Q.   -- wouldn't you think?
4    A.   -- in the police reports, but I didn't
5  see that listed anywhere.
6    Q.   Okay.  And yet you're making an
7  assessment about the reliability of her identi-
8  fication without knowing how far away she was?
9    A.   No.  What I'm saying is that when I
10  looked at the crime scene pictures I understood
11  the scene better.  I understood that it wasn't
12  this huge six-lane thoroughfare that I thought it
13  was in the beginning, it was just a two-lane
14  highway and it was -- they were much -- the
15  passengers and the drivers in the vehicles were
16  much closer to the curb where the incident
17  occurred than I thought.  That's all I was trying
18  to say.
19    Q.   So in this section about -- when I
20  asked about the degree of accuracy of the
21  witnesses is -- in describing the event was
22  considerable, the first witness you mentioned was
23  Ms. Reece.  So in your -- in your view, is
24  Ms. Reece's identification more reliable than
25  Ms. McDowell's?

1    A.   I don't think you can differentiate.
2  They both made a positive identification.  They
3  were both sure of their identification.  I don't
4  see how you could differentiate between the two.
5    Q.   Is there --
6    A.   I think Ms. Reece was a -- it appeared
7  to me that Ms. Reece was a very good witness.
8  That they were -- they both had made the
9  identification.  She may have articulated things
10  better than Ms. McDowell did.
11    Q.   You read Ms. Reece's deposition
12  transcript.  Correct?
13    A.   Which deposition?  The deposition
14  taken 20 years later after the crime?
15    Q.   Yeah.  The one taken after --
16    A.   Yeah.
17    Q.   -- the crime.
18    A.   Yes.  Yes.
19    Q.   And you're aware that her description
20  of what happened both at the photo array, the
21  lineup, and at trial is different than what it was
22  earlier in time.  Correct?
23    A.   Yes.
24        MR. KOSOKO:  Object to the form of the
25  question.

1  BY MR. THEIS:
2    Q.   I'm sorry, was that yes?
3    A.   Yes.
4    Q.   Okay.  Are you making a credibility
5  assessment about which one of the two events is
6  accurate?  You seem to only focus --
7        MR. KOSOKO:  Object to the --
8  BY MR. THEIS:
9    Q.   -- on the first identification of
10  Ms. Reece.
11    A.   Well, that was closer to the time
12  period, of course.  And descriptions and testimony
13  is going to be way more accurate than 20 years
14  later of course.  And, yes, I would -- I would --
15  I would submit testimony taken that day or
16  statements taken that day are far more credible
17  than statements taken 20 years later.
18        And, as I mentioned in my report,
19  there are a lot of reasons for witnesses to recant
20  their testimony years later.
21    Q.   And what are those reasons?
22    A.   Well, it's been my experience the main
23  two are intimidation and remuneration.  They get
24  intimidated or they get paid.  That's the two
25  that I've encountered most likely in homicide

1  investigation and robbery investigations.  It
2  happens.
3    Q.   And is there any evidence of that in
4  this case for Ms. Reece?
5    A.   Not that I saw.
6    Q.   Is there -- give me one second.
7        You talked about just now
8  Ms. Reece's identification because it was -- I'm
9  sorry, let me restate this.
10        You're suggesting that because
11  there's a gap in time between what happened in
12  2002 and today that the more recent testimony is
13  going to be more accurate.  Is that fair?
14    A.   Certainly.  Absolutely I think it is.
15    Q.   And that's because --
16    A.   As an example, I would submit, does
17  any of us on the Zoom call remember what we were
18  doing on July 4, 2002?  I mean, I certainly don't.
19  I'm sure I went to fireworks, but I certainly
20  don't remember what I was doing that day.  Do I
21  remember conversations I had that day?
22        I've worked cold case for over a
23  decade now, and I've come to learn that witnesses
24  do not remember 20 years ago.  I don't care how
25  much they tried to fill in the blanks with

48 (Pages 186 - 189)

Page 190

1 restored memory. Conversations, exact conver-
2 sations, are not remembered 20 years later.
3    Q.   Yeah, I mean I have -- yes. Go ahead.
4    A.   Events are. I mean, if there's a
5 traumatic event, the generalities of those events
6 are remembered. But exact specifics are -- are
7 fleeing -- fleeting.
8    Q.   Right. And, so, and that's why if
9 you -- even something that occurred, you know, a
10 month before, a month ago, that's something that
11 might be difficult to remember all of the details
12 of what happened?
13    A.   Well, a month and --
14       MR. KOSOKO: Object to form.
15       THE WITNESS: A month and 20 years is
16 a huge, huge difference.
17 BY MR. THEIS:
18    Q.   Right. But a month and two days,
19 that's a pretty significant difference. Would you
20 agree?
21       MR. KOSOKO: Object to the form.
22       THE WITNESS: It depends. It depends
23 upon the circumstances. Can be. Might not be.
24 BY MR. THEIS:
25    Q.   In your report at page 24, you state

Page 191

1 that -- here at the bottom -- the time that
2 elapsed between the murder and the first photo
3 identification by Lisa McDowell is 56 days. Do
4 you see that section?
5    A.   I do. I do.
6    Q.   While this is admittedly longer than
7 -- then you continue: While this is admittedly
8 longer than most homicide detectives would like,
9 it does not nullify the witness's ability to be
10 certain. Do you see that statement?
11    A.   I do, yes.
12    Q.   56 days is longer than most homicide
13 detectives would like because the longer time
14 between the event and the identification the more
15 unreliable the identification is. Correct?
16       MR. KOSOKO: Object to the form of the
17 question --
18       THE WITNESS: The more --
19       MR. KOSOKO: -- foundation. Calls for
20 a legal conclusion.
21       THE WITNESS: The more difficult it
22 might be for the witness to make an identi-
23 fication, yes. It just stands to reason that the
24 longer between the incident and the time of
25 viewing the photo array, it's going to be more

Page 192

1 difficult.
2 BY MR. THEIS:
3    Q.   If Ms. McDowell had not picked
4 Mr. Blackmon out of the photo array on August 29,
5 probable cause to arrest him would not have
6 existed at that point. Correct?
7       MR. KOSOKO: Object to the form of the
8 question.
9       THE WITNESS: Say that again.
10       MR. KOSOKO: Hang on. Hold on.
11 Object to the form of the question and incomplete
12 hypothetical.
13 BY MR. THEIS:
14    Q.   If Ms. McDowell had not picked
15 Mr. Blackmon out of the line -- the photo array on
16 August 29, 2002, probable cause to arrest him
17 would not have existed. Correct?
18    A.   I would agree with that, yes.
19    Q.   Assistant State's Attorney Fiedler was
20 the prosecutor who made the charging decision in
21 this case. Correct?
22    A.   You kind of broke up. What was the
23 name?
24    Q.   Sure. It's Assistant State's Attorney
25 Fiedler, Kenneth --

Page 193

1    A.   I think --
2    Q.   -- Kenneth Fiedler. Do you recall
3 reading his deposition?
4    A.   Fiedler. Okay.
5    Q.   I'm sorry.
6    A.   Yes. Okay.
7    Q.   Do you recall reviewing Mr. Fiedler's
8 deposition?
9    A.   I did.
10    Q.   And you would agree that, in making
11 the decision to charge Mr. Blackmon, Assistant
12 State's Attorney Fiedler relied on evidence
13 presented by the detectives in this case.
14 Correct?
15    A.   Well, as I recall, he didn't remember
16 much at his deposition. But I guess, in general,
17 that's true.
18    Q.   And in your report you state at 15
19 that the -- in the highlighted section here at the
20 bottom, that the detectives simply presented their
21 findings to the prosecutors. Do you see that
22 section?
23    A.   I do.
24    Q.   So, just to recap that, the detectives
25 presented the findings that they had about the

49 (Pages 190 - 193)

Page 194

1 shooting of Tony Cox to the prosecutors in this
2 case. Is that accurate?
3 A. Well, that's not an accurate
4 representation of that paragraph.
5 What I'm getting at is that the
6 prosecutor is the person that makes the final
7 decision on who will be charged with a crime. And
8 what I'm saying is in a homicide investigation the
9 duties of the detectives are different from the
10 duties of prosecutors. Detectives present their
11 findings to the prosecutor. Then the prosecutor
12 makes that ultimate decision whether or whether or
13 not to move forward. And that's what occurred in
14 this case.
15 Q. Do you --
16 A. Just to read that sentence alone does
17 not -- it's not inclusive. It doesn't explain the
18 whole -- what I -- the whole idea I was trying to
19 impart there.
20 Q. I mean, it's incumbent upon the
21 detectives to present their findings accurately.
22 Correct?
23 A. Yes.
24 Q. I'm sorry, give me one second.
25 I'm going to show you page 15 of

Page 195

1 your report. You state that the -- and, here, I
2 read you this first sentence: The detectives
3 simply presented their findings to prosecutors.
4 The last statement states: In
5 fact, the same prosecutors concluded that
6 Michael Davis should be -- would be released and
7 not charged even though the detectives had
8 developed sufficient probable cause to arrest him.
9 Do you see that?
10 A. I do.
11 Q. What was your basis for concluding
12 that there was sufficient probable cause to arrest
13 Michael Davis?
14 A. They had an ID, both a photo ID and a
15 live lineup.
16 Q. And who made the decision to arrest
17 Mr. Davis?
18 A. He was not arrested.
19 Q. Mr. Davis was arrested for the
20 shooting of Tony Cox. Do you know who made that
21 decision?
22 A. Mr. Davis was arrested?
23 Q. Is it your understanding that
24 Michael Davis was not arrested at any time of the
25 shooting of Tony Cox?

Page 196

1 A. That's my understanding. That's my
2 understanding. I've never read anything to the
3 contrary that he was.
4 Q. Well, let me -- maybe I can clear this
5 up. Mr. Davis was not charged with the shooting
6 of Tony Cox. Correct?
7 A. That's -- yeah. Exactly. That's what
8 I'm referring to, yes.
9 Q. But he was arrested for the shooting.
10 You don't --
11 A. Well, I guess arrested, detained, but
12 then he was never formally charged.
13 Q. There was significantly more evidence
14 tying Michael Davis to the shooting than there was
15 Eric Blackmon. Correct?
16 MR. KOSOKO: Object to the form of the
17 question.
18 THE WITNESS: No, I don't think so.
19 BY MR. THEIS:
20 Q. Well, you said before that
21 George Davis, also known as Boonie Black, was --
22 had reason to kill Tony Cox. Correct?
23 A. Correct.
24 Q. And Michael Davis was George Davis's
25 nephew. Correct?

Page 197

1 A. Yes.
2 Q. Richard Arrigo called a house that was
3 on Grenshaw Street right before the shooting.
4 Correct?
5 A. Yes.
6 Q. Mr. Davis was spotted on Grenshaw just
7 before he was arrested. Correct?
8 A. I don't know that I recall that.
9 Q. Several tips indicated that someone
10 named Keno shot Tony Cox. Correct?
11 A. True.
12 Q. And you state in your report that Keno
13 was known as Michael Davis. Correct?
14 A. Well, that's the information that I
15 got from reading the police reports, yes.
16 Q. Okay. So there was a connection to
17 the leader of the New Breeds, and this was a
18 New Breed shooting. Correct?
19 MR. KOSOKO: Object to the form of the
20 question.
21 THE WITNESS: Well, I assume it was,
22 yes. We don't know for sure. You're going to
23 motive again. You're delving into motive. And we
24 would think that would be the motive. But do we
25 know? We didn't know for sure. It could be over

Page 198

1 a girlfriend. What do we know?
2 BY MR. THEIS:
3    Q.   Isn't it true that Mr. Michael Davis
4 was not charged because only one eyewitness
5 identified him?
6        MR. KOSOKO: Object to the form of the
7 question --
8        THE WITNESS: That I don't know.
9        MR. KOSOKO: Hang on. Hang on. Let
10 me just -- I want to make sure my objection is
11 clear on the record.
12        Object to the form of the question.
13 Calls for a legal conclusion. And I believe the
14 State's Attorney's Office had asserted a
15 deliberate privilege on that specific question.
16        You can go ahead and answer,
17 Sergeant Monheim.
18        THE WITNESS: I forgot the question.
19 BY MR. THEIS:
20    Q.   Mr. Davis was not charged with the
21 shooting of Tony Cox because only one eyewitness
22 identified him. Correct?
23        MR. KOSOKO: Renew my objections.
24        THE WITNESS: That I don't know. It
25 was up to the prosecutors to make that

Page 199

1 determination. I'm not sure why or -- why they
2 did or didn't. It's their ultimate decision.
3 BY MR. THEIS:
4    Q.   Let me show you -- hang on one second.
5        Going back to your report at
6 page 14, there's a bold section at the top here.
7 After "I reject these assertions," you state: As
8 an experienced homicide investigator, it is my
9 opinion that the investigation into the murder of
10 Timothy Cox undertaken by the Chicago Police
11 Department homicide investigators was properly
12 conducted and clearly developed sufficient
13 probable cause to justify the arrest of
14 Eric Blackmon.
15        Do you state that -- see that
16 section?
17    A.   I do.
18    Q.   That should be Tony Cox, right, not
19 Timothy Cox? Right?
20    A.   Oh, you're right. I'm sorry. Yes.
21 You're correct.
22    Q.   In the next opinion below, it states:
23 As an experienced homicide investigator, it is my
24 opinion that the overall investigation conducted
25 by the Chicago Police Department's homicide

Page 200

1 detectives into the murder of Timothy Cox was
2 consistent in generally established -- consistent
3 with generally established and accepted -- I'm
4 sorry -- accepted investigative practices in place
5 in 2002. Correct?
6    A.   Yes.
7    Q.   What specific generally established
8 and accepted investigative practices are you
9 referring to here?
10    A.   Well, I think I get into them further
11 on in my opinion. And I list a number of critical
12 junctures in a homicide investigation. It
13 complied correctly with all of those.
14    Q.   Is it -- so there is the NIJ
15 guidelines on the identification procedures? Is
16 that what you're referring to here?
17    A.   No. If you'll look on page -- mine
18 is 32, but it's probably going to be 33 for yours
19 because we're -- the numbering is incorrect.
20    Q.   Could you -- could you just read a
21 section that points out which generally
22 established and accepted investigative practice in
23 place in 2002 you're referring to in that opinion?
24    A.   Well, I list -- it says the critical
25 junctures of competent investigations include, and

Page 201

1 I list in the bullet points: Securing the crime
2 scene and making it safe; preserving the crime
3 scene; photographing the crime scene; obtaining
4 search warrants to enter the crime scene, if
5 necessary.
6        I guess I'm going a little too fast
7 for the court reporter.
8        Documenting the crime scene;
9 properly impounding evidence; properly submitting
10 items of evidence to the crime lab; conducting an
11 area canvas; separating and interviewing
12 witnesses; issuing a BOLO, be-on-the-lookout;
13 identifying the victim; notifying the victim's
14 next of kin; reviewing the autopsy; securing an
15 arrest warrant; locating and arresting the
16 subject, if known; interrogating the subject;
17 recording any confession or statement; completing
18 the required reports; presenting the case to the
19 prosecutor; and testifying in court.
20        That's the basic as I've referred
21 to critical junctures in any homicide investi-
22 gation. And a good, competent investigation
23 should include those, if they're applicable.
24    Q.   Okay. So this bullet point list here,
25 these are the generally established and accepted

51 (Pages 198 - 201)

Page 202

1 investigative practices in place in 2002 --
2     A.   No.  No.
3     Q.   -- that --
4     A.   Generally accepted, no.  Those are
5 just what I would call critical junctures in a
6 homicide investigation.
7           Generally accepted practices and
8 procedures are what is accepted all over the
9 country as a competent, well-done homicide
10 investigation.  But not all departments do the
11 same things and not all generally accepted
12 practices are admissible in court.
13          For example, most departments use
14 polygraphs.  In fact, a lot of departments have
15 an entire SOP on how to conduct a polygraph
16 examination.  But those are not allowed in court.
17 But virtually every -- it is a generally accepted
18 practice that a polygraph examination is used in a
19 homicide investigation.  Some departments use
20 psychics.  And I would say that the -- the better
21 departments have seen the foolhardiness of using
22 psychics and don't use them, but some departments
23 do.  So this is not what I would consider a
24 generally accepted practice.  Hypnosis is another
25 one.  Some departments use hypnosis.  But I don't

Page 203

1 consider that a generally accepted practice.
2           It's what is -- it's what is used
3 by most major police departments throughout the
4 country in solving a homicide investigation.  It's
5 not generally written down anywhere, but it's
6 accepted.  I think every profession has certain
7 accepted principles or procedures.  But I would
8 say that the generally accepted practices
9 generally have to conform to laws and legality.
10    Q.   Okay.  So you mentioned polygraphs and
11 psychics.  Right?  Those are not -- those aren't
12 practices that were employed in this case.
13 Correct?
14    A.   No.  But they are -- they're generally
15 accepted practices and procedures throughout the
16 country and in homicide investigations.  I'm just
17 trying to make an example.
18    Q.   I totally understand.
19           But my question is, in this
20 specific conclusion that you reach here, you say
21 that an overall investigation was consistent with
22 generally established and accepted investigative
23 practices in place in 2002.  I'm trying to ask you
24 how you reached that conclusion.  What are the
25 generally established and accepted investigative

Page 204

1 practices that, in your view, the detectives
2 adhered to in this investigation?
3     A.   You're breaking up.  I really didn't
4 understand that question.  Try it again.
5     Q.   Sure.  So you conclude that it is your
6 opinion that the overall investigation conducted
7 by the police in this case, the detectives in this
8 case, was consistent with generally established
9 and accepted investigative practices in place in
10 2002.  That's your conclusion --
11    A.   Yes.
12    Q.   -- here that I've highlighted.
13    A.   Yes.
14    Q.   What I'm trying to understand is, what
15 are the generally established and accepted
16 investigative practices in place in 2002, the
17 specific practices, that the detectives in this
18 case carried out that was consistent with these
19 policies?
20    A.   Well, there are no specifics.  If you
21 ask me about specific things, I'd be happy to
22 answer.  But I said generally established.  And I
23 think I tried to explain that, but maybe -- maybe
24 I didn't explain it well.
25           There are certain generally

Page 205

1 accepted practices, investigative practices, in
2 homicide investigations and death investigations
3 that are -- that most major police agencies
4 conduct when doing investigations.  That would
5 include that generally -- the critical junctures
6 that I listed in my report.
7           But, then again, there are other
8 things that are not generally accepted or
9 generally established.  For example, psychics,
10 hypnosis, but police departments do use those.
11 But that's not what I would call a generally
12 accepted.
13           Every profession has generally --
14 surgeons have generally accepted practices that
15 they employ in the operating room.  Now, they're
16 not written down anywhere and they're not -- I
17 mean, it's just a collection of procedures that
18 have been used over time, they've been time
19 tested, and they're legal, they're tested by
20 legality also by the courts.
21           So there's no specific -- if you
22 want to ask me a specific, I'd be happy to answer
23 it.  But I don't think there's any specifics that
24 I can list.  They're probably too numerous to
25 mention.

52 (Pages 202 - 205)

Page 206

1    Q.   Well, I mean, this is your report.  I
2  want to give you the opportunity to provide a
3  specific practice that was in place in '02 that
4  you believe the detectives followed.
5    A.   Well, I did, when I listed the
6  critical junctures.
7    Q.   Okay.
8    A.   They did an area canvas.  Notified the
9  next of kin.  There's a lot of things.  There's a
10 whole gamut of generally accepted practices.  And
11 they change over time also.  But, for that time
12 period, this was a generally accepted investi-
13 gative practice.
14        Now, if they had violated any of
15 those, then -- for example, if they had used a
16 psychic, I would have said, well, this is not a
17 generally accepted practice.  If they had used
18 hypnosis.
19        If they had used a polygraph, I
20 would have agreed this is a generally accepted
21 practice.  It's not admissible in court, as we all
22 know, but it's generally accepted.
23        So in order to answer that
24 question, you have to give me specific -- a
25 specific question about a specific procedure that

Page 207

1  they did.  I can't answer it generally.  It's too
2  broad.
3    Q.   Okay.  So there's -- just to -- one
4  more time.  The bullet points that you list here
5  on 31, are these the examples of the specific
6  established and accepted investigative practices
7  in place in '02 that you believe the detectives
8  followed in this case?
9    A.   Some of them.
10       MR. KOSOKO:  Objection.  Misstates his
11 prior testimony.
12       THE WITNESS:  Some of them.
13 BY MR. THEIS:
14   Q.   Okay.  So we've got, you know, I'll
15 say two dozen or so here.  What other ones were
16 followed in this case that are not listed here?
17   A.   Well, they --
18       MR. KOSOKO:  Object to the form of the
19 question.
20       THE WITNESS:  I think I mentioned that
21 later on they did pen registers.  That's accepted.
22 I mean, that I didn't -- you know, that wouldn't
23 be in every investigation.
24       You can't -- you can't look at one
25 investigation and include every generally accepted

Page 208

1  practice there is.
2        They obtained a wiretap.  That's
3  unusual.  I've never done that in a homicide
4  investigation.  I've conducted 500 homicide
5  investigations, been the supervisor in those, and
6  I've never obtained a wiretap.  This is pretty
7  unique.
8        I've done pen -- [audio distortion]
9        (Court reporter clarifi-
10            cation.)
11       THE WITNESS:  That was my best stuff.
12 Can you hear me now?
13 BY MR. THEIS:
14   Q.   Yes.  Yes.  Okay.  So --
15   A.   I don't know how far back you didn't
16 hear me.
17       But I said they did a wiretap.
18 I've never done a wiretap in any investigation
19 I've ever been involved in.  So that's pretty
20 unique.  That's part of a generally accepted
21 practice.
22       Not every investigation is going to
23 include every generally accepted and established
24 practice for a homicide investigation.  There
25 are -- the ones that I've listed are definitely

Page 209

1  core junctures that you have to establish, but
2  there are many others.  For example, the pen
3  register.  I've only done a pen register a couple
4  of times in investigations.  So these are even
5  above and beyond what the normal investigation
6  would include.  But to include every generally
7  accepted practice is impossible.
8    Q.   And you weren't retained, of course,
9  to identify every single investigative practice
10 that was nationally recognized in 2002.  Correct?
11 You were --
12   A.   I don't think you could --
13   Q.   -- retained to -- I'm sorry.
14   A.   I don't think you could.  If you ask
15 me about a specific one, I'll tell you if that's
16 accepted or not.  But --
17   Q.   But you were --
18       (Indecipherable
19            simultaneous speaking.)
20 BY MR. THEIS:
21   Q.   You were retained for a much more
22 narrow purpose, and that's to determine whether or
23 not the officers in this case adhered to
24 nationally recognized standards of police
25 practices and -- is that right?

53 (Pages 206 - 209)

Page 210

1    A.   Yes.  Which they did.  Which I'm
2  stating they did.
3    Q.   And the -- okay.  When you refer to
4  the -- in that section, that opinion, about the
5  nationally -- I'm sorry, let me find it again.
6  There we go.  The generally established and
7  accepted investigative practices in place in 2002
8  in this conclusion on page 14.  You're not
9  referring to any written policy.  Correct?
10   A.   Well, some are written.  But there are
11  others that aren't.  I mean, I don't know how to
12  explain this any clearer.
13        There are certain SOPs, for
14  example, that have to do with polygraph
15  examination.  That is a generally accepted --
16  generally established and accepted investigative
17  practice.  However, not every department uses
18  polygraphs.  Most do.  In this case, it wasn't
19  done.  So this was a generally accepted
20  investigative practice that was not used in this
21  case.
22        So I'm just saying that what they
23  did in their investigation is acceptable --
24   Q.   And you --
25   A.   -- by the known standards of that time

Page 211

1  period for investigations.
2    Q.   But you don't -- you don't -- you
3  mention SOPs.  You don't mention -- you don't
4  specifically state that any detectives followed
5  any specific SOPs in this report.  Correct?
6    A.   I don't think I can.  I don't think
7  that's -- I don't think that's possible.
8    Q.   You don't think it's possible to state
9  whether or not a detective in a homicide investi-
10  gation complied with an SOP?
11   A.   Oh, an SOP.  I thought you meant
12  generally accepted and established investigative
13  practices.  I mean, they're too broad.  You have
14  to be specific on which one you're referring to.
15   Q.   And --
16   A.   Photo lineups would be part of the
17  identification process.  That's part of a
18  generally accepted practice.  There are things
19  that they did that were also part of the generally
20  accepted practices, such as wiretaps.  There's
21  things that they didn't do.  They didn't use a
22  psychic.  They didn't use hypnosis.  So, I mean,
23  it's just too broad to examine each -- each item.
24   Q.   And you didn't --
25   A.   It's an overview of the profession

Page 212

1  and --
2    Q.   Okay.
3    A.   -- other professions.  The legal
4  profession has the same generally accepted
5  practices --
6    Q.   So --
7    A.   -- but I can't list them all.
8    Q.   You don't list any of the specific
9  investigative practices in your report.  Correct?
10  You only state that there's general practices that
11  they adhere to.  Is that accurate?
12   A.   No.  I do.
13   Q.   Is that --
14   A.   I do --
15   Q.   And those are the bullet points later?
16   A.   -- are part of the investigative
17  process and are generally established practices,
18  the critical junctures.
19   Q.   Okay.
20   A.   That's the main -- the main ones that
21  you want to see in almost every investigation, if
22  they're applicable.  So that's just the baseline.
23  That's the baseline.
24        But there are other things that
25  they can become involved in, as we saw.  Wiretaps.

Page 213

1  Pen registers.  Subpoenas.
2        That's another.  I didn't mention
3  subpoenas.  They obtained subpoenas for phone
4  records.  That's huge now in homicide investi-
5  gation cases.
6    Q.   So for each of these bulleted items on
7  page 31 did you conduct an independent analysis to
8  see whether or not the detectives in this case did
9  those actions sufficiently?
10       MR. KOSOKO:  Object to the form of the
11  question.
12       THE WITNESS:  Well, I read the police
13  reports.  And, in the police reports, I was able
14  to determine that they conducted each aspect of
15  the critical junctures apparently properly.
16  BY MR. THEIS:
17   Q.   You would agree that mistakes are
18  inevitable in a murder investigation.  Correct?
19       MR. KOSOKO:  Object to the form of the
20  question.
21       THE WITNESS:  Well, you're quoting me,
22  so I'd have to agree with you.  Yes, that's --
23  you're quoting what I said in my report.
24  BY MR. THEIS:
25   Q.   What mistakes were made by the

54 (Pages 210 - 213)

Page 214

1  defendant detectives in this case?
2      A.   Well, I don't know specific mistakes.
3  If you would ask me a specific question, maybe I
4  could answer if that was a mistake or not.  I'm
5  not sure I can -- I can answer that.
6      Q.   So you don't have a specific
7  recollection of a specific mistake made by any of
8  the defendant detectives in this case?
9      A.   Well, without standing shoulder to
10 shoulder with them going through the crime scene
11 and interviewing witnesses, it would be difficult
12 for me to read police reports and come up with
13 mistakes.  I mean, I'm simply reading reports.
14 I'm not there doing the investigation.  So it's
15 difficult to come up with mistakes.
16     Q.   Are you saying you can't review police
17 reports --
18     A.   -- specific question.
19     Q.   I'm sorry.  I'm sorry.
20     A.   If you'd ask me a specific question
21 about some procedure they did, I would -- I would
22 be happy to answer that.
23     Q.   Are you saying that you can't identify
24 specific mistakes made by detectives in a homicide
25 investigation just by reviewing the reports?

Page 215

1          MR. KOSOKO:  Object to the form of the
2  question.  It misstates his testimony.
3          THE WITNESS:  Well, you can.  But
4  police reports, as you probably know, are pretty
5  antiseptic.  They put in a police report what they
6  want to put in.  They don't put -- if they made a
7  colossal mistake, it's not going to be in a police
8  report.
9  BY MR. THEIS:
10     Q.   You would agree that they would have
11 an obligation to put that in a police report,
12 though?
13     A.   If it -- if it impacted the investi-
14 gation, sure.
15          But I can only -- I can only opine
16 on what I read in the police reports.  That's all
17 I can do.
18     Q.   On page 30 of your report, the first
19 sentence here, you state:  A review of the
20 investigators' reports and their testimony at the
21 trial leads me to conclude that the detectives
22 simply followed the investigative leads to their
23 conclusion.  Do you see that?
24     A.   I do.
25     Q.   What investigative leads did the

Page 216

1  detectives in this case follow to their
2  conclusion?
3      A.   Well, there were numerous leads.  I
4  mean, they -- they interviewed witnesses, the
5  witnesses that talked about the -- Boonie Black,
6  the girlfriend.
7          They were told that there was a
8  message that was left from Mr. Arrigo.  They
9  obtained a subpoena.  They confronted him with the
10 information about leaving a message for Tony Cox.
11 He denied it.  And then when they played back the
12 information for -- the recording, he reluctantly
13 admitted.
14          I mean, there's -- I mean, do you
15 want me to go through every lead that they -- that
16 they followed?  There are numerous leads they
17 followed.
18     Q.   So, I mean, I just want to understand
19 what you're -- the basis for your conclusion that
20 the detectives followed their leads to their
21 conclusion.  So it's the information about
22 Boonie Black.  The interviews with some of the
23 witnesses.  Is there anything else?
24     A.   Well, I think after you go on in the
25 -- what I'm getting at, that first -- the lead-in

Page 217

1  to my point I'm making in this paragraph is that
2  they included exculpatory information in their
3  reports.  They didn't remove or delete or not put
4  information in there that was helpful to the
5  plaintiff.  And those -- that included the fact
6  that Mr. Arrigo did not identify Mr. Blackmon.
7  Davious Walker did not identify Mr. Blackmon.
8  Terrence Boyd claimed to be a witness, and he did
9  not identify Mr. Blackmon.  So there's a lot that
10 lead into that paragraph that's trying to
11 emphasize the fact that the Brady material, as
12 it's known, was included and divulged in their
13 police reports.  They didn't attempt to hide
14 things that were exculpatory to Mr. Blackmon.
15 That's what I was getting at.
16     Q.   In the reports that you reviewed, the
17 police did not identify the basis for why
18 Mr. Blackmon's photo was included in the
19 August 29 photo array.  Correct?
20     A.   I believe so.  And I believe I
21 addressed that, yes.
22     Q.   Yeah.  And in the reports that you
23 reviewed, the police did not identify the reasons
24 why they may or may not have believed that
25 Mr. Blackmon was a member of a gang.  Correct?

55 (Pages 214 - 217)

Page 218

1  A.  Well, he admitted he was in a gang,
2  but he said he was in a gang other than the
3  New Breeds.  But he admitted he was in a gang.
4  But I don't recall any specific information that
5  placed him in the New Breeds gang, no.
6  Q.  If you assume that Ms. Reece's current
7  testimony is correct, her current belief of what
8  happened in 2002 is correct, none of that
9  information was included by the officers in the
10 police reports.  Correct?
11      MR. KOSOKO:  Object to the form of the
12 question.
13      THE WITNESS:  Well, I'm not assuming
14 that at all.  I mean, it just -- it just doesn't
15 mesh with what happened in 2002.
16      I mean, she had ample opportunity
17 to divulge this information, were it true, to the
18 prosecute -- I mean, at least five prosecutors
19 interviewed her.  She was interviewed by the --
20 she was -- the judge took her testimony.  She
21 testified before a Grand Jury.  She had ample
22 opportunity at that time to divulge this
23 information.
24      So my conclusion was that -- by
25 reading her deposition, that she was just saying

Page 219

1  the complete opposite of what happened, what her
2  testimony was back in 2002, for whatever reason.
3  BY MR. THEIS:
4  Q.  In your report, you state that, let
5  me pull this up:  It is also my opinion that the
6  photographic and live lineup -- this is on page 14
7  -- it is also my opinion that the photographic and
8  live lineup identification procedures utilized by
9  the Chicago Police Department's homicide
10 investigation -- investigators were appropriate,
11 legally sufficient, properly conducted, and
12 consistent with all generally accepted and
13 established investigative practices in place in
14 2002.  Do you see that?
15 A.  I do.
16 Q.  Okay.  And I'll ask again.  What are
17 the generally accepted and established investi-
18 gative practices in place in 2002 that leads you
19 to this conclusion?
20 A.  My -- the same answer.  I mean, we've
21 talked about the IACP, their guidelines.  The NIJ,
22 their guidelines.  Those are certainly generally
23 accepted.  But there are also generally accepted
24 practices at that time.
25      In 2002, this was prior to all this

Page 220

1  simultaneous showing of photographs, and that
2  wasn't even used back then.  2002 was very
3  similar, if not identical, to 1974 when I first
4  became a detective.  So it hasn't changed that
5  much.  Even in 2002 you could still show
6  photographs in a stack.  You could show six
7  photographs and lay them down in a stack.  You
8  could show them in a binder with windows in the
9  binder.  So there's a number of different ways
10 that a photo array, I should say, could be shown.
11      Now, when we talk about the photo
12 -- the live lineup, ideally, of course, you would
13 not want to have two people in the same lineup.
14 But logistics sometimes force you to do something
15 like that.  And you're aware when you do that
16 there might be a suppression and a judge,
17 depending upon their point of view, might not like
18 that and might suppress or they might not.  So
19 you're aware of that at the time.  But you still
20 conduct the photo array or you conduct the live
21 lineup and allow the suppression hearing to go
22 forward.
23 Q.  You mentioned that --
24 A.  I don't know if that answers the
25 question.

Page 221

1  Q.  I'm sorry, go ahead.
2  A.  I don't know if that answers your
3  question.
4  Q.  In -- on page 17, you mention the
5  suppression hearing.  At the bottom here, you
6  state:  In this case, the plaintiff's defense
7  attorney inexplicably withdrew his motion to
8  suppress the identifications.  Do you see that?
9  A.  I do.
10 Q.  In your view, Mr. Blackmon's attorney
11 should have filed his motion to suppress the
12 identification?
13      MR. KOSOKO:  Object to the form of the
14 question.  Calls for a legal conclusion.
15      You can answer.
16      THE WITNESS:  Well, he did file it and
17 then he withdrew it, which is kind of odd.  I
18 would think that's odd, having -- I've been
19 through, I don't know, probably scores and scores
20 of suppression hearings.  And, generally speaking,
21 in a robbery or homicide investigation where the
22 photo arrays are the crux of the prosecution's
23 case, a defense attorney will always conduct or
24 request a suppression hearing just to see what
25 happens.  You never know.  You never know what a

56 (Pages 218 - 221)

Page 222

1  judge might rule. So I was surprised that he
2  withdrew that -- that motion because that's
3  standard operating procedure for most defense
4  attorneys to go through with the suppression
5  hearing.
6  BY MR. THEIS:
7      Q.   What should Mr. Blackmon's attorney
8  have argued at the suppression hearing?
9          MR. KOSOKO: Object to the form of the
10 question. Calls for a legal conclusion outside of
11 Sergeant Monheim's expertise.
12         You can answer, though, Sergeant.
13         THE WITNESS: His motion. If you read
14 his motion, it's all there. He should have argued
15 his motion.
16 BY MR. THEIS:
17     Q.   Do you think it was a valid motion?
18         MR. KOSOKO: Object to the form of the
19 question. Calls for a legal conclusion outside of
20 Sergeant Monheim's expertise. He's not a lawyer.
21         THE WITNESS: I'm not a lawyer, so I
22 don't know.
23 BY MR. THEIS:
24     Q.   Well, you base your opinion about the
25 propriety of the identification procedures in part

Page 223

1  on the fact that Mr. Blackmon's attorney withdrew
2  his motion to suppress the identifications. So
3  I'm asking you, why do you think it was a valid
4  motion?
5          MR. KOSOKO: Object to the form of the
6  question. Misstates his prior testimony.
7          THE WITNESS: That's correct. I
8  didn't say it was a valid motion. I said he
9  should have continued with his motion. That's
10 just normal practice for the defense attorney to
11 file the motion and have a suppression hearing and
12 see how the cards fall. That's a generally
13 accepted practice of attorneys when we're talking
14 about generally accepted practices.
15 BY MR. THEIS:
16     Q.   And you're aware that Mr. Blackmon's
17 attorney was found by a federal court to be an
18 ineffective attorney. Correct?
19         MR. KOSOKO: Object to the form of the
20 question.
21         THE COURT REPORTER: Did you say an
22 effective or an infective?
23         MR. THEIS: An ineffective.
24         THE WITNESS: I do. I know reading
25 the conclusion by the courts. But I'm not aware

Page 224

1  why that was decided. But I did read that
2  conclusion, yes.
3  BY MR. THEIS:
4      Q.   It states in this paragraph your
5  opinion, and let me know if I'm wrong about this,
6  is that Mr. Blackmon's attorney's pretrial
7  decision to withdraw his motion establishes, in
8  part, the propriety of the identification
9  procedure.
10     A.   Because he withdrew his motion. I'm
11 not sure why he withdrew it. But it would lead
12 you to believe, as would all the subsequent court
13 decisions and the appeals, which there was never
14 any mention of the photo arrays or the photo
15 lineups, all it was -- the only mention was of the
16 ineffective counsel, that the propriety of the
17 lineup was proper, that it was a -- it was a
18 lineup that was done properly.
19     Q.   So you mentioned the other attorneys.
20 This next paragraph here at the top, I'll
21 highlight it. And this states: The same must be
22 said for the prosecuting attorneys who obviously
23 had no reservations about bringing the case to
24 trial. Do you see that section here on page 18?
25     A.   I do, yes.

Page 225

1      Q.   And you conclude the sentence -- or
2  this paragraph by saying: Since none of the legal
3  experts expressed any opposition to the actual
4  lineups or the manner in which they were
5  presented, it can only be assumed that they
6  considered the actions of the detectives to be
7  proper and legally acceptable. Do you see that
8  sentence?
9      A.   Yes, I do.
10     Q.   Okay. To be clear, and you did not
11 interview the prosecutors in this case. Right?
12     A.   No.
13     Q.   And you're making an assumption. And
14 you say you're -- you say you're making an
15 assumption that the prosecutors had no concerns
16 with the lineups in the manner in which they were
17 presented. Correct?
18     A.   In my assumption, yes. I'm sure --
19 it's been my experience also that, if the
20 prosecutor has any problems, they will dump a case
21 pretty quickly if they don't think that anything
22 was done properly or legally. I also mention that
23 in my report. So that's what I'm getting at there
24 in that paragraph.
25     Q.   Are you offering expert testimony or

57 (Pages 222 - 225)

Page 226

1 opinion about general practices of attorneys?
2      MR. KOSOKO: Objection. Misstates his
3 testimony. Form.
4      THE WITNESS: I'm just saying what my
5 experience has been with prosecutors both at the
6 state and federal level.
7 BY MR. THEIS:
8      Q.   So you're not an expert in the
9 decisions that attorneys make in the course of a
10 criminal trial?
11     A.   No. I don't know if there is such a
12 person.
13     Q.   Or, even more generally, you're not
14 giving an expert opinion about general practices
15 of attorneys. Correct?
16     A.   That's correct.
17     Q.   You state in your report that you do
18 not have an opinion as to whether Eric Blackmon
19 shot Tony Cox. Correct?
20     A.   That's correct. Yes.
21     Q.   And you'll not be presenting an
22 opinion at trial about that issue. Correct?
23     A.   I can't.
24     MR. THEIS: Okay. What I'd like to do
25 is, if I could, could we take a five-minute break?

Page 227

1 And I might have a handful of additional things to
2 ask, but potentially not. Is that all right with
3 everyone?
4      MR. KOSOKO: Yes. I have a couple
5 questions, but I'll wait for you to finish up.
6      MR. BURNS: Hey, Jack, do you mind if
7 we take a ten-minute break? I have a quick call
8 to make then.
9      MR. THEIS: Yeah. Sure. Do you want
10 to just make it 3:30?
11     MR. BURNS: Yeah. That's fine.
12     MR. THEIS: Okay. All right.
13     THE VIDEOGRAPHER: Okay. We are going
14 off the record. The time is 3:14 p.m.
15          (A break was taken from
16          3:14 p.m. until 3:32 p.m.)
17     THE VIDEOGRAPHER: We are back on the
18 record. The time is 3:32 p.m. Please proceed.
19     MR. THEIS: Thank you. I don't have
20 any further questions at the moment. I'm going to
21 take a moment here, though, just to confirm some
22 of the exhibits that we used here today.
23          Exhibit 1, as we mentioned before,
24 is the expert report of Anthony Monheim.
25          Exhibit 2 is the document subpoena

Page 228

1 and rider of 12/1/21 to Mr. Monheim.
2          Exhibit 3 is the 1999 NIJ
3 Eyewitness Evidence report.
4          Exhibit 4 is the excerpt -- or, no,
5 is the CPD Daily Bulletin which is CITY-EB-00206
6 [sic].
7          (Monheim Deposition
8          Exhibit 4 was marked.)
9      MR. THEIS: Exhibit 5 is the live
10 lineup photos and information that's Blackmon
11 004079 to 004087.
12          (Monheim Deposition
13          Exhibit 5 was marked.)
14     MR. THEIS: And we're going to have
15 one more exhibit, which is the video that we
16 showed exhibits -- or excerpts from during the
17 deposition. And I think that was -- I don't think
18 that's included in the share file, but we're
19 making sure that that's been added right now.
20 It's the same video as the You Tube that we
21 showed.
22          (Monheim Deposition
23          Exhibit 6 was marked.)
24     MR. THEIS: Other than that, I have no
25 other questions.

Page 229

1          EXAMINATION
2      BY MR. KOSOKO:
3      Q.   All right. Sergeant Monheim, you've
4 been at this for a while, but I have just a few
5 questions because I want to clarify the record.
6 Okay?
7      A.   Sure.
8      Q.   All right. Would you -- would you
9 agree with me that probable cause is the existence
10 of certain facts that would lead a person of
11 reasonable intelligence and prudence to believe
12 that a crime has been committed.
13     A.   I would.
14     Q.   And, generally speaking, probable
15 cause, in your expertise, is required before an
16 arrest or even an arrest warrant can be issued.
17 Correct?
18     A.   Correct.
19     Q.   Okay. So let's go to specifically
20 some of the stuff that was addressed earlier.
21 Give me just a moment here. I just want to start
22 briefly with some of the stuff we finished out
23 with.
24          Now, Mr. Cowan, Mr. Blackmon's
25 trial attorney, was ineffective based on his

58 (Pages 226 - 229)

Page 230

1 failure to investigate Mr. Blackmon's other
2 witnesses. Correct?
3         MR. THEIS: Objection to form.
4 Misstates the evidence.
5 BY MR. KOSOKO:
6     Q.   Is that not what the legal ruling was,
7 was based upon a failure to present -- investigate
8 and present additional witnesses?
9         MR. THEIS: Objection. Calls for --
10        THE WITNESS: Yes.
11        MR. THEIS: -- a legal conclusion.
12 BY MR. KOSOKO:
13    Q.   So the court did not find that he was
14 ineffective because he withdrew his motion to
15 suppress the identification?
16        MR. THEIS: Same objection.
17        THE WITNESS: Correct.
18 BY MR. KOSOKO:
19    Q.   In fact, there's been no court that's
20 addressed that issue. Correct?
21        MR. THEIS: Same objection.
22        THE WITNESS: That's correct. Not
23 that --
24 BY MR. KOSOKO:
25    Q.   There's been no --

Page 231

1     A.   -- I read.
2     Q.   In fact, there's been no court that's
3 found that the lineup was suggestive?
4         MR. THEIS: Same objection.
5         THE WITNESS: That's correct.
6 BY MR. KOSOKO:
7     Q.   In fact, the first time Mr. Blackmon
8 was brought up at the lineup or photo array is
9 suggestive is actually in the civil proceedings.
10 Isn't that correct?
11    A.   Correct.
12        MR. THEIS: Objection. Outside the
13 scope of his expert report.
14 BY MR. KOSOKO:
15    Q.   Now, we also talked about the role of
16 the state's attorneys in this matter in bringing
17 charges. Is it unusual in your expertise that
18 Mr. Blackmon didn't sue the Cook County State's
19 Attorney's Office even though they were the ones
20 who actually charged him?
21        MR. THEIS: Objection. Calls for a
22 legal conclusion.
23        THE WITNESS: Well, it's not unusual
24 because he can't.
25           ///

Page 232

1 BY MR. KOSOKO:
2     Q.   But in recognizing what you placed in
3 your report, that had they saw, you know, some
4 legal defect or some issues with the investigation
5 they wouldn't have brought charges?
6         MR. THEIS: Objection. Form.
7         THE WITNESS: That's correct. That's
8 correct.
9 BY MR. KOSOKO:
10    Q.   In fact --
11    A.   If they had not, yes.
12    Q.   And, in fact, Kenneth Fiedler, who is
13 the former assistant that was responsible for
14 bringing charges, testified in this matter. And
15 you recall reviewing his deposition transcript?
16    A.   I do.
17    Q.   Give me just a moment here. I'm going
18 to screen share.
19        And, Sergeant Monheim, do you
20 recall actually coming across this question and
21 answer by Mr. Fiedler?
22    "Question by me: Now, I know you
23 don't have an independent recollection of
24 this, but as you sit here today you would
25 have no reason to believe that had you

Page 233

1 discovered any malfeasance in the
2 officers' invest -- in the investigation.
3 Is that correct?
4    "Answer by Mr. Fiedler: As I sit
5 here today, I have no -- I have no
6 independent recollection. I have no
7 reason to believe that."
8         So Mr. --
9     A.   I recall that.
10    Q.   You recall reviewing that. Correct?
11    A.   I do.
12    Q.   So Mr. Fiedler, he didn't believe that
13 he -- you know, even in his time in reviewing the
14 facts of the matter found any malfeasance by the
15 officers?
16        MR. THEIS: Objection. Form.
17        THE WITNESS: That's correct.
18 BY MR. KOSOKO:
19    Q.   And is that, in part, what you're
20 basing that section of your report on?
21        MR. THEIS: Objection to --
22        THE WITNESS: Yes.
23        MR. THEIS: -- not -- objection.
24 Under Rule 26, it's not included in his report.
25           ///

59 (Pages 230 - 233)

Page 234

1  BY MR. KOSOKO:
2      Q.   Mr. Blackmon's alleged membership in
3  the New Breed membership had nothing to do with
4  his identification. Correct?
5      A.   That's correct.
6      Q.   Ms. McDowell was not informed that he
7  was a New Breed. Correct?
8          MR. THEIS: Objection to form. I'm
9  sorry, I'm sorry, could you repeat the question?
10  I couldn't hear it.
11  BY MR. KOSOKO:
12     Q.   Ms. McDowell was never informed that
13  Mr. Blackmon was a New Breed. Correct?
14     A.   That's correct.
15     Q.   And it played no factor in why she
16  picked him out of that photo array. Correct?
17         MR. THEIS: Objection. All of this
18  is --
19         THE WITNESS: That's correct.
20         MR. THEIS: -- outside of the scope of
21  his expert report, and we'll move to strike it.
22         MR. KOSOKO: You do that.
23  BY MR. KOSOKO:
24     Q.   In fact, Ms. Reece also -- you were
25  asked questions earlier about New Breed

Page 235

1  membership. Ms. Reece was never informed that
2  Mr. Blackmon was a member of New Breeds. Correct?
3          MR. THEIS: Objection. This is not
4  included in his expert report. I'm going to make
5  that a standing objection for all of these
6  questions.
7          MR. KOSOKO: That's fine.
8          THE COURT REPORTER: I did not get an
9  answer.
10         THE WITNESS: That's true. That's
11  correct.
12  BY MR. KOSOKO:
13     Q.   And you were also asked questions
14  regarding the nickname Pride and what that played
15  in the investigation. That had nothing to do with
16  why Mr. Blackmon was identified by Ms. McDowell.
17  Correct?
18         MR. THEIS: Same objection.
19         THE WITNESS: That's correct.
20  BY MR. KOSOKO:
21     Q.   It had nothing to do with why
22  Ms. Reece picked him out of a photo lineup.
23  Correct?
24         MR. THEIS: Same objection.
25         THE WITNESS: Correct.

Page 236

1  BY MR. KOSOKO:
2      Q.   Neither one of those women were told
3  anything about the nickname Pride or any nickname
4  for that matter. Correct?
5          MR. THEIS: Same objection. Outside
6  the scope of his report.
7          THE WITNESS: That's right.
8  BY MR. KOSOKO:
9      Q.   We talked a lot about motive. There's
10  no legal requirements to ascertain motive. Is
11  that correct?
12         MR. THEIS: Objection. Calls for a --
13             (Indecipherable
14              simultaneous speaking.)
15             (Court reporter clarifi-
16              cation.)
17         MR. THEIS: Calls for a legal
18  conclusion.
19         THE WITNESS: That's correct.
20  BY MR. KOSOKO:
21     Q.   We talked about the part -- and we'll
22  go back to this. But you were asked about
23  Mr. Cox's girlfriends and what they stated
24  Boonie Black's motives may have been. Correct?
25     A.   Mr. who's girlfriend? Oh, Mr. Cox.

Page 237

1      Q.   Mr. Cox --
2      A.   Yes.
3      Q.   -- the decedent, the decedent in this
4  matter.
5      A.   Yes.
6      Q.   And the things that they stated to the
7  defendant officers were actually hearsay.
8  Correct?
9          MR. THEIS: Objection --
10             (Indecipherable
11              simultaneous speaking.)
12         MR. THEIS: -- calls for a legal
13  conclusion.
14  BY MR. KOSOKO:
15     Q.   That would be --
16             (Court reporter clarifi-
17              cation.)
18         THE WITNESS: Yes.
19  BY MR. KOSOKO:
20     Q.   And that actually -- that evidence
21  wouldn't have been admissible at trial against
22  Mr. Blackmon anyways. Correct?
23         MR. THEIS: Objection. Calls for a
24  legal conclusion.
25         THE WITNESS: From my experience,

60 (Pages 234 - 237)

Page 238

1 that's true, yes.
2 BY MR. KOSOKO:
3     Q.   In fact, in determining probable cause
4 of a crime revolves around the elements of a
5 crime. Correct?
6     A.   Yes.
7         MR. THEIS: Objection. Calls for a
8 legal conclusion.
9 BY MR. KOSOKO:
10     Q.   And murder, the motive for the murder
11 is not an element of that offense. Correct?
12         MR. THEIS: Objection. Calls for a
13 legal --
14         (Indecipherable
15               simultaneous speaking.)
16         MR. THEIS: -- conclusion and outside
17 the scope of this report.
18         (Court reporter clarifi-
19               cation.)
20         THE WITNESS: Yes. That's correct.
21 BY MR. KOSOKO:
22     Q.   Motive doesn't factor into whether
23 probable cause is established. Correct?
24         MR. THEIS: Objection. Calls for a
25 legal conclusion.

Page 239

1         THE WITNESS: That's correct.
2 BY MR. KOSOKO:
3     Q.   So, for example, if someone commits a
4 theft, you don't need to determine whether they
5 did it because they were hungry or they wanted to
6 sell the item on the black market. Correct?
7         MR. THEIS: Objection. Calls for a
8 legal conclusion.
9         THE WITNESS: Yes --
10 BY MR. KOSOKO:
11     Q.   You have probable --
12     A.   -- that's correct.
13     Q.   -- cause to determine that the person
14 has committed the offense of theft or burglary.
15 Correct?
16         MR. THEIS: Objection. Calls for a --
17         THE WITNESS: That's correct.
18         MR. KOSOKO: -- legal conclusion and
19 form.
20         THE WITNESS: That's right.
21 BY MR. KOSOKO:
22     Q.   When we talked about means and
23 opportunity, that's shown by Ms. McDowell and
24 Ms. Reece's identification. Correct?
25         MR. THEIS: Objection. That's outside

Page 240

1 the scope of his report.
2         THE WITNESS: That's correct.
3 BY MR. KOSOKO:
4     Q.   You talked about degree of attention.
5 I'm just going to show -- we talked about the five
6 factors that are from the Manson case. Are these
7 the five factors that you're talking about?
8         MR. THEIS: Objection --
9         THE WITNESS: Exactly --
10         MR. THEIS: -- calls for a legal
11 conclusion. And this document is not in any
12 discovery that we received in this case. And
13 we'll move to strike it.
14         MR. KOSOKO: Okay. This will be one
15 of my exhibits. You can mark it Exhibit
16 Number 1 [sic]. It's been used before in these
17 depositions.
18         (Monheim Deposition
19            Exhibit 7 was marked.)
20         THE WITNESS: That's exactly what I
21 was --
22 BY MR. KOSOKO:
23     Q.   And --
24     A.   -- referring to, yes.
25     Q.   In fact, in fact, I -- this is -- just

Page 241

1 for the purposes of this deposition, I'm going to
2 reflect to you this is actually an Illinois
3 Pattern Jury Instruction called Circumstances of
4 Identification, IPI 3.15. And it actually
5 mentions the Manson case that you were talking
6 about, correct, if you look --
7     A.   Yeah.
8     Q.   -- down here?
9     A.   Manson versus Braithwaite. Yes.
10     Q.   We talked about Ms. Reece's deposition
11 and Mr. Blackmon's habeas corpus petition. You
12 relied solely on the evidence presented during the
13 investigation. Correct?
14         MR. THEIS: Objection --
15         THE WITNESS: That's correct.
16         MR. THEIS: -- form.
17 BY MR. KOSOKO:
18     Q.   And, now, let's talk about the
19 generally accepted practices that we had. I
20 really, really need to clarify that.
21         So on July 4, 2002, when the
22 officers found out about -- when they were
23 notified about Tony Cox's murder, they canvassed
24 the area. That would be a generally accepted
25 practice. Correct?

61 (Pages 238 - 241)

Page 242

1    MR. THEIS: Objection. Form.
2    THE WITNESS: Yes. Yes.
3  BY MR. KOSOKO:
4    Q. They interviewed Frencshun Reece.
5  That would be a generally accepted practice.
6  Correct?
7    MR. THEIS: Objection to form.
8    THE WITNESS: That's correct. That's
9  correct.
10  BY MR. KOSOKO:
11    Q. Moving on. They interviewed
12  Davious Walker or -- and Schadia Joyce who are
13  children. That would be a generally accepted
14  practice. Correct?
15    MR. THEIS: Objection to form.
16    THE WITNESS: Yes.
17    MR. THEIS: And this is not included
18  in his expert report.
19  BY MR. KOSOKO:
20    Q. They interviewed Victor Arrigo. That
21  would be a generally accepted practice. Correct?
22    MR. THEIS: Same objection.
23    THE WITNESS: Yes. Yes.
24  BY MR. KOSOKO:
25    Q. Both of those -- both of those

Page 243

1  witnesses gave them a general description of the
2  two offenders. Is that correct?
3    MR. THEIS: Same objection.
4    THE WITNESS: Yes.
5  BY MR. KOSOKO:
6    Q. And the officers noted those -- noted
7  those descriptions down in their reports.
8  Correct?
9    A. They did.
10    Q. This would be a generally accepted
11  practice. Correct?
12    MR. THEIS: Objection to form.
13    THE WITNESS: It would, yes.
14  BY MR. KOSOKO:
15    Q. They canvassed other areas. This
16  would be a generally accepted practice. Correct?
17    MR. THEIS: Objection to form --
18    THE WITNESS: Yes.
19    MR. THEIS: -- outside of the report.
20  BY MR. KOSOKO:
21    Q. Based upon the information that they
22  received at that time, they assembled seven
23  digital photos that they then presented to
24  Ms. Reece. Correct?
25    MR. THEIS: Objection to form and is

Page 244

1  outside the scope of his report.
2    THE WITNESS: That's correct.
3  BY MR. KOSOKO:
4    Q. You can answer, Sergeant. That's
5  correct.
6    And, in fact, you mentioned that
7  Billy Howell was -- had cornrows in one of those
8  -- in that photo array. Correct?
9    MR. THEIS: Objection to --
10    THE WITNESS: That's correct.
11    MR. THEIS: -- form.
12  BY MR. KOSOKO:
13    Q. Presenting this photo array was a
14  generally accepted practice. Correct?
15    MR. THEIS: Objection to the form.
16  Outside the --
17    THE WITNESS: It is.
18    MR. THEIS: -- scope of his report.
19    THE WITNESS: It is.
20  BY MR. KOSOKO:
21    Q. They interviewed Sherrie Stevenson,
22  and that would be a generally accepted practice.
23  Correct?
24    MR. THEIS: Same objection.
25    THE WITNESS: Yes.

Page 245

1  BY MR. KOSOKO:
2    Q. And that was to ascertain motive even
3  though motive is not an element of a crime.
4  Correct?
5    MR. THEIS: Same objection.
6    THE WITNESS: Correct.
7    MR. THEIS: Calls for a legal
8  conclusion and, again, outside the scope of the
9  report.
10    THE WITNESS: Correct.
11  BY MR. KOSOKO:
12    Q. And that's because this is an
13  investigative tool to try to ascertain the
14  assailants. Correct?
15    MR. THEIS: Same objection.
16    THE WITNESS: Yes. Yes.
17  BY MR. KOSOKO:
18    Q. And they interviewed Sophia Jackson,
19  which would then be another generally accepted
20  practice. Correct?
21    MR. THEIS: Same objection --
22    THE WITNESS: Yes.
23    MR. THEIS: -- outside the scope of
24  his report.
25    THE WITNESS: Yes.

62 (Pages 242 - 245)

Page 246

1 BY MR. KOSOKO:
2    Q.   They submitted forms to the Illinois
3 State Police to have forensics done.  Correct?
4    A.   Yes.
5         MR. THEIS:  Form.
6 BY MR. KOSOKO:
7    Q.   That would be a generally accepted
8 practice.  Correct?
9         MR. THEIS:  Objection to form --
10        THE WITNESS:  It would.
11        MR. THEIS:  -- outside the scope of
12 his report.
13 BY MR. KOSOKO:
14   Q.   They issued search warrants --
15   A.   It would.
16   Q.   -- of Tony Cox's cell -- Sprint cell
17 phone.  That would be a generally accepted
18 practice.  Correct?
19        MR. THEIS:  Objection to form --
20        THE WITNESS:  [Indecipherable]
21        MR. THEIS:  -- and outside the scope
22 of his report.
23             (Court reporter clarifi-
24                 cation.)
25        THE WITNESS:  Yes, it would.  Yes, it

Page 247

1 would.
2 BY MR. KOSOKO:
3    Q.   Okay.  The officers, specifically
4 James Sanchez, assembled another -- another photo
5 array that he then presented to Lisa McDowell on
6 August 29, 2002.  Correct?
7         MR. THEIS:  Objection to the form.
8         THE WITNESS:  Yes.
9 BY MR. KOSOKO:
10   Q.   This would be a generally accepted
11 practice.  Correct?
12        MR. THEIS:  Objection to form and
13 outside the scope of the report.
14        THE WITNESS:  It would, yes.
15 BY MR. KOSOKO:
16   Q.   They also presented the same photo
17 array to Davious Whitaker, who was Ms. Reece's
18 son.  Correct?
19        MR. THEIS:  Objection to form and
20 compound.
21        THE WITNESS:  Yes.
22 BY MR. KOSOKO:
23   Q.   And that would be a generally accepted
24 practice.  Correct?
25        MR. THEIS:  Objection to form and

Page 248

1 outside the scope of the report.
2         THE WITNESS:  It would, yes.
3 BY MR. KOSOKO:
4    Q.   They interviewed Natasha Conley.
5 Correct?
6         MR. THEIS:  Objection to --
7         THE WITNESS:  Yes.
8         MR. THEIS:  -- form.
9 BY MR. KOSOKO:
10   Q.   This is a --
11   A.   Yes.
12   Q.   -- generally accepted practice,
13 correct, interviewing witnesses?
14        MR. THEIS:  Objection to the form and
15 outside the scope of the report.
16        THE WITNESS:  Yes, it is.
17 BY MR. KOSOKO:
18   Q.   Conley was unable to identify anyone
19 as an assailant.  Correct?
20        MR. THEIS:  Objection to the form.
21        THE WITNESS:  That's correct.
22 BY MR. KOSOKO:
23   Q.   And the officers included that in
24 their report.  Correct?
25        MR. THEIS:  Objection to form.

Page 249

1         THE WITNESS:  They did.
2 BY MR. KOSOKO:
3    Q.   This would be another generally
4 accepted practice.  Correct?
5         MR. THEIS:  Objection to the form and
6 outside the scope of his report.
7         THE WITNESS:  Yes, it would.
8 BY MR. KOSOKO:
9    Q.   The detectives also interviewed
10 Kenya Pitman who's -- may have been a New Breed.
11 Correct?
12        MR. THEIS:  Objection to the form,
13 outside the scope of his report and, yeah,
14 compound.
15        THE WITNESS:  Yes.
16 BY MR. KOSOKO:
17   Q.   This would be a generally accepted
18 practice.  Correct?
19        MR. THEIS:  Objection to the form and
20 outside the scope of his report.
21        THE WITNESS:  It would.
22 BY MR. KOSOKO:
23   Q.   They presented a photo array to
24 Ms. Pitman.  Correct?
25        MR. THEIS:  Objection to form.

63 (Pages 246 - 249)

Page 250

1    THE WITNESS: Yes. Yes.
2  BY MR. KOSOKO:
3    Q.  The photo array included Eric Blackmon
4  and Michael Davis. Correct?
5    MR. THEIS: Objection to form.
6    THE WITNESS: That's correct.
7  BY MR. KOSOKO:
8    Q.  Ms. Pitman failed to identify either
9  one of those people. Correct?
10    MR. THEIS: Objection to form.
11    THE WITNESS: That's right.
12  BY MR. KOSOKO:
13    Q.  This would be exculpatory for
14  Mr. Blackmon. Correct?
15    MR. THEIS: Objection to the form --
16    THE WITNESS: It would.
17    MR. THEIS: -- it calls for a legal
18  conclusion.
19  BY MR. KOSOKO:
20    Q.  It was included in the investigative
21  file. Correct?
22    MR. THEIS: Objection to form.
23    THE WITNESS: Yes.
24  BY MR. KOSOKO:
25    Q.  This would be a generally accepted

Page 251

1  practice. Correct?
2    MR. THEIS: Objection to the --
3    THE WITNESS: Yes.
4    MR. THEIS: -- form and outside the
5  scope of his report.
6    THE WITNESS: Yes, it would.
7  BY MR. KOSOKO:
8    Q.  Detectives then presented that same
9  photo array to Frencshun Reece on August 31, 2002.
10  Correct?
11    MR. THEIS: Objection to form.
12    THE WITNESS: That's correct.
13  BY MR. KOSOKO:
14    Q.  This would be a generally accepted
15  practice in law enforcement. Correct?
16    MR. THEIS: Objection to form and
17  outside the scope of his report.
18    THE WITNESS: Yes, it would.
19  BY MR. KOSOKO:
20    Q.  She identified Mr. Blackmon. Correct?
21    MR. THEIS: Objection to form.
22    THE WITNESS: Correct.
23  BY MR. KOSOKO:
24    Q.  She did not identify Mr. Davis.
25  Correct?

Page 252

1    MR. THEIS: Objection to the form.
2    THE WITNESS: That's correct.
3  BY MR. KOSOKO:
4    Q.  She made a tentative identification of
5  Mr. Davis. Correct?
6    MR. THEIS: Objection to the form and
7  outside the scope of his report.
8    THE WITNESS: I am going to say that
9  it was a tentative identification, yes.
10  BY MR. KOSOKO:
11    Q.  But that's not a -- under the -- under
12  -- under accepted standards, that's not an
13  identification. Correct?
14    MR. THEIS: Objection to the --
15    THE WITNESS: That's correct.
16    MR. THEIS: -- form and outside the
17  scope of his report.
18  BY MR. KOSOKO:
19    Q.  You can answer --
20    A.  That's correct.
21    Q.  -- Sergeant Monheim.
22    And the officers --
23    A.  That's correct.
24    Q.  -- included this in their report.
25  Correct?

Page 253

1    MR. THEIS: Objection to form.
2    THE WITNESS: Yes.
3  BY MR. KOSOKO:
4    Q.  This would be exculpatory, potentially
5  exculpatory. Correct?
6    MR. THEIS: Objection to the form,
7  outside the scope of his report, and calls for a
8  legal conclusion.
9    THE WITNESS: That's correct.
10  BY MR. KOSOKO:
11    Q.  And they included it in their
12  investigative file. Correct?
13    MR. THEIS: Objection to form.
14    THE WITNESS: They did.
15  BY MR. KOSOKO:
16    Q.  This is a generally accepted practice.
17  Correct?
18    MR. THEIS: Objection to form and
19  outside the scope of his report.
20    THE WITNESS: It is.
21  BY MR. KOSOKO:
22    Q.  Following that, they detained
23  Mr. Blackmon and Mr. Davis. Correct?
24    MR. THEIS: Objection to form.
25    THE WITNESS: Correct.

64 (Pages 250 - 253)

Page 254

1    BY MR. KOSOKO:
2        Q.   And they presented them in physical
3    lineups.  Correct?
4            MR. THEIS:  Objection to form.
5            THE WITNESS:  Yes.
6    BY MR. KOSOKO:
7        Q.   This is a generally accepted practice.
8    Correct?
9            MR. THEIS:  Objection to form and
10   outside the scope of his report.
11           THE WITNESS:  Yes, it is.
12   BY MR. KOSOKO:
13       Q.   They presented a photo array to
14   Mr. Arrigo.  Correct?
15       A.   Yes.
16           MR. THEIS:  Objection to form.
17   BY MR. KOSOKO:
18       Q.   Mr. Arrigo actually stated that --
19   despite the fact that Mr. Davis and Mr. Blackmon
20   were in the photo array, he stated that neither
21   one of those people were the assailants.  Correct?
22           MR. THEIS:  Objection to the form and
23   compound.
24           THE WITNESS:  Yes.
25              / / /

Page 255

1    BY MR. KOSOKO:
2        Q.   This is exculpatory for Mr. Blackmon.
3    Correct?
4            MR. THEIS:  Objection to form, outside
5    the scope of his report, and calls for a legal
6    conclusion.
7            THE WITNESS:  Yes, it is.
8    BY MR. KOSOKO:
9        Q.   This is a generally accepted practice.
10   Correct?
11           MR. THEIS:  Objection to the form and
12   outside the scope of his report.
13           THE WITNESS:  Yes, it is.
14   BY MR. KOSOKO:
15       Q.   And two years later on the eve of
16   trial when Terrence Boyd a/k/a Antwan Elem
17   [phonetic] requested to be interviewed, they
18   interviewed him.  Correct?
19           MR. THEIS:  Objection to the form and
20   compound.
21           THE WITNESS:  Who?  What was the name
22   you asked?
23   BY MR. KOSOKO:
24       Q.   Terrence Boyd.
25       A.   Terrence Boyd --

Page 256

1            MR. THEIS:  Same --
2            THE WITNESS:  -- yes.
3            MR. THEIS:  Same objection.
4            THE WITNESS:  Yes.  Yes.
5    BY MR. KOSOKO:
6        Q.   The officers interviewed
7    Terrence Boyd.  Correct?
8        A.   That's correct.
9        Q.   Terrence Boyd stated that another
10   individual committed the offense.  Correct?
11           MR. THEIS:  Objection to the form.
12           THE WITNESS:  He did.
13   BY MR. KOSOKO:
14       Q.   This was included in their investi-
15   gative file.  Correct?
16           MR. THEIS:  Objection to form.
17           THE WITNESS:  Yes.
18   BY MR. KOSOKO:
19       Q.   This would be potentially exculpatory
20   for Mr. Blackmon.  Correct?
21           MR. THEIS:  Objection to form, calls
22   for a legal conclusion, and outside the scope of
23   his report.
24           THE WITNESS:  That's correct.
25              / / /

Page 257

1    BY MR. KOSOKO:
2        Q.   And they included it in the investi-
3    gative file.  Correct?
4            MR. THEIS:  Objection to form.
5            THE WITNESS:  They did.
6    BY MR. KOSOKO:
7        Q.   This would all be a -- generally
8    accepted standards.  Correct?
9            MR. THEIS:  Objection to the form and
10   outside the scope of his report.
11           THE WITNESS:  Yes.
12   BY MR. KOSOKO:
13       Q.   Mr. Blackmon is listed as being 6'1",
14   160 in 2002.  Do you recall that?
15       A.   I do --
16           MR. THEIS:  Objection to form.
17           THE WITNESS:  -- on the arrest
18   reports, yes.
19   BY MR. KOSOKO:
20       Q.   There was a report that has him using
21   the nickname Little Eric.  Do you recall that?
22           MR. THEIS:  Objection to the form and
23   outside the scope of his report.
24           THE WITNESS:  I do.
25              / / /

65 (Pages 254 - 257)

1 BY MR. KOSOKO:
2    Q.   The arrest also has him engaging in
3 the narcotics trade in what was believed to be
4 New Breed territory.  Correct?
5         MR. THEIS:  Objection to the form,
6 outside the scope of the report, and compound.
7         THE WITNESS:  That's correct.
8 BY MR. KOSOKO:
9    Q.   It would be a generally accepted
10 practice to include him in that photo array.
11 Correct?
12         MR. THEIS:  Objection to the form and
13 outside the scope of his report.
14         THE WITNESS:  Yes.
15 BY MR. KOSOKO:
16    Q.   I believe one of the witnesses stated
17 that the second shooter was tall and slender.
18 Correct?
19         MR. THEIS:  Objection to the form and
20 outside the scope of his report.
21         THE WITNESS:  Yes.
22 BY MR. KOSOKO:
23    Q.   If Mr. Blackmon is 6'1", 160, is it
24 safe to say that he's tall and slender?
25         MR. THEIS:  Objection to the form and

1 outside the scope of his report.
2         THE WITNESS:  Yes, I would say so.
3         MR. KOSOKO:  No further questions.
4         MR. THEIS:  Okay.  I need just two
5 minutes.  And can we come back in literally two
6 minutes?
7         MR. KOSOKO:  Sure.  Should be good.
8 Thanks.
9         THE VIDEOGRAPHER:  We are off the
10 record at 3:55 p.m.
11              (A break was taken from
12              3:55 p.m. until 4:01 p.m.)
13         THE VIDEOGRAPHER:  We are back on the
14 record.  The time is 4:01 p.m.  Please proceed.
15              RE-EXAMINATION
16              BY MR. THEIS
17    Q.   Mr. Monheim, you're aware that you
18 were required to provide a written report in this
19 case that contains the complete statement of all
20 opinions that you'll express and the basis and the
21 reasons for those opinions.  Correct?
22         MR. KOSOKO:  Object to form of the
23 question.
24         THE WITNESS:  Yes.
25              ///

1 BY MR. THEIS:
2    Q.   And that your report must conclude --
3 contain all of the facts or data that you consider
4 in forming your opinions.  Correct?
5         MR. KOSOKO:  Objection.  Form of the
6 question.
7         THE WITNESS:  Yes.
8 BY MR. THEIS:
9    Q.   You discussed a series of -- we talked
10 at length earlier today about the generally
11 established and accepted investigative practices
12 that you believe the detectives complied with in
13 this case.  Do you recall that discussion that you
14 and I had about that?
15    A.   I do.
16    Q.   And I had a series of questions asking
17 for you to point to a part of your report where
18 you specifically identify what generally
19 established and accepted investigative practices
20 these detectives complied with.  Do you remember
21 that question?  Do you remember those questions
22 that we had?
23    A.   No, I don't remember you saying that.
24 But if you say you did.  I don't remember you
25 saying that.

1    Q.   Are the generally established and
2 accepted investigative practices, is that simply a
3 checklist of items/things that detectives must do
4 in a homicide investigation?
5         MR. KOSOKO:  Object to the form of the
6 question.
7         THE WITNESS:  No, not at all.
8 BY MR. THEIS:
9    Q.   Why is that?
10    A.   It can be.  It can be.  But it's not
11 necessarily complete.  I mean, there can be a
12 checklist.  In fact, we do have checklists.  We
13 have SOPs that have checklists.  But it's more
14 than that.  It can include those checklists, but
15 it's more than that.
16    Q.   When a -- when a detective in a
17 homicide investigation takes certain steps in a --
18 in that investigation, how do you determine
19 whether that step is consistent with generally
20 established and accepted investigative practices
21 at placing the time?
22    A.   Well, the foremost way is legality, if
23 they did something that was legal.  The second is
24 if most major police departments or most police
25 departments in the country adhere to these

66 (Pages 258 - 261)

Page 262

1 particular steps, it's considered a generally
2 accepted practice. However, as I mentioned, there
3 are certain things that some departments do that
4 aren't accepted but they still continue to do
5 that. So each one has to be viewed and examined
6 on its own merit.
7     Q. So it sounds like there's two
8 different analyses you're doing. There's whether
9 the step was completed and then whether it was
10 legal. Would that be fair?
11     A. No.
12     MR. KOSOKO: Objection to the form of
13 the question. Misstates his testimony.
14     THE WITNESS: No. It's always going
15 to be legal. If it's a generally accepted
16 practice, there's -- to my knowledge, there's no
17 generally accepted practice that's illegal.
18 BY MR. THEIS:
19     Q. Okay. So just conducting a lineup,
20 that in itself is not a generally established and
21 accepted investigative practice. Correct?
22     A. Sure it is.
23     Q. Well, you can conduct a lineup where
24 you fabricate evidence. Correct?
25     MR. KOSOKO: Object to --

Page 263

1     (Indecipherable
2     simultaneous speaking.)
3     MR. KOSOKO: -- the form of the
4 question.
5 BY MR. THEIS:
6     Q. Right. So that's my point.
7     (Court reporter clarifi-
8     cation.)
9 BY MR. THEIS:
10     Q. Was your answer that it was --
11 therefore, it would be illegal?
12     A. If it's illegal, it's not a generally
13 accepted practice.
14     Q. Okay. So if any of the detectives in
15 this case engage in activity that was either
16 fabricating evidence or was failing to meet
17 nationally accepted standards, that would be
18 inconsistent with the generally established and
19 accepted investigative practices?
20     A. No --
21     MR. KOSOKO: Objection to the form --
22     (Indecipherable
23     simultaneous speaking.)
24     MR. KOSOKO: Hang on, Sergeant
25 Monheim. Hang on. I just want to make sure --

Page 264

1     THE WITNESS: Okay.
2     MR. KOSOKO: -- my objection is clear.
3     Objection to the form of the
4 question. Incomplete hypothetical. Calls for a
5 speculative response. Calls for a legal
6 conclusion.
7     You can answer.
8     THE WITNESS: That's not at all what I
9 said. I said that a generally -- generally
10 accepted practices are not illegal. I mean are
11 not -- they're not illegal. If they're illegal,
12 they're not generally accepted practices.
13 BY MR. THEIS:
14     Q. Okay. So once a -- if a detective did
15 something illegal, that would not be a generally
16 accepted investigative practice. Would that be
17 fair?
18     A. Beating a confession out of a subject
19 is illegal, so it's not a generally accepted
20 practice. That would be a good example.
21     Q. Okay. And -- okay. Okay. So it's an
22 existential point. Let me ask it a different way.
23     If it is -- if the process is --
24 if the action that is taken by the detective is
25 illegal -- I just asked this question. Let me ask

Page 265

1 it a slightly different way.
2     By illegal what do you mean?
3     A. Against the law.
4     Q. Okay. So are there examples of
5 practices that are not consistent with generally
6 established and accepted investigative practices
7 in place in 2002 but that are legal?
8     A. I gave you a bunch of them. Psychics.
9 Hypnosis. There are. There are things that are
10 generally unaccepted -- generally unaccepted
11 principles but that are still legal. Legally he's
12 a psychic, but it's frowned upon by most major
13 police departments. I think that's probably the
14 best example I can give. There are probably
15 others. But that. Hypnosis. Yes.
16     Q. Okay. So it's not the only category
17 of activities that are not generally accepted
18 investigative practices. It includes things that
19 are either legal or illegal. Is that right?
20     MR. KOSOKO: Object to the form of the
21 question.
22     THE WITNESS: What I said originally
23 that brought you to this point was that generally
24 accepted practices are never illegal. That's what
25 I said. But I didn't say that generally accepted

67 (Pages 262 - 265)

Page 266

1  practices are things that are generally accepted
2  are necessarily illegal by themselves, no, I
3  didn't. You're twisting my words.
4  BY MR. THEIS:
5      Q.   Yeah, and I'm really just trying to
6  figure out what you mean by generally accepted
7  investigative practices. So it is -- you've said
8  several times that if something is illegal then it
9  is not a generally accepted practice. Is that --
10  that's accurate. Correct?
11     A.   I think that's -- you can take that to
12  the bank.
13     Q.   And then you also said that certain
14  activities that are generally accepted investi-
15  gative -- sorry, that are not generally accepted
16  investigative practices don't have to be illegal,
17  and that's the example of the psychic that you
18  mentioned. Is that fair?
19     A.   Right.
20          And another example I just thought
21  of would be a canine. The use of a canine is a
22  generally accepted investigator practice but it's
23  not legal in some jurisdictions to bring that
24  testimony in court. In some it is. In some it's
25  not. So you have to determine jurisdiction. But

Page 267

1  it's still a generally accepted practice used by
2  almost every major police department and small
3  police departments within this country.
4      Q.   That sounds like one where it's a
5  generally accepted police practice but that it's
6  -- also can be illegal. I thought you said that
7  there could be --
8      A.   Well, it can't be introduced --
9          MR. KOSOKO: Object. Objection to the
10  form of the question. Misstates his testimony.
11         THE WITNESS: Just like a polygraph,
12  it can't -- many -- in many areas, it can't be
13  introduced into evidence in court. And a
14  polygraph can't either, as you well know. So, so
15  it's not illegal, but it just is not allowed in
16  court. But it's still a generally accepted
17  practice.
18  BY MR. THEIS:
19     Q.   Okay. So there are certain generally
20  accepted practices that could not be introduced at
21  court?
22     A.   There are some, yes.
23     Q.   Okay. And -- okay. Okay. I have
24  nothing else.
25              ///

Page 268

1              RE-EXAMINATION
2              BY MR. KOSOKO
3      Q.   I have a couple follow-ups.
4          Sergeant Monheim, you were asked
5  about degree of attention earlier with both
6  Ms. McDowell and Ms. Reece. Do you recall that
7  line of questioning by Mr. Theis?
8          MR. THEIS: Objection. Again, outside
9  the scope. But go ahead.
10         MR. KOSOKO: I mean, you asked him the
11  questions --
12         THE WITNESS: I do.
13         MR. KOSOKO: -- Jack, did you not?
14  BY MR. KOSOKO:
15     Q.   Do you recall those questions,
16  Mr. Monheim, being asked those questions?
17     A.   I do.
18     Q.   Do you recall that you were asked
19  whether you reviewed the trial transcript of both
20  of these witnesses?
21     A.   Yes.
22     Q.   All right. I'm going to screen share.
23         We'll start with Lisa McDowell. Do
24  you recall this transcript, Sergeant Monheim?
25     A.   Yes. I'm sure I read it, the trial

Page 269

1  transcript, yes.
2      Q.   Lisa McDowell? I'm just going to
3  jump --
4      A.   Yes.
5      Q.   -- to page five. Do you recall
6  reviewing these questions and answers?
7      "Question: Okay. Can you tell the
8  court what that was?
9      "Answer: I heard a gunshot.
10     "Question: When you heard that
11  gunshot, which direction did you look in?
12     "Answer: To my left.
13     "Question: When you looked to your
14  left, what did you see?
15     "Answer: I saw an Italian guy
16  standing, and I saw two guys coming
17  around a building. There was a vacant
18  lot there. And one of those two guys
19  shot. I heard two more gunshots, and he
20  was standing over the body, and I heard
21  two more gunshots.
22     "Okay. When you say that you saw
23  those two guys coming around the
24  building, were they coming in the same
25  direction that your car was pointing?

68 (Pages 266 - 269)

Page 270

1    "They were coming towards me.
2    "Okay.
3    "MR. COWAN:  Pardon me?
4    "THE COURT:  They were coming
5 towards her she said.
6    "MR. MCCARTHY:  And you said that
7 there was a man lying on the ground?
8    "Answer:  Yes.
9    "Is that correct?  Was -- where was
10 that man that was lying on the ground?
11 Was he on the street or on the sidewalk?
12    "Answer:  He was on the sidewalk.
13    "Question:  And you said that there
14 had been an Italian guy that was standing
15 near that man that was lying -- that was
16 lying on the sidewalk?
17    "Yes -- "Answer:  Yes.
18    "Question:  And the two guys that
19 came around the building and came towards
20 your direction, did either of them have
21 anything in their hand?
22    "Answer:  Yes.
23    "Question:  Okay.  And what did one
24 or both of them have in their hands?
25    "Answer:  I saw one of them hold

Page 271

1 a gun -- with a gun."
2         We'll skip just a little bit here.
3    MR. THEIS:  Is there a question
4 coming?
5         MR. KOSOKO:  Yeah, there's a question.
6 BY MR. KOSOKO:
7    Q.  Do you recall reviewing this?
8    "Okay.  Could you do that for the
9 court, please?
10    "He was a tall guy, maybe six feet,
11 slender build."
12         Do you recall reviewing that
13 question and that answer?
14    MR. THEIS:  Objection.  Outside the --
15    THE WITNESS:  I do.
16    MR. THEIS:  -- scope.
17    THE WITNESS:  I do.
18 BY MR. KOSOKO:
19    Q.  "Question:  And as you sat
20 there watching, what did you see that man
21 do?
22    "Answer:  Fire two more shots."
23         Question -- do you recall reviewing
24 that question and that answer, Sergeant Monheim?
25    A.  I do.

Page 272

1    Q.  "Question:  And where did he
2 fire those two shots?
3    "Answer:  He was directly over the
4 victim."
5         Do you recall reviewing that
6 question and answer?
7    A.  Yes, I do.
8    Q.  When you say that their degree of
9 attention was drawn towards the shooting, that's
10 actually based on her trial testimony where she
11 testified that she looked in the direction of the
12 shooting, to her left?
13    MR. THEIS:  Objection.  Form and
14 outside the scope of his report.
15 BY MR. KOSOKO:
16    Q.  Is that correct --
17    A.  It is --
18    Q.  -- Sergeant Monheim?
19    A.  -- yeah.  Correct.
20    Q.  And we'll bring up Frencshun Reece's
21 testimony.  You were asked -- Mr. Theis asked you
22 a series of questions regarding the degree of
23 attention.
24    "Question:  When you say that, did
25 you hear anything?

Page 273

1    "Answer:  Yes.
2    "And what did you hear?
3    "I heard fire crackers.
4    "Okay.
5    "But it wasn't fire crackers.
6    "Okay.  Can you tell the judge what
7 you saw happening?
8    "I saw the guys talking with one
9 another, and one of the guys were on
10 the -- how do you say -- left of the
11 victim.  He was pulling something from
12 his pocket.  And he turned to see what he
13 was doing.  And the other guy on his
14 right pulled it and put it to his head.
15    "Question:  Pulled a what?
16    "A gun to his head.
17         So when you said that they were --
18 their attention was drawn to the shooting, based
19 on the shooting, that's actually based on trial
20 testimony.  Correct?
21    MR. THEIS:  Objection to form.
22 Compound.  It's outside the scope of his expert
23 report.
24    THE WITNESS:  It is, yes.
25         / / /

69 (Pages 270 - 273)

Page 274

1  BY MR. KOSOKO:
2    Q.  You reviewed these two transcripts,
3  correct, in formulating your opinions?  Correct?
4        MR. THEIS:  Same -- same objection.
5  That was not in his expert report.
6        THE WITNESS:  I did.
7        MR. KOSOKO:  Okay.  Was the --
8  Sergeant Monheim's expert report was Exhibit 4.
9  Is that correct?  That's what I'm screen sharing
10  right now.  Is that correct, Madame Court
11  Reporter?
12        THE COURT REPORTER:  I believe it was
13  Number 1.
14        MR. KOSOKO:  It was Number 1?  Okay.
15  I'm sorry.
16  BY MR. KOSOKO:
17    Q.  Sergeant Monheim, number 14 and 15,
18  those are the transcripts we just referenced in
19  this deposition.  Correct?
20    A.  Exactly, yes.
21    Q.  Okay.  No further questions.
22        THE VIDEOGRAPHER:  We are off the
23  record at 4:16 --
24        MR. THEIS:  I'm sorry, I'm sorry,
25  could we go back on the record?

Page 275

1        THE VIDEOGRAPHER:  We're still on.
2        MR. THEIS:  Okay.  Thanks.  Give me
3  one sec.
4        THE VIDEOGRAPHER:  Certainly.  Sorry
5  about that.
6        MR. THEIS:  No worries.
7        RE-EXAMINATION
8        BY MR. THEIS
9    Q.  Mr. Monheim, Lisa McDowell thought
10  that it was unusual that Eric Blackmon had braids.
11  Correct?
12        MR. KOSOKO:  Object to the form of the
13  question.
14        THE WITNESS:  Unusual?  I don't know
15  that she thought it was unusual.  I'm not sure
16  where you get that.  Unusual?
17  BY MR. THEIS:
18    Q.  There's a part of the deposition
19  transcript that you just looked at that Mr. Kosoko
20  did not read to you, and I want to read it to you.
21  The question from the prosecutor, do you see this
22  here, number six?  This is to Ms. McDowell.
23        "Did you notice anything unusual
24    about his hair?
25        "Response:  He had braids."

Page 276

1        Did you read that in preparation
2  for your report?
3    A.  I misunderstood your question.  I
4  thought you asked me if the fact he had braids she
5  thought was unusual.
6        I remember reading this, yes.
7    Q.  Yeah.  And she said -- she is asked:
8  Did you notice anything unusual about his hair?
9  And she responds:  He had braids.
10        Is that what that testimony states?
11    A.  It does.
12    Q.  Okay.  Thank you.  Nothing else.
13        THE VIDEOGRAPHER:  Shall we go off the
14  record?
15        MR. KOSOKO:  Not yet.
16        THE VIDEOGRAPHER:  Okay.  Sorry about
17  that.
18        RE-EXAMINATION
19        BY MR. KOSOKO
20    Q.  Sergeant Monheim, in all your review
21  of all the materials, has Lisa McDowell ever
22  stated that she chose Eric Blackmon in the photo
23  array because of his hair?
24        MR. THEIS:  Objection.  Outside the
25  scope of his report.

Page 277

1        THE WITNESS:  I saw nothing to that
2  effect.  She never --
3  BY MR. KOSOKO:
4    Q.  You said --
5    A.  -- said that.
6    Q.  Isn't it true that she stated she
7  chose him because of his face?
8        MR. THEIS:  Objection --
9        THE WITNESS:  She did.
10        MR. THEIS:  -- outside the scope of
11  his report.
12        MR. KOSOKO:  No further questions.
13        THE WITNESS:  She did.
14        MR. KOSOKO:  No further questions from
15  us.
16        MR. BURNS:  Reserving signature or
17  waiving or what?
18        MR. KOSOKO:  We'll reserve.
19        THE VIDEOGRAPHER:  Shall we go off the
20  record?
21        MR. BURNS:  Yes.
22        MR. THEIS:  That would be great.
23        THE VIDEOGRAPHER:  We are off the
24  record at 4:19 p.m., and this concludes today's
25  testimony given by Anthony Monheim.  The total

70 (Pages 274 - 277)

Page 278

1  number of media units used was five and will be
2  retained by Veritext.
3              (The following further
4          proceedings were had
5          off the video record:)
6      MR. BURNS:  Would you say that again,
7  please?  Five?
8      THE COURT REPORTER:  Five media units.
9      MR. BURNS:  Thank you.
10     THE COURT REPORTER:  Mr. Theis, are
11 you ordering a transcript?
12     MR. THEIS:  Yes, we will.
13     THE COURT REPORTER:  Copy, Mr. Kosoko?
14     MR. KOSOKO:  Yes, please.
15     THE COURT REPORTER:  Mr. Burns?
16     MR. BURNS:  No.  Thank you.
17         (The deposition was
18         concluded at 4:21 p.m.)
19         (Signature was reserved.)
20         --oo0oo--
21
22
23
24
25

Page 279

1              CERTIFICATE
2                   OF
3          CERTIFIED SHORTHAND REPORTER
4
5      I, DEBRA L. KLESZYK, a Certified Shorthand
6  Reporter of the State of Illinois, CSR License
7  084-002981, do hereby certify:
8      That previous to the commencement of the
9  examination of the aforesaid witness, the witness
10 was duly sworn by me to testify the whole truth
11 concerning the matters herein;
12     That the foregoing deposition transcript
13 was stenographically reported by me and was there-
14 after reduced to typewriting under my personal
15 direction and constitutes, to the best of my
16 ability, a true and accurate record of the
17 testimony given and the proceedings had at the
18 aforesaid deposition;
19     That the said deposition was taken before
20 me remotely via videoconference at the time and
21 place specified;
22     That I am not a relative or employee or
23 attorney or counsel for any of the parties herein,
24 nor a relative or employee of such attorney or
25 counsel for any of the parties hereto, nor am I

Page 280

1  interested directly or indirectly in the outcome
2  of this action.
3      IN WITNESS WHEREOF, I do hereunto set my
4  hand at Elk Grove Village, Illinois, this 12th day
5  of February, 2022.
6
7
8         Debra L. Kleszyk
           DEBRA L. KLESZYK
9         Certified Shorthand Reporter
           License No. 084-002981
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 281

1              Veritext Legal Solutions
              1100 Superior Ave
2                   Suite 1820
              Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
5  February 15, 2022
6  To: Ahmed Kosoko, Esq.
7  Case Name: Blackmon, Eric v. City of Chicago, et al.
   Veritext Reference Number: 5039296
8  Witness:  Anthony Monheim     Deposition Date:  1/31/2022
9
10 Dear Sir/Madam:
11     Enclosed please find a deposition transcript.  Please have the witness
12     review the transcript and note any changes or corrections on the
13     included errata sheet, indicating the page, line number, change, and
14     the reason for the change.  Have the witness' signature notarized and
15     forward the completed page(s) back to us at the Production address
16     shown
17     above, or email to production-midwest@veritext.com.
18     If the errata is not returned within thirty days of your receipt of
19     this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

71 (Pages 278 - 281)

Page 282

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5039296
CASE NAME: Blackmon, Eric v. City of Chicago, et al.
DATE OF DEPOSITION: 1/31/2022
WITNESS' NAME: Anthony Monheim
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have made no changes to the testimony
as transcribed by the court reporter.

_____
Date                Anthony Monheim
    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

        They have read the transcript;
        They signed the foregoing Sworn
            Statement; and
        Their execution of this Statement is of
            their free act and deed.

    I have affixed my name and official seal

this _____ day of_____, 20____.

        _____
        Notary Public
        _____
        Commission Expiration Date

---

Page 283

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5039296
CASE NAME: Blackmon, Eric v. City of Chicago, et al.
DATE OF DEPOSITION: 1/31/2022
WITNESS' NAME: Anthony Monheim
    In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
    I request that these changes be entered
as part of the record of my testimony.

    I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.
_____
Date                Anthony Monheim

    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
        They have read the transcript;
        They have listed all of their corrections
            in the appended Errata Sheet;
        They signed the foregoing Sworn
            Statement; and
        Their execution of this Statement is of
            their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20____.
        _____
        Notary Public
        _____
        Commission Expiration Date

---

Page 284

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
    ASSIGNMENT NO: 5039296
PAGE/LINE(S) /        CHANGE        /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Date                Anthony Monheim
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .

        Notary Public

        _____
        Commission Expiration Date

---

72 (Pages 282 - 284)

| & | | | |
| --- | --- | --- | --- |
| **&** 2:3 3:3 18:16 | **12:54** 129:16,17 | 283:22 284:22 | 190:25 |
| **0** | **12th** 280:4 | **2000** 64:6 | **240** 4:21 |
| **00206** 228:5 | **14** 199:6 210:8 | **2002** 50:21 85:7 | **25** 17:16,18 66:25 |
| **004079** 228:11 | 219:6 274:17 | 132:22 134:19 | 73:24 74:18 122:8 |
| **004087** 228:11 | **15** 54:18,19 67:3,3 | 135:6 137:2 155:3 | **259** 4:5 |
| **01315** 33:25 | 77:14 193:18 | 155:23 157:7 | **26** 76:17 165:12 |
| **01540** 42:23 | 194:25 274:17 | 159:18 173:5 | 233:24 |
| **02** 206:3 207:7 | 281:4 | 175:23 189:12,18 | **268** 4:6 |
| **02618** 31:22 | **150** 17:18 | 192:16 200:5,23 | **27** 77:22 |
| **03288** 28:5 | **16** 146:15 | 202:1 203:23 | **2700** 3:4 |
| **06** 38:19 | **160** 257:14 258:23 | 204:10,16 209:10 | **275** 4:5 |
| **07** 43:20 | **17** 77:14 221:4 | 210:7 218:8,15 | **276** 4:6 |
| **084-002981** 279:7 | **18** 17:11 64:15 | 219:2,14,18,25 | **29** 110:7 111:4 |
| 280:9 | 67:3 136:19 | 220:2,5 241:21 | 134:19 135:6 |
| **1** | 224:24 | 247:6 251:9 | 137:2 172:16 |
| **1** 4:12 110:14,16 | **1820** 281:2 | 257:14 265:7 | 192:4,16 217:19 |
| 138:11 227:23 | **1875** 280:8 | **2004** 14:3 50:21 | 247:6 |
| 240:16 274:13,14 | **19** 1:5 5:19 64:11 | 52:10 56:5 59:8 | **2900** 2:5 |
| **1/31/2022** 281:8 | 109:13,19 136:22 | 64:7,8,9,9,24 | **2:16** 127:17 |
| 282:3 283:3 | **1900** 15:3,8 | 66:20 67:18 | **3** |
| **10** 28:5 54:18 | **1974** 220:3 | **2006** 56:8 58:20 | **3** 4:14 110:22,24 |
| 67:24 172:14 | **1977** 64:12 | 64:7 | 111:2 228:2 |
| 175:23 | **1981** 63:18 64:6,9 | **2008** 56:6 | **3.15** 4:21 |
| **10,000** 18:8 | 64:17,18 | **2009** 56:6 | **3.15.** 241:4 |
| **1008** 22:5 | **1985** 51:2,6 53:3 | **2010** 109:5 | **30** 60:18 70:16 |
| **10:00** 1:18 5:2 | 54:2 | **2011** 58:17 | 117:21 172:23 |
| **11** 117:3,3 164:11 | **1992** 64:21 65:1 | **2020** 17:9 | 173:5 215:18 |
| 172:15 | **1996** 71:16 | **2021** 4:12 15:17 | **3004** 38:19 |
| **110** 4:12,13 | **1999** 54:8,14 | 17:3 77:22 | **31** 1:18 5:3 207:5 |
| **1100** 281:1 | 107:22 110:4 | **2022** 1:18 5:3 | 213:7 251:9 |
| **111** 4:14 | 228:2 | 280:5 281:4 | **311** 2:13 |
| **11:27** 79:8,10 | **1:14** 159:4,6 | **2025** 60:8 | **312** 2:6,14 3:5 |
| **11:42** 79:11,13 | **1:50** 159:6,8 | **216-523-1313** | **32** 200:18 |
| **12** 4:12 22:5 | **2** | 281:3 | **33** 3:4 200:18 |
| 121:16 174:3 | **2** 4:13 110:17,20 | **22** 130:21 177:19 | **35** 21:16 70:16 |
| **12/1/21** 228:1 | 227:25 | 177:24 | **3500** 59:18,18 |
| **12:45** 127:18 | **20** 66:25 67:1 | **225** 17:15 | **372-0770** 3:5 |
| 128:23 129:8 | 106:18,20 122:8 | **228** 4:17,19,20 | **3:13** 35:25 |
| | 169:12 187:14 | **229** 4:6 | **3:14** 227:14,16 |
| | 188:13,17 189:24 | **24** 67:1 77:20 | **3:30** 227:10 |
| | 190:2,15 282:16 | 157:6 159:18 | |

**3:32** 227:16,18
**3:55** 259:10,12

**4**

**4** 4:17 74:18
189:18 228:4,8
241:21 274:8
**40** 67:23 69:7
**416** 35:25
**44114** 281:2
**471-8700** 2:6
**4:01** 259:12,14
**4:10** 42:23
**4:15** 33:25
**4:16** 274:23
**4:19** 277:24
**4:21** 278:18

**5**

**5** 4:19 155:3 228:9
228:13
**5'10** 139:11 141:5
142:13 143:5
**5'5** 139:10 141:18
142:1,8
**5'6** 139:14 141:6
141:18 142:1,8
**5'8** 139:15 142:14
**5'9** 139:15 142:14
**50** 67:23,24
**500** 67:24 208:4
**5039296** 281:7
282:2 283:2 284:2
**5200** 2:13
**56** 191:3,12
**5:14** 31:22

**6**

**6** 4:20 16:16 18:4
47:18 138:5
228:23
**6'1** 257:13 258:23

**6,000** 59:18
**60602** 2:6
**60603** 3:4
**60606** 2:14
**666** 43:20
**67** 60:22

**7**

**7** 4:5,21 16:16
18:5 47:18 101:25
240:19
**70** 2:5 17:17,20
**70s** 128:1
**74** 64:13
**75** 64:14
**767** 1:5 5:19
**78** 127:2
**79** 127:2

**8**

**80** 17:20
**88-18** 130:13,24
131:6 132:7

**9**

**9** 155:23 156:9,21
**9-1-1** 162:9,11,18
163:11,24
**90** 17:20
**90s** 65:14,15 66:8
**92** 66:20 67:18
**96** 72:17
**982-0090** 2:14
**99** 63:4 64:20,20
109:21
**9:49** 127:19

**a**

**a.m.** 1:18 5:2 79:8
79:10,11,13
**abduct** 29:3
**abducted** 36:3

**abilities** 106:25
161:9
**ability** 7:21 100:19
101:13 123:5
151:1 153:6,15
191:9 279:16
**able** 21:9 56:23,24
91:3 102:9 118:11
213:13
**aboard** 56:6
**absolutely** 80:15
80:19 81:10
147:22 189:14
**academy** 53:7
64:14
**acceptable** 210:23
225:7
**accepted** 64:16
136:11 200:3,4,8
200:22 201:25
202:4,7,8,11,17,24
203:1,6,7,8,15,22
203:25 204:9,15
205:1,8,12,14
206:10,12,17,20
206:22 207:6,21
207:25 208:20,23
209:7,16 210:7,15
210:16,19 211:12
211:18,20 212:4
219:12,17,23,23
223:13,14 241:19
241:24 242:5,13
242:21 243:10,16
244:14,22 245:19
246:7,17 247:10
247:23 248:12
249:4,17 250:25
251:14 252:12
253:16 254:7
255:9 257:8 258:9

**260:11,19 261:2**
261:20 262:2,4,15
262:17,21 263:13
263:17,19 264:10
264:12,16,19
265:6,17,24,25
266:1,6,9,14,15,22
267:1,5,16,20
**access** 151:5,7,7
151:13 152:8
**accommodations**
125:12
**accomplish** 93:2
93:10,23
**accomplished**
150:24
**account** 29:7
**accounts** 29:6,7
138:14
**accuracy** 180:12
181:3 186:20
**accurate** 26:10
94:1 104:17 105:5
105:10 106:12,18
139:11,24 145:15
149:18 161:12
163:20 165:21
166:14 171:24
181:9 183:6 185:7
188:6,13 189:13
194:2,3 212:11
266:10 279:16
**accurately** 194:21
**accused** 23:4
32:17 34:3,8 36:3
36:5 43:4 89:2
93:5
**accuser** 93:10
**acknowledge**
282:11 283:16

acquaint 11:10
acquired 91:21
act 65:23 282:14
  283:20
acted 47:4
acting 65:3,7,17
  66:4,9,11
action 6:1 264:24
  280:2
actions 213:9
  225:6
active 16:18 67:4
activities 265:17
  266:14
activity 263:15
actual 99:16 120:6
  164:15,19 225:3
added 228:19
addendum 19:11
  21:17
addicts 32:14
adding 116:12
addition 117:5
additional 15:1
  77:5 95:24 227:1
  230:8
address 281:15
addressed 217:21
  229:20 230:20
adhere 118:12
  212:11 261:25
adhered 204:2
  209:23
administer 5:24
admissible 202:12
  206:21 237:21
admitted 216:13
  218:1,3
admittedly 191:6
  191:7

advantage 105:2
affairs 68:20,23
  70:7,22
affect 7:21 170:2
affiliated 13:21
affiliations 6:5
affixed 282:15
  283:21
aforesaid 279:9,18
afternoon 65:25
afternoons 65:25
  66:24
agencies 52:7 60:2
  60:3 62:9,10
  205:3
agent 30:2
ago 21:8 25:4,13
  27:24 48:11 60:5
  70:12,16 122:9
  126:22 127:23
  128:16 146:13
  189:24 190:10
agree 5:11 80:11
  81:7,8,25 82:5,10
  83:16 84:19 86:17
  86:21,24 87:8,20
  87:24 100:23
  101:1,5 104:16
  106:11 107:2
  112:20 113:1,12
  116:6 117:9 118:4
  118:20 119:6
  120:20 121:3,4
  123:14 128:2,18
  129:23 142:11
  144:8 163:23
  169:15 171:19
  179:19 183:8
  190:20 192:18
  193:10 213:17,22
  215:10 229:9

agreed 55:24
  99:14 127:24
  206:20
agreement 172:12
ahead 67:10 71:9
  72:11 99:22
  127:18 128:23
  150:20 165:11
  177:20 179:24
  190:3 198:16
  221:1 268:9
ahmed 3:3 6:15
  281:5
akin 165:20
akron 31:20,25
al 5:16 22:2 28:3
  33:22 35:24 43:18
  281:6 282:3 283:3
alachua 58:10,12
  58:12
album 182:15
alerted 177:25
  179:8
alexakis 2:5 65:12
allegation 168:11
allegations 70:5,5
alleged 25:10,12
  153:18 171:6
  174:12 177:1
  234:2
alleges 167:25
allen 43:18 44:9
  44:14
alleviate 56:2
allow 220:21
allowed 32:13
  33:10 202:16
  267:15
alternate 65:21
amazed 101:13
  102:8,18

agreed 55:24
amazing 103:11
amoco 43:5
amos 31:19 32:11
amount 17:14
  18:9 19:11 47:15
ample 218:16,21
analyses 262:8
analysis 25:22
  40:7,16 41:14
  155:14 180:8,10
  213:7
annual 52:23
  74:22
anonymous
  155:23 156:21
  157:2
answer 8:11,12
  9:2,10 10:4,8
  26:19 42:10 57:13
  72:11 74:13 86:15
  149:21 164:7
  175:9 198:16
  204:22 205:22
  206:23 207:1
  214:4,5,22 219:20
  221:15 222:12
  232:21 233:4
  235:9 244:4
  252:19 263:10
  264:7 269:9,12,15
  270:8,12,17,22,25
  271:13,22,24
  272:3,6 273:1
answered 37:17
answers 7:22 8:19
  220:24 221:2
  269:6
anthony 1:13 4:3
  5:14 7:1,14 76:11
  227:24 277:25
  281:8 282:4,9

283:4,13 284:20
**antiseptic** 215:5
**antwan** 255:16
**anybody** 152:2
  178:23
**anyway** 52:18
**anyways** 237:22
**apart** 59:4
**apologies** 64:7
**apologize** 58:9
**apparent** 145:9
**apparently** 213:15
**appeals** 224:13
**appear** 282:11
  283:15
**appearance** 6:7
  116:8
**appearances** 6:5
**appeared** 2:9,16
  3:6 161:25 182:3
  187:6
**appearing** 120:25
  125:16,24 128:12
**appears** 110:2
  134:21 181:9
**appended** 283:11
  283:18
**appendix** 19:10
**applicable** 201:23
  212:22
**applies** 111:10
**appointment**
  62:12
**appoints** 60:16
**appropriate** 33:12
  219:10
**approve** 175:5
**area** 20:8 24:2
  36:5,12 74:19
  75:3 77:13 81:22
  116:19 134:23

135:23,24 174:5
174:14,22,24
176:10 201:11
206:8 241:24
**areas** 243:15
  267:12
**argued** 222:8,14
**armed** 28:15
**arranged** 167:7
**array** 23:21 24:20
  24:25 25:24 30:6
  30:9,15,16,18,21
  31:4 34:21,25
  35:4 44:25 45:6,8
  50:12 88:17,18
  89:4,15,21 90:2,12
  90:23,23 91:11,14
  92:4,7 93:13,14,15
  93:20,25 94:20,21
  95:6,20,23 96:6,8
  98:15,15 100:10
  100:11,14,18
  103:18,25 104:1
  104:10 111:19
  112:1,10,11
  113:14 114:11,13
  117:2,10 118:24
  120:4,21 121:2,5
  123:17 124:17
  134:18 135:5,17
  135:20,25 137:1
  137:14 164:12,15
  164:25 167:16
  168:1,12,14,18
  169:16,17,24,25
  170:2,8,25 171:13
  171:15,23 172:13
  172:17 187:20
  191:25 192:4,15
  217:19 220:10,20
  231:8 234:16

244:8,13 247:5,17
249:23 250:3
251:9 254:13,20
258:10 276:23
**arrays** 23:15
  24:10 30:13 46:17
  49:22 50:7 51:24
  91:15 97:25
  109:18 111:10
  118:3 119:5
  125:14 130:8
  131:4 132:4 136:5
  164:17,20 168:19
  221:22 224:14
**arrest** 86:22 87:3
  90:14,24 103:14
  103:24 104:6
  125:3,4 149:19,24
  150:1 151:21
  161:4,5 192:5,16
  195:8,12,16
  199:13 201:15
  229:16,16 257:17
  258:2
**arrested** 28:18
  44:1 90:9 151:19
  195:18,19,22,24
  196:9,11 197:7
**arresting** 201:15
**arrigo** 138:15,23
  139:1,6,13,18,23
  140:8,21 141:5,10
  141:25 142:14
  143:12,12,16
  144:14,25 154:10
  154:18 175:24
  197:2 216:8 217:6
  242:20 254:14,18
**articulated** 187:9
**artificially** 116:12

**ascertain** 146:16
  236:10 245:2,13
**asked** 12:12 34:14
  34:16 36:25 47:2
  47:6,13 53:18
  58:21 62:14,16,17
  62:18 64:22
  127:23 128:16
  131:9,21 152:6
  185:21 186:20
  234:25 235:13
  236:22 255:22
  264:25 268:4,10
  268:16,18 272:21
  272:21 276:4,7
**asking** 74:14
  135:14 223:3
  260:16
**aspect** 213:14
**aspects** 32:23
**assailant** 248:19
**assailants** 245:14
  254:21
**assembled** 243:22
  247:4
**asserted** 198:14
**assertions** 199:7
**assessment** 63:11
  186:7 188:5
**assigned** 64:10
**assignment** 282:2
  283:2 284:2
**assistant** 174:4,13
  192:19,24 193:11
  232:13
**association** 52:2
  108:18,22
**assume** 9:3 27:22
  85:12 136:2 141:7
  160:15 161:4,8
  175:21 197:21

218:6
**assumed** 225:5
**assuming** 218:13
**assumption**
226:13,15,18
**assumptions** 78:20
**astronomical**
103:8
**astronomically**
103:19
**attached** 283:7
**attack** 65:5
**attacked** 38:25
**attacker** 39:5
**attempt** 32:16
141:6 217:13
**attempted** 28:15
29:2
**attempts** 24:5
**attending** 6:4
**attention** 178:9,19
179:10,14,17,21
180:2,6 240:4
268:5 272:9,23
273:18
**attentive** 178:25
**attorney** 6:8 10:23
22:11 25:19 31:24
37:9,12 43:14
44:12,12 76:2
192:19,24 193:12
221:7,10,23 222:7
223:1,10,17,18
229:25 279:23,24
**attorney's** 198:14
224:6 231:19
**attorneys** 12:9
16:23 105:1 174:4
174:14 222:4
223:13 224:19,22
226:1,9,15 231:16

**audio** 5:9,10 94:6
129:4 208:8
**august** 134:19
135:6 137:2
172:16,23 173:5
192:4,16 217:19
247:6 251:9
**authorize** 283:11
**authorized** 5:24
**autopsy** 155:2
167:6 180:18,24
181:5,8 201:14
**available** 37:16
152:16
**ave** 281:1
**avenues** 92:13
**average** 17:12
18:2 105:5
**aware** 8:2 11:19
41:3 47:15 130:7
153:21 154:18
187:19 220:15,19
223:16,25 259:17
**awareness** 178:10
178:19,23 179:14

**b**

**back** 10:11 17:10
19:10,11 22:10
25:3 31:2,10 37:5
37:10,15 41:22
48:8 57:21 63:5,6
64:19 73:15 77:2
77:18 79:12 89:12
89:24 91:25
110:23 120:20
132:2 143:8
154:24 159:7
166:15 167:21
172:14 173:1
174:3 177:16
182:10 183:2

199:5 208:15
216:11 219:2
220:2 227:17
236:22 259:5,13
274:25 281:15
**background** 62:14
**bad** 106:23
**ballistics** 181:16
**bank** 266:12
**base** 140:6 222:24
**based** 41:24 84:2
86:22 91:15
103:14,25 104:6
104:12 146:20
150:15 178:12
180:15 185:17
229:25 230:7
243:21 272:10
273:18,19
**baseline** 212:22,23
**bases** 79:22
**basic** 40:6 96:14
149:10 201:20
**basically** 25:7
26:22,23 28:23
29:23 36:25 39:19
85:15 100:10
**basics** 43:23
**basing** 233:20
**basis** 68:8 134:1
141:11 143:1
160:17 163:2
195:11 216:19
217:17 259:20
**bathroom** 58:3
**battery** 61:15
**beat** 39:6,6
**beaten** 39:1
**beating** 264:18
**beginning** 6:8
108:17 131:12

186:13
**begins** 136:21
145:6
**behalf** 1:14 2:9,16
3:6 6:9,12,13,15
6:18 22:13,14
**belief** 133:11
136:9 218:7
**believe** 22:7 28:16
33:9 35:1 37:8
38:12 39:2 43:3
47:19 49:15,15
52:3 53:8 60:8
73:7 75:23 78:3
94:25 126:1 131:1
132:8,23,24
133:24 134:8
139:18 140:18
142:24 145:20
147:22 151:17,19
154:16 156:16
157:4 158:23
161:2 163:5
164:17,18 169:14
172:22 173:8
174:25 175:13
179:18 198:13
206:4 207:7
217:20,20 224:12
229:11 232:25
233:7,12 258:16
260:12 274:12
**believed** 133:7
134:6 217:24
258:3
**bell** 3:3 18:16
**beneath** 166:21
**benefit** 107:10,15
**best** 105:24 106:2
106:3,3,5 113:16
123:1 171:14

182:11 183:6
208:11 265:14
279:15
**better** 112:23,25
186:11 187:10
202:20
**beyond** 131:21
209:5
**bifurcate** 10:10
**big** 116:4
**biggers** 178:15
**billy** 244:7
**binder** 220:8,9
**bio** 51:7
**bit** 16:5 38:14 59:5
97:13 128:4 130:8
146:13 159:1
271:2
**black** 96:12
111:23 123:15,17
124:1,2 143:23,24
144:15,20 146:4
155:25 157:16
161:18 173:14
176:3,10,21
196:21 216:5,22
239:6
**black's** 236:24
**blackman** 6:12
**blackmon** 1:3 5:16
6:14 7:10 132:17
132:21 133:7,16
133:21 134:7,13
141:4,10 142:22
142:25 146:8
151:13 154:10,15
154:19,22 155:17
155:20 156:22
158:6,9,11,13,21
165:15 168:6
169:9 173:11,17

174:12 192:4,15
193:11 196:15
199:14 217:6,7,9
217:14,25 226:18
228:10 231:7,18
234:13 235:2,16
237:22 250:3,14
251:20 253:23
254:19 255:2
256:20 257:13
258:23 275:10
276:22 281:6
282:3 283:3
**blackmon's**
134:17 135:4,16
136:25 165:7,9
217:18 221:10
222:7 223:1,16
224:6 229:24
230:1 234:2
241:11
**blanks** 189:25
**block** 51:22
**body** 269:20
**bold** 199:6
**bolo** 201:12
**boobie** 46:7,8
**book** 85:15
**booklet** 108:1
**boonie** 143:23,23
143:24 144:15,20
146:4 161:18
176:3,10,21
196:21 216:5,22
236:24
**bottom** 21:16
109:13 116:7
138:19 155:1
175:22 191:1
193:20 221:5

**box** 11:8 77:17
144:5
**boxes** 95:10
**boy** 127:1
**boyd** 217:8 255:16
255:24,25 256:7,9
**boys** 46:7,8
**brady** 88:9 217:11
**braid** 166:3,15
**braided** 167:3,6
167:11,11,12,13
168:20
**braids** 165:16,21
166:13,25 167:2,3
167:17 168:1,7,12
168:14,21 169:9
275:10,25 276:4,9
**braithwaite** 108:6
178:15 241:9
**break** 9:7,11 20:5
57:25 79:3,9
132:2 159:2,5
226:25 227:7,15
259:11
**breaking** 79:2
204:3
**breaks** 9:8
**breed** 134:22
144:10 176:4
197:18 234:3,7,13
234:25 249:10
258:4
**breeds** 132:22,25
133:7 143:25
144:15 158:2
197:17 218:3,5
235:2
**brief** 25:5 32:8
33:25 38:22 43:1
**briefly** 146:14
165:4 229:22

**bring** 29:3 100:4
266:23 272:20
**bringing** 224:23
231:16 232:14
**broad** 207:2
211:13,23
**broke** 192:22
**brother** 134:8,8
157:8,10,17 158:7
**brothers** 157:14
159:24
**brought** 36:4
176:10 177:14
231:8 232:5
265:23
**buffalo** 28:3,20
29:13 44:18
**build** 271:11
**building** 99:18
175:4 177:15
269:17,24 270:19
**bullet** 109:24
201:1,24 207:4
212:15
**bulleted** 213:6
**bulletin** 4:18
172:20 173:4
228:5
**bunch** 265:8
**bureau** 58:21
74:22
**burglary** 239:14
**burns** 2:12,13 6:18
6:18 10:4 18:19
227:6,11 277:16
277:21 278:6,9,15
278:16
**burton** 42:20 43:4
**business** 13:7,9,12
13:13,22,23 14:2
14:15 15:7,20,25

16:5
**businesses** 16:6
**businessman** 29:3
**byproduct** 71:10

**c**

**c** 2:1 3:1 43:17
**ca** 281:25
**call** 9:17 10:15,18
  11:25 95:1 110:21
  110:23 155:24
  162:9 166:3 167:8
  167:10 168:21
  184:13 189:17
  202:5 205:11
  227:7
**called** 7:2 26:12
  29:23 50:1 72:21
  73:1 79:18 109:16
  144:14 153:22
  154:10 174:14
  183:17,18 197:2
  241:3
**caller** 156:21
  157:3
**calling** 75:2
**calls** 72:9 85:14
  143:15,19 162:11
  162:18 163:24
  169:20 172:3
  191:19 198:13
  221:14 222:10,19
  230:9 231:21
  236:12,17 237:12
  237:23 238:7,12
  238:24 239:7,16
  240:10 245:7
  250:17 253:7
  255:5 256:21
  264:4,5
**cancila** 2:3

**canine** 266:21,21
**canvas** 201:11
  206:8
**canvassed** 241:23
  243:15
**captain** 62:25
**capturing** 129:2
**car** 34:4 269:25
**cards** 161:6
  223:12
**care** 47:25 189:24
**career** 19:6
**careful** 8:17
**carlos** 22:1 23:3
  25:17 26:8
**carried** 204:18
**casado** 45:25
  46:10
**case** 1:15 5:19
  7:10 11:6,6 12:10
  15:22 16:15,15
  20:8 21:1 22:4,6,9
  23:2 24:24,25
  25:6 27:2,9,12,16
  28:5,6,9,24,25
  29:8,14,21 30:4
  31:2,3,7,9,9,11,12
  31:16,20,21,23
  32:8,11,19,24 33:5
  33:19,22,24 34:1,6
  34:8,17 35:1,3,12
  35:15,25 36:1,2,15
  36:20,24 37:5,7,7
  37:9,18,19,23 38:2
  38:5,6,10,16,19,20
  38:23 39:19,23,24
  40:5,22 41:13
  42:17,17,20,23,24
  43:2,7,12,20,21,23
  44:7,23 45:25
  46:4,6 47:6,14,16

57:6 58:22 66:7
  67:13,15 68:9
  73:5,12 75:12,17
  76:6,12,20,21
  77:10,19 80:21
  81:16,17 84:2,15
  85:19,25 86:4
  90:7 91:5 95:9
  101:16 108:7
  109:7,8 113:16
  130:7 131:5,24
  132:5 133:3,6,20
  140:16 144:3,5
  146:18 147:1,25
  151:2,12,23 154:1
  157:2 167:25
  169:1 171:5,10
  174:6 180:5,9
  183:9 184:10
  189:4,22 192:21
  193:13 194:2,14
  201:18 203:12
  204:7,8,18 207:8
  207:16 209:23
  210:18,21 213:8
  214:1,8 216:1
  221:6,23 224:23
  225:11,20 240:6
  240:12 241:5
  259:19 260:13
  263:15 281:6
  282:3 283:3
**cases** 16:20,24
  17:3 18:3,5,24
  19:3,4,4,12,12,13
  19:14,15,17,22,22
  20:13,16,19 21:21
  21:22,25 32:20
  33:1 35:20 36:11
  38:14 45:3,11,16
  45:20,21,25 46:11

46:16,25 49:18
  54:21,24 58:15
  67:23,24 68:1
  70:7,9,10 78:24
  81:17 89:16 91:23
  98:18 131:25
  146:23 147:14
  179:11,15 184:4
  213:5
**casings** 155:12,16
**categorical** 82:18
**categories** 53:1
  76:8
**categorized**
  153:10
**category** 20:12
  24:8 76:10 265:16
**cation** 36:9 57:11
  69:21 94:9 128:25
  183:11 208:10
  236:16 237:17
  238:19 246:24
  263:8
**cause** 71:17,25
  86:22 87:3 90:14
  90:24 103:22
  136:13 149:24
  192:5,16 195:8,12
  199:13 229:9,15
  238:3,23 239:13
**caused** 40:12
**cell** 5:7 182:22
  183:1 184:8
  246:16,16
**cellular** 5:6
**center** 36:4 63:11
  162:20
**centered** 32:21
**centers** 163:11,11
**cernius** 174:5

certain 13:25
91:22 113:19
116:23 123:7
124:8,23 191:10
203:6 204:25
210:13 229:10
261:17 262:3
266:13 267:19
certainly 17:5
88:7 189:14,18,19
219:22 275:4
certificate 279:1
283:11
certification 282:1
283:1
certified 1:15 51:1
53:2,5,7 279:3,5
280:9
certify 279:7
cetera 130:4
chamber 29:4
change 60:10
206:11 281:13,14
283:8 284:3
changed 220:4
changes 281:12
282:7 283:7,9
channel 39:21,21
charac 124:18
characteristic
26:17
characteristics
100:8,17,21
113:19 170:10
charge 17:15
175:14 193:11
charged 144:20,25
162:6 194:7 195:7
196:5,12 198:4,20
231:20

charges 87:12
174:7,18 175:5
231:17 232:5,14
charging 87:18
175:16 192:20
charter 60:18
check 37:13 45:20
checklist 261:3,12
checklists 261:12
261:13,14
chicago 1:6,6,9 2:6
2:14,16 3:4 4:17
5:16 6:19 10:24
11:21 12:9 18:22
18:25 28:12 29:2
29:16,17 44:3,15
44:17 47:21,21
48:3 50:21 74:19
75:2 85:7 130:12
130:23 132:6
153:22 199:10,25
219:9 281:6 282:3
283:3
chief 55:21,21
56:17 59:12
chiefs 52:2 61:5
108:19,22
children 242:13
chino 94:11,16
choice 107:2
choose 98:16
chose 276:22
277:7
chronologically
78:12 156:20
cigar 184:21
cigarettes 98:23
circumstance
90:10 95:23
102:18

circumstances
4:21 29:10 33:12
87:21,25 101:19
114:14 190:23
241:3
circumvent
116:24
cite 115:16
city 1:6,9 2:16
5:16 6:19 9:18
10:24 11:20 12:9
18:21,25 22:7,15
22:23,24 28:12,16
29:15 31:19,24,25
32:3,5 33:22
35:23 36:18 37:7
40:2 42:20 47:20
48:3 53:13 85:7
228:5 281:6 282:3
283:3
civil 1:19 19:3,14
19:16 20:19 42:16
76:16 131:24
231:9 282:5 283:5
claim 32:18
claimed 217:8
claiming 47:4
claims 32:21
136:10
clarence 38:16
39:4,18 40:3
clarifi 57:10 69:20
94:8 128:24 208:9
236:15 237:16
238:18 246:23
263:7
clarify 9:1 13:5
24:19 229:5
241:20
class 17:11,12,13
17:15,16 53:13

55:8 94:12
classes 13:25
15:19 16:11 17:17
17:18,18 55:1
clear 24:18 196:4
198:11 225:10
264:2
clearer 210:12
clearly 199:12
cleveland 281:2
clicking 127:17
close 151:9 167:22
180:18,19,22
183:24 185:4
closely 96:6
closer 186:16
188:11
clothing 170:15
clue 106:19
coin 101:11
102:13
cold 58:22 189:22
collect 75:21
collected 155:12
collection 205:17
color 124:1
colossal 215:7
come 37:14 56:6
61:25 62:15,17
96:21 99:1,15
102:3 105:17
110:23 189:23
214:12,15 259:5
comes 93:22 167:4
coming 100:1
122:24 232:20
269:16,23,24
270:1,4 271:4
commander 43:17
44:9,14

commencement 279:8
commencing 1:18
comment 79:1
comments 119:9
commiserate 163:8
commission 172:9 282:19 283:25 284:25
commit 82:12,15 82:23 147:4 150:18 152:2,17
commits 239:3
committed 31:17 80:8 93:24 125:1 125:2 229:12 239:14 256:10
committing 28:15 81:19
common 150:16 179:1,4 184:2,7
comp 52:22
companies 14:6
company 12:25 55:7,10,18 56:5
compared 39:12 112:11
competent 200:25 201:22 202:9
compile 92:2,6 95:12,23 102:4 162:14,24 163:4 163:18
compiled 30:17,21 30:24 85:19 91:19 104:4
compiles 95:16
compiling 95:19 169:24 170:8

complaint 70:24 136:3,7,21
complaints 71:3,4 71:6,10
complete 70:17 219:1 259:19 261:11
completed 58:15 58:16 262:9 281:15
completely 26:10 93:5
completing 201:17
complex 81:18
complicated 66:15
complicit 139:24 140:14
complied 200:13 211:10 260:12,20
comply 112:18
component 16:7
compose 111:14
composed 111:18
composing 114:3
composition 170:24
compound 10:7 247:20 249:14 254:23 255:20 258:6 273:22
compressed 114:20
compromise 100:15,17
computer 22:10 37:13 77:15 95:14 95:15
concealing 116:12
concepts 108:21
concern 36:12

concerned 139:25
concerning 35:4 279:11
concerns 225:15
conclude 140:14 204:5 215:21 225:1 260:2
concluded 195:5 278:18
concludes 277:24
concluding 195:11
conclusion 72:9 143:2 146:20 150:15 169:20 172:4 178:12 180:15 181:3 191:20 198:13 203:20,24 204:10 210:8 215:23 216:2,19,21 218:24 219:19 221:14 222:10,19 223:25 224:2 230:11 231:22 236:18 237:13,24 238:8,16,25 239:8 239:18 240:11 245:8 250:18 253:8 255:6 256:22 264:6
condition 117:6,11
conditions 7:20
conduct 51:22 52:2,23 71:13 98:3 99:25 174:6 202:15 205:4 213:7 220:20,20 221:23 262:23
conducted 23:8 25:8 30:17 35:8,9 37:2 40:7,8 41:21

41:23 50:3 62:14 109:2 131:5 132:5 175:23 199:12,24 204:6 208:4 213:14 219:11
conducting 30:16 50:12 55:13,13,14 55:25 88:16,18 89:6 116:1 147:20 148:17,25 160:5 176:25 201:10 262:19
conferences 9:25 10:2 147:17
confession 201:17 264:18
confined 50:10 132:1
confirm 27:11 77:20 227:21
confirmed 128:17 181:8,16
confirms 180:18
conform 60:25 203:9
confronted 216:9
confronting 105:2
conley 248:4,18
connected 134:10 134:12,13 155:16 155:20
connection 85:9 163:24,25 176:14 197:16
consider 83:17 183:12 202:23 203:1 260:3
considerable 180:13 181:4 186:22

| | | | |
|---|---|---|---|
| **considerably** 105:22 | **controls** 118:19 | 93:7 98:13 100:24 | 197:4,7,10,13,18 |
| **considered** 49:2 | **conver** 190:1 | 101:3,8,9 104:18 | 198:22 199:21 |
| 61:17,22 225:6 | **conversations** 5:6 | 106:13 107:5,24 | 200:5 203:13 |
| 262:1 | 189:21 190:1 | 107:25 108:15 | 209:10 210:9 |
| **consist** 121:6 | **convict** 149:18 | 109:5,6,25,25 | 211:5 212:9 |
| 129:13 | 150:10 | 111:11,12,17,21 | 213:18 217:19,25 |
| **consistencies** | **convicted** 146:24 | 112:13 113:21 | 218:7,8,10 223:7 |
| 124:9 | **convincing** 84:8 | 114:6,11 115:17 | 223:18 225:17 |
| **consistent** 21:12 | **cook** 231:18 | 116:3 117:13 | 226:15,16,19,20 |
| 45:9 116:8 127:25 | **coordinated** | 118:8 119:8 | 226:22 229:17,18 |
| 200:2,2 203:21 | 139:19 | 123:18 127:14,15 | 230:2,17,20,22 |
| 204:8,18 219:12 | **copied** 110:1 | 128:14,19 130:8 | 231:5,10,11 232:7 |
| 261:19 265:5 | **copies** 77:17 | 130:13,25 131:6 | 232:8 233:3,10,17 |
| **constitutes** 279:15 | **copy** 20:25 76:5 | 131:14,24 132:7 | 234:4,5,7,13,14,16 |
| **consultancy** 18:12 | 77:10 130:14 | 132:14,18,22 | 234:19 235:2,11 |
| 58:23 | 173:2 278:13 | 133:3,4,8,12,13,17 | 235:17,19,23,25 |
| **consultant** 15:21 | **core** 209:1 | 133:21 134:3,4,7 | 236:4,11,19,24 |
| 19:6,8 58:22 59:3 | **cornell** 33:21 34:2 | 134:14,15,19 | 237:8,22 238:5,11 |
| **consulted** 47:5 | **corner** 185:14 | 136:20 137:2,3,14 | 238:20,23 239:1,6 |
| **consulting** 16:6,13 | **cornrows** 165:10 | 139:3,7,15 140:17 | 239:12,15,17,24 |
| 16:19 17:25 | 165:16,20,23 | 141:18 142:2,8,14 | 240:2 241:6,13,15 |
| **cont** 3:1 | 166:8,25 167:9,17 | 143:20 144:21 | 241:25 242:6,8,9 |
| **contacted** 53:17 | 168:7,16,20 | 145:1,2,11,19,25 | 242:14,21 243:2,8 |
| **contain** 122:17 | 173:17 244:7 | 146:8 151:24 | 243:11,16,24 |
| 129:19 130:1 | **corporate** 14:5 | 155:17,20 156:10 | 244:2,5,8,10,14,23 |
| 260:3 | **corpus** 241:11 | 156:23 157:3,21 | 245:4,6,10,14,20 |
| **containing** 172:17 | **correct** 13:20 16:8 | 157:22 158:7,12 | 246:3,8,18 247:6 |
| **contains** 79:17,21 | 16:11 20:18 27:9 | 158:14 160:3 | 247:11,18,24 |
| 259:19 | 27:14 33:8 37:24 | 161:24 162:3,7 | 248:5,13,19,21,24 |
| **contends** 136:3,21 | 37:25 38:1,4 | 164:2 167:17 | 249:4,11,18,24 |
| **context** 49:12 | 40:24,25 41:1,4,12 | 168:8 169:9,13,18 | 250:4,6,9,14,21 |
| 109:15 152:8 | 42:2,3 49:7,16 | 171:7,15 172:2,7 | 251:1,10,12,15,20 |
| **continue** 5:11 | 50:18,22,23 54:14 | 172:24 173:18 | 251:22,25 252:2,5 |
| 155:6,9 161:16 | 54:15,15 58:18 | 174:1,15 175:20 | 252:13,15,20,23 |
| 191:7 262:4 | 65:2,2 74:4 75:13 | 176:11 182:4,9,20 | 252:25 253:5,9,12 |
| **continued** 53:15 | 78:1 79:19,22 | 182:23 183:11 | 253:17,23,25 |
| 223:9 | 80:19,20 81:1,6,7 | 184:1,22 185:18 | 254:3,8,14,21 |
| **contrary** 196:3 | 82:19,24 84:21 | 187:12,22 191:15 | 255:3,10,18 256:7 |
| **control** 60:12 | 85:20 86:9,19 | 192:6,17,21 | 256:8,10,15,20,24 |
| | 87:3,13,18,22,23 | 193:14 194:22 | 257:3,8 258:4,7,11 |
| | 88:2,6,9,13,14 | 196:6,15,22,23,25 | 258:18 259:21 |

260:4 262:21,24
266:10 270:9
272:16,19 273:20
274:3,3,9,10,19
275:11
**corrections**  281:12
283:17
**correctly**  30:24
34:8 35:1,8,9
58:10 72:13 118:1
119:25 129:14,21
146:18 158:3
159:22 160:2
162:21 165:13
168:2 176:5
200:13
**corroborate**
104:11
**corroborated**
145:17
**corroborating**
102:21
**counsel**  5:15 6:3
9:16,17 12:14
78:19 224:16
279:23,25
**counties**  60:22
**country**  59:20,22
61:10 122:5 202:9
203:4,16 261:25
267:3
**county**  38:16,17
58:10,12 60:2,12
60:14,15,15 98:21
231:18 282:10
283:15
**couple**  16:20,25
21:8 45:23 46:12
51:17,23 52:15
61:15 65:8 66:7,9
76:8 106:10

126:15 209:3
227:4 268:3
**course**  8:23 11:14
17:13 23:24 24:23
34:17 46:1 51:14
52:3,3,4 53:6,9,19
54:9 55:6,14,16
56:2,14,15,17,19
74:5 83:12 87:11
87:17 98:14 147:2
178:23 184:10
188:12,14 209:8
220:12 226:9
**courses**  51:2,12,12
51:19 52:11 53:23
53:25 54:4,16
55:3,20 56:7,10
**court**  1:1 5:17,23
6:20,23 8:6,8
19:19 20:4,20
22:3 28:3 31:12
31:20 33:23 35:24
38:17,18 42:21
43:18 45:18,22,23
46:1,2,13,15 57:10
57:13 69:20 78:23
87:22 88:4 91:3
94:8 128:24
148:19 169:3
178:16 179:11,15
180:5 201:7,19
202:12,16 206:21
208:9 223:17,21
224:12 230:13,19
231:2 235:8
236:15 237:16
238:18 246:23
263:7 266:24
267:13,16,21
269:8 270:4 271:9
274:10,12 278:8

278:10,13,15
282:7
**courtroom**  105:2
**courts**  45:15 48:16
205:20 223:25
**cousins**  145:15
**cover**  123:3,4
**covid**  15:19 56:13
**cowan**  229:24
270:3
**cox**  132:18 143:20
144:21 145:1,10
145:14 151:14,24
156:1,22 157:6,12
157:14 158:5,7,21
159:18,23,24
161:24 162:7
167:5 176:15
194:1 195:20,25
196:6,22 197:10
198:21 199:10,18
199:19 200:1
216:10 226:19
236:25 237:1
**cox's**  134:8 145:5
145:15 236:23
241:23 246:16
**cpd**  131:6 160:5
160:24 161:11
228:5
**crackers**  273:3,5
**create**  116:8
**created**  14:9 85:8
87:1
**credentials**  73:1,2
**credibility**  188:4
**credible**  181:1
188:16
**crime**  24:6 44:1
61:16 64:3 74:20
82:12,15,23 91:16

93:25 102:2
120:25 125:2,9
128:11 135:22
136:7 147:4
149:20 150:18
152:17 153:7
155:12,14 172:9
177:10 185:2,17
186:10 187:14,17
194:7 201:1,2,3,4
201:8,10 214:10
229:12 238:4,5
245:3
**criminal**  19:3,15
19:17,21 20:13,16
51:1 53:3 61:6,13
61:25 71:25 85:9
131:25 226:10
**criteria**  82:13
100:11
**critical**  200:11,24
201:21 202:5
205:5 206:6
212:18 213:15
**cronin**  157:13,21
157:21 159:23
**crux**  221:22
**csr**  279:6
**cueto**  71:17,22
**curb**  186:16
**current**  12:22
218:6,7
**currently**  14:4
16:19 58:4,8
**cursor**  165:24
**custody**  55:15
56:1,16 89:19,22
90:8,8,9 98:18
99:9
**cut**  157:13 166:6,6
166:22

cutting 128:3
cv 1:5 5:19 22:5
  28:5 31:22 33:25
  35:25 38:19 42:23
  43:20
cyanide 151:4

**d**

d 4:1 43:17
dade 46:20 51:8
  52:13 55:22 58:5
  58:21 59:6,10
  60:7,15,24 61:4,18
  98:21 125:19
  126:2
daily 4:18 172:20
  173:4 228:5
darryl 42:20 43:4
data 260:3
date 169:10
  172:25 281:8
  282:3,9,19 283:3
  283:13,25 284:20
  284:25
dated 77:21
  172:23 173:5
datelines 39:20
davious 138:20
  217:7 242:12
  247:17
davis 143:16,22
  144:19 145:10,13
  154:14,22 160:7
  160:10,11,14
  161:17,18,19,24
  162:2,6 176:3,9
  195:6,13,17,19,22
  195:24 196:5,14
  196:21,24 197:6
  197:13 198:3,20
  250:4 251:24
  252:5 253:23

254:19
davis's 161:18,19
  196:24
day 52:3,4 55:6
  62:18,18 67:1
  188:15,16 189:20
  189:21 280:4
  282:16 283:22
  284:22
days 21:8 34:13
  66:12 68:16 96:24
  156:10 190:18
  191:3,12 281:18
dead 39:1 153:18
dealer 28:16
dean 35:23
dear 281:10
death 39:6 55:13
  55:15,25 56:1,10
  56:18 68:3 205:2
deaths 56:16
debra 1:15 5:23
  279:5 280:8
decade 189:23
decedent 237:3,3
decide 108:7
decided 60:24
  224:1
decides 170:3
decision 87:18
  175:16 192:20
  193:11 194:7,12
  195:16,21 199:2
  224:7
decisions 224:13
  226:9
deed 282:14
  283:20
deemed 281:19
defeat 96:7

defect 232:4
defendant 2:16
  6:16 12:2 18:25
  22:15,18 24:1
  29:25 71:12 133:6
  133:15 150:9
  214:1,8 237:7
defendant's
  146:17
defendants 1:10
  3:7 9:18 11:20
  12:1,6,14 22:18
  46:9,13 85:25
  133:20 134:6
defense 78:19
  105:1 221:6,23
  222:3 223:10
definitely 208:25
deformities 125:6
deformity 129:18
  129:20,25 130:1
degree 178:9,14
  178:19 179:9,13
  179:17 180:2,6,11
  181:3 186:20
  240:4 268:5 272:8
  272:22
delete 217:3
deliberate 198:15
deliberation 83:23
delve 32:25
delving 197:23
denial 133:2
denied 132:25
  216:11
dennis 77:21
department 4:14
  4:17 19:9,23 20:6
  20:17 28:13,20
  29:16 44:15,16
  46:20 47:22 49:7

51:8,15 52:14
  53:12 55:22 57:23
  58:6 59:6,10 60:7
  61:5,8,19 64:1,13
  66:3 68:19 70:21
  70:25 71:14 74:19
  75:3 108:2 130:13
  130:24 132:6
  153:22 199:11
  210:17 267:2
  281:22
department's
  74:21 162:20
  199:25 219:9
departments
  28:14 59:20 61:9
  161:8 202:10,13
  202:14,19,21,22
  202:25 203:3
  205:10 261:24,25
  262:3 265:13
  267:3
depending 17:21
  66:23 168:21
  220:17
depends 18:8
  101:14,15 124:22
  124:22 190:22,22
depicted 25:17
deposed 7:24 19:3
  27:9
deposition 1:13
  5:9,14,19 7:11
  9:19 10:3,16,25
  11:2,16 12:20
  23:12,14 38:5
  57:20 65:13 85:23
  110:15,19 111:1
  131:12 153:25
  164:23 169:4,7,11
  169:11 176:20

187:11,13,13
193:3,8,16 218:25
228:7,12,17,22
232:15 240:18
241:1,10 274:19
275:18 278:17
279:12,18,19
281:8,11 282:1,3
283:1,3
**depositions** 8:2
11:12,17 16:22
17:5 18:13 19:17
19:20,25 20:1
76:21 77:16 86:2
240:17
**describe** 97:20,20
97:21 116:11
145:3
**described** 90:10
145:9 170:18
182:25
**describes** 123:15
141:5,5 173:11
**describing** 152:25
180:12 181:4
185:5 186:21
**description** 4:11
23:1 32:8 34:1
36:1,23 38:22
115:21 116:1
118:25 119:7
121:1 139:24
140:6,7,8 144:5
181:8 182:5
187:19 243:1
**descriptions** 91:22
104:17 105:10
106:13 141:15
188:12 243:7
**designates** 60:16

**despite** 254:19
**destroyed** 15:20
**detail** 95:22 99:4
129:4 143:15
**detailed** 138:14
**details** 70:17
181:20 185:4
190:11
**detained** 196:11
253:22
**detective** 29:12
30:1,1 36:17,20
61:18,21,25 62:1,3
62:4,7,8,11 63:3
64:16 67:19,21
68:15 71:5 72:19
72:20 74:22 80:4
85:24 86:25 87:16
87:21,25 90:4
95:17 133:20
134:6 145:18
157:13,20 159:23
164:13 172:15,20
173:15 175:13,15
176:20,20 177:8
177:10 211:9
220:4 261:16
264:14,24
**detective's** 87:9
**detectives** 12:2
25:7 53:14 55:21
61:11,12 66:25
67:1,20 72:14
84:20 85:8 86:17
88:11 133:2,6,15
144:3 147:19,24
151:12 158:21
171:12 191:8,13
193:13,20,24
194:9,10,21 195:2
195:7 200:1 204:1

204:7,17 206:4
207:7 211:4 213:8
214:1,8,24 215:21
216:1,20 225:6
249:9 251:8
260:12,20 261:3
263:14
**determination**
199:1
**determine** 27:24
80:12 81:13 83:5
83:25 88:24 92:9
92:10,22 94:16
101:21 147:7
148:2,5 149:9
174:6 209:22
213:14 239:4,13
261:18 266:25
**determined** 83:12
88:25 91:12
120:17 146:24
160:13
**determines** 17:14
**determining** 93:23
169:17 238:3
**developed** 195:8
199:12
**dewey** 31:19 32:11
32:17 33:10
**diaries** 76:14
**died** 65:4 66:9
**difference** 190:16
190:19
**different** 16:6 24:9
52:25 59:11 60:2
61:3 63:19 73:24
81:16 92:13
101:15 106:10,21
125:6 126:7
127:13 142:3,4
145:24 148:20

152:20 153:12
170:1,18 171:4
187:21 194:9
220:9 262:8
264:22 265:1
**differentiate** 187:1
187:4
**differently** 23:19
**difficult** 17:19
53:22 83:22 84:14
98:14,24,25 99:21
99:25 105:16
106:7 116:20
118:10 122:24
166:5 190:11
191:21 192:1
214:11,15
**difficulties** 104:23
**digital** 243:23
**diminishing** 123:5
**direction** 84:12,13
269:11,25 270:20
272:11 279:15
**directly** 13:19
134:13,20 272:3
280:1
**director** 14:5
59:25 60:1,11,16
**disagree** 168:9,11
168:15 179:19,20
**discipline** 70:20
**disciplined** 70:18
**disclose** 88:9,12
**disclosure** 76:16
**discovered** 233:1
**discovery** 240:12
**discuss** 109:18
143:10 155:2
164:11
**discussed** 67:14
76:2 130:7 138:20

138:23 162:10
172:14 260:9
**discussing** 24:11
52:12 93:7 159:16
**discussion** 138:15
145:21 260:13
**disguise** 141:6
**dispatch** 162:20
163:11
**display** 23:21
24:25 121:6,22
128:7,7,19 129:8
129:12,17
**displaying** 30:12
**displays** 91:19
122:16 129:18,25
**distance** 105:3,15
106:13,15,16
**distinction** 23:14
140:21 150:19
152:23 166:24
**distinctive** 91:25
**distinguish** 142:17
**distortion** 94:6
208:8
**district** 1:1,1 5:17
5:18 22:3,3 28:3,4
31:20,21 33:23,24
35:24,25 38:18,18
42:21,22 43:18,19
**division** 1:2 5:18
22:4 28:5 31:21
33:24 38:17 42:23
43:20 61:5,7,7,12
61:14,16 62:1
65:18
**divisions** 61:4,12
**divulge** 218:17,22
**divulged** 217:12
**dna** 39:10 40:14

**document** 75:15
110:8 112:17
156:20 167:22
172:21,23 173:3,3
173:10,13 227:25
240:11
**documentaries**
39:22
**documented** 85:4
85:5 154:12
**documenting**
201:8
**documents** 11:3,5
75:22 76:8,10,10
78:13 154:1,9
165:3 176:13
**doing** 8:16,16 30:7
40:15 53:11,16
98:25 106:2,5
123:5 182:11
183:6 189:18,20
205:4 214:14
262:8 273:13
**dollars** 16:17 18:5
47:19
**don** 153:23 154:2
**door** 39:14 177:16
**doris** 14:7
**double** 89:3
**dozen** 54:19
207:15
**drafted** 77:25
**drafting** 79:25
**dramatically**
103:22 124:7
**drastically** 98:17
**draw** 141:8
**drawings** 76:14
**drawn** 272:9
273:18

**dreadlocks** 25:16
25:18,20,21,24
167:12 171:7,12
171:14,17,18
172:9
**drive** 2:13 85:1
177:6,10,16
**driven** 175:24
**drivers** 186:15
**driveway** 34:3
**driving** 184:23
**drop** 68:14
**drove** 176:21
**drug** 28:16
**duly** 6:22 7:3
279:10
**dump** 225:20
**duties** 194:9,10
**duty** 88:8 92:10,21

**e**

**e** 2:1,1 3:1,1 4:1
7:14 78:8 134:7,9
155:25
**e.g.** 116:10
**earlier** 68:12
118:9 127:10
135:21 147:23
154:8 171:5
187:22 229:20
234:25 260:10
268:5
**ears** 124:13
**easier** 8:8 148:2
**easily** 62:16 83:6
**eastern** 1:2 5:18
28:4 31:21 33:23
33:24 38:17 42:22
42:22 43:19
**eb** 228:5
**effect** 163:19
277:2

**effective** 109:5
223:22
**effort** 99:1
**efrain** 45:25 46:10
**eight** 19:12 20:7
20:15 51:21 53:11
67:23 143:10
155:1
**eighth** 59:21
**either** 12:1 30:25
59:21 88:16 91:8
102:2 132:14
141:18 142:1,13
153:3 161:4
167:17 250:8
263:15 265:19
267:14 270:20
**elapsed** 191:2
**elderly** 32:16
38:24
**elected** 60:9
**electronically**
77:10,12
**elem** 255:16
**element** 238:11
245:3
**elements** 238:4
**elevated** 152:19
**elevates** 152:19
**eleven** 101:25
**elk** 280:4
**elkins** 38:16 39:4,8
39:18 40:3,12,15
40:18 41:4
**email** 281:17
**emphasize** 217:11
**employ** 91:8,11
120:22 128:8
205:15
**employed** 58:5,8
203:12

employee  279:22
  279:24
employees  1:8
  59:19 99:17,19
enacted  60:6
enclosed  281:11
encountered  90:1
  188:25
encountering  56:3
enforcement  4:16
  47:4 51:15 53:12
  60:23 251:15
engage  263:15
engaging  258:2
engel  28:2,10 29:5
  31:9,10,11,17
enormous  122:22
ensure  81:4 93:4
  119:19
ensuring  80:25
enter  95:14 121:13
  146:25 150:3
  170:24 201:4
entered  283:9
entice  98:21
entire  68:18 85:22
  202:15 282:5
  283:5
entitled  1:15
equitable  116:24
eric  1:3 5:16 6:12
  6:14 7:10 133:16
  133:21 134:13,17
  136:25 141:10
  154:10 156:22
  158:1,6,8,9,11,21
  165:7,15 168:6
  196:15 199:14
  226:18 250:3
  257:21 275:10
  276:22 281:6

282:3 283:3
errata  281:13,18
  283:7,10,18 284:1
especially  8:15
  166:12 167:5
esq  281:5
essence  114:19
establish  83:2
  84:12,16 136:13
  148:6 150:3
  151:13,16 209:1
established  92:4
  151:24 200:2,3,7
  200:22 201:25
  203:22,25 204:8
  204:15,22 205:9
  207:6 208:23
  210:6,16 211:12
  212:17 219:13,17
  238:23 260:11,19
  261:1,20 262:20
  263:18 265:6
establishes  224:7
estimate  106:5
et  5:16 22:2 28:3
  33:22 35:24 43:18
  130:4 281:6 282:3
  283:3
ethanol  151:5
ethienne  157:6,12
  158:5 159:18,23
eugene  1:7 3:7
  6:17 11:22
eve  255:15
event  102:10
  180:12 181:4,21
  185:5 186:21
  190:5 191:14
events  188:5 190:4
  190:5

eventually  53:16
everybody  117:1
evidence  4:15
  39:11 40:14 64:2
  80:10,24 81:5,21
  82:2,7 86:19,23
  87:11 89:20,21,23
  102:23 110:5
  144:9 154:14,18
  154:21 161:23
  162:1 164:1
  175:13,15 181:10
  189:3 193:12
  196:13 201:9,10
  228:3 230:4
  237:20 241:12
  262:24 263:16
  267:13
evident  148:14
exact  105:17 190:1
  190:6
exactly  16:8,12
  18:13 50:15 93:8
  99:6 110:1 157:9
  180:10 185:19
  196:7 240:9,20
  274:20
examination  4:4
  7:5 8:10 202:16
  202:18 210:15
  229:1 259:15
  268:1 275:7
  276:18 279:9
examine  211:23
examined  7:3
  262:5
examiner  74:20
example  62:2,15
  86:25 87:4,7 94:4
  96:10 99:17
  111:22 122:22

123:15 124:24
  151:2 152:8,10,13
  189:16 202:13
  203:17 205:9
  206:15 209:2
  210:14 239:3
  264:20 265:14
  266:17,20
examples  207:5
  265:4
exception  9:9
  68:10 149:10
exceptions  87:6
excerpt  228:4
excerpts  228:16
excluded  27:3
  31:13 33:19 35:11
  35:11,20 37:20
excluding  76:15
exculpate  119:21
  120:5
exculpatory  86:8
  88:12 217:2,14
  250:13 253:4,5
  255:2 256:19
excuse  58:22
executed  283:10
execution  282:14
  283:19
exhibit  4:11,12,13
  4:14,17,19,20,21
  86:3 110:14,16,17
  110:20,22,22,24
  111:2 138:8,11
  227:23,25 228:2,4
  228:8,9,13,15,23
  240:15,19 274:8
exhibits  4:10
  110:10 227:22
  228:16 240:15

existed 192:6,17
existence 229:9
existential 264:22
existing 65:9
exonerate 89:1
96:8
exonerated 40:14
40:19 41:4
expand 166:25
expeditious 93:2,9
93:22
expenses 15:4
experience 73:10
104:22 147:13
175:12 176:24
188:22 225:19
226:5 237:25
experienced 199:8
199:23
expert 15:18 21:17
45:14,21 46:10,14
46:16,24 48:12,25
49:3,11,20 50:2,17
50:21 73:4,11
75:16 77:21
108:22 225:25
226:8,14 227:24
231:13 234:21
235:4 242:18
273:22 274:5,8
expertise 222:11
222:20 229:15
231:17
experts 225:3
expiration 282:19
283:25 284:25
explain 16:4 63:1
72:22 194:17
204:23,24 210:12
explained 99:6

explaining 148:13
express 259:20
expressed 225:3
extenuating
114:13
extremely 101:12
170:1 180:22
eye 122:23,23
124:24 125:3,4,10
130:4
eyes 123:16,18
124:12
eyewitness 4:15
50:17 100:23
101:2 107:23
108:15,23 109:3
110:4 111:5
138:14 171:11
198:4,21 228:3
eyewitnesses
101:6 184:8

**f**

fabricate 86:18
262:24
fabricated 86:22
fabricating 263:16
face 123:4 277:7
facial 96:17
170:14,15
fact 41:3,13 94:16
133:25 181:6
184:10,12 186:1
195:5 202:14
217:5,11 223:1
230:19 231:2,7
232:10,12 234:24
238:3 240:25,25
244:6 254:19
261:12 276:4
factor 41:14
234:15 238:22

factors 101:21
180:5 240:6,7
facts 41:20 42:6
79:24 229:10
233:14 260:3
factual 41:25
79:22
failed 120:2 250:8
failing 145:14
263:16
failure 230:1,7
fair 9:5 12:2 84:9
97:2 100:21,22
102:12 116:18
117:2 120:22
121:1,3 124:19
128:8 144:10
149:3 153:5,8
170:11 189:13
262:10 264:17
266:18
fall 223:12
fallible 100:24
106:17
false 87:1,16,21,25
88:3 139:19
falsely 89:2
familiar 94:23
154:3 167:7 173:9
family 158:20
182:14,15
famous 29:8 46:6
far 35:19 45:25
46:14 106:19
107:17 124:14
139:25 144:22
146:10 163:21
185:23 186:8
188:16 208:15
fast 108:3 113:22
121:14 184:23

201:6
fbi 28:18 29:24,25
30:2,15,17 53:17
feature 116:13,18
features 116:10,16
170:16
february 280:5
281:4
federal 1:19 22:3
28:3 42:21 43:18
45:15,23 46:1,13
48:15 76:16
223:17 226:6
feet 271:10
female 34:9
124:10
fence 16:10
fication 125:25
186:8 191:23
fiedler 192:19,25
193:2,4,12 232:12
232:21 233:4,12
fiedler's 193:7
field 161:5
figure 21:13 67:19
106:22 266:6
file 11:6 74:19
75:3 76:21 77:13
85:10,14,19,22
86:4,7 92:1,2
156:14 160:15
221:16 223:11
228:18 250:21
253:12 256:15
257:3
filed 5:17 40:21
221:11
files 78:9 146:22
161:6
fill 189:25

**filled** 66:6,10
  173:16
**filler** 94:24 95:3
  96:3,22 97:15
  121:7,23 122:17
  122:25 129:13,19
  130:1 136:10
**fillers** 95:2,25 96:1
  96:12 97:10 98:5
  98:16 99:2,5
  103:7 111:23
  112:11 113:18
  115:20,25 116:5,9
  116:17 118:13,24
  119:6 121:14,15
  121:24
**final** 194:6
**finally** 125:3
**financially** 6:1
**finch** 2:4 6:13,13
**find** 80:7,25
  100:20 118:13
  136:1 148:15,22
  149:7 170:9 210:5
  230:13 281:11
**finding** 99:4
**findings** 193:21,25
  194:11,21 195:3
**fine** 10:22,22
  21:10 33:3,4
  44:22 79:6 227:11
  235:7
**finish** 8:10,12
  227:5
**finished** 159:16
  229:22
**fire** 271:22 272:2
  273:3,5
**firearm** 151:20
**fired** 28:13 29:2
  29:18 180:17,19

**fireworks** 189:19
**firm** 5:22,23 18:16
  18:18
**first** 7:3 22:1 24:8
  38:15 51:11,16
  53:2,12 76:9,9
  90:11 96:10
  113:10 117:23
  139:10 141:14
  142:18 156:13,16
  157:25 165:12,13
  168:4 186:22
  188:9 191:2 195:2
  215:18 216:25
  220:3 231:7
**fischer** 55:21
  56:17
**fit** 115:20,25
  118:25 119:7
  134:23
**five** 10:19 16:25
  18:1 21:18,21,22
  66:21 67:20 103:7
  111:23 121:7,14
  121:24 129:13
  156:10 218:18
  226:25 240:5,7
  269:5 278:1,7,8
**fleeing** 190:7
**fleeting** 190:7
**floors** 98:20
**florida** 14:11,13
  45:15,17 48:16
  51:15,18 53:8,11
  53:14 60:3,6,20,22
**focus** 11:25 188:6
**foil** 95:3
**foils** 95:1 100:1
**follow** 121:22
  216:1 268:3

**followed** 206:4
  207:8,16 211:4
  215:22 216:16,17
  216:20
**following** 62:18
  73:20 253:22
  278:3
**follows** 7:4
**foolhardiness**
  202:21
**foot** 180:23
**force** 69:8 220:14
**foregoing** 279:12
  282:13 283:18
**forehead** 96:18,21
**foremost** 261:22
**forensic** 82:7
**forensics** 246:3
**forgot** 198:18
**forgotten** 110:22
**form** 10:6 12:16
  26:18 41:16 42:4
  42:9 47:23 48:4
  57:12 59:15 68:25
  69:23 70:24 71:1
  72:2,8 74:12 75:5
  78:11 80:16 83:19
  84:10,22 85:11
  86:12 88:20 90:16
  98:7 102:25
  104:19 105:12
  106:14 107:6
  112:2 115:9
  117:14 120:9
  121:8 122:1,19
  123:19 124:20
  131:7 139:21
  140:24 141:19
  144:11 146:1,9
  149:4 151:25
  164:5 169:19

171:25 175:6
  177:3 181:22
  183:14 187:24
  190:14,21 191:16
  192:7,11 196:16
  197:19 198:6,12
  207:18 213:10,19
  215:1 218:11
  221:13 222:9,18
  223:5,19 226:3
  230:3 232:6
  233:16 234:8
  239:19 241:16
  242:1,7,15 243:12
  243:17,25 244:11
  244:15 246:5,9,19
  247:7,12,19,25
  248:8,14,20,25
  249:5,12,19,25
  250:5,10,15,22
  251:4,11,16,21
  252:1,6,16 253:1,6
  253:13,18,24
  254:4,9,16,22
  255:4,11,19
  256:11,16,21
  257:4,9,16,22
  258:5,12,19,25
  259:22 260:5
  261:5 262:12
  263:3,21 264:3
  265:20 267:10
  272:13 273:21
  275:12
**formal** 174:7,18
**formally** 196:12
**formed** 133:25
**former** 232:13
**forming** 57:18
  76:12 260:4

forms  246:2
formulating  274:3
forth  147:11
forward  102:3
  194:13 220:22
  281:15
found  39:11 41:6
  41:14 144:16
  161:3 223:17
  231:3 233:14
  241:22
foundation  69:1,6
  69:23 72:5,9
  74:12 75:6 88:21
  90:17 98:8 104:20
  107:7 121:9 122:2
  123:21 136:11
  149:5 164:5
  169:20 172:1
  177:4 191:19
four  16:25 66:23
  66:24 121:11
  174:6,14,22,24
  176:10 180:17,19
free  282:14 283:20
frencshun  242:4
  251:9 272:20
frequent  32:14
  135:23,24
friends  55:24
frightened  105:16
front  43:24 72:21
frowned  265:12
functioned  65:3
further  89:23
  114:8 124:25
  136:8 184:25
  185:1 200:10
  227:20 259:3
  274:21 277:12,14
  278:3

future  47:22 48:3

**g**

galexakis  2:8
gamut  81:22
  206:10
gang  132:21
  144:10 157:21
  158:2 176:4
  217:25 218:1,2,3,5
gangs  50:21
gap  189:11
gas  101:25
gather  56:23,24
gathered  31:4
gathering  80:24
gation  23:9 85:5
  88:19 201:22
  211:10 213:5
  215:14
gations  56:2
  126:11
gative  206:13
  219:18 256:15
  257:3 266:15
gauge  106:22,25
general  22:25
  29:20 30:25 37:1
  48:15 88:15
  101:18 121:5
  122:12 124:5
  130:13,24 131:6
  132:7,10 153:15
  183:8 193:16
  212:10 226:1,14
  243:1
general's  37:9,12
generalities  190:5
generally  50:9
  75:23 89:19 94:20
  94:21 95:7 105:4
  113:20 115:20,25

116:4 118:15,24
119:7 122:4
126:24 127:14
128:20 150:10
160:1 170:16
171:16 175:18
200:2,3,7,21
201:25 202:4,7,11
202:17,24 203:1,5
203:8,9,14,22,25
204:8,15,22,25
205:5,8,9,11,13,14
206:10,12,17,20
206:22 207:1,25
208:20,23 209:6
210:6,15,16,19
211:12,18,19
212:4,17 219:12
219:17,22,23
221:20 223:12,14
226:13 229:14
241:19,24 242:5
242:13,21 243:10
243:16 244:14,22
245:19 246:7,17
247:10,23 248:12
249:3,17 250:25
251:14 253:16
254:7 255:9 257:7
258:9 260:10,18
261:1,19 262:1,15
262:17,20 263:12
263:18 264:9,9,12
264:15,19 265:5
265:10,10,17,23
265:25 266:1,6,9
266:14,15,22
267:1,5,16,19
gentleman  32:13
  32:16

genuine  91:13
george  143:16,22
  144:19 145:10,13
  154:14,22 161:18
  161:19,24 176:3,9
  196:21,24
georgia  2:5
getting  97:12
  142:6 163:10
  178:21 194:5
  216:25 217:15
  225:23
gillespie  35:23
  36:2,9 37:19
  38:10
girl  39:2
girlfriend  39:13
  198:1 216:6
  236:25
girlfriends  145:5
  236:23
gist  25:21
give  22:25 23:17
  24:9 25:5 30:3,20
  31:3 32:7 33:25
  34:14,16 36:1,23
  37:1 38:22 42:19
  43:1 56:25 57:3
  59:9 73:11 84:12
  95:21 102:4
  109:15 126:16
  131:13 132:20
  133:5,10 135:19
  189:6 194:24
  206:2,24 229:21
  232:17 265:14
  275:2
given  16:21 18:9
  19:17,20 33:11
  37:3 38:5 45:7
  57:1 65:7 85:21

88:25 92:23,23
102:1 103:1,5
114:23 120:24
128:10 277:25
279:17
**gives** 84:13 90:24
**giving** 106:3
226:14
**gleaning** 174:20
**go** 5:12 15:4,9,11
21:3,15 31:2,10
37:5,10 40:12
48:8 57:21 60:17
63:5 64:19,22
66:13 67:10 68:17
70:6 71:9 72:11
73:15 76:24 77:2
77:18 81:18 92:13
92:17 95:7,11
99:4,8,10,22 100:7
102:5,7 103:18
109:9 110:3,7
114:7 124:25
129:16 131:21
132:2 138:18
146:12 150:20
154:24 155:8
168:17 173:1,6
179:24 180:8
190:3 198:16
210:6 216:15,24
220:21 221:1
222:4 229:19
236:22 268:9
274:25 276:13
277:19
**goal** 80:11 93:23
97:3 114:12
118:17,17
**goals** 93:10

**goatee** 96:15 97:7
97:8,11,15,20
**goes** 15:15 182:10
183:2
**going** 5:2 8:2,7,8
9:3 20:22 21:3,4
23:11 24:11 30:8
32:25 34:12 38:13
48:8,9,18 56:25,25
57:3,19 58:1,19
63:3 69:8,9 74:9
79:7 95:5 96:12
97:14 99:23,24
103:8 110:7,10
113:6 116:20
120:20 122:24,25
123:2,2 124:8,10
124:11,12,13
126:14 127:8,18
127:19 128:23
129:16 131:20
138:1,18 148:12
150:18 157:13
159:3,10 164:23
165:3,11 167:21
172:14 174:3
177:15,21 178:24
178:25 184:17
188:13 189:13
191:25 194:25
197:22 199:5
200:18 201:6
208:22 214:10
215:7 227:13,20
228:14 232:17
235:4 240:5 241:1
252:8 262:14
268:22 269:2
**good** 5:1 7:7,8
55:24 106:18,23
106:24 141:23

148:21 187:7
201:22 259:7
264:20
**gotten** 34:4
**government** 60:13
60:21
**graduated** 64:14
**grand** 88:1,4
218:21
**granddaughter**
38:25
**grandmother** 39:6
39:14,17
**granted** 45:14,21
46:10,14,16,24
48:11,25 49:19
**grapher** 79:6
**great** 9:13 130:22
130:22 165:6
277:22
**green** 123:16,17
**gregory** 1:7 3:7
6:17 11:21
**grenshaw** 197:3,6
**ground** 8:1 270:7
270:10
**group** 12:3 24:6
53:14 120:25
128:11
**grove** 28:3,20
29:13 44:18 280:4
**growing** 128:11
**guarantee** 182:14
**guess** 66:25 67:24
90:20,22 102:17
102:17 136:22
161:7 163:16
180:9 193:16
196:11 201:6
**guessing** 72:19

**guide** 4:16 111:10
**guidelines** 112:22
121:22 129:9,17
200:15 219:21,22
**gun** 151:7 180:20
182:19 183:1,25
271:1,1 273:16
**gunfire** 178:1,8,22
178:24 179:9,16
179:21
**guns** 181:7 184:8
**gunshot** 269:9,11
**gunshots** 180:17
180:19 269:19,21
**guy** 269:15 270:14
271:10 273:13
**guys** 269:16,18,23
270:18 273:8,9

**h**

**h** 7:14
**habeas** 241:11
**hair** 96:17 165:9
166:19,22,22
167:3,6,13 170:14
173:17 275:24
276:8,23
**haircut** 166:6
**hairstyle** 165:15
165:19 168:6
170:17 173:12
174:1
**hairstyles** 169:15
169:25 170:15
**half** 11:13
**hall** 168:19
**hamper** 106:1
**hand** 101:10
182:20,23 184:21
270:21 280:4
**handful** 227:1

**handle** 68:15
126:16
**handling** 67:6
**hands** 67:13
270:24
**hang** 72:6,6
184:17 192:10
198:9,9 199:4
263:24,25
**hanging** 167:12
**happen** 71:11
176:25 177:5
**happened** 71:20
175:19 181:21
184:11,12 187:20
189:11 190:12
218:8,15 219:1
**happening** 184:20
184:23 273:7
**happens** 163:9
189:2 221:25
**happy** 204:21
205:22 214:22
**hard** 63:1 77:10
77:17 106:20
108:3 113:22
121:13 147:6
**harris** 13:16
**hat** 184:17
**hate** 95:5 96:4
**head** 8:20 144:15
273:14,16
**headlines** 29:1
**headquarters**
99:18 177:15
**heads** 171:17
172:8
**hear** 16:23 179:20
208:12,16 234:10
272:25 273:2

**heard** 27:21 71:23
147:16 157:15
159:24 178:21
180:17 269:9,10
269:19,20 273:3
**hearing** 120:18
170:3 220:21
221:5,24 222:5,8
223:11
**hearings** 221:20
**hears** 178:23
**hearsay** 237:7
**heart** 65:5
**heavy** 67:22
**height** 105:3,8,10
105:17 106:6
140:4 141:7,21
**heightened** 178:9
178:22
**heights** 104:24
139:6,19 140:22
142:7
**held** 5:20
**help** 21:7 84:17
**helped** 56:7
**helpful** 37:15 79:4
130:15 137:19
159:2 217:4
**hereto** 279:25
**hereunto** 280:3
**herring** 172:10
**hey** 227:6
**hide** 217:13
**high** 94:6
**highlight** 48:18
76:22,23,25
78:10 113:4
119:17 224:21
**highlighted** 76:25
146:15 156:7
193:19 204:12

**highlighting** 77:6
77:7 156:6
**highlights** 77:2,3
**highway** 186:14
**hinged** 36:8
**hired** 13:25 45:12
47:20,24 52:1
59:2
**hispanic** 182:4,9
182:13,16,16
183:12,16,19,22
**hold** 192:10
270:25
**holding** 50:16,20
**holiday** 65:23
**holmes** 2:3
**home** 32:9,9,14
39:1 60:18 81:20
176:21 177:6,11
177:17
**homicide** 13:1
14:6,14,23 15:18
16:3 22:19 23:24
45:16 46:15 48:12
48:19,20,21 49:14
49:20 50:1,4,14
52:4 55:12,13,14
56:10,18 58:21
61:6,14 62:16
64:5,22,23,23
65:19,19 66:20
67:17 68:15 70:14
72:18 80:4,12
81:3,9,13 82:1,6
82:10,19 83:2,16
84:20 85:3 87:9
88:18 89:1,7 91:8
91:10 127:14
139:25 140:15
146:17,22 147:1
147:14,20 148:17

149:1 163:24,25
175:12,14 177:2
188:25 191:8,12
194:8 199:8,11,23
199:25 200:12
201:21 202:6,9,19
203:4,16 205:2
208:3,4,24 211:9
213:4 214:24
219:9 221:21
261:4,17
**homicides** 19:18
68:3,4,5,17 86:18
**homicidetrainin...**
13:12
**hope** 47:20,24
138:5
**hopefully** 21:11
**hour** 11:13 51:21
53:11 57:25
**hours** 51:23 59:16
**house** 14:8 15:3,15
32:12 197:2
**howell** 244:7
**huge** 81:22,22
95:10 96:17
186:12 190:16,16
213:4
**huhs** 8:20
**human** 179:25
183:5
**hunch** 92:14 104:3
**hundred** 77:14
**hungry** 239:5
**husband** 81:18
**hypnosis** 202:24
202:25 205:10
206:18 211:22
265:9,15
**hypothetical**
72:10 192:12

[hypothetical - independent]

264:4

**i**

**ia** 69:9,25
**iac** 109:3
**iacp** 52:20 54:8,10
54:13,16 55:1,2,3
108:18,18,25
219:21
**idea** 47:25 75:7,10
194:18
**ideal** 114:21
118:16
**ideally** 114:10
129:11 220:12
**identi** 125:24
186:7 191:22
**identical** 140:22
220:3
**identifi** 36:8
183:10
**identification** 4:22
32:22,23 39:21
95:11 101:20,22
103:25 108:8,20
108:23 109:4,16
111:6 113:9 114:5
115:6 117:25
118:18 119:20
125:17 126:10
143:3 171:1
178:18 180:3
181:19 182:11
184:14 186:24
187:2,3,9 188:9
189:8 191:3,14,15
200:15 211:17
222:25 224:8
230:15 234:4
239:24 241:4
252:4,9,13

**identifications**
50:17 100:24
101:2,7 107:23
108:15 109:1
174:12 177:22
221:8 223:2
**identified** 86:4
89:15 90:2 91:1
142:24 143:5,7
164:24 174:7
198:5,22 235:16
251:20
**identifies** 39:4
90:11 142:22
**identify** 21:25
91:4 93:3 95:25
101:14 102:6,9,14
102:19 103:17
108:13 119:22
120:6,24 128:6,10
141:17 142:7,12
157:2 170:14
209:9 214:23
217:6,7,9,17,23
248:18 250:8
251:24 260:18
**identifying** 40:13
89:14 102:20
103:21 201:13
**identity** 161:11
**ignition** 85:1
**illegal** 262:17
263:11,12 264:10
264:11,11,15,19
264:25 265:2,19
265:24 266:2,8,16
267:6,15
**illinois** 1:1,17 2:6
2:14 3:4 5:18 28:4
43:19 155:13
241:2 246:2 279:6

280:4
**impacted** 215:13
**impart** 194:19
**implicate** 96:9
**implicated** 162:4
**important** 8:15
23:11 80:25 81:4
81:24 84:7,16,19
85:4 89:11 91:24
107:12 129:2
164:1 169:16
179:11 186:1
**impossible** 209:7
**impounding** 201:9
**impression** 184:24
**improper** 30:12
87:3,5
**improperly** 47:4
**inability** 118:13
**incident** 170:20
186:16 191:24
**incidents** 177:25
**include** 68:3 82:1
82:6,11 86:8
96:16,22 97:22
98:4 113:8,13
114:4,12,23 115:5
117:24 134:3
135:12,20,22,23
149:2 200:25
201:23 205:5
207:25 208:23
209:6,6 258:10
261:14
**included** 10:7
75:24 78:15
113:17 131:14
134:17 135:5,16
136:5 137:1,14
161:14 163:14
217:2,5,12,18

218:9 228:18
233:24 235:4
242:17 248:23
250:3,20 252:24
253:11 256:14
257:2 281:13
**includes** 74:19
82:22,24 118:5
173:12 265:18
**including** 48:14
76:12
**inclusive** 194:17
**income** 14:16 15:1
15:8,17,24 16:1,10
16:14 17:8,20
18:2
**incomplete** 72:10
192:11 264:4
**inconsistent**
112:21 113:13,22
114:22 115:23
117:17 118:6,21
120:11,12 263:18
**incorporate** 96:18
**incorporated** 55:5
59:24 283:12
**incorrect** 25:18
140:6 181:20
182:22 200:19
**increases** 103:21
179:16,21
**inculpatory** 86:9
**incumbent** 194:20
**indecipherable**
57:8 69:16 72:3
115:1 209:18
236:13 237:10
238:14 246:20
263:1,22
**independent** 213:7
232:23 233:6

**index** 4:10
**indiana** 22:4
**indianapolis** 22:4
  22:8
**indicate** 133:15
  134:6,16 167:15
**indicated** 30:11
  197:9
**indicating** 281:13
**indirectly** 12:13
  134:21 280:1
**individual** 6:16
  9:18 11:25 12:1,6
  12:13 22:14 30:14
  89:12 90:11 93:4
  101:16,16 106:21
  123:16 136:16
  152:9 169:8 171:3
  174:13 177:11
  182:9,19 183:25
  256:10
**individually** 95:12
**individuals** 12:3
  24:7,7 42:2 97:9
  100:6,20 125:6
  167:15 169:16
**indulge** 110:11
**ineffective** 223:18
  223:23 224:16
  229:25 230:14
**inevitable** 213:18
**inexplicably** 221:7
**infective** 223:22
**inferred** 134:23
**influenced** 107:4
  107:17
**informant** 102:2
  103:5 104:8,10
**information** 4:19
  64:4 84:1,20 86:8
  86:9 87:10,17

88:12 91:16,16,20
92:22 102:3 104:2
104:7,9,10 106:4
136:6 140:1
143:11 144:2
147:14 162:24
163:4,19 173:25
174:21 197:14
216:10,12,21
217:2,4 218:4,9,17
218:23 228:10
243:21
**informed** 234:6,12
  235:1
**initially** 51:14
  90:25 177:25
**initiated** 54:12
**innocent** 41:6,14
  93:5 119:21 120:5
**ins** 100:2
**insisted** 40:10
  42:12
**instance** 68:11
**institute** 4:14
  51:21 52:1,21
  53:18 54:11
  107:22 108:12
**instruct** 13:25
**instructing** 51:16
  119:13
**instruction** 53:1
  120:3 125:17
  241:3
**instructional**
  125:24
**instructions**
  119:19
**instructor** 51:1
  53:2,6,7
**instructors** 13:16
  13:22,24

**intelligence**
  229:11
**intended** 172:11
**intention** 178:14
**intentional** 183:5
**inter** 26:19
**interest** 140:5
**interested** 6:1
  22:12 28:21
  167:20 280:1
**interesting** 28:9
**interfere** 5:8
**interference** 5:6
**intermingled** 54:9
**internal** 68:19,23
  70:6,22
**international** 52:1
  108:18,21
**interrogating**
  201:16
**interrogation**
  161:6
**interrupt** 137:8
  168:23
**intertwined** 34:19
**interview** 62:12,13
  63:10 145:4,18,22
  157:6,20 159:18
  177:1 225:11
**interviewed** 45:2
  62:13 64:15
  172:16 176:14
  216:4 218:19,19
  242:4,11,20
  244:21 245:18
  248:4 249:9
  255:17,18 256:6
**interviewing**
  177:9 201:11
  214:11 248:13

**interviews** 216:22
**intimidated**
  188:24
**intimidation**
  188:23
**introduce** 148:7
  148:19
**introduced** 267:8
  267:13,20
**invalid** 123:25
**invalidate** 120:14
  120:15,16
**invasion** 32:10
**invest** 233:2
**investi** 23:8 56:1
  85:4 88:18 126:10
  201:21 206:12
  211:9 213:4
  215:13 219:17
  256:14 257:2
  266:14
**investigate** 230:1
  230:7
**investigating**
  86:18 144:3 157:1
**investigation** 25:8
  37:1,2 40:1,7,8
  41:9,10,15,21,23
  42:7 50:3,13,14
  51:2,16 53:15
  56:1,19 68:23
  69:9 70:23 80:5
  80:12 81:3,6,9,14
  81:16 82:1,2,6,7
  82:11,11 83:3
  84:17 85:3,9 89:7
  91:7,11 92:12,21
  93:22 104:14
  106:1 125:19
  126:2 147:20
  148:1,17,21 149:1

149:2,11,13
162:18 163:25
189:1 194:8 199:9
199:24 200:12
201:22 202:6,10
202:19 203:4,21
204:2,6 207:23,25
208:4,18,22,24
209:5 210:23
212:21 213:18
214:14,25 219:10
221:21 232:4
233:2 235:15
241:13 261:4,17
261:18
**investigations**
46:15 49:17 50:10
51:22 52:5 53:3
55:14 61:6,13
62:1 67:5,17 68:3
69:25 70:2,12,19
81:11,12 82:19
125:18,25 189:1
200:25 203:16
205:2,2,4 208:5
209:4 211:1
**investigative**
45:16 48:13,13,15
48:21 49:4,12,21
49:25 63:6 85:10
85:18 86:4,7
110:13 136:12
156:14 200:4,8,22
202:1 203:22,25
204:9,16 205:1
207:6 209:9 210:7
210:16,20 211:12
212:9,16 215:22
215:25 219:13
245:13 250:20
253:12 260:11,19

261:2,20 262:21
263:19 264:16
265:6,18 266:7,16
**investigator** 22:19
36:17,19 46:8,21
61:19 62:5 68:13
80:22 83:14,15,17
84:8 92:17,22
106:24 111:14,18
114:3 118:5
119:18 120:2
127:5 149:8 199:8
199:23 266:22
**investigators**
28:19 43:15 50:3
61:17,22 66:22
67:5 83:25 85:19
140:16 145:4,23
150:7 162:19
199:11 215:20
219:10
**invoice** 47:18
**involve** 49:21
**involved** 19:22
23:6 25:2 29:25
30:15 32:1,5 34:5
36:11 40:1,22
43:14 45:4,4 50:7
55:15,25 56:16
62:19 70:14 89:2
147:13,25 158:6
158:11,22 162:2
170:24 208:19
212:25
**involvement** 29:13
144:21 146:21
**involves** 61:14
130:7
**ipi** 4:21 241:4
**issue** 45:5 159:1
226:22 230:20

**issued** 75:16 76:6
144:2 229:16
246:14
**issues** 45:1,4,4
232:4
**issuing** 201:12
**italian** 182:13,14
182:16 183:13,17
269:15 270:14
**item** 74:18 77:20
211:23 239:6
**items** 11:10 73:25
201:10 213:6
261:3

**j**

**jack** 7:9 227:6
268:13
**jackson** 145:19,22
245:18
**jail** 40:12 98:21
**james** 1:7 3:7 6:17
11:21 247:4
**january** 1:18 5:3
**jbltd.com** 3:5
**jeff** 13:15
**jim** 174:5
**jimenez** 43:18
44:9
**job** 12:23
**john** 2:3 6:9
**johnson** 3:3 18:16
**joined** 65:12
**jones** 1:7 3:7 6:17
11:21 31:19 32:11
32:17 33:10
**jorge** 71:17,22
**joyce** 242:12
**jtheis** 2:7
**judge** 27:6 31:8
33:14 35:14,17
37:20 57:1 71:17

72:1,16,21 120:17
150:4 170:3
218:20 220:16
222:1 273:6
**judge's** 71:21
**july** 155:3,23
156:9,21 157:6
159:18 189:18
241:21
**jump** 127:18,19
128:23 269:3
**junctures** 200:12
200:25 201:21
202:5 205:5 206:6
209:1 212:18
213:15
**juries** 147:23
**jurisdiction** 28:22
266:25
**jurisdictions**
266:23
**jury** 83:3,21,22
84:7 88:1,4 148:8
150:5 218:21
241:3
**justice** 4:14,15
107:22 108:2,12
**justify** 87:2 199:13

**k**

**k** 2:3 43:17 155:25
161:18 176:3,9
255:16
**kansas** 28:16
**keep** 58:1 155:7
167:21
**kenneth** 45:24,24
46:4,9 192:25
193:2 232:12
**keno** 156:1 157:15
159:25 197:10,12

**keno's** 160:6,9,11
**kenya** 249:10
**key** 112:7
**keys** 84:25
**kick** 177:16
**kill** 29:8 147:21
150:21 151:6,23
152:9 196:22
**killed** 32:15 34:12
81:20 94:5 145:10
151:14 156:1,22
157:17 161:24
**killer** 83:13
**kin** 201:14 206:9
**kind** 17:21 19:4
34:18 66:14 70:21
76:24 79:2 125:10
128:3 147:5
192:22 221:17
**kinds** 121:12
**kleszyk** 1:15 5:23
279:5 280:8
**knew** 32:10 78:18
**knife** 151:8
**know** 8:4,20,25
15:6 22:11 24:17
25:19 27:15,22
31:15 33:18 35:19
36:19 37:15 54:7
54:18 66:14 69:13
70:14 74:12,15
75:11 76:4 80:2
83:3,4,21,23 84:3
85:2 87:5 94:10
94:12,13 97:6
101:22 102:19
106:9,20 117:16
124:7 126:12
131:8,9,18,25
138:5 144:1,22,22
146:10 147:23,24

147:25 148:9
149:20 150:4,5,6,7
151:15 155:18,21
156:5 159:21
160:12,24 163:21
164:18 165:12
166:19 174:10,16
174:17 175:10
176:12,18 178:13
183:19 185:21,22
185:25 190:9
195:20 197:8,22
197:25,25 198:1,8
198:24 206:22
207:14,22 208:15
210:11 214:2
215:4 220:24
221:2,19,25,25
222:22 223:24
224:5 226:11
232:3,22 233:13
267:14 275:14
**knowing** 186:8
**knowledge** 262:16
**known** 13:1 32:25
46:7 65:20 88:9
132:21 134:7
135:24 144:19
157:16 159:25
165:9 196:21
197:13 201:16
210:25 217:12
**knows** 83:13
**kosoko** 3:3 4:6
6:15,15 10:6,10,14
12:16,18 26:2,18
41:16 42:4,9
47:23 48:4 57:7
57:12 59:15 68:25
69:6,22 71:1 72:2
72:5,8 74:11 75:5

76:3 79:5 80:14
80:16 83:19 84:10
84:22 85:11 86:10
86:12 88:20 90:16
98:7 102:25
104:19 105:12
106:14 107:6
112:2,4 115:9
117:14 120:9
121:8 122:1,19
123:19,21 124:20
131:7 138:8,10
139:21 140:24
141:19 144:11
146:1,9 149:4
151:25 164:3,5
169:19 171:25
172:3 175:6,9
177:3,12 181:22
183:14 187:24
188:7 190:14,21
191:16,19 192:7
192:10 196:16
197:19 198:6,9,23
207:10,18 213:10
213:19 215:1
218:11 221:13
222:9,18 223:5,19
226:2 227:4 229:2
230:5,12,18,24
231:6,14 232:1,9
233:18 234:1,11
234:22,23 235:7
235:12,20 236:1,8
236:20 237:14,19
238:2,9,21 239:2
239:10,18,21
240:3,14,22
241:17 242:3,10
242:19,24 243:5
243:14,20 244:3

244:12,20 245:1
245:11,17 246:1,6
246:13 247:2,9,15
247:22 248:3,9,17
248:22 249:2,8,16
249:22 250:2,7,12
250:19,24 251:7
251:13,19,23
252:3,10,18 253:3
253:10,15,21
254:1,6,12,17
255:1,8,14,23
256:5,13,18 257:1
257:6,12,19 258:1
258:8,15,22 259:3
259:7,22 260:5
261:5 262:12,25
263:3,21,24 264:2
265:20 267:9
268:2,10,13,14
271:5,6,18 272:15
274:1,7,14,16
275:12,19 276:15
276:19 277:3,12
277:14,18 278:13
278:14 281:5
**kosokoa** 3:5

**l**

**l** 1:15 279:5 280:8
**l.a.** 85:14
**lab** 64:3 155:14
201:10
**lane** 186:12,13
**large** 61:8,9
**larger** 62:10
**largest** 59:19,22
**late** 66:8 128:1
**latitude** 116:5
**law** 4:16 14:8
18:16,18 31:1
47:4 51:15 53:12

60:23 112:17
146:21 251:15
265:3
**law.com** 2:7,7,8,8
**laws** 203:9
**lawsuit** 11:20
71:13
**lawyer** 222:20,21
**lay** 220:7
**lead** 46:8 67:9,12
67:14,15,20,21
68:6,7,12 92:21
149:11 216:15,25
217:10 224:11
229:10
**leader** 143:24
176:4 197:17
**leads** 215:21,22,25
216:3,16,20
219:18
**learn** 189:23
**learned** 160:6,9,10
**leave** 52:23 62:17
62:17,18 79:24
**leaving** 216:10
**led** 41:10
**left** 48:19 216:8
269:12,14 272:12
273:10
**legal** 3:12 14:10
72:9 78:24 108:4
112:17 121:18
146:16,25 147:10
147:10 149:16,17
149:22,23 169:20
172:3 191:20
198:13 205:19
212:3 221:14
222:10,19 225:2
230:6,11 231:22
232:4 236:10,17

237:12,24 238:8
238:13,25 239:8
239:18 240:10
245:7 250:17
253:8 255:5
256:22 261:23
262:10,15 264:5
265:7,11,19
266:23 281:1
284:1
**legality** 203:9
205:20 261:22
**legally** 148:6
219:11 225:7,22
265:11
**length** 260:10
**lesia** 22:2,18
**letter** 281:19
**level** 226:6
**levels** 152:20
**levied** 70:6 174:19
**lewis** 13:15
**library** 43:24
**license** 279:6
280:9
**lieutenant** 62:25
65:4,4,8,17,21,22
65:23 66:1,8,9,11
66:12,12,18 71:5
**limit** 35:18
**limited** 27:6 31:8
31:12 33:13 35:15
35:21 37:19 41:9
76:13 98:17,17
100:13,16 113:18
**line** 91:8 99:15
124:9 132:10
181:10 192:15
268:7 281:13
283:7 284:3

**lineup** 4:19 23:5,7
23:11,25,25 24:1
24:16,17,20,20,21
25:2,12,15,18,21
25:22,25 26:14,16
26:17 29:22 30:4
30:8 32:22 34:15
34:22,25 35:5
36:10 37:4 44:23
44:25 45:6,8
48:14 49:11 50:7
50:12 74:21 89:7
89:8,9,17 90:3,4
90:12,13 91:1
92:2,15 94:15
95:13,17,19 96:11
96:13,16,23 97:2,3
97:23 98:2,4,10,17
98:22,23,25 99:5
99:13,19,20 100:7
100:9,16 102:5
104:4,5 107:3,10
111:15,19 112:1
112:10,10,12
113:17,25 114:4
114:20 115:7
116:2 117:5 118:4
118:6,10,15 119:6
119:13,18 120:4
122:10,11 123:2
123:24 124:3
125:7 127:9,11
135:12 136:15
166:12 169:23
170:17 172:11
187:21 195:15
219:6,8 220:12,13
220:21 224:17,18
228:10 231:3,8
235:22 262:19,23

**lineups** 23:15 25:9
25:9 30:2 33:8
36:13 46:18 47:2
49:22 51:24 98:4
98:13 99:24
111:11 113:2
117:20 119:3
121:11,16 122:5
123:8 130:8 131:4
132:5,11 170:23
211:16 224:15
225:4,16 254:3
**link** 87:1
**linked** 133:16,20
133:23 164:21
**linking** 144:9
154:18,21
**links** 136:7
**lisa** 164:12 168:22
169:1 172:16
191:3 247:5
268:23 269:2
275:9 276:21
**list** 35:22 65:9
73:2 74:5,6,8
78:10,11 108:17
109:22 180:5
200:11,24 201:1
201:24 205:24
207:4 212:7,8
**listed** 13:16 21:21
73:8,25 78:5
108:20 111:13
119:16 178:16
186:5 205:6 206:5
207:16 208:25
257:13 283:7,17
**listing** 283:7
**literally** 15:20
259:5

**little** 16:5 59:14,17 60:1 95:21 97:13 99:4 128:4 130:8 134:7,9 146:13 155:25 157:16 159:1,25 201:6 257:21 271:2

**live** 4:19 23:15,25 24:7,16,17,19,21 25:2 44:24 46:17 46:18 89:8,9,17 90:3,3 91:1 98:10 98:13,16,25 99:5 99:13,24 100:15 107:3 112:10 117:20 118:4,10 118:14 119:3,6 120:4 195:15 219:6,8 220:12,20 228:9

**lived** 39:14

**living** 39:13

**llc** 14:7,8,9,25 15:9

**llp** 2:3,12

**locating** 201:15

**logistics** 220:14

**long** 10:18 25:13 27:21 39:3,9 53:9 53:9 58:22 63:16 70:12 126:21

**longer** 60:11,12 90:14 167:11 191:6,8,12,13,24

**look** 10:21 11:9 17:10 22:8,9 25:3 37:10 44:20 47:6 83:17 96:6 144:6 156:15 164:20 166:8 167:4 169:25 170:14,15 173:1 178:24

182:15,16,17 183:20 200:17 207:24 241:6 269:11

**looked** 25:20 27:24 41:20,21 91:18 185:2 186:10 269:13 272:11 275:19

**looking** 100:8 105:14

**lookout** 201:12

**looks** 157:23 166:5 166:13,15,18,22 173:9

**lot** 8:8 23:22 26:23 55:5 60:9 77:12 100:14 116:5 123:11,12 124:4 125:7 170:23 185:4 188:19 202:14 206:9 217:9 236:9 269:18

**louis** 33:22 34:10 37:7 42:21

**low** 166:6,22

**lying** 270:7,10,15 270:16

**m**

**m** 2:13 7:14,14

**madam** 281:10

**madame** 274:10

**madison** 2:5

**mail** 78:8

**main** 36:12 45:5 46:9 188:22 212:20,20

**maintains** 136:8

**major** 62:25 161:8 203:3 205:3

261:24 265:12 267:2

**making** 87:18 106:5 140:5 150:19 186:6 188:4 193:10 201:2 217:1 225:13,14 228:19

**male** 123:16,17 124:10 155:25

**males** 157:17

**malfeasance** 233:1 233:14

**man** 182:3,4,19 270:7,10,15 271:20

**mandates** 60:6

**manner** 33:8 45:9 111:15,19 225:4 225:16

**manson** 108:6 178:14 240:6 241:5,9

**maps** 76:15

**march** 64:14

**mark** 240:15

**marked** 4:11 110:16,20 111:2 228:8,13,23 240:19

**market** 239:6

**marking** 110:10

**material** 4:17 18:9 18:10,11 76:23 88:9 140:1 144:17 173:4 217:11

**materials** 54:20,23 54:25 55:4 56:20 57:2,5,17 73:16,20 74:1,7,10 76:11,15 77:5,9,18 78:5,6,8

78:15 130:10,11 276:21

**matter** 5:15 18:22 23:1 41:25 48:5 68:9 70:2 79:19 231:16 232:14 233:14 236:4 237:4

**matters** 16:18 23:6 279:11

**mayor** 60:13,14,15

**mccarthy** 270:6

**mcdowell** 134:18 135:6,17 137:1 164:12,16,25 167:16 169:1 172:16 181:14,19 181:20 183:10 185:23 187:10 191:3 192:3,14 234:6,12 235:16 239:23 247:5 268:6,23 269:2 275:9,22 276:21

**mcdowell's** 186:25

**mckay** 33:21 34:2 37:5 38:2

**mean** 18:11 24:19 24:21 40:11 45:19 48:24 54:1 57:1 63:2 70:4 73:8 74:12 81:15,18,22 84:24,25 85:2 96:13 100:3 101:12 106:17 108:5 112:14 113:24 114:11 116:3 121:12 122:21 123:1,25 124:10,13,23,25 131:19 134:13,20

141:6 146:21
147:19 150:25
160:25 164:7
169:2 170:1
173:20 174:23,24
179:1,19 182:13
184:9,9,20,22
189:18 190:3,4
194:20 205:17
206:1 207:22
210:11 211:13,22
214:13 216:4,14
216:14,18 218:14
218:16,18 219:20
261:11 264:10
265:2 266:6
268:10
**meaning** 178:8
184:7
**means** 82:16,17,23
116:4 147:3,3
150:9,17,21,23,25
151:1,4,8,23 152:2
152:3,6,11,15,17
152:18,20,21,23
153:11,13,17,19
239:22
**meant** 152:6
211:11
**media** 5:13 278:1
278:8
**medical** 74:20
**medications** 7:21
**meet** 9:17 10:3,23
263:16
**member** 68:7
158:20 217:25
235:2
**members** 47:21
158:2

**membership**
234:2,3 235:1
**memoranda** 76:13
**memory** 33:3
38:14 71:19 190:1
**men** 32:15
**mention** 26:7
99:23 107:8 135:7
155:2 156:17
205:25 211:3,3
213:2 221:4
224:14,15 225:22
**mentioned** 14:25
19:2 20:2 23:10
25:14 46:4 47:12
51:23 54:7 62:20
64:20 68:12 70:9
73:14 82:17 88:22
89:10,25 91:20
97:6,7 104:25
105:19 107:14
108:17,25 109:4
116:25 118:9
132:23,24 133:1
134:9 135:21
154:8 161:22
184:24 186:22
188:18 203:10
207:20 220:23
224:19 227:23
244:6 262:2
266:18
**mentions** 241:5
**merely** 30:1,18
114:8 136:9
**merit** 262:6
**mesh** 218:15
**meshed** 34:18
**message** 216:8,10
**method** 120:23
128:9

**metro** 125:19
**miami** 35:23 36:18
36:21 46:7,20
51:8 52:13 55:22
57:22 58:5,21
59:6,10 60:7,15,24
61:4,18 125:20
126:2
**michael** 3:12 5:21
160:7,10,11,14
161:17,18 162:2,6
195:6,13,24
196:14,24 197:13
198:3 250:4
**microphones** 5:4,8
**mid** 65:15 66:8
**middle** 51:3 113:3
173:10,13
**midwest** 281:17
284:1
**mike** 157:16
159:25
**million** 102:6
**mind** 171:10 227:6
**mine** 137:25
200:17
**minimal** 29:14
70:10
**minimum** 17:16
**minute** 127:19,23
128:16 226:25
227:7
**minutes** 10:19
259:5,6
**mirror** 24:3,4
**missouri** 28:16
33:22,24 37:12
42:21,22
**misstates** 112:4
207:10 215:2
223:6 226:2 230:4

262:13 267:10
**mistake** 183:17
184:2,4 214:4,7
215:7
**mistakes** 183:3,4
183:10 213:17,25
214:2,13,15,24
**misunderstood**
276:3
**mitigate** 123:7
**mo** 91:23,24 92:1
**model** 108:23,24
109:4
**moment** 48:11
227:20,21 229:21
232:17
**money** 17:14 29:6
145:14
**monheim** 1:13 4:3
5:14 7:1,7,14,15
7:18 76:11 79:15
110:12,15,19
111:1 126:19
130:6 159:10
198:17 227:24
228:1,7,12,22
229:3 232:19
240:18 252:21
259:17 263:25
268:4,16,24
271:24 272:18
274:17 275:9
276:20 277:25
281:8 282:4,9
283:4,13 284:20
**monheim's** 222:11
222:20 274:8
**monroe** 3:4
**month** 15:3 17:11
17:13 190:10,10
190:13,15,18

months 64:15
moore 22:2,18
morning 5:1 7:7,8
  10:17
mos 91:22
mother 14:8
  161:19
mother's 182:14
  183:21
motion 221:7,11
  222:2,13,14,15,17
  223:2,4,8,9,11
  224:7,10 230:14
motive 82:24,25
  83:2,3,4,5,12,13
  83:18,21,23,25
  84:2,3,11,12,13,15
  84:16 132:18
  140:9 145:10,13
  145:17,24 146:3,5
  146:7,13,17,23
  147:1,5,7,16,18,24
  147:24 148:1,3,4,6
  148:7,8,9,14,15,22
  149:2,7,9,11,13,21
  150:3,5,5,6 197:23
  197:23,24 236:9
  236:10 238:10,22
  245:2,3
motiveless 83:6
motives 146:17
  147:8 236:24
move 49:2 194:13
  234:21 240:13
moving 242:11
multiple 13:6
  103:20,20 147:8
municipalities
  59:24
murder 23:4
  34:17 80:7,8 83:6

85:15 87:1 89:3
  97:19 144:21
  149:20 152:3,14
  158:11,22 175:14
  191:2 199:9 200:1
  213:18 238:10,10
  241:23
murdered 39:16
  39:17 42:1
murders 28:21
  67:22
murphy 174:5
mustache 96:15
  97:7,9,11,14,20

**n**

n 2:1 3:1 4:1 7:14
name 5:21 7:9,12
  28:12 46:3 71:21
  72:17 88:24 92:20
  102:1,4,24 103:4
  158:1,13,24,24,24
  160:6,10,11
  192:23 255:21
  281:6 282:3,4,15
  283:3,4,21
named 93:11
  197:10
narcotics 32:14
  134:22 258:3
narrow 185:3,11
  209:22
natasha 248:4
national 4:14 29:1
  45:10 107:22
nationally 87:15
  88:5 147:11
  209:10,24 210:5
  263:17
natural 179:2
nature 180:1
  183:5

near 270:15
necessarily 120:15
  120:16 123:24
  169:22 261:11
  266:2
necessary 201:5
need 8:19 9:7 63:8
  95:24 110:9 137:4
  147:20 239:4
  241:20 259:4
needed 72:15
needs 81:9
neil 178:15
neither 236:2
  254:20
nephew 161:17
  196:25
never 35:20 70:13
  70:20 71:23 75:14
  75:15 83:11,14,14
  102:6,14 113:24
  123:9 131:23
  144:20 146:7
  155:16,19 162:6
  196:2,12 208:3,6
  208:18 221:25,25
  224:13 234:12
  235:1 265:24
  277:2
new 60:19,21 62:2
  66:12 132:22,25
  133:7 134:22,22
  138:8 143:24
  144:10,15 158:2
  176:4 197:17,18
  218:3,5 234:3,7,13
  234:25 235:2
  249:10 258:4
nickname 94:11
  94:12,18 133:16
  133:21,23 156:13

160:14 161:3,6
  235:14 236:3,3
  257:21
nicknames 161:5
niece 40:12
nij 109:19,25
  110:4 111:10
  112:16 113:24
  114:18,23 115:24
  116:16 117:12
  118:7 119:12
  120:7 200:14
  219:21 228:2
nine 19:12 61:3,5
  145:3 154:25
  155:10
nods 8:20
nomenclature
  173:19
nonbelief 133:11
normal 209:5
  223:10
normally 17:10
norms 132:10
northern 1:1 5:18
  28:4 31:21 38:18
  43:19
noses 124:11
notarized 281:14
notary 281:25
  282:10,18 283:15
  283:23 284:23
note 5:4 281:12
noted 243:6,6
notes 55:8 76:13
  76:20 77:5
notice 9:16 275:23
  276:8
noticed 21:7
noticing 6:8

**notified** 206:8
241:23
**notifying** 201:13
**november** 4:12
**nullify** 169:22
191:9
**number** 5:19
21:17 22:5 28:5
31:22 33:25 35:25
38:19 42:23 43:20
72:12 73:24 74:18
77:20 88:23 92:3
100:19 113:8
115:19 116:7,7
117:3,3,23 118:23
137:22 138:2
141:3,4,9,13,14
142:4,5,17,18
143:4,7 147:15
200:11 220:9
240:16 274:13,14
274:17 275:22
278:1 281:7,13
**numbered** 21:4,6
21:7,9
**numbering** 200:19
**numbers** 29:7
283:7
**numerous** 39:20
45:19,20 146:22
147:16 177:14
205:24 216:3,16

**o**

**o** 7:14
**oath** 5:25
**object** 10:6 12:16
41:16 42:4,9
47:23 48:4 57:7
57:12 59:15 68:25
69:6,23 71:1 72:2
72:8 74:11,11

75:5 80:14 83:19
84:10,22 85:11
86:10 88:20 90:16
98:7 102:25
104:19 105:12
106:14 107:6
112:2 115:9
117:14 120:9
121:8 122:1,19
123:19 124:20
131:7 140:24
141:19 144:11
146:1,9 149:4
151:25 164:3
169:19 171:25
175:6 177:3
183:14 187:24
188:7 190:14,21
191:16 192:7,11
196:16 197:19
198:6,12 207:18
213:10,19 215:1
218:11 221:13
222:9,18 223:5,19
259:22 261:5
262:25 265:20
267:9 275:12
**objection** 26:2,18
69:22 139:21
164:10 177:12
181:22 198:10
207:10 226:2
230:3,9,16,21
231:4,12,21 232:6
233:16,21,23
234:8,17 235:3,5
235:18,24 236:5
236:12 237:9,23
238:7,12,24 239:7
239:16,25 240:8
241:14 242:1,7,15

242:22 243:3,12
243:17,25 244:9
244:15,24 245:5
245:15,21 246:9
246:19 247:7,12
247:19,25 248:6
248:14,20,25
249:5,12,19,25
250:5,10,15,22
251:2,11,16,21
252:1,6,14 253:1,6
253:13,18,24
254:4,9,16,22
255:4,11,19 256:3
256:11,16,21
257:4,9,16,22
258:5,12,19,25
260:5 262:12
263:21 264:2,3
267:9 268:8
271:14 272:13
273:21 274:4
276:24 277:8
**objections** 6:6
198:23
**obligation** 92:11
215:11
**obtained** 89:23
143:11 208:2,6
213:3 216:9
**obtaining** 201:3
**obvious** 139:23
141:6
**obviously** 224:22
**occur** 50:4 145:25
180:24
**occurred** 19:18
28:22 52:12 70:15
102:10 174:16
186:17 190:9
194:13

**occurring** 49:24
**occurs** 49:1 89:18
**october** 64:13
**odd** 221:17,18
**odds** 103:8,18
**offenders** 243:2
**offense** 238:11
239:14 256:10
**offer** 55:7 98:22
131:3 132:3,16
**offered** 41:24
**offering** 225:25
**offhand** 50:6
154:20
**office** 11:8 37:9,12
58:11 60:8 64:4
198:14 231:19
**officer** 14:4 22:23
29:2,17 44:3,4
49:19 55:15,25
56:16 61:20 62:4
70:10 71:11,24
85:24
**officers** 1:7 6:16
22:14,18,22 28:10
32:1,3,5,6 39:25
40:2,22 43:13,14
48:3 88:8 99:17
157:1 182:5,25
184:4 209:23
218:9 233:2,15
237:7 241:22
243:6 247:3
248:23 252:22
256:6
**offices** 60:4
**official** 14:5
282:15 283:21
**oh** 17:11 31:18
36:22 38:4 44:6
69:5 84:23 100:5

126:12 127:1
135:18,18 178:4
199:20 211:11
236:25
**ohio** 31:21 35:25
36:21 38:16,18
281:2
**okay** 8:6,15 9:12
9:13,24 10:20
11:5,14,19,24
12:25 13:5,15,21
14:1,1,11,13,22
15:13,16,24 16:9
17:2,25 18:6,10,15
19:25 20:2,13,15
20:19,25 21:3,11
21:14,20,24 22:20
22:25 23:10,17
24:16,22 26:6
27:2,11,15,18 28:1
29:15,19,19 30:10
31:7,18 32:7
34:24 36:22 37:14
37:17 38:6,13
41:7 42:19,19
43:1,10,16 44:11
44:14 45:13 46:23
47:2,7,12 48:8
50:11,16 51:6,11
52:24 54:6,13
56:9,22 58:2,3,4,8
58:19 59:2,9 61:2
63:16,23 68:22
73:19 74:9 75:21
75:25 76:5,19
77:4 79:1 80:9,11
81:8,25 82:4,22
86:7 87:14 88:15
93:1,16,21 95:3
98:2 100:12 107:2
108:11 109:9,13

110:7,18,25 111:9
112:9,24 113:6
115:12,19 118:3
119:11 120:2
122:7 126:14,17
126:19,23 127:4,7
127:16 128:21
129:1,11,23 130:6
130:16,20 132:13
132:16 133:25
134:5,12,16
136:24 137:6,10
137:16,20,24
138:4,7,25 139:17
142:6,9,10,20
143:15 144:24
145:3,21 146:7
147:9 148:20,23
148:25 152:5
153:5 154:5,13,17
154:21 155:6
156:8,9,12,18
157:9 158:15,25
159:12,15 160:16
160:23 161:10,16
163:23 164:10,22
165:1,6,19 166:7
166:11,17,23
167:14 168:9
169:6,15 171:9,20
172:6,13 173:2,7
173:21 174:10
176:7 177:19
178:7 179:3 186:6
188:4 193:4,6
197:16 201:24
203:10 206:7
207:3,14 208:14
210:3 212:2,19
219:16 225:10
226:24 227:12,13

229:6,19 240:14
247:3 259:4
262:19 263:14
264:1,14,21,21,21
265:4,16 267:19
267:23,23,23
269:7,22 270:2,23
271:8 273:4,6
274:7,14,21 275:2
276:12,16
**old** 7:18 16:24,25
20:8 43:22 92:1
96:24
**older** 32:12 38:24
38:25 95:7
**olympic** 34:11
**olympics** 34:12
**once** 91:24 264:14
**ones** 27:18 207:15
208:25 212:20
231:19
**ongoing** 38:7,11
38:12 162:17
**oo0oo** 278:20
**operating** 74:23
205:15 222:3
**operation** 153:21
153:22 154:2
**opine** 215:15
**opined** 33:11 37:2
**opinion** 25:6 27:2
27:6 29:21 30:3
30:20,23 31:3,8,12
33:6,7,13,18 34:14
34:17,20 35:3,7,11
35:15 36:24 37:1
37:19 40:5,8 41:3
41:24 42:7 45:7
50:2 73:11 131:3
132:4,17,20 133:5
133:10 134:1,2,16

135:1 137:6,7,12
199:9,22,24
200:11,23 204:6
210:4 219:5,7
222:24 224:5
226:1,14,18,22
**opinions** 57:6,18
76:12 79:17,22,25
108:5 131:13
259:20,21 260:4
274:3
**opportunity** 82:12
82:14,15,22
120:24 128:10
147:3,4 150:10,17
150:22,23 151:11
152:3,24,25 153:1
153:3,6,11,13,17
153:20 206:2
218:16,22 239:23
**opposed** 142:4
**opposite** 219:1
**opposition** 225:3
**ops** 143:24
**option** 99:16
**options** 100:14,16
**order** 57:1 71:25
117:4 130:13,24
131:6 132:7,10
136:14 206:23
**ordering** 278:11
**organized** 61:16
**original** 55:8
117:6,11
**originally** 265:22
**outcome** 6:2 280:1
**outside** 44:17
222:10,19 231:12
234:20 236:5
238:16 239:25
243:19 244:1,16

245:8,23 246:11
246:21 247:13
248:1,15 249:6,13
249:20 251:4,17
252:7,16 253:7,19
254:10 255:4,12
256:22 257:10,23
258:6,13,20 259:1
268:8 271:14
272:14 273:22
276:24 277:10
**outweighs** 107:11
107:18
**overall** 59:13
199:24 203:21
204:6
**overview** 32:8
59:9 211:25
**owned** 14:9
**owner** 12:25 13:3
13:6,8 14:4
**owners** 13:6

**p**

**p** 2:1,1 3:1,1
**p.m.** 159:4,6,6,8
227:14,16,16,18
259:10,12,12,14
277:24 278:18
**packet** 23:21
**page** 4:4 21:5,16
21:20 50:25 51:4
73:15 74:18 77:15
77:16 109:13
110:7 111:4
116:11 117:21
136:19 137:21
138:6 143:10
145:3 146:15
154:24 155:1,7,10
155:10,22 156:3
157:5 159:14

162:9 164:11
172:14,15 174:3
175:22 177:19,24
190:25 194:25
199:6 200:17
210:8 213:7
215:18 219:6
221:4 224:24
269:5 281:13,15
283:7 284:3
**pages** 21:3,11
77:14 137:16,18
**paid** 15:21 17:2
47:14,16 58:22
188:24
**pam** 13:16
**panama** 53:13
**paper** 108:21
123:3
**paragraph** 136:20
136:24 145:6
149:17 159:20,21
160:4 161:17
162:11,15 167:24
194:4 217:1,10
224:4,20 225:2,24
**pardon** 270:3
**park** 85:1
**part** 26:3,4,6
44:24 55:6 62:6
63:4 67:18 75:1
82:25 91:14 92:24
106:24 130:23
136:1 148:16,25
149:13 157:5,13
162:17 165:11
166:19 169:23,24
180:10 181:14
208:20 211:16,17
211:19 212:16
222:25 224:8

233:19 236:21
260:17 275:18
283:9
**participant** 67:4
**participate** 98:23
99:11,12
**participating**
98:22
**particular** 34:13
49:3 81:4 115:10
115:13 168:17
262:1
**particularly** 91:23
97:4 101:25 185:5
**parties** 5:11
279:23,25
**partner** 29:5
**partners** 13:9
**parts** 75:2
**party** 5:25 18:11
47:3,10
**passenger** 176:2
**passengers** 186:15
**passwords** 29:7
**patch** 122:23
124:24 125:3,4,10
130:4
**pattern** 241:3
**pdf** 21:5 138:2
**peculiarity** 122:16
122:18 129:19,20
129:25 130:2
**pen** 207:21 208:8
209:2,3 213:1
**pending** 9:10
**pension** 14:19,20
14:21,23
**people** 7:16 17:17
26:11,13,15 29:6
60:20 66:6 91:22
91:22 96:16,18

98:18,21,24 99:9
99:11,11,14 100:4
101:14 102:13
106:7,17 111:23
113:25 118:14
124:9 135:22,23
170:13 179:23,25
220:13 250:9
254:21
**percent** 63:4 64:20
**percentage** 15:7
15:16
**perfect** 171:1
**performed** 155:3
**period** 37:3 57:21
188:12 206:12
211:1
**perpetrator** 89:1
92:6 93:4 115:21
116:1,12 118:25
119:8,22 120:6
123:15 149:12
**person** 9:21,22
17:15,16 24:1,5
39:5,12,15 42:12
63:5 80:8 81:1,21
82:14 84:9,14
89:2,12,15,18,21
90:5,6,7,11,15,24
91:4,4,24 92:5,9
92:10,14,17 93:11
93:24,24 94:5
96:3,7,14,17,20
97:13,16,22
101:14,15,16
102:5,7,7,20 103:6
103:9,17,19,21
104:3,5,8,15
107:10,12,15,16
111:22 114:12,15
118:17 122:22

**[person - plaintiff]**

123:6 124:6 125:1
125:4,10 143:8
146:24 151:3
152:12,16,21
153:4 168:1,12
170:18 171:17
172:8 194:6
226:12 229:10
239:13
**person's** 88:24
95:14
**personal** 167:9
279:14
**personally** 9:20
282:11 283:15
**persons** 120:25
128:12
**pertained** 151:22
**pertains** 85:2
**perused** 11:9
**petition** 241:11
**phase** 150:1,2
**phillips** 43:17 44:1
44:2
**phone** 10:21
143:15 154:9
155:24 182:23
183:1 184:1 213:3
246:17 281:3
**phones** 5:7 184:8
**phonetic** 255:17
**photo** 23:2,5,7,10
23:15,20,21,21,21
24:10,25,25 29:22
30:6,9,9,13,15,16
30:18,21 32:22,22
33:7 34:15,21,25
35:4 36:10,13
37:4 44:25 45:6,8
46:17 49:22 50:7
50:12 51:24 88:17

88:18 89:4,14,21
90:2,12,23,23
91:11,14,15,19
92:1,2,4,7,15
93:13,14,15,25
94:4,14,15,20,21
95:6,16,19,20,23
96:5,8,12,16 97:25
98:14,15 100:10
100:11,14,18
102:4 103:15,17
103:25 104:1,4,5
104:10,12 108:7
108:20 109:18
111:10,18 112:1
112:10,11 113:2
113:14 114:4,11
114:12,20 115:6
116:2 117:2,4,10
118:3,23 119:5
120:4,21 121:2,5,5
121:11,16,21
122:5,17 123:8,17
123:24 124:17
125:13 128:6,7,19
129:8,11,17,19
130:1,8 131:4
132:4,11 134:17
134:18 135:4,5,12
135:16,16,20,25
136:5,25 137:1,14
164:12,15,17,19
164:25 165:7,20
165:22 166:4
167:16 168:1,12
168:14,16,17,19
169:8,16,17,23,24
169:25 170:2,8,10
170:17,22,25
171:13,15,23
172:9,13,17

187:20 191:2,25
192:4,15 195:14
211:16 217:18,19
220:10,11,20
221:22 224:14,14
231:8 234:16
235:22 244:8,13
247:4,16 249:23
250:3 251:9
254:13,20 258:10
276:22
**photograph** 24:13
93:11 95:12,14
96:14 103:7 107:4
107:17
**photographic**
95:13 136:15
219:6,7
**photographing**
201:3
**photographs** 36:9
76:14 95:10,11,16
96:3 116:17 124:2
136:4 166:9
185:18 220:1,6,7
**photos** 4:19 11:17
23:22 47:3 74:21
74:21 100:20
117:5,9 121:6,7,11
121:17,23 124:1,2
124:18 129:12,13
137:13 165:3,14
168:5 170:7,14
171:22 228:10
243:23
**physical** 82:2 90:3
98:10,13 99:24
100:16 166:12
181:10 254:2
**physically** 100:4

**pick** 5:5 24:5
103:9,19
**picked** 104:5
192:3,14 234:16
235:22
**picture** 33:9 90:4
93:18,20 97:13
122:15 125:11,12
129:18,24 134:24
172:17 183:20
**pictures** 95:7
96:22 97:15
122:25 167:5,6
185:2 186:10
**piece** 96:23 123:3
**pieces** 164:1
**pigeonholed**
131:18 170:22
**pinpoint** 53:24
**pitman** 249:10,24
250:8
**place** 5:7,11 41:22
90:25 123:11
125:13 126:24
152:12,16 153:7
177:23 185:6
200:4,23 202:1
203:23 204:9,16
206:3 207:7 210:7
219:13,18 265:7
279:21
**placed** 218:5
232:2
**placing** 261:21
**plainclothes** 61:20
62:3
**plaintiff** 1:4,14
2:10 5:15 6:10,12
6:14 7:10 22:16
22:21 25:10,12
44:7 136:21

167:25 172:18
217:5
**plaintiff's** 136:4,9
168:11 221:6
**platoon** 65:24,25
**play** 127:20
**played** 127:21
216:11 234:15
235:14
**player** 34:9,9,11
**please** 5:4,6 6:6,21
8:4,20,25 57:14
79:13 159:8
227:18 259:14
271:9 278:7,14
281:11,11
**plus** 121:7,24
129:13
**pocket** 273:12
**point** 9:1 10:24
12:9 33:14 40:15
58:1 63:17,21
74:17 79:2 91:5
104:15 109:19
134:25 135:3
154:15 174:11
183:6,18 192:6
201:24 217:1
220:17 260:17
263:6 264:22
265:23
**pointed** 39:7
**pointing** 269:25
**points** 109:24
148:3 200:21
201:1 207:4
212:15
**poison** 152:8
**poisoning** 151:2
151:10 152:7

**poisons** 151:3
**police** 1:7 4:17
11:18 18:13 19:5
19:8,23 20:6
28:10,12,20 29:2
29:16,17 31:25
32:3,4,6 39:25
40:2 43:13,14
44:3,4,15 45:9
46:20 47:21 49:7
49:18 51:8,21
52:1,2,14,21 53:17
54:11 55:22 57:22
58:5 59:6,10,12,19
60:2,3,7 61:4,9,19
61:20 62:4 64:1
64:12,13 68:5,11
68:13 69:8 70:24
71:11,14,24 74:19
74:20,21 75:3
87:15 88:5,8
99:17 108:19,22
130:13,24 132:6
139:20 144:9
147:12 153:22
155:13 156:20
161:22 162:19
163:14,15,17
181:16 182:24,25
184:4,5 186:4
197:15 199:10,25
203:3 204:7 205:3
205:10 209:24
213:12,13 214:12
214:16 215:4,5,7
215:11,16 217:13
217:17,23 218:10
219:9 246:3
261:24,24 265:13
267:2,3,5

**policies** 108:24
204:19
**policy** 108:23
109:4 111:13,20
112:1,12,13
113:13 119:16
120:7 210:9
**polygraph** 202:15
202:18 206:19
210:14 267:11,14
**polygraphs**
202:14 203:10
210:18
**popped** 20:9
**portion** 135:13
136:18
**position** 117:1
128:2
**positive** 103:10
187:2
**possession** 151:20
**possible** 148:24
149:6 184:9 211:7
211:8
**possibly** 149:7
174:2
**post** 20:5
**posting** 126:8
**pot** 142:16
**potential** 87:11
**potentially** 227:2
253:4 256:19
**powder** 180:20,21
**practice** 15:18
98:3 122:15
136:12 200:22
202:18,24 203:1
206:3,13,17,21
208:1,21,24 209:7
209:9 210:17,20
211:18 223:10,13

241:25 242:5,14
242:21 243:11,16
244:14,22 245:20
246:8,18 247:11
247:24 248:12
249:4,18 251:1,15
253:16 254:7
255:9 258:10
262:2,16,17,21
263:13 264:16,20
266:9,22 267:1,5
267:17
**practices** 30:25
45:9 87:16 147:12
171:14 200:4,8
202:1,7,12 203:8
203:12,15,23
204:1,9,16,17
205:1,1,14 206:10
207:6 209:25
210:7 211:13,20
212:5,9,10,17
219:13,18,24
223:14 226:1,14
241:19 260:11,19
261:2,20 263:19
264:10,12 265:5,6
265:18,24 266:1,7
266:16 267:20
**prager** 3:12 5:21
**preference** 167:10
**prejudice** 107:11
107:18
**prejudicial** 25:10
25:12
**preparation** 9:19
10:3,24 11:2
73:21 74:2 78:14
276:1
**prepare** 10:16

**prepared** 21:1
74:3 76:11 172:20
**preparing** 78:21
**prescribed** 179:11
**present** 3:11 6:3
59:25 60:1 61:4
87:10,16 180:21
194:10,21 230:7,8
**presentation**
117:4 126:9
**presented** 29:24
86:3 117:10
164:12 172:17
193:13,20,25
195:3 225:5,17
241:12 243:23
247:5,16 249:23
251:8 254:2,13
**presenting** 87:11
119:17 201:18
226:21 244:13
**preserve** 117:4
**preserved** 117:6
117:11
**preserving** 81:5
201:2
**press** 38:14
**presumably**
124:12
**pretrial** 147:17
224:6
**pretty** 29:8 148:13
185:6 190:19
208:6,19 215:4
225:21
**prevailing** 108:5
**previous** 37:18,18
151:20 279:8
**previously** 18:16
57:2 107:5 119:10
143:5 171:6

**pride** 133:16,21,23
155:25 156:13
157:16 161:12
235:14 236:3
**pride's** 157:25
**primarily** 23:7
181:13
**principle** 153:15
**principles** 203:7
265:11
**print** 77:13
**printed** 77:12
**prior** 49:6 52:9
119:13,17 207:11
219:25 223:6
**prison** 39:13 40:19
152:14,21 153:2
153:17
**private** 5:5
**privilege** 198:15
**probable** 86:21
87:2 90:14,24
103:21 136:13
149:23 192:5,16
195:8,12 199:13
229:9,14 238:3,23
239:11
**probably** 8:1 9:8
17:12 18:4,4
19:12,12 20:14
26:23 33:1 56:6
58:10,24 59:17
65:15 67:24 70:7
70:9,15 127:1,2
160:14,19,20
161:15 185:4
200:18 205:24
215:4 221:19
265:13,14
**problems** 163:10
225:20

**procedure** 1:19
76:17,24 113:9
114:5 115:6
117:25 118:18
119:21 120:5,16
206:25 214:21
222:3 224:9 282:5
283:5
**procedures** 45:16
48:13,14,15,22
49:4,12,21 50:7
74:23 109:17
111:5 125:17,25
126:10 127:9,11
200:15 202:8
203:7,15 205:17
219:8 222:25
**proceed** 79:13
91:2,3,6 159:8
227:18 259:14
**proceeding** 6:6
71:17,20 87:22
88:4
**proceedings** 231:9
278:4 279:17
**process** 62:13
95:22,25 211:17
212:17 264:23
**produced** 74:10
74:13 75:4
**producing** 116:5
**production** 281:15
281:17,22
**productive** 52:17
**profession** 203:6
205:13 211:25
212:4
**professional** 73:10
**professions** 212:3
**projectiles** 155:10
155:19

**promoted** 61:23
63:20
**promotional** 65:9
**promotions** 62:21
65:6,8
**promulgated**
107:21
**pronouncing** 58:9
**proof** 150:9
**proper** 41:11,15
81:25 82:6,10
118:13 224:17
225:7
**properly** 37:3,4
40:9 80:24 81:5
199:11 201:9,9
213:15 219:11
224:18 225:22
**properties** 14:7
**property** 15:2,3
64:2
**proposition**
128:18 183:9
**propriety** 30:4
34:20 35:4 222:25
224:8,16
**prosecute** 218:18
**prosecuted** 89:22
**prosecuting**
224:22
**prosecution** 150:2
150:4
**prosecution's**
221:22
**prosecutor** 87:10
87:17 88:13 148:9
150:6 175:16
192:20 194:6,11
194:11 201:19
225:20 275:21

prosecutors
147:15 193:21
194:1,10 195:3,5
198:25 218:18
225:11,15 226:5
protected 76:16
protection 14:10
14:10
prove 84:6 147:15
147:18 152:14
153:16
proven 42:1,7
provide 15:1 55:9
55:11 57:5 73:4
78:19,23 79:18
80:10 87:21,25
119:18 120:3
139:19,23 173:25
206:2 259:18
provided 18:11
53:4 54:4 78:4
139:6 141:16
144:2
providing 88:3
proximity 151:10
153:4
prudence 229:11
psychic 206:16
211:22 265:12
266:17
psychics 202:20
202:22 203:11
205:9 265:8
public 64:4 282:10
282:18 283:15,23
284:23
publication 110:2
115:14,15 117:18
published 108:1
pulaski 185:11,13
185:14,20

pull 92:1 163:7
219:5
pulled 163:10
273:14,15
pulling 273:11
pump 129:5
purported 176:4
purpose 88:16,17
89:3,6 96:7
119:20 120:4,21
120:21 121:2
128:7 209:22
purposes 49:25
120:22 127:25
128:19 164:23
180:3 241:1
pursuant 1:19
pursue 84:1
put 74:9 76:25
84:25 85:1,1,8
96:12,23,25
113:25 116:25
118:14 135:24
160:21 163:22
215:5,6,6,11 217:3
273:14
putting 171:9
puzzled 165:14
168:5

**q**

qualified 73:4
qualify 73:11
question 8:13 9:2
9:4,10,11 76:9
90:21 125:22
126:7 131:16
132:3 141:17
144:12 146:2
171:4,11 175:7
181:23 183:4,15
184:13 187:25

191:17 192:8,11
196:17 197:20
198:7,12,15,18
203:19 204:4
206:24,25 207:19
213:11,20 214:3
214:18,20 215:2
218:12 220:25
221:3,14 222:10
222:19 223:6,20
232:20,22 234:9
259:23 260:6,21
261:6 262:13
263:4 264:4,25
265:21 267:10
269:7,10,13
270:13,18,23
271:3,5,13,19,23
271:24 272:1,6,24
273:15 275:13,21
276:3
questioned 133:1
questioning 268:7
questions 7:22 8:3
8:11,22,25 9:14
12:13 129:3
131:17,20 177:21
227:5,20 228:25
229:5 234:25
235:6,13 259:3
260:16,21 268:11
268:15,16 269:6
272:22 274:21
277:12,14
quick 23:17 227:7
quickly 102:11
178:25 184:20
225:21
quite 81:17
quotes 178:13
179:9

quoting 213:21,23

**r**

r 2:1 3:1 43:17
rachel 2:4 6:11
ran 185:6
range 141:21
180:18,20,22
rank 61:18,21
62:2,3,9,21 63:13
63:24 65:7 66:11
ranked 62:24
ranks 61:23 62:22
63:19 66:6
rape 36:2
raped 36:5 39:1,6
39:16,16 42:2
raping 36:3,6
rarely 104:17
105:9 106:12
reach 91:25
203:20
reached 55:20
203:24
reacquaint 11:11
read 26:24 33:1
48:11 74:6,7
76:23 78:9,25
93:3 117:25
119:24 129:13,21
144:23 146:18
157:24 158:3
160:1,12 162:15
162:21 168:2
176:5 187:11
194:16 195:2
196:2 200:20
213:12 214:12
215:16 222:13
224:1 231:1
268:25 275:20,20
276:1 282:5,6,12

283:5,6,17
**reading** 18:9,10
21:8 86:5 114:2
132:9 136:19
140:13,18 144:16
151:21 159:21
165:13 175:2
176:13,17,19,22
182:6 193:3
197:15 214:13
218:25 223:24
276:6 281:19
**real** 118:18 160:6
160:10,11
**realizing** 110:9
**really** 47:25 48:5
52:17 67:22 70:11
72:23 116:20
122:24 124:13
147:6 184:1
185:11 204:3
241:20,20 266:5
**reason** 83:20
84:23 85:2 100:1
135:12,19 139:17
191:23 196:22
219:2 232:25
233:7 281:14
283:8 284:3
**reasonable** 133:12
136:14 229:11
**reasons** 72:13
83:24 92:3 188:19
188:21 217:23
259:21
**recall** 7:22 17:9
19:1 22:8,22
25:11 27:3,5,19,25
28:6,11 29:19
31:5 32:19 33:5
34:2 35:10,14,17

38:19 42:24 44:22
45:17 46:25 49:14
50:6 51:12 53:13
54:5 56:4 70:1,4
70:11 71:3,6,6,16
72:16 75:19,25
78:2,17 86:5
92:24 125:16,23
125:23 126:8,24
132:9,12 154:11
156:24 160:17
165:2 172:21
173:3 176:9,13,17
176:19 182:6
193:2,7,15 197:8
218:4 232:15,20
233:9,10 257:14
257:21 260:13
268:6,15,18,24
269:5 271:7,12,23
272:5
**recant** 188:19
**recap** 193:24
**receipt** 281:18
**receive** 17:15
**received** 70:20
75:12 78:7 104:7
140:1 147:14
155:24 240:12
243:22
**recognize** 123:6
**recognized** 87:15
88:5 147:12
209:10,24
**recognizing** 232:2
**recollection** 214:7
232:23 233:6
**recommend**
117:17
**recommendation**
112:16 113:15,23

114:18 118:12,16
118:22 120:13
121:17
**recommendations**
108:3 109:1 114:9
114:23 115:24
116:16 117:12
118:7
**reconfirm** 127:10
**record** 5:2,12 6:5
7:13 79:8,13
84:20,24,25
156:25 159:4,8
198:11 227:14,18
229:5 259:10,14
274:23,25 276:14
277:20,24 278:5
279:16 283:9
**recorded** 5:14
**recording** 5:10
201:17 216:12
**recordings** 162:10
162:18 163:23
**records** 154:9
160:5,24 161:4,5
161:11 213:4
**red** 25:15 26:7,8,9
26:11,12,14
172:10
**redone** 55:6
**reduced** 279:14
**reece** 138:14,16
139:1,6,9,18
140:21,22 141:2,4
141:25 142:21
181:13 186:23
187:6,7 188:10
189:4 234:24
235:1,22 242:4
243:24 251:9
268:6

**reece's** 140:7
168:18 186:24
187:11 189:8
218:6 239:24
241:10 247:17
272:20
**refer** 21:4 23:22
24:10 82:18,21
165:16 167:2
168:7 210:3
**reference** 25:16
130:23 155:22
156:13 281:7
282:2 283:2
**referenced** 110:5
133:22 157:10
274:18 282:11
283:15
**referendum** 60:19
**referred** 62:8
201:20
**referring** 16:2
19:5 73:6 89:12
89:24 94:17,18
95:19 126:4,13
135:11,13 136:17
149:22 152:22
153:14 178:20
179:10 181:12
196:8 200:9,16,23
210:9 211:14
240:24
**refers** 178:14
**reflect** 241:2
**regarding** 19:17
45:1,15 46:17
48:12,21 49:3,11
49:20 107:22
235:14 272:22
**register** 209:3,3

**registers** 207:21
213:1
**reiter** 2:12 18:19
**reiterburns.com**
2:15
**reject** 199:7
**related** 5:25 11:5
12:10 15:17 19:22
20:16 27:12 56:20
71:13 75:16 81:5
154:1,8 177:2
**relative** 81:15,24
279:22,24
**relatives** 183:21
**released** 39:12
40:19 89:19,22
90:7,13,20 195:6
**relevant** 73:3
79:25 180:3
**reliability** 180:4
184:13 186:7
**reliable** 101:12,20
101:23 170:25
171:2 178:18
179:12,12 186:24
**relied** 57:17
193:12 241:12
**reload** 79:6
**reluctant** 99:12
104:6,13
**reluctantly** 216:12
**rely** 57:4
**relying** 179:3,5
**remained** 64:21
**remember** 26:23
28:23,25 43:2,6,10
43:11,20,23 44:19
49:23,24 70:17
91:25 151:21
154:4 176:22,23
178:2 189:17,20

189:21,24 190:11
193:15 260:20,21
260:23,24 276:6
**remembered**
190:2,6
**remembering** 34:7
35:1
**remind** 37:6
**remotely** 1:17
5:20 6:4 8:16
279:20
**remove** 156:6
217:3
**removed** 155:11
**remuneration**
188:23
**render** 50:2
**renew** 198:23
**rent** 15:4,8
**rental** 14:8 15:2
**repeat** 40:17 234:9
**rephrase** 59:3
103:23
**report** 4:12 11:4
20:25 26:25 45:13
48:9 58:19 72:25
73:3,15,21 74:2,3
74:20,22 77:3,21
77:24,25,25 78:6
78:11,12,14,21
79:16,16,21 80:1
82:18 88:23 89:10
89:13,25 91:20
92:19,24 94:24
105:1,19 107:9,14
107:20 108:14
109:10,11 110:4
110:14 115:16,24
117:12 118:7
119:12 120:8
130:12,15,23

131:2,12,14,19,22
132:1,3,14,16,24
133:14,19 134:3,5
134:10,14 135:1,4
135:9,15 136:20
137:13,17 138:9
138:13,25 139:5,9
140:13 154:12,24
156:19 158:16,18
158:19 159:11,14
159:17 160:13
163:14,15,17
165:6,8,11 166:23
167:14,21 172:14
172:19 173:16
174:3 185:8
188:18 190:25
193:18 195:1
197:12 199:5
205:6 206:1 211:5
212:9 213:23
215:5,8,11,18
219:4 225:23
226:17 227:24
228:3 231:13
232:3 233:20,24
234:21 235:4
236:6 238:17
240:1 242:18
243:19 244:1,18
245:9,24 246:12
246:22 247:13
248:1,15,24 249:6
249:13,20 251:5
251:17 252:7,17
252:24 253:7,19
254:10 255:5,12
256:23 257:10,20
257:23 258:6,13
258:20 259:1,18
260:2,17 272:14

273:23 274:5,8
276:2,25 277:11
**reported** 174:24
279:13
**reporter** 1:16 5:23
6:24 8:6,9 57:10
57:13 69:20 94:8
128:24 201:7
208:9 223:21
235:8 236:15
237:16 238:18
246:23 263:7
274:11,12 278:8
278:10,13,15
279:3,6 280:9
282:7
**reports** 11:18,18
18:13 72:13,15,21
72:22 74:20 84:21
140:19 156:16,20
158:17 163:5
174:20 175:2
186:4 197:15
201:18 213:13,13
214:12,13,17,25
215:4,16,20 217:3
217:13,16,22
218:10 243:7
257:18
**represent** 7:9
29:11 127:5,8
164:22
**representation**
194:4
**represented** 29:10
36:16 37:6
**representing**
31:25
**request** 76:17
175:4,15 221:24
283:9,11

requested  162:19
   255:17
required  83:1
   135:10,11 148:6
   148:14,19 150:10
   201:18 229:15
   259:18 281:25
requirement  83:1
   83:5 94:14,19
   121:19 136:13
   146:16,22,25
   147:10,11,17
   148:16 149:16,18
   149:22,23 150:3
requirements
   131:5 132:6
   236:10
research  78:24
resemble  96:3
reservations
   224:23
reserve  277:18
reserved  278:19
reserving  277:16
resolution  27:15
   27:23 31:15 42:16
resolved  16:21,22
   27:20,22 38:8,9
respect  116:9
respective  28:14
responded  174:5
   174:18,22
responding  175:4
responds  276:9
response  75:22
   80:18 131:16
   264:5 275:25
responsible
   232:13
rest  60:24 166:18
   166:21

restart  91:9
restate  141:22
   189:9
restated  130:3
restored  190:1
restricted  53:20
result  70:18
retained  18:12,15
   18:18,21,24 22:5
   22:13 28:6 30:14
   31:23 36:14 37:6
   39:24 43:12 44:8
   47:3,5,7,9,11 48:2
   209:8,13,21 278:2
retired  12:24 14:3
   17:12 19:8,16,19
   20:9 29:2 46:23
   52:8,19 59:5,8
   63:14 64:7,23
retirement  20:5
   52:8,10
return  20:10
   58:21
returned  281:18
reveal  149:14
revealed  83:14
   161:11
review  11:3 43:7
   58:15 77:9 85:23
   153:25 154:9
   159:17 164:15
   168:22,25 172:19
   174:6,18 175:15
   214:16 215:19
   276:20 281:12
   282:1 283:1
reviewed  11:15
   58:14 73:20 74:2
   75:3 77:15,19,24
   78:14 85:18,21
   130:11,12 164:19

184:5 185:18
   217:16,23 268:19
   274:2
reviewing  11:15
   75:25 76:20 165:2
   173:3 193:7
   201:14 214:25
   232:15 233:10,13
   269:6 271:7,12,23
   272:5
revolved  23:7
revolves  238:4
richard  138:15,23
   141:10 144:14
   154:10 175:24
   197:2
rider  228:1
right  8:4,22 16:8
   20:17 21:24 24:8
   27:13 54:13 60:15
   76:1 80:1,25 84:9
   85:10 86:14 87:12
   88:11 93:12 94:2
   97:25 98:12 102:7
   102:7,15,20 103:9
   109:20,23 110:3
   116:22 126:14
   129:16 130:6
   138:24 142:9
   156:7 158:10,22
   159:19 161:15
   165:23 173:15
   175:17 178:5
   185:19,19 190:8
   190:18 197:3
   199:18,19,20
   203:11 209:25
   225:11 227:2,12
   228:19 229:3,8
   236:7 239:20
   250:11 263:6

265:19 266:19
   268:22 273:14
   274:10
riley  2:3
rimas  174:5
road  185:11,13,17
   185:20
rob  28:15
robbed  34:4,5
   43:24 102:1
robberies  28:15
   89:17 101:25
   127:12
robbers  32:12
robbery  23:3,24
   32:10,16 34:13,15
   34:16 43:6 46:14
   48:13 49:12,16
   50:10,12 51:15,22
   53:15 55:23 61:14
   62:15 64:11,16,16
   64:17,19,20,21
   70:15 91:23 97:19
   103:6 125:18,19
   125:25 126:2,10
   127:5,12 189:1
   221:21
robbing  34:3
roger  35:23
role  66:18,19,19
   67:13 80:4,6 87:9
   231:15
room  6:3 7:16
   64:2 99:19 205:15
roosevelt  185:14
rotate  68:6
rotation  68:14,18
rotational  68:8
round  37:18
rows  165:9,16
   167:7,9 168:7

173:14

**rshc** 2:7,7,8,8

**rsifuentes** 2:8

**rudimentary**
96:13

**rule** 60:18 71:16
71:25 76:16
113:22 222:1
233:24

**rules** 1:19 8:1
282:5 283:5

**ruling** 230:6

**rumor** 157:15
159:25

**run** 59:25 60:3,22
60:23 61:5 153:21

**runs** 81:21

**rupt** 26:20

**russ** 55:21

**ruth** 161:19

**s**

**s** 2:1 3:1 281:15
283:8,8 284:3

**safe** 201:2 258:24

**safer** 2:3

**sanchez** 1:7 3:7
6:17 11:21 145:18
164:13 172:16,21
173:16 176:21
247:4

**sanchez's** 176:20

**sarah** 2:4 6:13

**sat** 271:19

**sations** 190:2

**satisfied** 92:16
131:5 132:5

**saw** 24:6 75:19
79:1 139:1 160:20
165:5 169:8 182:2
185:2 189:5
212:25 232:3

269:15,16,22
270:25 273:7,8
277:1

**saying** 49:10 84:6
99:24 103:11
105:9 114:1 124:5
137:3 141:20
148:18 152:7
168:10 170:22
180:25 186:9
194:8 210:22
214:16,23 218:25
225:2 226:4
260:23,25

**says** 21:17 38:2
50:25 74:18 94:5
111:5 113:8 114:2
114:7,8 117:24
121:19 127:4
128:13 129:11
138:5 160:23
173:14 176:2
200:24

**scar** 96:17,19,21
96:25 97:1,21
116:25 130:5

**scars** 116:10

**scenario** 113:16

**scene** 24:6 39:11
74:21 139:2
155:12 181:9
182:3 185:2,17
186:10,11 201:2,3
201:3,4,8 214:10

**scenes** 126:15

**schadia** 242:12

**schleder** 1:8 3:7
6:17 11:22

**school** 94:6

**scope** 231:13
234:20 236:6

238:17 240:1
244:1,18 245:8,23
246:11,21 247:13
248:1,15 249:6,13
249:20 251:5,17
252:7,17 253:7,19
254:10 255:5,12
256:22 257:10,23
258:6,13,20 259:1
268:9 271:16
272:14 273:22
276:25 277:10

**scores** 221:19,19

**screen** 20:22,23
43:8 48:9 79:16
126:17 128:8,13
129:2,9 137:19
138:3 178:3
232:18 268:22
274:9

**screens** 8:17

**scroll** 109:14

**scrolling** 119:11

**seal** 282:15 283:21

**search** 161:9
201:4 246:14

**searched** 161:3

**searches** 160:5,24
160:25 161:11

**sec** 275:3

**second** 46:3 51:7
109:14 110:11
115:4 126:16
127:20 139:11
141:13 142:19,20
154:6 174:13
189:6 194:24
199:4 258:17
261:23

**section** 48:17
52:12 72:25 73:16

73:22,25 74:24
78:6,16 109:10,16
109:17 111:4,7,9
113:2,4 116:13
117:20,21 119:1
119:12,14 120:7
130:10,11 134:25
135:3 138:13,23
143:13,17 146:12
146:15 155:4,14
156:1 157:7,18,24
158:17 159:15
164:13 165:17
174:8 178:1
186:19 191:4
193:19,22 199:6
199:16 200:21
210:4 224:24
233:20

**sections** 76:25
77:1

**securing** 201:1,14

**see** 20:23 21:18,22
22:17 27:19 39:21
48:17 49:5 51:3
73:17,22 74:24
76:17 77:4,22
89:11 92:11 97:12
97:17 107:12
109:11,21 111:6
111:16 113:3,10
115:21 116:13
117:7,21 118:2
119:1,14,24 125:2
126:17 129:4,5,9
130:18,19,19,20
135:8,18 136:1
138:2,15,22
139:15 143:12,17
144:6,24 145:6
150:11 154:14

155:3,14 156:1,8
156:25 157:7,17
158:19 159:13
160:7 161:20
162:8,11,25
164:13,20 165:17
165:23,23,24
166:3 167:6,18
173:12 174:8
175:24 178:1,6,10
180:13 183:25
185:4 186:5 187:4
191:4,10 193:21
195:9 199:15
212:21 213:8
215:23 219:14
221:8,24 223:12
224:24 225:7
269:14 271:20
273:12 275:21
**seeing** 156:4 173:6
**seen** 13:11 75:14
75:15 76:7 103:9
107:4,10 123:12
166:9 183:19
202:21
**select** 100:6
115:19,24 118:24
**sell** 239:6
**selling** 134:22
**semi** 32:9
**seminar** 53:15
**seminars** 52:23
**seniority** 62:19
**sense** 8:13 9:4 15:6
21:5 24:14 126:23
150:16 179:4,8
**sensitive** 5:5
**sent** 77:12
**sentence** 48:10,24
150:8 157:25

194:16 195:2
215:19 225:1,8
**separate** 62:23
70:22
**separating** 201:11
**september** 77:22
109:5 175:23
**sequence** 165:5
**sergeant** 62:21,24
63:2,5,9,15,17,18
63:20,25,25 64:1,3
64:4,10,18,25
65:20,21 66:4,5,19
66:19 67:13 71:4
72:6 80:22 127:2
198:17 222:11,12
222:20 229:3
232:19 244:4
252:21 263:24
268:4,24 271:24
272:18 274:8,17
276:20
**sergeant's** 63:24
**sergeants** 61:23,24
62:20,22 66:3
**serial** 147:5
**series** 109:24
260:9,16 272:22
**session** 53:9
**sessions** 53:11
**set** 29:9 131:19
135:1 147:11
280:3
**seven** 20:7,14,15
67:22 137:16
243:22
**seventy** 7:19
**sexual** 61:14
**sfinch** 2:7
**shadow** 166:21

**share** 43:8 228:18
232:18 268:22
**sharing** 178:5
274:9
**shave** 172:8
**shaved** 166:6
171:17
**sheet** 281:13 283:7
283:10,18 284:1
**shell** 155:11,16
**sheriff** 60:9,11,23
60:25
**sheriff's** 58:10
60:4,8
**sheriffs** 60:22
**sherrie** 145:5,7
244:21
**shift** 66:23,24,24
67:1,2 68:17
**shirt** 25:15 26:8,8
26:9,12,12
**shirts** 26:14
**shoes** 41:22
**shoot** 132:18
**shooter** 139:10,11
141:13,14 142:18
142:19,21 143:6
171:6,12 258:17
**shooters** 139:2,7
139:14 160:1
181:7,15,17
**shooting** 23:3,4
32:17 34:5,8 43:3
43:4 56:16 68:11
68:13 81:18 139:3
143:20 144:8,9,14
145:1,25 156:10
158:6 162:2,7
176:15 182:4
185:24 194:1
195:20,25 196:5,9

196:14 197:3,18
198:21 272:9,12
273:18,19
**shootings** 55:15,25
68:5 181:15
182:25 184:5
**shopping** 36:4
**short** 11:12 39:3,9
79:3 166:6
**shortcomings**
101:2
**shorthand** 1:16
279:3,5 280:9
**shortly** 144:8
**shot** 32:15 43:24
43:25 143:8 185:6
197:10 226:19
269:19
**shots** 271:22 272:2
**shoulder** 214:9,10
**show** 20:22 48:9
71:16,25 89:4
92:15 93:18,19,25
94:4,14,15,20
97:14 102:5 103:7
104:13 109:10
122:10 123:2
124:3 126:15
130:14 136:15
137:4,5,18 152:7
159:10 164:24
165:10 170:17
171:13 173:2
194:25 199:4
220:5,6,8 240:5
**showed** 23:5,8
25:9 30:2 154:10
174:25 228:16,21
**showing** 24:13
76:5 79:15 96:8
107:16 121:5

132:11 220:1
**shown** 23:23 33:8
33:9 34:15 37:4
45:8 91:14 122:5
122:8,9,11,13
134:18 135:5,17
137:1 164:16,25
167:16 168:19
220:10 239:23
281:16
**shows** 39:20
**showups** 108:20
**sic** 54:21 74:22
108:21 141:17
228:6 240:16
**sick** 65:23
**side** 16:10,13 17:9
17:23 18:1,2 77:1
101:11 102:13
123:4 183:21
**sidewalk** 270:11
270:12,16
**sifuentes** 2:4 6:11
6:11
**signature** 277:16
278:19 280:8
281:14
**signed** 282:13
283:18
**significant** 190:19
**significantly**
196:13
**signing** 281:19
**similar** 26:16
50:13 53:19 97:16
100:21 118:3,23
120:25 128:12
182:17 220:3
**simple** 66:15
81:17 152:17

**simply** 61:20
152:11,22 193:20
195:3 214:13
215:22 261:2
**simultaneous** 57:9
69:17 72:4 115:2
209:19 220:1
236:14 237:11
238:15 263:2,23
**sincerely** 281:21
**single** 59:12 84:24
94:4,15 103:14,25
209:9
**sir** 42:10 118:2
281:10
**sister** 161:19
**sit** 232:24 233:4
**situation** 87:7
94:13 124:22
148:7 151:22
**situations** 50:6
89:13 90:1 93:19
93:20 94:3 96:20
101:12,24 103:12
113:16 118:11,14
123:7 124:4,23
**six** 39:2 66:21
67:20,21 116:7
121:6,15,23
129:12 137:16
186:12 220:6
271:10 275:22
**sixth** 59:21
**skim** 165:3
**skip** 116:11
165:11 177:20
181:18 271:2
**slash** 65:20,21
68:11
**slender** 258:17,24
271:11

**slightly** 126:7
265:1
**small** 267:2
**smaller** 59:22
**sole** 13:6,8 89:20
104:1
**solely** 104:1
241:12
**solutions** 3:12
281:1 284:1
**solve** 80:7 84:15
**solved** 39:19
**solving** 39:23
203:4
**somebody** 149:19
**somewhat** 165:14
168:5
**son** 247:18
**sop** 202:15 211:10
211:11
**sophia** 145:19,22
245:18
**sops** 210:13 211:3
211:5 261:13
**sorry** 13:19 20:5
26:19 31:10 34:21
36:22 37:11 40:17
43:8,11 44:6
46:17 54:24 66:18
67:9 68:2 69:11
71:9 74:10 75:9
83:10,11 90:12
93:17 95:20 99:22
100:3 103:3
106:16 109:7
114:15,16 115:13
119:4 122:4
123:22 125:19
128:3,11 130:11
137:7 138:19
140:4 148:11

**slightly** 126:7
150:20 151:18,19
152:5 155:1,7
162:10 164:7
168:23,24 172:15
178:4 179:24
188:2 189:9 193:5
194:24 199:20
200:4 209:13
210:5 214:19,19
221:1 234:9,9
266:15 274:15,24
274:24 275:4
276:16
**sort** 55:10 122:16
147:11 149:2
152:8 173:25
**sorts** 95:15
**sound** 9:4 42:8
178:1,8,22 179:16
**sounded** 152:6
**sounds** 23:14
66:14 76:6 84:5
128:1 152:24
154:3 262:7 267:4
**sources** 14:15
**south** 2:13
**southern** 22:3
51:21,25 52:21
53:17 54:11
**speak** 8:9
**speaking** 57:9
69:17 72:4 113:20
115:2 118:15
126:25 148:11
170:16 171:16
209:19 221:20
229:14 236:14
237:11 238:15
263:2,23
**specialist** 157:21

**specific** 31:3 51:12
  61:21 62:9,15
  65:18 74:18 95:4
  104:23 126:4,5
  145:24 158:24
  170:9 183:9
  198:15 200:7
  203:20 204:17,21
  205:21,22 206:3
  206:24,25,25
  207:5 209:15
  211:5,14 212:8
  214:2,3,6,7,18,20
  214:24 218:4
**specifically** 31:6
  49:23 101:5
  109:18 160:17
  179:15 211:4
  229:19 247:3
  260:18
**specifics** 70:11
  71:7 104:24 154:4
  190:6 204:20
  205:23
**specified** 279:21
**speculative** 264:5
**spell** 7:12 46:3
**spoke** 12:19
**spoken** 11:24 12:5
  12:8
**spotted** 197:6
**sprint** 246:16
**squad** 66:4 68:7
**squads** 68:7
**st** 33:22 34:10 37:7
  42:21
**stack** 220:6,7
**stage** 91:7,10
**stamp** 127:16
**stand** 97:16,23
  99:15 100:2

111:16 170:12
**standard** 98:3
  147:12 222:3
**standards** 45:10
  50:11 87:15 88:5
  107:21 108:14,16
  108:19 109:19
  209:24 210:25
  252:12 257:8
  263:17
**standing** 74:22
  80:4 107:13 140:9
  214:9 235:5
  269:16,20 270:14
**stands** 97:2,4
  99:20 111:24,25
  112:9 124:7
  191:23
**starks** 22:1,21
  23:3 24:24 25:17
  26:8 31:2
**start** 8:11,12 9:14
  9:22 10:14 14:1
  19:7 20:11 66:19
  88:17 155:1
  162:15 229:21
  268:23
**started** 9:14 29:20
  51:20 52:6 53:11
  54:8 55:17,17
  56:5 64:11
**starts** 21:15 54:14
  113:3
**state** 1:16 6:4,7
  7:12 45:13,15,17
  45:18,22 46:1,15
  46:24 48:16 53:8
  60:24 92:19
  107:20 112:19
  129:24 130:12
  133:19 135:4,15

136:25 137:7,12
  148:10 150:8
  155:13 156:22
  158:5 159:22
  161:10 162:13
  165:8 166:24
  172:15 174:4,22
  177:19,24 178:7
  179:16 180:11
  181:16 185:8
  190:25 193:18
  195:1 197:12
  199:7,15 211:4,8
  212:10 215:19
  219:4 221:6 226:6
  226:17 246:3
  279:6 282:10
  283:15
**state's** 174:4,13
  192:19,24 193:12
  198:14 231:16,18
**stated** 124:24
  131:11 139:1,10
  139:13 141:25
  147:23 155:25
  158:20 163:5
  169:7 173:16
  176:14 182:2,18
  236:23 237:6
  254:18,20 256:9
  258:16 276:22
  277:6
**statement** 150:13
  160:17 163:2
  168:10 178:10
  179:6 180:13
  191:10 195:4
  201:17 259:19
  282:13,14 283:19
  283:19

**statements** 180:25
  188:16,17
**states** 1:1 5:17
  31:20 33:23 35:24
  38:18 111:14
  114:5 115:19
  116:8 117:3
  118:24 119:17
  128:8 129:8,17
  139:9 140:23
  157:12 160:4
  162:23 163:17
  167:24 173:11
  175:22 195:4
  199:22 224:4,21
  276:10
**stating** 135:14
  149:24 210:2
**station** 43:5 102:1
**status** 45:14,21
  46:10,14,17,24
  48:12,25 49:20
**statute** 60:6
**stay** 63:3 64:20
**stayed** 64:17,19,23
  66:9
**stenographically**
  279:13
**step** 261:19 262:9
**steps** 123:7 261:17
  262:1
**stevenson** 145:5,7
  145:9 244:21
**sticking** 166:4,20
**stolen** 57:2
**stood** 111:20
**stop** 43:8 175:23
  176:11,22
**stopped** 54:12
  56:9,13

stopper 91:16
stoppers 102:2
  135:22
story 39:3,9
strange 76:24
streak 97:1
street 2:5 3:4
  99:10 144:10
  176:4 197:3
  270:11
strictly 68:8
strike 234:21
  240:13
stripe 26:11
strive 83:25
  122:21
structure 59:10,13
structured 61:8
stuck 125:10
students 17:14,22
stuff 208:11
  229:20,22
style 165:9
subject 39:20,22
  68:22 69:9,14
  70:1,2,9,10,23
  71:25 96:5,5,11
  97:4 113:20 121:6
  121:24 125:1
  129:12 141:3,3,9
  141:13,14 142:4,5
  142:12,13,17,18
  143:4,7 171:18
  172:11 201:16,16
  264:18
subjects 140:7
  141:20 142:4,15
  158:1,2
submit 188:15
  189:16

submitted 4:17
  155:13 173:4
  246:2
submitting 201:9
subpoena 4:13
  75:12,14,15,18,20
  75:22,24 76:1,6
  110:17 143:11
  144:1 154:7 216:9
  227:25
subpoenas 213:1,3
  213:3
subscribed 282:10
  283:14 284:21
subsequent 53:10
  224:12
sue 231:18
sued 40:1,2,2
sufficient 175:13
  195:8,12 199:12
  219:11
sufficiently 213:9
suggested 121:10
suggesting 189:10
suggestions
  108:10
suggestive 25:24
  26:17 169:18
  171:22,23 231:3,9
suggests 157:1
suicide 31:17
  81:19
suit 40:21
suite 2:5,13 3:4
  281:2
summaries 76:13
summarized 134:9
summary 25:5
  40:4 43:1 141:12
summit 38:16

superior 281:1
supersede 131:21
supervise 66:17
  67:14
supervisor 50:1
  72:23 208:5
support 90:23
supports 181:2
supposed 85:8
supposedly 32:11
suppress 220:18
  221:8,11 223:2
  230:15
suppressed 121:12
suppression
  120:17 170:3
  220:16,21 221:5
  221:20,24 222:4,8
  223:11
sure 7:14 8:5,14
  10:9 12:4 16:15
  21:10,14,14 23:12
  24:12,18 25:5
  31:5,6 38:24
  42:18 44:21 54:11
  57:15 59:18 70:11
  71:2,4,5 72:7,23
  73:6,8 82:13 83:4
  83:20 85:22 86:14
  97:4 104:15
  106:11 114:19
  126:3,6,6,6 128:5
  131:16,20 140:6
  142:16 160:12
  161:13 163:22
  170:9 172:25
  174:19 177:13
  187:3 189:19
  192:24 197:22,25
  198:10 199:1
  204:5 214:5

215:14 224:11
  225:18 227:9
  228:19 229:7
  259:7 262:22
  263:25 268:25
  275:15
surfaces 92:20
surgeons 205:14
surprise 184:11
surprised 185:9
  185:10 222:1
survived 39:2
  43:25
suspect 87:2,12
  91:12,13 92:5,20
  93:16,21 95:4,24
  97:8 98:4 100:9
  107:5 111:15,20
  111:25 112:9
  113:9,14 114:4,24
  115:5 116:9,15
  117:24 118:5
  120:24 122:15
  124:17 128:10
  129:18,25 140:10
  140:12 147:21
  148:3 175:14
  177:10
suspects 111:6
  113:17 142:1,3,8
  174:8
suspicion 136:14
swear 6:21 183:21
sworn 6:23 7:3
  59:18 279:10
  282:10,13 283:14
  283:18 284:21
synopsis 160:21
  161:14
synopsized 144:4

| | | | |
|---|---|---|---|
| **synopsizing** 158:17 | **talks** 155:10 181:14 | **tentative** 252:4,9 **teristic** 124:19 | **text** 114:2 **thank** 31:11 36:22 |
| **t** | **tall** 105:20 258:17 258:24 271:10 | **term** 82:20 94:23 **terminology** 23:13 | 58:13 66:16 138:10 227:19 |
| **take** 5:11 9:7,8,11 | **taller** 142:23 | **terms** 23:18,20,22 | 276:12 278:9,16 |
| 52:16,22 53:22 | **tape** 96:23 | 24:9 88:15 98:2 | **thanks** 259:8 |
| 57:25 59:16 62:10 | **tapes** 163:7,10 | **terrence** 2:13 6:18 | 275:2 |
| 66:12 76:20 77:4 | **target** 95:6,6 96:4 | 217:8 255:16,24 | **theft** 239:4,14 |
| 79:3 123:3,7,11 | 177:9 | 255:25 256:7,9 | **theis** 2:3 4:5 6:9,9 |
| 124:2 125:13 | **tattooing** 180:20 | **terrifying** 102:10 | 7:6,9 10:9,11,13 |
| 154:6 226:25 | 180:21,23 | **territory** 59:23 | 12:17 26:5,21 |
| 227:7,21 266:11 | **tattoos** 116:10,20 | 258:4 | 27:1 41:18 42:5 |
| **taken** 1:14,17 5:15 | **taught** 51:13,14,18 | **terry** 10:7 | 42:15 48:1,7 |
| 79:9 159:5 169:12 | 51:21 52:15,18,20 | **test** 62:10,11 63:9 | 57:16 61:1 65:16 |
| 187:14,15 188:15 | 52:20 55:1,4 | 63:10 | 69:2,10,18,24 71:8 |
| 188:16,17 227:15 | **tburns** 2:15 | **tested** 205:19,19 | 72:24 74:16 75:8 |
| 259:11 264:24 | **teach** 52:20 54:9 | **testified** 7:4 20:4 | 79:1,14 80:17 |
| 279:19 | 54:10,17 55:24 | 20:20 39:7 49:10 | 84:4,18 85:6,17 |
| **takes** 65:22 99:1 | 56:12,14 | 131:23 218:21 | 86:13 89:5 90:19 |
| 153:16 163:12 | **teacher's** 82:20 | 232:14 272:11 | 94:22 98:11 103:2 |
| 261:17 | **teaching** 16:3,3,7 | **testify** 20:10 27:12 | 105:7 106:8 107:1 |
| **talk** 59:5 74:17 | 16:10 17:8,23 | 33:16 37:22 38:3 | 107:19 110:17,21 |
| 101:11 127:8 | 52:9 54:8 55:18 | 279:10 | 111:3 112:8 115:3 |
| 135:9 157:5 | 56:10,13 | **testifying** 22:13 | 115:11 117:19 |
| 159:14 167:24 | **team** 66:22 | 201:19 | 120:19 121:20 |
| 180:16 181:18 | **teams** 66:24 67:2 | **testimony** 20:1,3 | 122:6 123:13 |
| 220:11 241:18 | **tech** 126:16 | 21:17 35:10 57:5 | 124:15 125:15 |
| **talked** 67:11 | **technicians** 162:14 | 73:4,11 75:16 | 127:22 129:1,7 |
| 146:13,14 154:5,7 | 162:24 163:3,7,18 | 87:22 88:1,3 | 131:10 138:9,11 |
| 154:14 171:5 | **techniques** 48:14 | 112:5 168:22,25 | 138:12 140:3 |
| 180:7 189:7 216:5 | 49:11,25 | 169:2,4 188:12,15 | 141:1,22,24 |
| 219:21 231:15 | **telephone** 9:24 | 188:20 189:12 | 144:18 146:6,11 |
| 236:9,21 239:22 | 10:15 | 207:11 215:2,20 | 149:15 152:4 |
| 240:4,5 241:10 | **tell** 70:13 148:8 | 218:7,20 219:2 | 158:25 159:9 |
| 260:9 | 168:13,16 209:15 | 223:6 225:25 | 164:6 170:5 172:5 |
| **talking** 9:21 20:8 | 269:7 273:6 | 226:3 262:13 | 175:11 177:7,18 |
| 53:1 70:16 81:23 | **ten** 69:15,19,25 | 266:24 267:10 | 182:1 183:23 |
| 97:24 98:6,9 | 155:22 157:5 | 272:10,21 273:20 | 188:1,8 190:17,24 |
| 138:7 141:20 | 159:14 162:9 | 276:10 277:25 | 192:2,13 196:19 |
| 149:17 223:13 | 227:7 | 279:17 282:6,7 | 198:2,19 199:3 |
| 240:7 241:5 273:8 | | 283:6,9,12 | 207:13 208:13 |

209:20 213:16,24
215:9 219:3 222:6
222:16,23 223:15
223:23 224:3
226:7,24 227:9,12
227:19 228:9,14
228:24 230:3,9,11
230:16,21 231:4
231:12,21 232:6
233:16,21,23
234:8,17,20 235:3
235:18,24 236:5
236:12,17 237:9
237:12,23 238:7
238:12,16,24
239:7,16,25 240:8
240:10 241:14,16
242:1,7,15,17,22
243:3,12,17,19,25
244:9,11,15,18,24
245:5,7,15,21,23
246:5,9,11,19,21
247:7,12,19,25
248:6,8,14,20,25
249:5,12,19,25
250:5,10,15,17,22
251:2,4,11,16,21
252:1,6,14,16
253:1,6,13,18,24
254:4,9,16,22
255:4,11,19 256:1
256:3,11,16,21
257:4,9,16,22
258:5,12,19,25
259:4,16 260:1,8
261:8 262:18
263:5,9 264:13
266:4 267:18
268:7,8 271:3,14
271:16 272:13,21
273:21 274:4,24

275:2,6,8,17
276:24 277:8,10
277:22 278:10,12
**theoretically**  99:9
**thing**  10:9 84:24
  85:15 93:3 96:10
  154:13 160:23
  170:22
**things**  18:14 23:5
  25:14 36:10,12
  60:10 77:16 97:22
  105:4 116:23
  125:7 178:16
  184:17,20,22
  187:9 202:11
  204:21 205:8
  206:9 211:18,21
  212:24 217:14
  227:1 237:6 261:3
  262:3 265:9,18
  266:1
**think**  16:16 18:7
  19:11 20:4 27:20
  28:17 32:4 34:11
  36:17 37:17 38:8
  38:8 43:5 47:12
  47:13,17 48:19
  49:13 52:25 53:12
  59:20,22 61:3
  69:4,12 73:7,14
  91:17 92:14
  105:21 108:7,19
  112:6 122:14
  125:21 127:2,10
  129:1 130:3
  134:11,20 135:10
  135:21 137:22
  139:22 140:12,13
  141:9 143:7
  148:13 149:9
  151:22 152:1,2

153:9,9,14 154:11
158:25 160:20,22
166:20 168:13,15
168:18 170:7
174:25 179:18,20
179:23,25 180:16
181:1,13 183:16
184:8,15,15,16,18
186:3 187:1,6
189:14 193:1
196:18 197:24
200:10 203:6
204:23 205:23
207:20 209:12,14
211:6,6,7,8 216:24
221:18 222:17
223:3 225:21
228:17,17 265:13
266:11
**thinking**  102:5
**third**  182:2,19
**thirty**  281:18
**thorough**  81:9,14
  148:17 149:1
**thoroughfare**
  185:3 186:12
**thoroughness**
  81:23
**thought**  16:2
  52:19 90:4 140:17
  183:25 186:12,17
  211:11 266:20
  267:6 275:9,15
  276:4,5
**thousand**  16:16
  17:20 18:5 47:18
**thousands**  95:15
  95:16 98:15,16
**three**  52:3,25 55:6
  58:24,25 59:1,1
  66:23 67:2 73:16

85:24 86:2
**throw**  142:15
**tied**  146:7
**time**  6:7 9:8 20:16
  25:13 27:21 37:3
  39:2 41:2,23 51:9
  52:4,17,22,23,23
  53:21,22 54:3
  57:21 59:6 63:4
  65:1 72:1 79:8,13
  83:22 90:9 97:18
  98:19 104:17
  105:3,16 106:4
  122:24 125:9
  126:21 127:16
  139:2 151:10
  152:14 153:4,18
  156:17 159:4,8
  163:6,12 170:19
  187:22 188:11
  189:11 191:1,13
  191:24 195:24
  205:18,18 206:11
  206:11 207:4
  210:25 218:22
  219:24 220:19
  227:14,18 231:7
  233:13 243:22
  259:14 261:21
  279:20
**times**  10:15 20:3,6
  20:20 47:6 52:16
  52:16 59:21 62:11
  67:23 70:6 83:13
  98:23 99:13
  104:23 105:20
  106:10 113:18
  130:4 147:7,7,16
  148:2,4 149:12
  170:16 177:14
  209:4 266:8

**timothy** 199:10,19
200:1
**tip** 102:3
**tips** 135:22 197:9
**title** 63:13
**titled** 73:16
**today** 7:11 9:9,17
9:19 10:25 11:25
12:20 24:10 33:1
95:13 122:5
127:11 189:12
227:22 232:24
233:5 260:10
**today's** 277:24
**told** 35:20 75:20
75:21 103:5
157:12,14 158:20
158:21 159:23,24
216:7 236:2
**tony** 132:18
143:20 144:21
145:5,10,14,15
151:14,24 156:1
156:22 158:7,21
161:24 162:7
167:5 176:15
194:1 195:20,25
196:6,22 197:10
198:21 199:18
216:10 226:19
241:23 246:16
**tool** 245:13
**top** 48:10 111:5,14
138:3 143:10
154:25 155:23
199:6 224:20
**torture** 29:3,5
**total** 15:7 16:14
47:15 59:18
277:25

**totally** 203:18
**township** 35:24
36:18
**trade** 258:3
**tradition** 64:18
**traffic** 175:23
176:11,21 184:23
**trained** 184:3
**training** 13:1 14:6
14:15,24 15:18
16:3 53:4 55:9
56:19 57:4
**trainings** 50:25
55:11 108:24
**transcribed** 282:7
**transcript** 187:12
232:15 268:19,24
269:1 275:19
278:11 279:12
281:11,12 282:5
282:12 283:5,11
283:17
**transcriptions**
76:14
**transcripts** 11:16
85:24 154:1 274:2
274:18
**transferred** 64:22
**traumatic** 190:5
**travel** 152:12,16
**trial** 20:1,3 27:12
33:10,16 37:22
39:7,8 49:1,3,15
72:15 79:18 131:3
131:13,24 148:7
164:24 187:21
215:21 224:24
226:10,22 229:25
237:21 255:16
268:19,25 272:10
273:19

**trials** 131:17
**trick** 105:25
**tried** 74:4,5,6
99:13 141:13
189:25 204:23
**trinity** 82:18,25
**true** 81:19 84:15
118:21 121:16
124:6 181:19
182:24 193:17
197:11 198:3
218:17 235:10
238:1 277:6
279:16
**truth** 80:13 279:10
**try** 8:25 21:12
24:17 83:24 96:15
98:21 105:1
106:22 123:2,20
123:23 148:5,22
156:19 204:4
245:13
**trying** 28:11 41:22
53:24 92:8 105:24
105:25,25 106:2
108:6 140:20
179:7 186:17
194:18 203:17,23
204:14 217:10
266:5
**tube** 126:9 228:20
**turn** 5:7 72:19
76:19 137:17
**turned** 26:13
39:10,15 72:14,20
98:24 182:8
273:12
**twisting** 266:3
**two** 8:17 16:5
21:17 23:18 28:10
28:21 29:4 36:3

38:12 42:2 43:23
45:25 46:9 50:25
52:4 60:5 67:15
108:5 113:17,25
115:19 118:14,23
124:12 137:17
141:3,4,10,14
142:5,18,23 143:4
143:8 145:23
157:16 174:7,13
179:10 181:7,7,15
181:17 184:17
186:13 187:4
188:5,23,24
190:18 207:15
220:13 243:2
255:15 259:4,5
262:7 269:16,18
269:19,21,23
270:18 271:22
272:2 274:2
**twofold** 88:23
**tying** 196:14
**type** 53:19 60:21
71:3 114:13
180:23
**typewriting**
279:14
**typical** 61:7,9 66:2
85:13,13
**typically** 24:21
50:4 176:25

| u |
| --- |

**u.s.** 4:14
**uh** 8:20
**ultimate** 194:12
199:2
**unable** 248:18
**unaccepted**
265:10,10

**uncle** 39:4 40:11
**uncommon** 184:6
**understand** 7:22
8:24 23:12 49:9
125:21 140:20
147:9 174:23
203:18 204:4,14
216:18
**understanding**
23:18 80:5 156:12
177:22 185:9,16
195:23 196:1,2
**understands**
119:20
**understood** 9:3
175:1 186:10,11
**undertaken**
199:10
**undertaking** 99:1
**undoubtedly**
178:8
**unduly** 111:16,24
112:3,6,9
**unidentified** 1:8
**uniform** 61:7 63:5
64:15,19
**uniformed** 61:24
**unique** 26:16 29:9
116:9 170:10
173:25 208:7,20
**unit** 5:13 62:15
63:7 64:12 125:20
126:2
**united** 1:1 5:17
31:20 33:23 35:24
38:17
**units** 59:11 278:1
278:8
**universities** 34:10
**unknown** 155:24

**unprejudiced**
120:23 128:9
**unreasonable**
133:12
**unreliable** 101:7
191:15
**unusual** 59:14,17
116:10,16,18
124:16,18 132:12
208:3 231:17,23
275:10,14,15,16
275:23 276:5,8
**ups** 268:3
**upset** 145:14
**use** 4:18 23:18
50:13 52:22 58:3
77:8 94:21 95:5,9
95:22,25 96:4,24
99:9,16 105:1
123:25 138:1
152:19 161:4
173:19 202:13,19
202:22,25 205:10
211:21,22 266:21
**uses** 210:17
**usually** 17:19 49:1
49:24 62:12 66:21
66:21 85:14 92:5
104:2
**utilized** 219:8

**v**

**v** 1:5 281:6 282:3
283:3
**vacant** 269:17
**vacation** 65:22
66:5,13
**vaguely** 42:25
132:9
**valid** 92:23 136:10
136:11 222:17
223:3,8

**validates** 180:24
**variables** 121:13
123:11 125:13
170:23
**variations** 170:20
**varies** 17:13
**variety** 125:6
152:18
**various** 59:21
160:5,24,25
**vehicle** 175:24
176:3
**vehicles** 186:15
**verbal** 8:19
**verifiable** 136:6
**veritext** 3:12 5:22
5:24 278:2 281:1
281:7 284:1
**veritext.com.**
281:17
**versus** 5:16 22:2
22:15 28:2 31:19
33:22 35:23 38:16
42:20 43:17 108:6
178:15,15 241:9
**vested** 140:5
**vicinity** 24:2 153:7
**victim** 23:23,24
32:12 36:6 89:16
125:8 143:9
147:21 151:11
155:11 157:8,10
170:19 201:13
272:4 273:11
**victim's** 201:13
**victims** 36:7
103:20
**victor** 242:20
**video** 4:20 5:10,14
79:2,5 125:17,24
126:5,8,15,24

127:17,21 128:6
129:3,24 159:1
228:15,20 278:5
**videoconference**
1:17 2:9,16 3:6
279:20
**videographer** 3:12
5:1,22 6:20 79:7
79:12 159:3,7
227:13,17 259:9
259:13 274:22
275:1,4 276:13,16
277:19,23
**videotaped** 1:13
**view** 93:10 142:20
153:13 165:19
183:18 186:23
204:1 220:17
221:10
**viewed** 24:4
165:12,13 168:4
262:5
**viewing** 105:15
119:13 191:25
**village** 28:2 280:4
**violate** 88:5
111:20,24 112:1
112:12,14,15
117:12,16 120:7
120:11,12
**violated** 206:14
**violation** 30:25
**virtually** 42:13
202:17
**volleyball** 34:9,9
34:11
**volume** 129:6
**volunteer** 99:14
**voted** 60:20,21

**w**

w 43:17
wacker 2:13
wait 227:5
waiting 16:23
27:19
waived 281:19
waiving 277:17
walk 8:3 21:24
98:20 175:3
walker 217:7
242:12
waller 77:21
want 8:21 21:15
23:11 37:5 49:9
50:24 57:25 58:1
63:12 74:17 76:7
77:18 80:3 83:3,4
86:14 96:2,6 97:3
97:9,15 99:12
106:10 109:9
124:17 128:5
144:6 145:10
146:4,12 147:9
149:19 159:14
167:24 170:9,21
171:17 174:23
198:10 205:22
206:2 212:21
215:6 216:15,18
220:13 227:9
229:5,21 263:25
275:20
wanted 78:20
161:24 171:12
173:24 239:5
wants 83:21 149:8
warrant 201:15
229:16
warranted 174:8

warrants 201:4
246:14
watching 182:3
271:20
way 24:3 27:6
31:8 35:15 37:20
57:24 58:5 60:17
61:8 62:25 63:6
91:2 93:2,9,23
106:1 122:11,12
123:10,10,10
142:17 144:7
153:10 155:17,20
157:23 161:25
171:21 188:13
261:22 264:22
265:1
ways 122:10 124:4
170:9 220:9
wayside 60:17
we've 13:11 130:7
207:14 219:20
weapon 87:1
151:6,13
wearing 25:15
165:15 168:6
171:18
website 13:11,13
weeds 97:12
124:14
week 36:6 53:9,9
weeks 162:13,24
163:3,18
weight 105:3,8,11
105:18 106:6
weights 104:24
went 30:1 51:17
53:6 77:14 78:8
94:6 107:9 141:15
189:19

west 2:5 3:4
whereof 280:3
whispering 5:5
whitaker 138:20
247:17
white 96:11,23,25
111:22 124:1,2
whodunit 81:19
wide 185:17,20
wife 39:18 81:19
wife's 15:14,15
william 168:19
williams 45:24,24
46:4,9
willing 99:20
windows 220:8
wiretap 154:8
208:2,6,17,18
wiretaps 211:20
212:25
wite 96:24,24 97:1
116:25
withdraw 224:7
withdrew 221:7
221:17 222:2
223:1 224:10,11
230:14
witness 4:3 6:21
6:22 7:2 23:23
24:1,5 26:3,22
30:19 32:22 40:10
41:17 42:11,11
45:14 46:16,24
47:24 48:5,12,25
49:20 57:15 59:16
65:14 69:7 70:8
71:2 72:7,12
74:14 75:7 80:15
83:20 84:11,23
85:12 86:11 88:22
89:11,15 90:18

94:10 98:9 103:1
104:21 105:5,13
106:15,22,23,25
107:3,8 108:15
110:18,25 112:3,6
115:10 117:10,15
119:13,19,19
120:3,10,23
121:10 122:3,20
123:6,14,20,22
124:21 128:9
131:8 136:16
139:22 141:17
144:13 146:3,10
149:6 152:1 164:4
164:21 169:21
171:13 172:2
175:8,10 177:5,9
177:13 178:17
179:12,13 181:24
182:10,11 183:16
186:22 187:7
190:15,22 191:18
191:21,22 192:9
196:18 197:21
198:8,18,24
207:12,20 208:11
213:12,21 215:3
217:8 218:13
221:16 222:13,21
223:7,24 226:4
230:10,17,22
231:5,23 232:7
233:17,22 234:19
235:10,19,25
236:7,19 237:18
237:25 238:20
239:1,9,17,20
240:2,9,20 241:15
242:2,8,16,23
243:4,13,18 244:2

244:10,17,19,25
245:6,10,16,22,25
246:10,20,25
247:8,14,21 248:2
248:7,16,21 249:1
249:7,15,21 250:1
250:6,11,16,23
251:3,6,12,18,22
252:2,8,15 253:2,9
253:14,20,25
254:5,11,24 255:7
255:13,21 256:2,4
256:12,17,24
257:5,11,17,24
258:7,14,21 259:2
259:24 260:7
261:7 262:14
264:1,8 265:22
267:11 268:12
271:15,17 273:24
274:6 275:14
277:1,9,13 279:9,9
280:3 281:8,11
282:1,4,11 283:1,4
283:15
**witness's** 115:20
115:25 118:25
119:7 178:17
191:9
**witnesses** 45:1,1
89:16 90:1 91:17
97:19 103:16,20
104:16 105:9,20
105:23 106:12,19
107:14 125:2,9
141:17 145:24
170:19 177:25
180:12,25 181:1,4
181:11,12 183:3
184:3,25 186:21
188:19 189:23

201:12 214:11
216:4,5,23 230:2,8
243:1 248:13
258:16 268:20
**witness'** 281:14
**woman** 34:3 38:24
38:25 42:2
**women** 32:15 36:3
43:23 236:2
**wooded** 36:5
**word** 95:6 96:4
112:7,23,25
115:16,16 116:4
**words** 49:19
101:20 116:15
163:19 266:3
**wore** 173:17
**work** 63:6
**worked** 28:12,19
29:12 55:23 99:18
189:22
**worker** 55:20
**working** 19:18
51:20,25 52:6
53:21 65:24 92:2
**workload** 56:3
**world** 118:18
**worries** 275:6
**wounds** 180:21
**write** 77:3
**writing** 178:2
**written** 203:5
205:16 210:9,10
259:18
**wrong** 114:17
174:11 182:8
224:5
**wrongfully** 93:5
**wydrick** 43:16

| x |
|---|
| **x** 4:1 |
| **xavier** 157:14 |
| 159:24 |

| y |
|---|
| **y** 43:17 |
| **yards** 106:18,20 |
| **yeah** 9:22 10:11 |
| 21:6 26:21 30:8 |
| 31:11 48:23 55:3 |
| 69:22 74:17 79:5 |
| 86:24 95:1 99:7 |
| 105:23 106:15,16 |
| 110:1 112:25 |
| 116:3 118:17 |
| 124:24 130:19 |
| 136:2,22,23 148:4 |
| 150:12 156:8 |
| 165:5 166:2 |
| 168:14,21 173:8,8 |
| 173:9,9,14,23 |
| 177:8 187:15,16 |
| 190:3 196:7 |
| 217:22 227:9,11 |
| 241:7 249:13 |
| 266:5 271:5 |
| 272:19 276:7 |
| **year** 15:22 16:9 |
| 17:3,6,21 18:4,5 |
| 47:14 52:16 59:7 |
| 67:21,23 68:1 |
| 126:4,4 |
| **yearly** 17:19 |
| **years** 16:24,25 |
| 17:11 18:1 21:18 |
| 25:4 27:24 51:17 |
| 52:24 53:4,16,25 |
| 55:22,23 58:24 |
| 60:5,18 65:4,7,8 |
| 65:11 66:8,10 |

67:22 69:7 70:16
89:14 91:21 102:6
122:8 123:12
169:12 187:14
188:13,17,20
189:24 190:2,15
255:15
**yep** 10:12 20:13
30:7 170:6
**york** 62:2
**young** 39:1 65:5

| z |
|---|
| **zero** 15:19 16:10 |
| **zoom** 189:17 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT

1 (Monheim dep)

November 12, 2021


Mr. Ahmed A. Kosoko, Attorney at Law.
Johnson and Bell
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603


Dear Mr. Kosoko:

RE:  Eric Blackmon v. The City of Chicago, Illinois, et al. United States District
Court, Northern District of Illinois, Eastern Division, Case No.: 1:19-cv-767

Contained within this correspondence are my findings and opinions concerning the
above captioned case. These findings and opinions are based upon the materials
I have reviewed thus far. Of course, I reserve the right to add to or modify my
opinion if new information becomes available.

## CREDENTIALS

What follows is a summary of my law enforcement and academic background
which, I believe, qualifies me to render expert opinion, analysis, and testimony
regarding this case.

I retired from the Miami-Dade Police Department in 2004. My employment with the
department spanned 30 years. The Miami-Dade Police Department is the largest
law enforcement agency in the Southeastern United States and is the eighth
largest metropolitan police department in the entire nation. The vast majority of my
career was spent occupying investigative positions such as detective or supervisor
of detectives. I was assigned to the Homicide Bureau as a squad supervisor during
the final 12 years of my career. Prior to that, I spent 16 years in the Robbery Bureau
as both a detective and a supervisor.

At one point in my career, Miami-Dade County had the dubious distinction of being
considered "the murder capital of the United States." The U.S. Department of
Justice annually recognizes Miami-Dade County as one of most violent
jurisdictions in the country. The per capita murder rate in Miami-Dade is
consistently well above the national average. I have been personally responsible
for more than 500 homicide investigations, thousands of robbery investigations,
countless death investigations and scores of Officer-Involved Shooting

investigations. I have been granted expert witness status regarding homicide investigative procedures, robbery investigative procedures (including line-up techniques), and general investigative procedures in both Federal and State (Florida) courts.

In 2006, I was asked to return to the Miami-Dade Homicide Bureau as a paid Cold Case consultant. I was hired to evaluate the 2000+ unsolved murders within the bureau's archives for viable investigative leads. I successfully reviewed more than 400 cold cases and recommended that 65 be reopened.

I was also hired by the Alachua County (FL) Sheriff's Office, in 2011, to audit and assess their homicide cold case files. This evaluation (20 cases) was completed in eight months and investigative recommendations were made in several of the county's unsolved murders.

I have been a certified instructor of criminal investigations courses since 1985. For several years, I conducted an eight-hour seminar for the Southern Police Institute entitled, "How to Conduct Robbery Investigations." This block of instruction placed heavy emphasis on how to properly manage photo lineups and physical lineups.

In 1999, I began teaching a course called "Conducting Death and Homicide Investigations" for the International Association of Chiefs of Police (IACP). The IACP is the largest law enforcement association in the world and has a sterling reputation for providing an exceptional training curriculum.

I have conducted training sessions on homicide investigative techniques for the Department of Justice, the FBI, DEA, the Treasury Department (ATF), the Florida Department of Law Enforcement (FDLE), the Southeast Florida Institute of Criminal Justice in Miami, the Metropolitan Police Institute (MPI) also in Miami, SRR Training in Boston, the Taylor Group in Maryland, and the Public Agency Training Council (PATC) in Indianapolis, Indiana.

I am currently a member of the Public Agency Training Council's Cold Case Committee. The committee provides pro bono assistance to police departments across the country by analyzing unsolved murder cases and recommending new investigative strategies. I have also provided this same service individually to a number of homicide investigators who have sought my help in evaluating suicides, natural deaths, accidental deaths, and homicides.

In 2004, I formed my own company called HomicideTraining.com. HomicideTraining.com offers training in homicide investigative techniques and officer involved shooting investigative procedures to law enforcement agencies

throughout the country. Since the company's inception, I have personally trained more than 7,500 investigators in these specialized methodologies.

I received my Baccalaureate degree (B.S.) in Law Enforcement from Western Illinois University in Macomb, Illinois, and my Masters (M.S.) in Public Administration from St. Thomas of Villanova in Miami. Throughout my career, I have attended a number of homicide schools, including the Metro-Dade Medical Examiner's Office, "Police Medical Investigation of Death", Advanced Homicide Investigations (MPI), and the renowned Colonel Henry F. Williamson Homicide School in Albany, New York, sponsored by the New York State Police. I have also attended a variety of training sessions regarding the use of DNA evidence, including a seminar presented by Bode Laboratories.

## MATERIALS

I have reviewed the following materials in the preparation of this report:

1. Complaint filed under case number 1:19-cv-767 in the United States District Court Northern District of Illinois, Eastern Division.
2. Deposition of Commander Eric Winstrom dated July 13, 2021.
3. Deposition of Sergeant John Pellegrini dated July 26, 2021.
4. Deposition of Michael Cronin dated July 30, 2021.
5. Deposition of Detective Gregory Jones dated March 9, 2021.
6. Deposition of Lisa McDowell dated January 22, 2021.
7. Deposition of Frencshun Reese dated April 18, 2017.
8. Deposition of Eric Blackmon dated July 27, 2021.
9. Deposition of Kenneth Fiedler dated November 18, 2021.
10. Deposition of Eugene Schleder dated March 4, 2021.
11. Deposition of Rimas Cernius dated March 9, 2021.
12. Deposition of Detective James Sanchez dated July 20, 2021.
13. Court testimony of Geoffrey Loftus and Eric Blackmon dated January 14, 2021
14. Trial testimony of Lisa McDowell dated September 22, 2004.
15. Trial testimony of Frencshun Reece.
16. Verdict announcement by Judge Lacy
17. Application for Electronic Surveillance Order No.: 02 ESO-002.
18. Federal Writ of Habeas Corpus Memorandum dated January 27, 2018.
19. Appeal Decision from Circuit Court of Cook County dated September 28, 2007.
20. Appeal Decision from Circuit Court of Cook County dated May 14, 2021.
21. Motion to Suppress Identification Testimony dated April 28, 2004.

22. Chicago Police Department General Order 88-18.
23. Tony Cox Homicide Timeline.
24. Report of Expert Dennis Waller dated September 27, 2021.
25. Chicago Police Department Area File which includes Police Reports, Medical Examiner Report, Crime Scene Photos, Line-up Photos, Police Department's Annual Report, Detective Bureau Standard Operating Procedure and more.

## REFERENCE MATERIALS

I have utilized the following reference materials in preparation of my report; therefore, these materials have influenced my evaluation of this case:

O'Hara, Charles. Fundamentals of Criminal Investigation. Springfield, Charles Thomas Publisher, 2003.

Weston, Paul & Lushbaugh, Charles. Criminal Investigation: Basic Perspectives. New Jersey, Prentice-Hall, 2006.

Shuster, Beth. Police Lineups: Making Eyewitness Identification More Reliable, NIJ Journal (issue number 258), Washington D.C., U.S. Department of Justice, National Institute of Justice, 2007

Mecklenburg, Sherry. Eyewitness Identification: What Chiefs Need to Know Now, Police Chief Magazine, April 2009.

Showups, Photo Identification and Lineups: Concepts Paper, International Association of Chiefs of Police (IACP), Alexandria, Virginia, 1993, revised 2003.

Eyewitness Identification: Model Policy, International Association of Chiefs of Police (IACP), Alexandria, Virginia, Effective Date: September 2010.

Showups, Photo Identification and Lineups: Model Policy, International Association of Chiefs of Police (IACP), Alexandria, Virginia, 1993, revised 2003.

Showups, Photo Identification and Lineups: Training Key #414, International Association of Chiefs of Police (IACP), Alexandria, Virginia, 1992.

Reno, Janet and Fisher, Raymond and Robinson, Laurie and Brenan, Noel and Travis, Jeremy. Eyewitness Identification: A Guide for Law Enforcement Officers, Washington, D.C., U.S. Department of Justice, National Institute of Justice, 1999.

Ashcroft, John, Daniels, Deborah, and Hart, Sarah V. <u>Eyewitness Identification: A Trainer's Manual for Law Enforcement Officers</u>, Washington, D.C., U.S. Department of Justice, National Institute of Justice, 2003.

Reno, Janet and Fisher, Raymond and Robinson, Laurie and Brenan, Noel and Travis, Jeremy. <u>National Guidelines for Death Investigation</u>, Washington, D.C., U.S. Department of Justice, Nation Institute of Justice, 1997.

Parker, Robert. <u>Florida Law Enforcement Handbook</u>, Board of County Commissioners, Miami, 2007.

United States Supreme Court decision, *United States v. Wade*, 388 U.S. 218 (1967).

United States Supreme Court decision, *Kirby v. Illinois*, 406 U.S. 682 (1972)

United States Supreme Court decision, *Simmons v. United States*, 390 U.S. 377 (1968)

United States Supreme Court decision, *Brady v. Maryland*, 373 U.S. 83 (1963).

United States Supreme Court decision, *Giglio v. United States*, 450 U.S. 150 (1972).

United States Supreme Court decision, *Manson v. Braithwaite*, 432 U.S. 98 (1977).

United States Supreme Court decision, *Neil v. Biggers*, 409 U.S. 188 (1972).

United States Court of Appeals, Seventh Circuit. *Coleman v. City of Peoria, Illinois, et al*. 925 F.3d 336 (2019).

<u>Identification Procedures</u>. Rules 42.2.11 and 42.2.12, Commission on Accreditation for Law Enforcement Agencies (CALEA), 2008.

## CASE SUMMARY

On July 4, 2002, at approximately 4:30 in the afternoon, 36-year-old Tony Cox was shot multiple times by two assailants while standing in front of Fat Albert's Kitchen located at 1143 S. Pulaski Road in the city of Chicago. When Chicago Police Department uniform officers arrived on the scene, they observed the victim bleeding profusely from several gunshot wounds to the head. He was attended to by Chicago Fire Department personnel and eventually transported to Mt. Sinai Hospital where he was pronounced deceased.

A review of CPD police reports revealed the following:

A black female who identified herself as 33-year-old **Frencshun Reece** told officers that she had witnessed the shooting. She advised that she was travelling northbound on Pulaski Road in her Jaguar when she observed the victim standing on the sidewalk in front of Fat Albert's Restaurant. Standing with the victim was a white male and two black males. All four of the individuals appeared to be involved in casual conversation. She watched as the white male walked away from the group and appeared to be locking or unlocking the door to the restaurant. One of the black males (Subject #1) was standing to the left of the victim and the other black male (Subject #2) was standing on the victim's right side. As the victim turned to speak with Subject #2, Subject #1 shot the victim in the head. A split second before the victim was shot Subject #2 began running north on Pulaski. After firing the weapon into the victim, Subject #1 also ran north on Pulaski. Reece watched as the victim fell to his hands and knees. The victim was shaking violently and trying to stand up when he fell back on his butt. Apparently realizing the victim was still alive, Subject #1 returned and shot him again. Subject #2 also returned and shot the victim twice in the face. As they fled, both subjects ran directly in front of her vehicle. She would later testify that they were so close that she could have hit them with her car. In fact, her son told her to "ram them." They looked directly at her and fled north on Pulaski toward Grenshaw. Reece then called 911 and pulled her vehicle into an alleyway near the restaurant. She described the offenders as follows:

**Subject #1**- Black male; late 20s or early 30s; approximately 5'5"; 150 pounds; dark complexion; wearing a yellow shirt, dark shorts, white gym shoes and no socks.

**Subject #2**- Black male; in his 20s; approximately 5'10'; 160 pounds; dark complexion; wearing dark shorts and white gym shoes.

The witness's son, 12-year-old **Davious Whitaker** was a passenger in the car. He said he heard four shots and saw two black males run north on Pulaski and then west on Grenshaw. He gave the following descriptions:

**Subject #1**- Black male; medium afro; short; thin; wearing an oversized white shirt, black shorts, and black shoes. He saw him stick a handgun in his waistband.

**Subject #2**- Black male; no further description.

Frencshun Reece also testified that when the second subject returned, he shot the victim right in the eye and as he turned to flee, she saw him nod at the white male who was looking directly at him. She went on to say that the white male prevented

her from rendering aid to the victim and told her not to call 911 because he had already done so. (Phone records later revealed that the white male **did not** call 911). On a taped line Reece told the 911 operator, "Two black males shot another black male. This guy right here, this white guy with me, he can also give a positive ID because he was standing right there. I'm surprised they didn't shoot him."

The white male was subsequently identified as **Richard Arrigo**. He told detectives he was part owner of Fat Albert's and that he has known the victim since February of 2002. Before the shooting incident he said he and the victim were talking inside the restaurant for 20 or 30 minutes. They eventually walked outside because Arrigo wanted to show the victim a new dent on his car. As they were standing on the sidewalk Arrigo said he turned to lock the door to his business and as his back was to the victim, he heard two gunshots. When he looked around, he saw Tony on the ground and watched as a black male shot him two or three more times. He then saw two black males run north on Pulaski to Grenshaw. He gave descriptions of both:

**Subject #1**- Black male; 25-26; 5'8" – 5'9"; muscular build; short Afro; wearing a yellow shirt and jeans.

**Subject #2**- Black male; 20s; 5'6"; medium build; dark complexion; wearing a light blue tee shirt, jeans, and a blue baseball cap.

Arrigo acknowledged that his nickname was "Popeye." He gave permission to Detective Jones to examine his cell phone. He also showed Detective Jones a business card with a phone number (708) 960-0709 on it and "Boonie (house)" written next to it. Arrigo identified a photograph of George Davis as the same person he knew as Boonie. When Detective Jones viewed the call log on Arrigo's cell phone, he determined that Arrigo had placed a call to George Davis, aka: aka Boonie Black, immediately after the homicide had occurred. Investigators were familiar with Davis, aka: Boonie Black, as the leader of the New Breed Street Gang that was active in that area.

Arrigo also called someone at 4024 Grenshaw shortly before the murder. Investigators now suspected that Arrigo may be complicit in a plot to kill the victim[1]. Based on this information, detectives conducted a computer search of the criminal history database for individuals who had recently been arrested and given a home address in the 4000 block of Grenshaw. Seven names emerged as a result of that search and digital photographs of each person were obtained.

---

[1] Bates 5860

Richard Arrigo's phone records were obtained via subpoena and revealed that he did not call 911 as he had told the witness. However, he did call George Davis, aka: Boonie Black at 4:28:09 p.m. The first police car was dispatched to the murder scene at 4:28:15 p.m.; so, Arrigo called Davis even before the first emergency units were notified of the shooting incident.

The subpoena also revealed the following:

> On July 1, 2002, Arrigo called Davis eleven times
> On July 2, 2002, Arrigo called Davis six times
> On July 3, 2002, Arrigo called Davis three times
> On July 4, 2002, Arrigo called Davis nine times (seven of those calls were made shortly after the murder. One of the calls was made immediately following his interview with detectives at Area Four HQ. During that interview he stated that he had not spoken to Davis in weeks).

Between July 1 and July 4, Arrigo either called Cox (victim) or Cox called Arrigo ten times. Arrigo called Davis 58 minutes before leaving a voice mail message on Tony Cox's phone and less than four hours before the murder. A pen register placed on Arrigo's phone indicates that he called Davis 48 times between July 1 and August 12, 2002[2].

Witness, Frencshun Reece, was asked to go to Area Four police headquarters where she was shown the digital photos. From that group of seven she said two photos (Deon Howard and Vincent Williams) resembled the subjects. She also pointed to the hairstyle of one of the individuals in the pictures (Laranes Jackson) and said that it was similar to the way the second subject was wearing his hair.

On July 5, 2002, an autopsy was performed on the victim at the Cook County Medical Examiners' Office. Assistant Medical Examiner Dr. Eupil Choi determined that the cause of death was multiple gunshot wounds and that the manner of death was homicide. Dr. Choi's postmortem exam found that Tony Cox had sustained four gunshot wounds:

1. Through and through gunshot wound to the right ocular angle involving the eye and the brain.
2. Through and through gunshot wound of the right cheek involving the maxillary sinuses.
3. Gunshot wound of the left forehead involving the brain.

---

[2] Bates 6956-6981

4. Gunshot wound to the left forehead involving the brain.

He also suffered a laceration to the back of his head which may have occurred when he fell to the pavement after being shot.

Projectiles that were removed from the victim and shell casings that were collected at the crime scene were submitted to the Illinois state Police crime lab for analysis. The crime lab determined that the casings and the projectiles were fired by two different guns. The casings were ejected from a .25 caliber automatic pistol and the projectiles were fired by a .38/.357 caliber weapon.

A thorough area canvass was conducted by both uniform officers and detectives. Ridgell Lavelle was interviewed at the Hair Fanatics barber shop located next to Fat Albert's Kitchen. Lavelle said he did not see the shooting, but he did tell the detectives that the Jeep, which was parked in front of Fat Albert's Kitchen, was his.

Sherrie Stevenson, the victim's live-in girlfriend, was interviewed by investigators. She told them that on the afternoon of the murder the victim was taking a shower when she checked the messages on his cell phone to see if another woman had been calling him. One of the messages she listened to was from a male with an Italian accent who said it was important that Tony Cox get in touch with him right away. A search warrant was obtained for the voice mail on Cox's cell phone and the message was retrieved. The male voice on the message said, "Yeah Tone, it's Fat Albert. Give me a call buddy. You've got the number. 268-5555 area code 708." That number was known to be the phone number to Richard Arrigo's cell phone. When asked about the message Arrigo initially denied leaving the message; however, when it was played back, he recognized his voice and conceded that it was him on the recorded voice mail.

Stevenson also told investigators that Tony Cox had confided in her about problems he was having with Boonie Black the leader of the New Breed gang. Apparently Boonie Black (George Davis) had loaned $2000 and a quantity of drugs to the victim's cousins, "Darnell" and "L" to open a drug hole in another state. The two individuals never paid back the money or the drugs and Boonie told Tony Cox that it was now his problem and he needed to take care of it. Cox said that he told Boonie he was not going to get involved because "Darnell" and "L" are family.

In an interview with Sophia Jackson, a girlfriend of the victim, Detective Sanchez was told that the victim was "having problems" with "Pops." Jackson knew "Pops" to be the leader of the New Breed gang, George Davis, aka: Boonie Black. Tony Cox told her that Pops had given his cousin "L" and another person $2000 and an ounce of narcotics to start their own drug operation in either Minnesota or Indiana.

Pops was angry because he had not been paid back and he held the victim personally responsible for the loss because they were his friends. Pops told the victim that he either wanted his investment returned or he wanted them shot as punishment. Cox told Jackson that he refused Pops demands. She said that whenever Pops wanted to talk business with Tony, he would arrange to meet him at Fat Albert's on Pulaski. The victim told Jackson he was taking precautions because he knew Pops was angry about the money and drugs and might try to harm him.

On July 9, 2002, an anonymous phone call was received during which an unknown black male stated that "Pride" aka: "Little E" and "Keno" killed Tony Cox. The caller claimed they were driving a red Ford Tempo and still had the guns used in the murder with them. They were last seen in the area of Country Club Hills.

On July 24, 2002, the victim's brother Ethienne Cox was interviewed at the Cook County Jail by Detective Cronin. He said that approximately one month prior to the murder, his brother visited him in jail and told him that Boonie Black wanted to kill "Little L" and "Poo." Tony told his brother that Boonie had given an ounce of cocaine to "Little L" and "Poo" to sell in Peoria, Illinois. Because they had not paid him for the drugs, Boonie Black wanted them killed. Ethienne Cox also told Detective Cronin that another one of his brothers, Xavier Cox, told him he had heard a rumor that "Keno", also known as "Little Mike," and "Pride" were the two black males who killed their brother. He said "Pride's" first name is Eric and both subjects are members of the New Breed street gang.

By conducting various searches through CPD records it was learned that Keno's real name is Michael Davis. Michael Davis is the nephew of George Davis, aka: Boonie Black. Michael Davis' mother is Ruth Davis, who is George Davis' sister.

As part of the ongoing investigation, recordings of the 911 calls were requested by the investigators from the police department's dispatch center. It took several weeks for technicians to compile the information. The analysis of the 911 calls revealed that three females made emergency calls regarding the shooting. One call was from the known witness, Frencshun Reece, and the second was from a woman named Lisa McDowell.

On August 12, 2002, Detective Cronin interviewed Ms. McDowell. She told Detective Cronin she was driving southbound on Pulaski Road when she observed a black male and a Hispanic male standing on the sidewalk in front of a restaurant. She heard a gunshot, turned, and saw the black male had fallen to the ground. The Hispanic male was standing over the victim holding what she thought was a gun in his left hand and a cigar in his right. (It was later learned that the H/M was

holding a cell phone and not a gun). She then saw two black males emerge from the north side of a building and approach the victim. One of the black males was holding a dark colored handgun in his right hand. She watched as the gunman shot the victim twice while he was lying on the sidewalk. She described the subjects as follows:

**Subject #1**- Black male, early 30s; 6'; slender; braided hair; wearing a light blue shirt and dark colored pants. Armed with a dark handgun.

**Subject #2**- Black male; early thirties; 5'9"; slender; wearing a white shirt and dark colored pants.

McDowell described the Hispanic male as; late 40's; 5'10"; 210-220 pounds; with grey hair and a big stomach; wearing a dark green tee shirt and blue jeans. As she continued driving southbound on Pulaski, she looked in her rear-view mirror and saw the two black males run west and then south on Pulaski.

On August 29, 2002, Detective Sanchez interviewed Lisa McDowell and presented her with a photo array containing a picture of the Plaintiff. After viewing the photo display, she positively identified the plaintiff here, Eric Blackmon, as the person she saw shoot the victim and run from the scene.

On August 31, 2002, a photo array containing the photograph Eric Blackmon was shown to witness Frencshun Reece. From that photo array, Reese positively picked Blackmon as the person she saw shoot the victim in the head on July 4, 2002, in front of Fat Albert's Kitchen. She also tentatively identified the photo of Michael Davis as being the other subject involved in the murder.

During this interview Detective Sanchez learned that McDowell's niece, Natasha Conley, was also in the vehicle at the time of the shooting. Conley said she was in her aunt's vehicle traveling southbound on Pulaski Road when she heard three shots. She looked in the direction of the shots and saw a Hispanic male standing over a black male who was lying on the sidewalk. She also saw two black males run north on Pulaski. She said that one of the black males had braids but went on to say that she would be unable to identify either of them.

On September 3, 2002, Richard Arrigo was shown the photo array that contained the photographs of the Plaintiff and Michael Davis. After viewing the photographs, Arrigo stated that the subjects who shot Tony Cox were not in the photo display.

On September 5, 2002, Eric Blackmon was arrested when he attended a court appearance regarding an unrelated case. He was transported to Area Four

Headquarters where he was advised of his Miranda rights. He waived his rights and agreed to be interviewed. He denied his involvement in the homicide of Tony Cox. He claimed that on July 4th he spent the entire day at a Bar-B-Q near Homan Avenue and Douglas Boulevard. He declared that he was not a member of the New Breed street gang but maintained that he was affiliated with Traveling Vice Lords. He said he is known on the street as "Forty" and never frequents the area of Pulaski and Grenshaw.

While the plaintiff was being interviewed contact was made with Lisa McDowell who agreed to come to the Area Four station for the purpose of viewing a live physical line up. The lineup included the Plaintiff, Michael Davis, aka: Keno, and four other individuals. From that corporeal lineup the witness positively identified Eric Blackmon as the same person she watched shoot the victim in the head on July 4, 2002.

Two hours later, Witness Frencshun Reece viewed the same corporeal lineup and positively identified the Plaintiff as the person she watched shoot the victim as he was lying on the sidewalk in front of Fat Albert's Restaurant on July 4th. Reese's son Davious Whitaker positively identified Michael Davis, aka; Keno, as the other individual who shot the victim. He did not identify the Plaintiff.

Assistant State's Attorneys Jim Murphy and Rimas Cernius responded to Area Four to conduct a review of the case to determine if formal charges against the two identified subjects were warranted. The ASAs interviewed the witnesses at length regarding the murder and their positive identifications. A decision was made by the attorneys to not initiate formal charges for Blackmon or Davis until speaking with Richard Arrigo and Lisa McDowell.

On September 8, 2002, Richard Arrigo was present at Area Four for a live lineup that included the Plaintiff, Michael Davis and four others. Arrigo did not identify any of the participants in the lineup.

Later that same evening, ASA Kenneth Fiedler and Detective Jones responded to Lisa McDowell's residence where she was re-interviewed. She also furnished a written statement detailing what she saw occur during the murder. After evaluating all of the evidence, the State Attorney's Office approved the filing of formal charges of First-Degree Murder against the Plaintiff. No charges were filed against Davis.

On September 10, 2002, a traffic stop was conducted on a vehicle driven by Richard Arrigo. The passenger in the vehicle was George Davis, aka: Boonie Black, the purported leader of the New Breed street gang.

Federal Prison inmate Terrence Boyd was interviewed by ASA Rimas Cernius and Detectives Jones and Schleder on July 16, 2004. Boyd was incarcerated awaiting sentencing after having been convicted of perjury. He claimed that he witnessed the murder of Tony Cox. He alleged that he saw "Eric" and "Pride" shoot the victim multiple times while he was on the ground. He said that Eric had a tattoo on his neck that spelled "LEAH." When Boyd was asked to describe the scene and the events that took place during the shooting, his account was inconsistent with the facts. He stated that there was only one shooter, and that George Davis, aka: Boonie Black, was present at the time of the murder. He made no mention of seeing a white male (Richard Arrigo) standing near the victim. (He eventually related his version of the incident at the trial). Investigators did locate an individual named Eric Bridges in the criminal database that had the tattoo "LEAH" on his neck; however, Bridges' physical description differed from those provided by the witnesses of Shooter #2. Bridges is listed as 5'7" and both witnesses described the second shooter as 5'10" to 6 feet.

On September 22, 2004, the Plaintiff went to trial in the Circuit Court of Cook County. The Plaintiff opted for a bench trial and Judge William Lacy presided over the proceedings. As a result of that trial the Plaintiff was found guilty of First-Degree Murder and sentenced to sixty years in prison.

On April 7, 2011, the Plaintiff filed a petition for writ of habeas corpus in the U.S. District Court of Northern Illinois. The petition was dismissed by the District Court; however, the Seventh Circuit Court reversed that decision and remanded for an evidentiary hearing. Finally, on February 7, 2018, District Court Judge Ronald Guzman granted the petition solely on the issue of ineffective assistance of counsel and ordered the Plaintiff free on bond pending any retrial.

On January 16, 2019, the State of Illinois dismissed all charges and announced that the case would not be retried. No reason was given by the state as to why the Plaintiff would not be required to face trial once more.

## THE COMPLAINT

The complaint alleges Plaintiff was wrongfully convicted as a "direct result of police misconduct and in accordance with the unlawful pattern and practices of the Chicago Police Department." It further alleges that the Plaintiff's conviction for First-Degree murder was "wrongful" and "rested solely upon evidence fabricated by the Officer Defendants' false eyewitness identifications of Mr. Blackmon during tainted lineups." Additionally, the complaint alledges that the Officer Defendants

withheld and destroyed critical evidence that would have proven the Plaintiff's innocence.

Further the complaint alleges that the Officer Defendants: fabricated false evidence, engineered tainted lineups that were unduly suggestive, intentionally ignored material information, egregiously failed to investigate the case properly, and finally lacked motive and probable cause to arrest the Plaintiff.

**I reject these assertions. As an experienced homicide investigator, it is my opinion that the investigation into the murder of Timothy Cox undertaken by the Chicago police department homicide investigators was properly conducted and clearly developed sufficient probable cause to justify the arrest of Eric Blackmon.**

The complaint further implies that the investigation was shoddy, exculpatory evidence was withheld or ignored, suggestive or improper lineup procedures were utilized, and that the named police officers perjured themselves while actively suborning the perjured testimony of the witnesses.

**I also reject these assertions. As an experienced homicide investigator, it is my opinion that the overall investigation conducted by the Chicago Police Department's homicide detectives into the murder of Timothy Cox was consistent with generally established and accepted investigative practices in place in 2002.**

**It is also my opinion that the photographic and live lineup identification procedures utilized by the Chicago Police Department's homicide investigators were appropriate, legally sufficient, properly conducted, and consistent with all generally accepted and established investigative practices in place in 2002.**

**THESE OPINIONS ARE BASED ON THE FOLLOWING ANALYSIS:**

Let me first address the issue of probable cause. Throughout their careers, law enforcement officers are indoctrinated on the issue of probable cause. From the police academy on, the subject of what constitutes probable cause is continually examined. Black's Law Dictionary maintains that "probable cause exists when the facts and circumstances known to police are such as to justify a belief in the mind of a reasonable person that a crime is being, or has been, committed by the individual who is about to be arrested."

There is absolutely no doubt that probable cause existed for the arrest of Eric Blackmon. Any assertions to the contrary are misguided and have no basis in the accepted standards of police work. As soon as Lisa McDowell picked Blackmon out of the six-photograph array, probable cause to arrest him was created. This does not, however, mean that an immediate arrest should have been made just because probable cause had been minimally established. The ultimate decision to bring formal charges in any homicide investigation, in most jurisdictions, rests solely with the prosecutor. Based on my four decades of experience as an investigator and based on the evidence available to the CPD investigators at the time, probable cause did exist.

In over 30 years as a detective, I have worked with dozens of prosecutors at both the state and Federal levels. Without exception it is the prosecutor who decides if a case has merit and if it will proceed or not. The investigator's role is to pursue all available leads and if possible, develop sufficient probable cause to make an arrest. The prosecutor, though has the added burden of accepting cases, and formally charging a suspect, only when he or she ethically believes the case can be presented to a jury. In homicide cases this duty is elevated, and it is nearly always the prosecutor who makes the call whether the suspect will be charged or not.

That is exactly what occurred in this case. The investigators developed additional probable cause when Frencshun Reese identified the Plaintiff. The live lineups in which both McDowell and Reese positively identified the Plaintiff bolstered the probable cause even more. However, it was the prosecutors who, after a formal felony review of the evidence, and interviews with the witnesses, decided to proceed with the charges. It was not the homicide detectives who made the decision to formally charge the Plaintiff, it was the prosecutors. The detectives simply presented their findings to the prosecutors. In fact, the same prosecutors concluded that Michael Davis would be released and not charged even though the detectives had developed sufficient probable cause to also arrest him.

Once the arrest is made, after the State's Attorney's Office accepts the case, the whole dynamic of the investigation changes. The case now becomes the prosecutor's responsibility to evaluate. Any physical evidence, admissions by the defendant, eyewitness testimony, identification procedures, seizures, searches, and all other facets of the investigation are now assessed by the prosecutor for legal sufficiency. They will also independently interview the witnesses to determine their veracity. I can recall several cases I handled where the prosecutor declined to continue the prosecution after scrutinizing the evidence. Charges are then dropped, and the defendant is released from custody. It has been my experience that prosecutors have no qualms about dumping cases that are questionable. By

my count, at least five prosecutors (Murphy, Cernius, Fiedler, McCarthy, and Walowksi) reviewed all aspects of this case, determined it to be legally sound, and agreed that it should proceed to trial.

After the formal charges are made, it is the prosecutor who now controls the investigation as it proceeds forward. All decisions about how any new leads are managed becomes the province of the prosecutor. That is why the Plaintiff's criticism of the detectives for not showing the photograph of Eric Bridges to the witnesses is misplaced. ASA Rimus Cernius was present for the interview with Terrence Boyd at the Metropolitan Correctional Center. After the interview, the investigator's located a photograph of the same Eric Bridges, Boyd referred to and immediately notified Mr. Cernius. This is clearly stated in a police report authored by Detective Jones:

> On Monday 19-Jul-2004, the reporting detectives informed ASA
> REMUS CERNIUS of the newly discovered information[3].

If Mr. Cernius thought it was necessary to show a photo of Bridges to the witnesses he would have undoubtedly instructed Detective Schleder or Jones to do so. At this point it would have been inappropriate for the detectives to show the photo on their own without first checking with one of the prosecutors. It is the prosecutor who decides on any investigative strategies while the case is being prepared for trial. As a homicide supervisor I have been required to discipline subordinates who acted unilaterally without first clearing their actions with the prosecutor.

As to motive, something that is repeatedly referred to by the Plaintiffs expert in his report. There is no legal requirement to ascertain the defendant's motive (or motives) in a homicide case. Motive, means, and opportunity are sometimes referred to as the "categorical trinity" of homicide investigations. Proof that the defendant had the means and the opportunity are generally required to convict.

## IDENTIFICATION PROCEDURES

Even though eyewitness testimony is and always has been vital to the prosecution of criminals, the criminal justice system has long been aware of the fallibility of eyewitness identifications. Police investigators who deal with eyewitnesses frequently know that, while many are extremely accurate in their perceptions and recognitions, others tend to be unreliable. As stated by Charles O'Hara in his book, Fundamentals of Criminal Investigation, "Years of unfortunate experience have

---

[3] Bates 233

instilled in the investigator a deep-seated suspicion of the reliability of eyewitnesses."

Because of this longstanding skepticism, the courts have established certain guidelines to ensure that witness identification procedures are conducted fairly and impartially. Since most witnesses have a genuine desire to see to it that the perpetrator of a violent crime is brought to justice, they may be overly influenced by subtle suggestions communicated to them during the identification process. In United States v. Wade, the Supreme Court of the United States recognized this fact by stating:

> The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined.

In Simmons v. United States, though, the court opined:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement.

Therefore, in order to prevent erroneous eyewitness identifications during photo displays and live-physical lineups, the courts have established standards and criteria delineating what is acceptable and what is not. Police investigators are constantly schooled on these distinctions. National police practices rigidly adhere to these touchstones and most of these standards have not perceptibly changed in the last 50 years. The courts have also provided a conclusive method to safeguard the integrity and propriety of the identification procedure and that is the suppression hearing.

In this case the Plaintiff's defense attorney inexplicably withdrew his Motion to Suppress the identifications. In a murder case where the only evidence implicating the defendant was eyewitness testimony, it is indeed puzzling that Mr. Cowan would not even attempt to challenge the validity of the identifications. If the lineups were so suggestive and the manner in which they were shown to the witnesses so flagrantly flawed, why would he have elected to withdraw his motion? The propriety

of the identification procedure can be found in the fact that the motion to suppress was withdrawn by the Plaintiff in his criminal case.

The same must be said for the prosecuting attorneys, who obviously had no reservations about bringing the case to trial. Homicide investigators rely on prosecutors and legal practitioners for advice and direction regarding the law. Since none of these legal experts expressed any opposition to the actual lineups or the manner in which they were presented, it can only be assumed that they considered the actions of the detectives to be proper and legally acceptable

Photo displays and live-physical lineups are investigative tools that serve a dual purpose. First, they are utilized to correctly identify the perpetrator of a crime, and secondly, they are utilized to exonerate an innocent party incorrectly or falsely accused of a crime.

When the name of a suspect surfaces during an investigation, it is the duty of the lead investigator to determine if the information he has been given is valid or not; not only to identify the perpetrator but to ensure that an individual who is completely innocent is not wrongfully accused. The most expeditious way to accomplish both goals is for the accuser to view a photograph of the named person. This has been a basic principal of criminal investigations for over a century.

Plaintiff contends, in his complaint, that the Plaintiff's photograph should not have been included in the photo arrays shown to the witnesses because there is no verifiable information that links him to the crime. The complaint further maintains that it is the Plaintiff's belief that he was merely a filler in the photo displays and therefore the identifications should be nullified. These claims have no valid foundation in legality or accepted investigative practices. There is no requirement to establish probable cause or even reasonable suspicion in order to show a photographic lineup of an individual to a witness.[4] Investigators often show photo displays to establish suspects. I have done it myself. In a robbery investigation, for example, if the description of the offender furnished by the victim or witnesses "sounded like" a subject I was familiar with, I would pull that person's picture from my working file and compose an immediate photo array to be viewed by the witnesses. If the MO of the crime was similar to a previous case I had investigated, I would do the same thing.

Photo line-ups are routinely shown to victims and witnesses that result from an anonymous phone call or even a Crime Stoppers tip. There is no legal requirement

---

[4] COLEMAN v. CITY OF PEORIA, ILLINOIS, et al. 925 F.3d 336 (2019). "The U.S. Constitution does not mandate that photo arrays and lineups meet a certain standard of quality."

that an investigator disclose why an individual has been included in a photo array. But failure to act when receiving information can have adverse consequences. As any seasoned investigator is aware, failure to act responsibly to any accusation can be detrimental if it is later discovered that the individual, they neglected to follow-up on, is the actual perpetrator; or even worse, if that person committs another violent offense (murder, rape, robbery). Therefore, the most prudent course of action, many times, is to compile and show a photo display to determine if the person named is, or is not, the subject who committed the crime.

In the first photo array shown to Frencshun Reece, all seven of the photographs were of males who had recently been arrested in the 4000 block of Grenshaw. It could be argued that those depicted in that array were all fillers and all suspects simultaneously, because there was not any specific target in the lineup. This is a standard investigative tactic.

I have shown thousands upon thousands of photographs to witnesses over the years. Based on my experience with photo arrays and witnesses, the fact that Reece picked out two photographs of individuals that *resembled* subject #2 indicates to me that she probably possesses a discerning eye and is not inclined to positively identify the first photograph she sees that vaguely looks like the perpetrator.

As a robbery detective, I routinely carried stacks of photographs in my briefcase. These photographs were separated by geographical area and comprised of known robbers who were active in a particular region of the county. This was commonly referred to as a "working file." Mugshots were continually added and removed from these stacks. Victims and witnesses were routinely shown these groups of photos to see if they could identify the person who robbed them. Some of the stacks contained as few as 10-12 photos, others 50 or more. The photos in these stacks, therefore, could be considered both suspects and fillers. Identifications that resulted in the arrest of a perpetrator were often made from this working file. The courts are more concerned with how **<u>reliable</u>** the identification is, rather than how the photographs were compiled.

As mentioned previously, due to the shortcomings of eyewitness identification, the courts and the law enforcement profession have created general requirements when presenting the photograph of a crime suspect to a witness. In 1999, the National Institute of Justice made the following recommendations regarding photo arrays and live lineups:

**Photo Array (Simultaneous or "six pack")**

- Include only one suspect in each identification procedure.

- Select fillers who generally fit the witness's description.

- If multiple photos of the suspect are reasonably available to the investigator, select a photo that resembles the suspect description or appearance at the time of the incident.

- Include a minimum of five fillers (non-suspects) per identification procedure.

- Create a consistent appearance between the suspects and fillers with respect to any unique feature (e.g., scars tattoos) used to describe the perpetrator by artificially adding or concealing that feature.

- Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly in the lineup.

- When showing a new suspect, avoid reusing fillers in lineups shown to the same witness.

- Ensure that no writings or information concerning previous arrests will be visible to the witness.

- View the spread, once completed, to ensure that the suspect does not stand out.

- Preserve the presentation order of the photo lineup. In addition, the photos themselves should be preserved in their original condition.

The NIJ also emphasizes that the lineup should not be "too good"; meaning, the lineup should not defeat its own purpose by making the fillers and the subject so closely resemble one another that any identification would be impossible. According to the NIJ:

> ***Complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar***

*with the suspect might find it difficult to distinguish the suspect from the fillers.*

## Live Lineup (Simultaneous viewing)

Regarding the live-physical lineup, many of the same recommendations apply as they do to the photo display. According to the National Institute of Justice, when composing the live lineup, the investigator should:

- Include only one suspect in each identification procedure.

- Select fillers who generally fit the witness' description of the perpetrator.

- Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case.

- Include a minimum of four fillers (non-suspects) per identification procedure.

- Create a consistent appearance between the suspects and the fillers with respect to any unique or unusual feature (e.g., scars, tattoos).

Again, as in the photo display, the NIJ cautions against composing a lineup in which the participants all look identical:

> *Complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers.*

It should be emphasized that these were nothing more than **recommendations** by the NIJ and that they were implemented in 1999. These United States Department of Justice guidelines have remained constant since the manual was published in 1999.

## Photo Arrays

In my experience, when witnesses are presented photo displays, they are keenly aware of the importance of the process. They realize they are making a serious

accusation; one that could result in the arrest and lengthy incarceration of an individual. They are also acutely aware that they may be required to confirm their selection, under oath, in a public court of law. They are deeply concerned about any reprisals or retaliations that may result from their involvement in the process.

The Courts are fully aware of how difficult an undertaking this can be and have consistently ruled accordingly. The Courts have long held that it is the "totality of the circumstances" that dictates whether or not an eyewitness identification is acceptable. **In the landmark decisions, Neil v. Biggers and Manson v. Braithwaite, the Supreme Court ruled that even if a lineup is suggestive, it can still be viewed as reliable and, therefore, admissible; it is the totality of the circumstances that determines if it is reliable or not.** Nationally recognized police standards and training are tailored accordingly.

The Court has also indicated that when evaluating reliability, one factor that should be considered is the "level of certainty of the witness." By evoking this level of certainty standard, the Court is obviously acknowledging that there are different degrees of identification that may still be acceptable. Police investigators are trained to evaluate and consider the certainty and reliability of witnesses.

Here both witnesses were initially alerted to the incident by the sound of gunfire. This undoubtedly heightened their "degree of attention" and awareness. The degree of accuracy by the witnesses in describing the event was considerable. Both witnesses testified that they heard four gunshots and that they were fired from close range. This is confirmed by the postmortem examination report that indicates that the victim suffered four gunshot wounds and gunpowder tattooing was present on the wounds[5]. Witness Reece was even more specific:

> *"The victim turned around and looked at him with a face like: Oh my God. And then he shot in his ear. He grabbed his head and went down to the ground and tried to get back up."*

> *"He had the victim by the shoulders to keep him from getting up and he shot him. He fell backwards. And when he fell forwards, this guy still had his hand on his shoulder and he crossed[6] down on one knee and he shot him in his neck and blood started shooting out on the right side of his neck."*

---

[5] The autopsy also confirms that there were two shooters as claimed by the witness.
[6] Probably "crouched."

*"He bent all the way down and shot him point blank in his eye."[7]*

What is remarkable about Reese's account is that it conforms exactly to the autopsy report regarding the placement of the wounds. The victim **was** shot directly in the eye and to the side of his neck as she described. This uncanny accuracy enhances her standing as a witness. I would argue that her abilities of observation are far above average.

Both witnesses were certain of their identifications and this certainty was exhibited numerous times: (1) to the detectives, (2) to the prosecutors, (3) to the grand jury, and (4) to Judge Lacy. In fact, witness McDowell is still positive of her identification today, twenty years later.

Both witnesses had ample opportunity to view the suspects, during the commission of the murder, and as they fled from the scene. The fact that the subjects returned to the scene to shoot the victim again allowed for an even longer look. The average witness is only afforded one chance to observe the subject.

When I viewed the crime scene photographs, I was surprised by how narrow Pulaski Road actually is. After reading the depositions, I was under the impression that it was a much wider thoroughfare. In my opinion, the photos validate the witnesses' statements and confirm that they could accurately survey the crime scene from their vehicles.

The descriptions furnished by the two witnesses were strikingly similar:

**Reese** - Black male; in his 20s; approximately 5'10'; 160 pounds; dark complexion; wearing dark shorts and white gym shoes.

**McDowell** - Black male, early 30s; 6'; slender; braided hair; wearing a light blue shirt and dark colored pants. Armed with a dark handgun.

Defense attorneys are generally enamored with witness descriptions, distances, and time. When confronted with a seemingly insurmountable case presented by the prosecution and with no evidence to the contrary, many defense attorneys will resort to attacking discrepancies in these areas. Admittedly, this is a valid method used to impeach a witness' credibility, but years of interviewing thousands of witnesses has taught me that they are rarely accurate in their descriptions or their estimates of time and distance. Mr. Cowan, the Plaintiff's defense attorney during

---

[7] Bates 5936-5938

the trial, used these very tactics repeatedly when questioning the witnesses and Judge Lacy rejected them.[8]

My 30 plus years of experience as an investigator has taught me that there are many factors that enter into the equation when considering the accuracy of witness descriptions. Tall people tend to perceive others as shorter than they actually are, and vice-versa, short people tend to perceive others as taller. An older person will have a much more difficult time affixing an estimate of age to a younger person. An individual running will appear shorter because they tend to lean forward. A witness standing on a platform will often conclude that a subject is shorter. A person seated in a vehicle will have a more difficult time estimating the height of a subject. A person standing will appear taller to someone sitting in a chair or lying on the ground, etcetera, and etcetera.

Skin tone is also highly subjective. "Light skinned" to one person might be "bright skinned" to another, or "medium complexioned" to another, or "high yellow" to another. Lighting conditions can have a profound effect on how skin tone is perceived.

As a homicide investigator, after obtaining a physical description from a witness, I would routinely ask, "How tall do you think I am? How much do you think I weigh? How old am I?" Very often I would be stunned by the responses. But in the sterile environment of the courtroom, a witness who has misjudged the defendant's height by one or two inches can easily be made to look unreliable. Not everyone is capable of making precise estimates. The average witness just does the best that he or she can do. Human nature dictates that not all witnesses will agree on every point. Any absence of variations in the witnesses' accounts would be suspicious.

The foremost reason why witness descriptions are obtained at the scene of a crime is for the issuance of a BOLO. A BOLO is a bulletin, broadcast over the police radio, which describes the offender and alerts all police officers in the area to "Be On the Look Out" for a particular person. All police officers are trained to issue a BOLO description over the police frequencies promptly. This is a basic tenet of police work: to obtain the BOLO information and circulate it as expeditiously as possible, hoping that the offender will be apprehended quickly. It is indeed ironic that this information, sometimes obtained with great haste, can be later used to challenge the credibility of the witnesses.

The time that elapsed between the murder and the first photo identification by Lisa McDowell is 56 days. While this is admittedly longer than most homicide detectives would like, it does not nullify the witness's ability to be certain. The delay in receiving the 911 call tapes prolonged the time it took to locate witness McDowell;

---

[8] Bates 4636-4637

however, her identification can still be deemed reliable. Her trial testimony indicates that she was positive of her selection and that she was not pressured or told which photograph to choose:

> *Q. And when you marked this photograph what did you tell the detectives that the individual did that you were identifying?*
>
> *A. That was the person I saw shoot the gun.*
>
> *Q. And shoot the victim on the street, is that right?*
> *A. Yes, twice.*
>
> *Q. Ma'am, at any time that day when detectives were at your home, did they in any way suggest to you or tell you who you should be picking out of those photographs that they showed you?*
>
> *A. No.[9]*

There is similar trail testimony from Frencshun Reese:

> *Q. And, Miss Reese, when Detective Jones showed you the pictures, first the night that this happened and then again when he came to your house in a car, did he tell you who to pick out?*
>
> *A. No.[10]*

It is not unheard of for dependable identifications to be made weeks, months, even years, after the crime. I was researching cold cases at the Miami-Dade Police Department in November of 2006 when a University of Miami football player, was shot in the head and killed by a gunman who fled on foot. Only one person, who just happened to be driving by the shooting scene, witnessed the crime. Fifteen years later (2021) that witness positively identified the gunman from a photo array, and he was charged with First-Degree murder.

**In my opinion, the totality of the circumstances renders both identifications reliable. The detectives' acceptance of these identifications as reliable is consistent with nationally recognized police standards and training in place in 2002.**

---

[9] Bates 4252
[10] Bates4173

**I have viewed the photo array shown to witnesses Reece and McDowell and find it to be fair and not "improperly suggestive" or "tainted" as the Complaint maintains. The photo array itself, and the method in which it was generated and presented, complies with nationally accepted police standards and training in place in 2002.**

It has been my experience that witnesses typically do not identify suspects in a lineup from articles of clothing, hair styles or facial hair; they identify facial features. Clothing, hair styles and facial hair are inconstant and can be easily changed.

Hypothetically, if a witness or victim described a perpetrator as wearing a number "12" Green Bay Packers jersey, and the subject of the lineup is wearing a number "12" Green Bay Packers jersey, this would certainly warrant a challenge of the lineup during a Suppression Hearing. But this would not necessarily nullify the lineup. If the witness could convince the presiding judge that the jersey had no influence on his or her selection, the photo spread would be considered reliable and, therefore, allowed as evidence. Again, the "totality of the circumstances" prevails.

In this case the Plaintiff alleges that he was the only person with braids in the photo array. When I first viewed the photos, I was somewhat puzzled because the hair style Eric Blackmon was wearing was not what I would refer to as braids but "rows" or "cornrows." In fact, the victim, Tony Cox had the exact same hairstyle, and it was described in the autopsy report as cornrows. In the first photo array Reece was shown, William Hall's hair was in braided cornrows. Neither witness ever stated that the braids had any influence whatsoever on their identifications. **Live Lineup**

When photo arrays are the only evidence linking a suspect to a crime it is advisable that a live physical lineup be conducted as soon as possible. Admittedly, the witness could be influenced in his/her choice by having seen the photograph of the suspect previously, but the value of the witness being able to view the accused in person far outweighs any of these concerns.

Photographs can be deceiving, even to the best witness. There is no better method for witness identification than a face-to-face confrontation with other individuals in a live-physical lineup. Many jurisdictions insist that whenever a photo display is the only probable cause connecting a suspect to a crime, and an arrest has been made, that a live-physical lineup must be held. The photo lineup establishes the probable cause to affect the arrest, and the live lineup is then used to confirm or invalidate that identification.

I have conducted scores of live-physical lineups during my career. On a few occasions, witnesses, upon viewing the suspect in person, failed to make any identification (even though they had already chosen the suspect in a previous photo spread). In these instances, all charges are dropped, and the suspect is immediately released. On other occasions, witnesses/victims have told me, "Detective, from the photograph that I saw, I was sure that he was the person who robbed me…but now that I see him in person, I know that's not the man."

Thus, the live-physical lineup is a valuable investigative tool that, when used properly, safeguards the innocent, and ensures that justice prevails. It also serves to reassure the investigator that no mistakes have been made.

The difficulty that always exists with live lineups is locating sufficient fillers or foils. The supply of stand-ins is usually limited by the number of prisoners in the local lock-up. It is possible to use volunteers, but most people are not eager to participate in such a procedure.

The Plaintiff contends that the lineup in which he was identified was suggestive because he was the only person with braided rows in his hair. The lineup was shown two months after the murder occurred. Just as with photo arrays, witnesses make identifications based on facial features, not hair styles, facial hair, or clothing, which can change over time. None of the witnesses who viewed the live lineup indicated that it was the Plaintiff's hairstyle that they identified or were drawn to. Again, it is the totality of the circumstances that prevails.

**The complaint alleges that the photo array and the live-physical lineup were suggestive. Judge Lacy decided they were not. It was ultimately his decision to allow the lineups to be introduced into evidence during the trial, and to allow the testimony of the witnesses. In announcing his verdict Judge Lacy said that the identification procedures, "were in no way suggestive in nature, and that they were conducted in an almost pristine manner."[11] I concur with Judge Lacy. The lineups were not unduly suggestive or prejudicial and complied with generally accepted police practices in place in 2002**.

In addition, attorneys for the Plaintiff filed two separate appeals to the Appellate Court of Illinois First Judicial District. In both of those appeals, nothing was mentioned regarding any improprieties by the homicide investigators or any deficiencies in the lineups or the lineup procedures. A writ of habeas corpus was

---

[11] Bates 4638. He also stated. "As to Miss McDowell and Miss Reese, I am struck by the level of certainty that they showed while testifying as to the identity of the second shooter. They expressed confidence in their previous identifications in the photo array and the lineups. Both witnesses withstood an extensive and vigorous cross-examination. They did not waver in any way.

filed in Federal court by the Plaintiff which also made no mention of any wrongdoing by the detectives or errors in the identification process.

**In-Court Identifications**

The criminal justice system is highly proficient at weeding out the prevaricator. The whole process from beginning to end is designed to ensure that the truth will prevail. The endless interrogation of witnesses by investigators, defense attorneys, prosecutors, and judges, has been conceived to safeguard the rectitude of the system.

A vital element of this paradigm is the in-court identification. Although admittedly highly suggestive, courts have long felt that even the most devious witness would crumble before entering a courtroom and, under oath, point out an innocent person.

Both witnesses made in-court identifications during the trial.

**Frencshun Reese:**

> *Q. Now Miss Reese, I'm going to have you look in this courtroom. The person you saw come back to the victim and lean over him and shoot him in the eye, do you see that person in the court today?*
>
> *A. Yes*
>
> *Q. Can you please point him out and describe what he's wearing in court today? What is he wearing in court today?*
>
> *A. A beige jumper.*
>
> *MS. WASLOWSKI: May the record reflect an in-court identification of the defendant?*
>
> *THE COURT: The record may so reflect[12].*

**Lisa McDowell:**

> *Q. Ma'am, I'm going to ask you to take a look around the courtroom and tell me if you see the individual that you saw with the dark colored*

---

[12] Bates 4172

*gun in his right hand firing two shots into the body of the victim on the sidewalk on Pulaski that day.*

*A. Yes.*

*Q. Okay. Can you indicate an article of clothing that he is wearing? Where is he sitting?*
*A. He is sitting to my left.*

*Q. Okay. What is he wearing, ma'am?*

*A. A beige jump suit.*

*MR. MCCARTHY: Judge, may the record reflect the in-court identification of the defendant?*

*THE COURT: The record may so reflect.*[13]

## Investigative issues

The Complaint and the Plaintiff's expert imply that the homicide investigation undertaken by the Chicago Police Department detectives into the murder of Tony Cox was inferior, and "slanted". Mr. Waller opines that:

*"Detectives Sanchez, Jones and Schleder failed to conduct a thorough and complete investigation into the death of Tony Cox.*[14]

*The involved detectives conducted an investigation that was neither objective nor thorough. They fabricated evidence designed to implicate Mr. Blackmon to clear the case instead of working diligently to determine the truth about what happened."*[15]

 **I disagree.**

In fact, I believe that the Tony Cox homicide investigation actually exceeded the established criteria for what was generally accepted as proper homicide investigative techniques for that time period.

---

[13] Bates 4243-4244
[14] Waller report page 20.
[15] Waller report page 28.

A review of the investigator's reports, and their testimony at the trial, leads me to conclude that the detectives simply followed the investigative leads to their conclusion; and if those leads resulted in the disclosure of exculpatory evidence that benefitted the Plaintiff, they were not hesitant to include that information in their reports. For example, the fact that eyewitness Richard Arrigo did not identify Eric Blackmon in either the photo array or the live lineup is fully divulged. The non-identification of Mr. Blackmon by Davious Whitaker is also included. Moreover, the interview with Terrence Boyd in which he claimed to be a witness to the shooting and gave information that led to Eric Bridges, is also fully documented, as is the fact that Boyd failed to identify Mr. Blackmon from a photo array. The interviews with Kenya Pittman and Torrance Williams who furnish the nickname "Cameo" to the detectives are documented. They also faithfully recorded in their reports that Mr. Blackmon denied killing Tony Cox, denied knowing Michael Davis, and claimed to be at a Bar-B-Q at the time of the murder.

There is every indication that the investigation conducted by the named detectives was typical for that era and was diligently and thoroughly pursued.

Homicide investigations can be complex, confounding, and at times, overwhelming. Law enforcement and society both view murder as the ultimate crime. Generally, the most seasoned, skilled, and experienced investigators are assigned to death investigations. Homicide investigations are a blend of art, science, and craft. They require finesse, deductive reasoning, sound judgment, exceptional communication skills, and complete dedication.

This is a crime that receives no input from the victim. The investigator must literally start from scratch and follow the clues to their successful conclusion.

I say all of this to emphasize how intricate and formidable homicide investigations can be. Consequently, there is no such thing as a flawless murder investigation. The sheer enormity and duration of these cases guarantees that mistakes do, in fact, occur. Mistakes are inevitable and are many times magnified by the carping scrutiny of "armchair quarterbacks." The goal, of course, is to keep mistakes to a minimum and to always safeguard the integrity of the case.

That being said, there is, however, a minimum baseline, an accepted standard, if you will, that investigators must adhere to. After reviewing all of the police reports generated by the Chicago Police Department homicide investigators involved in the Tony Cox murder investigation, I can only conclude that they either met or surpassed these generally accepted practices.

The critical junctures of a competent homicide investigation include:

- Securing the crime scene and making it safe.
- Preserving the crime scene.
- Photographing the crime scene.
- Obtaining a search warrant to enter the crime scene (if necessary)
- Documenting the crime scene.
- Properly impounding evidence.
- Properly submitting items of evidence to the crime lab
- Conducting an area canvass
- Separating and interviewing witnesses
- Issuing a BOLO (Be On The Lookout)
- Identifying the victim
- Notifying the victim's next of kin
- Reviewing the autopsy
- Securing an arrest warrant
- Locating and arresting the subject (if known)
- Interrogating the subject
- Recording any confession or statement
- Completing the required reports
- Presenting the case to the prosecutor
- Testifying in court

All of the above were adequately accomplished by the homicide detectives in this case. They then ventured into areas that exceeded the typical homicide inquiry. They secured subpoenas for phone records and voice mail. They monitored a pen register and eventually applied for and received a court order to establish a wiretap. These actions are far above and beyond what is expected in the average murder investigation.

**For these reasons, it is my opinion that the investigation into the homicide of Tony Cox by the Chicago Police Department and in particular by Detectives Schleder, Jones, Sanchez, Cronin, and Pellegrini, was more than properly conducted and was consistent with all generally established and accepted investigative practices in place in 2002.**

**Further, it is also my opinion that there is no justification to contend that the named detectives engaged in any type of conspiracy to falsely accuse Mr. Blackmon of murder. Indeed, their reports contain many exculpatory entries.**

## CONCLUSION

The vast majority of the allegations of impropriety on the part of the homicide detectives mentioned in the complaint come from two sources: Richard Arrigo and Frencshun Reese.

Arrigo is clearly not credible. Any novice homicide investigator reviewing the facts of the case would conclude that he was complicit in the murder of Tony Cox. He seemingly lured the victim to his restaurant the day he was killed and then lied about it. Arrigo was clearly in league with George Davis, aka: Boonie Black, leader of the New Breed street gang, who had a "beef" with the victim and had previously threatened him. This close affiliation between Arrigo and Davis would plainly invalidate any of Richard Arrigo's allegations regarding the investigation because he had a vested interest in undermining it. The fact that he did not identify anyone in the photo array, or the live lineup, is not surprising.

Reese was a solid witness in front of the grand jury and at the trial. The fact that she recanted her story nearly 20 years later does not diminish the impact of that testimony. There are a variety of reasons why a person may disavow previous statements to the police, but the fact remains that she swore that she was telling the truth then, and now swears that it was not the truth. Reese now asserts that she first noticed Eric Blackmon's photograph while perusing "mug books" at Area Four Headquarters the night of the murder.

The complaint states that when Detective Jones and Schleder showed her the Blackmon photo array:

> *"They falsely reported that Reece identified Blackmon as one of the offenders. What Reece actually told them was that she only recognized Mr. Blackmon's photograph as one she had previously viewed in the mugshot book on the night of the shootings. She further explained to them that she did not recognize Mr. Blackmon as one of the assailants*."

This is completely contrary to what she told the prosecutors, swore to the grand jury, and swore to Judge Lacy during the trial. If this were true, she had ample opportunity to make her concerns known. Over a month after the identifications, she testified (under oath) before the grand jury, and two years after that testified (under oath) at the trial. On both occasions she positively and unequivocally identified Eric Blackmon as the shooter.

I read Frencshun Reece's' testimony to the grand jury and during the trial. My experience with witnesses tells me she is no shrinking violet. Any witness who will challenge a prosecutor and the judge during a murder trial about revealing her age:

> Q. How old are you:
>
> A. My age is not relevant.
>
> THE COURT: Your age is what?
>
> A. Not relevant to this case, my age.
>
> THE COURT: You see, that's my job to decide what's relevant, okay? She is asking you what your age is. Answer the question.
>
> MS. WALOWSKI: If you could just give us your age?
>
> A. Thirty something.[16]

Or would interrupt the entire proceedings to insist that she be allowed to go to the bathroom:

> THE COURT: No, you don't, ma'am. Hold on. You don't ask me any questions. You just answer the lawyer's questions, and the state attorneys can ask you questions as well.
>
> A. But your honor I have to go bad.[17]

Would certainly not hesitate to tell one of the five Assistant State Attorney's that interviewed her, or the grand jurors that questioned her, or Judge Lacy during the trial, that the wrong man had been arrested and was erroneously on trial for First Degree murder.

I don't know who killed Tony Cox. I have no opinion on Eric Blackmon's guilt or innocence.

**It is my opinion, though, that the homicide detectives from the Chicago Police Department conducted a sound, complete, unbiased investigation,**

---

[16] Bates 4156
[17] Bates 4228

**and that the investigation met or exceeded generally accepted police practices for investigating homicides during that time period.**

Respectfully,

Anthony Monheim

## Addendum #1 – Fee Schedule

My fee schedule as an expert witness is as follows:

1.   Charges for work involving research, analysis, review, and inspections will be billed at the rate of two hundred fifty dollars ($250) per hour.

2.   Sworn testimony of any kind will be billed at the rate of two thousand five hundred dollars ($2500) per day.

3.   Out-of-town travel of any kind will be billed at seven hundred fifty dollars ($750) per day.

4.   Any materials used or other expenses, including but not limited to out-of-town travel, lodging and meals will be added at cost.

5.   An initial retainer of three thousand dollars ($3000) is required. The retainer fee will be credited at the time of issuance of a final bill.

**Addendum #2 – Expert Testimony (Past five years)**

1.    Carlos Starks v. Lesia Moore, et al. Federal District Court for the Southern District of Indiana, Indianapolis Division Case No.: 1:12-cv-1008-WTL-DML

      I was a witness for the defense and testified at a deposition only.

2.    Engel v. Village of Buffalo Grove, ET AL Federal District Court for the Northern District of Illinois, Eastern Division Case No.:  10CV03288

      I was a witness for the defense and testified at a deposition only.

3.    Dewy Amos Jones v. The City of Akron, ET AL, Unite States District Court Northern District of Ohio, Eastern Division Case No.:  5:14-cv-02618

      I was a witness for the defense and testified at a deposition only.

4.    Cornell McKay v. The City of St. Louis, Missouri, et al. United States District Court, Eastern District of Missouri, Eastern Division, Case No.: 4:15-cv-01315-JAR.

      I was a witness for the defense and have yet to testify.

5.    Roger Dean Gillispie v. The City of Miami Township, ET AL, United States District Court Southern District of Ohio, Case No.:  3:13-cv-416.

      I was a witness for the defense and testified at deposition only.

# Addendum #3 – Publications

Monheim, Tony (2007). "The Forgotten Area Canvass." Law and Order Magazine, Hendon Publications: Deerfield, Illinois.

Monheim, Tony (2011). "Murder by Poison: Rare or Rarely Detected?" <u>Law and Order Magazine</u>, Hendon Publications: Deerfield, Illinois.

Monheim, Tony (2006). "The Shocking Truth About Lightning Deaths." <u>Florida Police Chief Magazine</u>: FPCA Publications, Tallahassee, Florida.

Monheim, Tony. *I Have a Devil Inside Me.* Amazon Publishing, 2021.

EXHIBIT

2 (Monheim dep)

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Illinois

| | |
|---|---|
| Eric Blackmon | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 19 CV 767 |
| City of Chicago, et. al | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:         Anthony Monheim c/o Ahmed Kosoko, Johnson & Bell
Via Email: kosokoa@jbltd.com

_(Name of person to whom this subpoena is directed)_

✔ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

           ******************** SEE ATTACHED RIDER**********************************

| Place: Riley Safer Holmes & Cancila LLP 70 W Madison St Ste 2900, Chicago, IL 60602 | Date and Time: 12/17/2021 10:00 am |
|---|---|

❑ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

     The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/01/2021

| | | |
|---|---|---|
| _CLERK OF COURT_ | OR | |
| _____ | | /s/ John K. Theis |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Eric Blackmon
_____ , who issues or requests this subpoena, are:
John K. Theis, RSHC, 70 W Madison St STE 2900, Chicago IL 60622   Email: jtheis@rshc-law.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   19 CV 767

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## RIDER TO SUBPOENA TO ANTHONY MONHEIM
## DEFINITIONS AND INSTRUCTIONS

1.    Please produce all documents as they are kept in the ordinary course of business and/or correlate the production to the specific requests below.

2.    Please produce all documents with all metadata contained within such documents in the usual course of business.

3.    Please produce Electronically Stored Information ("ESI") in a form that neither removes nor degrades the ability to search the ESI by electronic means where the ESI in ordinarily maintained in a way that makes it searchable by electronic means.

4.    Please provide a privilege log for any documents withheld on the basis of the attorney-client privilege, the attorney work product doctrine, or any similar privilege or protection.

5.    This "Action" means *Blackmon v. City of Chicago, et al*., Case No. 19-CV-767.

6.    "All" shall include the term "each" and vice-versa, as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside the scope of the request.

7.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all responses that might otherwise be construed to be outside the scope of that request.

8.    "Communication" or "Communications" refers to any exchange of information, words, numbers, pictures, charts, studies, or graphs by any means of transmission, sending or receipt of information of any kind by or through any means including personal delivery, speech, writings, documents, language (machine, foreign or otherwise) of any kind, computer electronics or Electronically-Stored Information (as defined herein), sound, radio or video signals, telecommunication, telephone, facsimile, mail, film, photographic film of all types, or other media

1

of any kind. The term "Communication" also includes all inquiries, discussions, conversations, correspondence, negotiations, agreements, presentations, understandings, meetings, notices, requests, responses, demands, complaints, or press, publicity, or trade releases.

9.      "Defense Firms" means any of the following law firms: Johnson & Bell and Reiter Burns LLP.

10.     "Document" is intended to have the broadest possible meaning under Rule 34(a) of the Federal Rules of Civil Procedure, and includes electronic or computerized data compilations; electronic file backup tapes; hard drives and images of hard drives; all drafts; Communications; Memoranda; records; presentations; books; reports; transcripts or summaries of conversations or interviews; diaries; graphs; charts; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; transcripts or summaries of meetings or conferences; records and reports of consultants; press releases; stenographic, handwritten or any other notes; workpapers; and any paper or writing of whatever description, including any electronic database or server or information contained on any Electronic Media (as defined herein) although not yet printed out. A draft or non-identical copy of any document is a separate document within the meaning of this term.

11.     "Person" or "Persons" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations, and all other entities.

12.     "Relate," "related to," "relating to," or "regarding" shall mean directly or indirectly mentioning or describing, pertaining to, being connected with, reflecting upon, constituting, evidencing, or having any logical or factual connection with the stated subject matter.

## DOCUMENTS TO BE PRODUCED

1.      Any and all documents and other materials prepared by Anthony Monheim ("Monheim") in forming his opinions in this case, including but not limited to notes, summaries, memoranda, transcriptions, diaries, photographs, drawings and maps, but excluding those materials that are protected from disclosure by Federal Rule of Civil Procedure 26.

2.      Any and all communications between Monheim and any third-party witness to this case.

3.      Any and all documents and other materials provided to Monheim in the course of working on this case.  For any documents previously produced by the parties in this case, a description of the documents and corresponding bates-stamp numbers will suffice.

4.      Any and all communications between Monheim and any defendant, representative of a defendant, or partner, agent, employee, or member of the Defense Firms that relates to compensation for the work done by Monheim in this case, inclusive of any such correspondence between Monheim, Defendants, and/or their counsel.

5.      Any and all communications between Monheim and any defendant, representative of a defendant, or partner, agent, employee, or member of the Defense Firms that identifies facts or data that Monheim reviewed or considered in forming his opinions in this case, inclusive of any such communications between Monheim, Defendants, and/or their counsel.

6.      Any and all communications between Monheim and any defendant, representative of a defendant, or partner, agent, employee, or member of the Defense Firms that identifies assumptions provided to Monheim and upon which Monheim relied or considered in forming his opinions in this case.  This includes any such communications between Monheim, Defendants, and/or their counsel.

7.    Any and all contracts or agreements entered into between Monheim and any defendant, representative of a defendant, or partner, agent, employee, or member of the Defense Firms, or attorneys associated with such firms.

8.    Any and all documents and records itemizing and/or reflecting the time Monheim spent and/or billed for his work in this case.

9.    A list of all articles, books and other writings (whether published or unpublished) authored in whole or in part by Monheim that relate to police investigatory practices, including, but not limited to, peer-reviewed works.

10.    Any and all brochures, publications, pamphlets, direct mailings, advertisements, and other materials relative to Monheim's expert consulting services or areas of expertise, whether sent to the general public, lawyer groups, trade associations, or professional groups, affiliations, or associations.

11.    A list of all seminars, lectures, and/or other speaking engagements authored or given by Monheim that relate to police investigatory practices.

12.    A list of all federal and state cases, as well as docket numbers and years, in which Monheim has been disclosed as an expert witness in the past ten years, including the attorneys who retained Monheim.

13.    A list of all federal and state cases, as well as docket numbers and years, in which Monheim has been disclosed as an expert witness by any of the Defense Firms, or attorneys associated with such firms, in the last ten years.

14.    A list of all federal and state cases in which Monheim's proposed testimony or opinions have been barred or limited in whole or in part by the Court.

15.     Copies of all articles or policies or standards referenced in Monheim's expert report in this case.  For any materials that have been previously produced by the parties in this litigation, a description of the documents and corresponding bates-stamp numbers will suffice.

16.     A copy of any summary or table or spreadsheet or similar document provided to Monheim, regardless of whether the subject matter of the summary, etc. is a deposition, trial testimony, reports of any kind, or any other document or information, related to Monheim's testimony or opinions in this case.

17.     All documents relating to any complaint made against Monheim, or discipline or sanctions imposed upon Monheim, at any time in his professional career, including but not limited to any complaints and responses to complaints, including but not limited to, death investigations, death in custody, coroner's inquest, violations of any law enforcement agency procedures, grand jury proceedings, any lawsuits and complaints made against Monheim and Monheim's responses to the lawsuits and complaints.

**U.S. Department of Justice**

Office of Justice Programs

*National Institute of Justice*

**3 (Monheim dep)**



# Eyewitness Evidence

## A Guide for Law Enforcement



*research report*

**U.S. Department of Justice**
**Office of Justice Programs**
810 Seventh Street N.W.
Washington, DC 20531

**Janet Reno**
*Attorney General*

**Raymond C. Fisher**
*Associate Attorney General*

**Laurie Robinson**
*Assistant Attorney General*

**Noël Brennan**
*Deputy Assistant Attorney General*

**Jeremy Travis**
*Director, National Institute of Justice*

---

**Department of Justice Response Center**
800–421–6770

---

**Office of Justice Programs**
**World Wide Web Site**
*http://www.ojp.usdoj.gov*

**National Institute of Justice**
**World Wide Web Site**
*http://www.ojp.usdoj.gov/nij*

---

# Eyewitness Evidence:
# A Guide for Law Enforcement

Developed and Approved by the
Technical Working Group for Eyewitness Evidence

October 1999

**U.S. Department of Justice**

Office of Justice Programs

**National Institute of Justice**

Jeremy Travis, J.D.

Director

Richard M. Rau, Ph.D.

Project Monitor

This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.

Opinions or points of view expressed in this document represent a consensus of the authors and do not necessarily reflect the official position of the U.S. Department of Justice.

**NCJ 178240**

The National Institute of Justice is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime.

# Message From the Attorney General

**E**yewitnesses frequently play a vital role in uncovering the truth about a crime. The evidence they provide can be critical in identifying, charging, and ultimately convicting suspected criminals. That is why it is absolutely essential that eyewitness evidence be accurate and reliable. One way of ensuring we, as investigators, obtain the most accurate and reliable evidence from eyewitnesses is to follow sound protocols in our investigations.

Recent cases in which DNA evidence has been used to exonerate individuals convicted primarily on the basis of eyewitness testimony have shown us that eyewitness evidence is not infallible. Even the most honest and objective people can make mistakes in recalling and interpreting a witnessed event; it is the nature of human memory. This issue has been at the heart of a growing body of research in the field of eyewitness identification over the past decade. The National Institute of Justice convened a technical working group of law enforcement and legal practitioners, together with these researchers, to explore the development of improved procedures for the collection and preservation of eyewitness evidence within the criminal justice system.

This *Guide* was produced with the dedicated and enthusiastic participation of the seasoned professionals who served on the Technical Working Group for Eyewitness Evidence. These 34 individuals brought together knowledge and practical experience from jurisdictions large and small across the United States and Canada. I applaud their effort to work together over the course of a year in developing this consensus of recommended practices for law enforcement.

In developing its eyewitness evidence procedures, every jurisdiction should give careful consideration to the recommendations in this *Guide* and to its own unique local conditions and logistical circumstances. Although factors that vary among investigations, including the nature and quality of other evidence and whether a witness is also a victim of the

crime, may call for different approaches or even preclude the use of certain procedures described in the *Guide*, consideration of the *Guide*'s recommendations may be invaluable to a jurisdiction shaping its own protocols. As such, *Eyewitness Evidence: A Guide for Law Enforcement* is an important tool for refining investigative practices dealing with this evidence as we continue our search for truth.

**Janet Reno**

# Technical Working Group for Eyewitness Evidence

The Technical Working Group for Eyewitness Evidence (TWGEYEE) is a multidisciplinary group of content-area experts from across the United States and Canada, from both urban and rural jurisdictions, each representing his or her respective agency or practice. Each of these individuals is experienced in the use of eyewitness evidence in the criminal justice system from the standpoints of law enforcement, prosecution, defense, or social science.

At the outset of the TWGEYEE effort, the National Institute of Justice (NIJ) created a Planning Panel—composed of distinguished law enforcement, legal, and research professionals—to define needs, develop initial strategies, and steer the larger group. Additional members of the Technical Working Group then were selected from recommendations solicited from the Planning Panel, NIJ's regional National Law Enforcement and Corrections Technology Centers, and national organizations, including the National Sheriffs' Association, the International Association of Chiefs of Police, the National District Attorneys Association, the National Association of Criminal Defense Lawyers, and the National Legal Aid & Defender Association.

Collectively, over a 1-year period, the 34 members of TWGEYEE listed below worked together to develop this handbook, *Eyewitness Evidence: A Guide for Law Enforcement*.

*Planning Panel*

Comdr. Ella M. Bully (Ret.)
Detroit Police Department
Detroit, Michigan

Sgt. Paul Carroll (Ret.)
Chicago Police Department
Chicago, Illinois

Carole E. Chaski, Ph.D.
Institute for Linguistic
 Evidence
Georgetown, Delaware

James Doyle
Attorney at Law
Boston, Massachusetts

Ronald P. Fisher, Ph.D.
Florida International
 University
North Miami, Florida

Mark R. Larson
King County Prosecutor's
 Office
Seattle, Washington

Capt. Donald Mauro
Los Angeles County Sheriff's
 Office
Los Angeles, California

Melissa Mourges
New York County District
 Attorney's Office
New York, New York

Gary L. Wells, Ph.D.
Iowa State University
Ames, Iowa

## *TWGEYEE Members*
### *Northeast*

Michael J. Barrasse
Lackawanna County District
  Attorney
Scranton, Pennsylvania

Det. Sgt. Chet Bush
Kent County Sheriff's Office
Grand Rapids, Michigan

Solomon M. Fulero, Ph.D., J.D.
Sinclair College
Dayton, Ohio

David C. Niblack
Attorney at Law
Washington, D.C.

Det. Lt. Kenneth A. Patenaude
Northampton Police
  Department
Northampton, Massachusetts

Patricia Ramirez
Dodge County District
  Attorney
Juneau, Wisconsin

Senior Investigator
  Eugene Rifenburg
New York State Police (Ret.)

Oneida Indian Nation Police
Munnsville, New York

Det. Edward Rusticus
Kent County Sheriff's Office
Grand Rapids, Michigan

Capt. Michael B. Wall
Northampton Police
  Department
Northampton, Massachusetts

### *Southeast*

Deputy Daniel Alarcon II
Hillsborough County Sheriff's
  Office
Tampa, Florida

First Sgt. Roger Broadbent
Virginia State Police
Fairfax Station, Virginia

Cpl. J.R. Burton
Hillsborough County Sheriff's
  Office
Tampa, Florida

Caterina DiTraglia
State of Missouri
Public Defender System
St. Louis, Missouri

Officer Patricia Marshall
Chicago Police Department
Chicago, Illinois

Det. Ray Staley
Kansas City Police Department
Kansas City, Missouri

Lt. Tami Thomas
Atlantic Beach Police
  Department
Atlantic Beach, North Carolina

### *Rocky Mountain*

Det. Sgt. J. Glenn Diviney (Ret.)
Tarrant County Sheriff's
  Office
Fort Worth, Texas

Investigations Chief Arlyn
  Greydanus
Montana Department of
  Justice
Division of Criminal
  Investigation
Helena, Montana

Investigator Kathy Griffin
Loveland Police Department
Loveland, Colorado

Roy S. Malpass, Ph.D.
University of Texas at El Paso
El Paso, Texas

Jeralyn Merritt
Attorney at Law
Denver, Colorado

### *West*

James Fox
San Mateo County District
  Attorney
Redwood City, California

William Hodgman
Los Angeles County District
  Attorney's Office
Los Angeles, California

### *Canada*

Rod C.L. Lindsay, Ph.D.
Queen's University
Kingston, Ontario

John Turtle, Ph.D.
Ryerson Polytechnic University
Toronto, Ontario

# Acknowledgments

The National Institute of Justice (NIJ) acknowledges with great thanks the members of the Technical Working Group for Eyewitness Evidence (TWGEYEE) for their extensive efforts on this project and their dedication to improving the use of eyewitness evidence in the criminal justice system. All of the 34 members of this network of experts gave their time and expertise to draft and review the *Guide*, providing feedback and perspectives from a variety of disciplines and from all areas of the United States as well as Canada. The true strength of this *Guide* is derived from their commitment to develop procedures that could be implemented across the Nation, from small, rural townships to large, metropolitan areas. In addition, thanks are extended to the agencies and organizations represented by the Technical Working Group members for their flexibility and support, which enabled the participants to see this project through to completion.

NIJ is grateful to all the individuals from various national organizations across the Nation who responded to the request for nominations of experts in the field of eyewitness evidence to serve on TWGEYEE. It was from their recommendations that the members were selected. In particular, thanks are extended to James D. Polley IV of the National District Attorneys Association, Daniel Rosenblatt of the International Association of Chiefs of Police, Stuart Statler of the National Association of Criminal Defense Lawyers, Clinton Lyons of the National Legal Aid & Defender Association, and Aldine N. "Bubby" Moser, Jr., of the National Sheriffs' Association.

NIJ would also like to thank the many individuals and organizations who reviewed the draft of the *Guide* and provided valuable comments. Although these comments were given careful consideration by the Technical Working Group in developing the final document, the review by these organizations and individuals is not intended to imply their endorsement of the *Guide*.

Aspen Systems Corporation, particularly Gayle Garmise and Erica Pope, provided tireless work on editing and re-editing the various drafts of the *Guide*. CSR, Incorporated, provided support in arranging the group's many meetings.

Staff from NIJ and the Office of Justice Programs provided valuable input, particularly Janice Munsterman, Karl Bickel, Luke Galant, and Anjali Swienton. Special thanks are extended to Lisa Forman and Kathleen Higgins for their contributions to the TWG program and to Lisa Kaas for her patience, dedication, endurance, and editing skills that made the work of TWGEYEE easier.

Finally, NIJ would like to acknowledge Attorney General Janet Reno, whose support and commitment to the improvement of the criminal justice system made this work possible.

# Contents

**Message From the Attorney General** ............................................................... iii

**Technical Working Group for Eyewitness Evidence** ......................................... v

**Acknowledgments** ........................................................................................... vii

**Introduction** ..................................................................................................... 1

**Eyewitness Evidence: A Guide for Law Enforcement** .................................... 11

**Section I: Initial Report of the Crime/First Responder
(Preliminary Investigator)** ................................................................ 13

A. Answering the 9–1–1/Emergency Call
(Call-Taker/Dispatcher) .......................................................... 13

B. Investigating the Scene (Preliminary Investigating Officer) .... 14

C. Obtaining Information From the Witness(es) ........................... 15

**Section II: Mug Books and Composites** ............................................... 17

A. Preparing Mug Books ............................................................. 17

B. Developing and Using Composite Images .............................. 18

C. Instructing the Witness ........................................................... 19

D. Documenting the Procedure ................................................... 20

**Section III: Procedures for Interviewing the Witness by the
Followup Investigator** ...................................................................... 21

A. Preinterview Preparations and Decisions ............................... 21

B. Initial (Preinterview) Contact With the Witness ...................... 22

C. Conducting the Interview ........................................................ 22

D. Recording Witness Recollections ........................................... 23

E. Assessing the Accuracy of Individual Elements of a
Witness' Statement ................................................................. 24

F. Maintaining Contact With the Witness .................................... 25

**Section IV: Field Identification Procedure (Showup) ......................... 27**

    A. Conducting Showups .................................................................. 27

    B. Recording Showup Results ...................................................... 28

**Section V: Procedures for Eyewitness Identification of Suspects ..... 29**

    A. Composing Lineups .................................................................. 29

        *Photo Lineup* ............................................................................ 29

        *Live Lineup* .............................................................................. 30

    B. Instructing the Witness Prior to Viewing a Lineup .................. 31

        *Photo Lineup* ............................................................................ 31

        *Live Lineup* .............................................................................. 32

    C. Conducting the Identification Procedure .................................. 33

        *Simultaneous Photo Lineup* .................................................... 33

        *Sequential Photo Lineup* ......................................................... 34

        *Simultaneous Live Lineup* ....................................................... 35

        *Sequential Live Lineup* ........................................................... 36

    D. Recording Identification Results ............................................... 38

**Appendixes ........................................................................................ 39**

**Appendix A: Further Reading ......................................................... 41**

**Appendix B: Reviewer List .............................................................. 43**

# Introduction

**T**he legal system always has relied on the testimony of eyewitnesses, nowhere more than in criminal cases. Although the evidence eyewitnesses provide can be tremendously helpful in developing leads, identifying criminals, and exonerating the innocent, this evidence is not infallible. Even honest and well-meaning witnesses can make errors, such as identifying the wrong person or failing to identify the perpetrator of a crime.

To their credit, the legal system and law enforcement agencies have not overlooked this problem. Numerous courts and rulemaking bodies have, at various times, designed and instituted special procedures to guard against eyewitness mistakes. Most State and local law enforcement agencies have established their own policies, practices, and training protocols with regard to the collection and handling of eyewitness evidence, many of which are quite good.

In the past, these procedures have not integrated the growing body of psychological knowledge regarding eyewitness evidence with the practical demands of day-to-day law enforcement. In an effort to bring together the perspectives of law enforcement, lawyers, and researchers, the National Institute of Justice (NIJ) convened the Technical Working Group for Eyewitness Evidence (TWGEYEE). The purpose of the group was to recommend uniform practices for the collection and preservation of eyewitness evidence.

This *Guide* differs from earlier efforts in several fundamental ways:

**This *Guide* is supported by social science research.** During the past 20 years, research psychologists have produced a substantial body of findings regarding eyewitness evidence. These findings offer the legal system a valuable body of empirical knowledge in the area of eyewitness evidence. This *Guide* makes use of psychological findings, either by including them in the procedures themselves or by using them to point

1

the way to the design and development of further improvements in procedures and practices for possible inclusion in future amendments or revisions to this document.

**This *Guide* combines research and practical perspectives.** The growth of social science research into the eyewitness process coincided with parallel efforts of law enforcement agencies to improve their own procedures. This *Guide* benefits from the inclusion of the diverse perspectives of TWGEYEE members; the group included not only researchers but also prosecutors, defense lawyers, and working police investigators from departments of all sizes and from all regions. This *Guide* represents a combination of the best current, workable police practices and psychological research.

**This *Guide* does not flow from the fear of misconduct.** This *Guide* assumes good faith by law enforcement. It identifies procedures and practices that will produce more reliable and accurate eyewitness evidence in a greater number of cases while reducing or eliminating practices that can undermine eyewitness reliability and accuracy.

**This *Guide* promotes accuracy in eyewitness evidence.** This *Guide* describes practices and procedures that, if consistently applied, will tend to increase the accuracy and reliability of eyewitness evidence, even though they cannot guarantee the accuracy (or inaccuracy) of a particular witness' testimony in a particular case. Adherence to these procedures can decrease the number of wrongful identifications and should help to ensure that reliable eyewitness evidence is given the weight it deserves in legal proceedings.

**This *Guide* is not a legal mandate; it promotes sound professional practices.** The *Guide* is not intended to state legal criteria for the admissibility of evidence. Rather, it sets out rigorous criteria for handling eyewitness evidence that are as demanding as those governing the handling of physical trace evidence. This *Guide* encourages the highest levels of professionalism.

Finally, it should be noted that, while this *Guide* outlines basic procedures that can be used to obtain the most reliable and accurate informa-

2

tion from eyewitnesses, it is not meant as a substitute for a thorough investigation by law enforcement personnel. Eyewitness evidence is often viewed as a critical piece of the investigative puzzle, the utility of which can be further enhanced by the pursuit of other corroborative evidence. Sometimes, even after a thorough investigation, an eyewitness identification is the sole piece of evidence. It is in those cases in particular where careful use of this *Guide* may be most important.

# Purpose and Scope of the Project

After reviewing the National Institute of Justice Research Report, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial*, Attorney General Janet Reno directed NIJ to address the pitfalls in those investigations that may have contributed to wrongful convictions. The most compelling evidence in the majority of those 28 cases was the eyewitness testimony presented at trial.

NIJ initiated this study in May 1998 with the primary purpose of recommending best practices and procedures for the criminal justice community to employ in investigations involving eyewitnesses. Using its "Template for Technical Working Groups," NIJ established the Technical Working Group for Eyewitness Evidence to identify, define, and assemble a set of investigative tasks that should be performed in every investigation involving eyewitness evidence to best ensure the accuracy and reliability of this evidence. The initial members of this group were the Planning Panel, a multidisciplinary group of nine professionals brought together to identify the needs of the criminal justice system in the area of eyewitness evidence, define goals and objectives for TWGEYEE, and develop the initial strategy for achieving TWGEYEE's mission.

The Planning Panel agreed that eyewitness evidence, in general, can be improved and made more reliable through the application of currently accepted scientific principles and practices. It was acknowledged that research has shown that a witness' memory of an event can be fragile

and that the amount and accuracy of information obtained from a witness depends in part on the method of questioning. Based on these precepts, the following goals and objectives for the study were identified:

◆ Increase the amount of information elicited from witnesses through improved interview techniques.

◆ Heighten the validity/accuracy of eyewitness evidence as police, prosecutors, and other criminal justice professionals work with witnesses to identify suspects.

◆ Improve the criminal justice system's ability to evaluate the strength and accuracy of eyewitness evidence.

Although the development of a guide for eyewitness evidence can be instructive in addressing issues surrounding this evidence, the Planning Panel recognized that local logistical and legal conditions may dictate the use of alternative procedures. Further, eyewitness identification procedures that do not employ the practices recommended in this *Guide* will not necessarily invalidate or detract from the evidence in a particular case.

# Project Design

**Technical Working Group process.** The National Institute of Justice has developed a template for technical working groups that has been successfully used in previous studies of this nature. The process begins with a request from the criminal justice community, generally through the Attorney General; NIJ researches the issue of concern and assembles a planning panel of content-area experts. This panel, together with NIJ, determines whether a Technical Working Group is needed to explore the issue further.

Once the decision is made to form a Technical Working Group, the planning panel determines the group's size and composition and drafts an agenda. NIJ supports the planning panel by requesting member nominations from its multidisciplinary membership resource pool throughout the

4

national criminal justice community based on regional distribution and individual expertise and availability.

Once members are identified, meetings are conducted by designated planning panel members. NIJ maintains a purely facilitative function.

The Planning Panel for Eyewitness Evidence met for the first time in May 1998 in Washington, D.C. After two planning meetings (the second in Oak Brook, Illinois), the Technical Working Group for Eyewitness Evidence was formed and convened for the first time in October 1998 in Chicago. The 34 TWGEYEE members (including the 9 Planning Panel members) represent the law enforcement, prosecution, defense, and research communities from across the United States and Canada.



The regional distribution of the Technical Working Group members is:

| Region | Number of Participants | Percentage of Total |
|---|---|---|
| Northeast | 14 | 41 |
| Southeast | 9 | 26 |
| Rocky Mountain | 5 | 15 |
| West | 4 | 12 |
| Canada | 2 | 6 |

The disciplinary distribution of the Technical Working Group members is:

| Discipline | Number of Participants (Full TWG/ Planning Panel) | Percentage of Total (Full TWG/ Planning Panel |
|---|---|---|
| Law Enforcement | 17/3 | 50/33.3 |
| Prosecutors | 6/2 | 18/22.2 |
| Defense Lawyers | 4/1 | 12/11.1 |
| Researchers | 7/3 | 20/33.3 |

**Development of the *Guide*.** During the course of three full meetings—the second in Washington, D.C., in January 1999 and the third in San Francisco in May 1999—and four Planning Panel meetings during a 1-year period, the Technical Working Group for Eyewitness Evidence members identified specific investigative tasks they felt represented the best practices currently available to investigators. These tasks were organized based on the categories of investigation defined by the Planning Panel, and these categories were modified during the process where necessary. Once specific tasks were identified, they were incorporated into the following format:

◆ A statement of *principle* citing what is accomplished by performing the procedure.

◆ A statement of *policy* to the investigator regarding performance of the procedure.

◆ The *procedure* for performing the list of tasks.

◆ A *summary* statement explaining the justification for and importance of performing the procedure.

**National reviewer network.** After the Technical Working Group completed the initial draft of the *Guide* in March 1999, it was distributed to a broad audience throughout the criminal justice community for review. Comments from these organizations and individuals then were considered by TWGEYEE at its May 1999 meeting to finalize and approve the *Guide* for publication.

The 95 organizations and individuals whose comments were solicited during the national review of the *Guide* represented all levels of law enforcement from local officers to State superintendents to Federal agencies, regional and national organizations, individual attorneys and judges, and social science researchers from around the United States and Canada. The disciplinary distribution of these reviewers was as follows: 43 law enforcement and corrections agencies and organizations; 20 prosecutors, defense lawyers, and judges (individuals and organizations); 19 national law enforcement and legislative policy organizations; and

7

13 individual social science and legal researchers (a complete list of reviewers can be found in appendix B).

# Training Criteria

NIJ is planning a second phase of this study to produce training criteria for each of the procedures included in this document. This research is expected to be completed and disseminated by the summer of 2000. TWGEYEE members and other training practitioners from around the Nation will define and verify minimum levels of performance for each procedure. The training criteria will be published and widely distributed to provide organizations and individuals with the materials needed to establish and maintain the knowledge and skills for performance of the procedures.

# Validation of the Guide

Although the investigative tasks identified in this *Guide* represent the consensus of the TWGEYEE members on procedures for collection and preservation of eyewitness evidence, no attempt was made to conduct validation studies to state the significance or degree of improvement in eyewitness evidence these practices should be expected to yield. NIJ plans to develop a national validation strategy for the field testing and validation of each procedure. It should be noted that the existing *Guide* is subject to future modification or revision based on the outcome of these validation procedures.

# Future Considerations

Advances in social science and technology will, over time, affect procedures used to gather and preserve eyewitness evidence. The following examples illustrate areas of potential change.

8

Scientific research indicates that identification procedures such as lineups and photo arrays produce more reliable evidence when the individual lineup members or photographs are shown to the witness sequentially— one at a time—rather than simultaneously. Although some police agencies currently use sequential methods of presentation, there is not a consensus on any particular method or methods of sequential presentation that can be recommended as a *preferred* procedure; although sequential procedures are included in the *Guide*, it does not indicate a preference for sequential procedures.

Similarly, investigators' unintentional cues (e.g., body language, tone of voice) may negatively impact the reliability of eyewitness evidence. Psychology researchers have noted that such influences could be avoided if "blind" identification procedures were employed (i.e., procedures conducted by investigators who do not know the identity of the actual suspect). However, blind procedures, which are used in science to prevent inadvertent contamination of research results, may be impractical for some jurisdictions to implement. Blind procedures are not included in the *Guide* but are identified as a direction for future exploration and field testing. In the interim, an enhanced awareness on the part of investigators of the subtle impact they may have on witnesses will result in more professional identification procedures.

Technological advances such as computer-based imaging systems and the Internet will enable law enforcement to share images among departments and can facilitate the use of improved procedures. This *Guide* is not meant to inhibit the development and field testing of new technologies and procedures. On the contrary, it anticipates those developments and can provide a framework for innovation.

9

# Eyewitness Evidence: A Guide for Law Enforcement

| Section I | Initial Report of the Crime/First Responder (Preliminary Investigator) |
|---|---|
| **Section II** | Mug Books and Composites |
| **Section III** | Procedures for Interviewing the Witness by the Followup Investigator |
| **Section IV** | Field Identification Procedure (Showup) |
| **Section V** | Procedures for Eyewitness Identification of Suspects |

**This handbook is intended as a guide to recommended practices for the collection and preservation of eyewitness evidence.**

**Jurisdictional, logistical, or legal conditions may preclude the use of particular procedures contained herein.**

# Section I. Initial Report of the Crime/First Responder (Preliminary Investigator)

## A. Answering the 9–1–1/Emergency Call (Call-Taker/Dispatcher)

**Principle:** As the initial point of contact for the witness, the 9–1–1/emergency call-taker or dispatcher must obtain and disseminate, in a nonsuggestive manner, complete and accurate information from the caller. This information can include the description/identity of the perpetrator of a crime. The actions of the call-taker/dispatcher can affect the safety of those involved as well as the entire investigation.

**Policy:** The call-taker/dispatcher shall answer each call in a manner conducive to obtaining and disseminating accurate information regarding the crime and the description/identity of the perpetrator.

**Procedure:** During a 9–1–1/emergency call—after obtaining preliminary information and dispatching police— the call-taker/dispatcher should:

1. Assure the caller the police are on the way.

2. Ask open-ended questions (e.g., "What can you tell me about the car?"); augment with closed-ended questions (e.g., "What color was the car?").

3. Avoid asking suggestive or leading questions (e.g., "Was the car red?").

4. Ask if anything else should be known about the incident.

5. Transmit information to responding officer(s).

6. Update officer(s) as more information comes in.

## A. Answering the 9–1–1/Emergency Call (Call-Taker/Dispatcher)

**Summary:**   The information obtained from the witness is critical to the safety of those involved and may be important to the investigation. The manner in which facts are elicited from a caller can influence the accuracy of the information obtained.

# B.   Investigating the Scene (Preliminary Investigating Officer)

**Principle:**   Preservation and documentation of the scene, including information from witnesses and physical evidence, are necessary for a thorough preliminary investigation. The methods used by the preliminary investigating officer have a direct impact on the amount and accuracy of the information obtained throughout the investigation.

**Policy:**   The preliminary investigating officer shall obtain, preserve, and use the maximum amount of accurate information from the scene.

**Procedure:**   After securing the scene and attending to any victims and injured persons, the preliminary investigating officer should:

1. Identify the perpetrator(s).

    a. Determine the location of the perpetrator(s).

    b. Detain or arrest the perpetrator(s) if still present at the scene.

2. Determine/classify what crime or incident has occurred.

3. Broadcast an updated description of the incident, perpetrator(s), and/or vehicle(s).

4. Verify the identity of the witness(es).

14

5. Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses.

6. Canvass the area for other witnesses.

**Summary:**     The preliminary investigation at the scene forms a sound basis for the accurate collection of information and evidence during the followup investigation.

# C.        Obtaining Information From the Witness(es)

**Principle:**    The manner in which the preliminary investigating officer obtains information from a witness has a direct impact on the amount and accuracy of that information.

**Policy:**      The preliminary investigating officer shall obtain and accurately document and preserve information from the witness(es).

**Procedure:**   When interviewing a witness, the preliminary investigating officer should:

1. Establish rapport with the witness.

2. Inquire about the witness' condition.

3. Use open-ended questions (e.g., "What can you tell me about the car?"); augment with closed-ended questions (e.g., "What color was the car?"). Avoid leading questions (e.g., "Was the car red?").

4. Clarify the information received with the witness.

5. Document information obtained from the witness, including the witness' identity, in a written report.

6. Encourage the witness to contact investigators with any further information.

15

## C. Obtaining Information From the Witness(es)

7. Encourage the witness to avoid contact with the media or exposure to media accounts concerning the incident.

8. Instruct the witness to avoid discussing details of the incident with other potential witnesses.

**Summary:** Information obtained from the witness can corroborate other evidence (e.g., physical evidence, accounts provided by other witnesses) in the investigation. Therefore, it is important that this information be accurately documented in writing.

# Section II. Mug Books and Composites

## A. Preparing Mug Books

***Note:*** *"Mug books" (i.e., collections of photos of previously arrested persons) may be used in cases in which a suspect has not yet been determined and other reliable sources have been exhausted. This technique may provide investigative leads, but results should be evaluated with caution.*



**Principle:** Nonsuggestive composition of a mug book may enable the witness to provide a lead in a case in which no suspect has been determined and other reliable sources have been exhausted.

**Policy:** The investigator/mug book preparer shall compose the mug book in such a manner that individual photos are not suggestive.

**Procedure:** In selecting photos to be preserved in a mug book, the preparer should:

1. Group photos by format (e.g., color or black and white; Polaroid, 35mm, or digital; video) to ensure that no photo unduly stands out.

2. Select photos of individuals that are uniform with regard to general physical characteristics (e.g., race, age, sex).

3. Consider grouping photos by specific crime (e.g., sexual assault, gang activity).

4. Ensure that positive identifying information exists for all individuals portrayed.

5. Ensure that photos are reasonably contemporary.

6. Ensure that only one photo of each individual is in the mug book.

## A. Preparing Mug Books

**Summary:** Mug books must be objectively compiled to yield investigative leads that will be admissible in court.

# B. Developing and Using Composite Images

*Note:* *Composite images can be beneficial investigative tools; however, they should not be used as stand-alone evidence and may not rise to the level of probable cause.*

**Principle:** Composites provide a depiction that may be used to develop investigative leads.

**Policy:** The person preparing the composite shall select and employ the composite technique in such a manner that the witness' description is reasonably depicted.

**Procedure:** The person preparing the composite should:

1. Assess the ability of the witness to provide a description of the perpetrator.

2. Select the procedure to be used from those available (e.g., identikit-type, artist, or computer-generated images).

3. Unless part of the procedure, avoid showing the witness any photos immediately prior to development of the composite.

4. Select an environment for conducting the procedure that minimizes distractions.

5. Conduct the procedure with each witness separately.

6. Determine with the witness whether the composite is a reasonable representation of the perpetrator.

**Summary:** The use of composite images can yield investigative leads in cases in which no suspect has been determined. Use of these procedures can facilitate obtaining from the witness a description that will enable the development of a reasonable likeness of the perpetrator.

# C. Instructing the Witness

**Principle:** Instructions to the witness prior to conducting the procedure can facilitate the witness' recollection of the perpetrator.

**Policy:** The investigator/person conducting the procedure shall provide instructions to the witness prior to conducting the procedure.

**Procedure:**

*Mug Book:* The investigator/person conducting the procedure should:

1. Instruct each witness without other persons present.

2. Describe the mug book to the witness only as a "collection of photographs."

3. Instruct the witness that the person who committed the crime may or may not be present in the mug book.

4. Consider suggesting to the witness to think back to the event and his/her frame of mind at the time.

5. Instruct the witness to select a photograph if he/she can and to state how he/she knows the person if he/she can.

6. Assure the witness that regardless of whether he/she makes an identification, the police will continue to investigate the case.

7. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

19

## C. Instructing the Witness

***Composite:*** The investigator/person conducting the procedure should:

1. Instruct each witness without other persons present.

2. Explain the type of composite technique to be used.

3. Explain to the witness how the composite will be used in the investigation.

4. Instruct the witness to think back to the event and his/her frame of mind at the time.

**Summary:** Providing instructions to the witness can improve his/her comfort level and can result in information that may assist the investigation.

# D. Documenting the Procedure

**Principle:** Documentation of the procedure provides an accurate record of the results obtained from the witness.

**Policy:** The person conducting the procedure shall preserve the outcome of the procedure by accurately documenting the type of procedure(s) employed and the results.

**Procedure:** The person conducting the procedure should:

1. Document the procedure employed (e.g., identikit-type, mug book, artist, or computer-generated image) in writing.

2. Document the results of the procedure in writing, including the witness' own words regarding how certain he/she is of any identification.

3. Document items used and preserve composites generated.

**Summary:** Documentation of the procedure and its outcome improves the strength and credibility of the results obtained from the witness and can be an important factor in the investigation and any subsequent court proceedings.

# Section III. Procedures for Interviewing the Witness by the Followup Investigator

## A. Preinterview Preparations and Decisions

**Principle:** Preparing for an interview maximizes the effectiveness of witness participation and interviewer efficiency.

**Policy:** The investigator shall review all available witness and case information and arrange an efficient and effective interview.

**Procedure:** Prior to conducting the interview, the investigator should:



1. Review available information.

2. Plan to conduct the interview as soon as the witness is physically and emotionally capable.

3. Select an environment that minimizes distractions while maintaining the comfort level of the witness.

4. Ensure resources are available (e.g., notepad, tape recorder, camcorder, interview room).

5. Separate the witnesses.

6. Determine the nature of the witness' prior law enforcement contact.

**Summary:** Performing the above preinterview preparations will enable the investigator to elicit a greater amount of accurate information during the interview, which may be critical to the investigation.

# B. Initial (Preinterview) Contact With the Witness

**Principle:** A comfortable witness provides more information.

**Policy:** Investigators shall conduct themselves in a manner conducive to eliciting the most information from the witness.

**Procedure:** On meeting with the witness but prior to beginning the interview, the investigator should:

1. Develop rapport with the witness.

2. Inquire about the nature of the witness' prior law enforcement contact related to the incident.

3. Volunteer no specific information about the suspect or case.

**Summary:** Establishing a cooperative relationship with the witness likely will result in an interview that yields a greater amount of accurate information.

# C. Conducting the Interview

**Principle:** Interview techniques can facilitate witness memory and encourage communication both during and following the interview.

**Policy:** The investigator shall conduct a complete, efficient, and effective interview of the witness and encourage postinterview communication.

**Procedure:** During the interview, the investigator should:

1. Encourage the witness to volunteer information without prompting.

2. Encourage the witness to report all details, even if they seem trivial.

3. Ask open-ended questions (e.g., "What can you tell me about the car?"); augment with closed-ended, specific questions (e.g., "What color was the car?").

4. Avoid leading questions (e.g., "Was the car red?").

5. Caution the witness not to guess.

6. Ask the witness to mentally recreate the circumstances of the event (e.g., "Think about your feelings at the time").

7. Encourage nonverbal communication (e.g., drawings, gestures, objects).

8. Avoid interrupting the witness.

9. Encourage the witness to contact investigators when additional information is recalled.

10. Instruct the witness to avoid discussing details of the incident with other potential witnesses.

11. Encourage the witness to avoid contact with the media or exposure to media accounts concerning the incident.

12. Thank the witness for his/her cooperation.

**Summary:** Information elicited from the witness during the interview may provide investigative leads and other essential facts. The above interview procedures will enable the witness to provide the most accurate, complete description of the event and encourage the witness to report later recollections. Witnesses commonly recall additional information after the interview that may be critical to the investigation.

## D.    Recording Witness Recollections

**Principle:** The record of the witness' statements accurately and completely reflects all information obtained and preserves the integrity of this evidence.

## D. Recording Witness Recollections

**Policy:** The investigator shall provide complete and accurate documentation of all information obtained from the witness.

**Procedure:** During or as soon as reasonably possible after the interview, the investigator should:

1. Document the witness' statements (e.g., audio or video recording, stenographer's documentation, witness' written statement, written summary using witness' own words).

2. Review written documentation; ask the witness if there is anything he/she wishes to change, add, or emphasize.

**Summary:** Complete and accurate documentation of the witness' statement is essential to the integrity and success of the investigation and any subsequent court proceedings.

# E.      Assessing the Accuracy of Individual Elements of a Witness' Statement

**Principle:** Point-by-point consideration of a statement may enable judgment on which components of the statement are most accurate. This is necessary because each piece of information recalled by the witness may be remembered independently of other elements.

**Policy:** The investigator shall review the individual elements of the witness' statement to determine the accuracy of each point.

**Procedure:** After conducting the interview, the investigator should:

1. Consider each individual component of the witness' statement separately.

24

2.  Review each element of the witness' statement in the context of the entire statement. Look for inconsistencies within the statement.

3.  Review each element of the statement in the context of evidence known to the investigator from other sources (e.g., other witnesses' statements, physical evidence).

**Summary:**   Point-by-point consideration of the accuracy of each element of a witness' statement can assist in focusing the investigation. This technique avoids the common misconception that the accuracy of an individual element of a witness' description predicts the accuracy of another element.

# F.        Maintaining Contact With the Witness

**Principle:**   The witness may remember and provide additional information after the interview has concluded.

**Policy:**   The investigator shall maintain open communication to allow the witness to provide additional information.

**Procedure:**   During postinterview, followup contact with the witness, the investigator should:

1.  Reestablish rapport with the witness.

2.  Ask the witness if he/she has recalled any additional information.

3.  Follow interviewing and documentation procedures in subsections C, "Conducting the Interview," and D, "Recording Witness Recollections."

4.  Provide no information from other sources.

**Summary:**   Reestablishing contact and rapport with the witness often leads to recovery of additional information. Maintaining open communication channels with the witness throughout the investigation is critical.

25

# Section IV. Field Identification Procedure (Showup)

## A.    Conducting Showups

**Principle:**    When circumstances require the prompt display of a single suspect to a witness, the inherent suggestiveness of the encounter can be minimized through the use of procedural safeguards.

**Policy:**    The investigator shall employ procedures that avoid prejudicing the witness.

**Procedure:**    When conducting a showup, the investigator should:

1. Determine and document, prior to the showup, a description of the perpetrator.

2. Consider transporting the witness to the location of the detained suspect to limit the legal impact of the suspect's detention.

3. When multiple witnesses are involved:

    a. Separate witnesses and instruct them to avoid discussing details of the incident with other witnesses.

    b. If a positive identification is obtained from one witness, consider using other identification procedures (e.g., lineup, photo array) for remaining witnesses.

4. Caution the witness that the person he/she is looking at may or may not be the perpetrator.

5. Obtain and document a statement of certainty for both identifications and nonidentifications.

**Summary:**    The use of a showup can provide investigative information at an early stage, but the inherent suggestiveness of a showup requires careful use of procedural safeguards.

IV

27

# B.  Recording Showup Results

**Principle:**   The record of the outcome of the field identification procedure accurately and completely reflects the identification results obtained from the witness.

**Policy:**   When conducting a showup, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness.

**Procedure:**   When conducting a showup, the investigator should:

1. Document the time and location of the procedure.

2. Record both identification and nonidentification results in writing, including the witness' own words regarding how certain he/she is.

**Summary:**   Preparing a complete and accurate record of the outcome of the showup improves the strength and credibility of the identification or nonidentification results obtained from the witness and can be a critical document in the investigation and any subsequent court proceedings.

# Section V. Procedures for Eyewitness Identification of Suspects

## A.         Composing Lineups

**Principle:**    Fair composition of a lineup enables the witness to provide a more accurate identification or nonidentification.

**Policy:**     The investigator shall compose the lineup in such a manner that the suspect does not unduly stand out.

**Procedure:**

***Photo Lineup:*** In composing a photo lineup, the investigator should:

1.  Include only one suspect in each identification procedure.

2.  Select fillers who generally fit the witness' description of the perpetrator. When there is a limited/inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.

3.  If multiple photos of the suspect are reasonably available to the investigator, select a photo that resembles the suspect description or appearance at the time of the incident.

4.  Include a *minimum* of five fillers (nonsuspects) per identification procedure.

5.  Consider that complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers.

6.  Create a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos)



V

29

## A. Composing Lineups

> used to describe the perpetrator by artificially adding or concealing that feature.

7. Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly in the lineup.

8. When showing a new suspect, avoid reusing fillers in lineups shown to the same witness.

9. Ensure that no writings or information concerning previous arrest(s) will be visible to the witness.

10. View the spread, once completed, to ensure that the suspect does not unduly stand out.

11. Preserve the presentation order of the photo lineup. In addition, the photos themselves should be preserved in their original condition.

***Live Lineup:***    In composing a live lineup, the investigator should:

1. Include only one suspect in each identification procedure.

2. Select fillers who generally fit the witness' description of the perpetrator. When there is a limited/inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.

3. Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly unless, where local practice allows, the suspect or the suspect's attorney requests a particular position.

4. Include a *minimum* of four fillers (nonsuspects) per identification procedure.

5. When showing a new suspect, avoid reusing fillers in lineups shown to the same witness.

30

6. Consider that complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers.

7. Create a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature.

**Summary:**    The above procedures will result in a photo or live lineup in which the suspect does not unduly stand out. An identification obtained through a lineup composed in this manner may have stronger evidentiary value than one obtained without these procedures.

# B.    Instructing the Witness Prior to Viewing a Lineup

**Principle:**    Instructions given to the witness prior to viewing a lineup can facilitate an identification or nonidentification based on his/her own memory.

**Policy:**    Prior to presenting a lineup, the investigator shall provide instructions to the witness to ensure the witness understands that the purpose of the identification procedure is to exculpate the innocent as well as to identify the actual perpetrator.

**Procedure:**

*Photo Lineup:*  Prior to presenting a photo lineup, the investigator should:

1. Instruct the witness that he/she will be asked to view a set of photographs.

## B. Instructing the Witness Prior to Viewing a Lineup

2. Instruct the witness that it is just as important to clear innocent persons from suspicion as to identify guilty parties.

3. Instruct the witness that individuals depicted in lineup photos may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.

4. Instruct the witness that the person who committed the crime may or may not be in the set of photographs being presented.

5. Assure the witness that regardless of whether an identification is made, the police will continue to investigate the incident.

6. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

*Live Lineup:*     Prior to presenting a live lineup, the investigator should:

1. Instruct the witness that he/she will be asked to view a group of individuals.

2. Instruct the witness that it is just as important to clear innocent persons from suspicion as to identify guilty parties.

3. Instruct the witness that individuals present in the lineup may not appear exactly as they did on the date of the incident because features such as head and facial hair are subject to change.

4. Instruct the witness that the person who committed the crime may or may not be present in the group of individuals.

5. Assure the witness that regardless of whether an identification is made, the police will continue to investigate the incident.

6. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

32

**Summary:**     Instructions provided to the witness prior to presentation of a lineup will likely improve the accuracy and reliability of any identification obtained from the witness and can facilitate the elimination of innocent parties from the investigation.

# C.          Conducting the Identification Procedure

**Principle:**     The identification procedure should be conducted in a manner that promotes the reliability, fairness, and objectivity of the witness' identification.

**Policy:**     The investigator shall conduct the lineup in a manner conducive to obtaining accurate identification or nonidentification decisions.

**Procedure:**

***Simultaneous***
***Photo Lineup:***     When presenting a simultaneous photo lineup, the investigator should:

1. Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2. Confirm that the witness understands the nature of the lineup procedure.

3. Avoid saying anything to the witness that may influence the witness' selection.

4. If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

5. Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

33

## C. Conducting the Identification Procedure

6. Document in writing the photo lineup procedures, including:

   a. Identification information and sources of all photos used.

   b. Names of all persons present at the photo lineup.

   c. Date and time of the identification procedure.

7. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

### *Sequential*
***Photo Lineup:*** When presenting a sequential photo lineup, the investigator should:

1. Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2. Provide the following *additional* viewing instructions to the witness:

   a. Individual photographs will be viewed *one at a time*.

   b. The photos are in random order.

   c. Take as much time as needed in making a decision about each photo before moving to the next one.

   d. All photos will be shown, even if an identification is made; *or* the procedure will be stopped at the point of an identification (consistent with jurisdictional/departmental procedures).

3. Confirm that the witness understands the nature of the sequential procedure.

4. Present each photo to the witness separately, in a previously determined order, removing those previously shown.

5. Avoid saying anything to the witness that may influence the witness' selection.

34

6. If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

7. Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

8. Document in writing the photo lineup procedures, including:

   a. Identification information and sources of all photos used.

   b. Names of all persons present at the photo lineup.

   c. Date and time of the identification procedure.

9. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

### Simultaneous

***Live Lineup:***     When presenting a simultaneous live lineup, the investigator/lineup administrator should:

1. Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2. Instruct all those present at the lineup not to suggest in any way the position or identity of the suspect in the lineup.

3. Ensure that any identification actions (e.g., speaking, moving) are performed by all members of the lineup.

4. Avoid saying anything to the witness that may influence the witness' selection.

5. If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

35

## C. Conducting the Identification Procedure

6. Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

7. Document the lineup in writing, including:

   a. Identification information of lineup participants.

   b. Names of all persons present at the lineup.

   c. Date and time the identification procedure was conducted.

8. Document the lineup by photo or video. This documentation should be of a quality that represents the lineup clearly and fairly.

9. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

### *Sequential*
***Live Lineup:*** When presenting a sequential live lineup, the lineup administrator/investigator should:

1. Provide viewing instructions to the witness as outlined in subsection B, "Instructing the Witness Prior to Viewing a Lineup."

2. Provide the following *additional* viewing instructions to the witness:

   a. Individuals will be viewed *one at a time*.

   b. The individuals will be presented in random order.

   c. Take as much time as needed in making a decision about each individual before moving to the next one.

   d. If the person who committed the crime is present, identify him/her.

36

    e.   All individuals will be presented, even if an identification is made; *or* the procedure will be stopped at the point of an identification (consistent with jurisdictional/departmental procedures).

3. Begin with all lineup participants out of the view of the witness.

4. Instruct all those present at the lineup not to suggest in any way the position or identity of the suspect in the lineup.

5. Present each individual to the witness separately, in a previously determined order, removing those previously shown.

6. Ensure that any identification actions (e.g., speaking, moving) are performed by all members of the lineup.

7. Avoid saying anything to the witness that may influence the witness' selection.

8. If an identification is made, avoid reporting to the witness any information regarding the individual he/she has selected prior to obtaining the witness' statement of certainty.

9. Record any identification results and witness' statement of certainty as outlined in subsection D, "Recording Identification Results."

10. Document the lineup procedures and content in writing, including:

    a.   Identification information of lineup participants.

    b.   Names of all persons present at the lineup.

    c.   Date and time the identification procedure was conducted.

11. Document the lineup by photo or video. This documentation should be of a quality that represents the lineup clearly and fairly. Photo documentation can be of either the group or each individual.

12. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

### C. Conducting the Identification Procedure

**Summary:**   The manner in which an identification procedure is conducted can affect the reliability, fairness, and objectivity of the identification. Use of the above procedures can minimize the effect of external influences on a witness' memory.

# D.   Recording Identification Results

**Principle:**   The record of the outcome of the identification procedure accurately and completely reflects the identification results obtained from the witness.

**Policy:**   When conducting an identification procedure, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness.

**Procedure:**   When conducting an identification procedure, the investigator should:

1. Record both identification and nonidentification results in writing, including the witness' own words regarding how sure he/she is.

2. Ensure results are signed and dated by the witness.

3. Ensure that no materials indicating previous identification results are visible to the witness.

4. Ensure that the witness does not write on or mark any materials that will be used in other identification procedures.

**Summary:**   Preparing a complete and accurate record of the outcome of the identification procedure improves the strength and credibility of the identification or nonidentification results obtained from the witness. This record can be a critical document in the investigation and any subsequent court proceedings.

# Appendixes

## Appendix A — Further Reading

## Appendix B — Reviewer List

# Appendix A. Further Reading

Connors, E., T. Lundregan, N. Miller, and T. McEwen. *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial*. Washington, DC: U.S. Department of Justice, National Institute of Justice, 1996, NCJ 161258.

Cutler, B.L., and S.D. Penrod. *Mistaken Identification: The Eyewitness, Psychology, and the Law*. New York: Cambridge University Press, 1995.

Fisher, R.P., and R.E. Geiselman. *Memory Enhancing Techniques for Investigative Interviewing*. Springfield, IL: Charles Thomas, 1992.

Fisher, R.P., and M.L. McCauley. "Information Retrieval: Interviewing Witnesses." In *Psychology and Policing*, ed. N. Brewer and C. Wilson. Hillsdale, NJ: Erlbaum, 1995: 81–99.

Fisher, R.P., R.E. Geiselman, and D.S. Raymond. "Critical Analysis of Police Interview Techniques." *Journal of Police Science and Administration* 15 (1987): 177–185.

Geiselman, R.E., and R.P. Fisher. "Ten Years of Cognitive Interviewing." In *Intersections in Basic and Applied Memory Research*, ed. D. Payne and F. Conrad. Mahwah, NJ: Erlbaum, 1997: 291–310.

Lindsay, R.C.L., and G.L. Wells. "Improving Eyewitness Identification From Lineups: Simultaneous Versus Sequential Lineup Presentations." *Journal of Applied Psychology* 70 (1985): 556–564.

Loftus, E.F., and J. Doyle. *Eyewitness Testimony: Civil and Criminal*, 3d ed. Charlottesville, VA: Lexis Law Publishing, 1997.

Wells, G.L., M.R. Leippe, and T.M. Ostrom. "Guidelines for Empirically Assessing the Fairness of a Lineup." *Law and Human Behavior* 3 (1979): 285–293.

Wells, G.L., S.M. Rydell, and E.P. Seelau. "On the Selection of Distractors for Eyewitness Lineups." *Journal of Applied Psychology* 78 (1993): 835–844.

Wells, G.L., E.P. Seelau, S.M. Rydell, and C.A.E. Luus. "Recommendations for Properly Conducted Lineup Identification Tasks." In *Adult Eyewitness Testimony: Current Trends and Developments*, ed. D.F. Ross, J.D. Read, and M.P. Toglia. New York: Cambridge University Press, 1994: 223–244.

Wells, G.L., M. Small, S.D. Penrod, R.S. Malpass, S.M. Fulero, and C.A.E. Brimacombe. "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads." *Law and Human Behavior* 22 (1998): 603.

# Appendix B. Reviewer List

During the review process, drafts of this document were sent to the following agencies and organizations for comment. Although the Technical Working Group considered all comments and issues raised by these organizations, this *Guide* reflects only the positions of its authors. Mention of the reviewers is not intended to imply their endorsement.

The Academy Group, Inc.

American Bar Association

American Correctional Association

American Jail Association

American Society of Law Enforcement Trainers

American Prosecutors Research Institute

Association of Federal Defense Attorneys

Bureau of Alcohol, Tobacco and Firearms

Campaign for Effective Crime Policy

Commission on Accreditation for Law Enforcement Agencies, Inc.

Conference of State Court Administrators

Cleveland State College Basic Police Academy

Council of State Governments

Criminal Justice Institute

Drug Enforcement Administration

Executive Office for United States Attorneys

Fairfax County (Virginia) Police Association

Federal Bureau of Investigation

Federal Law Enforcement Training Center, Department of the Treasury

Home Office, Policing and Reducing Crime Unit (UK)

International Association of Chiefs of Police

International Association for Identification

International City/County Managers Association

International Homicide Investigators Association

Law Enforcement Training Institute, University of Missouri - Columbia

Madison County (New York) Sheriff's Department

Metro Nashville Police Academy

National Association of Attorneys General

National Association of Black Women Attorneys

National Association of Counties

National Association of Criminal Defense Lawyers

National Association of Drug Court Professionals

National Association of Police Organizations

National Association of Sentencing Commissions

43

National Association of State Alcohol and Drug Abuse Directors

National Association of Women Judges

National Black Police Association

National Center for State Courts

National Conference of State Legislators

National Council on Crime and Delinquency

National Crime Prevention Council

National Criminal Justice Association

National District Attorneys Association

National Governors Association

National Institute of Standards and Technology, Office of Law Enforcement Standards

National Law Enforcement and Corrections Technology Centers

National Law Enforcement Council

National League of Cities

National Legal Aid & Defender Association

National Organization of Black Law Enforcement Executives

National Organization for Victim Assistance

National Sheriffs' Association

National Victim Center

New York State Police

Oneida County (New York) Sheriff's Office

Oneida Indian Nation Police

Peace Officers Standards & Training

Police Executive Research Forum

Police Foundation

Royal Canadian Mounted Police

Tennessee Law Enforcement Training Academy

United States Conference of Mayors

United States Secret Service

Utah State Crime Scene Academy

44

For more information on the National Institute of Justice,
please contact:

**National Criminal Justice Reference Service**
Box 6000
Rockville, MD 20849–6000
800–851–3420
e-mail: askncjrs@ncjrs.org

To access the World Wide Web site, go to
http://www.ncjrs.org

If you have any questions, call or e-mail NCJRS.

# About the National Institute of Justice

The National Institute of Justice (NIJ), a component of the Office of Justice Programs, is the research agency of the U.S. Department of Justice. Created by the Omnibus Crime Control and Safe Streets Act of 1968, as amended, NIJ is authorized to support research, evaluation, and demonstration programs, development of technology, and both national and international information dissemination. Specific mandates of the Act direct NIJ to:

◆ Sponsor special projects, and research and development programs, that will improve and strengthen the criminal justice system and reduce or prevent crime.

◆ Conduct national demonstration projects that employ innovative or promising approaches for improving criminal justice.

◆ Develop new technologies to fight crime and improve criminal justice.

◆ Evaluate the effectiveness of criminal justice programs and identify programs that promise to be successful if continued or repeated.

◆ Recommend actions that can be taken by Federal, State, and local governments as well as by private organizations to improve criminal justice.

◆ Carry out research on criminal behavior.

◆ Develop new methods of crime prevention and reduction of crime and delinquency.

In recent years, NIJ has greatly expanded its initiatives, the result of the Violent Crime Control and Law Enforcement Act of 1994 (the Crime Act), partnerships with other Federal agencies and private foundations, advances in technology, and a new international focus. Some examples of these new initiatives:

◆ New research and evaluation is exploring key issues in community policing, violence against women, sentencing reforms, and specialized courts such as drug courts.

◆ Dual-use technologies are being developed to support national defense and local law enforcement needs.

◆ Four regional National Law Enforcement and Corrections Technology Centers and a Border Research and Technology Center have joined the National Center in Rockville, Maryland.

◆ The causes, treatment, and prevention of violence against women and violence within the family are being investigated in cooperation with several agencies of the U.S. Department of Health and Human Services.

◆ NIJ's links with the international community are being strengthened through membership in the United Nations network of criminological institutes; participation in developing the U.N. Criminal Justice Information Network; initiation of UNOJUST (U.N. Online Justice Clearinghouse), which electronically links the institutes to the U.N. network; and establishment of an NIJ International Center.

◆ The NIJ-administered criminal justice information clearinghouse, the world's largest, has improved its online capability.

◆ The Institute's Drug Use Forecasting (DUF) program has been expanded and enhanced. Renamed ADAM (Arrestee Drug Abuse Monitoring), the program will increase the number of drug-testing sites, and its role as a "platform" for studying drug-related crime will grow.

◆ NIJ's new Crime Mapping Research Center will provide training in computer mapping technology, collect and archive geocoded crime data, and develop analytic software.

◆ The Institute's program of intramural research has been expanded and enhanced.

The Institute Director, who is appointed by the President and confirmed by the Senate, establishes the Institute's objectives, guided by the priorities of the Office of Justice Programs, the Department of Justice, and the needs of the criminal justice field. The Institute actively solicits the views of criminal justice professionals and researchers in the continuing search for answers that inform public policymaking in crime and justice.

For information on the National Institute of Justice, please contact:

**National Criminal Justice Reference Service**
Box 6000
Rockville, MD 20849–6000
800–851–3420
e-mail: askncjrs@ncjrs.org

You can view or obtain an electronic version of this document from the
NCJRS Justice Information Center World Wide Web site.
To access this site, go to http://www.ncjrs.org

If you have questions, call or e-mail NCJRS.

| MATERIAL SUBMITTED FOR USE IN THE DAILY BULLETIN | INSTRUCTIONS: Prepare original only. | DATE |
|---|---|---|
| CHICAGO POLICE DEPARTMENT | Forward to Reproduction & Graphic Arts Section. | 30-AUG-02 |

This form is provided to assist you in submitting material for the Daily Bulletin. Material should be prepared in narrative form as nearly as possible to the way it is to be used in the Daily Bulletin.
Material considered most desirable are photographs and descriptions of wanted and missing persons and photographs and descriptions of property taken in burglaries and thefts. Descriptive information and pictures of stolen property can generally be obtained from the manufacturer's catalogs. Pictures will be returned on request whenever possible.

### DESCRIPTION OF WANTED OR MISSING PERSON

| NAME (LAST - FIRST - MIDDLE) | ALIAS/NICKNAME (LAST - FIRST - MIDDLE) | I.R. NO./Y.D. NO. |
|---|---|---|
| BLACKMON  Eric | AKA- Pride | 1261494 |

| ADDRESS | SEX | RACE ☐ WHITE ☐ WHITE HISP. ☒ BLACK ☐ BLACK HISP. ☐ AMER.INDIAN/ALSK.NAT. ☐ ASIAN/PACIF.ISL. ☐ UNK. | F.B.I. NO./S.I.D. NO. |
|---|---|---|---|
| 3656 W. Grenshaw | M | | 682167LB7 |

| AGE/D.O.B. | HEIGHT | WEIGHT | BUILD | COMPLEXION | EYES | HAIR (Color-Style) | FACIAL HAIR (Specify) | PHOTO ATTACHED |
|---|---|---|---|---|---|---|---|---|
| 21- 26-AUG-02 | 601 | 160 | Med | Med | Brn | Blk/rows | Unk | ☒ YES ☐ NO |

| GLASSES ☒ NO ☐ YES - Color | DESCRIPTION OF CLOTHING | | GANG AFFILIATION |
|---|---|---|---|
| | DNA | | New Breed |

| SCARS, TATTOOS, MARKS, HANDICAPS, OTHER PECULIARITIES (Describe) | PERSONAL HABITS | FREQUENTS |
|---|---|---|
| Rt forearm- "Cross" | Unk | Roosevelt/Kedvale |

| TYPE OF INCIDENT | LOCATION OF INCIDENT | MAY BE SEEN IN THE COMPANY OF | WARRANT/STOP ORDER NO. |
|---|---|---|---|
| Homicide | 1143 S.Pulaski | Michael DAVIS | |

| VEHICLE | YR. | MAKE | BODY STYLE | Top | COLOR Bottom | STATE VEH. LICENSE NO. | CITY VEH. LICENSE NO. |
|---|---|---|---|---|---|---|---|
| | V.I.N. | | | | OTHER IDENTIFIERS | | |

### STOLEN PROPERTY

| PROPERTY STOLEN (Describe thoroughly) |
|---|

| SERIAL NO. | MODEL NO. | PHOTO OF PROPERTY ATTACHED ☐ YES ☐ NO |
|---|---|---|

| HOW STOLEN | DATE STOLEN | LOCATION OF OCCURRENCE |
|---|---|---|

NARRATIVE - GIVE TITLE OR DESCRIPTION OF MATERIAL. WORD AS NEARLY AS POSSIBLE TO THE WAY IT IS TO BE USED IN THE BULLETIN.

R/d's want to interview listed subject regarding a Homicide which ocurred on 04-JUL-02 @ 1143 S.Pulaski.Subject has been identified as one of two offenders who shot and killed victim with a handgun. Should be considered Armed/Dangerous. Notify A4-VC. 312-746-8252. Probable Cause to Arrest. Memeber of the New Breed Street Gang, frequents 010-011 Districts. May be in the company of Michael DAVIS, IR# 1032157.

| RD NO. | CASE REPORT/REQUEST FROM OUTSIDE AGENCY ATTACHED ☐ YES ☒ NO | SUBMITTED BY - NAME | STAR NO. | UNIT NO. |
|---|---|---|---|---|
| HH-486986 | | Det. J.Sanchez | 20336 | 640 |
| APPROVED - UNIT C.O./WATCH COMMANDER | | APPROVED FOR SUBMISSION - COMMANDING OFFICER, EXEMPT RANK | | |

CPD-11.463 (REV 2/91)



EXHIBIT

4  (Monheim dep)

PLAINTIFF'S EXHIBIT

14

tabbies

CITY-EB-000206



BLACKMON004079



BLACKMON004080



# CLEAR DATA WAREHOUSE

ARREST DATE= 08-AUG-2002
ARREST ADDR= 1330 S CHRISTIANA AVE
**LAST NAME= BLACKMON**
**FIRST NAME= ERIC**
LKA= 3656 W GRENSHAW ST
CITY= CHICAGO
CB NUMBER= 15203501
IR NUMBER= 1261494
DOB= 26-AUG-1981

REPORT DATE= 9-September-2002 4:45:26 PM
REQUESTED BY= PC0Q401
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



CLICK HERE TO ENLARGE



http://167.165.43.107/scripts/image_mug3.asp

9/9/02

BLACKMON004081

Page 1 of 1



## CLEAR DATA WAREHOUSE



ARREST DATE= 08-MAR-2002
ARREST ADDR= 7460 S SOUTH SHORE DR
**LAST NAME= WARREN**
**FIRST NAME= VONNAL**
**LKA= 3326 W DOUGLAS BL**
**CITY= CHICAGO**
**CB NUMBER= 15056029**
**IR NUMBER= 954039**
**DOB= 15-OCT-1973**



CLICK HERE TO ENLARGE

REPORT DATE= 9-September-2002
4:39:35 PM
REQUESTED BY= PC0Q401
*FOR OFFICIAL POLICE USE ONLY!*
*NOT FOR DISSEMINATION!*

BLACKMON004082

Page 1 of 1

Page 1 of 1



## CLEAR DATA WAREHOUSE



ARREST DATE= 11-AUG-2000
ARREST ADDR= 4237 W GRENSHAW ST
LAST NAME= DAVIS
FIRST NAME= MICHAEL
LKA= 1216 S KEDVALE AV
CITY= CHICAGO
CB NUMBER= 14554270
IR NUMBER= 1032157
DOB= 18-FEB-1976

REPORT DATE= 9-September-2002
4:26:59 PM
REQUESTED BY= PC0Q401
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!

CLICK HERE TO ENLARGE

http://167.165.43.107/scripts/image_mug3.asp

9/9/02

BLACKMON004083

Page 1 of 1



## CLEAR DATA WAREHOUSE

ARREST DATE= 06-SEP-2002
ARREST ADDR= 115 S PULASKI RD
LAST NAME= HOWARD
FIRST NAME= JIMMIE
LKA= 4834 W WEST END AVE
CITY= CHICAGO
CB NUMBER= 15230515
IR NUMBER= 1140226
DOB= 06-SEP-1978

REPORT DATE= 9-September-2002
4:47:49 PM
REQUESTED BY= PC0Q401
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



CLICK HERE TO ENLARGE

BLACKMON004084

Page 1 of 1



# CLEAR DATA
# WAREHOUSE



ARREST DATE= 12-JUL-2002
ARREST ADDR= 1622 S KEDVALE AVE
LAST NAME= RICHARDSON
FIRST NAME= CHEVELLE
LKA= 1620 S KEDVALE AVE
CITY= CHICAGO
CB NUMBER= 15178345
IR NUMBER= 1018865
DOB= 10-SEP-1973

REPORT DATE= 9-September-2002
4:46:06 PM
REQUESTED BY= PC0Q401
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!

CLICK HERE TO ENLARGE

http://167.165.43.107/scripts/image_mug3.asp

9/9/02

BLACKMON004085

Page 1 of 1



## CLEAR DATA WAREHOUSE

ARREST DATE= 17-APR-2000
ARREST ADDR= 2101 E 71 ST
**LAST NAME= CAGE**
**FIRST NAME= JOHNATHAN**
**LKA= 6925 S DANTE AV**
**CITY= CHICAGO**
**CB NUMBER= 14459113**
**IR NUMBER= 1119351**
**DOB= 01-SEP-1978**

REPORT DATE= 9-September-2002
4:04:19 PM
REQUESTED BY= PC0Q401
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



CLICK HERE TO ENLARGE

http://167.165.43.107/scripts/image_mug3.asp

9/9/02

BLACKMON004086

Page 1 of 1



# CLEAR DATA WAREHOUSE

ARREST DATE= 23-FEB-2002
ARREST ADDR= 300 N MANNHEIM RD
**LAST NAME= MCCORD**
**FIRST NAME= ERICK**
**LKA= 116 MARSHALL AV**
**CITY= BELLWOOD**
**CB NUMBER= 15043424**
**IR NUMBER= 1179553**
**DOB= 11-OCT-1977**

REPORT DATE= 9-September-2002
4:38:31 PM
REQUESTED BY= PC0Q401
FOR OFFICIAL POLICE USE ONLY!
NOT FOR DISSEMINATION!



**CLICK HERE TO ENLARGE**

http://167.165.43.107/scripts/image_mug3.asp

9/9/02

BLACKMON004087

EXHIBIT

7   (Monheim dep)

## 3.15
## Circumstances Of Identification

When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[2] The witness's degree of attention at the time of the offense.

[3] The witness's earlier description of the offender.

[4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation.

### Committee Note
### *Amendments to Committee Note Approved July 28, 2017*

This new instruction simply lists factors well-established by case law. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977); *People v. Manion*, 67 Ill.2d 564, 367 N.E.2d 1313 (1977); *People v. Slim*, 127 Ill.2d 302, 537 N.E.2d 317 (1989). The Committee believes this instruction would serve the interests of justice by offering guidance in an area that contains complexities and pitfalls not readily apparent to some jurors.

Give this instruction when identification is an issue.

See Instruction 3.15A when the identification evidence involves law-enforcement conducted line-up procedures as set forth in Article 107A of the Code of Criminal Procedure (725 ILCS 5/107A-0.1 *et seq*.).

Give numbered paragraphs that are supported by the evidence.

The bracketed numbers are present solely for the guidance of court and counsel and should not be included in the instruction submitted to the jury.

The jury should be instructed on only the factors with any support in the evidence. Other factors should be omitted. Do not use "or" or "and" between the factors where more than one factor is used. *People v. Herron*, 215 Ill.2d 167, 191-92, 830 N.E.2d 467 (2005).

For an example of the use of this instruction, see Sample Set 27.02.