THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC BLACKMON, | ) |
| *Plaintiff*, | ) |
| | ) No. 19 C 767 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) |
| *Defendant*. | ) |

## MEMORANDUM OPINION & ORDER

Plaintiff Eric Blackmon was convicted of the murder of Tony Cox and spent over fifteen years in prison. (Dkt. 75 ¶ 1). Blackmon's conviction was reversed in 2018, and the State ultimately dismissed the charges against him. (*Id.* ¶¶ 84–86). Blackmon proceeded to sue the City of Chicago and various members of Chicago law enforcement involved in the case. (*See generally* Dkt. 73). Blackmon alleges violations of his constitutional rights, pursuant to 42. U.S.C. § 1983, and several state-law claims. (*Id.*).

The Court assumes familiarity with the facts of this case, having recently provided a detailed background in *Blackmon v. City of Chi.*, No. 19-cv-767, 2020 WL 60188 (N.D. Ill. Jan. 6, 2020). In summary, Tony Cox was shot and killed by two assailants on July 4, 2002. *Id.* at *1. Three eyewitnesses were subsequently shown a photo array that included a photograph of Blackmon. *Id.* at *2. Two of those eyewitnesses – Frencshun Reece and Lisa McDowell – identified Blackmon as an assailant, while the third eyewitness, Richard Arrigo, did not. *Id.* Blackmon was then arrested without a warrant on September 5, 2002 and participated in live lineups for the eyewitnesses. *Id.* at *2–3 (explaining that only McDowell affirmatively identified Blackmon as an assailant in the live lineup). Blackmon ultimately proceeded to a bench trial where

1

he was convicted of the murder of Tony Cox. *Id.* at *3. Blackmon remained in custody until March 28, 2018, when his conviction judgment was vacated and he was released on bond. *Id.* On January 16, 2019, the State dismissed all charges against him. *Id.*

Defendants now move to exclude the proposed testimony of Dr. Geoffrey Loftus, Blackmon's expert on human perception and memory. (Dkt. 125). The Court held a hearing on the motion on June 21, 2022. (Dkt. 153). For the following reasons, the motion is denied.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W.* ex rel. *Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)) (internal quotation marks omitted). In evaluating the expert's proposed testimony, the Court should "scrutinize

2

proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the Daubert framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* FED. R. EVID. 702 advisory committee's note to 2000 amendment.

## DISCUSSION

Blackmon retained Dr. Loftus to testify about "the science of memory and perception." (Dkt. 153 at 47:9–11). More specifically, Dr. Loftus reviewed the eyewitness testimony and identification procedures relevant to this case and applied his expertise to assess their reliability. (*Id.* at 46:7–12 ("I was retained to read over the discovery and then render opinions about . . . when identifications and memories may be unreliable, and to apply those scientific principles to the case at hand.")). He opines as follows:

1. Ms. Reece's and Ms. McDowell's initial memories of the shooter alleged to have been Mr. Blackmon, which they acquired as a result of having seen the shooter at the time of the shooting, were likely poor.

2. [The Officer Defendants] carried out identification procedures that were biased against Mr. Blackmon and that were inherently unreliable.

    3. Ms. Reece's and Ms. McDowell's identifications of Mr. Blackmon from the photo arrays and the live lineup, as well as their subsequent in-court identifications of Mr. Blackmon were therefore unreliable.

(Dkt. 129-1 at 4–5). Defendants move to bar Dr. Loftus's opinions on the grounds that he failed to apply a reliable methodology to the facts of this case; his testimony is "well within the knowledge of an ordinary juror;" and his testimony would confuse, mislead, and unduly influence the jury. (Dkt. 125 at 6–11).

