THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC BLACKMON, | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) No. 19 C 767 ) ) Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) ) |
| *Defendant*. | ) |

## MEMORANDUM OPINION & ORDER

Plaintiff Eric Blackmon was convicted of the murder of Tony Cox and spent over fifteen years in prison. (Dkt. 75 ¶ 1). Blackmon's conviction was reversed in 2018, and the State ultimately dismissed the charges against him. (*Id.* ¶¶ 84–86). Blackmon proceeded to sue the City of Chicago and various members of Chicago law enforcement involved in the case. (*See generally* Dkt. 73). Blackmon alleges violations of his constitutional rights, pursuant to 42. U.S.C. § 1983, and several state-law claims. (*Id.*).

The Court assumes familiarity with the facts of this case, having recently provided a detailed background in *Blackmon v. City of Chi.*, No. 19-cv-767, 2020 WL 60188 (N.D. Ill. Jan. 6, 2020). In summary, Tony Cox was shot and killed by two assailants on July 4, 2002. *Id.* at *1. Three eyewitnesses were subsequently shown a photo array that included a photograph of Blackmon. *Id.* at *2. Two of those eyewitnesses – Frencshun Reece and Lisa McDowell – identified Blackmon as an assailant, while the third eyewitness, Richard Arrigo, did not. *Id.* Blackmon was then arrested without a warrant on September 5, 2002 and participated in live lineups for the eyewitnesses. *Id.* at *2–3 (explaining that only McDowell affirmatively identified Blackmon as an assailant in the live lineup). Blackmon ultimately proceeded to a bench trial where

1

he was convicted of the murder of Tony Cox. *Id.* at *3. Blackmon remained in custody until March 28, 2018, when his conviction judgment was vacated and he was released on bond. *Id.* On January 16, 2019, the State dismissed all charges against him. *Id.*

Defendants now move to exclude the proposed testimony of Dennis Waller, Blackmon's expert on police practices. (Dkt. 127). The Court held a hearing on the motion on June 21, 2022. (Dkt. 152). For the following reasons, the motion is granted in part and denied in part.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W.* ex rel. *Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)) (internal quotation marks omitted). In evaluating the expert's proposed testimony, the Court should "scrutinize

2

proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

The Court utilizes a three-part analysis when applying the Daubert framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam*, 877 F.3d at 782; *see also* FED. R. EVID. 702 advisory committee's note to 2000 amendment.

## DISCUSSION

Blackmon retained Waller to opine on whether the Officer Defendants conducted Blackmon's criminal investigation in accordance with generally accepted police practices. (Dkt. 132-1 at 8; Dkt. 152 at 4:23–5:6, 68:5–12). Waller concluded that Defendants failed to adhere to such standards – highlighting errors in the identification procedures they implemented; their failure to conduct a complete and thorough investigation; and their neglect of other legal and ethical obligations to criminal suspects. (*See generally* Dkt. 132-1; *see also, e.g.*, Dkt. 152 at 24:13–17 ("There were a number of areas where [the officers] were inconsistent with [applicable standards of training, practice, professional ethics].")). Defendants seek to bar Waller's testimony on the

grounds that he is not qualified to render opinions in this case, he failed to apply a reliable methodology, and his opinions would not be helpful to the jury. (Dkt. 127).

