**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC BLACKMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  19 C 0767 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL MATERIAL
FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Eric Blackmon, through his undersigned counsel and pursuant to Local Rule 56.1(b)(3)(C), hereby submits this Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment, and states as follows:

**I.    July 4, 2002**

*a.  Eric Blackmon's Barbeque*

1.    On July 4, 2002, Eric Blackmon hosted a barbeque to celebrate Independence Day and his brother's birthday at Homan Avenue between 13th Street and Douglas Boulevard.  (Ex. 1 Eric Blackmon Dep., at 20:20–23; 106:7-12.)  At about 2:00 P.M. he fired up the grill and guests started to arrive.  (Ex. 1 Blackmon Dep. at 118:24.)  The barbecue lasted all day and into the night, finishing with fireworks after 11:00 P.M.  (Ex. 1 Blackmon Dep. at 118:22-119:3; 136:23-137:1.)

*b.  Tony Cox's Murder*

2.    A few hours after Mr. Blackmon had started grilling, and about a mile away, Tony Cox was killed by two shooters.  Richard Arrigo (a.k.a. "Fat Albert") met with Mr. Cox at Arrigo's restaurant called Fat Albert's at 1143 South Pulaski Avenue.  (Ex. 2 BLACKMON000021-23 at ¶ 4.)  At about 4:30 P.M., after their discussion, Mr. Cox and Mr. Arrigo exited Fat Albert's

restaurant. (Ex. 2 BLACKMON000021-23 at ¶ 5.) As Mr. Arrigo turned around to lock the door, he heard gun shots and turned around to see a black male shoot Mr. Cox twice and flee westward on Grenshaw Street with an accomplice. (Ex. 2 BLACKMON000021-23 at ¶¶ 6–10.)

*c. Eyewitnesses' Descriptions of Shooters*

3. On July 4, 2002 Lisa McDowell was driving southbound on Pulaski Avenue towards Roosevelt at the time of the Tony Cox murder. (Ex. 3 BLACKMON001258; Ex. 4 BLACKMON007127.) She was on the west side of Pulaski on the opposite side of the street from Fat Albert's. (Ex. 3 BLACKMON001258.) The northbound driving lane was between Ms. McDowell and Fat Albert's. (Ex. 5 McDowell Dep. at 44:11-15; 55:10-58:6.) There were cars parked on the street directly in front of the building where the shooting occurred, and the shooter was approximately 15 to 20 feet away from her. (Ex. 5 McDowell Dep. at 44:16–18; 58:5–6.) Ms. McDowell was stopped behind two cars at the Roosevelt Road stoplight. (Ex. 5 McDowell Dep at 30:5-10.)

4. Ms. McDowell saw the shooters come around the south side of the building. (Ex. 5 McDowell Dep. at 38:2-39:5; Ex. 6 BLACKMON005766.) She saw the shooter from the back as he shot the victim. (Ex. 5 McDowell Dep. at 41:12-21.) Ms. McDowell saw the shooter's face for about five seconds. (Ex. 5 McDowell Dep. at 42:21-44:10; Ex. 3 BLACKMON001258.)

5. At the time of the shooting, Ms. McDowell had four passengers, including her nephew and three children who were ages 3, 11, and 13. (Ex. 5 McDowell Dep. at 51:6-22; Ex. 3 BLACKMON001258; Ex. 4 BLACKMON007127.) Ms. McDowell was concerned about making sure her children were safe. (Ex. 5 McDowell Dep. at 51:23-52:2.)

6. After the light turned green at Roosevelt Road, Ms. McDowell continued to drive south on Pulaski Street. (Ex. 7 CITY-EB000312.) Ms. McDowell called 911 and saw the shooter

running across Pulaski Street in her rearview mirror.  (Ex. 5 McDowell Dep. at 52:10-18.)  The shooter was 45 feet or three car lengths behind her when she saw him in her review mirror.  (Ex. 5 McDowell Dep. at 52:19-54:5; Ex. 8 BLACKMON004283.)

7.     Ms. McDowell incorrectly identified Mr. Arrigo as Hispanic when she saw him standing in front of Fat Albert's restaurant on July 4, 2002.  (Ex. 5 McDowell Dep. at 45:1-10; Ex. 9 BLACKMON6970; Ex. 4 BLACKMON007127.)  Mr. Arrigo is not Hispanic.  (Ex. 10 Cronin Dep. at 47:8-17; Ex. 9 BLACKMON6960.)  One of the Detectives told Ms. McDowell that Mr. Arrigo was Italian, not Hispanic.  (Ex. 5 McDowell Dep. at 45:24-47:2.)

8.     Ms. McDowell incorrectly described Mr. Arrigo as holding a silver gun in his left hand down by his side when she saw him standing in front of Fat Albert's restaurant on July 4, 2002.  (Ex. 5 McDowell Dep. at 47:3-23; Ex. 9 BLACKMON6970; Ex. 4 BLACKMON007127.)  Mr. Arrigo was not holding a gun; he was holding a cell phone.  (Ex. 5 McDowell Dep. at 47:3-23; Ex. 3 BLACKMON001262.)  Gang Specialist Cronin told Ms. McDowell that Mr. Arrigo was holding a cellphone not a gun.  (Ex. 5 McDowell Dep. at 47:3-23.)

9.     Fresnchun Reece was driving northbound on Pulaski Street at the time of the murder.  (Ex. 11 Reece Dep. at 25:10-26:12.)  Her two young sons, Schadi and Davious were in the car with her.  (Ex. 11 Reece Dep. at 26:13-27:5.)  When Ms. Reece heard the gunshots, she tried to push her kids' heads down because she didn't want them to see the murder.  (Ex. 11 Reece Dep. at 27:6-28:8.)  Ms. Reece described the first shooter as being approximately 5'6" and the second shooter as being approximately 5'10."  (Ex. 12 Jones Dep. at 83:2-5.)  She also described the shooters as having a dark complexion.  (Ex. 12 Jones Dep. at 83:12-14.)  Mr. Blackmon was listed in CPD's files as having a light complexion.  (Ex. 12 Jones Dep. at 84:4-7.)

10.     Richard Arrigo described the black male whom he observed shooting Tony Cox as 25-26 years old and 5'8" to 5'9" with a muscular build wearing a yellow tee shirt, jeans and a short afro hair style.  (Ex. 9 BLACKMON006961.)  He described the other black male assailant as in his 20s, about 5'6," with a dark complexion, medium build, wearing a light blue tee shirt, jeans and a blue baseball cap.  (Ex. 9 BLACKMON006961.)

## II.     Tony Cox Murder Investigation

### a.  Detectives Assigned to the Tony Cox Murder Investigation

11.     Detective Eugene Schleder was the lead detective assigned to the Tony Cox murder investigation.  (Ex. 13 Schleder Dep. at 14:1-4.)  Detective Gregory Jones was Detective Schleder's partner and was also assigned as a primary detective on the Tony Cox murder investigation. (Ex. 13 Schelder Dep. at 14:10-16; Ex. 12 Jones Dep. at 17:11-14.) Detective James Sanchez and Detective John Pellegrini also assisted in the Tony Cox murder investigation. (Ex. 13 Schelder Dep. at 14:10-16.)

12.     The lead or primary detective is responsible for making sure that all the reports are together and directing assisting detectives to conduct interviews.  (Ex. 12 Jones Dep. at 8:22-9:7.) If an interview was conducted, the primary detective would make sure that a Case Supplementary Report was completed which was required by CPD at the time.  (Ex. 12 Jones Dep. at 9:8-23.) The primary detective would also read all the Case Supplementary Reports that were prepared. (Ex. 12 Jones Dep. at 9:24-10:4.)

13.     The Detectives submitted all of their handwritten notes and typed reports for the Tony Cox murder investigation for inclusion in the case investigative file which was required by the Detective Division's Standard Operating Procedures.  (Ex. 12 Jones Dep. at 31:13-16; Ex. 131 Schelder Dep. at 131:7-10.)

14.     The investigative file is "a criminal case file pertaining to an investigation which contains official Department reports, notes, memoranda, and miscellaneous documents generated or received by a Division member during an investigation.  The investigative file provides all parties engaged in a criminal proceeding (including the judge, state's attorney, defense attorney, and Department members) with the available written documentation about a criminal investigation." (Ex. 14 Detective Division Standard Operating Procedures CITY-EB-000798-804, 953-954.)

*b. Scene Investigation July 4, 2002*

15.     Detectives Schleder and Jones separately canvassed the scene of the Tony Cox shooing on July 4, 2002.  (Ex. 13 Schleder Dep. at 31:21-32:8.)

16.     An officer went into the barber shop at 1141 S. Pulaski Street, next door to Fat Albert's and spoke with LaJuan Webb who was working at the time of the shooting.  (Ex. 15 BLACKMON000001-02.)  Mr. Webb gave his name to the officer and said a detective would contact him for questioning.  (Ex. 15 BLACKMON000001-02.)  Mr. Webb was never contacted. (Ex. 15 BLACKMON000001-02.)  Had he been contacted, Mr. Webb would have told Detectives that he recognized the two shooters from the neighborhood and that neither of the shooters was Eric Blackmon.  (Ex. 15 BLACKMON000001-02.)

