**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC BLACKMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  19 C 0767 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT**
**<u>DETECTIVES' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE FACTS .......................................................................... 1

    Tony Cox's Murder............................................................................................ 1

    Eyewitnesses to the Shooting........................................................................... 2

    The Tony Cox Murder Investigation Provides No Link to Mr. Blackmon ....... 3

    The Unduly Suggestive Photo Arrays............................................................... 5

    The Fabricated Evidence and Unduly Suggestive Identifications ..................... 6

    Mr. Blackmon is Wrongfully Charged with Murder ........................................ 7

    Evidence that Eric Bridges, a.k.a. "Pride," was One of the Shooters............... 8

    At Trial, Prosecutors Relied Exclusively on the Identifications....................... 9

    Expert Opinion Presented by Mr. Blackmon ................................................... 9

    Mr. Blackmon's Exoneration.......................................................................... 10

ARGUMENT ...................................................................................................... 11

I.    A Jury Must Decide Whether the Defendants Violated Mr. Blackmon's Due Process Rights (Count I) ................................................................................. 11

    A.    Defendants' Unduly Suggestive Identifications Claim Should be Submitted to a Jury ...................................................................... 11

        1.    Mr. Blackmon's unduly suggestive identification claim is cognizable under § 1983. ....................................................... 16

        2.    The Evidence Must be Viewed in the "Totality of the Circumstances"... 18

        3.    Mr. Blackmon has not Waived or Forfeited his Unduly Suggestive Lineup Claim ........................................................ 19

        4.    The Unduly Suggestive Identifications Caused the Denial of a Fair Trial.......................................................................... 21

        5.    Defendants are not Entitled to Qualified Immunity on Mr. Blackmon's Unduly Suggestive Identification Claim................................. 23

B.     Mr. Blackmon's Fabrication Claim Should be Submitted to a Jury ..................... 28

       1.     Defendants Fabricated Information in Police Reports Relating to Ms. Reece ................................................................................................ 29

       2.     The Credibility of Ms. Reece's Testimony is a Matter of Factual Dispute ................................................................................................... 30

       3.     Ms. Reece's Sworn Deposition Testimony is Admissible ....................... 32

       4.     Defendants Fabricated Several Other Key Pieces of Information that Deprived Mr. Blackmon of his Liberty ...................................................... 34

C.     Defendant Officers Withheld Exculpatory Evidence ............................................ 37

D.     A Jury Should Decide Claims Related to Mr. Blackmon's Due Process Claim ... 39

II.     A Jury Must Decide Eric Blackmon's Malicious Prosecution and Pretrial Detention Claims (Counts V & VI) .................................................................................................. 40

A.     The Fourth Amendment Pretrial Detention Claim (Count V) is Timely .............. 40

B.     A Jury Could Find That Defendants Lacked Probable Cause ............................... 41

C.     A Jury Could Find that Defendants Acted with Malice ......................................... 45

D.     Prosecutors Relied on Defendants' Investigation to Prosecute Mr. Blackmon .... 46

III.     A Jury Must Decide Eric Blackmon's Failure to Intervene Claim (Count III) ............... 48

IV.     Plaintiff's Conspiracy Claims (Counts II and VIII) Must be Decided by a Jury .............. 51

       1.     Evidence of an Agreement Among the Defendant Officers ..................... 52

       2.     Defendants' Overt Acts in Furtherance Violating Mr. Blackmon's Rights ...................................................................................................... 53

       3.     Every Defendant Need not be Present for Each Overt Act to Further the Conspiracy ............................................................................................. 54

CONCLUSION ........................................................................................................................ 55

## **TABLE OF AUTHORITIES**

Page

**CASES**

*Adcock v. Brakegate, Ltd.*,
    164 Ill.2d 54 (1994) ...................................................................................52

*Aleman v. Vill. of Hanover Park*,
    662 F.3d 897 (7th Cir. 2011) .......................................................................46

*Alexander v. City of S. Bend*,
    433 F.3d 550 (7th Cir. 2006) ...........................................................11, 17, 18

*Allied Ins. Co. v. United States*,
    No. 20 C 4015, 2022 WL 4182383 (N.D. Ill. Sept. 13, 2022)...................34

*Anderson v. City of Rockford*,
    932 F.3d 494 (7th Cir. 2019) ..................................................................38, 39

*Anderson v. Creighton*,
    483 U.S. 635 (1987).................................................................................25, 39

*Arce v. Chicago Transit Auth.*,
    311 F.R.D. 504 (N.D. Ill. 2015)...................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................49

*Avery v. City of Milwaukee*,
    847 F.3d 433 (7th Cir. 2017) .......................................................................21

*Bahena v. City of Chicago*,
    No. 17 C 8532, 2020 WL 5076688 (N.D. Ill. 2020)...................................43

*Beaman v. Freesmeyer*,
    131 N.E.3d 488 (Ill. 2019)...........................................................................47

*Beaman v. Freesmeyer*,
    183 N.E.3d 767 (Ill. 2021) ...........................................................40, 41, 47, 48

*Beaman v. Freesmeyer*,
    776 F.3d 500 (7th Cir. 2015) .......................................................................52

*Blackmon v. Pfister*,
    No. 11 C 2358, 2018 WL 741390 (N.D. Ill. Feb. 7, 2018)........................20

*Blackmon v. Williams*,
    823 F.3d 1088 (7th Cir. 2016) ...................................................................1, 4, 20

*Bolden v. City of Chicago*,
    No. 17 CV 417, 2019 WL 3766104 (N.D. Ill. Aug. 9, 2019) .................................24

*Bolden v. Pesavento*,
    No. 17-CV-417, 2022 WL 3684432 (N.D. Ill. Aug. 25, 2022) ............................19, 21, 25, 45

*Brady v. Maryland*,
    373 U.S. 83 (1963)................................................................................23, 37, 39, 40

*Brandon v. Maywood*,
    157 F. Supp. 2d 917 (N.D. Ill. 2001) ........................................................................44

*Brower v. Cnty. of Inyo*,
    489 U.S. 593 (1989)................................................................................................22

*Carmichael v. Village of Palatine*,
    605 F.3d 451 (7th Cir. 2010) ..................................................................................42

*Carvajal v. Dominguez*,
    542 F.3d 561 (7th Cir. 2008) ..................................................................................37

*Casciaro v. Allmen*,
    No. 17 C 50094, 2021 WL 1626879 (N.D. Ill. Mar. 26, 2021) .............................55

*Castro v. DeVry Univ., Inc.*,
    786 F.3d 559 (7th Cir. 2015) ..................................................................................31

*Coleman v. City of Peoria, Illinois*,
    925 F.3d 336 (7th Cir. 2019) ............................................................................37, 45

*Collier v. City of Chicago*,
    No. 14 C 2157, 2015 WL 5081408 (N.D. Ill. Aug. 26, 2015)...................29, 36, 49

*Cooney v. Casady*,
    735 F.3d 514 (7th Cir. 2013) ..................................................................................52

*Crowder v. Lash*,
    687 F.2d 996 (7th Cir. 1982) ..................................................................................50

*Doxtator v. O'Brien*,
    39 F.4th 852 (7th Cir. 2022) ..................................................................................49

*Faulkner v. City of Chicago*,
    No. 1:20-CV-4206, 2023 WL 35177 (N.D. Ill. Jan. 4, 2023).................................45

*Fields v. Wharrie*,
740 F.3d 1107 (7th Cir. 2014) ...................................................................37

*Flannery v. Recording Indus. Ass'n of Am.*,
354 F.3d 632 (7th Cir. 2004) ....................................................................32

*Fletcher v. Bogucki*,
No. 20-CV-04768, 2021 WL 4477968 (N.D. Ill. Sept. 30, 2021) ...................19, 21

*Foster v. California*,
394 U.S. 440 (1969)..................................................................................23, 27

*Fritz v. Johnston*,
209 Ill.2d 302 (2004) ...............................................................................52

*Gonzalez v. City of Elgin*,
578 F.3d 526 (7th Cir. 2009) ...................................................................42

*Goudy v. Cummings*,
922 F.3d 834 (7th Cir. 2019) ...................................................................38

*Grayson v. City of Aurora*,
157 F. Supp. 3d 725 (N.D. Ill. 2016) ......................................................23, 42, 46

*Hampton v. City of Chicago*,
No. 12-CV-5650, 2017 WL 2985743 (N.D. Ill. July 13, 2017)............................24, 52, 53, 55

*Hampton v. Cnty. of Cook*,
No. 18 C 6346, 2020 WL 6381366 (N.D. Ill. Oct. 31, 2020) ...............................47

*Hensley v. Carey*,
818 F.2d 646 (7th Cir. 1987) ...................................................................17

*Hernandez-Cuevas v. Taylor*,
723 F.3d 91 (1st Cir. 2013)......................................................................42

*Hill v. Cook Cnty.*,
463 F. Supp. 3d 820 (N.D. Ill. 2020) ......................................................41

*Hill v. Rubald*,
No. 13 C 4847, 2017 WL 201357 (N.D. Ill. Jan. 18, 2017) .................................48

*Holland v. City of Chicago*,
643 F.3d 248 (7th Cir. 2011) ...................................................................46

*Holloway v. City of Milwaukee*,
43 F.4th 760 (7th Cir. 2022) ....................................................................17, 23, 25, 28

*Hurt v. Wise*,
   880 F.3d 831 (7th Cir. 2018) .................................................................30

*Israel v. Odom*,
   521 F.2d 1370 (7th Cir. 1975) ...............................................................27

*Jackson v. Curry*,
   888 F.3d 259 (7th Cir. 2018) .................................................................25

*Jimenez v. City of Chicago*,
   732 F.3d 710 (7th Cir. 2013) .................................................................40

*Jimenez v. City of Chicago*,
   830 F. Supp. 2d 432 (N.D. Ill. 2011) .....................................................42

*Johnson v. City of Chicago*,
   711 F. Supp. 1465 (N.D. Ill. 1989) ........................................................40

*Jones v. City of Chicago*,
   856 F.2d 985 (7th Cir. 1988) .....................................................22, 37, 52

*Kincaid v. Ames Dep't Stores*,
   670 N.E.2d 1103 (Ill. App. Ct. 1996) .....................................................43

*Kubat v. Thieret*,
   867 F.2d 351 (7th Cir. 1989) .................................................................27

*Kuri v. City of Chicago*,
   No. 13 C 1653, 2017 WL 4882338 (N.D. Ill. Oct. 30, 2017) ..................42

*Kyles v. Whitley*,
   514 U.S. 419 (1995)...............................................................................38

*Lawson v. Veruchi*,
   637 F.3d 699 (7th Cir. 2011) .................................................................43

*Lee v. Foster*,
   750 F.3d 687 (7th Cir. 2014) .................................................................11

*Mason v. Brathwaite*,
   432 U.S. 98 (1977)...........................................................................25, 26

*McDonough v. Smith*,
   139 S. Ct. 2149 (2019)......................................................................40, 41

*Michigan v. DeFillippo*,
   443 U.S. 31 (1979)................................................................................42

*Mihalko v. Daley*,
  No. 01 C 4846, 2002 WL 726917 (N.D. Ill. 2002) ................................................................44

*Miller v. Smith*,
  220 F.3d 491 (7th Cir. 2000) .............................................................................................52

*Mitchell v. City of Decatur*,
  528 F. Supp. 3d 904 (C.D. Ill. 2021), *appeal dismissed sub nom. Mitchell v. Wittmer*, 21-
  1689, 2021 WL 8154942 (7th Cir. June 29, 2021) .............................................................26

*Mwangangi v. Nielsen*,
  48 F.4th 816 (7th Cir. 2022) .........................................................................................49, 50

*Neil v. Biggers*,
  409 U.S. 188 (1972) .......................................................................................................25, 26

*Patrick v. City of Chicago*
  213 F. Supp. 3d 1033 (N.D. Ill. 2016) ...........................................................................36, 37

*Patton v. MFS/Sun Life Fin. Distribs., Inc.*,
  480 F.3d 478 (7th Cir. 2007) ...............................................................................................32

*Payne v. Pauley*,
  337 F.3d 767 (7th Cir. 2003) ...............................................................................................30

*Pearson v. Callahan*,
  555 U.S. 223 (2009) .............................................................................................................23

*Peck v. Robinson*,
  --- F.Supp.2d ---, 2022 WL 16947896 (N.D. Ill. Nov. 15, 2022) (Ellis, J.) ...........................17

*People v. Castillo*,
  130 Ill. App. 2d 387 (1st Dist. 1970) ...................................................................................27

*People v. Harrell*,
  104 Ill. App. 3d 138 (1982) ..................................................................................................27

*People v. Maloney*,
  201 Ill. App. 3d 599 ..............................................................................................................27

*Petrovic v. City of Chicago*,
  No. 06 C 6111, 2008 WL 4286954 (N.D. Ill. Sept. 16, 2008) ..............................................46

*Petty v. City of Chicago*,
  754 F.3d 416 (7th Cir. 2015) ................................................................................................29

*Sanders v. City of Chicago Heights*,
  No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ........................................ *passim*

*Saunders-El v. Rhode*,
    778 F.3d 556 (7th Cir. 2015) ........................................................................39

*Savory v. Cannon*,
    947 F.3d 409 (7th Cir. 2020) ..............................................................19, 41

*Simmons v. United States*,
    390 U.S. 377 (1968)......................................................................................27

*Smith v. Cain*,
    565 U.S. 73 (2012)........................................................................................39

*Sornberger v. City of Knoxville*,
    434 F.3d 1006 1013-14 (7th Cir. 2006) ....................................................42

*Sow v. Fortville Police Dept.*,
    636 F.3d 293 (7th Cir. 2011) ......................................................................52

*Stewardson v. Biggs*,
    43 F.4th 732 (7th Cir. 2022) ................................................................49, 51

*Swicegood v. State of Alabama*,
    577 F.2d 1322 (5th Cir. 1978) ....................................................................27

*Tuduj v. Newbold*,
    958 F.3d 576 (7th Cir. 2000) ......................................................................23

*United States v. Funds in the Amount of $271,080*,
    816 F.3d 903 (7th Cir. 2016) ................................................................30, 32

*United States v. Gonzalez*,
    863 F.3d 576 (7th Cir. 2017) ......................................................................18

*United States v. O'Malley*
    796 F.2d 891 (7th Cir. 1986) ......................................................................33

*United States v. Reed*,
    443 F.3d 600 (7th Cir. 2006) ......................................................................42

*United States v. Sanders*,
    479 F.2d 1193 (D.C. Cir. 1973)..................................................................27

*United States v. Sklena*,
    692 F.3d 725 (7th Cir. 2012) ......................................................................34

*United States v. Wallace*,
    753 F.3d 671 (7th Cir. 2014) ......................................................................33

*Vance v. Rumsfeld*,
701 F.3d 193 (7th Cir. 2012) ........................................................................49

*Vega v. Tekoh*,
142 S. Ct. 2095 (2022) ........................................................................16, 17

