**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Eric Blackmon, | |
| *Plaintiff,* | No. 19 CV 767 |
| v. | Judge Lindsay C. Jenkins |
| City of Chicago, *et al.*, | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eric Blackmon was convicted of first-degree murder for the July 4, 2002 shooting death of Tony Cox based largely on the testimony of two eyewitnesses. *Blackmon v. Williams*, 823 F.3d 1088, 1092 (7th Cir. 2016). In 2018, a federal district court granted his petition for a writ of habeas corpus because he had received ineffective assistance of counsel at trial, *Blackmon v. Pfister*, 2018 WL 741390, at *10 (N.D. Ill. Feb. 7, 2018), and Blackmon's conviction was vacated [Dkt. 195 ¶ 163]. The state declined to retry Blackmon and dismissed the charges against him. [*Id.* ¶ 165.]

Blackmon then sued the City of Chicago, three police detectives, and several unidentified City employees. [Dkt. 73.] He brings claims under 42 U.S.C. § 1983[1] and state law against the detectives and a *Monell* claim and derivative state law claims against the City. [Dkt. 197 at 1.] All Defendants have moved for summary judgment [Dkt. 168, 170], but Blackmon's claims against the detectives take center stage. Blackmon failed to identify the unnamed City employees during discovery, and the

---

[1]    Blackmon initially pursued claims under 42 U.S.C. §§ 1985 and 1986 as well, but he has abandoned those claims. [Dkt. 182 at 48 n.13, 51 n.14.]

parties agree that the claims against them should be dismissed. [Dkt. 168 ¶¶ 4–5; Dkt. 184 ¶ 4.] Further, the Court previously granted the City's motion to bifurcate the *Monell* claim [Dkt. 95], and Blackmon's other claims against the City require him to prevail against one or more of the detectives, so the City's motion for summary judgment rises or falls with the detectives' motion. [Dkt. 168 ¶¶ 2–3; Dkt. 184 ¶ 3; Dkt. 191 ¶ 2.] Accordingly, the bulk of this Opinion discusses only Blackmon's claims against the detectives, to whom the Court collectively refers as "Defendants."

Defendants' motion for summary judgment is granted in part and denied in part. Blackmon brings direct and derivative liability claims against the detectives. His substantive claims fall into two categories: (1) wrongful detention and malicious prosecution and (2) due process. As explained below, the first set of claims fails, but a jury must decide the second set of claims. Defendants' main argument against the derivative claims is that if the substantive claims fail, so do the derivative claims. [Dkt. 197 at 43–44.] Because Blackmon's due process claims survive, so do the derivative claims against the detectives and the City. The Court also rejects Defendants' other reasons for granting summary judgment on the derivative claims.

## I.    Use of Prior Deposition Testimony

The Court first resolves a key evidentiary dispute: whether the transcript of a 2017 deposition of Frencshun Reece, one of the eyewitnesses who identified Blackmon as a shooter at trial, may be used to establish disputes of fact at summary judgment. The parties frame this as an issue of admissibility. Blackmon argues that the transcript is admissible under Federal Rule of Evidence 801(d)(1)(A) as a prior inconsistent statement or under Rule 804(b)(1) as former testimony by an unavailable

declarant; Defendants take the opposite positions. [Dkt. 197 at 14–15; Dkt. 182 at 32–34; Dkt. 194 at 20–22.] From the Court's perspective, the proper question is whether the content of the deposition may be used to establish disputes of fact at summary judgment, irrespective of whether the transcript itself would be admissible at trial.[2]

The normal rule is that a deposition transcript can be used to defeat summary judgment if the content of the deposition can be introduced in admissible form at trial. *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) ("[Summary judgment] evidence need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." (citations omitted)); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994) (defeating summary judgment requires the nonmovant to "present evidence of evidentiary quality … such as that found in depositions," though that evidence need not be in admissible form (citations omitted)). Thus, deposition testimony about matters within a deponent's personal knowledge can establish a dispute of fact at summary judgment. *Cf. REXA, Inc. v. Chester*, 42 F.4th 652, 655

---

[2]     The fact that Blackmon does not articulate this basis for considering the transcript does not preclude the Court from addressing it. A summary judgment movant must show that it is entitled to judgment as a matter of law with the record construed in the nonmovant's favor, even if the nonmovant fails to respond. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Blackmon relies on Reece's deposition testimony to establish disputes of fact, so to the extent that granting summary judgment depends on disregarding Reece's deposition, it is Defendants' burden to show that the Cout should disregard this testimony.

(7th Cir. 2022) ("Had [the deponent's] testimony been based on his personal knowledge, a disputed question of fact would exist ….").

It is not dispositive that Reece was deposed in Blackmon's habeas proceeding but has not been deposed or submitted a sworn declaration in this case. [*See* Dkt. 194 at 22; Dkt. 197 at 11–12.] "[D]eposition testimony can be admitted at summary judgment if (1) the deposition satisfies Rule 56's affidavit requirements and (2) the deposition has been made part of the record in the case before the court." *Gamble v. FCA US LLC*, 993 F.3d 534, 538 (7th Cir. 2021) (citation omitted); *see* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration … must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); 8A Charles Alan Wright et al., Federal Practice and Procedure § 2142 & n.19 (3d ed. Apr. 2023 update) ("A deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible, even though the conditions of [Rule 32(a)] on use of a deposition at trial are not satisfied.")). *Gamble*'s second requirement is satisfied because Reece's 2017 deposition transcript was produced to Defendants [*see* Dkt. 182 at 33] and put into the record in this case [Dkt. 172-2, 173 (collectively, "Reece Dep.")],[3] and to the extent that Reece's deposition covers matters within her personal knowledge to which she is competent to testify, *Gamble*'s first requirement is also satisfied. *See* 993 F.3d at 538.

---

[3]     Docket entry 173 contains a confidential portion of Reece's deposition testimony, from page 162 to page 198. The pagination among both portions is consecutive, so the Court cites the relevant page numbers without specifying which docket entry the testimony appears in.

Defendants object to Blackmon relying on Reece's deposition because they do not believe she will be available to testify at trial. Their reply brief states:

> Defendants did not depose Reece because they could not locate her. Reece utilized multiple forms of identification with multiple addresses. When Defendant Detectives investigated the residences, no one answered, exited, or entered the residence. Additionally, the Defendant Detectives attempted to locate Reece's son Whitaker but found that he resided in Carrollton, Kentucky. Further, Reece may have changed her last name to "Akeredolu." Despite these efforts she could not be served, and Plaintiff has no reason to believe she will be found to testify at trial.

[Dkt. 194 at 20–21.] Blackmon, however, asserts that he "disclosed Ms. Reece as a witness with discoverable information, along with Ms. Reece's deposition testimony, in May 2019." [Dkt. 182 at 33.] If Reece will be unavailable to testify about the content of her deposition at trial, then it may not be proper to consider her deposition at summary judgment because only "evidence that would be admissible at trial" can be considered. *Wheatley*, 826 F.3d at 420 (citation omitted).

The Court does not doubt Defendants' diligence in attempting to locate Reece, but it sees no way to determine, on the summary judgment record, whether Reece will be available at trial. Defendants did not alert the Court to problems locating Reece in the status reports or motions for extensions that were filed during discovery. [Dkt. 88, 99, 100, 105, 107.] They did not seek the Court's assistance in locating Reece or compelling her to sit for a deposition. They do not assert that they informed Blackmon about their trouble locating Reece or that they would object to his use of the deposition transcript if they were unable to find and depose her. Defendants may earnestly think that Blackmon "has no reason to believe [Reece] will be found to testify at trial," but they cite no evidence in support of this assertion. [Dkt. 194 at 21.]

The Court holds that it is too late to object to Blackmon using the deposition to oppose summary judgment. If Defendants had raised this issue earlier, Blackmon may have been able to help make Reece available for a deposition, and if neither party could locate her, then her unavailability at trial might have been established, allowing the Court to decide whether the transcript is admissible under Rule 804(b)(1). Since the record does not permit the Court to conclude that Reece will be unavailable, the Court will consider Reece's deposition when ruling on Defendants' motion for summary judgment to the extent it is about matters within her personal knowledge under the normal principle that depositions may be used at summary judgment if their content can be admitted at trial in admissible form. *See Wheatley*, 826 F.3d at 420.[4]

## II. Background

The Court draws on the parties' very helpful Local Rule 56.1 statements to recount the facts. The events at issue here date back two decades, and the parties did an excellent job identifying which points in the voluminous record are in dispute. Because the parties have already done so, the Court need not undertake an

---

[4] Because the Court cannot know if Reece will be unavailable, it declines to address now whether her deposition transcript would be admissible under Rule 804(b)(1). That question, if it arises, will turn on whether the respondent in the habeas proceeding was Defendants' predecessor in interest. *See United States v. McGowan*, 590 F.3d 446, 451 (7th Cir. 2009).

The Court does hold, however, that the transcript is not admissible under Rule 801(d)(1)(A), which kicks in only after a declarant testifies in the current proceeding. [*See* Dkt. 194 at 20.] By its terms, the Rule applies only to a declarant who "testifies and is subject to cross-examination about a prior statement" that "is inconsistent with the declarant's testimony"; the use of the present tense indicates that the witness must testify at the present proceeding. *See United States v. Cooper*, 767 F.3d 721, 728 (7th Cir. 2014) ("Federal Rule of Evidence 801(d)(1)(A) permits the court to admit a prior inconsistent statement given under oath for the truth of the matter asserted in the statement when the declarant testifies at trial and is subject to cross-examination regarding the prior statement." (citations omitted))."

exhaustive recitation of the details of the investigation into Cox's murder. Instead, the Court summarizes the facts, focusing on disputes of material fact.

### A.    Tony Cox's Murder

On July 4, 2002, Tony Cox was murdered outside of Fat Albert's restaurant, on South Pulaski Road in Chicago. [Dkt. 178 ¶ 6.] At about 4:30 p.m., Cox was outside the restaurant with its owner, Richard Arrigo. [*Id.* ¶ 7.][5] Two Black men approached Cox and Arrigo, and one ("the first shooter") shot Cox in the head, then both men fled, but the other ("the second shooter") returned to shoot Cox in the face, then fled again. [*Id.* ¶¶ 15–16.] Eyewitnesses to the murder included two women who were driving past the restaurant at the time, Lisa McDowell and Frencshun Reece, and Reece's 12-year-old son Davious Whitaker, who was riding in his mother's car. [*Id.* ¶¶ 15, 20, 43.][6] McDowell drove away from the scene and called 911. [*Id.* ¶¶ 45, 107.] Reece stayed at the scene; she called 911 and attempted to provide first aid to Cox, but Cox died from his wounds. [*Id.* ¶¶ 8, 17–19.] Chicago police arrived about 15 minutes after the shooting. [*Id.* ¶ 10.] Meanwhile, about a mile away, Eric Blackmon hosted a barbeque to celebrate Independence Day and his brother's birthday. [Dkt. 195 ¶¶ 1–2.] The barbeque lasted roughly from 2:00 p.m. to 11:00 p.m. [*Id.* ¶ 1.] Blackmon denies that he was one of the shooters.