### A. Dr. Loftus's Qualifications

Dr. Loftus is an experimental psychologist who holds a bachelor's degree from Brown University and a PhD from Stanford University in that field. (Dkt. 153 at 5:17–24 (adding that he completed post-doctoral work at New York University), 7:4–7 (explaining that experimental psychologists are "scientist[s] whose main job is to do experiments, collect data, develop theory in an effort to understand how normal people operate")). He is now an Emeritus Professor of Psychology at the University of Washington in Seattle, where he has worked for approximately fifty years. (Dkt. 129-1 at 2). Dr. Loftus's main area of research concerns human perception, or "the means by which people get information . . . . into their brains," and "the associated study of human memory." (Dkt. 153 at 6:6–18). Throughout his career, Dr. Loftus has conducted "hundreds, if not thousands, of experiments" in memory and perception. (*Id.* at 56:25–57:5). Dr. He has further authored or co-authored over one hundred book chapters and articles in total, (*id.* at 7:8–14), served as an editor and assistant editor of two major scientific journals in his field, (*id.* at 7:22–25), and worked on various other editorial boards, (*id.* at 8:1–2). He has made approximately one hundred fifty presentations about his research and its application to "various real-world issues, such as eyewitness memory in legal cases." (*Id.* at 7:15–20). Finally, Dr. Loftus also testified as an expert witness at trial on nearly five hundred occasions. (Dkt. 129-1 at 2

4

(specifying that his testimony concerned perception and memory)). Considering his decades of experience, Dr. Loftus is qualified to offer testimony as an expert in this case – a conclusion that Defendants do not contest. (*See generally* Dkt. 125).

### B. Reliability of Dr. Loftus's Methodology

Defendants argue that Dr. Loftus's testimony should be excluded because he failed to apply a reliable methodology. (*E.g.*, Dkt. 125 at 6). Defendants frame Dr. Loftus's opinion as "nothing more than a guess based on an assumption of facts that are not present in the record." (*Id.*; *see also* Dkt. 136 at 2 ("[A]ll of Dr. Loftus' opinions are based on conjured facts.")). For example, although Dr. Loftus discusses the impact of stress on human perception and memory, neither Reece nor McDowell ever explicitly "indicated that they were under high stress [during the shooting] and that such stress impacted their . . . perception and memory [of the shooting]." (Dkt. 125 at 8). Nor did Dr. Loftus take into account any of Reece or McDowell's personal characteristics that might have enhanced their ability to remember the underlying events as they actually happened. (*E.g.*, *id.* at 6–7; *see also, e.g.*, Dkt. 153 at 72:1–25 (showing Defendants' questioning about whether an individual's employment – such as "[b]eing a sharpshooter" – might impact her ability to perceive and memorize an event)). As such, Defendants maintain that Dr. Loftus's methodology was unreliable in that its factual underpinnings belie the eyewitnesses' own version of the events. (*E.g.*, Dkt. 125 at 7 ("[I]t appears that Loftus totally disregarded what the women actually said about their reaction to the event."), 8 ("Loftus speculated about the degree of attention Reece and McDowell had during the shooting. Indeed, Loftus'[s] findings are in contradiction with Reece and McDowell's testimony.")).

In his expert report and during the hearing, Dr. Loftus described a scientific framework of human perception and memory that is generally accepted in the field of psychology. (*E.g.*, Dkt.

5

129-1 at 6–15 (adding that the paradigm he relies upon was developed "over the past century primarily using controlled laboratory research as a means of identifying basic scientific laws"); Dkt. 153 at 9–45). To that end, Dr. Loftus utilized a demonstrative during his hearing – reproduced below as Exhibit A – to lay the groundwork for his conclusions. (Dkt. 153 at 10:1–13).

**EXHIBIT A**



In sum, Exhibit A depicts "how memory is understood to work," (*id.* at 15:4–5) and sets forth three key concepts. **First**, "almost any memory begins with an original event." (*Id.* at 10:14–17 ("[An original] event can be a crime . . . a wedding . . . a basketball game . . . [or] a car accident, it could be whatever.")). This is represented by the uppermost box, which contains green crosshatching overlaying the words "Original Event."