A. **Waller's Qualifications**

Waller earned a Bachelor of Science in Police Administration from Michigan State University as well as a Master of Science in Public Administration from Florida International University. (Dkt. 132-1 at 1; Dkt. 152 at 6:4–17). He served as a law enforcement officer for nearly two decades, in various capacities – including as a police officer, Sergeant, and Chief of Police. (Dkt. 152 at 6:18–15:19; *see also* Dkt. 132-1 at 1–2). Waller has undergone more than 3,700 hours of training throughout his career in law enforcement practices from various institutions. (Dkt. 152 at 15:20–23; *see also, e.g., id.* at 10:22–11:7 (explaining that the South Miami Police Department assigned him 80 hours of training concerning criminal investigations, during which he learned about conducting photo arrays and lineups), 15:24–17:11 (noting that Waller's training ranged "a variety of subjects" and included a "specialized course" on homicide investigation), 121:2–12 (adding that Waller received training on and personally conducted dozens of photo arrays and lineups as a detective); Dkt. 132-1 at 1). He was trained as an assessor for the Commission on Accreditation for Law Enforcement Agencies and is a certified law enforcement instructor in several states. (Dkt. 132-1 at 2; Dkt. 152 at 17:12–17). That said, Waller has extensive experience training law enforcement personnel. For example, he served as the director of a police training academy for several years and has educated "hundreds of law enforcement personnel" on conducting investigations, writing police reports, and other topics. (Dkt. 132-1 at 2; Dkt. 152 at 14:4–21 (explaining that Waller taught students and police recruits about homicide investigations, lineups, and photo arrays), 121:13–19 (highlighting that Waller taught postsecondary coursework on eyewitness identifications, including photo arrays and lineups)). He

4

is also active in several professional associations related to law enforcement. (Dkt. 152 at 18:8–19:10). Finally, Waller has served as an expert witness in the field of police practices in "[w]ell over 750" civil and criminal cases, including cases involving homicide investigations. (Dkt. 152 at 19:11–21; *see also id.* at 20:18–20 (explaining that no court has deemed Waller unqualified in his field)).

The Court finds that Waller is qualified to opine on police practices generally given his training, education, and experience in law enforcement. *See Trs. of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (internal quotation marks omitted). Waller's opinions speak to various police practices used in criminal investigations, which is an area in which he has years of experience as set forth above. *See also, e.g.*, *Andersen v. City of Chi.*, 454 F. Supp. 3d 808, 815 (N.D. Ill. 2020) (finding Waller to be qualified to provide similar testimony); *cf. United States v. Truitt*, 938 F.3d 885, 889–90 (7th Cir. 2019) (noting that a generalist can speak to specialized subjects he has experience with, but not those he does not).

To the extent that Defendants wish to highlight Waller's lack of experience in certain areas – including in gang-related homicides, (*see* Dkt. 127 at 13 ("Waller lacks any experience in gang-related crimes."); Dkt. 152 at 85:13–21) – they may do so through cross-examination. *Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991) ("Once the district court has found a sufficient foundation for an expert's testimony, it properly leaves questions concerning his methodology, findings, and expertise to cross-examination."); *Schultz*, 721 F.3d at 431 ("So long as the principles

5

and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' "); *see also, e.g.*, *Wielgus v. Ryobi Techs., Inc.*, No. 08-cv-1597, 2012 WL 3643682, at *3 (N.D. Ill. Aug. 23, 2012) ("[T]he trial court's role as gatekeeper is not intended to replace cross-examination and the presentation of conflicting evidence as traditional mechanisms for highlighting weaknesses in the expert's testimony."); *Wells v. City of Chi.*, No. 09-cv-1198, 2012 WL 116040, at *8–9 (N.D. Ill. Jan. 16, 2012) (denying the City of Chicago's motion to exclude Waller's testimony on the basis that he had not previously rendered expert testimony specific to the issues in that litigation).

### B. Reliability and Relevance of Waller's Opinions

Waller set forth his methodology in his report and during the hearing. He first reviewed the information provided to him to gain an understanding of the facts. (Dkt. 132-1 at 2; Dkt. 152 at 21:4–6). Here, that information included files from the criminal case, the criminal trial transcripts, deposition transcripts in the present case, and more. (Dkt. 132-1 at 3–4; Dkt. 152 at 21:24–22:19 (Waller testifying it would "probably be an understatement" to say that he reviewed "thousands of pages of materials" to form his opinion)). He then analyzed the actions of officers involved in this case and compared those actions with "various standards of training and practice." (Dkt. 132-1 at 2; Dkt. 152 at 21:10–11, 24:7–10). Finally, he determined how the officers' actions were consistent or inconsistent with those standards. (Dkt. 132-1 at 3; Dkt. 152 at 21:11–13).