17.     Detective Schleder recovered Tony Cox's cell phone from the murder scene and searched the phone to identify the phone numbers belonging to the individuals who Tony Cox had communicated with shortly before he was shot.  (Ex. 13 Schleder Dep. at 35:5-14; 38:6-15; Ex. 16 BLACKMON002925.)  One of the numbers on Tony Cox's phone indicated that he communicated with someone at phone number associated with George Davis a.k.a. Boonie Black.  (Ex. 13 Schleder Dep. at 39:10-40:8; Ex. 16 BLACKMON002925.)

18.     The Detectives' working theory during the investigation was that George Davis a.k.a. Boonie Black, the head of the New Breed street gang, ordered the murder of Tony Cox because Tony Cox's associates owed a drug debt to him.  (Ex. 10 Cronin Dep at 22:12-18; Ex. 13 Schleder Dep. at 40:9-41:9.)  The Detectives suspected that Mr. Arrigo lured Tony Cox to Fat Albert's to be killed at George Davis a.k.a. Boonie Black's request.  (Ex. 12 Jones Dep. at 14:16-15:15.)

19.     Tony Cox's phone records indicated that he communicated with someone at a phone number associated with Jean Williams at 4024 West Grenshaw.  (Ex. 13 Schelder Dep. at 41:10-13; Ex. 16 BLACKMON002925.)  This led Detective Jones to search for individuals associated with 4024 W. Grenshaw.  (Ex. 12 Jones Dep. at 46:3-21; Ex. 17 BLACKMON005860.)  Mr. Blackmon did not have any affiliation with 4024 West Grenshaw.  (Ex. 12 Jones Dep. at 47:7-10.)  Detective Jones did not attempt to interview Jean Williams at any point during the investigation.  (Ex. 12 Jones Dep. at 50:20-51:13.)

20.     Tony Cox's phone records indicated that he communicated with someone at a phone number Detective Schleder later learned to be associated with Mr. Arrigo.  (Ex. 13 Scheler Dep. at 42:23-43:8; Ex. 16 BLACKMON002925.)

21.     Detective Schleder's closing report did not associate Mr. Blackmon with any nickname.  (Ex. 18 CITY-EB-000352.)

22.     The police investigation did not reveal any connection, prior relationship, or prior contact between Mr. Blackmon and Tony Cox.  (Ex. 13 Schleder Dep. at 97:6-9; Ex. 1 Blackmon Dep. at 252:6-16.)  The police investigation did not reveal any link between Mr. Blackmon and George Davis a.k.a. Boonie Black.  (Ex. 13 Schleder Dep. at 104:5-7; Ex. 12 Jones Dep. at 174:21-23.)

23.     Detective Schleder did not create a report for every interview he conducted regarding the Tony Cox murder investigation. (Ex. 13 Schleder Dep. at 109:13-111:4.) Preparing the reports of witness interviews was required by the detective division standard operating procedures in 2002. (Ex. 13 Schleder Dep. at 129:17-20.)

24.     Detective Schleder did not know how Mr. Blackmon first became the suspect in the Detectives' investigation of the Tony Cox murder. (Ex. 13 Schleder Dep. at 238:10-239:8.) Detective Schleder did not know how Mr. Blackmon was placed in the photo array. (Ex. 13 Schleder Dep. at 234:7-15.)

*c.  Involvement of Gang Specialist Michael Cronin*

25.     Michael Cronin was a gang expert for the Chicago Police Department. (Ex. 12 Jones Dep. at 118:23-119:6.) At the time of the Tony Cox murder investigation, Gang Specialist Cronin had been investigating gangs on the west side of Chicago for over 25 years. (Ex. 10 Cronin Dep. at 53:1-11; Ex. 9 BLACKMON006951.)

26.     At the time of the Tony Cox murder investigation, Gang Specialist Cronin was familiar with locations, affiliations, memberships and hierarchies of various street gangs in Chicago, including the Vice Lords, Black Souls, New Breeds, Gangster Disciples, Black Disciples, and New Breeds. (Ex. 10 Cronin Dep. at 53:8-14; Ex. 9 BLACKMON006951.)

27.     Gang Specialist Cronin became involved in the Tony Cox murder investigation because he had expertise in wiretaps and was involved in getting the wiretap on Mr. Arrigo's phone. (Ex. 10 Cronin Dep. at 22:19-23:15; 38:15-39:4; 69:24-70:3; Ex. 17 BLACKMON005862; Ex. 9 BLACKMON006950-006984.)

28.     Gang Specialist Cronin obtained phone records for the cell phones of Tony Cox, Mr. Arrigo, and the wife of George Davis a.k.a. Boonie Black from July 1, 2002-July 8, 2002.

(Ex. 10 Cronin Dep. at 66:12-67:2; Ex. 9 BLACKMON006972-77.)  None of those phone records established a link to Mr. Blackmon.  (Ex. 10 Cronin Dep. at 67:3-6; Ex. 12 Jones Dep. at 54:6-15; Ex. 9 BLACKMON006972-6977.)  Those phone records were not logged into evidence or added to the investigative file for the Tony Cox murder investigation.  (Ex. 12 Jones Dep. at 56:3-10.)

29.     Gang Specialist Cronin interviewed Tony Cox's brother in Cook County Jail, listened to the wiretap of Mr. Arrigo's phone, and swore to affidavits regarding the wiretap.  (Ex. 10 Cronin Dep. at 24:18-25:13; Ex. 9 BLACKMON6965-67.)

30.     At the time of the Tony Cox murder investigation, Gang Specialist Cronin identified George Davis a.k.a. Boonie Black and Kenya Pittman a.k.a. "KP" as members of the New Breeds street gang.  (Ex. 10 Cronin Dep. at 53:15-54:2; Ex. 9 BLACKMON006967.)

31.     Gang Specialist Cronin testified that in 2002, the Vice Lords street gang was associated with the 3600 block of West Grenshaw, which is the block where Eric Blackmon lived at the time.  (Ex. 10 Cronin Dep. at 11:7-12:5; Ex. 1 Blackmon Dep at 125:10-19.)  Mr. Blackmon also testified that the Traveling Vice Lords were associated with the 3600 block of West Grenshaw Street.  (Ex. 1 Blackmon Dep. at 37:15-38:11; 85:4-13.)  He further testified that the New Breeds were not associated with Grenshaw Street at all.  (Ex. 1 Blackmon Dep. at 38:8-11.)

32.     During the course of the investigation of Tony Cox's murder, Gang Specialist Cronin did not develop any evidence connecting Mr. Blackmon to the New Breeds street gang.  (Ex. 10 Cronin Dep. at 113:14-16.)

33.     On July 5, 2002, Gang Specialist Cronin received a phone call from a confidential informant in federal prison in downstate Illinois that George Davis a.k.a. Boonie Black loaned Tony Cox money for a couple of guys to set up a drug spot out of State.  (Ex. 10 Cronin Dep. at 35:19-37:1; Ex. 17 BLACKMON005861.)  According to the confidential informant, those guys

messed up and so Tony Cox had to pay with his life. (Ex. 10 Cronin Dep. at 35:19-37:1; Ex. 17 BLACKMON005861.)

34. On July 8, 2002, Gang Specialist Cronin relayed to the Detectives working the Tony Cox murder investigation that another number Mr. Arrigo called before the Tony Cox murder was to the building at 3911 W. Fillmore, where Kenya Pittman a.k.a. KP, who had ties to high-ranking New Breeds gang members, was staying. (Ex. 10 Cronin Dep. at 37:6-23; Ex. 17 BLACKMON005862.)

35. On July 8, 2002, Detectives Sanchez and Pellegrini interviewed Xavier Cox, Tony Cox's brother who was in Cook County Jail. (Ex. 17 BLACKMON005862.) There are no General Progress Reports or Case Supplementary Reports detailing that interview. (Ex. 19 Pellegrini Dep. at 35:9-21.) Xavier Cox told Detectives Sanchez and Pellegrini that Vonnal Warren and William Hall may be the shooters. (Ex. 17 BLACKMON005862.) Detectives Shanchez and Pellegrini pulled Vonnal Warren and William Hall's photos. (Ex. 17 BLACKMON005862.)

36. On July 8, 2002, Detectives Schleder and Jones attempted to reach out to Ms. Reece to show her Vonnal Warren and William Hall's photos. (Ex. 12 Jones Dep. at 108:11-16; Ex. 17 BLACKMON005862.) Vonnal Warren and William Hall were supposedly included in the photo array shown to Ms. Reece on July 4, 2002. (Ex. 12 Jones Dep. at 108:19-22; Ex. 20 BLACKMON004049-4058.) Jones could not explain why he tried to show Ms. Reece photos of Vonnal Warren and William Hall on July 8, 2002 when he had already shown her those photos on July 4, 2002. (Ex. 12 Jones Dep. at 109:1-5.)