*Walker v. White*,
No. 16 CV 7024, 2021 WL 1058096 (N.D. Ill. Mar. 19, 2021) ................................30, 53, 54

*Washington v. Boudreau*,
No. 16-CV-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) ....................................13, 17

*Wheeler v. Lawson*,
539 F.3d 629 (7th Cir. 2008) ........................................................................42

*Whitlock v. Brueggemann*,
682 F.3d 567 (7th Cir. 2012) ........................................................................22, 29, 33

*Williams v. City of Chicago*,
733 F.3d 749 (7th Cir. 2013) ........................................................................43, 46

*Wilson v. City of Los Angeles*,
No. 2:18-CV-05775 KS, 2021 WL 192014 (C.D. Cal. Jan. 8, 2021), *appeal dismissed sub
nom. Wilson v. Marks*, 21-55056, 2021 WL 6751443 (9th Cir. Dec. 9, 2021)........................24

*Yang v. Hardin*,
37 F.3d 282 (7th Cir. 1994) ........................................................................49

*Zolicoffer v. City of Chicago*,
No. 11 C 6362, 2013 WL 2598151 (N.D. Ill. June 11, 2013) ................................46

## STATUTES

42 U.S.C. § 1983 ........................................................................ *passim*

42 U.S.C. § 1985 ........................................................................52

42 U.S.C. § 1986 ........................................................................49

## RULES

Fed. R. Evid. 604(b)(1)(B) ........................................................................34

Fed. R. Evid. 801(d)(1) ........................................................................32, 33

Fed. R. Evid. 804(b)(1) ........................................................................33, 34

L.R. 56.1(g) ........................................................................46

**OTHER AUTHORITIES**

National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* ....................14

## INTRODUCTION

Eric Blackmon was incarcerated for nearly 16 years for a crime he did not commit. The Seventh Circuit previously highlighted "the weakness of the State's case—the complete lack of any motive, the dearth of physical evidence, and the heavy reliance on the eyewitness identifications of two strangers who saw the killers for only seconds"—in obtaining his wrongful conviction. *Blackmon v. Williams*, 823 F.3d 1088, 1107 (7th Cir. 2016). Through this lawsuit, Mr. Blackmon seeks to hold those accountable for his wrongful arrest, prosecution, and conviction.

Defendants Gregory Jones, James Sanchez, and Eugene Schleder ("Defendants") move for summary judgment on each of Mr. Blackmon's claims. But the claims should be submitted to a jury. There is ample evidence in the record that Defendants violated Mr. Blackmon's due process right to a fair trial by carrying out an unduly suggestive lineup procedure, fabricating evidence, and withholding exculpatory evidence. Defendants' challenges to Mr. Blackmon's remaining claims lack merit and rely on heavily disputed facts. Defendants' motion for summary judgment should accordingly be denied.

## STATEMENT OF THE FACTS

The facts described below are set forth in Mr. Blackmon's Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment ("PSOF"), which is incorporated herein by reference.

### Tony Cox's Murder

On July 4, 2002, Tony Cox was killed by two shooters as he stood outside of Fat Albert's restaurant at 1143 South Pulaski Avenue, near the intersection of Roosevelt Road and Pulaski Avenue. PSOF ¶¶ 1-2. Mr. Cox had been called to the restaurant by Richard Arrigo, the restaurant's owner. PSOF ¶¶ 18, 20, 45. According to multiple witnesses, at approximately 4:30

p.m., Mr. Cox and Mr. Arrigo were talking outside of the restaurant when Mr. Cox was shot and killed by two men. PSOF ¶¶ 2-4, 9-10.

### Eyewitnesses to the Shooting

Eyewitness Lisa McDowell was driving southbound on Pulaski Avenue towards Roosevelt Road at the time of the Tony Cox murder. PSOF ¶ 3. She was on the west side of Pulaski on the opposite side of the street from Fat Albert's and the northbound driving lane was between Ms. McDowell and Fat Albert's. PSOF ¶ 3. There were cars parked on the street directly in front of the building where the shooting occurred, and the shooter was approximately 15 to 20 feet away from her. PSOF ¶ 3. Ms. McDowell saw the shooters come from the south side of the building and saw the shooter from the back as he shot Tony Cox. PSOF ¶ 4. Ms. McDowell saw the shooter's face for only five seconds. PSOF ¶ 4. At the time of the shooting, Ms. McDowell had four passengers in her car with her, including her nephew and three children who were ages 3, 11, and 13. PSOF ¶ 5. After the light turned green at Roosevelt Road, Ms. McDowell continued to drive south on Pulaski Street. PSOF ¶ 6. Ms. McDowell saw the shooter running across Pulaski Street about in her rearview mirror 45 feet behind her and called 911. PSOF ¶ 6.

Elements of Ms. McDowell's description of the events of the shooting evolved over time. McDowell first described Mr. Arrigo as holding a silver gun in his left hand down by his side. PSOF ¶ 8. Gang Specialist Michael Cronin, who was assisting in the investigation, told Ms. McDowell that Mr. Arrigo was holding a cell phone, not a gun. PSOF ¶ 8. In addition, Ms. McDowell initially identified Mr. Arrigo as Hispanic. PSOF ¶ 7. Prior to Mr. Blackmon's trial, a Detective would inform her that Mr. Arrigo is Italian, not Hispanic. PSOF ¶ 7.

A second eyewitness to the Tony Cox murder, Frenschun Reece, was driving northbound on Pulaski Road from Roosevelt Road with her two children, who were ages 8 and 12 at the time. PSOF ¶ 9; Defendants' Rule 56.1 Statements of Fact ("DSOF") (Dkt. 171) at ¶ 15. Ms. Reece

observed the victim standing in front of Fat Albert's restaurant with two Black males and a white male when he was shot. DSOF ¶ 15. When Ms. Reece heard the gunshots, she tried to push her kids' heads down because she didn't want them to see the murder. PSOF ¶ 9. Ms. Reece described the first shooter as being approximately 5'6" and the second shooter as being approximately 5'10." PSOF ¶ 9. On the night of the shooting, Ms. Reece went to the police station and was asked to look through two photo books to see if any of the mugshots were of the shooters. PSOF ¶¶ 51-52. One of the Detectives pointed at specific pictures in the photobook and asked Ms. Reece if she recognized the person. PSOF ¶ 52. She did not recognize anyone in the photo books. PSOF ¶ 52. However, she did state that one person had a similar "hairstyle" as the shooter. PSOF ¶ 56. In a deposition, Detective Jones would describe the hairstyle of that person as "twisted braids." PSOF ¶ 56. An officer then showed Ms. Reece two individual photographs out of the book and asked her if she recognized a specific person. PSOF ¶ 52. Ms. Reece indicated that she recognized that person only from the photobook. PSOF ¶ 52.

**The Tony Cox Murder Investigation Provides No Link to Mr. Blackmon**

Detective Eugene Schleder was the lead detective assigned to the Tony Cox murder investigation. PSOF ¶ 11. Detective Gregory Jones was Detective Schleder's partner and was also assigned as a primary detective on the Tony Cox murder investigation. PSOF ¶ 11. Detectives James Sanchez and John Pellegrini also assisted in the Tony Cox murder investigation, as did Gang Crime Specialist Michael Cronin. PSOF ¶¶ 11, 25-27. The officers' working theory during the investigation was that the leader of the New Breeds street gang, George Davis, a.k.a. Boonie Black, ordered the murder of Tony Cox because of a dispute over a drug debt. PSOF ¶ 18. The officers also suspected that Mr. Arrigo lured Tony Cox to Fat Albert's to be killed at the request of Mr. Davis. PSOF ¶ 18. An analysis of Tony Cox's phone records revealed that he communicated with someone at a phone number associated with 4024 W. Grenshaw Street right before the shooting.

PSOF ¶ 19. This led Detective Jones to search for individuals associated with 4024 W. Grenshaw Street. PSOF ¶ 19.

Mr. Blackmon did not have any affiliation with 4024 West Grenshaw Street or any connection with Tony Cox, Mr. Davis, or Mr. Arrigo. PSOF ¶¶ 19, 22, 28. At the time of the murder, Eric Blackmon was attending a barbeque to celebrate Independence Day and his brother's birthday at Homan Avenue between 13th Street and Douglas Boulevard. PSOF ¶ 1. The barbecue lasted all day and into the night, finishing with fireworks at after 11:00 p.m. PSOF ¶ 1. Over twenty people saw Mr. Blackmon over the course of the afternoon. *Blackmon,* 823 F.3d at 1095.

At the time of the Tony Cox murder investigation, Gang Specialist Cronin had been investigating gangs on the west side of Chicago for over 25 years and was familiar with locations, affiliations, memberships and hierarchies of various street gangs in Chicago. PSOF ¶¶ 25-26. During the course of the Tony Cox murder investigation, Gang Specialist Cronin did not develop any evidence connecting Eric Blackmon to the New Breeds street gang. PSOF ¶ 32. Gang Specialist Cronin indicated that in 2002, the Vice Lords street gang was associated with the 3600 block of West Grenshaw, the block on which Mr. Blackmon lived. PSOF ¶ 31.

On July 24, 2002 Mr. Cronin interviewed Ethienne Cox, Tony Cox's brother and New Breed gang member, at Cook County Jail. PSOF ¶ 38. Ethienne Cox said that he learned from another one of his brothers, Xavier Cox, that "Keno" a.k.a. "Lil Mike" and "Pride" killed their brother Tony. PSOF ¶ 38. Michael Davis was George Davis a.k.a. Boonie Black's nephew. PSOF ¶ 37. Ethienne Cox also told Mr. Cronin that Michael Davis and "Pride" were members of the New Breed street gang. PSOF ¶ 38.

On August 12, 2002, Mr. Cronin interviewed Ms. McDowell. PSOF ¶ 39. Ms. McDowell's described one of the shooters as having braids, a hairstyle she would describe his hairstyle at trial as "unusual." PSOF ¶ 72. She also said that the same shooter was "tall" and "slender." PSOF ¶ 39.

### The Unduly Suggestive Photo Arrays

Detective Sanchez showed Ms. McDowell a photo array which included Mr. Blackmon's photo on August 29, 2002. PSOF ¶ 62. Detective Sanchez has provided multiple contradictory reasons for why Mr. Blackmon's photo was in the array. PSOF ¶¶ 63-67. Whatever the reason, Detective Sanchez admitted in his deposition that he "may have" relied upon Ms. McDowell's description of one of the shooters as having braided hair. PSOF ¶ 67. Mr. Blackmon was the only individual in the photo array who had braids. PSOF ¶¶ 39, 72. Detective Sanchez also showed Davious Whitaker, Frenschun Reece's son, a photo array on August 29, 2002. PSOF ¶ 73. Mr. Blackmon's photo was included in the array. PSOF ¶ 73. Mr. Whitaker did not identify Mr. Blackmon. PSOF ¶ 74.

On August 31, 2002 Detectives Jones and Schleder showed Ms. Reece a photo array at her home. PSOF ¶ 89. One of the officers told Ms. Reece that she had to view the photos and go to court, and if she did not, she would be subpoenaed and her kids would "go into foster care." PSOF ¶ 91. Defendants Jones and Schleder falsely reported in a police report that Ms. Reece identified Mr. Blackmon as one of the offenders. PSOF ¶ 89. Ms. Reece did not identify Mr. Blackmon. PSOF ¶ 92. She further told the Detectives that that she only recognized Mr. Blackmon's photograph as one she had previously viewed. PSOF ¶ 92. Two other individuals viewed photo arrays and lineups that included Mr. Blackmon, and neither of them identified him as one of the shooters PSOF ¶¶ 76, 94-95.

**The Fabricated Evidence and Unduly Suggestive Identifications**

On August 30, 2002, Detective Sanchez drafted two documents that stated that there was probable cause to arrest Mr. Blackmon and that Mr. Blackmon's "alias" was "Brandon Blackmon." PSOF ¶¶ 78-79. In a third document that Detective Sanchez drafted that day, a "Material Submitted for Use in the Daily Bulletin" form, Detective Sanchez listed Mr. Blackmon's "Alias/Nickname" as "Pride." PSOF ¶¶ 80-81. Detective Sanchez testified that he indicated Mr. Blackmon's nickname as "Pride" in the Material Submitted for Use in the Daily Bulletin because of information he found "somewhere on the computer" or in the "CPD database." PSOF ¶ 81. He could not recall the exact source of the information, but he testified that at the time that he drafted the document that Mr. Blackmon had an arrest report with the nickname "Pride." PSOF ¶ 81. There is no arrest report for Eric Blackmon dated prior to August 30, 2002 stating that Mr. Blackmon's nickname was "Pride." PSOF ¶ 82. In fact, the Material Submitted for Use in the Daily Bulletin drafted by Detective Sanchez is the earliest known document indicating that Mr. Blackmon's nickname was "Pride." PSOF ¶ 82. Detective Sanchez also stated in the Material Submitted for Use in the Daily Bulletin that Mr. Blackmon was a "Member of the New Breed Street Gang." PSOF ¶ 84. Detective Sanchez testified that he obtained this information from a CPD database. PSOF ¶ 84. There is no document dated prior to August 30, 2002 stating that Eric Blackmon was associated with the New Breeds. PSOF ¶ 85. The Material Submitted for Use in the Daily Bulletin drafted by Detective Sanchez is the earliest document indicating that Mr. Blackmon was associated with the New Breeds. PSOF ¶ 85.

On the morning of September 5, 2002, Mr. Blackmon was detained and transported to Area 4. PSOF ¶ 98; DSOF ¶ 55. Later that day, Ms. McDowell viewed a live lineup that included Mr. Blackmon. PSOF ¶¶ 99, 102. Before viewing the lineup, Detective Jones told Ms. McDowell the officers had someone they wanted her to view in the lineup. PSOF ¶ 99. Based on what Detective

Jones told her, Ms. McDowell knew that the suspect was going to be in the lineup. PSOF ¶ 99. This was in violation of CPD policy. PSOF ¶ 100.

Mr. Blackmon's appearance made him stand out from the other participants. PSOF ¶¶ 102-04. He was the only lineup participant who had his hair styled in braids, he was the tallest among the participants (6'1"), and his weight (160 pounds) was less than every other participant for whom weights were recorded (and far less than the next tallest participants.) PSOF ¶¶ 102-04, 107-09. After Ms. McDowell selected Mr. Blackmon from the lineup, Detective Jones told Ms. McDowell that the other witness picked the same guy. PSOF ¶ 105. Detective Jones's statement increased Ms. McDowell's confidence that she had correctly identified the shooter. PSOF ¶ 105.

Ms. Reece also viewed a live lineup on September 5, 2002. PSOF ¶ 106. Again, Mr. Blackmon was the only lineup participant who had his hair styled in braids. PSOF ¶ 109. Ms. Reece testified that when she viewed the lineup, she told the Detective that the only person she recognized was the "skinny guy" from the photo book. PSOF ¶ 110. When the Detective asked Ms. Reece whether she recognized anyone from the crime scene, Ms. Reece said, "No." PSOF ¶ 110. After she viewed the lineup, one of the officers said, "We got the shooter" and started slapping hands. PSOF ¶ 110.