---

[5]    It is disputed whether a skinny woman was also present [Dkt. 178 ¶ 15], but this dispute is not material, and the Court does not address it further.

[6]    Blackmon asserts that another man, LaJuan Webb, witnessed the murder from a barbershop next door to Fat Albert's [Dkt. 195 ¶ 16], but he makes no argument about Webb in his opposition to Defendants' motion, so the Court disregards Webb.

B.    **The Investigation**

Four Chicago police detectives, including the three Defendants, investigated the murder. [*Id.* ¶ 11.] Defendant Eugene Schleder was the lead detective, and his partner Detective Gregory Jones was also a primary detective. [*Id.*] Defendant James Sanchez and John Pellegrini, another detective who is not a party to this case, assisted in the investigation. [*Id.*]

1.    **July 4, 2002**

Schleder, Jones, and other officers arrived at the scene around 4:45 p.m. to begin the investigation. [Dkt. 178 ¶ 10.] Reece was present, and Jones interviewed her. [*Id.* ¶ 13.] According to police reports, Reece stated that she was driving with her two sons, 12-year-old Whitaker and 8-year-old Schadi Joyce, and saw the victim (Cox) standing with a white man (Arrigo) and two Black men, who appeared to be talking. [*Id.* ¶ 15.] The first shooter shot Cox in the head; when Cox fell to his knees, the same man shot him again, then fled north on Pulaski. [*Id.* ¶¶ 15–16.] The second shooter, who had begun running a few seconds before the first shot, ran back to Cox and shot him one or two times in the face. [*Id.*] Reece described the first shooter as a dark-skinned Black man in his late 20s to early 30s, approximately 5′6″ tall and weighing 150 pounds; she described the second shooter as a Black man in his 20s, about 5′10″ tall and weighing about 160 pounds. [*Id.* ¶ 18; Dkt. 195 ¶ 9.]

Relying on Reece's 2017 deposition testimony, Blackmon raises disputes about this narrative. As relevant here, he contends that this account omits the fact that Reece attempted to push her children's heads down when she heard gunshots and that Arrigo called the second shooter, who was running away, back to where Cox was.

8

[Dkt. 178 ¶¶ 15–16.] He also argues that Reece told the police she saw a car with the two shooters come from nearby Grenshaw Street and drive north. [*Id.* ¶ 19.][7]

According to Defendants, after canvassing the neighborhood, Schleder and Jones returned with Arrigo to police headquarters to question him about the shooting. [*Id.* ¶ 26.] Arrigo denied involvement in the shooting and stated that he saw the shooters flee on foot toward Grenshaw. [*Id.*] With Arrigo's permission, they checked his phone records, learning that he had placed a call to someone at 4024 West Grenshaw before the murder and a call to George Davis, known as "Boonie Black," after the shooting. [*Id.*; Dkt. 195 ¶ 19.] Black was the founder of the New Breeds street gang. [Dkt. 178 ¶ 26.] Police then assembled a photo array of seven Black men aged 19–30 with a last known address of 4024 West Grenshaw and asked Reece to come to the station to review the photos. [*Id.* ¶¶ 27–28.] Blackmon's photo was not in the array. [*Id.* ¶ 28.] Reece did not positively identify anyone, but she indicated that one man's hairstyle—"twisted braids"—resembled one of the shooters', said two other men resembled the first shooter, and asked to see a live lineup. [*Id.* ¶ 29.]

Blackmon disputes several points about the photos Reece viewed, again relying on her 2017 deposition.[8] He asserts that she was shown two books of mugshots and asked whether she recognized the shooters, which she did not. [*Id.*] An officer then pointed out specific photos and asked if Reece recognized the individuals in the

---

[7]     Police also interviewed Joyce, who could not provide information about either shooter, and Whitaker, who provided a description of the first shooter. [Dkt. 178 ¶¶ 21–22.] Blackmon points out that Reece did not want officers to speak with her children. [*Id.*]

[8]     Blackmon also disputes details about the canvass, Arrigo's questioning, and the assembly of the photo array, but these disputes are not material.

photos, which she denied. [*Id.*] Later, Reece was shown two individual photos and asked if she recognized a specific person; Reece indicated that she recognized someone only from the photobooks, not one of the shooters. [*Id.*] The photo appears to have been of Blackmon, because Reece testified that the man she was asked to identify at trial was "the same guy they kept shoving down my throat." [Reece Dep. at 164–65.]

### 2. Ensuing Weeks

In the weeks following Cox's murder, the investigation continued. The parties discuss the investigation in detail, but many of the developments are immaterial. Briefly, the detectives learned that the murder may have been connected to Black and the New Breeds; they were told that the shooters were nicknamed "Keno" and "Pride" or "Little E," and "Keno" was the nickname of Black's nephew, Michael Davis. [Dkt. 178 ¶¶ 31–36.] On August 8, 2002, Blackmon was arrested on unrelated drug charges; the arrest report indicated that he went by the nickname "Little Eric" and his address was 3656 West Grenshaw, about four blocks from where the shooters fled. [*Id.* ¶¶ 37–41.][9] According to Defendants, the investigators believed that Blackmon's address was in New Breeds territory, but Blackmon disputes this. [*Id.* ¶ 40.]

Separately, the detectives received a copy of the recording of the 911 call made by McDowell, the witness who drove away from the crime scene. [Dkt. 178 ¶ 42.] On August 12, 2002, Michael Cronin, a gang specialist, interviewed McDowell. [*Id.*] According to a police report, she stated that as she was stopped at a traffic light, she heard a gunshot and saw a Black man on the ground (Cox) and a man she believed to

---

[9] Blackmon admits that he went by "Forty" and "Little Eric," but it is disputed whether Blackmon went by the nickname "Little E." [Dkt. 178 ¶ 38.] This dispute is not material.

be Hispanic (Arrigo, who is white) standing. [*Id.* ¶ 43.] She saw two other Black men approach, one of whom was holding a gun and shot Cox twice while he was on the ground. [*Id.* ¶ 44.] McDowell described the shooter as in his early 30s, about 6′ tall, slender, and with braided hair; the other man was about 5′9″ with a slender build. [*Id.*] McDowell wrongly described Arrigo as holding a silver gun, when in fact he held a silver cell phone, and she saw the shooter's face for five seconds. [*Id.* ¶¶ 43–44.]

### 3. Identification Procedures

On August 29, 2002, Sanchez created a photo array including photos of Blackmon and six other Black men, including Michael Davis; only Blackmon wore his hair in braids. [*Id.* ¶¶ 46–47.][10] That same day, Sanchez interviewed McDowell and showed her the photo array; McDowell identified Blackmon as a shooter but did not identify Davis. [*Id.* ¶ 48.][11] Also on August 29, 2002, Sanchez showed Whitaker the photo array, and he identified Davis as a shooter but not Blackmon. [*Id.* ¶ 49.]

Two days later, on August 31, 2002, Jones spoke to Reece and showed her a photo array featuring the same individuals. [*Id.* ¶¶ 50–51.] According to police reports, she tentatively identified Davis and positively identified Blackmon. [*Id.* ¶ 51.] Blackmon disputes that Reece identified him, citing her 2017 deposition

---

[10]    Blackmon disputes the information Sanchez relied on to create this photo array [Dkt. 178 ¶¶ 46–47], but the dispute is not material. Defendants note that the only reason it is possible to tell that Blackmon's hair was braided in the photo was that a braid was visible in "a loose strand of hair." [Dkt. 194 at 4.] Defendants appear to be correct that hairstyle was a subtle point, but at summary judgment, the Court cannot exclude the possibility that a jury could find that McDowell would have noticed Blackmon's hairstyle in the photo.

[11]    Blackmon points out that the photo array McDowell was shown was not inventoried and that the array that was later inventoried was the one that had been shown to another witness. [Dkt. 178 ¶ 48.] He points to no evidence to support a finding that McDowell's photo array was different from the one the other witness was shown, and McDowell testified at trial that she viewed the same photo array. [*Id.* ¶ 51.]

11

testimony. He contends that she was threatened with a subpoena and her kids being taken into foster care if she did not agree to view the photos, and she did not identify Blackmon as a shooter but only stated that she had previously seen his photo. [*Id.*]

On August 30, 2002, Sanchez submitted investigative alerts about Blackmon and Davis. [*Id.* ¶ 52.] On September 5, 2002, Blackmon was taken into custody following a hearing in another criminal case. [*Id.* ¶¶ 55, 57.] He waived his *Miranda* rights and told Schleder and Jones that he had no involvement, his nickname was "Forty," and he was a member of the Traveling Vice Lords, not the New Breeds. [*Id.* ¶ 56.] Later that day, Blackmon and Davis (who had been arrested the same day) were placed in lineups along with four "fillers," Black men of the same approximate age in custody on unrelated charges. [*Id.* ¶ 57.] Only Blackmon had braids. [*Id.*]

McDowell viewed the lineup and identified Blackmon but not Davis. [*Id.*] It is undisputed that Jones did not tell McDowell whom to select from the lineup, but Blackmon argues that Jones influenced the lineup in other ways. [*Id.* ¶ 58.] Jones picked McDowell up to take her to the police station for the lineup, telling her the police had someone they wanted her to view, implying that a suspect would be in the lineup. [*Id.*] Jones also showed her pictures of the victim and the crime scene, which increased her desire to identify the shooters. [*Id.*] And after McDowell identified Blackmon, Jones told her another witness picked the same suspect, increasing her confidence that she had correctly identified the shooter. [Dkt. 195 ¶ 105.]

Later in the evening of September 5, 2002, Reece and Whitaker viewed the same lineup. [Dkt. 178 ¶ 61.] According to police reports, Reece identified Blackmon

as a shooter but not Davis [*id.*; Dkt. 195 ¶ 110], but Blackmon, relying on Reece's deposition, disputes this. He argues that Reece only stated that she recognized him from the photo book she viewed earlier and denied recognizing anyone from the crime scene. [Dkt. 195 ¶ 110.] When police said, "We got the shooter" and began slapping hands, Reece told them they had the wrong man. [*Id.*] Whitaker was then brought in to view the lineup. Reece stayed in the room but was not allowed to speak, and Whitaker identified Davis but not Blackmon as a shooter. [Dkt. 178 ¶ 62.][12]

## C.    Criminal Proceedings

That evening, the Cook County State's Attorney Office interviewed Reece and Whitaker. [*Id.* ¶ 64.] It is disputed whether what Reece told the reviewing Assistant State's Attorney ("ASA") was consistent with what the police reports stated. [*Id.*] Another ASA went with Jones to McDowell's home on September 8, 2002 and interviewed her; she identified Blackmon as the shooter and signed a written version of the statement she had given. [*Id.* ¶ 65.] That night, Blackmon was charged with first-degree murder, and Davis was released. [*Id.* ¶ 66.] Blackmon was arraigned the next day, and a judge determined there was probable cause to detain him. [*Id.* ¶ 68.]