**Second**, Exhibit A depicts two kinds of information that affect people's eventual memory of an event. On one hand is the "Conscious Experience" of that event represented by a green box containing that phrase. Dr. Loftus explained that by Conscious Experience, he refers to what happens "[w]hen anybody experiences an event" – namely, "you form a conscious perception or conscious experience of what is happening." (*Id.* at 11:17–24 ("Based on this conscious

6

experience, you can transfer some information about what's happening in the event to an initial memory for the event.")). Conscious Experience "is accurate" in that it "faithfully reflects what actually happened in the event." (Dkt. 153 at 12:2–6). A green arrow is drawn from the Original Event box to the Conscious Experience box to represent this flow of information.

On the other hand, Dr. Loftus notes that "Post-event Information" is a second "route by which witnesses can and do acquire information" concerning the original event, (*id.* at 13:1–4), and it is identified with a red box in the image. According to Dr. Loftus, Post-event Information is something that "the witness acquires at varying times after the event is over that the witness can use to plug gaps, fill in hold in the original memory. . . . [and otherwise] construct a better, more complete narrative of what the original event was all about." (*Id.* at 13:5–10; *see also id.* at 41:22–42:11 (elaborating that Post-event Information can be gained by talking to other people, reading about the event, or engaging in identification procedures like a biased lineup)). It is shown in red to flag that "there's no way of telling [] whether post-event information accurately reflects what happened in the original event or whether it conflicts with what actually happened." (*Id.* at 13:13–19).

**Finally**, at the bottommost portion of Exhibit A is a box representing one's "Eventual Memory for the Event." The use of arrows demonstrates that Eventual Memory is created by information flowing from both the Conscious Experience stage <u>and</u> extraneous Post-event Information. The box depicting Eventual Memory prominently displays red crosshatching with some green intermixed therein. Dr. Loftus used these visual cues to convey that "there is relatively little [C]onscious [E]xperience information in this [Eventual Memory] . . . compared to the amount of information in the original event." (*Id.* at 12:10–14). Dr. Loftus concludes that through this process of encoding, eyewitnesses can form memories that are "very detailed" and "very real-

seeming," yet "potentially false in important respects" because of Post-event Information that is "of dubious accuracy." (*Id.* at 14:18–15:3).

Dr. Loftus then detailed various factors that may impact memory formation – particularly at the Conscious Experience stage – including (a) attention, (*see id.* at 18:22–24:12); (b) stress, (*id.* at 24:13–27:15); and (c) time, (*id.* at 27:16–29:25 (discussing how the duration of an observation can affect memory), 42:23–43:7 (discussing how the passage of time can affect memory)). He also discussed how each of these factors (among others) could have plausibly played a role in this case. (*Cf. id.* at 21:24–22:2 ("[B]ased on . . . a century-and-a-half's worth of research in attention, we can make some pretty good predictions about how attention would be relevant to . . . the witnesses in the kind of situation [at issue here]."), 24:24–25:1 ("[O]ver the last century or so, there have been a number of scientific procedures that have allowed us to evlauate the effects of very high stress on mental functioning.")). For example, Dr. Loftus explained that an eyewitness to a shooting "would realize that they are in proximity to a very dangerous situation." (*Id.* at 22:3–7). Being in the vicinity of a shooting places certain demands on one's attentional capacity, leading them to consider things like whether they or their children are in immediate danger and where the gun is pointing. (*Id.* at 22:3–23:8). Observing a shooting is also a "highly stressful experience," (*id.* at 25:22–26:4), which Dr. Loftus explains can lead to memories "filled largely with [inaccurate] [P]ost-event [I]nformation," (*id.* at 26:20–27:15).