This is a reliable methodology for experts in police practices, such as Waller. *See Jimenez v. City of Chi.*, 732 F.3d 710, 721 (7th Cir. 2013) (noting that it was appropriate for police-practices expert to "describe[e] sound professional standards and identify[ ] departures from them") (internal quotation marks omitted); *see also, e.g.*, *Andersen*, 454 F. Supp. 3d at 814

6

(finding same); *Damiani for Estate of Damiani v. Allen*, No. 4:16-cv-00053-RLY-DML, 2018 WL 4095080, at *5 (S.D. Ind. Aug. 28, 2018) (same, adding that "[t]here is nothing unreliable about Waller's methodology."); *Estate of Robinson* ex rel. *Irwin v. City of Madison, Wis.*, No. 15-cv-502-jdp, 2017 WL 564682, at *10 (W.D. Wis. Feb. 13, 2017) (finding same); *Avery v. City of Milwaukee*, No. 11-cv-408, 2015 WL 247991, at *2 (E.D. Wis. Jan. 20, 2015) (same); *Wells*, 2012 WL 116040, at *9 (same). That said, Waller must explain <u>how</u> he reaches his conclusions – either by linking them to generally accepted standards in the field or by citing information within his own practical experience. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered."); *see also, e.g.*, *Andersen*, 454 F. Supp. 3d at 814; *Potts v. Manos*, No. 11-cv-3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) ("A witness who offers expert testimony based on his experience must <u>connect his experience to the facts of the case</u> in order to meet the standard for reliability under *Daubert* and the Federal Rules of Evidence.") (emphasis added); *see also* FED. R. EVID. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then <u>the witness must explain how that experience leads to the conclusion reached</u>, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (emphasis added).

In addition to being reliable, Waller's opinions must be relevant. This means that they must assist the jury in "understand[ing] the evidence" or "determin[ing] a fact in issue." *Myers*, 629 F.3d at 644 (internal quotation marks omitted). The Court's role is to address each of Waller's opinions and assess whether they properly apply a reliable methodology and whether they are relevant. Defendants raise numerous such challenges to the reliability and relevance of Waller's opinions, (Dkt. 127), which the Court will address in turn.

1. **Purpose of Investigations**

Defendants seek to exclude Waller's explanation that the "purpose of any investigation is to determine the truth about what happened." (Dkt. 127 at 5–6 (citing Dkt. 132-1 at 8)). This is generally not the kind of testimony that an expert is needed for, in that it does not address "technical issues that laypeople would have difficulty resolving on their own." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). Indeed, the goal of a criminal investigation is a "very simple principle" that jurors are perfectly capable of understanding without the input of an expert witness. *E.g.*, *Andersen*, 454 F. Supp. 3d at 815 (citing *Stollings*, 725 F.3d at 765); *see also Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602–03 (7th Cir. 2011) ("[W]hen the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."). Waller thus will not be permitted to opine on this subject. *See, e.g.*, *Wells*, 2012 WL 116040, at *12 ("[Waller] contends [police officers] violated obligations to safeguard lives, be mindful of the welfare of others, respect constitutional rights, and so on. The opinion is far too general to be helpful to the jury in determining whether plaintiff has proved her claims.").

2. **Identification Procedures**

Waller found that the Officer Defendants deviated from nationally accepted standards of practice when conducting the identification procedures which led to Blackmon's conviction. (Dkt. 132-1 at 8, 13). Defendants seek to exclude testimony related to this opinion on several grounds.