37. On July 9, 2002 Detectives Sanchez and Pellegrini learned that a girl named Shelia told Xavier Cox that "Pride" and "Keno" a.k.a. Michael Davis, George Davis a.k.a. Boonie Black's

nephew, killed Tony Cox. (Ex. 17 BLACKMON005862.) On July 9, 2002, Detective Jones searched the database for "Pride," and nothing came up. (Ex. 17 BLACKMON005862.)

38.     As part of the investigation, Gang Specialist Cronin interviewed Ethienne Cox, Tony Cox's brother and New Breed gang member, at Cook County Jail on July 24, 2002. (Ex. 9 BLACKMON6965.) Tony Cox visited his brother Ethienne about a month before he was killed and told Ethienne that George Davis a.k.a. Boonie Black wanted to kill a man named "Little L" and another man named "Poo" because Boonie Black gave Little L and Poo an ounce of cocaine to sell and did not pay Boonie back for the cocaine. (Ex. 9 BLACKMON6965-66.) Ethienne learned from another one of his brothers, Xavier Cox, that "Keno" a.k.a. "Lil Mike" and "Pride" killed their brother Tony. (Ex. 9 BLACKMON6966.) According to Ethienne Cox at the time, Keno and Pride were members are of the New Breed street gang and controlled the narcotics sold in the area of Keeler from Roosevelt to Grenshaw. (Ex. 9 BLACKMON6966; Ex. 13 Schleder Dep. at 86:15-20; Ex. 18 CITY-EB-000351.)

39.     On August 12, 2002, Gang Specialist Cronin, interviewed Ms. McDowell after she was identified from the 911 recordings made on July 4, 2002 about the Tony Cox murder. (Ex. 12 Jones Dep. at 114:1-6; Ex. 4 BLACKMON007124-27; Ex. 9 BLACKMON006970.) Ms. McDowell described one shooter as 6' tall and slender with braided hair and the other shooter as 5'9." (Ex. 9 BLACKMON6970; Ex. 4 BLACKMON7124-27.)

        d.  *Operation Don*

40.     The Chicago Police Department named the Tony Cox Murder investigation and associated wiretap of Mr. Arrigo's phone "Operation Don." (Ex. 10 Cronin Dep. at 68:18-69:13.) "Don" referred to George Davis a.k.a. Boonie Black because he was the Don of the New Breeds street gang. (Ex. 10 Cronin Dep. at 69:14-16.) The goal of Operation Don was to obtain enough

evidence to charge the individuals responsible with the murder of Tony Cox. (Ex. 10 Cronin Dep. at 69:17-21.)

41. As part of Operation Don, on August 19, 2002, Detective Jones and Gang Specialist Cronin submitted an affidavit in support of a wiretap for Mr. Arrigo's phone as to the Circuit Court of Cook County. (Ex. 10 Cronin Dep. at 49:9-50:14; Ex. 9 BLACKMON006950-6984.) The affidavit described the investigative steps Gang Specialist Cronin and the Detectives had taken thus far in the Tony Cox murder investigation. (Ex. 10 Cronin Dep. at 49:22-50:14.)

42. As of August 19, 2002, the date the wiretap affidavit was submitted, there was no evidence linking the nicknames "Pride" or "Little E" to Mr. Blackmon. (Ex. 12 Jones Dep. at 123:8-124:8; Ex. 9 BLACKMON006950-6984.)

43. As of August 19, 2002, Mr. Blackmon was not a suspect in the Tony Cox murder. (Ex. 12 Jones Dep. at 123:17-124:8; Ex. 9 BLACKMON006950-6984.)

44. Based on the investigation and analysis of Mr. Arrigo's phone, Gang Specialist Cronin concluded that George Davis a.k.a. Boonie Black ordered Tony Cox's murder. (Ex. 10 Cronin Dep. 59:4-60:20; Ex. 9 BLACKMON006980.)

45. Based on the investigation and analysis of Mr. Arrigo's phone, Gang Specialist Cronin concluded that Mr. Arrigo was involved in setting up the murder of Tony Cox at the request of George Davis, a.k.a. Boonie Black, the leader of the New Breeds Street gang because Mr. Arrigo called George Davis a.k.a. Boonie Black shortly after the murder of Tony Cox. (Ex. 10 Cronin Dep. at 22:2-18; 59:4-60:20; Ex. 9 BLACKMON006980-6982.) Richard Arrigo and George Davis, a.k.a. Boonie Black knew each other because they were incarcerated together. (Ex. 10 Cronin Dep. at 56:3-17.)

46.     As a result of Gang Specialist Cronin's investigation and affidavit regarding the same, on August 19, 2002 Judge Biebel approved a wiretap of Mr. Arrigo's telephone.  (Ex. 9 BLACKMON006950-6984.)  The wiretap intercepted and recorded telephone conversations on Mr. Arrigo's telephone from August 19, 2002 until September 27, 2002.  (Ex. 10 Cronin Dep. 99:14-100:8; Ex. 21 EB-ARRIGO-00000806; Ex. 22 EB-CCSAO-00002649.)  Eric Blackmon was never mentioned on any of the calls that were recorded as part of the electronic surveillance of Mr. Arrigo's phone.  (Ex. 10 Cronin Dep. at 85:17-21.)

47.     During the course of the investigation of Tony Cox's murder, Gang Specialist Cronin did not develop any evidence that Eric Blackmon had a motive to murder Tony Cox.  (Ex. 10 Cronin Dep. at 112:15-19.)

48.     During the course of the investigation Detective Jones never developed any evidence suggesting that Eric Blackmon had a motive to murder Tony Cox.  (Ex. 12 Jones Dep. at 174:9-13.)  Detective Jones also testified that there was no evidence establishing that Mr. Blackmon was in the New Breeds.  (Ex. 12 Jones Dep. at 175:15-20.)

49.     According to a summary prepared by Assistant States Attorney Rimas Cernius, on September 19, 2022, Mr. Arrigo called Kenya Pittman a.k.a. KP, a member of the New Breeds.  (Ex. 23 EB-CCSAO002642; Ex. 24 Cernius Dep. at 56:2-9.)  On that call, Mr. Arrigo discussed a lineup that he viewed and stated that "[t]hey supposedly have three witnesses that say that kid and somebody else was the shooter.  But you want to know something between you, me and the wall?  None of them mother fuckers was the guys that were the shooters.  None of them."  (Ex. 23 EB-CCSAO002642).

50.     In a September 10, 2002 progress report regarding the wiretap submitted to Circuit Court Judge Paul Biebel drafted by Mr. Cernius and two other Assistant State's Attorneys, Mr.

Cernius stated that Mr. Blackmon was also known as "Pride." (Ex. 25 EB-CCSAO-00002628.) The information in this report was provided to Mr. Cernius by the Detectives investigating the Tony Cox murder or through the police reports related to the investigation. (Ex. 24 Cernius Dep. 116:23-117:10; 136:6-11.)

III. **Photo Arrays**

*a. July 4, 2002 Photo Array*

51.     After Ms. Reece left the murder scene, she spent some time at her friend's house and then at her mother's house. (Ex. 11 Reece Dep. at 52:4-11.) Later that night she was called to the police station. (Ex. 11 Reece Dep. at 52:12-14.)

52.     Ms. Reece was asked to look through two photo books to see if any of mugshots were of the shooters. (Ex. 11 Reece Dep. at 57:18-23; 59:22-60:2.) She did not recognize anyone in the photo books. (Ex. 11 Reece Dep. at 59:23-60:16.) One of the officers then started to flip the photo book, point at specific pictures and asked Ms. Reece if she recognized the person. (Reece Dep. at 60:17-61:4.) She did not recognize anyone in the photo books. (Ex. 11 Reece Dep. at 61:1-4.) After Ms. Reece looked through the photobooks, she was shown two individual photographs out of the book. (Ex. 11 Reece Dep. at 62:1-8; 62:19-21.) When she was shown those photographs, the officer asked her if she recognized a specific person. (Ex. 11 Reece Dep. at 62:9-15.) Ms. Reece indicated that she recognized that person only from the photobook. (Ex. 11 Reece Dep. at 62:16-18; 63:3-8.)

53.     Detectives Jones and Schleder showed Ms. Reece a photo array on July 4, 2002. (Ex. 13 Schleder Dep. at 135:7-15; Ex. 26 CITY-EB-000040.) Three of the seven individuals in this array had addresses on Grenshaw. (Ex. 12 Jones Dep. at 59:14-19; Ex. 20

BLACKMON004049-4058.)  According to Detective Jones, the other four individuals in the photo array were randomly selected.  (Ex. 12 Jones Dep. at 59:20-24.)