### Mr. Blackmon is Wrongfully Charged with Murder

On September 9, 2002, Mr. Blackmon was charged with the murder of Tony Cox. PSOF ¶ 115. Assistant State's Attorney Kenneth Fiedler was on duty for Area 4 and made the determination to charge Mr. Blackmon. PSOF ¶ 115. Mr. Fiedler recorded all information relevant to the charging decision in a document known as a "felony review folder." PSOF ¶ 116. For this particular case, the information in the felony review folder related to the charging of Mr. Blackmon came from either Detectives Sanchez, Jones, and Schleder or interviews conducted by Mr. Fiedler. PSOF ¶ 117. The felony review folder contained multiple inaccuracies, including that: (1) "Darius"

Whitaker identified Mr. Blackmon as one of the shooters (which he did not); (2) Mr. Blackmon stated after his arrest that he could not talk to the police officers without his lawyer (Mr. Blackmon did talk to the police officers, and stated that he was at a barbeque at the time of the shooting); (3) Mr. Blackmon was associated with the New Breeds street gang; (4) Mr. Blackmon's nickname was "Pride;"; and (5) that Ms. Reece identified Mr. Blackmon. PSOF ¶ 118.  Additionally, the felony review folder did not contain evidence that may have been exculpatory to Mr. Blackmon's guilt, including (1) Mr. Blackmon's alibi; (2) that Mr. Arrigo did not identify Mr. Blackmon as a shooter in a photo array; or (3) why Mr. Blackmon was included in the August 29, 2002 photo array. PSOF ¶ 120.

### Evidence that Eric Bridges, a.k.a. "Pride," was One of the Shooters

After Mr. Blackmon was charged but before his trial, Defendants and prosecutors received evidence that another individual named Eric shot Tony Cox. PSOF ¶ 125. Terence Boyd, through his attorney, notified prosecutors that he had evidence relevant to the Cox murder. DSOF ¶ 76. Mr. Cernius, Mr. McCarthy, Detective Jones, and Detective Schleder interviewed Mr. Boyd. PSOF ¶ 125. Mr. Boyd stated that he saw the shooting, and that a man named "Eric" who went by the nickname "Pride" shot Tony Cox. PSOF ¶ 125.  Mr. Boyd also stated that "Pride" was a Black male and had a tattoo of the name "Leah" on his neck. PSOF ¶ 125.  Detectives Jones and Schleder showed Mr. Boyd a photo array including a photo of Mr. Blackmon.  POSF ¶ 126. Boyd did not identify anyone as the individual who he saw shoot Tony Cox. PSOF ¶ 126.

Detective Jones then searched the CLEAR database and located Eric Bridges. PSOF ¶ 127. Mr. Bridges was listed as a Black male and associated with the New Breeds.  PSOF ¶ 127. Police records indicate that Eric Bridges was associated with the nickname "Pride."  PSOF ¶ 127. In a 2003 photo, Mr. Bridges's hair was in braids. PSOF ¶ 127. According to Mr. Cernius, the police

did not investigate Mr. Bridges for the murder of Tony Cox. PSOF ¶ 128. Detectives did not show the photo of Eric Bridges to Ms. Reece, Ms. McDowell or Mr. Arrigo. PSOF ¶ 129.

### At Trial, Prosecutors Relied Exclusively on the Identifications

Mr. Blackmon's case proceeded to a bench trial in September 2004. DSOF ¶ 85. The only evidence directly implicating Mr. Blackmon in the shooting was the fabricated and unduly suggestive eyewitness identifications of Ms. Reece and Ms. McDowell. PSOF ¶ 133. Defendant Sanchez falsely testified that Reece identified Mr. Blackmon during the lineup, when, in fact, Reece told police officers that she did not recognize Mr. Blackmon as one of the shooters. PSOF ¶¶ 110, 134.

### Expert Opinion Presented by Mr. Blackmon

Mr. Blackmon presented expert testimony from two experts. Dr. Geoffrey Loftus, a human perception expert, opined that Ms. Reece and Ms. McDowell's original memories of the shooter were likely poor because their abilities to perceive and memorize the shooter's appearance would have been diminished by (1) a lack of attention to the shooter's appearance, (2) a lack of adequate time to memorize the shooter's appearance, and (3) high stress experienced attributable to the active shooting taking place near them and the children in their cars. PSOF ¶¶ 150-51. According to Dr. Loftus, some of the factors competing for Ms. Reece and Ms. McDowell's attention at the time of the shooting include, trying to keep themselves and their children safe, seeking help, evaluating the victim's attention, weapon focus, and the divided attention on multiple shooters. PSOF ¶ 152. Dr. Loftus further testified that the shooters' appearances would have been largely irrelevant at the moment and would likely have been allocated minimal of Ms. Reece and Ms. McDowell's limited attentional resources. PSOF ¶ 152.

Mr. Blackmon also presented expert testimony from Dennis Waller, an expert in police practices. PSOF ¶ 142. Mr. Waller testified the Detectives' identification procedures failed to meet

the standard laid out by CPD policy, CPD training, best law enforcement practices, and nationally excepted standards. PSOF ¶ 142. The Detectives used improperly suggestive identification techniques with both Ms. McDowell and Ms. Reece, including using fillers with different physical characteristics than Mr. Blackmon, presenting a photo array where only Mr. Blackmon had braids, telling Ms. Reece that Mr. Blackmon was the "guy that [she] picked out" even though she did not recognize him from the shooting. PSOF ¶ 142. Mr. Waller also opined that Defendants failed to conduct a complete and thorough investigation into the death of Tony Cox. PSOF ¶ 146. The Defendants failed to investigate a potential vehicle allegedly used by the shooters, failed to pursue leads given by the Xavier Cox, failed to properly maintain or identify photos a witness said depicted the shooter, and failed to consider that eyewitnesses had previously identified people who did not look like Mr. Blackmon. PSOF ¶ 146. The Defendants failed to make a concerted effort to locate and interview all potential witnesses that could provide inculpatory or exculpatory information. PSOF ¶ 147.

### Mr. Blackmon's Exoneration

On April 7, 2011, Eric Blackmon filed a *pro se* petition for writ of habeas corpus. PSOF ¶ 161. After an initial dismissal and appeal to the Seventh Circuit, the district court granted Eric Blackmon's habeas petition on February 7, 2018. PSOF ¶ 162. In doing so, the court observed both that the State had a "weak case" against Mr. Blackmon, and that Mr. Blackmon "provided straightforward answers" at the hearing and was "generally credible," with his testimony supported by the record. PSOF ¶ 162. On March 26, 2018, the Circuit Court entered an order vacating the judgment of conviction and sentence for first-degree murder and setting bond. PSOF ¶ 163. Mr. Blackmon was released from custody on May 3, 2018, and on January 16, 2019, the State dismissed the charges against Mr. Blackmon. PSOF ¶ 164. On February 24, 2020, Eric Blackmon

was granted a Certificate of Innocence, which stated that "Mr. Blackmon is innocent of the offenses charged in the indictment or information." PSOF ¶ 166.

## ARGUMENT

I.     **A Jury Must Decide Whether the Defendants Violated Mr. Blackmon's Due Process Rights (Count I)**

Contrary to Defendants' Motion ("Mot."), evidence in the record demonstrates that Defendants deprived Mr. Blackmon of his constitutional right to a fair trial, and that Mr. Blackmon has stated a cognizable claim for relief under the Fourteenth Amendment. That claim (Count I) is premised on three categories of evidence: (1) the improprieties during the identification procedures, which led to unduly suggestive identifications; (2) the fabrication of evidence against Mr. Blackmon; and (3) the improper withholding of exculpatory evidence.

### A.     **Defendants' Unduly Suggestive Identifications Claim Should be Submitted to a Jury**

Unduly suggestive identification claims are actionable through the Due Process Clause of the Fourteenth Amendment. "[A] witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) (internal quotations omitted). To determine whether improprieties in an identification procedure constitute a due process violation, courts evaluate, under the "totality of the circumstances": (1) whether defendants used unduly suggestive identification procedures; and (2) whether the resulting identification was unreliable. *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006). Both suggestiveness and reliability are evaluated by reference to the "totality of the circumstances." *Id.* Additionally, a plaintiff must put forth evidence demonstrating how the identification tainted the trial, including whether the identification was admitted at trial, what

11

testimony witnesses provided, what exhibits were admitted, and what other evidence linked the plaintiff to the crime. *Id.* at 555-56.

In this case, the evidence overwhelmingly demonstrates that the identification procedures conducted by Defendants were unduly suggestive, and that the resulting identifications were impermissibly tainted and unreliable. Regarding Ms. McDowell's identifications, on August 12, 2002, Ms. McDowell told the police that one of the shooters was tall, slender, and had braids. PSOF ¶ 39. Ms. McDowell thought that the braids were notable and would later testify at trial that the hairstyle was "unusual." PSOF ¶ 72. On August 29, 2002, Detective Sanchez compiled a photo array, including Mr. Blackmon's photograph, and showed it to Ms. McDowell. PSOF ¶ 62. In that photo array, Mr. Blackmon was the only individual that had braids. PSOF ¶ 72. Ms. McDowell then viewed a lineup on September 5, 2002. PSOF ¶ 99. Detective Jones intentionally and improperly made statements to Ms. McDowell causing her to believe that the suspect was going to be in the lineup. PSOF ¶¶ 99-100. Mr. Blackmon was also the only individual in the lineup with braids. PSOF ¶ 104. He was also taller and thinner than all of the other participants whose weights were recorded. PSOF ¶¶ 102-03. If Ms. McDowell was looking for an individual that was tall, slender, and had braids, Defendants had provided her with the only individual fitting that description—Mr. Blackmon. Finally, Detective Jones told Ms. McDowell that another eyewitness had identified the same individual, which reinforced her view that her identification was correct. PSOF at ¶ 105.

Ms. Reece testified in a deposition that she did not identify Mr. Blackmon in the August 31, 2002 photo array, as Defendants falsely stated in police reports. PSOF ¶¶ 89, 92. Instead, Ms. Reece recognized Mr. Blackmon's photo as a photo that she had previously viewed and told the officers that fact. PSOF ¶ 92. In addition, Ms. Reece testified that Defendants threatened her with

the possibility of losing custody of her children if she did not testify in Mr. Blackmon's trial. PSOF ¶ 91. Defendants dispute this testimony. (Mot. at 11-14.) But that factual dispute should be resolved by a jury, not at summary judgment. *See Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *23 (N.D. Ill. Sept. 30, 2022) ("Whether the circumstances under which the Officer Defendants procured identification evidence—such as [an eyewitness's] identifications of Plaintiffs at night from a (disputed) distance away—were sufficiently coercive is a question of fact that cannot be resolved on the present motion.").

Even putting the Defendants' threats to Ms. Reece aside (which this Court cannot do at the summary judgment stage), the photo array and lineup shown to Ms. Reece was still unduly suggestive. According to Defendants, Ms. Reece did not identify a shooter in the first photo array she viewed, but did state that one of the shooters had the hairstyle of one of the individuals in the array. PSOF ¶¶ 54, 56. That individual had his hair in "twisted braids." PSOF ¶ 56. Ms. Reece then viewed a second photo array where Mr. Blackmon was the only individual with braids. PSOF ¶ 90. In the lineup viewed by Ms. Reece, again, Mr. Blackmon was the only individual with braids. PSOF ¶ 109. Detectives celebrated after Ms. Reece allegedly identified Mr. Blackmon. PSOF ¶ 110.

The procedures employed by Defendants for these identifications violated CPD policy and were outside of generally accepted professional standards. Mr. Blackmon's police practices expert, opined that the identification procedures employed by Defendants violated both CPD's policies and generally accepted law enforcement standards and practices. PSOF ¶¶ 142-45; *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *8-9 (N.D. Ill. May 17, 2016) (expert opinion may be used to establish that photo arrays and line-ups are outside of generally accepted professional standards and biased, and therefore unnecessarily suggestive). Regarding CPD

13

policies, Mr. Waller noted that CPD General Order 88-18 stated "[i]nsofar as possible, suspects in a lineup should generally be *the same height and weight and should have similar hair* and skin color." PSOF at ¶ 137 (emphasis added). Again, Mr. Blackmon was the tallest individual and the only person with braids. The policy also stated that "the fact that any person in the lineup has been arrested as a suspect will not be mentioned to … witnesses," PSOF ¶ 138, a provision violated by Detective Jones.

Mr. Waller also explained how Defendants' conduct violated nationally recognized standards for police identifications. He first cited a report published by the National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement*, which includes guidance on photo arrays and lineups. That report states that "the investigator shall compose the lineup [or photo array] in such a manner that the suspect does not unduly stand out." PSOF ¶ 143. Critically, the report also states that investigators should "[c]reate a consistent appearance between the suspect and fillers with respect to any unique or unusual feature (e.g., scars, tattoos) used to describe the perpetrator by artificially adding or concealing that feature." PSOF ¶ 142. Braids is an unusual and distinctive hairstyle, as McDowell said at trial. PSOF ¶ 72. Detectives intentionally did not create a consistent appearance with that unique feature across the participants.

Mr. Waller (as well as the Defendants' police practices expert) also testified that the International Association of Chiefs of Police Training Keys set national standards for identification procedures at the time. PSOF ¶ 144. As the Court noted earlier in this case, "the Training Keys and IACP's other publications are broadly recognized as authoritative national standards in the field of police practices." (Dkt. 159 at 9 (gathering cases).) Those Training Keys indicate that: (1) a lineup should consist of individuals of similar physical characteristics, including hair style; (2) officers should avoid making suggestive statements, "such as telling the witness that the person

whom the police suspect will be in the lineup"; and (3) "witnesses should not be praised or congratulated for picking out the suspect," as "[t]his may serve to reinforce a shaky identification, convincing the witness that he has picked out the actual perpetrator when the witness is in some doubt." *Id.* The identification procedures here violated each of these principles. PSOF ¶ 145.

Mr. Blackmon also presented an expert opinion from a human perception expert, Dr. Geoffrey Loftus. PSOF ¶ 150. Dr. Loftus concluded that the identifications were not only unduly suggestive, but that the identifications allegedly produced from identification procedures were also unreliable. PSOF ¶ 150. Dr. Loftus opined that Ms. Reece's and Ms. McDowell's initial memories of the shooter alleged to have been Mr. Blackmon, which they acquired as a result of having seen the shooter at the time of the shooting, were likely poor. PSOF ¶ 151. According to Dr. Loftus, both witnesses' abilities to perceive and memorize the shooter's appearance would have been severely diminished by, among other things, a likely lack of attention to the shooter's appearance, a lack of adequate time to memorize the shooter's appearance, and high stress experienced both witnesses, attributable to the active shooting taking place in the near vicinity of themselves and the children in their cars. PSOF ¶ 151. Dr. Loftus opined that the Defendants carried out identification procedures that were biased against Mr. Blackmon and inherently unreliable. PSOF at ¶¶ 150, 155-59. Dr. Loftus concluded that Ms. Reece's and Ms. McDowell's identifications of Mr. Blackmon from the photo arrays and the live lineup, as well as their subsequent in-court identifications of Mr. Blackmon were therefore unreliable. PSOF ¶¶ 150, 155-60.