On September 24, 2002, Reece testified before a grand jury, identifying a photograph as depicting the second shooter, who Reece saw shoot Cox. [*Id.* ¶ 70.] In her 2017 deposition, Reece testified that the photograph she identified did not depict the shooter; Blackmon points out that because that photograph is not in the record, it is impossible to determine who Reece identified. [*Id.*] McDowell testified before the

---

[12]    Arrigo also viewed a photo array and lineup featuring Blackmon and Davis, but he did not identify anyone. [Dkt. 178 ¶ 53; Dkt. 195 ¶ 114.]

grand jury on October 1, 2002; she identified a shooter after being shown a picture and testified about the statement she signed on September 8. [*Id.* ¶ 71.] The grand jury indicted Blackmon with first-degree murder. [*Id.* ¶ 73.]

During pretrial proceedings, Blackmon moved to suppress McDowell's and Reece's identifications based on allegations that Arrigo may have been pressured by the detectives to identify Blackmon and Davis. [*Id.* ¶ 75.] Blackmon withdrew his motion before a hearing was held. [*Id.*] Blackmon elected a bench trial, which took place on September 22, 2004. [*Id.* ¶ 85.] The heart of the prosecution's case was McDowell's and Reece's testimony. [*Id.* ¶ 86; Dkt. 195 ¶ 133.] *Blackmon*, 823 F.3d at 1092. Reece testified consistently with her statements in the police report and the grand jury testimony, which included making an in-court identification of Blackmon as a shooter, affirming that the inventoried photo array was the same one she had viewed, and describing the lineup identification. [Dkt. 178 ¶¶ 89–100.] Blackmon acknowledges that Reece so testified, but he points out that in her 2017 deposition, she maintained that Blackmon was not the shooter, that she had been pressured to identify him, and that she was worried about being in court. [*Id.*] McDowell also testified consistently with her previous statements. [*Id.* ¶¶ 101–12.] Blackmon acknowledges this, but he notes factors that he believes undermine the reliability of McDowell's identification. [*Id.*] Blackmon presented an alibi defense, calling two alibi witnesses and a man who claimed to have been a witness to the murder. [*Id.* ¶ 115.]

The judge found Blackmon guilty on September 27, 2004, stating that he was impressed by McDowell's and Reece's certainty as to Blackmon's identity and that

the lineup procedures "were conducted in an almost pristine manner." [*Id.* ¶ 117.] Blackmon was sentenced to 60 years' imprisonment, and his conviction was upheld on appeal. [*Id.* ¶¶ 118–20.]

### D. Subsequent Proceedings

After unsuccessfully pursuing state postconviction relief, Blackmon petitioned for federal habeas corpus relief, arguing that his trial counsel was constitutionally ineffective. [*Id.* ¶¶ 121–24.] The district court dismissed Blackmon's petition, but that decision was reversed on appeal and remanded for an evidentiary hearing. [*Id.* ¶ 125.] In 2017, during the habeas proceedings, Reece was deposed by both Blackmon's counsel and the respondent's counsel. [*Id.* ¶ 128; *see* Reece Dep.] Reece's testimony was largely inconsistent with her grand jury and trial testimony and Defendants' versions of what she told the police during the investigation. [Dkt. 178 ¶¶ 129–31.] The evidentiary hearing was held in May 2017, and Blackmon did not call Reece as a witness or put the transcript into the record. *Id.* ¶ 132.] In February 2018, the district court granted Blackmon's habeas petition, and in January 2019, the state declined to retry him. [*Id.* ¶¶ 132–33.]

Blackmon then brought this suit under 42 U.S.C. § 1983 and state law, naming the City of Chicago, Schleder, Jones, and Sanchez as Defendants. [Dkt. 1.] He later filed a 10-count Amended Complaint, which remains the operative pleading. [Dkt. 73.] Count IV, a *Monell* claim against the City, has been bifurcated [Dkt. 95], but the remaining nine counts are live. The detectives and the City have moved for summary judgment. [Dkt. 168, 170.] The Court turns to the substance of those motions now.

### III. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted).

### IV. Wrongful Detention and Malicious Prosecution Claims

The Court begins with Blackmon's first set of substantive claims, wrongful arrest and detention under § 1983 (Count V) and malicious prosecution under Illinois law (Count VI).[13] Both claims require Blackmon to prove that Defendants lacked probable cause to arrest him, *see Thompson*, 142 S. Ct. at 1337; *Moran v. Calumet*

---

[13] The Court previously dismissed Blackmon's § 1983 claim, initially styled as a claim for malicious prosecution, relying on Seventh Circuit precedent that rejected that framing. [Dkt. 60 at 7–9.] *See Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) ("[T]he malicious-prosecution claim is really one for wrongful arrest and detention in violation of the Fourth Amendment."). More recently, the Supreme Court has used the malicious prosecution label, explaining that such a claim is "sometimes referred to as a claim for unreasonable seizure pursuant to legal process," *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022). It is possible that these claims are equivalent, but the Court uses the phrasing in the Amended Complaint.

*City*, 54 F.4th 483, 499 (7th Cir. 2022), meaning that probable cause is an absolute defense, *see Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015); *Moran*, 54 F.4th at 499. Here, no reasonable jury could find that Defendants lacked probable cause, so they are entitled to summary judgment on these claims.[14]

Probable cause is a relatively low bar for police to clear. It "exists if the totality of the facts and circumstances … would warrant a reasonable, prudent person in believing that the arrestee had committed … a crime. The inquiry is purely objective, and the officer's subjective state of mind and beliefs are irrelevant." *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022) (cleaned up). The Seventh Circuit has repeatedly held that eyewitness identification creates probable cause, even if the identification is questionable or the officers subjectively doubt its accuracy. *See, e.g.*, *Moran*, 54 F.4th at 499–500; *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019); *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016); *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012). But neither a fabricated identification, *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011), nor an identification obtained by knowingly tricking the witness into identifying the suspect, *Phillips*, 668 F.3d at 917, creates probable cause.

Defendants argue that eyewitness identifications of Blackmon as a shooter by McDowell and Reece gave them probable cause to arrest Blackmon. [Dkt. 197 at 9–11.] A single eyewitness identification is enough to establish probable cause, *Moran*, 54 F.4th at 499–500, so for Blackmon to survive summary judgment, a jury must be

---

[14]     The parties dispute the accrual date of at least part of Blackmon's claim in Count V [Dkt. 197 at 8–9; Dkt. 182 at 40–41; Dkt. 194 at 28–30], but because Defendants are entitled to summary judgment on other grounds, the Court does not consider the timeliness issue.

able to find that none of the identifications established probable cause. Blackmon argues that Reece's identifications were fabricated and McDowell's identifications after the first were merely cumulative. [Dkt. 182 at 42–43.] As will be explained below, a jury could make those findings (or something close to them as to McDowell's identifications), but for purposes of Blackmon's wrongful detention and malicious prosecution claims, only McDowell's first identification—picking Blackmon out of a photo array—matters. *Cf. United States v. Daniels*, 64 F.3d 311, 314 (7th Cir. 1995) (probable cause existed when witness first identified suspect).

Blackmon argues that "the procedures that led to [that] identification were flawed, and Defendants knew they were flawed" because McDowell "identified Mr. Blackmon from a photo array in which he was the only member that matched her description of the shooter." [*Id.* at 43; *see* Dkt. 195 ¶ 72 (noting that McDowell described the shooter as having braids and that, among the individuals in the photo array, only Blackmon's hair was braided).] This is not a sufficient basis to permit a reasonable jury to find that probable cause was absent. The Seventh Circuit has held that an identification procedure in which only one individual matches a witness's description does not necessarily mean a resulting identification is unduly suggestive, a more exacting standard than probable cause. *See United States v. Traeger*, 289 F.3d 461, 472–74 (7th Cir. 2002) (lineup was not unduly suggestive where witnesses described a very large suspect and the defendant was the tallest, heaviest member of the lineup); *Phillips*, 668 F.3d at 915 ("[E]vidence need not be admissible at trial in order to support a finding of probable cause."). Blackmon cites no case holding that if

18

only one person in a photo array or lineup shares a characteristic a witness identified, then the witness's identification does not clear the low bar of probable cause [*see* Dkt. 182 at 41–45], and other Seventh Circuit cases bolster the conclusion that McDowell's photo-array identification established probable cause.

*Coleman* explained that "[w]here a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence." 925 F.3d at 351 (citation omitted). *Hart v. Mannina* held that a witness identification established probable cause even though police used a flawed interview technique—not starting a recording until after a witness indicated she recognized someone—noting that "criticism of police methods does not by itself establish a constitutional violation" and that there was "simply no evidence of coercion or manipulation." 798 F.3d 578, 588 (7th Cir. 2015); *see also id.* at 590 (rejecting the plaintiff's argument that an identification was coached, and therefore could not support probable cause, where a detective may have encouraged a wishy-washy witness to sign the array *after* making the identification). *Phillips* suggested that the level of unreliability necessary for a witness identification not to establish probable cause resembles "showing a witness just one photo and asking her to 'confirm' that the photo depicts the culprit." 668 F.3d at 917. To be sure, none of these cases is directly on point, but read in light of the default principle that a witness identification creates probable cause even if it is flawed, *Moran*, 54 F.4th at 499–500, the fact that only Blackmon wore his hair in braids does not defeat probable cause, and Blackmon has no evidence that police tricked or coerced

McDowell into picking him out of the photo array. Thus, on this record, no reasonable jury could find that McDowell's first identification did not establish probable cause. [*Contra* Dkt. 182 at 41.]

McDowell's identification of Blackmon in the photo array gave Defendants probable cause to arrest him, which is an absolute defense to Blackmon's wrongful detention and malicious prosecution claims. *Burritt*, 807 F.3d at 249; *Moran*, 54 F.4th at 499. Defendants are therefore entitled to summary judgment on Counts V and VI.

## V.    Due Process Claims

The Court now turns to Count I, which contains Blackmon's second set of claims, based on violations of his Fourteenth Amendment due process right to a fair trial. He advances three theories: fabrication of evidence, suppression of exculpatory evidence, and unduly suggestive identification procedures. As explained below, the presence of genuine factual disputes requires these claims to go to a jury. But before diving into the analysis, the Court begins with a threshold question.