To render his expert opinion, Dr. Loftus applied the scientific framework described above to the facts surrounding Reece and McDowell's eyewitness identifications. (*See, e.g.*, Dkt. 129-1 at 16 (citing his education, training, experience, and "careful evaluation of the totality of the materials and circumstances in this matter" as the basis of his opinion)). He concluded that their identifications were likely "unreliable," (Dkt. 153 at 79:8–13), explaining:

8

> Ms. Reece's and Ms. McDowell's original memories of the shooter were likely poor because while they were in visual contact with the shooter alleged to have been Mr. Blackmon, both witnesses' abilities to perceive and memorize the shooter's appearance would have been severely diminished by, among other things, a likely **lack of attention** to the shooter's appearance, a **lack of adequate time** to memorize the shooter's appearance, and **high stress** experienced both witnesses, attributable to the active shooting taking place in the near vicinity of themselves and children in the car.

(Dkt. 129-1 at 4 (emphasis added)).

The Court finds that Dr. Loftus employed a reliable methodology with the "soundness and care" expected of experts. *United States v. Protho*, --- F.4th ----, 2022 WL 2824656, at *2 (7th Cir. July 20, 2022). From the outset, it is clear that Dr. Loftus familiarized himself with – and relied exclusively upon – the relevant facts of this case. (*E.g.*, Dkt. 129-1 at 2–4). Among other things, he highlighted that Reece, McDowell, and their children were in the "near vicinity" of an active shooter and that this was "amost certainly" a highly stressful experience for "most people." (Dkt. 153 at 25:22–26:4, 80:24–81:2; *see also* Dkt. 129-1 at 4, 9 ("Certainly both Ms. McDowell and Ms. Reece had reason to be stressed: they were in positions where their safety and, the safety of the children in the car were directly threatened.")). Dr. Loftus also noted that "any normal human" in the eyewitness's shoes would have had "multiple things competing for their attention" – principally including their instincts to keep themselves and their children out of the line of fire and otherwise seeking safety. (Dkt. 129-1 at 8). When confronted by Defense counsel about "taking it for granted" that the eywitnesses were under stress or thinking about protecting their children during the shooting, Dr. Loftus explained as follows:

> I'm going on the basis of how people generally behave. So in order to evaluate attention, in general, you have to first make an inference about what somebody would have been doing in a particular situation. And **simple common sense** would tell us that, under the conditions that . . . both your witnesses found themselves, a major goal would be to protect their children. That's what any person in charge of small children in that of circumstances would do – or would almost always do. . . . I [also] take it as a **matter of common sense** that, if somebody is waving a gun

9

>around and shooting people in the near vicinity and you have children in your car with you, that it will be an extremely, highly stressful situation, yes.

(Dkt. 153 at 62:19–63:4, 80:21–81:2). Critically, Dr. Loftus further explains that human perception and memory are affected by various inputs "unbeknownst to the witness," (Dkt. 153 at 14:20–15:3, 27:8–15, 41:11–21; *see also* Dkt. 125 at 228–29; Dkt. 129-1 at 9), and he would "be surprised" if an eyewitness raised such matters during a police investigation. (*Id.* at 66:3–67:9; *see also id.* at 64:3–8 ("What [eyewitnesses] remember is not necessarily the same as what was happening at the time [due to various processes known to affect memory and perception].")). Dr. Loftus permissibly made reasonable inferences to reach his conclusions – e.g., that the eyewitnesses experienced stress during the shooting – and ultimately "stayed within reliable scientific bounds" in so doing. *Protho*, 2022 WL 2824656, at *2; *contra Textron*, 807 F.3d at 834 ("When a district court 'conclude[s] that there is simply too great an analytical gap between the data and opinion proffered' such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under Daubert to exclude that testimony."); *see also, e.g.*, *Africano v. Atrium Med. Corp.*, No. 17-cv-7238, 2021 WL 2375994, at *4 (N.D. Ill. June 10, 2021) ("[T]he Court looks at whether the [expert's] 'hypothesis was <u>reliably supported</u> and <u>applied to the known facts</u>, such that it rises above speculation and becomes a presentable probability.' ") (emphasis added). In any case, "[t]he soundness of the factual underpinnings of the expert's analysis . . . [is a] factual matter[] to be determined by the trier of fact." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)); *see also, e.g.*, *Livingston v. City of Chi.*, --- F. Supp. 3d ----, 2022 WL 1044192, at *4 (N.D. Ill. Apr. 6, 2022); *In re Allstate Corp. Secs., Litig.*, No. 16-cv-10510, 2022 WL 842737, at *4 (N.D. Ill. Jan. 10, 2022).