Defendants first claim that Waller failed to identify what, if any, national standards support his conclusions about the identification procedures. (Dkt. 127 at 6). Puzzlingly, however, Defendants concede – in the same sentence – that Waller identified the International Association of Chiefs of Police ("IACP") Training Keys as his frame of reference on this point. (*Id.* ("Waller cites to [Chicago Police Department ("CPD")] General Order 88-18 and **IACP Training Keys**,

8

but fails to identify the nationally accepted standard that supports this opinion.") (emphasis added)). Waller also specified in his report that he relied on the IACP Training Keys, (Dkt. 132-1 at 8–9 ("Training Keys . . . have long served as training aids and as an informational source for law enforcement best practices. The IACP Training Key 414 . . . [is] reflective of [relevant] nationally accepted standards [at the relevant time].")), and during his testimony before the Court, (Dkt. 152 at 29:18–21, 31:13–18, 43:6–10, 121:20–122:4). Critically, the Training Keys and IACP's other publications are broadly recognized as authoritative national standards in the field of police practices. *See, e.g.*, *Thomas v. Lambert*, No. 1:19-cv-11046, --- F. Supp. 3d ----, 2022 WL 2078022, at *7 (E.D. Mich. June 9, 2022) (finding expert's methodology reliable where he relied, in part, on model policy papers published by the IACP and other documents from the state police agency); *Andersen*, 454 F. Supp. 3d at 815 (noting that the IACP Training Keys represent "nationally accepted standards" in police practices); *Sloan v. Long*, No. 4:16-cv-86 (JMB), 2018 WL 1243664, at *4 (E.D. Mo. Mar. 9, 2018) (stating that the IACP promulgates "nationally accepted police procedures"); *Morris v. Opsahl*, No. 12–cv–2134–RPM, 2014 WL 675419, at *4 (D. Colo. Deb. 21, 2014) (stating that the IACP is the " 'industry standard' regarding police practices"); *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 30 (D.D.C. 2007) (referring to IACP publications as containing "identifiable, objective standards of police practice" and as "authoritative"). Defendants' own police practices expert, Anthony Monheim, similarly "relied heavily upon" IACP publications. (*See* Dkt. 148 at 17:17–19). The Court notes that Waller also relied on a 1999 publication from the U.S. Department of Justice's National Institute of Justice ("NIJ"), entitled *Eyewitness Evidence: A Guide for Law Enforcement*, to render his opinion about the identification procedures. (Dkt. 132-1 at 9–11; Dkt. 152 at 25:17–26:9, 36:24–37:6). Per Waller, the NIJ issued this document "to promote sound professional practices" and it "reflects

9

nationally accepted standards of practice [concerning photo and physical lineups" at [the relevant] time." (Dkt. 132-1 at 9). Defendants' motion is thus denied on this ground.

Waller found that Defendants improperly associated Blackmon with (1) the New Breeds street gang and (2) the nickname "Pride," because they did so "without substantiation or basis as reflected in the investigative file." (Dkt. 132-1 at 13). Defendants argue that Waller has merely "offer[ed] a summary of evidence from the case" on this point, and that he has thus not applied any expertise in reaching his finding. (Dkt. 127 at 7). This misapprehends the nature of Waller's opinion. Waller explained that applicable national standards concerning recordkeeping within police departments would have required the officers to develop an investigative file concerning Blackmon. (*E.g.*, Dkt. 152 at 62:10–16). CPD's internal guidelines reflected those national standards, (*id.* at 63:10–15, 64:7–11), and required officers to preserve their notes, memoranda, and "all relevant information" in an investigative file in "all homicide investigations," (*id.* at 63:8–9, 64:4–6). During his hearing, Waller also discussed a treatise cited by Defense Expert Monheim entitled the *Fundamentals of Criminal Investigation*. (*Id.* at 54:16–20). Waller explained that this seminal treatise reflects nationally accepted standards of practice in the field, (*id.* at 55:5–9 (referring to it as the "bible of criminal investigation"), 116:24–117:3 (describing the treatise as "the gold standard that's existed for years")), and it teaches that police should record and retain "permanent official record[s] of the relevant information obtained in the course of [an] investigation," (*id.* at 65:11–15). Waller's opinion contrasts these national standards for recordkeeping with what occurred in this case – where Blackmon's investigative file contained <u>no</u> evidence indicating how the officers concluded that he was a New Breed or that his nickname was Pride. (*Id.* at 70:8–11, 72:7–15, 74:14–19; *see also* Dkt. 132-1 at 13, 15 (stating that "nothing in the investigative file" connected Blackmon to the underlying crime and that he was implicated