54.     Upon viewing the array, Ms. Reece indicated that Deon Howard and Vincent Williams resembled the two shooters.  (Ex. 13 Schleder Dep. at 136:18-137:1; Ex. 26 CITY-EB-000040.)  Ms. Reece asked to view Deon Howard and Vincent Williams in a live lineup.  (Ex. 13 Schleder Dep. at 140:5-17.)  She was never shown Deon Howard or Vincent Williams in a live lineup.  (Ex. 13 Schleder Dep. at 140:5-17.)

55.     Deon Howard used the alias Jonathan Cage.  (Ex. 12 Jones Dep. at 74:10-13.)

56.     Ms. Reece also pointed out the hair on a third individual in the photo array, Laranes W. Jackson.  (Ex. 12 Jones Dep. at 72:19-73:10; Ex. 20 BLACKMON004058.)  Detective Jones, described Mr. Jackson's hairstyle as "twisted braids."  (Ex. 12 Jones Dep. at 86:6-23.)

57.     Detective Jones's timeline indicated that the three tentative identifications Ms. Reece made were all individuals who had home addresses of 4024 West Grenshaw.  (Ex. 17_ BLACKMON005860.)  Deon Howard a.k.a. Jonathan Cage did not have an address of 4024 West Grenshaw.  (Ex. 12 Jones Dep. at 74:18-23; Ex. 20 BLACKMON004057.)

58.     The case supplementary report related to the July 4, 2002 photo array shown to Ms. Reece only identified Deon Howard a.k.a. Jonathan Cage and Vincent Williams as being included in the array.  (Ex. 26 CITY-EB-000040.)  The other five individuals in the array are not listed. (Ex. 26 CITY-EB-000040.)  There is no general progress report related to the July 4, 2002 photo array included in the investigative file.

59.     Several of the photos in the inventoried array were printed after Ms. Reece was shown the photo array.  (Ex. 20 BLACKMON004049-4058.)

60.     Detective Jones's timeline indicates that on July 8, 2002, Xavier Cox told Sanchez and Pellegrini that Vonnal Warren and William Hall may be the shooters.  (Ex. 12 Jones Dep. at 69:20-70:4; Ex. 17 BLACKMON005862.)  Therefore, the photos of Vonnal Warren and William Hall could not have been included in the photo array shown to Ms. Reece on July 4, 2002.  (Ex. 12 Jones Dep. at 70:1-24.)

61.     Vonnal Warren and William Hall's photos were printed on August 22, 2002, the same day the July 4, 2002 array was inventoried.  (Ex. 20 BLACKMON004049-4058.)

b. *August 29, 2002 Photo Array*

62.     Detective Sanchez showed Ms. McDowell a photo array on August 29, 2002.  (Ex. 27 BLACKMON002933; Ex. 28 BLACKMON005831.)  Mr. Blackmon's photo was in the array shown to Ms. McDowell on August 29, 2002.  (Ex. 29 BLACKMON004079-4087.)

63.     As to why Detective Sanchez included Mr. Blackmon's photo in the photo array shown to Ms. McDowell on August 29, 2002, at trial, Detective Sanchez stated on direct examination that he included Mr. Blackmon in the photo array based on "computer work" and "various information and leads." (Ex. 30 Sanchez Trial Tr. GG-112.)  On cross examination, Detective Sanchez stated that he placed Mr. Blackmon's photo in the photo array based on information provided to him from Tony Cox's "family members," through investigation from Detectives Schleder and Jones, and a "computer check."  (Ex. 30 Sanchez Trial Tr. GG118-GG119-11.)

64.     In his deposition, Detective Sanchez first testified that he ran a search for the nickname "Little E" in a CPD database, and based on that search, he "selected individuals that had the similar characteristics of the offenders that were described."  (Ex. 31 Sanchez Dep. at 29:24-30:23; 37:1-13).)  He later contradicted that testimony and testified that he could not remember if

he put "Little E" into the database or what specific name he used to conduct the search.  (Ex. 31 Sanchez Dep. at 38:2-8.)  He also testified that he might not have connected Eric Blackmon to the nickname "Little E" at the time that he assembled the photo array.  (Ex. 31 Sanchez Dep. at 99:13-100:1).

65.     Though Detective Sanchez testified at trial that Tony Cox's "family members" gave him information which led him to include Mr. Blackmon's photo in the August 29, 2002 photo array, (Ex. 30 Sanchez Trial Tr. at GG118-GG119-11), at his deposition, he stated that it might have actually been one of Mr. Cox's girlfriends who gave him that information.  (Ex. 31 Sanchez Dep. at 58:2-19.)

66.     Detective Sanchez further testified in his deposition that he included Mr. Blackmon's photo in the August 29, 2002 photo array after reviewing Mr. Blackmon's previous arrest report.  (Ex. 31 Sanchez Dep. at 55:5-8; 225:6-18; 228:15-19.) He admitted in his deposition that he did not mention the arrest report when he was asked at trial about why he included Mr. Blackmon's photo on in the August 29, 2002 photo array.  (Ex. 31 Sanchez Dep. at 55:9-11.)

67.     Detective Sanchez also testified that, in compiling the photo array, he "may have" relied upon Ms. McDowell's description of one of the shooters as having braided hair.  (Ex. 31 Sanchez Dep. at 93:15-94:1.)

68.     For his part, Detective Jones testified that Eric Blackmon's photo ended up in this array because of an anonymous phone call to Area 4 that provided the nicknames of the shooters as "Keno" and "Little E."  (Ex. 12 Jones Dep. 26:20-27:5.)  Detective Jones testified that the nickname Little E was associated with Mr. Blackmon because of searches that were run on "the department's databases."  (Ex. 12 Jones Dep. at 27:6-14.)  Detective Jones did not know what search parameters were used.  (Ex. 12 Jones Dep. at 27:6-14.)

16

69.     Detective Sanchez did not inventory the actual photo array that was shown to Ms. McDowell on August 29, 2002.  The photos inventoried as being shown during the August 29, 2002 array are dated September 9, 2002.  (Ex. 29 BLACKMON004079-4087.)  The General Progress Report and Case Supplementary Report memorializing the photo array shown to McDowell on August 29, 2002 did not list all of the individuals in the photo array or indicate whether the photo array was inventoried.  (Ex. 19 Pellegrini Dep. at 45:4-46:18; 47:6-21; Ex. 27 BLACKMON002933; Ex. 28 BLACKMON005831.)

70.     Detective Sanchez testified that all of the individuals included in the August 29, 2002 photo array were "fillers."  (Ex. 31 Sanchez Dep. at 80:15-81:15; 83:3-83:9.)  The fact that Mr. Blackmon was included as a "filler" in the August 29, 2002 was not disclosed to the defense at trial.  (Ex. 13 Schleder Dep. at 241:2-243:24.)

71.     Detective Sanchez testified that, if an eyewitness identified a "filler" in a lineup, that fact would be exculpatory evidence that could be helpful to the defense.  (Ex. 31 Sanchez Dep. at 52:10-20.)  Detective Sanchez further testified that if a filler in a photo array was picked by an eyewitness, "I'm not even sure if it got to the charging point."  (Ex. 31 Sanchez Dep. at 52:1-52:11.)

72.     Plaintiff Eric Blackmon was the only array participant viewed by Ms. McDowell who had his hair styled in braids.  (Ex. 29 BLACKMON004079-4087; Ex. 5 McDowell Dep. at 23:6-9.)  Ms. McDowell described the shooter as having braids.  (Ex. 4 BLACKMON007124-27.)  At trial, Ms. McDowell described the shooter's hair as "unusual" because of the braids.  (Ex. 32 McDowell Trial Testimony at FF-8:9-FF-9:15.)

73.     Detective Sanchez also showed Davious Whitaker, Ms. Reece's son a photo array on August 29, 2002.  (Ex. 33 BLACKMON002932; Ex. 28 BLACKMON005831.)  The photos

inventoried as being shown during the August 29, 2002 array are dated September 9, 2002. (Ex. 29 BLACKMON004079-4087.)

74. The General Progress Report and Case Supplementary Report memorializing the photo array shown to Mr. Whitaker on August 29, 2002 does not list all of the individuals in the photo array or indicate whether the photo array was inventoried. (Ex. 19 Pellegrini Dep. at 53:11-56:2; Ex. 33 BLACKMON002932; Ex. 28 BLACKMON005831.) Mr. Whitaker did not identify Mr. Blackmon from the photo array. (Ex. 33 BLACKMON002932; Ex. 28 BLACKMON005831.)

75. Ms. Reece was not aware that Detective Sanchez interviewed Mr. Whitaker and showed him a photo array. (Ex. 11 Reece Dep. at 86:10-12.)

76. The array shown to Ms. McDowell and Mr. Whitaker was not inventoried. The photo array used with Ms. McDowell at trial, inventoried as 10027021 (Ex. 29 BLACKMON004079-4087), was the array shown to Kenya Pittman a.k.a. "KP" on August 30, 2002. (Ex. 34 CCSAO56-59; Ex. 35 CCSAO129; Ex. 36 CCSAO 274-280.)