A fact finder could reasonably conclude that the unduly suggestive identifications tainted the criminal trial. The identifications were the *only* evidence introduced against Mr. Blackmon at trial. PSOF ¶ 133. The prosecution presented no physical or forensic evidence that Mr. Blackmon participated in the shooting. PSOF ¶ 133. Nor did they present evidence that Mr. Blackmon had

any connection to the victim, any access to the firearms used to commit the shooting, nor any motive to shoot the victim. PSOF ¶ 133. In fact, according to the lead prosecutor in Mr. Blackmon's criminal trial, there was no evidence, other than the alleged identifications, linking Mr. Blackmon to the shooting of Tony Cox. PSOF ¶ 133. Absent the two identifications, the prosecution would not have had a case.

The evidence in the record raises triable issues that the identification procedures were unnecessarily suggestive, that the identifications were unreliable, and that the identification evidence tainted Mr. Blackmon's criminal trial. Accordingly, Mr. Blackmon has established his suggestive identification due process claim for purposes of defeating summary judgment. *See Sanders v. City of Chicago Heights*, Case No. 13 C 0221, 2016 WL 2866097, at *9 (N.D. Ill. 2016) (denying summary judgment where plaintiff presented evidence of an unduly suggestive and unreliable identification that tainted the plaintiff's criminal trial).

### 1. Mr. Blackmon's unduly suggestive identification claim is cognizable under § 1983.

Defendants raise several arguments as to why Mr. Blackmon's due process claim should not be submitted to a jury, none of which has merit. Defendants first contend that unduly suggestive identification claims are not cognizable under § 1983. (Mot. at 31.) According to Defendants, the Supreme Court's decision in *Vega v. Tekoh*, 142 S. Ct. 2095, 2106 (2022) precludes this claim because "a violation of a prophylactic rule does not give rise to § 1983 liability." (Mot. at 31.) Defendants misstate and misapply the law.

In *Vega*, the Supreme Court held that a violation of a prophylactic rule alone—without any subsequent constitutional violation—does not give rise to § 1983 liability. *Id.* at 2099, 2101. That unremarkable holding does not preclude Mr. Blackmon's due process claim. Here, the unduly suggestive identification procedures led to an unreliable identification of Mr. Blackmon, and that identification impaired Mr. Blackmon's Fourteenth Amendment right to a fair trial. In contrast to

16

*Vega*, the violation of the prophylactic rule regarding identification procedures is therefore accompanied by a constitutional violation. That is exactly the type of due process claim that this Circuit has routinely recognized, including in cases that post-date *Vega*. *See Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) ("[T]he *Brathwaite* rule regarding unduly suggestive identification procedures 'is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of that core right and not the prophylactic rule that should be actionable under § 1983.'") (citing *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987))); *Sanders*, 2016 WL 2866097, at *10 ("[I]t has been clearly established since at least 1977 that a criminal defendant has a due process right not to be subjected to unduly suggestive identifications that taint his criminal trial."); *see also Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *22 (N.D. Ill. Sept. 30, 2022) ("[T]he Seventh Circuit has recognized as a 'prophylactic rule' that 'unduly suggestive identification procedures' are actionable under Section 1983." (cleaned up)); *Peck v. Robinson*, --- F.Supp.2d ---, 2022 WL 16947896, at *2 (N.D. Ill. Nov. 15, 2022) (holding that while *Vega* provided that a *Miranda* violation alone cannot be the basis for § 1983 liability, "that he was denied counsel may support his argument that his confession was coerced in violation of the Fifth Amendment"). *Vega* did not overturn that longstanding authority.

Defendants' suggestion that *Holloway v. City of Milwaukee*, 43 F.4th 760 (7th Cir. 2022) "signaled" that unduly suggestive lineup claims are no longer valid (Mot. at 31) is also incorrect. In *Holloway*, the Seventh Circuit expressly declined to determine *Vega*'s application to unduly suggestive lineup cases. *Id.* at 766 ("[W]hether the protection against unduly suggestive identification procedures is, like *Miranda*, only a trial right, or whether it is more broadly enforceable, through either a suit under section 1983 or otherwise . . . is an important question, but

17

we conclude that it need not be resolved in this opinion…. We thus flag this issue and save it for another day."). Accordingly, *Holloway* does not preclude Mr. Blackmon's due process claim arising out of unduly suggestive identifications that tainted his criminal trial.

### 2. The Evidence Must be Viewed in the "Totality of the Circumstances"

Defendants next attempt to narrow Mr. Blackmon's unduly suggestive identification claim. They focus exclusively on the fact that Mr. Blackmon was the only individual in the photo array with braids, and then cite a series of Illinois cases holding that a lineup is not suggestive simply because an individual has a different hairstyle from the other lineup participants. (Mot. at 32-34.) This framing ignores all the acts that rendered the identification procedure suggestive and the identification unreliable. (*See supra* at 11-16.) The Court is required to examine whether the identification procedures employed by Defendants as a whole, under "the totality of the circumstances," were unduly suggestive, and not whether any individual act siloed from other acts rendered the identification suggestive. *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (holding that "both suggestiveness and reliability are evaluated by reference to the totality of the circumstances").

The evidence demonstrates that Mr. Blackmon looked different from the other individuals in the photo arrays and lineups. His hair was in braids—an "unusual" hairstyle, according to Ms. McDowell—and he was the tallest individual in the lineups, and he weighed less than all other individuals whose weight was recorded. PSOF ¶¶ 72, 102-04. These facts demonstrate that Mr. Blackmon stood out among the other participants. But what renders the identification procedures even more problematic in this case is that Mr. Blackmon's distinguishing features are the very features that Ms. McDowell used to describe the shooter. Ms. McDowell told the police that the shooter was a tall, skinny man with braids. PSOF ¶ 39. Mr. Blackmon was the only tall, skinny participant with braids in the identification procedures. PSOF ¶¶ 72, 102-04. Even if viewed in a

silo, as Defendants suggest it should be, a reasonable jury could find that this fact alone rendered the identification procedures suggestive. *See, e.g.*, *United States v. Gonzalez*, 863 F.3d 576, 585 (7th Cir. 2017) (photo array was suggestive where only a suspect and one other man in the array matched the witness's description of a particular hairstyle). But when viewed in combination with the other procedural improprieties employed by Defendants, as this Court is required to do, it is even more clear that the Defendants' tactics rendered the identifications unduly suggestive.

### 3. Mr. Blackmon has not Waived or Forfeited his Unduly Suggestive Lineup Claim

Defendants next argue that Mr. Blackmon's unduly suggestive identification claim fails because he did not establish a due process violation at his criminal trial. (Mot. at 34-36.) According to Defendants, because Mr. Blackmon's prior counsel cross examined eyewitnesses, withdrew a motion to suppress the identifications, and elected a bench trial, Mr. Blackmon cannot now claim that the identifications were unduly suggestive and unreliable. (Mot. at 34-36.) This argument fails for several reasons.

First, Defendants cite no legal authority to support the theory that Mr. Blackmon's constitutional claim fails because he did not establish that the identifications were unduly suggestive in his criminal trial or appeal. For good reason, as this argument has no basis in law. *See, e.g.*, *Fletcher v. Bogucki*, No. 20-CV-04768, 2021 WL 4477968, at *6 (N.D. Ill. Sept. 30, 2021) (rejecting the argument that a criminal defendant "must first successfully suppress a challenged identification in his criminal case before he can pursue a claim for unduly suggestive identification techniques"); *Bolden v. Pesavento*, No. 17-CV-417, 2022 WL 3684432, at *7 (N.D. Ill. Aug. 25, 2022) (rejecting defendants' argument that "a plaintiff can bring a section 1983 claim

19

about an unduly suggestive lineup[] only if that plaintiff successfully challenged the lineup on direct appeal or collateral review").[1]

Moreover, the facts supporting Defendants' argument—his previous counsel's cross examination, the choice to have a bench trial, the withdrawal of the suppression motion—are all premised on the strategic decisions of Mr. Blackmon's trial counsel. But Defendants fail to acknowledge that two federal courts found Mr. Blackmon's trial counsel constitutionally ineffective. *Blackmon*, 823 F.3d at 1092 ("The record before us supports the conclusion that Blackmon's trial counsel was constitutionally ineffective…"); *Blackmon v. Pfister*, No. 11 C 2358, 2018 WL 741390, at *10 (N.D. Ill. Feb. 7, 2018) ("[T]he Court concludes that Blackmon would have had a reasonable chance of acquittal absent counsel's errors."). Defendants cannot plausibly contend that Mr. Blackmon had a fair opportunity to litigate the validity of the identifications when his previous counsel was found to be ineffective—let alone that if Mr. Blackmon had such an opportunity, it would foreclose his claims in this case.

Finally, Defendants' suggestion that the trial court in the criminal case "heard evidence regarding the identification procedures and viewed all the evidence regarding the photo arrays and lineups" (Mot. at 35) is belied by the record. The trial court did *not* hear evidence at trial about the fact that Ms. McDowell told the police prior to the photo array and the lineup that one of the shooters had braided hair. Nor did the trial court hear evidence that Ms. Reece's identification was fabricated. All of this is evidence that would have supported a suppression of the evidence, and none of these facts was presented at trial.

---

[1] To the extent that Defendants are arguing that Mr. Blackmon needed to raise constitutional claims under Section 1983 in one of his earlier collateral proceedings, those claims did not accrue until the underlying charges against him were dismissed on January 16, 2019. *See Savory v. Cannon,* 947 F.3d 409, 418 (7th Cir. 2020) ("[N]o Section 1983 claim [can] proceed until the criminal proceeding ended in the defendant's favor or the or the resulting conviction was invalidated[.]").

Defendants make the alternative argument that Mr. Blackmon has "forfeited" his due process claim by "failing to move to suppress the identifications in his criminal proceedings and by not objecting to the in-court identifications." (Mot. at 37.) This argument fails for all of the same reasons that Defendants' previous argument fails. Defendants fail to cite a case holding that a civil rights plaintiff "forfeits" arguments that he did not present during his criminal trial, direct appeal, or post-conviction proceedings. That is not the law. *See, e.g.*, *Fletcher*, 2021 WL 4477968, at *6; *Bolden*, 2022 WL 3684432, at *7. And the argument, again, is premised on the notion that Mr. Blackmon had a fair opportunity to litigate the validity of the identifications, which he did not.

Defendants' forfeiture argument also strains logic. If Mr. Blackmon's prior counsel had successfully suppressed the identifications at trial, that suppression would have affected Mr. Blackmon's criminal trial, and there would likely be no constitutional harm. "[U]nduly suggestive identification procedures only give rise to a due process claim when they taint the underlying trial; where the fruits of such a procedure are successfully suppressed, no prejudice can result." *Fletcher*, 2021 WL 4477968, at *6. Here, the procedures were *not* successfully challenged and Mr. Blackmon was accordingly harmed.

### 4. The Unduly Suggestive Identifications Caused the Denial of a Fair Trial.

Defendants further contend that the unduly suggestive lineup claim must fail because they did not "proximately cause" a denial of a fair trial. (Mot. at 39.) Defendants posit that, because prosecutors introduced the evidence of the identifications and the judge heard that evidence, the Defendants cannot be liable for any violation in the identification process. (*Id.* at 39-40.) The Court should reject Defendants' attempt to avoid liability for the unduly suggestive identifications.

Under common-law causation principles, applicable in § 1983 cases, "[h]e who creates the defect is responsible for the injury that the defect foreseeably causes later." *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017) (citation omitted). Pre-trial misconduct that leads

21

to deprivation of a fair trial can form the basis of § 1983 liability. *See id.* (finding that detectives could be liable for pre-trial misconduct under § 1983, even if the detectives could not be liable for conduct that occurred at trial); *see also Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012) (finding that officer's fabrication of evidence later used to deprive plaintiff of liberty "can be both a but-for and proximate cause of the due process violation," because "[w]ithout the fabrication, the prosecuting attorney would have had no tainted evidence to introduce at trial"); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").

The only case cited by Defendants to support their argument—*Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)—is unavailing. In that case, the Supreme Court in *dicta* posited that officers who set up a roadblock may have not proximately caused the death of a driver, depending on how the facts developed on remand. *Id. Brower* does not support Defendants' position that the presentation of evidence at trial somehow breaks the causal chain between an officer's bad acts and a constitutional violation. If that were the law, all officer misconduct would be absolved simply by presenting the fruits of that misconduct at trial. In this case, when the Defendants constructed the unduly suggestive identifications, it was entirely foreseeable that the resulting identifications would be used by the prosecutors at trial. Indeed, the identifications were the *only* evidence introduced against Mr. Blackmon introduced at trial. PSOF ¶ 133. Those identifications led directly to Mr. Blackmon's conviction. There is therefore an unbroken causal chain between the Defendants' unduly suggestive identifications and the deprivation of Mr. Blackmon's right to a fair trial.

5. *Defendants are not Entitled to Qualified Immunity on Mr. Blackmon's Unduly Suggestive Identification Claim.*

Finally, Defendants argue that they are entitled to qualified immunity on Mr. Blackmon's unduly suggestive identification claim. (Mot. at 40-41.) Relying principally on *Holloway*, Defendants contend that there is "no controlling or persuasive authority that clearly establishes that it was impermissible for the police to use a photo array where [Mr. Blackmon] is the only photograph with braided hair before the live lineup." (*Id.* at 41.) Defendants both underrepresent Mr. Blackmon's suggestive identification claim and misinterpret *Holloway*. [2]

To determine whether a government actor is entitled to qualified immunity, a court must determine (1) "whether the facts that a plaintiff has alleged make out a violation of a constitutional right," and (2) "if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations and quotation marks omitted). As set forth above (*supra* 11-22), Mr. Blackmon's states a cognizable claim under the due process clause of the Constitution and has supported that claim with evidence in the record.