### A.    Whether Reece's Deposition Creates Genuine Disputes

Above, the Court addressed the question of whether Reece's 2017 deposition testimony can be considered at summary judgment. A separate question is whether her testimony is sufficient to create genuine disputes of material fact that preclude summary judgment. Defendants argue that it is not, calling her testimony "bizarre" and submitting that the Court "should not accept evidence that is so incredible." [Dkt. 197 at 12 (citations omitted).]

At summary judgment, the Court must not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," *Johnson*, 936

F.3d at 705 (internal quotation omitted), but reasonable inferences only go so far. Blackmon cannot rely on mere speculation, *Moran*, 54 F.4th at 491, nor will the Court "draw every conceivable inference" in his favor, *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (cleaned up). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). One side's story being "blatantly contradicted" usually occurs when, as in *Scott*, video captures the underlying events, *cf. Eagan v. Dempsey*, 987 F.3d 667, 691–92 (7th Cir. 2021) ("*Scott* is simply not apposite. There is a significant qualitive difference between a videotape and crisis-watch logs that were in the hands of officers." (footnote omitted)), but it may also occur when "[d]ocuments or objective evidence … contradict the witness' story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it," *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (internal quotation omitted).

Granting summary judgment because the nonmovant's version of the facts is blatantly contradicted by the record is truly exceptional, proper only when, as a matter of law, a jury could not find in favor of the nonmovant. *Id.*; *cf. United States v. Jarigese*, 999 F.3d 464, 471 (7th Cir. 2021) ("We do not second guess jury determinations on credibility unless the testimony is so implausible that it cannot be trusted as a matter of law." (citation omitted)). Ordinarily, "[w]here the material facts

21

specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *cf. Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022) ("Even if a judge might believe a moving party has more and/or better evidence in its favor, a motion for summary judgment does not authorize or invite the judge to weigh evidence and decide whose story is more credible or persuasive."). Even video evidence will not always suffice to secure summary judgment. *See Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) ("Video evidence … can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." (citing *Scott*, 550 U.S. at 380)).

Defendants raise concerns with Reece's deposition testimony that they believe require the Court to disregard it. They liken it to a sham affidavit, which cannot be used to create a genuine dispute by contradicting earlier testimony. [Dkt. 197 at 12.] "[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. [Courts] also disregard an affidavit that contradicts a statement made under penalty of perjury, even if the statement was not made in the course of litigation." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (citations omitted). Reece's deposition is not an affidavit, but Defendants identify similar concerns about her testimony, about which they were unable to cross-examine Reece, and which contradicts her earlier sworn testimony in

important ways. The Court doubts that the sham affidavit rule applies here,[15] but it makes no difference. The rule does not require the Court to strike offending testimony in its entirety, *see Dunn v. Menard, Inc.*, 880 F.3d 899, 910–12 (7th Cir. 2018) (only contradictory portions of an affidavit stricken), and if Reece's testimony is so incredible that a reasonable jury could not rely on it to resolve disputes in Blackmon's favor, ordinary summary judgment principles would find no genuine dispute of fact without resorting to the sham affidavit rule, *see FKFJ*, 11 F.4th at 585.

Turning to the substance of Reece's deposition, Defendants are correct that some of her testimony is so contradicted by other evidence that no reasonable jury could credit it. *See Seshadri*, 130 F.3d at 801–02. The most powerful examples are Reece's assertions that she did not identify Blackmon as a shooter at the grand jury proceedings or at trial, and that she told everyone, including the judge, that he was

---

[15]     Other courts in this district have found that the rule does not apply to recantations. *See, e.g., Hampton v. City of Chicago*, 2017 WL 2985743, at *17 (N.D. Ill. July 13, 2017); *Rodriguez v. Woodall*, 2004 WL 2583883, at *3–4 (N.D. Ill. Nov. 12, 2004). The Court agrees with its colleagues. The sham affidavit rule does not prevent a witness from ever denying prior sworn testimony; indeed, witnesses are generally permitted to explain inconsistencies in earlier testimony. *See Seshadri*, 130 F.3d at 804. Rather, "[t]he organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing. We adopted the sham-affidavit rule to weed out unfounded claims, specious denials, and sham defenses." *James*, 959 F.3d at 316 (cleaned up). Reece's deposition transcript is not like an affidavit submitted by the nonmovant during summary judgment briefing to "manipulat[e] … testimony to avoid an adverse summary judgment ruling." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 569 (7th Cir. 2022) (citation omitted); *see also Hickey v. Protective Life Corp.*, 988 F.3d 380, 383, 389–91 (7th Cir. 2021) (district court did not abuse its discretion by striking an affidavit submitted in opposition to summary judgment that "was an effort to undo the deposition testimony that precluded his recovery"). Blackmon submitted Reece's deposition transcript to Defendants early on, and there was no indication he was trying to manipulate the evidentiary record by submitting the transcript. As explained above, the Court cannot conclude, on this record, that Defendants were unable to depose Reece. If they had done so, they could have questioned her about contradictions between her prior and current testimony, which she might have explained were due to threats by police and her concern for her children. [*See* Dkt. 182 at 31–32.] *Seshadri*, 130 F.3d at 804.

not the shooter. [*See* Reece Dep. at 163–67.] Those proceedings were transcribed, and there is no dispute about the accuracy of the transcriptions. [*See* Dkt. 178 ¶¶ 70, 89–100.] Without evidence to suggest that "not just … Defendant Detectives made up [Reece's] identification, but everyone else in the justice system that she talked to did as well" [Dkt. 197 at 13], no reasonable jury could credit Reece's deposition testimony over the official transcripts. *Cf. Moran*, 54 F.4th at 495 ("We doubt that calling a defendant untruthful without any other evidence can satisfy a plaintiff's burden at summary judgment." (citations omitted)). Likewise, no reasonable jury could find that Reece saw Blackmon in a lineup on July 4, 2002, the day of the murder, when it is undisputed that an investigative alert regarding him went out until August 30, 2002, and he was not arrested for the murder until September 5, 2002. [Dkt. 178 ¶¶ 52, 55.] *See Seshadri*, 130 F.3d at 802 (disregarding testimony is proper where objective evidence utterly refutes it).

The more difficult question is whether these inconsistencies call Reece's overall testimony into so much doubt that no reasonable factfinder could credit any of her testimony. Defendants say yes, arguing that her testimony contains not "mere inconsistencies," but "fundamental and demonstrably false assertions," and "[h]er testimony was often incoherent, and she seemed confused." [Dkt. 194 at 22–23.] Defendants are correct that in addition to the points discussed above, Reece seemed genuinely confused, exhibiting little grasp of names, dates, and the identities of individuals, including Blackmon himself. [*See* Reece Dep. at 51:5–:16 ("Q.: And if you know, was the second shooter Eric Blackmon? A.: I thought the guy that was dead

was Eric Blackmon. … Well, see, now, when you bring it up, I forgot you guys are for Eric Blackmon ….").] But the fact that Reece seemed confused and made statements that are known to be incorrect does not mean her whole deposition can be ignored. A reasonable jury viewing this testimony in Blackmon's favor could conclude that any misstatements about dates were mistakes rather than lies. For example, it is undisputed that Reece went to the police station on July 4, 2002 to view a photo array and that she viewed a lineup including Blackmon on September 5, 2002. [Dkt. 178 ¶¶ 27–29, 61.] It would be reasonable to conclude that Reece confused events at the police station on July 4 with those on September 5; a jury would not be compelled to find that she was lying.

Similarly, before Reece was asked about whether she identified Blackmon as the shooter at the grand jury and at trial, this exchange occurred:

> Q.:  … Did you ever tell any attorney, at any point, that Blackmon was not the guy who was the second shooter?
>
> A.:  I don't know if they was attorneys or police officers or --
>
> Q.:  Okay.
>
> A.:  -- detectives. I don't know who I was talking to. But I know I've told everybody that talked to me that he was not the shooter.

[Reece Dep. at 163:13–:21.] Reece was later asked, "[D]id you tell the judge at the court that, This is not the guy?" She answered: "I told him no, that was not the guy. But they was insisting that I said that was the guy that was on the paper -- on the pictures that I seen." [*Id.* at 164:7–:11.] While this answer appears to be a definite statement, what immediately followed was uncertain testimony about prosecutors' identities and whether lawyers or judges asked her questions at the proceedings. [*Id.*

25

at 164:12–:21.] Then, Reece appears to have been shown a transcript of her trial testimony and agreed that she testified that Blackmon committed the crime. [*Id.* at 166:14–167:4.] A jury could interpret that exchange to indicate that Reece confused what happened at trial with what happened at other times, not that she was lying.

What Reece was adamant about throughout her deposition was that she did not see Blackmon shoot Cox and that the detectives pressured her to identify him, including by threatening to take her children from her if she did not comply. [*See, e.g.*, Dkt. 178 ¶ 99.] While Defendants offer strong arguments for why a jury should not and would not believe this testimony [*see* Dkt. 197 at 13 ("Reece's implausible habeas testimony stands in stark contrast to her earlier concise Grand Jury and trial testimony that she saw Plaintiff shoot Cox in the eye, and that she identified him to Defendant Detectives as the person that performed that horrific act.")], the Court cannot say that a reasonable jury could not, as a matter of law, believe Reece on this point. Thus, to the extent that it is not squarely refuted by undisputed evidence, Reece's deposition testimony can create genuine disputes of fact for a jury to resolve.

## B.     Fabrication of Evidence

Blackmon's first due process theory is that Defendants violated his right to a fair trial by fabricating evidence against him. [Dkt. 182 at 28–30, 34–37.] A due process fabrication claim requires Blackmon to "prove that a police officer manufactured false evidence against him, which was later used to deprive him of his liberty in some way. The fabricated evidence must be material, which means there is a reasonable likelihood the evidence affected the judgment of the jury." *Moran*, 54 F.4th at 498 (cleaned up). While it may be possible that evidence not introduced at

26

trial could affect the jury's judgment, the Seventh Circuit has implied that fabricated evidence must be introduced at trial to satisfy the materiality requirement. *See, e.g.*, *id.* at 499 (disregarding allegedly fabricated evidence that was not introduced at trial); *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) ("If fabricated evidence is … used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial." (citation omitted)). At minimum, for fabricated evidence to be material despite not being introduced at trial, a plaintiff must demonstrate that the evidence affected the trial proceedings.[16]

Blackmon argues that Defendants fabricated four categories of evidence, but the Court focuses on one category: Reece's identification of Blackmon as a shooter.[17] This evidence is clearly material. Along with McDowell's identification, it formed the core of the case against Blackmon. A jury could also find that this testimony was fabricated based on Reece's deposition statements. *See Fields*, 740 F.3d at 1110

---

[16]     Blackmon argues that evidence need not be introduced at trial to support a fabrication claim, citing *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help him."), and two district court opinions. [Dkt. 182 at 36.] But the Seventh Circuit has more recently clarified that "[a] claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause. If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial." *Patrick*, 974 F.3d at 834 (citations omitted); *see also Lewis v. City of Chicago*, 914 F.3d 472, 476–80 (7th Cir. 2019). As discussed above, even if Reece's identification was fabricated, McDowell's first identification established probable cause, so a Fourth Amendment fabrication claim would fail.