Finally, Dr. Loftus appropriately applied his knowledge and decades of experience to the facts of this case. He concluded that the factors above likely would have diminished the eyewitnesses' ability to focus on the shooters' appearances given that high stress "diminishes mental functioning," for example. (Dkt. 153 at 8–9). To the extent that Defendants challenge Dr. Loftus's conclusions, a *Daubert* motion is not the proper vehicle to do so. "[T]he correct inquiry focuses not on the ultimate correctness of the expert's conclusions, but rather on the soundness and care with which the expert arrived at her opinion." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (citing *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993–94 (7th Cir. 2019)) (internal quotation marks omitted); *see also Burton*, 994 F.3d at 826 (explaining same); *Textron*, 807 F.3d at 834 (same); *Schultz*, 721 F.3d at 431 (same, adding that "the inquiry must 'focus . . . solely on principles and methodology, not on the conclusions they generate' "). Instead, Defendants may challenge Dr. Loftus's conclusions through cross-examination. *Protho*, 2022 WL 2824656, at *2 ("Once a district judge properly finds an expert's testimony relevant and reliable, any challenge to it goes to its 'weight . . . not its admissibility.' "); *Schultz*, 721 F.3d at 431 ("So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' "); *see also, e.g.*, *Wielgus v. Ryobi Techs., Inc.*, No. 08-cv-1597, 2012 WL 3643682, at *3 (N.D. Ill. Aug. 23, 2012) ("[T]he trial court's role as gatekeeper is not intended to replace cross-examination and the presentation of conflicting evidence as traditional mechanisms for highlighting weaknesses in the expert's testimony.").

### C. Relevance of Dr. Loftus's Opinions

Defendants challenge the relevance of Dr. Loftus's opinions on two grounds. First, they argue that Dr. Loftus's testimony is "well within" the knowledge of an average juror and thus would not be helpful to the jury. (Dkt. 125 at 9 (adding that jurors "may not know the psychological terms" used by Dr. Loftus but would be able to understand the relevant subject matter "very easily")). However, the kind of expert testimony about human perception and memory that Dr. Loftus would present is widely considered helpful to juries. *See Webster v. Daniels*, 784 F.3d 1123, 1143 (7th Cir. 2015) ("We have often pointed out the dangers of relying on 'common sense' when social science reveals that common assumptions are wrong."); *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012) ("[N]othing is obvious about the psychology of eyewitness identification. Indeed, one point well established in the psychology literature is that most people's intuitions on the subject of identification are wrong."); *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) ("That jurors have beliefs about [the fallibility of memory] does not make expert evidence irrelevant; to the contrary, it may make such evidence vital."); *United States v. Williams*, 522 F.3d 809, 811–12 (7th Cir. 2008) ("If there is one thing known about eyewitness identification, it is that 'common sense' misleads more often than it helps. . . . It takes data rather than intuition to answer questions [about the psychology of identification procedures]."); *Newsome v. McCabe*, 319 F.3d 301, 305–06 (7th Cir. 2003) (finding expert testimony about the suggestibility of memory and psychology of identification procedures "invaluable" and "an important ingredient" of the plaintiff's wrongful conviction); *see also, e.g.*, *Cage v. City of Chi.*, 979 F. Supp. 2d 787, 843 (N.D. Ill. 2013) ("[T]he Seventh Circuit [and several district courts around the country have] been receptive to eyewitness identification expert testimony in the civil arena."). In fact, a court in this District recently denied a motion to exclude Dr. Loftus's testimony on the grounds

that the subject of his opinion was obvious to laypeople. *Sanders v. City of Chi. Heights*, No. 13-cv-221, 2016 WL 4398011, at *6 (N.D. Ill. Aug. 18, 2016) ("[T]he Seventh Circuit's guidance . . . teaches that nothing is obvious about the psychology of eyewitness identification . . . and expert evidence helps jurors evaluate the reliability of eyewitness testimony by taking into account the psychology of eyewitness identification.") (citing cases).