10

therein for "unsubstantiated reasons," contrary to national standards)). Waller may testify about his opinions in this respect because he appropriately interprets the facts of this case through the lens of his experience and applicable standards of practice.

Waller further concluded that the officers' photo array and lineup procedures were inconsistent with various nationally accepted standards of practice. (*E.g.*, *id.* at 33:23–34:21, 44:20–48:4). Defendants seek to exclude certain parts of this proposed testimony Waller "was unable to cite to the Training Key or national standard that stated that hairstyles of participants have to be the same." (Dkt. 126 at 7–8 (emphasis added); *id.* (further proposing that " 'a lineup of clones' is not required")). This argument misconstrues Waller's opinion. At no time has Waller suggested that all individuals in a lineup must wear the same hairstyle for that lineup to be deemed valid. Waller plainly set forth the following observations about the photo array and lineup at issue:

> According to the photographs that Ms. McDowell stated were shown to her on August 29, 2002, M[r]. Blackmon was the **only** individual with braids. This was improperly suggestive because on August 12, 2002, Ms. McDowell had described the shooter to police officers as having braided hair. . . . Ms. McDowell . . . acknowledged that Mr. Blackmon was the **only** person in the lineup with braids. . . . Ms. McDowell . . . testified that she viewed [a photo] array [in which she identified Mr. Blackmon as the shooter and] in which Mr. Blackmon was the **only** person with braids.

(Dkt. 132-1 at 16–17, 19–21 (emphasis added); *see also* Dkt. 152 at 34:4–16, 44:25–45:1, 45:20–21). Waller explained that Blackmon being the **only** individual with braids was problematic considering standard practice was to curate arrays and lineups containing individuals with overall "consistent appearance[s]." (*E.g.*, Dkt. 132-1 at 8–10 (describing IACP and NIJ's relevant standards); Dkt. 152 at 27:16–24 (quoting NIJ policy to "compose . . . lineup[s] in such a manner that the suspect does not unduly stand out" and "[s]elect fillers who generally fit the witness's description of the perpetrator")). Waller has appropriately drawn his conclusions here by

11

comparing the facts of this case with the foregoing nationally accepted standards. He will be permitted to testify about those conclusions.

Defendants' remaining arguments are denied. For example, Defendants assert that Waller's testimony should be barred because it constitutes a legal determination. (Dkt. 127 at 8–9 ("Waller's opinion regarding the photo array and lineups [being unduly suggestive] amounts to an instruction on the law and application of the law to the facts.")). Their position is untenable because Waller has done no more than apply his expertise to the relevant evidence.

### 3. Failure to Conduct a Complete and Thorough Investigation

Defendants next seek to bar Waller's opinion that they failed to conduct a complete and thorough investigation. (*Id.* at 10–12). First, Defendants argue that Waller "is unable to provide any source that indicates the standard that determines what a complete and thorough investigation entails." (*Id.* at 10 (internal quotation marks omitted); *see also id.* at 10 ("Waller does not explain what general standards or what in his experience led him to [his conclusions]."), 10–11 ("Waller reaches [his] conclusions without appropriately linking them to standards or his experience."), 12 ("Waller does not explain what general standards or what in his experience led him to [his conclusions].")). This assertion is belied by the record. In relevant part, Waller explained that the nationally accepted standards for police practices in 2002 would have called on the homicide detectives to fully investigate a suspect's motive, means, and opportunity. (Dkt. 152 at 53:8–23 (adding that Defendants' expert witness on police practices, Monheim, referred to motive, means, and opportunity as the "holy trinity" of homicide investigations); *see also id.* at 57:17–58:13 (discussing "motive"), 58:20–59:20 (discussing "means"), 58:20–62:9 (discussing "opportunity")). These nationally accepted standards are adopted and reflected in the CPD' Standard Operating Procedures, (*id.* at 48:25–51:14); the IACP's "Law Enforcement Code of