77. On August 30, 2002 at 10:21 a.m., the day after the photo arrays were shown to Ms. McDowell and Mr. Whitaker, Detective Sanchez drafted an "Investigative Alert." (Ex. 37 CITY-EB-000203; Ex. 31 Sanchez Dep. at 100:19-101:2.) The Chicago Police Department uses Investigative Alerts to notify officers that there may or may not be probable cause to arrest an individual in the event that an officer searched the individual's name in a CPD database. (Ex. 31 Sanchez Dep. at 101:3-16)

78. Detective Sanchez indicated on the Investigative Alert that there was probable cause to arrest Mr. Blackmon for murder. (Ex. 37 CITY-EB-000203.) Detective Sanchez listed Eric Blackmon's "alias" as "Brandon Blackmon." (Ex. 37 CITY-EB-000203.) The investigative alert for Eric Blackmon was issued after Ms. McDowell was shown the photo array and before

18

Ms. Reece was shown the photo array. (Ex. 13 Schleder Dep. at 118:24-119:4; Ex. 37 CITY-EB-000203.)

79.     Also on August 30, 2002, Detective Sanchez also drafted a "Stop Order." (Ex. 38 CITY-EB-000207; Ex. 31 Sanchez Dep. at 102:16-103-8.) Again, Detective Sanchez listed Mr. Blackmon's "Alias" as Brandon Blackmon on the Stop Order. (Ex. 38 CITY-EB-000207.) Detective Sanchez also indicated on there was probable cause to arrest Mr. Blackmon. (Ex. 38 CITY-EB-000207.)

80.     Also on August 30, 2002, Detective Sanchez drafted and submitted a "Material Submitted for Use in the Daily Bulletin" form. (Ex. 39 CITY-EB-000206; Ex. 31 Sanchez Dep. at 110:1-19.) This form was used by officers in 2002 to include information in the CPD Daily Bulletin, which would include suspects wanted for particular crimes. (Ex. 39 CITY-EB-000206; Ex. 31 Sanchez Dep. at 110:1-14.)

81.     In the Material Submitted for Use in the Daily Bulletin, Detective Sanchez listed Eric Blackmon's "Alias/Nickname" as "Pride." (Ex. 39 CITY-EB-000206.) Detective Sanchez testified that he indicated Mr. Blackmon's nickname as "Pride" in the Material Submitted for Use in the Daily Bulletin because of information he found "somewhere on the computer" or in the "CPD database." (Ex. 31 Sanchez Dep. at 111:7-15). He could not recall the exact source of the information, but he testified that at the time that he drafted the document that Mr. Blackmon had an arrest report with the nickname "Pride." (Ex. 31 Sanchez Dep. at 114:6-7.)

82.     There is no arrest report for Eric Blackmon dated prior to August 30, 2002 stating that Eric Blackmon's nickname was "Pride." (Ex. 41 Investigative File.) The Material Submitted for Use in the Daily Bulletin drafted by Detective Sanchez is the earliest document indicating that Mr. Blackmon's nickname was "Pride." (Ex. 41 Investigative File.)

19

83.     Mr. Blackmon did not go by the nickname "Pride." (Ex. 1 Blackmon Dep. at 281:1-282:3.) Mr. Blackmon's nickname was Forty. (Ex. 1 Blackmon Dep. at 53:1-3; 339:9-13.) Mr. Blackmon's father was also named Eric. Sometimes Mr. Blackmon's family would call him "Little Eric" to distinguish him from his father "Big Eric." (Ex 1 Blackmon Dep. at 53:11-21; 339:14-19.) He also never used the nickname "Little E." (Ex. 1 Blackmon Dep. at 339:20-22.)

84.     Detective Sanchez also stated in the Material Submitted for Use in the Daily Bulletin that Mr. Blackmon was a "Member of the New Breed Street Gang." (Ex. 39 CITY-EB-000206.) Detective Sanchez testified that he obtained this information from a CPD database. (Ex. 31 Sanchez Dep. at 116:15-117:3.)

85.     There is no document dated prior to August 30, 2002 stating that Eric Blackmon was associated with the New Breeds. (Ex. 40 Investigative File.) The Material Submitted for Use in the Daily Bulletin drafted by Detective Sanchez is the earliest document indicating that Mr. was associated with the New Breeds. (Ex. 40 Investigative File.)

86.     Mr. Blackmon was not in a gang in 2002. (Ex. 1 Blackmon Dep. at 85:13-22; 87:9-23; 250:9.)

87.     Detective Sanchez identified Mr. Blackmon's hairstyle as "rows" in the Material Submitted for Use in the Daily Bulletin. (Ex. 39 CITY-EB-000206.)

88.     The earliest photo of Eric Blackmon in the investigative file is dated August 30, 2002, the day after Ms. McDowell purportedly viewed and identified him in the photo array. (Ex. 41 BLACKMON005764; Ex. 40 Investigative File.)

   *c. August 31, 2002 Photo Array*

89.     On August 31, 2002 Detectives Jones and Detective Schleder showed Ms. Reece a photo array at her home. (Ex. 42 BLACKMON005712). The photos inventoried as being shown

during the August 31, 2002 array are dated September 9, 2002.  (Ex. 43 BLACKMON004092-4100.)  Detective Schleder testified that the typical protocol is to inventory the actual physical photos that were shown during the array.  (Ex. 13 Schelder Dep. at 161:2-4.)  Detective Jones does not know why the actual photos shown to Ms. Reece were not logged into evidence.  (Ex. 12 Jones Dep. at 139:1-15.)

90.     Mr. Blackmon was the only array participant viewed by Ms. Reece who had his hair styled in braids.  (Ex. 43 BLACKMON004092-4100.)

91.     One of the Detectives told Ms. Reece that she had to view the photos and go to court and if she didn't she would be subpoenaed and that her kids would go into foster care.  (Ex. 11 Reece Dep. at 76:8-17.)

92.     The Detective showed Ms. Reece photos that she had already seen.  (Ex.11 Reece Dep. at 80:15-82:20.)  She told the Detective that the picture he was showing her was not the person at the scene of the crime, but the same person she had previously seen in the photo book.  (Ex. 11 Reece Dep. at 81:12-82:2.)

93.     Detective Schleder also testified that normally the Detectives would have the witness sign their name next to the photo they identified.  (Ex. 13 Schleder Dep. at 161:6-10.)

     *e.  September 3, 2002 Photo Array*

94.     Detectives Schleder and Jones presented a photo array to Mr. Arrigo on September 3, 2002.   (Ex. 12 Jones Dep. at 90:1-4; Ex. 44 BLACKMON005715-16; Ex. 45 BLACKMON004059-4067.)   Mr. Blackmon was included in this array because of Ms. McDowell's earlier identification.  (Ex. 12 Jones Dep. at 90:5-8.)  Michael Davis a.k.a Keno was included in the array because he was suspected of being the first shooter.  (Ex. 12 Jones Dep. at 90:9-12.)

95. Mr. Arrigo indicated that none of the photos were the individuals he saw shoot Tony Cox. (Ex. 12 Jones Dep. at 90:13-16; Ex. 44 BLACKMON005715-16.)

96. Mr. Blackmon was the only photo array participant in the arrays shown to Ms. McDowell, Mr. Whitaker and Ms. Reece who had his hair styled in braids. (Ex. 29 BLACKMON004079-4087; Ex. 43 BLACKMON004092-4100.)

97. In 2002, it was CPD policy that suspects in a photo array or live lineup should generally be the same height and weight and should have similar hair and skin color. (Ex. 46 CITY-EB-001207-08.) Detective Schleder knew that to be the policy at the time. (Ex. 13 Schleder Dep. at 51:20-24.)

**IV.** **Arrest**

98. The investigative alert for Eric Blackmon was issued on August 30, 2002, after Ms. McDowell was shown the photo array and before Ms. Reece was shown the photo array. (Ex. 13 Schleder Dep. at 118:24-119:4; Ex. 37 CITY-EB- 000203.) On September 5, 2002, Mr. Blackmon was arrested at 3151 W. Harrison at 9:50 a.m. (Ex. 18 CITY-EB-000358.)

**V.** **Line Ups**

99. On September 5, 2002, Ms. McDowell viewed a live lineup conducted by Detectives Jones and Schleder. (Ex. 47 BLACKMON002939; Ex. 48 BLACKMON005720.) Detective Jones picked up Ms. McDowell from her home and took her to view the lineup. (Ex. 5 McDowell Dep. at 58:8-12.) Before Ms. McDowell viewed the lineup, Detective Jones told Ms. McDowell the officers had someone they wanted her to view in the lineup. (Ex. 5 McDowell Dep. at 58:13-18.) Based on what Detective Jones told her, McDowell knew that the suspect was going to be in the lineup. (Ex. 5 McDowell Dep. at 58:20-59:1.)