Regarding the second prong of the qualified immunity test, it was clearly established long before 2002 that "the conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law." *Foster v. California*, 394 U.S. 440, 442 (1969) (internal citations and quotations omitted). A consensus

---

[2] Defendants have not asserted qualified immunity for any of Mr. Blackmon's other claims, including the remaining due process claims (based on fabricated evidence or exculpatory evidence), the Fourth Amendment claim, the conspiracy claim, the malicious prosecution claim, the failure to intervene claim, or the intentional infliction of emotional distress claim. Defendants have therefore waived that they are entitled to immunity qualified immunity on these claims. *See Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2000) ("[A]rguments not raised in an opening brief are waived[.]"); *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 743 (N.D. Ill. 2016) ("Because the Defendants' did not argue that they are entitled to qualified immunity regarding Grayson's *Brady* and coerced confession claims, they have waived that argument.").

of persuasive cases in this district have consistently held that criminal defendants have a longstanding due process right not be subjected to unduly suggestive identifications, and that officers who violate that right are not entitled to qualified immunity. *See Bolden v. City of Chicago*, No. 17 CV 417, 2019 WL 3766104, at *21 (N.D. Ill. Aug. 9, 2019) (denying summary judgment of a suggestive identification claim, and finding "[i]was clearly established many years before 1994 that 'the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law'" (quoting *Foster*, 394 U.S. at 442)); *Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743, at *29 (N.D. Ill. July 13, 2017) (same); *Sanders*, 2016 WL 2866097, at *10 (same); *see also Wilson v. City of Los Angeles*, No. 2:18-CV-05775 KS, 2021 WL 192014, at *25 (C.D. Cal. Jan. 8, 2021) (collecting cases, including *Sanders*, and finding that "this Court joins a well-established lineage of authorities in finding that, at least at early as 1972, the contours of a criminal defendant's due process right to be free of suggestive photo identification techniques by law enforcement that emphasizes 'a single such individual' were clearly established.), *appeal dismissed sub nom. Wilson v. Marks*, 21-55056, 2021 WL 6751443 (9th Cir. Dec. 9, 2021).

For example, in *Sanders*, the plaintiff presented material evidence that an identification underlying the plaintiff's conviction was unnecessarily suggestive and unreliable. The defendants argued that they were shielded by qualified immunity because there were no universally adopted police standards for conducting identification procedures at the time of the allegedly suggestive identifications. *Sanders*, 2016 WL 2866097, at *10. The Court rejected that argument:

> [W]hether there were generally accepted police practices for conducting identification procedures does not speak to whether it was clearly established in December 1993 and January 1994 that police officers violated a criminal defendant's due process rights by conducting impermissibly suggestive identification procedures. Indeed, it has been clearly established since at least 1977 that a criminal defendant has a due process right not to be subjected to unduly suggestive identifications that taint his criminal trial. *See Mason v.*

> *Brathwaite*, 432 U.S. 98, 116 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972). As such,
> Defendant Officers' qualified immunity argument fails.

*Id.*  As in *Sanders*, the question before the Court is whether it was clearly established in 2002 that

police officers violated a criminal defendant's due process rights by conducting impermissibly

suggestive identification procedures. It was. Defendants knew in 2002 that they could not construct

identification procedures that inevitably led an eyewitness to select a specific individual.

Further, Defendants once again attempt to narrow Mr. Blackmon's unduly suggestive

identification claim to the fact that Mr. Blackmon was the only individual in the photo array with

braids.  (Mot. at 41.)  But as explained herein, Mr. Blackmon alleges that Defendants did much

more than that.  The qualified immunity assessment does not require this Court or the jury to parse

each particular act undertaken by the Defendants during the identification procedures to determine

whether that specific act—in isolation—was impermissible.  *See Jackson v. Curry*, 888 F.3d 259,

264 (7th Cir. 2018) ("[A]s required by qualified-immunity jurisprudence … the district court

properly considered *the totality of the circumstances*, with deference appropriate at this stage, and

concluded the officers plausibly violated clearly established rights." (emphasis added)). Mr.

Blackmon also does not need to point to an identical factual circumstance in a decision pre-dating

the conduct in question to rebut qualified immunity.  *See Anderson v. Creighton*, 483 U.S. 635,

640 (1987) ("Th[at] is not to say that an official action is protected by qualified immunity unless

the very action in question has previously been held unlawful . . . but it is to say that in the light of

pre-existing law the unlawfulness must be apparent."); *Bolden*, 2022 WL 3684432, at *19 (decided

after (and citing to) *Holloway*, and finding no qualified immunity even though the defendants

argued that the plaintiff "[could not] point to any precedent that clearly established that [the

specific] type of suggestive lineup violated the Constitution.").  Rather, the Court should examine

the identification procedures used by Defendants as a whole and determine whether, under the

25

totality of the circumstances, a reasonable officer would have known the procedures were unduly suggestive. *Id.*; *see also Mitchell v. City of Decatur*, 528 F. Supp. 3d 904, 921 (C.D. Ill. 2021) (examining qualified immunity under the "totality of the circumstances" and denying summary judgment), *appeal dismissed sub nom. Mitchell v. Wittmer*, 21-1689, 2021 WL 8154942 (7th Cir. June 29, 2021).

A reasonable officer in this case would have known that the identification procedures were suggestive because, in addition to the fact that Mr. Blackmon was the only individual with braids: (1) Mr. Blackmon was the only participant who matched Ms. McDowell's description; (2) he was the tallest individual in each lineup; (3) Ms. McDowell understood from the Defendants that the suspect was in the lineup; (4) Defendants told Ms. McDowell after the fact that she identified the same person as another witness; and (5) she had seen Mr. Blackmon previously in the photo array. The combined effect of these acts was to point the two eyewitnesses in the direction of Eric Blackmon, in violation of the longstanding due process right not to be subjected to unduly suggestive identifications that taint his criminal trial. *See Brathwaite*, 432 U.S. at 116; *Biggers*, 409 U.S. at 198.[3]

Even examining Defendants' conduct in isolation, it was clearly established well before 2002 that the following factors could contribute to an unconstitutionally suggestive lineup procedure: (1) whether the plaintiff's appearance differs significantly from the appearance of the

---

[3] The nature of the allegations in this case also differ vastly from Defendants' cited authority in that this is not a case where an officer used a procedure that, unbeknownst to the officer, was suggestive and therefore unintentionally violated a suspect's rights. The allegations (and evidence) here are that Defendants *intentionally* assembled a photo array and lineup of individuals who (1) did not match Ms. McDowell's description, and (2) looked nothing like Mr. Blackmon, for the sole purpose of securing an identification from Ms. McDowell that she would not have made absent the suggestive procedures. The officers then fabricated Ms. Reece's identification out of thin air and threatened her into going along with it. The Court need not look for pre-2002 cases saying this conduct is unlawful in order to find that reasonable police officers would have understood as much.

other participants;[4] (2) whether officers used the same suspect in two separate identification procedures;[5] and (3) whether the officers told the witness that a suspect is in the lineup.[6] Each of these factors, on their own, could render an identification unconstitutionally suggestive. And here, each factor is present.

*Holloway*, does not compel a different conclusion. There, the Seventh Circuit found that, because the plaintiff could not point to authority establishing that it was impermissible for the police to use a photo array a day before a physical lineup, defendants were entitled to qualified immunity. 43 F.4th at 767. But the violative conduct here far exceeds the single, isolated conduct

---

[4] *See, e.g.*, *Foster v. California*, 394 U.S. 440, 442-43 (1969) ("[T]his case presents a compelling example of unfair lineup procedures … petitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber."); *Israel v. Odom*, 521 F.2d 1370, 1373-74 (7th Cir. 1975) ("We have no doubt that the pretrial identification procedures utilized by the police in this case contained elements of suggestiveness … of the five men appearing, three were approximately six feet or taller while Odom's height was only 5 feet 5 ½ inches."); *People v. Maloney*, 201 Ill. App. 3d 599, 607 ("[W]hen the difference in physical size, specifically the weight difference, between defendant and the four men in the lineup is added to the differences between them [in dress], we find the lineup so suggestive of defendant as the guilty party as to have been improper *per se*.").

[5] *See, e.g.*, *Foster v. California*, 394 U.S. 440, 443 (1969) (finding due process violation where "Petitioner was the only person in this lineup who had also participated in the first lineup"); *Simmons v. United States*, 390 U.S. 377, 383–84 (1968) (recognizing that the danger of misidentification is increased if the police recurrently show the same individual to the witness because "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification"); *Kubat v. Thieret*, 867 F.2d 351, 357–58 (7th Cir. 1989) ("[Plaintiff] was the only person whose picture appeared in all three photo arrays […] we disapprove of the procedures used in these identification interviews."); *United States v. Sanders*, 479 F.2d 1193, 1197 (D.C. Cir. 1973) (observing that where Plaintiff "was the one man whose photograph had previously been shown to both witnesses, it was well-nigh inevitable that he would be chosen in the circumstances").

[6] *See, e.g.*, *Simmons v. United States*, 390 U.S. 377, 383 (1968) ("The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."); *Swicegood v. State of Alabama*, 577 F.2d 1322, 1329 (5th Cir. 1978) ("[The witnesses'] in-court certainty could have been tainted, however, by a police officer's remark after the lineup to the effect that the Carters had chosen the 'right man.' […]"); *United States v. Sanders*, 479 F.2d 1193, 1197 (D.C. Cir. 1973) ("When shown the eight photographs, Miss Samuels testified that the detective told her 'that one of these men might be the robber and if I looked through them and see if I could see the man there.' […] The statement made by the investigating officer to Mr. Johnson as he viewed these photographs is admitted by the Government to have been suggestive, though the Government minimizes its effect. The suggestiveness of the statement to Mr. Johnson cannot be dismissed …."); *People v. Harrell*, 104 Ill. App. 3d 138, 146 (1982) ("[I]t is preferable that the witness not be told that a suspect is included in a particular photo array or lineup.").

addressed in *Holloway*. To be clear, Mr. Blackmon does not contend that Defendants violated his rights simply because they included him in a photo array prior to a live lineup, as was alleged in *Holloway*. Rather, the evidence in this case demonstrates that Defendants engaged in multiple acts that violated the well-established right protecting against subjecting criminal defendants to unduly suggestive identifications that taint his criminal trial. Moreover, in contrast to the plaintiff in *Holloway*, Mr. Blackmon *has* pointed to a host of cases decided before the conduct at issue establishing that it was unduly suggestive—and therefore impermissible—for Defendants to conduct the lineup in the way they did. Qualified immunity is therefore unavailable to Defendants.

### B. Mr. Blackmon's Fabrication Claim Should be Submitted to a Jury

Evidence in the record demonstrates that Defendants fabricated evidence in order to charge, try, and convict Mr. Blackmon. Ms. Reece's identification of Mr. Blackmon—one of only two pieces of evidence against Mr. Blackmon presented at trial—was fabricated. Defendants also: (1) created a link between Mr. Blackmon and the nickname "Pride" and to the New Breeds gang; (2) provided evidence to a prosecutor that a third individual identified Mr. Blackmon as a shooter; and (3) misrepresented to the prosecutor that approved the charges against Mr. Blackmon what Mr. Blackmon stated after he was arrested. All of this was untrue, and all was relevant to Mr. Blackmon's arrest and detention.

Defendants dispute this evidence, arguing first that Ms. Reece's 2017 deposition testimony is unreliable, and second, that the association of the nickname "Pride" with Mr. Blackmon was not used against him at trial. Both arguments fail. The reliability of Ms. Reece's testimony is a factual matter not suitable for resolution at summary judgment. Further, Mr. Blackmon's association with the nickname "Pride" was—counter to Defendants' claims—relevant to deciding to investigate and charge him for a crime he did not commit.

### 1. Defendants Fabricated Information in Police Reports Relating to Ms. Reece

"[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Falsifying police reports can constitute fabrication. *See Collier v. City of Chicago,* No. 14 C 2157, 2015 WL 5081408, at *7 (N.D. Ill. Aug. 26, 2015) (citing *Petty v. City of Chicago,* 754 F.3d 416, 422-23 (7th Cir. 2015)) (denying summary judgment and noting that false police reports satisfy the Seventh Circuit's definition of evidence fabrication).

Evidence in the record demonstrates that Defendants fabricated the fact that Ms. Reece had identified Mr. Blackmon in a photo array and in a lineup. (*See* Section I.A.) Ms. Reece testified in her deposition that, contrary to what was indicated in police reports, she did not identify Mr. Blackmon as a shooter in either identification procedure. PSOF ¶¶ 89, 92, 110. When she viewed the photo array on August 31, 2002, the Detectives showed Ms. Reece photos that she had already seen. PSOF ¶ 92. She told the officer that the picture he was showing her was not the person at the scene of the crime, but the same person she had previously seen in the photo book. PSOF ¶ 92. Ms. Reece testified that after she viewed the lineup, one of the officers said, "We got the shooter" and started slapping hands. PSOF ¶ 110. Ms. Reece told the Detectives they were making a mistake and that they had the wrong guy. PSOF ¶ 110. At her deposition Ms. Reece stated that she was pressured by one of the Detectives to view photos and go to court. PSOF ¶ 91. Ms. Reece further testified that the Detectives threatened her and said that if she did not view the photos and go to court, she would be subpoenaed and her kids would go to foster care. PSOF ¶ 91. Ms. Reece further testified that she was worried about going to Court because she knew the shooter was not Mr. Blackmon. PSOF ¶ 131. All of this evidence directly contradicts the police reports drafted by Defendants, PSOF ¶¶ 89, 110, and supports Mr. Blackmon's claim that Defendants fabricated

evidence in violation his right to a fair trial. *See Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *8 (N.D. Ill. Mar. 19, 2021) (citing *Hurt v. Wise*, 880 F.3d 831, 837 (7th Cir. 2018) (treating evidence, including police reports that contained egregious omissions as fabricated)).

### 2. *The Credibility of Ms. Reece's Testimony is a Matter of Factual Dispute*

Defendants first argue that the Court should credit Ms. Reece's testimony from Mr. Blackmon's 2004 trial and discredit her subsequent deposition testimony from Mr. Blackmon's habeas case. (Mot. at 11-14, 18-19).[7] In doing so, Defendants attempt to play fact finder. The reliability of Ms. Reece's testimony should be determined by a jury, not Defendants. Defendants contend that the Court should ignore this evidence because it is "unbelievable" and "unreliable." (Mot. at 11-14; 18.) Defendants can certainly argue that their version of the facts is true—but not at the summary judgment stage. Credibility determinations are for the jury. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). This is true for witnesses who change their testimony. *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) ("Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony[.]"); *see also Arce v. Chicago Transit Auth.*, 311 F.R.D. 504, 511 (N.D. Ill. 2015) ("[C]ourts ordinarily must defer to juries to resolve factual disputes and decide the credibility of witnesses who change their testimony after [testifying.].").

---

[7] In the section of their brief addressing Mr. Blackmon's Due Process claim (Count I) (Mot. at 18-19), Defendants incorporate their argument regarding the unreliability and inadmissibility Ms. Reece's testimony from the section of their brief regarding malicious prosecution (Count VI) (Mot at 11-14). Mr. Blackmon addresses this argument here and incorporates it into the section below regarding the malicious prosecution claim. (*See infra* at 40-41.)