[17]     The other categories—Blackmon's nickname being "Pride" and him being a member of the New Breeds, Reece's son Whitaker identifying Blackmon, and Blackmon declining to speak to police upon his arrest [Dkt. 182 at 28–30, 34–36]—are not material because no evidence in the record suggests that evidence related to them was introduced at or affected the trial. [*See id.* at 36–37 (arguing only that this evidence caused him to be confined "in some way" (quotation omitted)).] Blackmon notes that there was testimony about the nickname "Pride" at trial, but not that it was his nickname. [Dkt. 178 ¶ 116; *see* Dkt. 180-26 at HH-4.]

27

("Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it."); *cf. Camm*, 937 F.3d at 1112 ("Camm does not contend that the investigators fed Boney a story they knew was false. He argues instead that the investigators used suggestive interrogation methods to elicit a story they should have known was unreliable. Without more, however, the claim for evidence fabrication cannot succeed."). The question, therefore, is whether there is a genuine dispute as to whether Defendants fabricated Reece's identifications.

The Court concludes that there is a genuine dispute on this point. The Court has already rejected Defendants' arguments that Reece's deposition is inadmissible and so incredible that it should be disregarded. [Dkt. 197 at 18–19; Dkt. 194 at 19–23.] Reece testified that from the first time police showed her pictures of Blackmon, she said that she only recognized him from a mugshot book; that she did not identify him as a shooter in a lineup; and that she was told her children would be taken to foster care if she did not cooperate with the identification. [*See* Dkt. 195 ¶¶ 91–92, 110.] If a jury credited this testimony, it could find that Defendants caused fabricated testimony to be introduced at trial by coercing Reece into identifying Blackmon as a shooter despite her denials that she saw him shoot Cox. *See Fields*, 740 F.3d at 1110. Defendants' motion for summary judgment on Blackmon's fabrication claim is denied to the extent it is based on this testimony.

### C.    Suppression of Evidence

Next, the Court turns to Blackmon's suppression of evidence claim. To prevail, Blackmon must show that Defendants violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing exculpatory evidence. *Moran*, 54 F.4th at 492. "Evidence is suppressed if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* (cleaned up). Police officers' duty to turn over exculpatory evidence is limited: "A police officer's *Brady* obligation extends only insofar as they must turn over potentially exculpatory evidence to the prosecution. Thus, police officers discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Id.* (cleaned up).

Defendants note that the Amended Complaint alleges that several categories of evidence were suppressed [Dkt. 197 at 20; *see* Dkt. 73 ¶ 109], but Blackmon has abandoned all his theories besides suppression of Reece's fabricated identification [*see* Dkt. 182 at 37–39]. As the Court explained above, there is a genuine dispute as to whether Defendants fabricated Reece's identification, so the question for purposes of Blackmon's *Brady* claim is whether there is a genuine dispute as to whether evidence of the fabrication was suppressed. The Court holds that there is.

Defendants argue that a *Brady* claim for suppression of fabricated evidence is improper. [Dkt. 197 at 25–26.] They rely on *Saunders-El v. Rohde*, which held that a fabrication of evidence claim could not be recast as a *Brady* claim, 778 F.3d 556, 562 (7th Cir. 2015), but that case is distinguishable. There, the defendant was acquitted,

so there could have been no violation of the right to a fair trial, *id.* at 561 ("It would be anomalous to hold that attending a trial deprives a criminal defendant of liberty without due process of law, when the purpose of the trial is to effectuate due process." (internal quotation omitted)), and the discussion of *Brady* fabrication claims was limited to where a *Brady* claim would have "require[d] the creation of exculpatory evidence" or "compel[led] police officers to accurately disclose the circumstances of their investigations to the prosecution," rather than disclosure of already existing evidence, *id.* at 561–62. More recently, the Seventh Circuit has recognized *Brady* claims based on suppression of fabricated evidence where a defendant was convicted or detained pending trial. *Patrick*, 974 F.3d at 834–35; *Lewis*, 914 F.3d at 480.

Defendants also argue that evidence of fabrication could not be material for purposes of a § 1983 suit against them because it was known to the prosecutors: "by Reece's own account, she told multiple prosecutors, the judge in court, and 'everybody' else who talked to her throughout the prosecution that Plaintiff was not the perpetrator. That means her allegedly exculpatory statements regarding Plaintiff's participation in the Cox murder were not suppressed." [Dkt. 194 at 27–28 (citation omitted).] This would be true if the exculpatory or impeachment evidence at issue was the fact that Reece said Blackmon was not a shooter, but it is not. The tactics Reece said Defendants used to induce her to identify Blackmon would themselves have been useful for impeachment, independent of her disavowing that Blackmon was the shooter. This case is akin to *Avery v. City of Milwaukee*, which distinguished between when the defendant knows about the improper tactics used and a situation

in which the defendant "knew that the informants' statements were false, but did *not* know about the pressure tactics and inducements the detectives used to obtain them" or that one informant had "recanted his statement just before trial but was told that he 'had to' testify." 847 F.3d 433, 443–44 (7th Cir. 2017); *see also Moran*, 54 F.4th at 496 (indicating that a *Brady* claim may be viable if a certain form of evidence would be more useful than what was known to the defendant).

Here, Reece testified that she told the prosecution that her identification was not accurate, but given her confusion about events and individuals, a jury would not be compelled to find that she disclosed all material information about how Defendants procured her identification. *See Avery*, 847 F.3d at 443–44. If a jury finds that Reece's identification was fabricated, there is a genuine dispute as to whether all pertinent information about the police tactics used to obtain it was disclosed to the prosecution or defense. The Court therefore denies Defendants' motion for summary judgment to the extent that it is based on the failure to disclose such evidence.

### D. Unduly Suggestive Identifications

The Court now turns to Blackmon's final due process theory, that Defendants secured McDowell's identification by using unduly suggestive procedures.[18] The due process right to a fair trial is violated "if unduly suggestive identification techniques are allowed to taint the trial." *Holloway v. City of Milwaukee*, 43 F.4th 760, 765 (7th

---

[18]     Blackmon also argues that Reece's identifications were the result of unduly suggestive procedures [Dkt. 182 at 12–13], but since the Court has already determined that a reasonable jury could find that Defendants fabricated Reece's identifications and coerced her to identify Blackmon at trial, it is apparent that there is a genuine dispute as to whether the procedures used to secure Reece's identifications were unduly suggestive.

Cir. 2022) (quoting *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006)); *see Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) ("We have held that a witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (cleaned up)). The test for an unduly suggestive identification claim has two steps: first, the Court determines "whether the identification procedure used by law enforcement was both suggestive and unnecessary," and if so, it asks, "based on the totality of the circumstances, whether the identification was sufficiently reliable to outweigh the effect of the tainted procedure." *Holloway*, 43 F.4th at 766 (cleaned up). The Seventh Circuit has also suggested that a police officer must know that identifications are tainted to be liable under § 1983. *See Coleman*, 925 F.3d at 348–49; *Phillips*, 668 F.3d at 915–16.

Defendants argue that they did not employ unduly suggestive identification procedures and, in the alternative, that they are entitled to qualified immunity. [Dkt. 197 at 30.] The Court disagrees. A reasonable jury could find that Defendants arranged for McDowell to view Blackmon in a lineup under circumstances designed to increase the chances that she would be convinced that she correctly identified him as a shooter from a photo array. If it made that finding, then a jury could reasonably find that McDowell's confident identification of Blackmon at trial was the product of unduly suggestive investigative procedures. Moreover, it was clearly established in 2002 that police cannot manipulate a witness to identify their preferred suspect, so

factual disputes preclude awarding Defendants qualified immunity at this stage. Before turning to the merits, the Court considers two threshold issues.

### 1. Cognizability Under § 1983

Defendants argue that a claim like this one is not cognizable in a § 1983 suit. [*Id.* at 31.] As the Supreme Court recently explained, "the right conferred by *Miranda* is only a trial right, not a free-standing constitutional right; defendants may thus seek to suppress evidence obtained in violation of their Miranda rights at their criminal trials, but they may not sue officials under section 1983 for that violation." *Holloway*, 43 F.4th at 766 (citing *Vega v. Tekoh*, 142 S. Ct. 2095, 2101 (2022)). *Holloway* raised the possibility that, like *Miranda* warnings, the right to be free from unduly suggestive identification procedures is a trial right not enforceable under § 1983, but it declined to answer that question. *Id.*

Defendants urge the Court to take up this question and hold that unduly suggestive identification procedure claims are not cognizable under § 1983. [Dkt. 197 at 31.] Blackmon concedes that subjecting a criminal defendant to suggestive identification procedures is not itself actionable in a § 1983 suit, but he argues that when such procedures impair the due process right to a fair trial, a § 1983 claim is proper. [Dkt. 182 at 16–18.] The Court agrees with both parties on this point. In its view, existing Seventh Circuit precedent resolves when such claims are enforceable:

> The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality. It does, however, guarantee the right to a fair trial—in this context, via the due process clause of the Fourteenth Amendment—and that right is violated if unduly suggestive identification techniques are allowed to taint the trial. …

> Grounded in due process, the constitutional interest implicated in challenges to police identification procedures is evidentiary in nature. Thus, ... the ... rule regarding unduly suggestive identification procedures is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of that core right and not the prophylactic rule that should be actionable under § 1983.

*Alexander*, 433 F.3d at 555 (cleaned up). This approach tracks the Supreme Court's treatment of *Miranda* rights in *Vega*. A violation of the prophylactic rule (*Miranda* warnings) is not itself a constitutional violation; only a violation of the core right (the Fifth Amendment right against self-incrimination) can support a § 1983 claim. *See Vega*, 142 S. Ct. at 2101, 2106, 2018; *cf. Holloway*, 43 F.4th at 766 (not suggesting that *Vega* undermines *Alexander*'s reasoning). Therefore, Blackmon's claim is viable to the extent that he can prove improper identification procedures affected his trial.[19]

### 2. Necessity of Objecting in the Criminal Proceeding

The second threshold issue Defendants press is the argument that they cannot be held liable for any unduly suggestive identification procedure because Blackmon did not object to the introduction of McDowell's (or Reece's) identification at trial.