A like result is warranted in this case. Having reviewed Dr. Loftus's purported testimony, Dr. Loftus will aid the jury in understanding (a) the potential effect of heightened stress on mental functioning, (b) suggestibility during lineups lacking double-blind procedures, (c) "weapon focus" and other attention issues relevant to eyewitness identifications, and (d) the confounding effects of Post-even Information, among other things. (*See generally* Dkt. 129-1). This evidence is highly probative of Blackmon's claims – and so will not be barred as irrelevant or unhelpful. *See Williams*, 522 F.3d at 811 ("Perceptual biases and errors are endemic to identification. . . . The normal way of dealing with them is to expose the problem at trial so that a discount may be applied to the testimony, rather than to exclude relevant evidence.").

Finally, Defendants move to exclude Dr. Loftus's testimony as confusing and misleading, arguing that it "amount[s] to [an] improper attempt[]" to assail the eyewitnesses' credibility. (Dkt. 125 at 10–11 (specifically challenging, for example, Dr. Loftus's conclusions about "how stress affects witnesses")). This is not a fair characterization of Dr. Loftus's opinions. At no point does he invade the province of the jury by, for example, injecting his personal views about whether certain testimony is believable, and he makes no comment as to whether any witness in this case has embellished their testimony. (*E.g.*, Dkt. 153 at 44:17–45:3 ("It's not my conclusion that these witnesses were lying. Rather, they were likely testifying on the basis of a memory, that seemed very strong and very real to them . . . . It's just, for whatever of the many reasons that we've been

talking about today, their memor[ies] of [Blackmon] as the offender were incorrect."), 52 at 7–19 ("I always, when I evaluate cases like this, begin with the default assumption that [eyewitnesses] are accurately describing the contents of their memory.")).

Instead, Dr. Loftus specifically addresses the <u>reliability</u> of witness identifications considering an array of confounding factors – including the fallibility of memory and human error in conducting photo arrays. (*E.g.*, 153 at 9:6–9 ("[M]ost of my testimony has a bottom line of having to do with reliability."), 30:2–31:16 (operationalizing the terms "reliable" and "unreliable" as used in this case), 46:9–12 ("I was retained to . . . render opinions about . . . when identifications and memories may be unreliable, and to apply those scientific principles to the case at hand."), 79:6–13 (describing the methodology used in this case and concluding that "the [eyewitnesses'] identifications were [likely] unreliable"); *see also* Dkt. 129-1 at 4–5, 10 (discussing possibility that the witnesses provided unreliable identifications that should thus be given little weight)). Dr. Loftus applied his decades of experience in psychology to the facts of this case to reach his conclusions. (*E.g.*, Dkt. 129-1 at 2, 16). As such, his opinions about human perception and memory are the proper subjects of expert testimony here. *See Phillips*, 668 F.3d at 916 ("[N]othing is obvious about the psychology of eyewitness identification. . . . Lawyers' talk is no substitute for data."); *Williams*, 522 F.3d at 811–12 ("It takes data rather than intuition to answer questions [about the psychology of identification procedures]."); *Newsome*, 319 F.3d at 305–06 (explaining that expert testimony in this area can be "invaluable"); *see also, e.g.*, *Sanders*, 2016 WL 4398011, at *6 (denying motion to exclude Dr. Loftus in a similar case, finding his testimony would "help[] jurors evaluate the reliability of eyewitness testimony by taking into account the psychology of eyewitness identification."). Defendants' motion to exclude Dr. Loftus is therefore denied.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to exclude Dr. Loftus's testimony [125] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: August 30, 2022