Ethics," (*id.* at 51:15–53:7); and the *Fundamentals of Criminal Investigation* treatise discussed above, (*id.* at 54:16–57:1). Waller tied these standards and his professional experience back to the facts of this case, finding that Defendants did not conduct a complete and thorough investigation consistent with nationally recognized standards. (*E.g.*, *id.* at 57:3–61:6). Therefore, this opinion is admissible expert testimony.

Defendants also assail Waller's consideration of certain facts in rendering his opinions about the investigation. For example, that note that Waller "takes issue with the detectives' failure to investigate a red Ford Tempo that the assailants may have used to flee the location," but counter that "[n]othing indicates that [this vehicle] was a significant piece of evidence." (Dkt. 127 at 10). Defendants similarly challenge Waller's references to their failure to document interviews of Tony Cox's relative, (*id.* at 10–11); maintain the original set of photos shown to a witness, (*id.* at 11–12); and adequately document their basis for making Blackmon a suspect, (*id.* at 12). In other words, Defendants essentially dispute the facts underlying of Waller's conclusions – which is not the proper subject of a *Daubert* motion. *Gopalratnam*, 877 F.3d at 781 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment."); *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 847 (7th Cir. 2017) (quoting *Smith*, 215 F.3d at 718); *Manpower*, 732 F.3d at 806 ("Reliability . . . [is] not [a question of] the quality of the data used in applying the methodology or the conclusions produced. . . . [The Court's inquiry] does not ordinarily extend to the reliability of the [expert's] conclusions . . . that is, whether [his] conclusions are unimpeachable.") (internal quotation marks omitted). To the extent

that Defendants wish to challenge the facts which formed the basis of Waller's opinions, they made do so on cross-examination.

### 4. Failure to Identify Exculpatory Evidence

Waller opined that the detectives failed to "identify and/or locate witnesses to provide potential exculpatory information or evidence." (Dkt. 132-1 at 22). Defendants argue that this opinion is inadmissible because Waller "cites nothing about [national] standards or anything else that supports his conclusions." (Dkt. 127 at 13). This is unsupported by the record, however, because Waller did refer to CPD's Standard Operating Procedures in crafting his opinion. (*E.g.*, Dkt. 152 at 48:25–49:19). He explained that these policies – which require, among other things, detectives to "pursue all investigate leads" and otherwise conduct "thorough, careful, and objective investigation[s]" – reflected nationally accepted standards for police practices in 2002. (*E.g.*, *id.* at 50:4–51:14; *see also id.* at 61:7–15 ("My understanding, from the testimony of the detectives, is that [it] was . . . require[d of them to locate or interview all potential witnesses with exculpatory evidence in 2002].")). Defendants' motion is thus denied on this ground because Waller's opinion finds support in relevant standards of practice.

### 5. Fabrication of Inculpatory Evidence

Waller stated that the officers who investigated Blackmon fabricated a link between Blackmon and the New Breeds gang. (Dkt. 132-1 at 23). Defendants contend that Waller "cherry picked" portions of the record while wrongly ignoring others to reach this conclusion. (Dkt. 127 at 13). However, "[t]hough the facts on which an expert bases his opinion must have some basis in the record, there is no requirement that the basis must consist of <u>undisputed</u> evidence." *E.g.*, *Wells*, 2012 WL 116040, at *11 (emphasis added); *see also, e.g.*, *Andersen*, 454 F. Supp. 3d at 814 ("[An expert] may rely on disputed facts to reach his opinions, as long as there is evidence to