100.     In 2002, it was CPD policy that officers were not to tell any witness viewing a photo array or live line up that any person in the array or lineup had been arrested or was a suspect.  (Ex. 46 CITY-EB-001207-08.)

101.     Prior to viewing the live line up, Detective Jones showed Ms. McDowell photos of the crime scene and the victim which increased her desire to help the police in identifying the shooter.  (Ex. 5 McDowell Dep. at 59:14-61:9.)

102.     The heights and weights of the lineup participants Ms. McDowell viewed are as follows:

- Eric Blackmon - 6'1" ; 160 lbs
- Anton Edwards - 5'9" ; 190 lbs
- Michael Davis - 5'8" ; 167 lbs
- Tyrese Bell 6'0" ; 200 lbs
- George Catchings 6'0" ; 190 lbs
- Arnell Clemmons - 5'8" ; weight not listed

(Ex. 47 BLACKMON002939; Ex. 49 CITY-EB002759.)

103.     Mr. Blackmon was the tallest line up participant at 6'1" and 160 pounds.  (Ex. 47 BLACKMON002939; Ex. 49 CITY-EB002759.)  Of the individuals whose weight is listed, Mr. Blackmon is the thinnest.  (Ex. 47 BLACKMON002939; Ex. 49 CITY-EB002759.)

104.     Mr. Blackmon was the only lineup participant who had his hair styled in braids.  (Ex. 13 Schleder Dep. at 56:6-10; 172:11-13; Ex. 12 Jones Dep. at 147:21-23; Ex. 50 CITY-EB-000461-462, 469.)     Ms. McDowell described the shooter as having braids.  (Ex. 4 BLACKMON007124-27.)  Mr. Blackmon and Michael Davis a.k.a. "Keno" were the only two lineup participants that were also in the photo array shown to Ms. McDowell, on August 29, 2002.  (Ex. 29 BLACKMON004079-4087; Ex. 50 CITY-EB-000424-469.)

105.     After Ms. McDowell selected Mr. Blackmon from the lineup, Detective Jones told Ms. McDowell that the other witness picked the same guy.  (Ex. 5 McDowell Dep. at 63:8-12.)

Detective Jones's statement increased Ms. McDowell's confidence that she had correctly identified the shooter. (Ex. 5 McDowell Dep. at 63:16-18.)

106. On September 5, 2002, Ms. Reece viewed a live lineup conducted by Detectives Jones, Schleder and Sanchez. (Ex. 51 BLACKMON006098; Ex. 13 Schleder Dep. at 176:5-13; Ex. 18 CITY-EB-000359.)

107. The heights and weights of the lineup participants Ms. Reece viewed are as follows:

- Eric Blackmon - 6'1" ; 160 lbs
- Anton Edwards - 5'9" ; 190 lbs
- Michael Davis - 5'8" ; 167 lbs
- Tyrese Bell 6'0" ; 200 lbs
- George Catchings 6'0" ; 190 lbs
- Arnell Clemmons - 5'8" ; weight not listed

(Ex. 51 BLACKMON006098; Ex. 49 CITY-EB002759.)

108. Mr. Blackmon was the tallest line up participant at 6'1" and 160 pounds. (Ex. 51 BLACKMON006098; Ex. 49 CITY-EB002759.) Of the individuals whose weight is listed, Mr. Blackmon is the thinnest. (Ex. 51 BLACKMON006098; Ex. 49 CITY-EB002759.)

109. Mr. Blackmon was the only lineup participant who had his hair styled in braids. (Ex. 13 Schleder Dep. at 56:6-10; 172:11-13; Ex. 50 CITY-EB-000461-462, 469.) Mr. Blackmon and Michael Davis a.k.a. Keno were the only two lineup participants that were also in the photo array shown to Ms. Reece on August 31, 2002. (Ex. 43 BLACKMON004092-4100; Ex. 50 CITY-EB-000424-469.)

110. Police reports indicate that Ms. Reece identified Mr. Blackmon from the September 5, 2002 lineup. (Ex. 18 CITY-EB-000359.) Ms. Reece testified that when she viewed the lineup, she told the Detective that the only person she recognized was the "skinny guy" from the photo book. (Ex. 11 Reece Dep. at 64:1-17.) When the Detective asked Ms. Reece whether she recognized anyone from the crime scene, Ms. Reece said, "No." (Ex. 11 Reece Dep. at 64:18-21.)

After Ms. Reece viewed the lineup, one of the officers said, "We got the shooter" and started slapping hands. (Ex. 69 Reece Dep. at 69:23-70:5.) Ms. Reece told the Detectives they were making a mistake and that they had the wrong guy. (Ex. 52 BLACKMON 000005-06.)

111. Mr. Blackmon was the only lineup participant viewed by Ms. McDowell and Ms. Reece who had his hair styled in braids. (Ex. 13 Schleder Dep. at 56:6-10; Ex. 12 Jones Dep. at 147:21-23; Ex. 50 CITY-EB-000424-469.)

112. Mr. Blackmon and Michael Davis a.k.a. Keno were the only two lineup participants that were also in the photo arrays shown to Ms. McDowell and Ms. Reece on August 29 and August 31, 2002. (Ex. 29 BLACKMON004079-4087; Ex. 43 BLACKMON004092-4100; Ex. 50 CITY-EB-000424-469.)

113. The Detectives had the option of postponing the line up to look for fillers who had braids in their hair. (Ex. 13 Schleder Dep. at 65:13-17.)

114. On September 8, 2002, Mr. Arrigo viewed a live lineup. (Ex. 12 Jones Dep. at 152:12-15.) Mr. Blackmon was included in line up that Mr. Arrigo viewed. (Ex. 53 CITY-EB-224; Ex. 54 CCSAO 00487.) Mr. Arrigo did not identify anyone in the live line up. (Ex. 53 CITY-EB-224; Ex. 54 CCSAO 00487.)

## VI. Charging Decisions

115. Mr. Blackmon was charged with murder on September 9, 2002. (Ex. 56 EB-CCSAO-00004164 Felony Review Folder.) Assistant States Attorney Kenneth Fiedler was on duty for Area 4. (Ex. 55 Fiedler Dep. at 47:24-48:24; Ex. 56 EB-CCSAO-00004164 Felony Review Folder.) In making a charging decision, Mr. Fiedler would generally rely on the information provided to him by the detectives that were investigating the case (Ex. 55 Fiedler Dep. 23:20-24.) He expected that the detectives would provide him with whatever information they had

at the time, including evidence that would be favorable or unfavorable to the suspect. (Ex. 55 Fiedler Dep. at 30:3-10.)

116. Mr. Fiedler would record all information relevant to the ultimate charging decision in a document known as a "felony review folder." (Ex. 55 Fiedler Dep. 35:14-24; 151:15-23)

117. The information in the felony review folder related to the charging of Mr. Blackmon came from either the detectives in this case or interviews conducted by Fiedler. (Ex. 55 Fiedler Dep. 61:16-21; 62:6-61:1; Ex. 56 EB-CCSAO-00004160-65.) The detective handling the case were Detectives Sanchez, Jones, and Schleder. (Ex. 31 Sanchez Dep. at 11:24-12:8.)

118. The felony review folder contained multiple falsehoods, including that (1) Darius [sic] Whitaker and Ms. Reece identified Mr. Blackmon as one of the shooters (which they did not (Ex. 57 CITY-EB-218; Ex. 11:64:1-17, 18-21)); (2) Mr. Blackmon stated after his arrest that he could not talk to the police officers without his lawyer (Mr. Blackmon did talk to the police officers, and stated that he was at a barbeque at the time of the shooting (Ex. 58 CITY-EB-000223; Ex. 18 CITY-EB-000358); (3) Mr. Blackmon was associated with the New Breeds street gang; and (4) Mr. Blackmon's nickname was "Pride." (Ex. 56 EB-CCSAO-00004160-65.)

119. The detectives investigating the murder of Tony Cox told Mr. Fiedler that Mr. Blackmon was affiliated with the New Breeds street gang. (Ex. 55 Fiedler Dep. at 91:16-25.) The detectives investigating the murder of Tony Cox also told Mr. Fiedler that Mr. Blackmon's nickname was "Pride." (Ex. 55 Fiedler Dep. at 92:1-13.) According to Mr. Fiedler, the detectives assigned to this case were the "most likely source" of the false information in the felony review folder that Darius [sic] Whitaker identified Mr. Blackmon as one of the shooters. (Ex. 55 Fiedler Dep. 108:12-18.)

120.    The felony review folder did not contain evidence that may have been exculpatory to Mr. Blackmon's guilt, including (1) his alibi; (2) that Ms. Reece and Mr. Whitaker did not identify Mr. Blackmon as a shooter; and (3) why Mr. Blackmon was included in the August 29, 2002 photo arrays. (Ex. 56 EB-CCSAO-00004160-65.)