Defendants specifically attempt to undermine Ms. Reece's testimony by pointing to various alleged inconsistencies within her deposition testimony. (Mot. at 12-14.) But a witness's lapse in memory on certain issues does not render their entire testimony incredible. *See Castro v. DeVry Univ., Inc*., 786 F.3d 559, 571–72 (7th Cir. 2015) (stating that honest witnesses suffer from occasional lapses in memory, and that holding lay witnesses to a standard of perfect memory "would usurp the trier of fact's role in determining which portion of the testimony was most accurate and reliable"). In any event, Defendants are free to impeach Ms. Reece with those alleged inconsistencies at trial.

Moreover, while Defendants point to inconsistencies in Ms. Reece's testimony, they conveniently ignore multiple inconsistencies in Ms. McDowell's testimony. For example, Ms. McDowell originally told detectives that Mr. Arrigo as holding a silver gun in his left hand down by his side when she saw him standing in front of Fat Albert's restaurant on July 4, 2002. PSOF ¶ 8. Mr. Arrigo was not holding a gun—he was holding a cell phone. PSOF ¶ 8. Ms. McDowell also originally described Mr. Arrigo as Hispanic. PSOF ¶ 7. But at trial, she testified that he was Italian. PSOF ¶ 7. Ms. McDowell changed her view about both facts because the detectives in this case provided her with information that changed her story. PSOF ¶¶ 7-8. The fact that detectives "coached" Ms. McDowell to match their story calls into question the credibility of much of her testimony. Of course, as with Ms. Reece, Ms. McDowell's credibility should be resolved at trial, not at summary judgment.

Finally, the Defendants' assert that Ms. Reece's deposition testimony creates "sham" disputed facts. (Mot. at 12-13.) The Seventh Circuit has cautioned that the "sham-affidavit rule" is to be used with "great caution." *Funds in the Amount of $271,080*, 816 F.3d at 907. "Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony,

and thus the sham-affidavit rule applies only when a change in testimony 'is incredible and unexplained,' not when the change is 'plausible and the party offers a suitable explanation[.]'" *Id.* (citation omitted).

As discussed above in Section I.B.1, at her 2017 deposition, Ms. Reece explained that she was pressured by one of the Detectives to view photos and go to court and threatened with a subpoena and putting her kids into foster care if she did not. A jury could infer from Ms. Reece's testimony that the pressure and threats of the Detective caused her to testify the way she did at trial. That explanation for her change in testimony is entirely plausible. Because Ms. Reece's change in testimony is not "plainly incredible," the Court should allow the jury to determine Ms. Reece's credibility. *See Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 488 (7th Cir. 2007); *see also Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004) (discounting sham issue argument at summary judgment and noting that "credibility and weight are generally issues of fact for the jury, and "we must be careful not to usurp the jury's role.").

### 3. *Ms. Reece's Sworn Deposition Testimony is Admissible*

Defendants also contend that Ms. Reece's deposition testimony from 2017 should not be considered because it is hearsay. (Mot. at 14-15, 18-19.) But Ms. Reece's 2017 deposition testimony is not hearsay and is admissible pursuant to Federal Rule of Evidence 801(d)(1)(A). Rule 801(d)(1)(A) provides that when a declarant testifies and is subject to cross-examination about a prior statement and the statement is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding in a deposition, that statement is not hearsay. The Rule does not create any requirement of privity of the parties.

Ms. Reece's 2017 deposition testimony was subject to cross-examination and contradicts her 2002 grand jury testimony and 2004 trial testimony. Accordingly, it is admissible pursuant to the hearsay exclusion in Rule 801(d)(1). *See e.g.*, *Whitlock v. Brueggemann*, 682 F.3d 567, 575

(7th Cir. 2012) (providing that witness's sworn recantation would be admissible at trial as a prior statement by a witness and noting that if witness's trial testimony is inconsistent with the recantation, the recantation would be admissible under Fed. R. Evid. 801(d)(1)(A)); *see also United States v. Wallace*, 753 F.3d 671, 673–74 (7th Cir. 2014) (recanting testimony admissible if it made at a deposition); *United States v. O'Malley* 796 F.2d 891, 899 (7th Cir. 1986) (applying an older version of the rule and allowing a prior inconsistent statement to be admitted at trial where the witness had been subject to cross-examination on the statement).

Defendants do not address Rule 801(d)(1)(A), and instead argue that Reece's testimony should be excluded under Rule 804(b)(1)(B) because Defendants were not parties to the habeas case and therefore lacked the opportunity to question Ms. Reece. As a threshold matter, the suggestion that Defendants could not confront Ms. Reece rings hollow given that they chose not to depose her in this case. Indeed, Defendants took only a single deposition over a 26-month fact discovery period. Mr. Blackmon disclosed Ms. Reece as a witness with discoverable information, along with Ms. Reece's deposition testimony, in May 2019. Defendants had ample opportunity to challenge her testimony.

In any event, though Defendants were not (and could not have been) parties to Mr. Blackmon's habeas case, their predecessor in interest was. Under Rule 804(b)(1)(B), testimony is admissible where offered "against a party who had—or in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross, or redirect examination." Fed. R. Evid. 604(b)(1)(B). "[P]redecessor in interest in its most literal sense, is simply one who precedes another in desiring a particular object." *Allied Ins. Co. v. United States*, No. 20 C 4015, 2022 WL 4182383, at *6 (N.D. Ill. Sept. 13, 2022). Randy Pfister, the warden of the Illinois prison where Mr. Blackmon was wrongfully detained, was the defendant in the habeas

33

case. He was represented at Ms. Reece's 2017 deposition by the office of the Illinois Attorney General who subjected Ms. Reece to cross examination. *See, e.g.,* PSOF ¶ 131. Mr Pfister had every interest in showing that Mr. Blackmon's conviction was correct, and in showing that Ms. Reece was unreliable. The testimony is therefore also admissible under Rule 804(b)(1)(B). *See United States v. Sklena*, 692 F.3d 725, 731–33 (7th Cir. 2012) (reversing trial court's decision to bar prior deposition testimony as hearsay and finding that it should have been admitted pursuant to Rule 804(b)(1) because CFTC and DOJ had similar motives to develop witnesses' testimony).

### 4. *Defendants Fabricated Several Other Key Pieces of Information that Deprived Mr. Blackmon of his Liberty*

Defendants also fabricated several other critical pieces of information during the investigation and prosecution of Mr. Blackmon. First, Detectives fabricated a link between Mr. Blackmon and the nickname "Pride" and the New Breed street gang. It is undisputed that, as early as July 2002, Detectives believed that Tony Cox's murder was New Breed gang hit committed by two individuals nicknamed "Pride" and "Keno." PSOF ¶¶ 37-38; DSOF ¶ 34. On August 30, 2002, Detective Sanchez drafted a document that identified Mr. Blackmon as a suspect in Tony Cox's murder. PSOF ¶ 80. Inexplicably, Detective Sanchez added two key pieces of information to finger Mr. Blackmon as Tony Cox's murderer without any basis. He falsely identified "Pride" as Mr. Blackmon's known alias and indicated that Mr. Blackmon was a member of the New Breeds gang. PSOF ¶¶ 81, 84. There is no evidence in the investigative file in this case, or in any other document that pre-dates Detective Sanchez's August 30, 2002 "Daily Bulletin" document, that indicates that Eric Blackmon used the nickname "Pride" or was affiliated with the New Breeds. PSOF ¶¶ 42, 82, 85. Indeed, both Detective Jones and Gang Crimes Specialist Cronin testified in the depositions in this case that there was no evidence linking Mr. Blackmon to the New Breed gang. PSOF ¶¶ 32,

48.  Nevertheless, just six days after the Daily Bulletin was issued, Mr. Blackmon was arrested. PSOF ¶ 98.

This information regarding the nickname and the gang affiliation—which Detective Sanchez fabricated—was relevant to the decision to charge Mr. Blackmon with Tony Cox's murder, which ultimately lead to his wrongful conviction and incarceration.  Assistant States Attorney Kenneth Fiedler recorded all information relevant to the ultimate charging decision in a document known as the "felony review folder."  PSOF ¶ 116.  The felony review folder related to the decision to charge Eric Blackmon indicated that Mr. Blackmon's nickname was "Pride."  PSOF ¶ 118.  Mr. Fiedler testified that the detectives investigating the case provided him with the connection between Mr. Blackmon and the nickname "Pride." PSOF ¶ 119. Though Mr. Fiedler at his deposition could not specifically recall if the nickname "came into play" in his charging decision, he recorded that specific nickname on the document containing all information relevant to the ultimate charging decision. PSOF ¶ 116. The detectives also told Mr. Fielder that Mr. Blackmon was affiliated with the New Breeds. PSOF ¶ 119.  Mr. Fielder recorded that information in the felony review folder, which, again, contained all information relevant to his charging decision. PSOF ¶ 116.  Detective Jones would later testify before the grand jury that Mr. Blackmon was affiliated with the New Breeds—a fact that, he would later admit in his deposition in this case, was not true.  PSOF ¶ 48; DSOF ¶ 73.

Mr. Fielder's felony review folder contains two other pieces of evidence that were fabricated by Defendants. First, the folder indicates that Mr. Whitaker identified Mr. Blackmon as one of the shooters. PSOF ¶ 118.  This is false.  At no point did Mr. Whitaker identify Mr. Blackmon as a shooter. PSOF ¶ 74; DSOF ¶ 62. This fabricated evidence is particularly important, because Mr. Fiedler testified that he relied upon the identifications when bringing the charges

against Mr. Blackmon. PSOF ¶ 121. According to Mr. Fiedler, the detectives were the "most likely source" of the false information in the felony review folder that Mr. Whitaker identified Mr. Blackmon as one of the shooters. PSOF ¶ 119. Second, the document states that, upon arrest, Mr. Blackmon stated after his arrest that he could not talk to the police officers without his lawyer. PSOF ¶ 118. That is also untrue. Mr. Blackmon *did* talk to the police officers, and specifically stated that he was at a barbeque at the time of the shooting. PSOF ¶ 118. Tellingly, the fact that Mr. Blackmon stated that he had an alibi is nowhere in the document containing Mr. Fiedler's recording of information relevant to the charging decision.

In their Motion, Defendants argue that Mr. Blackmon cannot base a fabrication claim on the fabricated link to the nickname "Pride" because the nickname was not introduced at trial. (Mot. at 19-20.) But courts have held that fabricated evidence need not be introduced at trial to give rise to liability, so long as it results in a deprivation of liberty, such as arrest and indictment. *Patrick v. City of Chicago* 213 F. Supp. 3d 1033, 1047-48 (denying summary judgment and finding that fabricated police report *not* introduced at trial could form the basis of a due process claim) (N.D. Ill. 2016); *Collier*, 2015 WL 5081408, at *7 (permitting a due-process fabrication claim where the plaintiff, who spent 15 months in jail awaiting trial, claimed that fabricated evidence was used to secure his arrest and indictment); *see also Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him.").

In this case, Mr. Blackmon was detained from the date of his arrest until the charges against him were dropped. The categories of fabricated evidence described above were either included in documents that led to Mr. Blackmon's arrest or were noted by the felony review prosecutor as evidence relevant to the decision to charge Mr. Blackmon. He has therefore presented admissible

evidence sufficient for a jury to find that the falsified nickname—as well as the other categories of evidence described above—"caused a [him] to be wrongfully confined ('in some way')." *Patrick*, 213 F. Supp. 3d at 1048. That is sufficient to survive summary judgment. *See Jones* 856 F.2d at 993 (holding the causation requirement is satisfied where fabricated facts are "likely to influence" the decision to prosecute); *Patrick*, 213 F. Supp. 3d at 1048 (The law does not require a smoking gun to be entered into evidence, just facts sufficient to support a "fact-specific analysis guided by familiar tort principles of causation.").

### C. Defendant Officers Withheld Exculpatory Evidence

Mr. Blackmon asserts that the Defendants suppressed exculpatory evidence that undermined the fairness of his trial and violated his due process rights. In *Brady v. Maryland* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "While most commonly viewed as a prosecutor's duty to disclose to the defense," it is settled that the duty imposed by *Brady* "extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); see also *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 349 (7th Cir. 2019).

"To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police "suppressed" the favorable evidence, and prejudice ensued because the suppressed evidence was material." *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019). To satisfy *Brady*'s prejudice prong, a civil plaintiff must demonstrate that the withheld evidence was material, meaning "there is a 'reasonable probability' that the result would have been different had the suppressed evidence

been put before the jury." *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) (quoting *Kyles v. Whitley*, 514 U.S. 419, 442 (1995)).

Ms. Reece's exculpatory statements regarding Mr. Blackmon's participation in the Tony Cox murder were suppressed from prosecutors.[8] Ms. Reece testified that one of the Detectives investigating the Tony Cox murder told her that she had to view photos and go to court and if she did not, she would be subpoenaed and that her kids would go into foster care. PSOF ¶ 91. Ms. Reece ultimately agreed to look at the photos and a live lineup. PSOF ¶¶ 89, 106. Ms. Reese testified the Detective showed her photos that she had been previously shown. PSOF ¶ 92. She told the Detective that the picture he was showing her was not the person at the scene of the crime, but the same person she had previously seen in the photo book. PSOF ¶ 92. Ms. Reece testified that after she viewed the lineup, one of the officers said, "We got the shooter" and started slapping hands. PSOF ¶ 110. Ms. Reece told the Detectives they were making a mistake and that they had the wrong guy. PSOF ¶ 110. The Detectives withheld Ms. Reece's exculpatory statements from prosecutors. That is a classic *Brady* violation. Indeed, "suppressed evidence takes on particular significance—and is 'plainly material'—where the prosecution's case rests solely on the credibility of an eyewitness." *Anderson*, 932 F.3d at 506 (quoting *Smith v. Cain,* 565 U.S. 73, 76 (2012)). As is the case here, in *Anderson*, there was no physical or forensic evidence that linked plaintiffs to the murder and the State's case "hinged on the reliability" of eyewitness testimony. *Id.* Ms. Reece's suppressed statements would have invalidated her purported identification of Mr. Blackmon which would have had a material outcome on the charging and conviction decisions.

---

[8] Defendants restate their argument that Ms. Reece's 2017 testimony should be found inadmissible. (Mot. 11-14.) As discussed *supra* at 32-34 Ms. Reece's 2017 testimony is admissible.

Accordingly, Defendants' motion should be denied. *Id.* (reversing grant of summary judgment when suppressed evidence would have impeached eyewitness testimony).