---

[19] In their reply brief, Defendants argue that the Seventh Circuit's order in *Carter v. Wrobel*, No. 21-1018, issued in the wake of *Vega*, "demonstrates that, even where evidence that should have been suppressed was admitted against the criminal defendant and tainted the criminal trial, there is still no constitutional violation." [Dkt. 194 at 8–10; Dkt. 194-1.] But *Carter* is distinguishable because, there, the appellant "conceded at oral argument that his statement had not been coerced" [Dkt. 194-1], meaning that the core right had not been violated, *see Vega*, 142 S. Ct. at 2101 ("[T]he right bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion." (citations omitted)). Thus, in *Carter*, the only possible § 1983 claim was for the mere failure to give *Miranda* warnings, which *Vega* foreclosed, but that result follows from the fact that only the introduction of a coerced confession violates the right against self-incrimination. *See* 142 S. Ct. at 2101. By contrast, under Seventh Circuit precedent, while protections against unduly suggestive identification procedures are prophylactic, allowing such procedures to taint a trial violates the core due process right and is actionable in a § 1983 suit. *Alexander*, 433 F.3d at 555.

[Dkt. 197 at 37–39.] This, Defendants argue, constituted forfeiture, which prevents

him from bringing a § 1983 claim based on the identifications. [*Id.*]

In support of this position, Defendants rely in large part on Seventh Circuit

dicta. [Dkt. 197 at 12.] First, in *Alexander*, the Seventh Circuit observed that "[i]t is

telling that Alexander did not move to suppress or otherwise object to the introduction

of the identification evidence on grounds of unconstitutional suggestiveness." 433

F.3d at 556. But that observation came in the context of briefing that made it

impossible to determine what occurred at trial:

> Alexander has come up short because he has not made any effort to
> describe how the police identification procedures tainted his trial. He
> has not identified or produced the relevant portions of the trial
> transcript or even described the pertinent trial testimony or evidence.
> He has recited a litany of poor investigative practices, but his argument
> is scattershot and does not direct us to anything that occurred during
> the pretrial or trial proceedings in the prosecution against him. Photos
> of the lineup and photo array are in the record, but without the
> corresponding trial testimony from the police, victims, and
> eyewitnesses, we cannot conduct the appropriate legal analysis.
>
> It is telling that Alexander did not move to suppress or otherwise object
> to the introduction of the identification evidence on grounds of
> unconstitutional suggestiveness. Without the trial record we cannot
> determine whether such a motion, had it been made, would or should
> have been granted. The photos of the lineup and photo array do not
> depict identification procedures so obviously suggestive and unreliable
> as to establish, by themselves, a constitutional violation.

*Id.* By noting the absence of a motion to suppress, the Seventh Circuit was not

adverting to a prerequisite that a criminal defendant move to suppress or object to

an unreliable identification before suing under § 1983 related to that identification,

but rather was commenting on the failure to develop a sufficient record.

Second, *Coleman* stated that the "[d]efendants in this case cannot be held liable for depriving Coleman of his constitutional rights simply because the trial court rejected Coleman's legal arguments, or because he forfeited them." 925 F.3d at 347. Here, too, the context of this statement sheds light. After explaining the test for suppression of an identification in a criminal case, the Seventh Circuit explained that the standard for § 1983 liability differs:

> These principles address the admissibility of eyewitness identifications at trial, not § 1983 liability. In his criminal case, Coleman moved to suppress Tequilla's photo and lineup identifications as tainted by the early morning hallway encounter. The trial court examined those arguments at a suppression hearing but denied the motion. Coleman did not object to Tequilla's in-court identification, and he did not address the suppression ruling in his criminal appeal. Defendants in this case cannot be held liable for depriving Coleman of his constitutional rights simply because the trial court rejected Coleman's legal arguments, or because he forfeited them.

*Id.* What this passage means is that if the jury saw an identification that it should not have—because the defendant did not object or the court erred by allowing it in— the officers who conducted the identification procedure are not automatically liable under § 1983. Indeed, *Coleman* continued by analyzing whether the plaintiff had made a sufficient showing to survive summary judgment, *id.* at 347–49, which would have been unnecessary if objecting in the criminal proceeding was required. As Blackmon notes [Dkt. 182 at 19–20], the two district courts to have considered whether *Coleman* recognized such a requirement have concluded that it did not. *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 906–08 (N.D. Ill. 2022); *Fletcher v. Bogucki*, 2021 WL 4477968, at *6 (N.D. Ill. Sept. 30, 2021). The Court agrees with its

colleagues. A defendant need not object to an identification procedure to later challenge it in a § 1983 action.[20]

### 3. Defendants' Identification Procedures

With those matters out of the way, the Court turns to the merits. In Blackmon's view, and construing the record in his favor, Defendants heard McDowell describe a suspect with braids, and then gave her a photo array in which only Blackmon matched that description. [Dkt. 182 at 12.][21] Next, when McDowell was picked up to

---

[20]    Defendants also point out that under Illinois law, a criminal defendant must object to an identification, or he waives or forfeits any argument that it was improper. [Dkt. 197 at 38.] Defendants cite cases decided on direct appeal for this proposition, *People v. Pierce*, 284 N.E.2d 279 (Ill. 1972); *People v. Campbell*, 450 N.E.2d 1318 (Ill. App. Ct. 1983), but the uncontroversial point that failing to object in a trial court waives or forfeits an argument on appeal does not establish that the lack of an objection is dispositive in a separate proceeding. Also unavailing is Defendants' argument that allowing Blackmon to challenge identification procedures now would ill serve judicial economy because the Court or a jury would have to adjudicate an issue resolved in the state court proceeding. [Dkt. 197 at 38–39.] Defendants' argument mirrors the Supreme Court's explanation for why it declined to extend § 1983's protections to violations of prophylactic *Miranda* warnings, but while it may be sound policy not to recognize a cause of action that forces a federal court to revisit an issue fully settled by a state court, 142 S. Ct. at 2107, that is not the situation here. Instead, a due process claim for unduly suggestive identification procedures aims to enforce an established constitutional right and does not require relitigating an issue decided by a state court. *See Bolden*, 623 F. Supp. 3d at 907–08 ("It is undoubtedly true that a ruling by a trial court in a criminal case … does not necessarily give rise to liability in a later civil case under section 1983. A trial court in a criminal case addresses the admissibility of evidence, not tort liability.").

[21]    Blackmon also argues that the photo array was suggestive because McDowell described a tall, thin suspect and Blackmon was the tallest and lightest among the men in the photo array. [Dkt. 182 at 12.] Defendants argue that McDowell could not have been influenced by these factors because the array did not list height or weight and depicted only heads and shoulders. [Dkt. 194 at 4, 18, 32; *see* Dkt. 180-1.] Defendants have a point about height. Given that she saw headshots, it is unlikely that a jury could find that McDowell was influenced by Blackmon's height relative to the others'. Weight is a closer question because build can be perceived in a headshot, at least to some degree. The second and fifth men depicted in the photo array, for example, are clearly heavier set than Blackmon. [*Compare* Dkt. 180-1 at 4, *with id.* at 5, 8.] A jury could find that at least these lineup participants were "appreciably" heavier than Blackmon. *Cf. United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996) (rejecting claim where other lineup participants' appearances were not appreciably taller nor conspicuously heavier than the suspect). Even so, noticeable height or weight

view the lineup, she was told that there was someone the police wanted her to view, suggesting the suspect would be in the lineup; again, Blackmon was the only participant with braids; and he was taller and thinner than the other individuals. [*Id.*] When she identified Blackmon, she was told that another witness had identified the same individual. [*Id.*] This sequence of events "reinforced [McDowell's] view that her identification was correct." [*Id.*] Prior to the lineup, she was also shown pictures of the crime scene and victim, which made her more motivated to identify the shooters. [*Id.* at 53.] Under the totality of the circumstances, Blackmon argues, a reasonable jury could find that Defendants employed unduly suggestive identification techniques. [*Id.* at 12.] The Court agrees.[22]

On the first step, whether the procedure was both suggestive and unnecessary, *Holloway*, 43 F.4th at 766, viewing the record in the light most favorable to Blackmon, a reasonable jury could answer both questions in the affirmative. Taking the second point first, 17 days passed between when McDowell described a tall, thin shooter with braided hair and when she viewed the photo array. Further, when McDowell viewed

---

differences between a suspect and others do not necessarily render a lineup unduly suggestive. *See id.* at 253–54; *Traeger*, 289 F.3d at 473–74.

[22] Because the Court explained above that McDowell's first identification of Blackmon was sufficient to establish probable cause, the Court pauses here to clarify why that holding is consistent with its conclusion that a jury could find in Blackmon's favor on the suggestive procedures claim. Probable cause is measured by an objective standard, and once it exists, it defeats any claim for wrongful detention or malicious prosecution, regardless of what occurs after. *See Burritt*, 807 F.3d at 249; *Moran*, 54 F.4th at 499. But if, under the totality of the circumstances, an "identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," then that identification can form the basis for a due process claim, even if the initial events do not render the procedures unduly suggestive. *See Lee*, 750 F.3d at 691 (internal quotation omitted). And as noted above, probable cause is a lower standard than admissibility, *Phillips*, 668 F.3d at 915, so it may be that a dubious first identification clears the probable cause threshold but still contributes to an unduly suggestive procedures claim.

the lineup with Blackmon, he had been arrested, and Defendants have offered no evidence that they were under time pressure to conduct the photo array or lineup. [Dkt. 178 ¶ 57 (noting only that the lineup members besides Blackmon and Davis were fillers, Black men ages 21–33 who had been arrested on unrelated charges); Dkt. 195 ¶ 113 (admitting that the lineup could have been postponed to get fillers with braids).] *Cf. Phillips*, 668 F.3d at 914 ("Police need not run down all leads before making an arrest—especially not when a crime is violent and leaving the perpetrator at large may endanger other persons."). A reasonable jury could find that there was sufficient time to prepare identification procedures in which Blackmon was not the only individual who matched McDowell's description. A jury could also find that the extraneous comments and showing McDowell pictures of the crime scene and victim were unnecessary.

A jury could also reasonably find that these procedures were suggestive. *See Holloway*, 43 F.4th at 766. Making Blackmon the only suspect in the photo array and lineup who matched a descriptor she gave of the suspect (braided hair), and including only individuals shorter and heavier in the lineup, could be found to have increased the chances that McDowell would identify him as the shooter and repeat that identification later. Additionally, a reasonable jury could find that by priming McDowell to identify a suspect and telling her she identified the same person another witness did, Defendants' aim was to manipulate McDowell into identifying Blackmon and sticking with that identification.