14

support such facts."); *Sanders v. City of Chi. Heights*, No. 13-cv-221, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016) ("[A]lthough an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions."). Here, Waller's opinion is sufficiently based on facts in the record. (*See* Dkt. 132-1 at 23–24 (describing, for example, that Detective Sanchez created a document inculpating Blackmon in the crime which ultimately lacked "a substantiated or factual basis"); *see also* Dkt. 132 at 14 (summarizing facts Waller relied upon in drawing his conclusion)). Defendants are permitted to challenge the weight of Waller's testimony at trial by contradicting the factual basis of his opinion. However, Defendants' motion to exclude on this ground is denied.

### 6. Withholding Significant Information Related to the Investigation

Waller opined that the officers "deliberately withheld, and suppressed, significant information related to their investigation. (Dkt. 132-1 at 24). Defendants assert that this opinion "amounts to a legal conclusion that the officers violated *Brady*." (Dkt. 127 at 14). Experts generally cannot offer legal opinions or conclusions. *Jimenez*, 732 F.3d at 721 ("It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. As a general rule, accordingly, an expert may not offer legal opinions."). However, at no point in Waller's report or hearing testimony did he so much as mention *Brady v. Maryland*, 373 U.S. 83 (1963), let alone purport to set forth its applicable principles of law. Defendants' motion is accordingly denied on this ground.

### 7. Lack of Probable Cause

Waller stated that the officers "<u>were aware</u> they lacked probable cause for the prosecution of Mr. Blackmon in the death of Tony Cox; however, they manufactured evidence to <u>maliciously</u>

prosecute him." (Dkt. 132-1 at 28 (emphasis added)). However, experts may not "opine on the state of mind of the police officers, [because they are] no more qualified to do [so] than the jury." *See, e.g.*, *Wells*, 2012 WL 116040, at *11–12; *Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 949–50 (N.D. Ill. 2010) ("[T]he Court has no reason to believe that [the expert's] expertise affords him the ability to read minds. . . . Permitting him to testify regarding the state of mind of [other parties] would effectively allow him to substitute his inferences for those that the trier of fact can and should draw on its own. This is not permitted."). Accordingly, Waller may not opine as to the officers' subjective awareness of certain facts or their subjective intent in the underlying investigation.

Defendants further argue that this testimony must be barred because it amounts to an impermissible legal conclusion on Plaintiff's due process claim. (Dkt. 127 at 15). While Waller may not opine about or suggest specific legal conclusions to the jury, *see Jimenez*, 732 F.3d at 721, he may testify about standard criminal investigation procedures from a law enforcement officer's perspective. For example, he may describe how police develop cases against person of interest including how they approach the issue of probable cause. He is permitted to do so by drawing on his years of experience in the field and nationally accepted standards of practice, and by relating that expertise to the facts of this case.

### 8. Detectives' Legal and Ethical Obligations

Waller's report concludes that the detectives together "engaged in improper identification procedures, the fabrication of evidence, and the withholding and/or suppression of significant information," and that they "knowingly failed to intervene to protect Mr. Blackman's constitutional rights to due process." (Dkt. 132-1 at 28–29). Defendants seek to bar this testimony as baseless, overly broad, and comprising impermissible legal conclusions. (Dkt. 127 at 15).

16

Defendants' motion is denied in part because Waller's report and hearing testimony provide ample detail as to how he reached these conclusions. (*See generally* Dkt. 132-1; Dkt. 152). However, the Court again notes that Waller may not opine on the state of mind of the police officers. *See, e.g.*, *Wells*, 2012 WL 116040, at *11–12; *Hershey*, 697 F. Supp. 2d at 949–50. As such, Waller must refrain from reaching conclusions about the officers' subjective state of mind (e.g., that they "knowingly" or purposely made certain decisions).

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Waller's testimony [127] is granted in part and denied in part. His testimony will be limited consistent with this Opinion.

_____
Virginia M. Kendall
United States District Judge

Date: August 30, 2022