121.    In approving the charges against Mr. Blackmon, Mr. Fiedler relied exclusively upon the two alleged identifications of Mr. Blackmon as the shooter and the handwritten statement of Ms. McDowell describing her identification. (Ex. 55 Fiedler Dep. at 122:15-19; 127:24-128:5; Ex. 24 Cernius Dep. at 60:7-14.) According to the prosecutors that approved the charges against Mr. Blackmon and handled his criminal trial, the alleged identifications were the only evidence linking Mr. Blackmon to the crime. (Ex. 55 Fiedler Dep. at 120:25-121:12; Ex. 24 Cernius Dep. at 151:23-152:6.)

122.    Michael Davis a.k.a. Keno was never charged for the murder of Tony Cox because only one witness identified him. (Ex. 13 Schleder Dep. at 26:19-28:9; Ex. 12 Jones Dep. at 21:15-22:1.) Detective Schleder agreed with the decision not to charge Mr. Davis. (Ex. 13 Schleder Dep. at 26:19-28:9.) Detective Sanchez believed that Mr. Davis was involved in the shooting. (Ex. 31 Sanchez Dep. at 26:3-10.)

123.    Detective Jones disagreed with the decision not to charge Mr. Davis. (Ex. 12 Jones Dep. at 22:16-21.)

## VII.    Pre-Trial & Trial

### a. Pre Trial

124.    In preparing for trial, Mr. Cernius relied on the detectives involved in the case to provide him evidence that was both inculpatory and exculpatory of Mr. Blackmon. (Ex. 24 Cernius Dep. 125:22-126:2; 128:2-5.) Mr. Cernius testified that if there was inculpatory evidence that was

27

actually false, he would have sought approval to dismiss the charges against Mr. Blackmon before trial. (Ex. 24 Cernius Dep. 127:12-16.)

125.    In July 2004, Terrence Boyd was identified as another eyewitness to the Tony Cox murder. (Ex. 12 Jones Dep. at 176:8-13.) Mr. Cernius, Mr. McCarthy, and Detectives Jones and Schleder interviewed Boyd. (Ex. 59 CITY-EB-000233.) Boyd indicated that a man named Eric who went by the nickname Pride and had a tattoo of the name Leah on his neck shot Tony Cox. (Ex. 59 CITY-EB-000233; Ex. 12 Jones Dep. at 176:14-21.) Mr. Boyd also stated that "Pride" was a Black male, 5'9", and 180 pounds. (Ex. 59 CITY-EB-000233.)

126.    Detectives Jones and Schleder showed Boyd a photo array including a photo of Eric Blackmon. Boyd did not identify anyone as the individual who he saw shoot Tony Cox. (Ex. 12 Jones Dep. at 184:11-16; Ex. 59 CITY-EB-000233.)

127.    Detective Jones searched the CLEAR database and located Eric Bridges. (Ex. 60 CITY-EB-000240.) Mr. Bridges was listed as a Black male, 5'7", and 160 pounds. (Ex. 59 CITY-EB-000233.) He was associated with the New Breeds. (Ex. 60 CITY-EB-000240.) Police records indicated that Eric Bridges was associated with the nickname "Pride." (Ex. 61 EB-CCSAO-000383; Ex. 24 Cernius Dep. at 185:1-5.) In a 2003 photo, Mr. Bridges had his hair in braids. (Ex. 62 EB-CCSAO-000001355.)

128.    According to Mr. Cernius, the police did not investigate Mr. Bridges for the murder of Tony Cox. (Ex. 24 Cernius Dep. at 144:2-11.)

129.    Detectives did not show the photo of Eric Bridges to Ms. Reece, Ms. McDowell or Mr. Arrigo. (Ex. 12 Jones Dep. at 179:23-180:2.)

130.     Ms. Reece stated that the photograph she was shown while testifying in front of the grand jury was not a photograph of either of the two shooters she saw at the murder scene.  (Ex. 11 Reece Dep. at 91:17-20.)

131.     Ms. Reece was worried about going to court because she knew the murderer was not the guy they had in court.  (Ex. 11 Reece Dep. at 155:24-156:5.)

132.     In her 2017 deposition, Ms. Reece explained that the prisoner she saw in the courtroom was the "same guy in the photo book and same guy from the lineup, but it wasn't the same guy that did the murder."  (Ex. 11 Reece Dep. at 101:10-16.)

    a. *Trial*

133.     According to Mr. Cernius, the lead prosecutor at Mr. Blackmon's trial, the State's case against Mr. Blackmon was entirely dependent on the two alleged eyewitness identifications. (Ex. 24 Cernius 151:23-152:2; 179:20–180:1)   Prosecutors presented no physical or forensic evidence that Mr. Blackmon participated in the Tony Cox shooting. (Ex. 24 Cernius Dep. at 152:3-6; 160:3-16.)  They also presented no evidence of motive.  (Ex. 24 Cernius Dep. at 152:3-6; 160:3-16.)  Mr. Cernius testified that there was no other evidence, other than the alleged identifications, linking Mr. Blackmon to the shooting of Tony Cox.  (Ex. 24 Cernius Dep. at 152:3-6; 160:3-16.)

134.     Detective Sanchez falsely testified that Ms. Reece identified Mr. Blackmon during the lineup.  (Ex. 30 Sanchez Trial Testimony GG-114:22-GG-116:4.)

135.     Mr. Cernius testified that if he was presented with evidence that undermined the integrity of the two alleged eyewitness identifications, he would have considered that evidence in deciding whether or not to try Mr. Blackmon.  (Ex. 24 Cernius Dep. at 177:10-17.)  For example, Mr. Cernius testified that if he learned that the lineups were conducted with suggestive techniques that violated police procedures, that would have weighed in the decision of whether to try Mr.

Blackmon. (Ex. 24 Cernius Dep. at 179:7-13.) Similarly, if Mr. Cernius learned that Ms. Reece had *not* identified Mr. Blackmon in a lineup, he would have considered that information in deciding whether to try Mr. Blackmon. (Ex. 24 Cernius Dep. 173:21-174:2.)

## VIII.  Police Procedures

### a.  *Investigations*

136.    The Chicago Police Department Detective Division Standard Operating Procedures governed investigations conducted by CPD detectives in 2002-2004. (Ex. 14 CITY-EB-000798.) The Procedures state: "In every case received for field investigation the assigned detective will …I. pursue all investigative leads." (Ex. 14 CITY-EB-000873-74.)

### b.  *Lineups*

137.    Chicago Police Department General Order 88-18, which governed lineups in August and September of 2002, states: "When more than one suspect is placed in the lineup, the lineup ideally should consist of at least four non-suspects in addition to the number of suspects in the lineup. Insofar as possible, suspects in a lineup should generally be the same height and weight and should have similar hair and skin color.  When more than one suspect is to be viewed, and great disparity is evident between suspects in height, weight and skin color, separate lineups will be conducted and non-suspects in each lineup will have the same general physical characteristics as suspects." (Ex. 46 CITY-EB-001207.)

138.    General Order 88-18 also states that "the fact that any person in the lineup has been arrested as a suspect will not be mentioned to victims or witnesses." (Ex. 46 CITY-EB-001207.)

139.    The concepts included in General Order 88-18 were followed in practice by detectives in the Chicago Police Department prior to 2003, including the requirements discussed above. (Ex. 63 Winstrom Dep. at 117:11-118:10.)

140.    If an eyewitness's description of a suspect includes a unique characteristic, such as being tall, and the lineup includes a tall suspect and short non-suspects, that lineup would be improperly suggestive.  (Ex. 63 Winstrom Dep. at 50:5-16; 85:17-86:4; Ex. 31 Sanchez Dep. at 35:21-36:5.)

141.    According to the City's Rule 30(b)(6) witness, if a lineup includes two suspects and the suspects were different heights, the two suspects should be viewed in different lineups. (Ex. 63 Winstrom Dep. at 89:11-17.)

142.    Mr. Blackmon's police practices expert, Dennis Waller, opined that Defendants' identification procedures failed to meet the standard laid out by CPD policy, CPD training, best law enforcement practices, and nationally excepted standards.  The Defendants used improperly suggestive identification techniques with both Ms. McDowell and Ms. Reece, including using fillers with different physical characteristics than Mr. Blackmon, presenting a photo array where only Mr. Blackmon had braids, and telling Ms. Reece that Mr. Blackmon was the "guy that [she] picked out" even though she did not recognize him from the shooting.  (Ex. 64 Waller Report at 8–20.)

143.    In reaching this opinion, Mr. Waller relied on a report published by the National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement*, which includes guidance on photo arrays and lineups.  That report states that "the investigator shall compose the lineup [or photo array] in such a manner that the suspect does not unduly stand out."  (Ex. 65 NIJ Policy p. 29.)  The report also states that investigators should "[c]reate a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature."  (Ex. 65 (NIJ V.A.6.)