Defendants also argue that the *Brady* claim fails because Mr. Blackmon cannot recast his fabrication claim as a *Brady* claim. (Mot. at 26.) Defendants rely on *Saunders-El v. Rhode* in support of their argument. 778 F.3d 556 (7th Cir. 2015). *Saunders-El* is readily distinguishable from the instant case. First, the plaintiff in *Saunders-El* was acquitted. 778 F.3d at 558. That is not the case here, where Mr. Blackmon was wrongfully imprisoned for nearly two decades. Moreover, the plaintiff's *Brady* claim was foreclosed in *Saunders-El* because the police officers were silent about their alleged evidence fabrication, not that they failed to turn over existing exculpatory evidence. 778 F.3d 556, 562 (7th Cir. 2015). The facts here are different. Mr. Blackmon does not allege that the Defendants merely stayed silent and covered up their wrongdoing. Rather, the officers had exculpatory evidence—an eyewitness saying that Mr. Blackmon was not a shooter—and failed to turn over that evidence to prosecutors. That is a textbook *Brady* violation, and the fact that the Defendants also fabricated evidence of Ms. Reece's identification should not shield them from liability for it.[9]

### D.   A Jury Should Decide Claims Related to Mr. Blackmon's Due Process Claim

Defendants contend that Mr. Blackmon's claims for conspiracy (Counts II & VIII), failure to intervene (Count III), and intentional infliction of emotional distress (Count VII) are derivative

---

[9] Contrary to Defendants' assertion, Mr. Blackmon does not bring a standalone due process claim for the failure to investigate evidence relevant to his case. (Mot. at 28-30). However, because evidence of a severe and persistent deviation from police investigatory standards may "support an inference of intentional and reckless conduct that violated a plaintiff's constitutional rights," Mr. Blackmon raises Defendants' failure to investigate in conjunction with his wrongful detention claim. *Jimenez v. City of Chicago*, 732 F.3d 710, 722 (7th Cir. 2013); *see also Johnson v. City of Chicago*, 711 F. Supp. 1465, 1470 (N.D. Ill. 1989) (stating that a wrongful detention "coupled with the failure to investigate a claim of mistaken identification, may suggest a deprivation of liberty without due process".). The evidence also supports his malicious prosecution claim, as the claim can rely on evidence of a bad-faith and incomplete investigation. *Beaman v. Freesmeyer,* 183 N.E.3d 767, 786 (Ill. 2021); *see* Sections II.C-D.

of his due process claim (Count I), and that if Count I is dismissed these derivative claims must also be dismissed.  (Mot. at 43.)  For all of the reasons that Count I survives summary judgment, these claims survive as well.

## II.  A Jury Must Decide Eric Blackmon's Malicious Prosecution and Pretrial Detention Claims (Counts V & VI)

Next, Defendants raise several challenges to Mr. Blackmon's Fourth Amendment pretrial detention claim (Count V) and malicious prosecution claim (Count VI), none of which has merit.

### A.    The Fourth Amendment Pretrial Detention Claim (Count V) is Timely

Defendants first contend that Mr. Blackmon's Fourth Amendment claim for wrongful detention accrued on September 9, 2004, or two years after he was initially charged.  (Mot. at 8-9.)  Defendants misapprehend the law.  Contrary to Defendants' assertion, a claim for wrongful arrest and detention does not accrue until the plaintiff obtains a favorable termination of the criminal proceedings against him.  *See McDonough v. Smith,* 139 S. Ct. 2149, 2156-57 (2019); *Savory*, 947 F.3d at 418 ("[N]o Section 1983 claim [can] proceed until the criminal proceeding ended in the defendant's favor or the or the resulting conviction was invalidated[.]"); *see also Sanders*, 806 F. App'x at 484-85 (finding that plaintiff "could not have used § 1983 to contest his custody while it was ongoing"); *Savory*, 532 F. Supp. 3d at 636-37 (N.D. Ill. 2021) ("*McDonough* makes clear that a plaintiff must wait until the favorable termination of the criminal proceedings to bring a § 1983 claim, that if successful, would be incompatible with his guilt.")

Eric Blackmon was in continuous custody from the time of his arrest on September 5, 2002, until he was released on bond on May 3, 2018. PSOF ¶ 164. The charges against him were dismissed on January 16, 2019. PSOF ¶ 165. That is when his Section 1983 claims, including the claim for wrongful arrest and detention, accrued. *See Hill v. Cook Cnty.,* 463 F. Supp. 3d 820, 838-39 (N.D. Ill. 2020) (unlawful detention claim did not accrue until Circuit Court of Cook County

dismissed indictment). Mr. Blackmon filed his Complaint, replete with Section 1983 claims, on February 6, 2019 (Dkt. 1), less than a month after the charges against him were dismissed and well before the two-year statute of limitations expired.

### B. A Jury Could Find That Defendants Lacked Probable Cause

Defendants next argue that Defendants had probable cause to detain Mr. Blackmon, which, according to Defendants, would defeat Mr. Blackmon's claims for malicious prosecution and wrongful arrest and detention.[10]  The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville*, 434 F.3d 1006 1013-14 (7th Cir. 2006). Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez v. City of Elgin,* 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). "It is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed,* 443 F.3d 600, 603 (7th Cir. 2006). To make this determination, courts "step[ ] into the shoes of a reasonable person in the position of the officer[,]" *Wheeler v. Lawson,* 539 F.3d 629, 634 (7th Cir.

---

[10] Malicious prosecution requires proof of five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman v. Freesmeyer*, 183 N.E.3d 767, 781-82 (Ill. 2021) (internal quotations omitted).  Likewise, for wrongful arrest and pretrial detention under the Fourth Amendment, "courts have set forth the following elements: 'the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'" *Kuri v. City of Chicago*, No. 13 C 1653, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017) (quoting *Hernandez-Cuevas v. Taylor,* 723 F.3d 91, 101 (1st Cir. 2013)).

2008), considering the facts known to the officer at the time. *Carmichael v. Village of Palatine,* 605 F.3d 451, 457 (7th Cir. 2010).

Here, the parties sharply dispute the issue of probable cause. Defendants point to the positive identifications of Mr. Blackmon as the basis for the existence of probable cause. (Mot. at 10-11.) But the circumstances of both alleged identifications raise genuine issues of material fact over the legitimacy of the identifications and Defendants' reasonableness in relying on those identifications. *See Grayson v. City of Aurora,* 157 F. Supp. 3d 725, 745 (N.D. Ill. 2016) ("[T]he circumstances surrounding both witnesses, however, raise genuine issues of material fact over the credibility of the witnesses' statements and reasonableness in relying on those statements that make a finding of probable cause as a matter of law inappropriate."); *see also Jimenez v. City of Chi.*, 830 F. Supp. 2d 432, 450 (N.D. Ill. 2011) (citing *Kincaid v. Ames Dep't Stores*, 670 N.E.2d 1103, 1110 (Ill. App. Ct. 1996)) (witness statements supporting probable cause must be reliable).

There is ample evidence that Defendants fabricated Ms. Reece's identification (*see supra* at 29-30) on which they cannot rely for probable cause. *See Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (setting aside purportedly fabricated or manufactured evidence when analyzing whether probable cause existed); *Bahena v. City of Chicago,* No. 17 C 8532, 2020 WL 5076688, at *5 (N.D. Ill. 2020) (denying summary judgment where there was genuine dispute as to whether witness volunteered identification or whether defendants drew it out of him without regard to its truth and denying summary judgment). Defendants dispute the admissibility of Mr. Reece's testimony; that argument is addressed above. *Supra* at 32-34. Defendants further dispute the credibility of Ms. Reece's deposition testimony. But in deciding probable cause, courts "must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew

at the time." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013). The credibility of Ms. Reece's testimony should be decided by a jury, not at summary judgment. *Id.*[11]

That leaves Ms. McDowell's identifications. But the record demonstrates that the procedures that led to those identifications were flawed, and Defendants knew they were flawed. Ms. McDowell's identified Mr. Blackmon from a photo array in which he was the only member that matched her description of the shooter. PSOF ¶¶ 69, 72. Regarding the lineup, Ms. McDowell understood that a suspect was in the lineup; Mr. Blackmon was the only participant that matched Ms. McDowell's description; Mr. Blackmon was one of two individuals that she had already seen; and Detective Jones told Ms. McDowell that the other witness picked the "same guy" increasing Ms. McDowell's confidence that she had correctly identified the shooter. PSOF ¶ 105. As detailed by Mr. Waller, all of these procedures contradicted CPD policies and nationally recognized police practices. PSOF ¶¶ 97, 100, 142. Even if Ms. McDowell's identifications were not procedurally defective, they still could not form the basis of a probable cause determination because they were unreliable. Dr. Loftus provided testimony that Defendants' suggestive procedures cast doubt on the reliability of both alleged identifications of Mr. Blackmon. PSOF ¶¶150, 155-59.

Without the identifications of McDowell and Reece, the Defendants had nothing else upon which to base their charge. Because the undisputed facts do not conclusively show the existence of probable cause, probable cause should remain for the jury. *See e.g., Mihalko v. Daley,* No. 01 C 4846, 2002 WL 726917, at *5 (N.D. Ill. 2002) ("[S]ummary judgment on the issue of probable cause is inappropriate if there is room for a difference of opinion concerning the facts or the

---

[11] Even crediting Defendants' version of Ms. Reece's identification, the identification procedures were fatally flawed, as discussed in Section I.A. Ms. Reece's identification of Mr. Blackmon from a lineup in which: Mr. Blackmon was the only lineup participant who had his hair styled in braids after she identified a person who had similar hair that Detective Jones described as "twisted braids"; Mr. Blackmon was one of two members whom she had seen before (in the photo array); and one of the Detectives indicated, "We got the shooter" and started slapping hands. PSOF ¶ 110.

reasonable inferences to be drawn from them[.]"); *Brandon v. Maywood,* 157 F. Supp. 2d 917, 926 (N.D. Ill. 2001) ("Whether an officer had probable cause generally will present a question for the jury in actions for damages[.]").

Defendants next contend that because Mr. Blackmon was indicted by a grand jury, there is prima facie evidence of probable cause. (Mot. at 11.) Such a presumption can be rebutted when plaintiff demonstrates that defendants knew they lacked probable cause to arrest him. *Coleman v. City of Peoria, Illinois,* 925 F.3d 336, 351 (7th Cir. 2019). Here, the jury could find that Defendants knew that they lacked probable cause. First, that grand jury indictment was based on the same unduly suggestive and unreliable identifications discussed above. That is sufficient to rebut the presumption of probable cause from a grand jury indictment. *See, e.g.*, *Bolden*, 2022 WL 3684432, at *20 (finding that plaintiff rebutted the presumption of probable cause from a grand jury indictment because "probable cause rested on the identification, and the record was loaded with evidence supporting an inference that identification was problematic"). Second, the grand jury's indictment occurred on October 1, 2002, well *after* Mr. Blackmon's September 5, 2002 arrest and September 9, 2002, when charges were brought against him. PSOF ¶¶ 98, 115; DSOF ¶¶ 55, 63, 73. The grand jury's indictment is therefore irrelevant to the probable cause determination at the time Plaintiff was charged with Tony Cox's murder. *See, e.g., Faulkner v. City of Chicago*, No. 1:20-CV-4206, 2023 WL 35177, at *1 (N.D. Ill. Jan. 4, 2023) (noting that plaintiff was arrested *before* indictment and that grand jury found probable cause only *after* defendants' investigation yielded additional evidence).

Finally, Defendants provide a laundry list of "information developed in the investigation" that, according to Defendants, corroborate the identifications. (Mot. at 15.) But Defendants fail to directly cite any specific paragraphs in their Rule 56.1 Statement of Facts to support this

argument. These alleged "facts" therefore cannot form the basis of any legal argument, and should be ignored. L.R. 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the LR 56.1 statements or responses."). Regardless, Mr. Blackmon strongly disputes the validity of the asserted "information"—including, most importantly for the probable cause, whether Defendants knew or relied on any of that information.

### C. A Jury Could Find that Defendants Acted with Malice

"To defeat summary judgment, [a plaintiff is] not required to clearly prove the lack of probable cause or to come forward with evidence that would *require* the court to infer malice. He [is] required to come forward only with evidence that would *permit* a finding of no probable cause and *permit* a reasonable inference of malice." *Williams v. City of Chicago,* 733 F.3d 749, 760 (7th Cir. 2013) (emphasis in original); *see also Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *Aleman v. Vill. of Hanover Park,* 662 F.3d 897, 907 (7th Cir. 2011). Therefore, if plaintiff can persuade a jury that the defendants lacked probable cause, he may also be able to persuade the jury that the defendants acted with malice. *Zolicoffer v. City of Chicago*, No. 11 C 6362, 2013 WL 2598151, at *5 (N.D. Ill. June 11, 2013) (denying summary judgment).

As discussed above, probable cause is a disputed fact that will need to be decided by a jury. Because such a finding permits the inference of malice, that element will too need to be decided by the jury. *Grayson,* 157 F. Supp. 3d at 746-47 (denying summary judgment and holding that reasonable jury could decide that defendants acted with malice); *see also Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 4286954, at *10 (N.D. Ill. Sept. 16, 2008) ("Because [plaintiff] has raised a genuine issue as to a material fact regarding whether [defendants] lacked probable cause for the arrest, []he has also raised a triable issue regarding malice because malice may be inferred from the lack of probable cause.").

Beyond the lack of probable cause, the record is replete with additional evidence from which a jury could infer malice. Malice is defined as any motivation "other than to bring the responsible party to justice." *Beaman v. Freesmeyer*, 183 N.E.3d 767, 792 (Ill. 2021) *reh'g denied* (Sept. 27, 2021). Leads pointed the detectives towards another individual, and they effectively ignored them. PSOF ¶ 147. Defendants repeatedly acted in ways inconsistent with generally applicable police standards, including but not limited to during the identification procedures. PSOF at ¶¶ 142-45. Defendants fabricated evidence and suppressed exculpatory evidence. PSOF at ¶¶ 89, 92, 110; *see* Sections I.B & C. Defendants misled the prosecutor making the charging decision. PSOF ¶¶ 115-20; *see* Section. II.D. All of this could lead a jury to find that Defendants sought to bring someone other than the culprit to justice.