Defendants argue that the identification procedures were not suggestive because the Seventh Circuit and Illinois courts have found similar lineups not unduly suggestive. [Dkt. 197 at 32–34; Dkt. 194 at 10–11.] *See Traeger*, 289 F.3d at 473–74 (lineup not unduly suggestive where other lineup participants were not as tall or heavy as 6′5″, 350-pound suspect); *Funches*, 84 F.3d at 253–54 (district court's finding that lineup was not unduly suggestive where suspect was shorter and lighter than other participants was not clearly erroneous); *People v. Love*, 878 N.E.2d 789, 794–95 (Ill. App. Ct. 2007) (one of several Illinois cases holding that a suspect being the only lineup participant in braids was not unduly suggestive). As an initial matter, the Court is doubtful that state court decisions carry authoritative weight in this context, although their reasoning may be persuasive. Defendants have not cited any authority for that proposition, and the Court has found none. *Cf. United States ex rel. Haywood v. O'Leary*, 827 F.2d 52, 56–61 (7th Cir. 1987) (reviewing state court findings in a 28 U.S.C. § 2254 habeas corpus proceeding).

The Court need not resolve that issue here, though, because Blackmon does not argue that the procedures alone were problematic, but rather that Defendants sought to secure those identifications by improper means. [Dkt. 182 at 12.] That the Seventh Circuit and Illinois courts have upheld lineups with similar disparities between a suspect and others in a lineup does not control the question of whether a jury could find that the discrepancies between Blackmon's build and hairstyle, combined with the extraneous comments before and after the lineup, rendered this lineup unduly suggestive. The Court is not required to consider these lineup

40

procedures in a vacuum without taking Defendants' conduct and inferences from that conduct into account—due process claims under § 1983 require a showing of intent. *See Coleman*, 925 F.3d at 348–49 (suggesting that knowledge about the impropriety of identification procedures is necessary to a § 1983 claim); *Moran*, 54 F.4th at 493 ("[F]or purposes of [§ 1983] civil liability, negligent conduct does not offend the Due Process Clause." (cleaned up)).[23]

Nor does Blackmon's claim fail because McDowell stood by her identification of Blackmon during cross-examination and testified during the habeas proceedings that she believed her identification of Blackmon was accurate. [Dkt. 197 at 34–36; Dkt. 178 ¶ 113.] It "is too much of a leap at the summary-judgment stage" to conclude, as a matter of law, that a witness who confidently identified a suspect and testified that the identification was not influenced by improper procedures because such procedures can "operate[ ] at the level of the subconscious, and so even a sincere and well-intentioned witness can unwittingly identify the wrong person." *Holloway*, 43 F.4th at 767. The Seventh Circuit was speaking in the context of "unconscious transference," *id.* at 766–67, but Blackmon has presented expert testimony showing that McDowell's identification was similarly susceptible to influence [Dkt. 182 at 8], in part because McDowell only saw the shooters for about five seconds while in a car with several others [Dkt. 195 ¶¶ 4–5]. *See Reyes v. Nurse*, 38 F.4th 636, 645 (7th Cir.

---

[23]    *Phillips*'s rejection of the argument that an officer "must have known that he was steering [the witness] to pick" the plaintiff out of the lineup under "the rule that the officer's motives do not count" does not prove otherwise, because *Phillips* was a Fourth Amendment case about probable cause, which uses an objective test. 668 F.3d at 915 (citations omitted).

2022) (calling 15–25 seconds "very little time to view [a] shooter's face");[24] *cf. Traeger*, 289 F.3d at 474 (2–3 minutes in proximity with the suspect, despite not looking at him some of that time, was "ample opportunity" for an identification, especially where the witness's "attention was likely sharpened by the fact that she was being robbed").

Also unavailing is Defendants' resort to the presumption that a judge presiding over a bench trial considers admissible evidence and disregards inadmissible evidence. [Dkt. 197 at 35–36 (citing cases).] The judge did not hear evidence about the circumstances that would permit a jury to find that McDowell's confident identification was secured by improper means, most significantly the extraneous comments before and after the lineup. [*See* Dkt. 182 at 20 (making a similar point).] As noted above, failing to argue a basis for suppressing the identification to the judge in the criminal proceedings does not foreclose Blackmon from raising that argument in his § 1983 suit. Presuming the judge properly considered the evidence as presented to him at the trial does not answer the question of whether a reasonable jury could find that the identification procedures were unduly suggestive. [*Cf.* Dkt. 197 at 36–37 (noting that the judge opined that the procedures were "almost pristine").][25] As the Court has explained, a jury could reasonably make that finding.

---

[24]     In *Reyes*, the Seventh Circuit was applying 28 U.S.C. § 2254's deferential standard of review to state court determinations, but it made clear that "[i]f it were up to us, we would have no trouble saying that each of these considerations supports [the petitioner's] claim that [the witness's] identification was unreliable." 38 F.4th at 646.

[25]     Similarly, when the Seventh Circuit observed that McDowell's and Reece's testimony "was enough to support the guilty verdict," *Blackmon*, 823 F.3d at 1106, it was reviewing a record that lacked the evidence of fabrication and unduly suggestive procedures Blackmon has adduced in this case.

Turning to the second prong of the suggestive identification procedures test, the Court considers "whether [McDowell's] identification was sufficiently reliable to outweigh the effect of the tainted procedure." *Holloway*, 43 F.4th at 766 (citation omitted). The answer is no. McDowell saw the shooters for only five seconds from her car, less than the 15–25 seconds that constituted "very little time" to make an identification in *Reyes*, 38 F.4th at 645. She also misidentified the cell phone Arrigo was holding as a gun. [Dkt. 195 ¶ 8.] And Blackmon has presented evidence that her confident identification under cross-examination at trial could have been caused by the subconscious effects of Defendants' suggestive procedures. [Dkt. 182 at 8.] *See Holloway*, 43 F.4th at 767. A reasonable jury could find that, under these circumstances, McDowell's identification was not reliable enough to outweigh the effect of the tainted identification procedures. *Id.* at 766.

A jury could find that Defendants used unduly suggestive techniques to induce McDowell to confidently identify Blackmon as a shooter through the combination of: (1) not including other braided individuals in the photo array, although McDowell said one shooter had braids; (2) priming her to identify a suspect in the lineup by showing her pictures of the crime scene and victim and implying the suspect would be in the lineup; (3) having Blackmon be the only braided individual in the lineup, as well as the tallest and lightest participant; and (4) telling McDowell that another witness had identified Blackmon after she picked him out. A jury could also find that that McDowell's identification was not sufficiently reliable to overcome the effect of

43

the suggestive identification procedures. Therefore, there is a genuine dispute on this claim that a jury must resolve.

### 4.    Qualified Immunity

Blackmon is not out of the woods yet. Defendants have argued that even if they committed a due process violation by using unduly suggestive identification procedures, they are entitled to qualified immunity. "'Officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.' A party seeking to defeat qualified immunity must show both elements; on the other hand, the defendant obtains qualified immunity by blocking either part." *Holloway*, 43 F.4th at 767 (internal alteration omitted) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). "Qualified immunity is an affirmative defense, but once the defendant raises it, the burden shifts to the plaintiff to defeat it." *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (cleaned up).[26] The Court has already explained that Blackmon has met the first prong because a jury could find a due process violation here. The remaining question is whether a jury could find that this constitutional right was clearly established by 2002. A jury could make that finding.

Overcoming qualified immunity is not easy. As the Seventh Circuit recently explained:

> The inquiry into whether a constitutional right is clearly established must be undertaken in light of the specific context of the case, not as a

---

[26]    Defendants only seek qualified immunity on the unduly suggestive procedures claim. [Dkt. 182 at 23 n.2.] Since qualified immunity is an affirmative defense, Defendants have waived immunity at summary judgment with respect to Blackmon's other § 1983 claims. *See Henry v. Hulett*, 969 F.3d 769, 785–86 (7th Cir. 2020) (en banc).

> broad general proposition. A right is clearly established when it is defined clearly enough to put officers on notice of their duties under the circumstances they confront. This does not require a prior case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Prude v. Meli*, 76 F.4th 648, 659 (7th Cir. 2023) (cleaned up). A plaintiff may show that a right is clearly established in three ways:

> First, by identifying a closely analogous case finding the alleged violation unlawful. Second, by identifying in the relevant caselaw such a clear trend that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time. … [Third, in] rare cases, [by] arguing [that a defendant's] conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully.

*Stockton v. Milwaukee County*, 44 F.4th 605, 620–21 (7th Cir. 2022) (cleaned up). This test considers what an objectively reasonable officer could believe, *see Rainsberger v. Benner*, 913 F.3d 640, 652–53 (7th Cir. 2019), but when a claim turns on a defendant's state of mind, the issue whether an objectively reasonable officer could believe it was constitutional to take certain actions for the reasons in question, *see Prude*, 76 F.4th at 660 ("No reasonable official could believe that predetermining the outcome of a disciplinary hearing—no matter how that is accomplished—is consistent with due process." (citation omitted)).

In arguing that Blackmon cannot overcome qualified immunity, Defendants argue that, like in *Holloway*, Blackmon "can point to no controlling or persuasive authority that clearly established that it was impermissible for the police to use a photo array where [the suspect] is the only photograph with braided hair before the live lineup." [Dkt. 197 at 40–41 (citing Illinois cases regarding braided hair); *see also* Dkt. 194 at 16–18.] Here, again, Defendants focus on the lineup procedures in

45

isolation without engaging with the evidence that McDowell's identifications were affected by extraneous comments combined with factors that made Blackmon more likely to be identified than other individuals in the lineup. [*See* Dkt. 182 at 25–26 (arguing that Defendants wrongly "attempt to narrow" Blackmon's claim).] But as the Court has explained, a jury could find that Defendants attempted to manipulate McDowell's identification, and at summary judgment, the Court must assume they did so. If Defendants' qualified immunity depends on which version of the facts is true, it must be denied at the summary judgment stage. *See Gant v. Hartman*, 924 F.3d 445, 448 (7th Cir. 2019).

Such a factual dispute exists here. On Blackmon's version of the facts, Defendants employed procedures designed to induce McDowell to identify Blackmon and to be confident in her identification, despite the fact that she had seen the shooter for only five seconds. The question for qualified immunity purposes is whether an objectively reasonable officer in Defendants' position could have believed it was consistent with due process to influence a witness to identify a specific suspect in this way. In urging an affirmative answer, Defendants rely heavily on *Holloway* [Dkt. 197 at 40–41; Dkt. 194 at 18], but that case is inapposite. There, the Seventh Circuit held that the officers were entitled to qualified immunity because no case had held the procedures they used unlawful, but there was no indication that the defendants had manipulated the lineup to induce the witness to identify the plaintiff. *See Holloway*, 43 F.4th at 766–67. [Dkt. 182 at 26 n.3 (pointing out that Defendants cite caselaw involving "an officer us[ing] a procedure that, unbeknownst to the officer, was

46

suggestive and therefore unintentionally violated a suspect's rights," not intentional manipulation).] Blackmon, in contrast, cites cases supporting the general proposition that police may not subject criminal defendants to unduly suggestive identification procedures. [Dkt. 182 at 26–27 & nn.4–6.][27] While these cases may involve more egregious conduct than what the evidence would permit a jury to find here [*see* Dkt. 194 at 17], that does not necessarily mean they cannot put Defendants on notice that their conduct violates the Constitution. *Stockton*, 44 F.4th at 620–21.