144.     Mr. Waller also testified that the International Association of Chiefs of Police Training Keys set national standards for identification procedures at the time.  (Ex. 66 Waller Hearing Tr. at 29:6-21.)   Those Training Keys indicate that: (1) a lineup should consist of individuals of similar physical characteristics, including hair style; (2) officers should avoid making suggestive statements to witnesses, "such as telling the witness that the person whom the police suspect will be in the lineup"; and (3) "witnesses should not be praised or congratulated for picking out the suspect," as "[t]his may serve to reinforce a shaky identification, convincing the witness that he has picked out the actual perpetrator when the witness is in some doubt."  (Ex. 66 Waller Hearing Tr. at 40:3-23;42:12-43:4.)

145.     Mr. Waller opined that the identification procedures here violated each of these principles.  (Ex. 64 Waller Report at 8-20.)

146.     Mr. Waller also opined that Defendants failed to conduct a complete and thorough investigation into the death of Tony Cox because they failed to investigate a potential vehicle allegedly used by the shooters, failed to pursue leads given by the Xavier Cox, failed to properly maintain or identify photos a witness said depicted the shooter, and failed to consider that eye witnesses had previously identified people who did not look like Mr. Blackmon.  (Ex. 64 Waller Report at 20–22.)

147.     Mr. Waller also opined that Defendants failed to make a concerted effort to locate and interview all potential witnesses that could provide inculpatory or exculpatory information and did not pursue leads related to either Michael Davis or Eric Bridges, who was known as "Pride."  (Ex. 64 Waller Report at 22–23; Ex. 24 Cernius Dep. 144: 2-11.)

148.     Mr. Waller also opined that the Defendants fabricated a link between Mr. Blackmon and the New Breeds street gang without any substantial support.  (Ex. 64 Waller Report at 23.)

149.     Finally, Mr. Waller opined that Defendants deliberately withheld, and suppressed, significant information related to their investigation.  The Defendants failed to record all significant information they relied on in the investigation file, including information pertaining to other leads, and information detailing why Mr. Blackmon became a suspect.  (Ex. 64 Waller Report at 23–26.)

## IX.     Reliability of Ms. McDowell and Ms. Reece's Identifications

150.     Mr. Blackmon's human perception and memory expert Dr. Geoffrey R. Loftus, Ph.D., opined that Ms. Reece and Ms. McDowell's identifications of Eric Blackmon are unreliable. (Ex. 67 Loftus Report at 3; Ex. 68 Loftus Hearing Tr. at 9:10-21.)

151.     Dr. Loftus opined that Ms. Reece and Ms. McDowell's original memories of the shooter were likely poor because their abilities to perceive and memorize the shooter's appearance would have been diminished by a lack of attention to the shooter's appearance, a lack of adequate time to memorize the shooter's appearance, and high stress experienced attributable to the active shooting taking place near them and the children in their cars.  (Ex. 67 Loftus Report at 3.)

152.     Dr. Loftus opined that some of the factors competing for Ms. Reece and Ms. McDowell's attention at the time of the shooting include, trying to keep themselves and their children safe, seeking help, evaluating the victim's attention, weapon focus, and the divided attention on multiple shooters.  (Ex. 67 Loftus Report at 7-8.)  The shooters' appearances would have been largely irrelevant at the moment and would likely have been allocated minimal of Ms. Reece and Ms. McDowell's limited attentional resources.  (Ex. 67 Loftus Report at 7.)

153.     Dr. Loftus opined that a high stress event, such as a shooting, diminishes mental functioning.  (Ex. 67 Loftus Report at 8.)  A stressful event is one in which few accurate details

33

about the original event are memorized and there is substantial opportunity for the original minimal memory to be supplemented with inaccurate post-event information. (Ex. 67 Loftus Report at 8.)

154.     Dr. Loftus opined that an event of shorter duration provides less information to the witness to form an original memory. (Ex. 67 Loftus Report at 8.) Neither Ms. McDowell nor Ms. Reece had a lengthy amount of time to see the shooters' appearances. (Ex. 67 Loftus Report at 9.) Ms. Reece likely overestimated the amount of time that the shooting lasted. (Ex. 67 Loftus Report at 9.)

155.     Dr. Loftus opined that Ms. McDowell and Ms. Reece viewed all-suspect photo arrays, meaning that if a witness identifies any one of them, grave suspicion is cast on the identified person. (Ex. 67 Loftus Report at 10.) The chance of a false identification is considerably greater in an all-suspect array. (Ex. 67 Loftus Report at 10.)

156.     Dr. Loftus opined that Eric Blackmon was the only member of the photo array and lineup that matched Ms. McDowell's description of the shooter as having braids. From Ms. McDowell's perspective, the photo array and lineup were essentially show up procedures. (Ex. 67 Loftus Report at 11.)

157.     Dr. Loftus opined that Eric Blackmon and Michael Davis a.k.a. Keno were the only two members of the lineup whom Ms. McDowell and Ms. Reece had seen before (in the photo arrays) and would have looked more familiar on that basis alone. (Ex. 67 Loftus Repot at 11.)

158.     When the office administering the lineup knows the suspect's identity, the officer may unconsciously provide information to the witness as to who the suspect is. (Ex. 67 Loftus Report at 11.) Detectives Schleder, Jones and Sanchez, who conducted the lineups, knew Mr. Blackmon was a suspect. (Ex. 67 Loftus Report at 11.)

159. Dr. Loftus opined that when a witness believes that the offender is in the lineup the witness is likely to choose someone thereby increasing the chances of a false identification. (Ex. 67 Loftus report at 12.)

160. Dr. Loftus opined that Ms. McDowell and Ms. Reece's confident in-court identifications of Eric Blackmon as the shooter were based on strong memories that were not constructed based on their perceptions of the actual shooter during the actual shooting but rather had been reconstructed after the fact, based on post-event information. (Ex. 67 Loftus Report at 14.)

**X.**     **Post-Trial**

161. On April 7, 2011, Eric Blackmon filed a *pro se* petition for writ of habeas corpus in the United States District Court for the Northern District of Illinois. *Blackmon v. Pfister,* No. 11 CV 2358 (Dkt. 1). After an initial dismissal and appeal to the Seventh Circuit, the federal district court held an evidentiary hearing in May 2017. *Blackmon v. Williams*, 823 F.3d 1088 (7th Cir. 2016). The Seventh Circuit highlighted "the weakness of the State's case—the complete lack of any motive, the dearth of physical evidence, and the heavy reliance on the eyewitness identifications of two strangers who saw the killers for only seconds." *Id.* at 1107.

162. On February 7, 2018, the district court granted Eric Blackmon's habeas petition. In doing so, the court observed both that the State had a "weak case" against Mr. Blackmon, and that Mr. Blackmon "provided straightforward answers" at the hearing and was "generally credible," with his testimony supported by the record. *Blackmon v. Pfister*, No. 11 C 2358, 2018 WL 741390, at *6 (N.D. Ill. Feb. 7, 2018).

163.    On March 26, 2018, the Circuit Court entered an order vacating the judgment of conviction and sentence for first-degree murder and setting bond. (Ex. 69 Order Vacating Conviction & Setting Bond.)

164.    On May 3, 2018, Eric Blackmon was released from custody. (Ex. 1 Blackmon Dep. at 247:5-18.) Mr. Blackmon was in continuous custody from September 5, 2002 to May 3, 2018. (Ex. 1 Blackmon Dep. at 176:14-16; 247:5-18.)

165.    On January 16, 2019, the State dismissed the charges against Mr. Blackmon. (Ex. 70 Order Dismissing Charges & Certified Disposition of Case.)

166.    On February 24, 2020, Eric Blackmon was granted a Certificate of Innocence stating:

- Mr. Blackmon was convicted of one or more than one felony by the State of Illinois in the County of Cook and was subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

- Mr. Blackmon's judgment or conviction was reversed or vacated; a new trial was ordered; he was not retried, and the indictment or information was dismissed;

- Mr. Blackmon's indictment or information was dismissed and a Petition for a Certificate of Innocence was filed within two years of the dismissal or the indictment or information;

- **Mr. Blackmon is innocent of the offences charged in the indictment or information;**

- Mr. Blackmon did not by his own conduct voluntarily cause or bring about his conviction.

(Ex. 71 Order Granting Certificate of Innocence.) (emphasis added).

Dated:  February 10, 2023                    Respectfully submitted,

                                             /s/  *Ronald S. Safer*
                                             Ronald S. Safer (rsafer@rshc-law.com)
                                             John K. Theis (jtheis@rshc-law.com)
                                             Sarah E. Finch (sfinch@rshc-law.com)
                                             RILEY SAFER HOLMES & CANCILA LLP
                                             70 W. Madison Street, Suite 2900
                                             Chicago, Illinois 60602
                                             (312) 471-8700 (tel)
                                             (312) 471-8701 (fax)

                                             *Attorneys for Plaintiff Eric Blackmon*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 10, 2023, I electronically filed the foregoing using the Court's

CM/ECF system, which will automatically send notification of such filing to all counsel of record.


*/s/ Sarah E. Finch*
Sarah E. Finch