### D. Prosecutors Relied on Defendants' Investigation to Prosecute Mr. Blackmon

Defendants also contend that they were not the proximate cause of Mr. Blackmon's prosecution and so his malicious prosecution claim fails.[12] (Mot. at 15-17). But "liability may extend to anyone, including police officers, if they played a 'significant role' in causing the prosecution." *Hampton v. Cnty. of Cook*, No. 18 C 6346, 2020 WL 6381366, at *6 (N.D. Ill. Oct. 31, 2020) (citing *Beaman v. Freesmeyer*, 131 N.E.3d 488, 498 (Ill. 2019)). The "rule that a prosecutor's independent decision to commence or continue a criminal action 'breaks the causal chain' only applies in the absence of a police officer's conduct that satisfies the significant-role assessment." *Beaman*, 183 N.E.3d at 783. The Illinois Supreme Court has "held that the

---

[12] Defendants state that the alleged lack of proximate cause makes the "claim" to fail. (Mot. at 15.) It is unclear which "claim" they mean, given that this section of their brief addresses both the malicious prosecution and pretrial detention claims. Based on the authority cited in the brief, it appears that they are addressing the malicious prosecution claim. To the extent that this section was meant to address both claims, the common law principles addressed herein and in Section I.A.4. above rebut any suggestion that the prosecutorial decisions broke the chain of causation between the Defendants' improper acts and Mr. Blackmon's unlawful detention.

significant-role determination must include 'those persons who … knowingly provided misinformation to [the prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct' that was instrumental in the commencement or continuation of the criminal prosecution." *Id.* at 782. If "an investigative team conducts a bad-faith and incomplete investigation—designed to implicate a particular individual regardless of the evidence—the prosecutor is effectively prevented from fully exercising that independent judgment." *Id.*

Here, there is ample evidence that the Detectives carried out a bad-faith and incomplete investigation. *See* Section II.C. (describing the Defendants' failure to conduct a fulsome investigation, deviations from policies and practices, fabrication of evidence, and failure to disclose exculpatory evidence). Evidence in the record also demonstrates that Defendants provided false and misleading information to the prosecutor that made the decision to charge Mr. Blackmon. As discussed in detail above, Mr. Fiedler's record of the information relevant to the charging decision contained false information provided by Defendants, including that (1) "Darius" Whitaker identified Mr. Blackmon as one of the shooters (which he did not); (2) Mr. Blackmon stated after his arrest that he could not talk to the police officers without his lawyer (Mr. Blackmon did talk to the police officers, and stated that he was at a barbeque at the time of the shooting); (3) Mr. Blackmon was associated with the New Breeds street gang (he was not); (4) Mr. Blackmon's nickname was "Pride" (it was not); and (5) Ms. Reece identified Mr. Blackmon (she did not). Section I.B.4; PSOF ¶ 118. Further, Mr. Fiedler's felony review folder did not contain evidence that may have been exculpatory to Mr. Blackmon's guilt, including (1) Mr. Blackmon's alibi; (2) that Mr. Arrigo did not identify Mr. Blackmon as a shooter in a photo array; or (3) why Mr. Blackmon was included in the August 29, 2002 photo array. PSOF ¶ 120.

Based on all of this, a jury could find that Detectives Jones, Schleder and Sanchez played a significant role in causing Mr. Blackmon's prosecution. Accordingly, summary judgment on these grounds should be denied. *See Hill v. Rubald*, No. 13 C 4847, 2017 WL 201357, at *8 (N.D. Ill. Jan. 18, 2017) (material issue as to whether defendant officers "commenced or continued" legal proceedings against plaintiff when record showed that one defendant prepared documents with information alleged to be false and second defendant prepared and signed name to the criminal complaint for preliminary examination which also allegedly contained false information); *Collier,* 2015 WL 5081408, at *9 (denying summary judgment and holding that reasonable jury could find that officers played a "sufficiently significant role" in prosecution when they provided false statements to prosecutors).

### III.    A Jury Must Decide Eric Blackmon's Failure to Intervene Claim (Count III)

Defendants contend that Mr. Blackmon's failure to intervene claim (Count III) is not cognizable under § 1983.[13] (Mot. at 42-43.) Relying exclusively on a concurring opinion in *Mwangangi v. Nielsen*, 48 F.4th 816 (7th Cir. 2022), Defendants argue that a theory of vicarious liability is not consistent with the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, (2009) or the Seventh Circuit's decision in *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012).

Defendants misstate the law. The Seventh Circuit has long held that "failure to intervene" is a valid theory of liability in § 1983 claims, including in cases that post-date *Iqbal* and *Vance*. *See Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (holding that it is "clearly established that an officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983" if the officer knew the

---

[13] Defendants contend that this claim must be dismissed because it was brought, in part, pursuant to § 1986. (Mot. at 46.) Though Mr. Blackmon originally pled the claim as under both §§ 1983 and 1986, Mr. Blackmon is only pursuing a federal conspiracy claim under § 1983, not § 1986.

violation was occurring and had a realistic opportunity to intervene); *Doxtator v. O'Brien*, 39 F.4th 852, 865 (7th Cir. 2022) (same); *see also Yang v. Hardin*, 37 F.3d 282, 285-86 (7th Cir. 1994) (holding that an "officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983"); *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (finding that an official satisfies the "personal responsibility requirement of § 1983" if he or she "acts *or fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights" (emphasis added)).  Neither the majority opinion in *Mwangangi*, nor any other Seventh Circuit decision, overruled this longstanding authority.

Defendants also argue that they were not aware of one another's actions and so they cannot be liable for failing to intervene.  (Mot. at 43.) This factual contention is a matter of dispute and must be decided by a jury.  The Seventh Circuit "has made clear that the prongs of [the failure to intervene] analysis almost always implicate questions of fact for the jury."  *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).  Summary judgment is only appropriate where a jury "*could not possibly conclude*" that an officer had the opportunity to intervene.  *Id.* (emphasis in original).

Here, there is sufficient evidence to support the inference that Defendants had multiple chances to intervene and failed to do so.  Each Defendant was involved in some way in the identification procedures that led to Mr. Blackmon's wrongful identification, prosecution and conviction.  It is undisputed that Detective Sanchez compiled the photo array shown to Ms. McDowell on August 29, 2022. PSOF ¶¶ 62-63; DSOF ¶ 46. Though Detectives Jones and Schleder were not present for the meeting in which she was shown those photos, they showed the identical, faulty array Detective Sanchez compiled to Ms. Reece. PSOF ¶ 89. Detectives Schleder and Jones ignored the impropriety of the array created by Detective Sanchez.  A reasonably jury

could conclude that they failed to intervene in the use of these photographs. *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (summary judgment only appropriate where a jury "*could not possibly conclude*" that officer had the opportunity to intervene) (emphasis in original).

Defendants also participated in the violative live lineups with Ms. McDowell and Ms. Reece on September 5, 2002, and *all three* Detectives participated in the live line up with Ms. Reece. PSOF ¶¶ 99-112. None of the Detectives intervened in these improper lineups despite the fact that CPD policy in 2002, of which Defendants were aware, required that suspects in a photo array or live lineup should generally be the same height and weight and should have similar hair and skin color. PSOF ¶ 97. For example, Detectives could have postponed the line up to look for fillers who had braids in their hair, in line with CPD policy and Mr. Blackmon's constitutional rights, but none of them exercised that option. PSOF ¶ 113. A jury could find that this, too, demonstrates a failure to intervene. *See Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) ("[A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983[.]").

In addition to allowing the improper live lineups to proceed, Detectives also failed to intervene when their colleagues exhibited suggestive behavior before, during, and after the live lineups that resulted in the unreliable identification, prosecution, and conviction of Mr. Blackmon for Tony Cox's murder. After Ms. McDowell selected Mr. Blackmon from the lineup, Detective Jones told her that the other witness picked the same guy. PSOF ¶ 105. Detective Jones's statement increased Ms. McDowell's confidence that she had correctly identified the shooter. PSOF ¶ 105. After Ms. Reece viewed the live lineup, one of the officers said, "We got the shooter" and started slapping each other's hands. PSOF ¶ 110. Ms. Reece told the Detectives they were making a

mistake and that they had the wrong guy. PSOF ¶ 110. None of the Detectives did anything to halt these suggestive procedures, in violation of Mr. Blackmon's constitutional rights. Accordingly, summary judgment on this claim should be denied. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (reversing grant of summary judgment on failure to intervene claim).

## IV. Plaintiff's Conspiracy Claims (Counts II and VIII) Must be Decided by a Jury

To prove a conspiracy claim brought pursuant to 42 U.S.C. § 1983, [14] "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).[15] Moreover, "[t]he participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result." *Cooney v. Casady,* 735 F.3d 514, 518 (7th Cir. 2013). It is enough to hold a defendant liable for conspiracy if they understand "the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." *Jones,* 856 F.2d 985, 992 (7th Cir. 1988); *Sanders*, 2016 WL 2866097, at *11. An agreement to deprive a plaintiff of his constitutional rights may be inferred from circumstantial evidence. *Sow v. Fortville Police Dept.,* 636 F.3d 293, 305 (7th Cir. 2011). This is so "because conspiracies are often carried out clandestinely and direct evidence is rarely available." *Freesmeyer,* 776 F.3d at 511.

---

[14] Defendants contend that Count II should be dismissed because it was brought pursuant to § 1985. (Mot. at 45.) Though Mr. Blackmon originally pled the claim as under both §§ 1983 and 1985, Mr. Blackmon is only pursuing a federal conspiracy claim under § 1983, not § 1985.

[15] The elements of a state-law conspiracy are similar to federal-law conspiracy. A plaintiff must prove that two or more people agreed to participate in an unlawful act, and that one of the parties performed a tortious act in furtherance of the agreement that caused an injury. *Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004). Like federal conspiracy, a plaintiff may prove state conspiracy with circumstantial evidence. *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 66 (1994).

Courts in this district have held that concerted investigative action is sufficient to show a conspiracy. For example, in *Hampton*, 2017 WL 2985743, at *25, the court denied summary judgment on the plaintiff's Section 1983 conspiracy claim against two detectives who were jointly responsible for the underlying criminal investigation. The plaintiff pointed to evidence that each detective used the same suggestive techniques with separate witnesses to attempt to influence their identifications, and they jointly authored a false police report implicating the plaintiff as an offender. *Id*.; *see also Walker*, 2021 WL 1058096, at *15 (noting that if a jury concluded three officers fabricated evidence, "that finding would necessarily imply they had an agreement to do so—it's highly improbably that three officers would independently decide to plant drugs on a suspect without consulting each other first.").

### 1. *Evidence of an Agreement Among the Defendant Officers*

Defendants contend that Mr. Blackmon has not cited any evidence that an agreement or scheme existed among the Defendants to violate his rights. (Mot. at 44.) Not so. Circumstantial evidence of an agreement among the Defendants and acts in furtherance in violation of Mr. Blackmon's due process rights is plentiful here.

There is sufficient evidence for a jury to infer that Defendants acted in concert to influence the identifications of Mr. Blackmon through the use of faulty photo arrays and live lineups with Ms. Reece and Ms. McDowell. Detective Sanchez compiled the improper photo array shown to Ms. McDowell on August 29, 2022 . PSOF ¶ 72; Section I.A (discussing the impropriety of the photo array). Detectives Jones and Schleder ignored the impropriety of that array and showed the exact same photos to Ms. Reece two days later. PSOF ¶¶ 89-90. This is evidence that Defendants used "the same suggestive techniques with separate witnesses to attempt to influence their identifications" *Hampton*, 2017 WL 2985743, at *25. Similarly, the lineups were both unduly suggestive and fabricated, as discussed above. Section I. B. All three Defendants were present for

the lineup with Ms. Reece, and Detectives Schleder and Jones were present for the lineup with Ms. McDowell. PSOF ¶¶ 99, 106. More broadly, all three Defendants were actively involved in the investigation into the shooting of Tony Cox from the very beginning. PSOF ¶ 11. Each Defendant drafted documents contained within the investigative file, including related to the identifications. PSOF ¶ 12. Viewing these facts in Mr. Blackmon's favor, a jury could find that Defendants had an agreement to deprive Mr. Blackmon of his constitutional rights. *See Walker*, 2021 WL 1058096, at *15 (denying summary judgment on conspiracy claim, finding it "highly improbable" that three officers would independently decide to deprive individual of his rights).

2. *Defendants' Overt Acts in Furtherance Violating Mr. Blackmon's Rights*

Defendants acted in furtherance of their agreement. The various acts in furtherance of the conspiracy have been repeatedly described herein, but in sum: Defendants fabricated evidence and suppressed exculpatory evidence (PSOF at ¶¶ 89, 92, 110; *see* Sections I. B & C); Defendants acted in ways inconsistent with generally applicable police standards, including but not limited to during the identification procedures (PSOF at ¶¶ 142-45); Defendants failed to investigate relevant evidence (PSOF ¶¶ 128, 14); and Defendants misled the prosecutor making the charging decision (PSOF ¶¶ 115-20; *see* Section. II.D). All of these acts could lead a jury to find that Defendants took overt acts in furtherance of their conspiracy to deny Mr. Blackmon his constitutional rights.

In particular, Defendants acted in concert to influence the identifications of Mr. Blackmon. Before Ms. McDowell viewed the lineup, Detective Jones told her the officers had someone they wanted her to view in the lineup, in violation of CPD policy. PSOF ¶ 99. Prior to viewing the live line up, Detective Jones also showed Ms. McDowell photos of the crime scene and the victim which increased her desire to help the police in identifying the shooter. PSOF ¶ 101. Ms. McDowell was confident that she had correctly identified the shooter because Detective Jones reassured her another witness had done the same. PSOF ¶ 105. Ms. Reece told the Detectives that

they were making a mistake and that they had the wrong guy, but they celebrated regardless. PSOF ¶ 110. The fact that Detectives used the same faulty arrays, live lineups, and suggestive techniques with Ms. McDowell and Ms. Reece in an investigation where they were jointly responsible is sufficient at the summary judgment to establish that the Detectives conspired to violate Mr. Blackmon's due process rights. *See Hampton*, 2017 WL 2985743, at *25 (denying summary judgment on conspiracy claim and holding that defendants worked together using coercive techniques to get eyewitness to identify plaintiff as perpetrator).

### 3. *Every Defendant Need not be Present for Each Overt Act to Further the Conspiracy*

Finally, Defendants argue in a standalone section of their brief that each Defendant cannot be liable for certain isolated actions of other Defendants. (Mot. at 41-32 (arguing that Detective Jones and Schleder did not participate in the photo array shown to Ms. McDowell on August 29, 2002, and that Detective Sanchez was not present for the August 31, 2002 meeting with Ms. Reece).) As a factual matter, the various Defendants' knowledge of each other's actions is disputed. For example, as discussed above, Detective Jones and Schleder showed Ms. McDowell the exact same photo array that was shown by Detective Sanchez, which suggests that they were acting in concert with Detective Sanchez. PSOF ¶¶ 62, 89. Similarly, while Detective Sanchez was not at the presentation of the photo array to Ms. Reece, he was there with the other Defendants for her fabricated lineup. PSOF ¶ 106. In any event, the Defendants would be liable for each of these acts under the conspiracy claim, because each Defendant need not be present for every other Defendant's actions in furtherance of a conspiracy. *See, e.g.*, *Casciaro v. Allmen*, No. 17 C 50094, 2021 WL 1626879, at *16 (N.D. Ill. Mar. 26, 2021) (denying summary judgment as to conspiracy claims, even though one defendant did not directly take part in some of the wrongdoing).

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Blackmon respectfully requests that this Court deny Defendants' motion for summary judgment of the Amended Complaint.

Dated:  February 10, 2023                  Respectfully submitted,

/s/  *Ronald S. Safer*
Ronald S. Safer (rsafer@rshc-law.com)
John K. Theis (jtheis@rshc-law.com)
Sarah E. Finch (sfinch@rshc-law.com)
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (tel)
(312) 471-8701 (fax)
*Attorneys for Plaintiff Eric Blackmon*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2023, I electronically filed the foregoing using the Court's

CM/ECF system, which will automatically send notification of such filing to all counsel of record.

<u>*/s/ Sarah E. Finch*</u>
Sarah E. Finch