The caselaw Blackmon cites is sufficient to clearly establish the law here. The Court finds *Bolden* instructive on this point. There, the district court observed:

> The whole point of a lineup is that the witness – not the police – does the picking. That reality has been true since day one. Case law predating 1981 put a police officer on reasonable notice that it would violate due process to signal to a witness during the viewing of a lineup the identity of the suspected offender. As such, officers in 1994 knew that they couldn't point to a suspect and tell the witness to choose that person.

623 F. Supp. 3d at 921 (cleaned up). True, the record here does not show that Defendants "point[ed] to" Blackmon and told McDowell to identify him, but if the jury believes Blackmon's side of the story, they did the near equivalent by taking steps designed to induce McDowell to identify him. No reasonable officer could conclude

---

[27]     Defendants take issue with Blackmon's citations appearing in footnotes. They argue that "[u]ndeveloped arguments and arguments raised in footnotes are waived." [Dkt. 194 at 16 (internal quotation omitted).] Invoking waiver here is an aggressive reading of Seventh Circuit precedent, to say the least. The key words are "perfunctory" and "undeveloped," *see, e.g.*, *United States v. Davis*, 29 F.4th 380, 385 n.2 (7th Cir. 2022) ("This one sentence observation without argument is undeveloped and thus waived." (citation omitted)), and while "[a] party may waive an argument by presenting it only in an undeveloped footnote," *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 829 (7th Cir. 2017) (citations omitted), that does not mean all material in footnotes is waived. Blackmon's argument is neither perfunctory nor undeveloped, and the Court considers footnotes to be a much better place for lengthy string citations than the main text of a brief.

that such a distinction influences the constitutionality of identification procedures, even without a closely analogous case on point. *See Prude*, 76 F.4th at 660 ("No reasonable official could believe that predetermining the outcome of a disciplinary hearing—*no matter how that is accomplished*—is consistent with due process." (emphasis added and citation omitted)); *see also Bolden*, 623 F. Supp. at 921 n.9 ("It seems obvious that an officer can't tell a witness who to pick, and then use that identification to bring charges against the handpicked suspect. The Court is skeptical that this is the sort of behavior that requires identical precedent to overcome qualified immunity. … Surely a police officer knows that he cannot tell a witness who to pick in a lineup, even if the exact sort of lineup at issue hadn't been considered by the Seventh Circuit or Supreme Court before 1994.").

In sum, the Court's denial of qualified immunity here hinges on the disputed factual record. If Blackmon cannot establish at trial that Defendants violated a clearly established due process right, Defendants will be entitled to qualified immunity. But viewing the record in the light most favorable to Blackmon, the Court cannot conclude at this stage that Defendants are immune. It follows that Defendants are not entitled to summary judgment on Blackmon's suggestive procedures claim.[28]

## VI.  Other Issues

With the substantive issues taken care of, the Court wraps up a few loose ends.

---

[28]     The Court's analysis on this claim has focused on McDowell, but for completeness, viewing the record in Blackmon's favor, a reasonable jury could also find that Defendants violated Blackmon's clearly established rights by fabricating Reece's identification and coercing her to testify. No reasonable officer could conclude that doing so was constitutional.

### A.    Derivative Claims

Defendants argue that Blackmon's conspiracy (Counts II and VIII), failure to intervene (Count III), and intentional infliction of emotional distress (Count VII) claims are derivative of his due process claim. [Dkt. 197 at 43.] Likewise, the City of Chicago argues that the non-*Monell* claims against it, for *respondeat superior* and indemnity (Counts IX and X), are derivative of Blackmon's claims against the detectives. Since the Court has held that Blackmon's due process claims withstand summary judgment in part, the motions for summary judgment on the derivative claims are granted to the extent that those claims seek to impose derivative liability based on theories the Court has rejected and denied to the extent that they seek recovery based on the surviving portions of Blackmon's due process claims.

### B.    Failure to Intervene

Blackmon advances a theory of § 1983 liability based on Defendants' failure to intervene to prevent violations of Blackmon's constitutional rights. [Dkt. 73 ¶¶ 123–27.] Defendants argue that they are entitled to summary judgment on this claim because § 1983 provides only for direct liability, but failure to intervene is a theory of vicarious liability. [Dkt. 197 at 42–43.] They rely on a concurrence by Judge Easterbrook arguing that the Seventh Circuit's recognition of failure to intervene claims is inconsistent with Supreme Court caselaw. *Mwangangi v. Nielsen*, 48 F.4th 816, 834–35 (7th Cir. 2022) (Easterbrook, J., concurring).

The Court lacks the authority to hold that failure to intervene claims are impermissible, despite Defendants' argument that Supreme Court precedent compels that conclusion. Seventh Circuit caselaw firmly establishes the viability of failure to

intervene claims, *e.g.*, *Patrick v. City of Chicago*, 81 F.4th 730, 737–38 (7th Cir. 2023), and that precedent—including the majority opinion in *Mwangangi*, which Judge Easterbrook joined—is binding on this Court. Only the Supreme Court or the Seventh Circuit can abrogate those cases, so Defendants are mistaken to imply that Blackmon bears any burden to "rebuff[ ] Judge Easterbrook's concurrence." [Dkt. 194 at 35–36.] *See Haynes v. United States*, 873 F.3d 954, 955 (7th Cir. 2017) (Easterbrook, J.) ("The Supreme Court has under advisement a case … that may reveal whether [Seventh Circuit cases] correctly applied [a Supreme Court case], but the district judge properly treated those decisions as controlling unless the Justices say otherwise."). If Defendants' aim in making this argument was to preserve the issue for appeal, it would have been better form to make that intention clear rather than ask this Court to overrule Seventh Circuit precedent. *See, e.g.*, *United States v. Ericksen*, 2023 WL 4946723, at *1 (7th Cir. Aug. 3, 2023) (nonprecedential).

### C.     Conspiracy Claims

In addition to arguing that Blackmon's conspiracy claims under § 1983 and Illinois law fail because they are derivative, Defendants argue that Blackmon has not adduced evidence of an agreement among themselves or between themselves and prosecutors to violate Blackmon's rights. [Dkt. 197 at 44.] Blackmon argues that a jury could infer agreement based on Defendants' active involvement in the investigation of Cox's murder; their presence at the lineup Reece viewed, the identification stemming from which a jury could find was fabricated; and two Defendants' presence at McDowell's lineup, which a jury could find was tainted by Defendants' attempts to manipulate McDowell into identifying Blackmon and

sticking to that identification. [Dkt. 182 at 52–53.] In reply, Defendants fall back on their arguments about why the Court should disregard Reece's testimony and hold that the procedures Defendants used in conjunction with McDowell's identifications are not unduly suggestive as a matter of law. [Dkt. 194 at 36–37.]

The Court has explained above why a jury could infer from the record that Reece's identification was fabricated and that McDowell's was secured through the use of unduly suggestive techniques. If a jury made that finding, it could take the next step and infer that Defendants conspired to violate Blackmon's rights. *See McCann v. Mangialardi*, 337 F.3d 782, 789–90 (7th Cir. 2003) ("[A] government official is liable as a conspirator, for purposes of establishing liability under § 1983, if he is a voluntary participant in a common venture, although he need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are so long as he understands the general objectives of the scheme, accepts them, and agrees, either explicitly or implicitly, to do his part to further them." (cleaned up)); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("[T]he gist of a [civil] conspiracy claim [under Illinois law] is not the agreement itself, but the tortious acts performed in furtherance of the agreement." (citations omitted)). The Court therefore denies Defendants' motion for summary judgment as to the conspiracy claims.

### D.    Personal Involvement

Last, Defendants argue that Jones and Schleder were not personally involved in McDowell's photo-array identification and Sanchez was not personally involved in Reece's ostensible photo-array identification, so each Defendant cannot be held liable based on one of the photo arrays. [Dkt. 197 at 41–42.] Defendants are correct that

§ 1983 liability requires personal involvement, *see, e.g.*, *Snowden v. Ill. Dep't of Hum. Servs.*, 75 F.4th 789, 796 (7th Cir. 2023), but the liability on Blackmon's due process claims is premised on the effects of evidence that was fabricated, suppressed, or procured by unduly suggestive identification procedures *on his trial*. As Defendants have argued and the Court has explained, Blackmon has no freestanding § 1983 claim for improper photo array procedures; any due process violation occurred because of the use at trial of evidence improperly gathered or the suppression of exculpatory or impeachment evidence. Despite all Defendants not being present at each identification procedure, a jury could find that each was personally involved in the ultimate due process violations that Blackmon argues occurred at trial. Therefore, the Court will not further pare down the scope of Blackmon's § 1983 claims based on a lack of personal involvement.

## VII. Conclusion

For the foregoing reasons, the motions for summary judgment [Dkt. 168, 170] are granted in part and denied in part. The individual Defendants' motion is denied with respect to Blackmon's due process claims (Count I) to the extent they are based on: (1) the detectives' fabricating Reece's identification of Blackmon as a shooter and coercing her to testify to that identification at trial; (2) the suppression of exculpatory or impeachment evidence related to that fabrication; and (3) the trial being tainted by unduly suggestive identification procedures. The motion is granted as to Count I in all other respects. The motion is granted in full as to Blackmon's wrongful detention and malicious prosecution claims (Counts V and VI).

The individual Defendants' motion is denied with respect to Blackmon's conspiracy (Counts II and VIII), failure to intervene (Count III), and intentional infliction of emotional distress (Count VII) claims to the extent that he asserts derivative liability claims under § 1983 or Illinois law for conduct implicated in the surviving portion of Count I. Summary judgment is granted with respect to these claims in all other respects. Likewise, the City of Chicago's motion for summary judgment as to Blackmon's *respondeat superior* and indemnity claims (Counts IX and X) is denied to the extent that he seeks to hold the City derivatively liable for conduct underlying his surviving portion of Count I and granted in all other respects, including as to any claims against unnamed City officials.

Enter: 19-cv-767
Date:  October 31, 2023



_____

Lindsay C. Jenkins
United States District Judge

53